# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### Charlotte Division

| | |
|---|---|
| ALEJANDRO UMAÑA,<br>　　　　　　Movant,<br><br>　　　v.<br><br>UNITED STATES,<br>　　　　　　Respondent. | 3:16-CV-00057-RJC<br><br>CAPITAL § 2255 PROCEEDING<br><br>HON. ROBERT J. CONRAD, JR. |

**AMENDED MOTION TO VACATE AND SET ASIDE
CONVICTION AND SENTENCE PURSUANT TO 28 U.S.C. § 2255**

*/s/ Kelly D. Miller*
KELLY D. MILLER
Asst. Federal Public Defender
Federal Public Defender
Middle District of Pennsylvania
100 Chestnut Street, Third Floor
Harrisburg, PA 17101
Tel: 717-782-3843
Fax: 717-782-3966
kelly_miller@fd.org

**TABLE OF CONTENTS**

TABLE OF CONTENTS................................................................................................I

PRELIMINARY STATEMENT ................................................................................ 1

PRELIMINARY MATTERS...................................................................................... 1

    A.    Statement Regarding Form............................................................................ 1

    B.    Statement Regarding Citations..................................................................... 1

    C.    Statement Regarding Amendment ............................................................... 2

    **D.    Statement on Relation Back ....................................................................... 3**

STATEMENT OF RELEVANT FACTS .................................................................. 28

PROCEDURAL HISTORY...................................................................................... 32

GROUNDS FOR RELIEF ...................................................................................... 35

CLAIM I.    AS A RESULT OF THEIR FAILURE TO ADEQUATELY INVESTIGATE OR PRESENT READILY AVAILABLE MITIGATION EVIDENCE AT THE PENALTY PHASE OF HIS TRIAL, TRIAL COUNSEL DEPRIVED MR. UMAÑA OF THE EFFECTIVE ASSISTANCE OF COUNSEL TO WHICH HE WAS ENTITLED, IN VIOLATION OF HIS RIGHTS UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION........................................................................................ 35

    A.    Introduction ................................................................................................ 35

    B.    Trial Counsel's Performance was Deficient................................................ 40

    1.    Trial counsel's preparation to present mitigating evidence at the penalty phase of trial was inadequate and constituted deficient performance. **........................................................ 40**

    2.    Despite the fact that trial counsel were aware of the need to conduct a thorough and expeditious investigation and knew that doing so for a foreign-born defendant would take considerable time, they delayed most of their investigation for months.**................................. 44**

    3.    Trial counsel failed to conduct interviews of family and neighbors who knew Mr. Umaña and his family during his childhood despite having readily available means to approach them. **................................................................................................... 48**

        a.    Mr. Umaña's mother, Leticia Ramirez, and brother, Saul. ...................... 48

        b.    Neighbors who Knew Mr. Umaña as a Child............................................ 48

        c.    Other Family Members.............................................................................. 52

i

  d. Luis Ramos ................................................................................................ 54

4. Trial counsel failed to adequately prepare and present the little information that they did obtain during their mitigation investigation. ................................................................ **55**

5. Trial counsel failed to adequately investigate Mr. Umaña's place and year of birth. ............................................................................................................................ **57**

6. Trial counsel failed to collect readily available records. ............................................ **58**

7. Trial counsel failed to file specific, formal discovery requests relating to the Government interviews of Mr. Umaña's family, failed to seek mitigating evidence and information about the whereabouts of potential mitigation witnesses, and failed to use the little they learned from the Government as the impetus to renew and enlarge their own search for mitigating evidence. ................................................................................................ **59**

C. Trial Counsel's Failure to Adequately Investigate and present abundant, readily available mitigating evidence resulted in prejudice. ...................................................... 63

1. The contrast between the mitigation case the defense did put on and the mitigation case the defense could have put on was stark. ...................................................................... **63**

  a. The mitigation evidence presented at trial. ...................................................... 63

  b. The case in mitigation the defense could have put on. ...................................... 65

   i. In utero development, exposure to physiological assaults, difficult birth, loss of mother, and early exposure to familial violence. .......................................... 65

   ii. Conditions of Poverty .............................................................................. 71

   iii. Loss of Francisca, his protector and second mother figure. ................... 76

   iv. Rafael's Physical and Emotional Abuse and Neglect; Mr. Umaña's search for employment and protection. ..................................................................... 79

   v. Repeated exposure to traumatic events. ................................................... 84

   vi. Evidence of low cognitive functioning and intellectual disability ......... 90

   vii. Other evidence of mental health problems. ............................................ 97

2. The prosecution could not have made the arguments it made in closing had trial counsel presented the full case in mitigation they had available. ............................................. **99**

3. There is a reasonable likelihood the jury would not have imposed death had jurors heard this full account of Mr. Umaña's life. ......................................................................... **101**

CLAIM II.   TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO INVESTIGATE AND PRESENT AVAILABLE LAY WITNESS EVIDENCE BEARING ON MR. UMAÑA'S MENTAL HEALTH; FAILING TO RETAIN ADEQUATE EXPERT ASSISTANCE; AND FAILING TO PREPARE THE EXPERTS THEY DID RETAIN IN SUPPORT OF COMPELLING MENTAL HEALTH MITIGATION THAT INCLUDED TRAUMA, INTELLECTUAL DEFICITS, BRAIN DAMAGE, AND MENTAL ILLNESS IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS. ............................. 103

A.      Counsel's failure to investigate and present evidence of Mr. Umaña's serious intellectual deficits deprived him of the reliable determination of punishment to which he was entitled.................................................................................................................... 106

1.      Counsel should have presented the jury with the evidence of intellectual impairment available from the pretrial *Atkins* hearing. ............................................................. **106**

2.      The sentencing jury did not hear additional, readily available evidence that Alejandro Umaña has substantial deficits in intellectual functioning that impact his daily functioning.................................................................................................................... **108**

3.      Trial counsel's inadequate investigation of lay witness testimony regarding Mr. Umaña's adaptive behavior deficits prejudiced the defendant**............................................... 114**

B.      Trial counsel's failure to investigate and present evidence of trauma deprived Mr. Umaña of a reliable sentencing determination......................................................... 116

1.      The jurors were not told about the traumas suffered by Mr. Umaña in his own home as a child. ............................................................................................................................... **117**

2.      The jurors were not told about what Mr. Umaña personally witnessed and suffered on account of the civil war. ............................................................................................ **121**

3.      Trial counsel failed to provide evidence from an expert on trauma who, properly informed about Mr. Umaña's actual experiences, could have testified about the effects of chronic trauma on his development and state of mind.......................................... **122**

4.      The failure to provide any evidence, much less expert testimony about trauma, prejudiced Mr. Umaña.......................................................................................... **125**

C.     Trial counsel's failure to investigate lay witness testimony supporting a claim of brain damage, to provide that evidence to their experts, to consult with their experts, or to insist on necessary testing deprived Mr. Umaña of a reliable sentencing determination. .................... 127

1.     Trial counsel failed to investigate or present available lay witness testimony establishing brain damage **................................................................................................. 128**

2.     Trial counsel failed to present to the jury available expert testing and testimony regarding brain damage. **............................................................................................... 130**

3.     Trial counsel failed to adequately consult with their chosen mental health expert and unreasonably limited the evaluation and testimony of their only testifying expert who had examined Mr. Umaña. **.............................................................................................. 139**

D.     Trial Counsel's failure to investigate and present lay witness and expert testimony that Mr. Umaña exhibits behaviors consistent with mental illness deprived Mr. Umaña of a reliable sentencing determination ................................................................................................ 145

E.     Had counsel properly investigated, developed and presented mitigation about Mr. Umaña's mental health impairments, there is a reasonable probability that at least one juror would not have found death to be an appropriate punishment for him. ................................ 149

F.     Had counsel properly investigated, developed, and presented mitigation about Mr. Umaña's mental health impairments, there is at least a reasonable probability that the jury would have found he lacked the *mens rea* to be convicted of willful, intentional, deliberate, or premeditated murder. ................................................................................................ 155

CLAIM III.   TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT ALL AVAILABLE EVIDENCE AND TO FULLY PREPARE THEIR EXPERTS AT THE PRETRIAL ATKINS HEARING DEPRIVED THE COURT OF THE FACTS NECESSARY FOR A RELIABLE DETERMINATION AND TO A FINDING THAT MR. UMAÑA CANNOT CONSTITUTIONALLY BE EXECUTED UNDER THE EIGHTH AMENDMENT. ............. 157

A.    Counsel failed to investigate, present and prepare lay witness evidence that would have established that Mr. Umaña meets the criteria for intellectual disability as defined by *Atkins v. Virginia* and is ineligible for a sentence of death. .................................................... 158

B.    Had counsel properly prepared their expert witnesses, the result of the *Atkins* hearing would have been different....................................................................................... 163

CLAIM IV.   MR. UMAÑA IS A PERSON WITH INTELLECTUAL DISABILITY, AND HIS EXECUTION WOULD VIOLATE THE EIGHTH AMENDMENT IN LIGHT OF THE SUPREME COURT'S DECISION IN *HALL V. FLORIDA* AND ITS PROGENY.................. 168

A.    This Court's previous findings were made without the guidance of *Hall v. Florida* and thus do not preclude a determination in 2255 that Mr. Umaña has an intellectual disability. 169

1.    Medically-accepted standards **.......................................................................... 171**

2.    In light of *Hall v. Florida*, the Eighth Amendment prohibits Mr. Umaña's execution, notwithstanding the Court's pre-trial findings on his claim of intellectual disability.**........... 174**

B.    Appellate counsel were ineffective for failing to ensure that the Fourth Circuit ruled on counsel's challenge to this Court's pretrial *Atkins* determination and for failing to address the effect of *Hall*, which was decided while Mr. Umaña's direct appeal was still pending......... 177

CLAIM V.   TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE AND PRESENT READILY AVAILABLE EVIDENCE CHALLENGING THE GOVERNMENT'S ACCOUNT OF MR. UMAÑA'S ROLE IN THE UNADJUDICATED CALIFORNIA MURDERS ALLEGED IN SUPPORT OF NON-STATUTORY AGGRAVATING FACTORS 4(A) AND (B), IN VIOLATION OF MR. UMAÑA'S RIGHTS UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS. ......................................... 180

A.    The Record Developed at the Penalty Phase Relating to the California Murders. ...... 182

1.    The Lemon Grove shooting.**............................................................................... 182**

2.    The Fairfax Avenue Shooting **............................................................................ 186**

3.    The alleged ballistics link between the two shootings. **............................................. 188**

B.    The Post-Conviction Investigation.............................................................................. 189

C.     Trial Counsel's Failure to Investigate and Present Readily Available Evidence Challenging the Government's Account of Mr. Umaña's Role in the Lemon Grove and Fairfax Shootings was Objectively Unreasonable.................................................................. 192

1.     Trial counsel unreasonably failed to conduct an adequate, independent investigation into the California murders.**................................................................................................. 192**

2.     Trial counsel failed to obtain readily available records that could have significantly undermined the Government's case. **.................................................................................. 196**

3.     Trial counsel unreasonably failed to use the information they received in discovery to challenge the Government's allegations about the Fairfax Avenue and Lemon Grove incidents.**.............................................................................................................................. 198**

    a.     Trial Counsel unreasonably failed to use important information about the Lemon Grove shooting favorable to Mr. Umaña. ......................................................................... 198

        i.     Trial counsel unreasonably failed to present evidence that the only witness who identified Mr. Umaña as the shooter, Freddy Gonzalez, also made prior statements and identifications implicating two others as the one Lemon Grove shooter. ..................... 198

        ii.     Trial counsel unreasonably failed to present readily available evidence that key Lemon Grove witnesses Roberto Ramos and Juan Lara did not select Mr. Umaña's photograph during a pre-trial photographic lineup. ...................................................... 204

        iii.   Trial counsel unreasonably failed to present additional exculpatory statements regarding the Lemon Grove shooting.......................................................................... 206

    b.     Trial Counsel unreasonably failed to use important information about the Fairfax shooting favorable to Mr. Umaña. ...................................................................................... 208

        i.     Trial counsel completely overlooked that key witness Alex Barrera identified Luis Ramos as the Fairfax Avenue shooter, not Mr. Umaña. ............................................. 208

D.     Trial counsel unreasonably failed to present information and adequate arguments establishing that the neutral eyewitnesses who identified the car's driver as the Fairfax shooter and not Mr. Umaña were more reliable than the hearsay of Mr. Umaña's co-defendants. .... 209

E.     Trial counsel did not present information that mitigated the circumstances of the Fairfax shooting.................................................................................................................................... 211

1. Trial counsel unreasonably failed to present evidence that ballistics and other evidence provided in discovery linked Alex Barrera to both the Fairfax and Lemon Grove shooting. **212**

2. Trial counsel failed to object to foundationless, unreliable, double-hearsay statements that Mr. Umaña was the Lemon Grove shooter. ................................................................ **213**

3. Trial counsel failed to present readily available evidence that the LAPD detectives coached the Fairfax co-defendants' statements that implicated Mr. Umaña as the shooter. **. 215**

4. Trial Counsel unreasonably failed to object to Detective Parshall's opinion testimony that he believed Mr. Umaña's co-defendant when he implicated Mr. Umaña even though the Court ruled that the evidence was inadmissible and ordered it redacted. .............................. **220**

5. Trial counsel unreasonably failed to object to and rebut the Government's evidence that the .22 caliber bullet casings were fired from one firearm in violation of the Fifth, Sixth, and Eighth Amendments. ................................................................................................ **224**

6. Trial counsel were ineffective for failing to request a jury instruction that would have properly explained to the jury how they should regard the "presumptively unreliable" hearsay statements from MS-13 accomplices that were introduced through professional law enforcement witnesses. ............................................................................................ **230**

7. Mr. Umaña Was Prejudiced by Trial Counsel's Deficient Performance. .................... **233**

   a. The Prior Unadjudicated Offenses Were Central to The Government's Case. ........ 233

   b. There is a Reasonable Probability That If Trial Counsel Had Presented Readily Available Exculpatory or Otherwise Mitigating Evidence Relating to Mr. Umaña's Role in the Lemon Grove and Fairfax Incidents, at Least One Juror Would Have Voted Differently. ......................................................................................................... 236

   c. Regarding the Lemon Grove shooting, numerous failings resulted in prejudice against Mr. Umaña. ....................................................................................................... 238

   d. During the presentation of the Fairfax evidence, there were also numerous failings that also resulted in prejudice against Mr. Umaña. ...................................................... 241

CLAIM VI. THE GOVERNMENT FAILED TO DISCLOSE EXCULPATORY, IMPEACHMENT, AND MITIGATING INFORMATION IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS. ................................................................. 243

**A. The Government violated *Brady* and *Giglio* regarding the unadjudicated murders used as non-statutory aggravating factors at the penalty phase.** .................................... 244

1. The Government violated *Brady* and *Giglio* by failing to disclose exculpatory information about one of its testifying eyewitnesses who was prepared to exclude Mr. Umaña as the Lemon Grove shooter affirmatively (*Brady* suppression). ......................................... 245

2. The Ramos information constituted material exculpatory and impeachment evidence (*Brady* favorability). ............................................................................... 246

3. The nondisclosure of the Ramos information was prejudicial (*Brady* materiality). .... 247

B. The Government violated *Brady* and *Giglio* by failing to turn over numerous recorded interviews that contain exculpatory and/or impeachment statements regarding Mr. Umaña's involvement in the Lemon Grove and Fairfax shootings......................................................... 250

1. The Government suppressed exculpatory and/or impeachment statements by witnesses to the Lemon Grove Park Shooting. ......................................................... 250

2. Since produced audiotapes show that Gonzalez was not confident in his ability to identify the shooter and that he only identified Mr. Umaña after coaching by detectives..... 251

3. The Gonzalez information constituted material exculpatory and impeachment evidence. ................................................................................................ 253

C. The Government Failed to Disclose Material Mitigation Evidence Obtained from Alejandro Umaña's Mother ................................................................................ 254

1. The Government suppressed statements made by Mr. Umaña's mother during an interview with the prosecution. ........................................................................ 255

2. The Government has not disclosed statements made by Ms. Ramirez regarding her son's background.......................................................................................... 257

3. Ms. Ramirez's statements regarding Mr. Umaña's upbringing and struggles in life were material because they directly contradict the Government's closing remarks that Mr. Umaña "by every account" had a "normal life." ............................................................ 262

4. Ms. Ramirez's statements regarding Mr. Umaña's background were material to Mr. Umaña's claims on intellectual disability. ............................................................ 265

CLAIM VII   THE GOVERNMENT PRESENTED FALSE AND MISLEADING EVIDENCE, AND ASKED JURORS TO RELY ON THIS EVIDENCE, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS. ................................................................................. 266

    A.    Introduction and Summary of Argument ................................................... 266

    B.    During the *Atkins* Hearing, the Government Knew, or Should Have Known, Based on Records and Interviews of Witnesses that the Court was Relying on Information that was False or Left a False Impression................................................................................... 267

    C.    At the Guilt and Penalty Phase, the Government Presented Misleading Evidence and Argument that Mr. Umaña "Earned" His MS-13 Tattoo by Killing People........................... 272

    1.    The Government knew or should have known that Grandos's testimony that Mr. Umaña's MS tattoo meant he had killed before was false and misleading............................ 274

    2.    There is a reasonable likelihood that the false testimony could have affected the judgment of the jury. ................................................................................ 277

    D.    During the Penalty Phase, the Government Presented and Argued False and Misleading Evidence Relating to the Lemon Grove and Fairfax Shooting ............................................. 280

    1.    Lemon Grove Park ................................................................................... 281

    2.    Fairfax ..................................................................................................... 285

    3.    Materially Misleading and False Evidence in Mr. Umaña's Interrogation Transcript  288

CLAIM VIII.  TRIAL COUNSEL FAILED TO ADEQUATELY OBJECT TO AND MITIGATE EVIDENCE OF JAIL LETTERS IN VIOLATION OF THE FIRST, FIFTH, SIXTH, AND EIGHTH AMENDMENTS. ....................................................................................... 290

    A.    Trial counsel's performance was objectively unreasonable. ........................................ 296

    1.    Counsel unreasonably failed to object to Ms. Conrad's testimony.............................. 296

    2.    Trial counsel failed to request redaction of the letters and limiting instructions ......... 298

        a.    Religiously inflammatory remarks. ........................................................... 299

        b.    Politically inflammatory remarks. ............................................................. 300

        c.    Anti-government or anti-imperialist beliefs................................................. 301

        d.    Defiance towards police............................................................................ 302

    e.    Coarse language and other remarks. ........................................................... 303

B.    Trial counsel unreasonably failed to object to the full translations of the letters being released to the jury during deliberations. ................................................................. 304

C.    Trial counsel unreasonably failed to object to the Government reading a letter during closing argument that was never ruled upon, nor introduced at trial. .................................... 305

D.    Trial Counsel unreasonably failed to mitigate the jail letters. ..................................... 307

1.    The code was unsophisticated and could be written by a child. .................................. 307

2.    The writing in the letters was poor. ............................................................. 309

3.    Evidence that Mr. Umaña was not threatening Luis Ramos (aka Chipis) in a letter..... 313

4.    Evidence of Mr. Umaña's belief in God in the letters. .................................... 314

E.    The failure to adequately object to and mitigate the jail letter evidence was prejudicial. ................................................................................................... 315

F.    Appellate Counsel Were Ineffective for Failing to Raise the Court's Erroneous Admission of the English Translations on Direct Appeal ....................................... 319

CLAIM IX.    TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL BY NOT SUBMITTING MR. UMAÑA'S NOTE OF APOLOGY IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS. ................................................................. 321

A.    Trial counsel's failure to introduce Mr. Umaña's apology note was objectively ....... 321

B.    Mr. Umaña was prejudiced by trial counsel's failure to introduce the note. ............... 323

CLAIM X.    MR. UMAÑA WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE PENALTY PHASE OF TRIAL, IN VIOLATION OF HIS RIGHTS UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, WHEN HIS ATTORNEYS ALLOWED UNRELIABLE AND UNFAIRLY PREJUDICIAL EVIDENCE THAT MR. UMAÑA HAD COMMITTED MURDERS IN EL SALVADOR TO BE CONSIDERED BY THE JURY, EVEN AFTER THE COURT HAD PRECLUDED THE GOVERNMENT FROM INTRODUCING THIS EVIDENCE. .............. 327

A.    Trial Counsel performed deficiently by not reviewing the transcripts and redacting the precluded, prejudicial information before it was presented to the jury. ................................ 329

B.  Trial counsel had no reasonable strategy for failing to review the transcripts and prevent the jury from relying on the inadmissibly and highly damaging evidence............................. 331

C.  Mr. Umaña suffered prejudice from the introduction of improperly admitted evidence that he had murdered people in El Salvador. ........................................................................... 334

CLAIM XI.  TRIAL COUNSEL WAS INEFFECTIVE AT ALL PHASES OF TRIAL FOR FAILIING TO CHALLENGE AND REBUT THE FALSE AND MISLEADING EVIDENCE AND ARGUMENT PRESENTED BY THE GOVERNMENT THAT MR. UMAÑA "EARNED" HIS MS-13 TATTOO BY KILLING PEOPLE IN VIOLATION OF MR. UMAÑA'S RIGHTS UNDER THE FIFTH, SIXTH AND EIGHTH AMENDMENTS. ............................................. 336

A.  Trial counsel's failure to adequately challenge Alexander Granados's testimony was objectively unreasonable and constituted deficient performance. ........................................ 336

B.  Trial counsel's failure to object to the inadmissible and inflammatory testimony was objectively unreasonable.................................................................................................... 340

C.  Mr. Umaña was prejudiced by trial counsel's deficient performance........................... 341

CLAIM XII. THE GOVERNMENT VIOLATED MR. UMAÑA'S RIGHT TO A FAIR TRIAL BY ENGAGING IN A PATTERN OF MISCONDUCT IN WHICH IT REPEATEDLY INTRODUCED INADMISSIBLE EVIDENCE TO THE JURY, IN DIRECT VIOLATION OF, OR BY CIRCUMVENTING THE COURT'S ORDERS, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS. ............................................................................ 343

A.  The prosecution's trial exhibits contained various references to evidence that the Court had ruled to be impermissible and therefore inadmissible...................................................... 344

1.  Unreliable evidence that Mr. Umaña had killed people in El Salvador went to the jury despite the fact that he was acquitted in El Salvador and the Court had ruled it inadmissible.................................................................................................................... 344

2.  The Government introduced to the jury inflammatory racial remarks in Mr. Umaña's jail letters that the Court precluded. ........................................................................... 345

3.  The Government introduced improper opinion evidence that Mr. Umaña's accomplices were telling the truth about Mr. Umaña being the shooter in a non-statutory aggravator alleged against him (the Fairfax Avenue shooting), in direct violation of the Court's order. ............ 346

xi

4. The Government's introduction of the above evidence was part of a pattern and practice to introduce otherwise inadmissible evidence through its exhibits. ........................................ 348

B. The Government elicited an unreliable, double hearsay statement that Mr. Umaña was the shooter in the Lemon Grove murder, without proffering the statement to the Court for a reliability finding. .................................................................................................. 348

C Mr. Umaña was prejudiced by the Government's many foul blows............................ 350

D. Counsel Were Ineffective................................................................................................ 350

CLAIM XIII. TRIAL COUNSEL DEPRIVED MR. UMAÑA OF EFFECTIVE ASSISTANCE IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS WHEN THEY FAILED TO ASK FOR A CONTINUANCE OF HIS INTELLECTUAL DISABILITY PRETRIAL HEARING AND THE CAPITAL TRIAL DATE................................................. 351

A. Although trial counsel had an incomplete and inaccurate life history of Mr. Umaña, counsel failed to request an additional continuance of the *Atkins* hearing and trial. .............. 352

1. The defense was inadequately prepared to present the *Atkins* claim at the time of the hearing. .............................................................................................................................. 353

2. By trial, counsel remained inadequately prepared to present a mitigation case -- and learned new information that showed that their mitigation case was incomplete and inaccurate -- but continued to proceed with trial without further investigation. ..................................... 354

B. Trial counsel received a significant amount of discovery immediately prior to trial. Because of a lack of time, they could not review and use the discovery in preparation for trial, prejudicing Mr. Umaña. .................................................................................................. 359

xii



Case 3:16-cv-00057-MOC    Document 148    Filed 03/24/23    Page 14 of 592

CLAIM XVII. TRIAL COUNSEL FAILED TO RAISE A TIMELY CHALLENGE TO THE COMPOSITION AND SELECTION OF THE GRAND AND PETIT JURY VENIRES IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS. ............................ 408

    A.    Trial Counsel's Failure to Raise a Timely Challenge to the Composition and Selection

    of the Grand and Petit Jury Venires Constituted Deficient Performance. ............................ 408

    B.    Trial counsel's failure to challenge the jury selection processes for the grand and petit

    juries prejudiced Mr. Umaña, because the under-representation of distinct groups violated his

    Fifth, Sixth, and Eighth Amendment rights. ............................... 410

CLAIM XVIII. THE PROSECUTION ENGAGED IN RACIAL DISCRIMINATION IN ITS EXERCISE OF PEREMPTORY STRIKES, AND TRIAL COUNSEL UNREASONABLY FAILED TO ADEQUATELY OBJECT TO THESE UNCONSTITUTIONAL STRIKES. ...... 416

    A.    Trial counsel failed to argue that the Government engaged in purposeful

    discrimination. ............................................................... 417

    B.    Mr. Umaña suffered prejudice ............................... 422

CLAIM XIX. TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL BY NOT INVESTIGATING AND INTRODUCING AVAILABLE MENTAL HEALTH EVIDENCE TO CONTEST THE ADMISSIBLITY AND CREDIBILITY OF MR. UMAÑA'S STATEMENTS TO LAW ENFORCEMENT OFFICERS IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS. ............................... 423

CLAIM XX. MR. UMAÑA WAS DEPRIVED THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL, DUE PROCESS AND A FAIR TRIAL BY THE DENIAL OF HIS RIGHT TO BE PRESENT AT EVERY STAGE OF THE PROCEEDINGS, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS. ............................... 431

    A.    Mr. Umaña was denied the right to be present and the right to effective assistance of

    counsel during the jury selection process, in violation of the Fifth, Sixth, and Eighth

    Amendments. ............................................................ 432

    1.    Mr. Umaña's right to be present during jury selection was violated. ............. 433

    2.    The denial of this right was prejudicial. ............................... 434

B.      Mr. Umaña was denied his right to presence and right to effective assistance of counsel throughout the proceedings because he was not provided with an effective mechanism to participate in his capital trial, to communicate with trial counsel, and to assist in his defense, in violation of the Fifth, Sixth and Eighth Amendments. .......................................................... 435

C.      Counsel Were Ineffective. .................................................................................... 437

CLAIM XXI. THE OVERWELMING NUMBER OF SECURITY MEASURES DEPRIVED MR. UMAÑA OF A FAIR TRIAL AND SENTENCING, AND AN IMPARTIAL JURY IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS. ............................ 437

CLAIM XXII. MR. UMAÑA'S SENTENCES OF DEATH MUST BE VACATED BECAUSE HIS CONVICTIONS FOR USE AND POSSESSION OF A FIREARM DURING AND IN RELATION TO A CRIME OF VIOLENCE RESULTING IN DEATH ARE VOID IN LIGHT OF RETROACTIVE SUPREME COURT PRECENT JOHNSON AND *DAVIS*. ..................... 440

A.      In light of *Johnson*, Mr. Umaña's convictions under 18 U.S.C. § 924(c) cannot be sustained because racketeering conspiracy and murder in aid of racketeering fail to qualify as "crimes of violence" ................................................................................................... 442

1.      Section 924(c)'s residual clause is unconstitutionally vague. ..................................... 444

a.    Johnson expressly overruled the "ordinary case" approach to determining whether a felony qualifies as a "crime of violence." ................................................................. 445

b.    Johnson means that § 924(c)(3)(B) is unconstitutionally vague. ............................ 447

2.      Conspiracy to commit racketeering in violation of § 1962(d) categorically fails to qualify as a crime of violence under the force clause. ........................................................ 450

3.      The offense of murder in aid of racketeering, in violation of § 1959(a)(1) also does not categorically satisfy the force clause. ............................................................................... 453

B.      Mr. Umaña's claim is cognizable under § 2255(a). ...................................................... 455

1.      Mr. Umaña's invalid § 924(j) convictions also invalidate his death sentences on Counts 22 and 24. ....................................................................................................................... 456

C.      Relevant Background. ..................................................................................................... 461

D.      The §924(c) Convictions Must Be Vacated Because Neither Predicate Offense Is Categorically a Crime of Violence. .................................................................................... 464

Case 3:16-cv-00057-MOC    Document 148    Filed 03/24/23    Page 16 of 592

1. The risk/residual clause of §924(c)(3)(B) is unconstitutional, and thus convictions resting thereon violate due process. ........................................................................ 465

2. The force/elements clause of §924(c)(3)(A) does not categorically encompass Mr. Umaña's predicate offenses........................................................................................ 465

3. RICO conspiracy categorically is not a crime of violence under the elements clause. 468

4. Murder in violation of North Carolina G.S. §14-17 in aid of racketeering is not categorically a crime of violence under the elements clause. ................................... 470

    a. Starvation theory................................................................................ 472
    b. Felony murder theory.......................................................................... 478
    c. Reckless conduct and reckless causation ............................................ 481
    d. Generic murder ................................................................................... 482
    e. Poisoning ............................................................................................ 483
    f. Aiding and Abetting............................................................................ 483

E. The §924(c) Convictions Must Be Vacated Even if Only One Predicate Is a Crime of Violence. ............................................................................................................... 484

1. The categorical/modified categorical approach compels relief. ..................... 485

2. Relief is Required Because the Jury's General Verdict Relied on an Unconstitutional Ground.................................................................................................................... 489

3. Due process and constitutional jury trial rights compel relief. ..................... 492

4. The Davis violations are structural error and compel relief........................... 494

5. Harmless error analysis compels relief........................................................... 495

F. Vacatur of the §924(c) Convictions, and of the VICAR Murder Sentences, Is Required Under §2255........................................................................................................... 497

G. Supplemental authority demonstrates the Government's procedural default arguments are wrong. ........................................................................................................... 508

1. Supplemental authority demonstrates the Government's conduct-based approach arguments are wrong. ..................................................................................... 510

2.   Supplemental authority demonstrates RICO conspiracy is not categorically a crime of violence. ................................................................................................................................ 511

3.   Supplemental authority demonstrates N.C. Gen. Stat. §14-17 VICAR murder is not categorically a crime of violence.......................................................................................... 512

CLAIM XXIII. MR. UMAÑA WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE PRESENTATION TO THE DEPARTMENT OF JUSTICE IN OPPOSITION TO THE AUTHORIZATION OF A CAPITAL PROSECUTION, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS. ................................................................ 520

CLAIM XXIV. TRIAL COUNSEL RENDERED DEFICIENT PERFORMANCE FOR FAILING TO ADEQUATELY EXPLAIN TO THEIR INTELLECTUALLY IMPAIRED, BRAIN DAMAGED CLIENT FROM EL SALVADOR THE RISKS AND BENEFITS OF A PLEA DEAL IN THIS CAPITAL CASE, THEREBY VIOLATING RIGHTS GUARANTEED HIM BY THE FIFTH, SIXTH AND EIGHTH AMENDMENTS. .......................................... 524

CLAIM XXV. THE IMPOSITION OF THE DEATH PENALTY ON ALEJANDRO UMAÑA WAS BASED ON RACE AND GEOGRAPHY, TWO CONSTITUTIONALLY IMPERMISSIBLE SENTENCING FACTORS, IN VIOLATION OF HIS FIFTH, SIXTH, AND EIGHTH AMENDMENT RIGHTS. .................................................................. 527

A.   The Attorney General's Decision to Seek the Death Penalty Based on Mr. Umaña's Race Violates His Constitutional Rights.................................................................. 528

B.   The Attorney General's Decision to Seek the Death Penalty Based on Geographic Location Violates Mr. Umaña's Constitutional Rights............................................. 530

A.   Counsel Were Ineffective................................................................................. 531

CLAIM XXVI. THE FAILURE TO PRESERVE MR. UMAÑA'S RIGHTS UNDER THE VIENNA CONVENTION AND HIS RIGHTS TO CONSULAR ASSISTANCE VIOLATED MR. UMAÑA'S FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS AND ARTICLE VI OF THE CONSTITUTION.................................... 531

A.   The Law............................................................................................................ 533

B.   The Government's Failure to Honor Its Treaty, International Law, and Constitutional Obligations Violated the Fifth, Sixth, Eighth, and Fourteenth Amendments and Article VI....................................................................................................... 536

1.   The Government Violated its Duty to Inform Mr. Umaña of His Right to Guatemalan Consular Assistance and to Notify the Guatemalan Consulate of His Detention ................. 537

2. The Government violated Mr. Umaña's right to due process and a fair trial in violation of the Fifth and Sixth Amendments. ...................................... 538

3. The Government violated Mr. Umaña's right to present mitigating evidence under the Fifth and Eighth Amendments. ...................................... 540

4. The Government's violation of its obligation of consular notification under the Vienna Convention and federal law prejudiced Mr. Umaña. ........................................... 542

C. Counsel's Failure to Notify Mr. Umaña of His Rights to Guatemalan Consular Assistance Under the Vienna Convention; to Contact the Guatemalan Consulate; and Counsel's Failure to Raise and Litigate the Government's Failure to Honor Its Treaty, International Law, and Constitutional Obligations Violated the Fifth, Sixth, Eighth, and Fourteenth Amendments and Article VI. ............................................... 544

D. Conclusion.................................................................................................. 550

CLAIM XXVII. TRIAL COUNSEL FAILED TO ADEQUATELY PRESERVE ISSUES FOR APPEAL IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS......... 551

CLAIM XXVIII. EXECUTING SOMEONE WITH BRAIN DAMAGE AND THE OTHER MENTAL IMPAIRMENTS FROM WHICH MR. UMAÑA SUFFERS WOULD VIOLATE THE EIGHTH AMENDMENT............................................................................................... 552

CLAIM XXIX. THE CUMULATIVE EFFECT OF COUNSEL'S INEFFECTIVENESS IN MR. UMAÑA'S CASE, IN VIOLATION OF THE FOURTH, FIFTH, SIXTH, AND EIGHTH AMENDMENTS, WARRANTS POSTCONVICTION RELIEF............................................. 555

CLAIM XXX. THE CUMULATIVE EFFECT OF THE INEFFECTIVE ASSISTANCE OF COUNSEL AND THE GOVERNMENT'S *BRADY* VIOLATIONS, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS, UNDERMINE CONFIDENCE IN THE RESULT OF MR. UMAÑA'S TRIAL................................................................................ 557

CLAIM LIX. THE UNCONSTITUTIONAL ALIEN-WITH-A-FIREARM CONVICTION MUST BE VACATED BASED ON *REHAIF*, AND MR. UMAÑA'S DEATH SENTENCES ACCORDINGLY MUST BE VACATED. ............................................................................ 559

Alejandro Umaña, through undersigned counsel, respectfully requests, in accord with 28 U.S.C. § 2255 and Rule 2 of the *Rules Governing Section 2255 Proceedings in the United States District Courts*, that this Court grant him a new trial, vacate the judgment entered against him, and/or vacate, set aside or correct the sentence. Through counsel, Mr. Umaña provides the following grounds for granting this motion:

## PRELIMINARY MATTERS

### A. Statement Regarding Form

In accordance with *Rule 2* of the *Rules Governing Section 2255 Proceedings in the United States District Courts*, this Motion sets forth only the facts and claims entitling Mr. Umaña to relief. It contains minimal legal argument or citation. Mr. Umaña will file separate pleadings regarding discovery, evidentiary development, and legal briefing later in the proceedings.

### B. Statement Regarding Citations

References to prior proceedings are as follows:

- Reference to Voir Dire Transcripts: VDT at x;

- References to Guilt Phase Transcripts: GPT at x;

- References to Penalty Phase Transcripts: PPT at x;

- References to hearing transcripts not consecutively numbered with the trial transcripts: [date] [name of hearing] at x;

- References to documents filed with the criminal court such as pleadings, motions, and orders that cite the docket number: Crim. Doc. x;

- References to documents filed with the civil court such as pleadings, motions and order that cite the docket number:  Civ. Doc. x

1

- References to Trial Exhibits: Def. Exh. x / Gov. Exh. x

- References to *Atkins* Exhibits: Atkins Def. Exh. x / Atkins Gov. Exh. x;

References to the appendices to this Motion are by the appendix number as "Appx. x." All other references are self-explanatory or based on the Blue Book.

Redactions to this pleading and to the attached exhibits have been made in accordance with the requirements of Rule 5.2 of the Federal Rules of Civil Procedure. Additionally, references to pleadings, orders, and transcripts that were placed under seal at the time of trial and that remain under seal have also been redacted.

## C. Statement Regarding Amendment

Mr. Umaña brings this Amended Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Convictions and Sentences of a Person in Federal Custody as of right following the Government's Motion to Dismiss.

Rule 15(a)(1)[1] of the Federal Rules of Civil Procedure allows a party to "amend its pleading once as a matter of course" "if the pleading is one to which a responsive pleading is required, [within] 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier."

On October 11, 2022, this Court ordered the Government to respond to Mr. Umaña's Initial 2255 Motion (Docs. 22, 24); his Supplemental Claim 59 (Doc. 89); and his Supplement/Amendments to Claim 22 (Docs. 91, 111). Doc. 131 at 55. *See also* Rules Governing 2255, Rule 4(b) (requiring the court to direct the United States attorney to "file an answer, motion,

---

[1] 28 U.S.C. 2242 provides that an application for habeas corpus "may be amended of supplemented as provided in the rules of procedure applicable to civil actions." *See also Mayle v. Felix*, 545 U.S. 644 (2005) (applying Rule 15 in the 2254 context); *see also* Doc 131 at 3, Sealed Order, ("Federal Rule of Civil Procedure 15 governs the amendments of § 2255 motions.")

2

or other response" upon completion of initial review and conclusion that the allegations pled may entitle the movant to relief). The Government complied with that Order and, on March 2, 2023, filed a Motion to Dismiss Alejandro Umaña's 2255 Motion. Thus, pursuant to Rule 15(a)(1), Mr. Umaña now files this as-of-right Amended 2255 Motion.[2]

This Amended 2255 Motion is timely as it is filed 21 days after the Government's response to Mr. Umaña's 2255 Motion.

### D. Statement on Relation Back

This Amended 2255 Motion is also timely under Rule 15(c) because the Claims in this Amended 2255 Motion relate back to the Claims in the Initial 2255 Motion filed in June 2016 and the Supplemental Claim 59, filed on June 19, 2020.  Civ. Doc. 88.

As "long as the original and amended petitions state claims that are tied to a common core of operative facts, relation back will be in order." *Mayle v. Felix,* 545 U.S. 644, 665 (2005). The 31 Claims in this *Amended 2255 Motion* are the same 30 Claims that were included in the *Initial 2255 Motion* and Supplemental Claim 59, except where such claims have been supplemented with allegations of ineffective assistance of appellate counsel.[3]   Those Claims are identified accordingly.

---

[2] Although the Government's Motion to Dismiss does not cite Rule 12(b), the Motion is analogous to a motion under that Rule as it argues for dismissal based on Mr. Umaña's alleged failure to state a single prima facie claim that entitles him to relief. *See generally* Doc. 142. *E.g., Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009) ("A motion under Rule 12(b)(6) challenges the legal sufficiency of a complaint . . .."). Under such conception, the Government's *Motion* is one of the enumerated motions that similarly triggers Rule 15(a)(1)'s right to amend.

[3] Prior 2255 counsel were also direct appeal counsel. Consequently, they were incapable of asserting their own ineffectiveness, and so suffered a conflict of interest. *E.g. Juniper v. Davis*, 737 F.3d 288, 289 (4th Cir. 2013) (""[A] clear conflict of interest exists in requiring [petitioner's] counsel to identify and investigate potential errors that they themselves may have made…'"). Recognizing their conflict of interest, prior 2255 counsel moved to withdraw from this case, Civ.

Mr. Umaña's Initial 2255 Motion and Supplemental Claim 59 alleged both his grounds for relief and the factual bases supporting those grounds (except for the claims of ineffective assistance of appellate counsel, as described above), as required by Rule 2 of the Rules Governing Section 2255 Cases in the United States District Courts.

Nevertheless, to ensure the completeness of the record, and to provide this Court with as much relevant evidence as is reasonable at this pleading-stage, Mr. Umaña brings this amendment solely to proffer to this Court additional evidence (in the form of witness affidavits, expert reports, and other materials) in support of the allegations he previously pled. Based on both the allegations and the associated supporting appendices, this *Amended 2255 Motion* contains claims for relief that are "'plausible on [their] face'", *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 n. 26 (4th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)), and which, "if true, would entitle him to relief." *McCarver v. Lee*, 221 F.3d 583, 598 (4th Cir. 2000). *See also Nemet Chevrolet Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009) (the court must accept as true all factual allegations in the complaint) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). This Motion satisfies the pleading requirements found in the Rules Governing Section 2255 Proceedings, Rule 2.

Turning to the substance of the Claims themselves, Claim I of this Amendment relates back to Claim I of the Initial 2255 Motion. Claim I of the Initial 2255 Motion alleged that trial counsel were ineffective for failing to investigate and develop lay witness evidence to present to the Court at Mr. Umaña's *Atkins* hearing to make the case for Intellectual Disability, to the jury at

---

Doc. 94, a motion this Court granted, Civ. Doc. 107. Undersigned counsel is not so conflicted and are compelled to bring Mr. Umaña's claims of ineffective assistance of appellate counsel at every available opportunity, including this amendment as of right.

4

Mr. Umaña's penalty hearing to make the case for life; and to Mr. Umaña's expert witnesses to fully develop readily-available expert testimony. In support, Mr. Umaña included references to an Appendix which contained affidavits, declarations, expert reports, and other materials, all of which contained evidence that Mr. Umaña would expect to present at an evidentiary hearing to prove his allegations.

Amended Claim I alleges that trial counsel were ineffective for failing to investigate and develop lay witness evidence to present to the Court at Mr. Umaña's *Atkins* hearing to make the case for Intellectual Disability, to the jury at Mr. Umaña's penalty hearing to make the case for life; and to Mr. Umaña's expert witnesses to fully develop readily-available expert testimony. In support, the factual allegations include direct quotations of, excerpts from, and citations to the attached Appendix, which contains affidavits, declarations, expert reports, and other materials, all of which contain evidence that Mr. Umaña expects to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

Also, Amended Claim I includes references, where necessary, to specific evidence that Mr. Umaña has reason to believe is in the sole possession of the Government or its agents, and is at least relevant to – and potentially dispositive of – the Claim, and the basis for that belief.

Finally, Amended Claim I includes references, where necessary, to specific evidence that Mr. Umaña is unable to obtain without leave of Court, and is at least relevant to – and potentially dispositive of – the Claim, and the basis for that belief.

Claim II of this Amendment relates back to Claim II of the Initial 2255 Motion. Claim II of the Initial 2255 Motion alleged that trial counsel were ineffective for failing to investigate and present lay witness and expert evidence detailing the compelling mitigation evidence of Mr.

5

Umaña's brain damage, trauma, intellectual deficits, and mental illness and offering a guilt phase defense regarding mens rea. Mr. Umaña supported those allegations with factual pleadings and references to an Appendix which contained affidavits, declarations, expert reports, and other materials, all of which contained evidence that Mr. Umaña expected to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

Amended Claim II alleges that trial counsel were ineffective for failing to investigate and present lay witness and expert evidence detailing the compelling mitigation evidence of Mr. Umaña's brain damage, trauma, intellectual deficits, and mental illness and offering a guilt phase defense regarding mens rea. In support, the factual allegations include direct quotations of, excerpts from, and citations to the attached Appendix, which contains affidavits, declarations, expert reports, and other materials, all of which contain evidence that Mr. Umaña expects to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

Finally, Amended Claim II includes references, where necessary, to specific evidence that Mr. Umaña is unable to obtain without leave of Court, and is at least relevant to – and potentially dispositive of – the Claim, and the basis for that belief.

Claim III of this Amendment relates back to Claim III of the Initial 2255 Motion. Claim III of the Initial 2255 Motion alleged that trial counsel were ineffective for failing to investigate, develop, and present readily-available lay and expert witness evidence in support of Mr. Umaña's Intellectual Disability at the pretrial *Atkins* hearing. In support, Mr. Umaña included references to an Appendix which contained affidavits, declarations, expert reports, and other materials, all of

6

which contained evidence that Mr. Umaña would expect to present at an evidentiary hearing to prove his allegations.

Amended Claim III alleges that trial counsel were ineffective for failing to investigate, develop, and present readily-available lay and expert witness evidence in support of Mr. Umaña's Intellectual Disability at the pretrial *Atkins* hearing. In support, the factual allegations include direct quotations of, excerpts from, and citations to the attached Appendix, which contains affidavits, declarations, expert reports, and other materials, all of which contain evidence that Mr. Umaña expects to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

Claim IV of this Amendment relates back to Claim IV of the Initial 2255 Motion. Claim IV of the Initial 2255 Motion alleged that the Eighth Amendment prohibits Mr. Umaña's death sentence and execution because he is Intellectually Disabled. To prevail on this Claim, Mr. Umaña must demonstrate that he is Intellectually Disabled under prevailing medical norms. Mr. Umaña pled in Claim IV that he is Intellectually Disabled under prevailing professional and clinical standards and supported that allegation with factual pleading of what he expected to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

Amended Claim IV alleges that the Eighth Amendment prohibits Mr. Umaña's death sentence and execution because he is Intellectually Disabled. To prevail on this Claim, Mr. Umaña must demonstrate that he is Intellectually Disabled under prevailing medical norms. Mr. Umaña pleads in Amended Claim IV that he is Intellectually Disabled under prevailing professional and clinical standards. In support, the factual allegations include direct quotations of, excerpts from, and citations to the attached Appendix, which contains affidavits, declarations, expert reports, and

7

other materials, all of which contain evidence that Mr. Umaña expects to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

Finally, Amended Claim IV contains allegations that direct appeal counsel were ineffective for failing to raise on appeal the effect of *Hall v. Florida* on the Court's finding at the pre-trial *Atkins* hearing. Those allegations rely on the same "common core of operative facts" that formed the basis of the original Claim IV, and so "relation back will be in order." *Mayle,* 545 U.S. at 665.

Claim V of this Amendment relates back to Claim VI of the Initial 2255 Motion. Claim V alleged that trial counsel were ineffective for failing to investigate and present evidence challenging the government's account of Mr. Umaña's role in the unadjudicated California murders alleged in support of non-statutory aggravating factors 4(a). Mr. Umaña supported those allegations with factual pleading of what he expected to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

Amended Claim V alleges that trial counsel were ineffective for failing to investigate and present evidence challenging the government's account of Mr. Umaña's role in the unadjudicated California murders alleged in support of non-statutory aggravating factors 4(a). In support, the factual allegations include direct quotations of, excerpts from, and citations to the attached Appendix, which contains affidavits, declarations, expert reports, and other materials, all of which contain evidence that Mr. Umaña expects to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

8

Also, Amended Claim V includes references, where necessary, to specific evidence that Mr. Umaña has reason to believe is in the sole possession of the Government or its agents, and is at least relevant to – and potentially dispositive of – the Claim, and the basis for that belief.

Finally, Amended Claim V includes references, where necessary, to specific evidence that Mr. Umaña is unable to obtain without leave of Court, and is at least relevant to – and potentially dispositive of – the Claim, and the basis for that belief.

Claim VI of this Amendment relates back to Claim VI of the Initial 2255 Motion. Claim VI of the Initial 2255 Motion alleged that the Government violated *Brady v. Maryland* and its progeny by withholding favorable, material evidence: 1) that undermined the Government's case in aggravation regarding the unadjudicated Los Angeles homicides; 2) obtained by the Government from Mr. Umaña's mother that was material to both Intellectual Disability and the jury's punishment determination; and 3) that undermined the Government's argument that Mr. Umaña had earned, and was flaunting, his "MS" tattoo for killing on behalf of MS-13. Mr. Umaña supported those allegations with factual pleading of what he expected to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

Amended Claim VI alleges that that the Government violated *Brady v. Maryland* and its progeny by withholding favorable, material evidence: 1) that undermined the Government's case in aggravation regarding the unadjudicated Los Angeles homicides; 2) obtained by the Government from Mr. Umaña's mother that was material to both Intellectual Disability and the jury's punishment determination; and 3) that undermined the Government's argument that Mr. Umaña had earned, and was flaunting, his "MS" tattoo for killing on behalf of MS-13. In support, the factual allegations include direct quotations of, excerpts from, and citations to the attached

9

Appendix, which contains affidavits, declarations, expert reports, and other materials, all of which contain evidence that Mr. Umaña expects to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

And, Amended Claim VI includes references, where necessary, to specific evidence that Mr. Umaña has reason to believe is in the sole possession of the Government or its agents, and is at least relevant to – and potentially dispositive of – the Claim, and the basis for that belief.

Finally, Amended Claim VI includes references, where necessary, to specific evidence that Mr. Umaña is unable to obtain without leave of Court, and is at least relevant to – and potentially dispositive of – the Claim, and the basis for that belief.

Claim VII of this Amendment relates back to Claim VII of the Initial 2255 Motion. Claim VI of the Initial 2255 Motion alleged that the Government presented false and misleading evidence and argument at the *Atkins* hearing and at penalty phase. Mr. Umaña supported those allegations with factual pleading of what he expected to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

Amended Claim VII alleges that the Government presented false and misleading evidence and argument at the *Atkins* hearing and at penalty phase. Umaña had earned, and was flaunting, his "MS" tattoo for killing on behalf of MS-13. In support, the factual allegations include direct quotations of, excerpts from, and citations to the attached Appendix, which contains affidavits, declarations, expert reports, and other materials, all of which contain evidence that Mr. Umaña expects to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

10

And, Amended Claim VII includes references, where necessary, to specific evidence that Mr. Umaña has reason to believe is in the sole possession of the Government or its agents, and is at least relevant to – and potentially dispositive of – the Claim, and the basis for that belief.

Finally, Amended Claim VII includes references, where necessary, to specific evidence that Mr. Umaña is unable to obtain without leave of Court, and is at least relevant to – and potentially dispositive of – the Claim, and the basis for that belief.

Claim VIII of this Amendment relates back to Claim VIII of the Initial 2255 Motion. Claim VIII of the Initial 2255 Motion alleged that trial counsel were ineffective for failing to adequately object to and mitigate inadmissible and highly prejudicial jail letters admitted as evidence by the Government. Mr. Umaña supported those allegations with factual pleading of what he expected to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

Amended Claim VIII alleges that trial counsel were ineffective for failing to adequately object to and mitigate inadmissible and highly prejudicial jail letters admitted as evidence by the Government. In support, the factual allegations include direct quotations of, excerpts from, and citations to the attached Appendix, which contains affidavits, declarations, expert reports, and other materials, all of which contain evidence that Mr. Umaña expects to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

Also, Amended Claim VIII contains allegations that direct appeal counsel were ineffective for failing to raise on appeal the Court's error in admitting the Government's translations of the jail letters when there existed a clear dispute as to whether the translations were accurate. Counsel's

11

failures refer to the same "common core of operative facts" that formed the basis of the original Claim VIII, and so "relation back will be in order." *Mayle,* 545 U.S. at 665.

And, Amended Claim VIII includes references, where necessary, to specific evidence that Mr. Umaña has reason to believe is in the sole possession of the Government or its agents, and is at least relevant to – and potentially dispositive of – the Claim, and the basis for that belief.

Finally, Amended Claim VIII includes references, where necessary, to specific evidence that Mr. Umaña is unable to obtain without leave of Court, and is at least relevant to – and potentially dispositive of – the Claim, and the basis for that belief.

Claim IX of this Amendment relates back to Claim IX of the Initial 2255 Motion. Claim IX of the Initial 2255 Motion alleged that trial counsel were ineffective for not presenting Mr. Umaña's apology note. Mr. Umaña supported those allegations with factual pleading of what he expected to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

Amended Claim IX alleges that trial counsel were ineffective for not presenting Mr. Umaña's apology note. In support, the factual allegations include direct quotations of, excerpts from, and citations to the attached Appendix, which contains affidavits, declarations, expert reports, and other materials, all of which contain evidence that Mr. Umaña expects to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

Claim X of this Amendment relates back to Claim X of the Initial 2255 Motion. Claim X of the Initial 2255 Motion alleged that trial counsel were ineffective for failing to object to the jury receiving government exhibits that contained evidence of *acquitted conduct* in El Salvador and which this Court had held inadmissible. Mr. Umaña supported those allegations with factual

12

pleading of what he expected to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

Amended Claim X alleges that trial counsel were ineffective for failing to object to the jury receiving government exhibits that contained evidence of *acquitted conduct* in El Salvador which this Court had held inadmissible. In support, the factual allegations include direct quotations of, excerpts from, and citations to the attached Appendix, which contains affidavits, declarations, expert reports, and other materials, all of which contain evidence that Mr. Umaña expects to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

Claim XI of this Amendment relates back to Claim XI of the Initial 2255 Motion. Claim XI alleged that trial counsel were ineffective for failing to rebut the false and misleading evidence presented by the Government that Mr. Umaña "earned" his MS-13 tattoo by killing people. Mr. Umaña supported those allegations with factual pleading of what he expected to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

Amended Claim XI alleges that trial counsel were ineffective for failing to rebut the false and misleading evidence presented by the Government that Mr. Umaña "earned" his MS-13 tattoo by killing people. In support, the factual allegations include direct quotations of, excerpts from, and citations to the attached Appendix, which contains affidavits, declarations, expert reports, and other materials, all of which contain evidence that Mr. Umaña expects to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

13

And, Amended Claim XI includes references, where necessary, to specific evidence that Mr. Umaña has reason to believe is in the sole possession of the Government or its agents, and is at least relevant to – and potentially dispositive of – the Claim, and the basis for that belief.

Finally, Amended Claim XI includes references, where necessary, to specific evidence that Mr. Umaña is unable to obtain without leave of Court, and is at least relevant to – and potentially dispositive of – the Claim, and the basis for that belief.

Claim XII of this Amendment relates back to Claim XII of the Initial 2255 Motion. Claim XII alleged that the government violated Mr. Umaña's right to a fair trial by engaging in a pattern of misconduct in which it repeatedly introduced inadmissible evidence to the jury, in direct violation of, or by circumventing the Court's orders. Mr. Umaña supported those allegations with factual pleading of what he expected to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

Amended Claim XII alleges that that the government violated Mr. Umaña's right to a fair trial by engaging in a pattern of misconduct in which it repeatedly introduced inadmissible evidence to the jury, in direct violation of, or by circumventing the Court's orders. In support, the factual allegations include direct quotations of, excerpts from, and citations to the attached Appendix, which contains affidavits, declarations, expert reports, and other materials, all of which contain evidence that Mr. Umaña expects to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

Also, Amended Claim XII contains allegations that trial and direct appeal counsel were ineffective for failing to adequately object to or challenge, and to raise on appeal, the

14

Government's misconduct. Counsels' failures refer to the same "common core of operative facts" that formed the basis of the original Claim XII, and so "relation back will be in order." *Mayle,* 545 U.S. at 665.

Claim XIII of this Amendment relates back to Claim XIII of the Initial 2255 Motion. Claim XIII alleged that trial counsel were ineffective for failing to request a continuance of his pretrial *Atkins* hearing and of his capital trial date. Mr. Umaña supported those allegations with factual pleading of what he expected to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

Amended Claim XIII alleges that trial counsel were ineffective for failing to request a continuance of his pretrial *Atkins* hearing and of his capital trial date. In support, the factual allegations include direct quotations of, excerpts from, and citations to the attached Appendix, which contains affidavits, declarations, expert reports, and other materials, all of which contain evidence that Mr. Umaña expects to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

Claim XIV of this Amendment relates back to Claim XIV of the Initial 2255 Motion. Claim XIV alleged that trial counsel were ineffective for failing to object to the excusal for cause of jurors based on their answers questionnaires and without further questioning in voir dire. Mr. Umaña supported those allegations with factual pleading of what he expected to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

Amended Claim XIV alleges that trial counsel were ineffective for failing to object to the excusal for cause of jurors based on their answers questionnaires and without further questioning

in voir dire. In support, the factual allegations include direct quotations of, excerpts from, and citations to the attached Appendix, which contains affidavits, declarations, expert reports, and other materials, all of which contain evidence that Mr. Umaña expects to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

Claim XV of this Amendment relates back to Claim XV of the Initial 2255 Motion. Claim XV alleged that several jurors concealed evidence of their inability to remain impartial, which would have warranted their removal for cause, and which exposed the jury to extraneous evidence. Mr. Umaña supported those allegations with factual pleading of what he expected to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

Amended Claim XV alleges that several jurors concealed evidence of their inability to remain impartial, which would have warranted their removal for cause, and which exposed the jury to extraneous evidence. In support, the factual allegations include direct quotations of, excerpts from, and citations to the attached Appendix, which contains affidavits, declarations, expert reports, and other materials, all of which contain evidence that Mr. Umaña expects to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

Also, Amended Claim XV contains allegations that trial and direct appeal counsel were ineffective for failing to adequately investigate or discovery, and to raise on appeal, the juror's misconduct. The failures of counsel refer to the same "common core of operative facts" that formed the basis of the original Claim XV, and so "relation back will be in order." *Mayle,* 545 U.S. at 665.

16

Finally, Amended Claim XV includes references, where necessary, to specific evidence that Mr. Umaña is unable to obtain without leave of Court, and is at least relevant to – and potentially dispositive of – the Claim, and the basis for that belief.

Claim XVI of this Amendment relates back to Claim XVI of the Initial 2255 Motion. Claim XVI alleged that trial counsel were ineffective during voir dire for failing to adequately question one juror's obvious biases and statutory ineligibility, and for failing to adequately explore multiple jurors' stated inability to consider mitigation evidence. Mr. Umaña supported those allegations with factual pleading of what he expected to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

Amended Claim XVI alleges that trial counsel were ineffective during voir dire for failing to adequately question one juror's obvious biases and statutory ineligibility, and for failing to adequately explore multiple jurors' stated inability to consider mitigation evidence. In support, the factual allegations include direct quotations of, excerpts from, and citations to the attached Appendix, which contains affidavits, declarations, expert reports, and other materials, all of which contain evidence that Mr. Umaña expects to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

Claim XVII of this Amendment relates back to Claim XVII of the Initial 2255 Motion. Claim XVII alleged that trial counsel were ineffective for failing to raise a timely challenge to the under-representative composition of the grand and petit jury venires. Mr. Umaña supported those allegations with factual pleading of what he expected to prove after full evidentiary development

17

(which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

Amended Claim XVII alleges that trial counsel were ineffective during voir dire for failing to adequately question one juror's obvious biases and statutory ineligibility, and for failing to adequately explore multiple jurors' stated inability to consider mitigation evidence. In support, the factual allegations include direct quotations of, excerpts from, and citations to the attached Appendix, which contains affidavits, declarations, expert reports, and other materials, all of which contain evidence that Mr. Umaña expects to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

Finally, Amended Claim XVII includes references, where necessary, to specific evidence that Mr. Umaña is unable to obtain without leave of Court, and is at least relevant to – and potentially dispositive of – the Claim, and the basis for that belief.

Claim XVIII of this Amendment relates back to Claim XVII of the Initial 2255 Motion. Claim XVIII alleged that trial counsel were ineffective for failing to adequately object to the Government's use of race-based peremptory jury strikes. Mr. Umaña supported those allegations with factual pleading of what he expected to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

Amended Claim XVIII alleges that trial counsel were ineffective for failing to adequately object to the Government's use of race-based peremptory jury strikes. In support, the factual allegations include direct quotations of, excerpts from, and citations to the attached Appendix, which contains affidavits, declarations, expert reports, and other materials, all of which contain

18

evidence that Mr. Umaña expects to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

And, Amended Claim XVIII includes references, where necessary, to specific evidence that Mr. Umaña has reason to believe is in the sole possession of the Government or its agents, and is at least relevant to – and potentially dispositive of – the Claim, and the basis for that belief.

Finally, Amended Claim XVIII includes references, where necessary, to specific evidence that Mr. Umaña is unable to obtain without leave of Court, and is at least relevant to – and potentially dispositive of – the Claim, and the basis for that belief.

Claim XIX of this Amendment relates back to Claim XIX of the Initial 2255 Motion. Claim XIX alleged that trial counsel were ineffective for failing to investigate and present available mental health evidence to contest the admissibility and credibility of Mr. Umaña's statements to law enforcement officers. Mr. Umaña supported those allegations with factual pleading of what he expected to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

Amended Claim XIX alleges that trial counsel were ineffective for failing to adequately object to the Government's use of race-based peremptory jury strikes. In support, the factual allegations include direct quotations of, excerpts from, and citations to the attached Appendix, which contains affidavits, declarations, expert reports, and other materials, all of which contain evidence that Mr. Umaña expects to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

19

And, Amended Claim XIX includes references, where necessary, to specific evidence that Mr. Umaña has reason to believe is in the sole possession of the Government or its agents, and is at least relevant to – and potentially dispositive of – the Claim, and the basis for that belief.

Finally, Amended Claim XIX includes references, where necessary, to specific evidence that Mr. Umaña is unable to obtain without leave of Court, and is at least relevant to – and potentially dispositive of – the Claim, and the basis for that belief.

Claim XX of this Amendment relates back to Claim XX of the Initial 2255 Motion. Claim XX alleged that trial counsel were ineffective for failing to protect Mr. Umaña's right to be present at every stage of the proceedings. Mr. Umaña supported those allegations with factual pleading of what he expected to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

Amended Claim XX alleges that trial counsel were ineffective for failing to protect Mr. Umaña's right to be present at every stage of the proceedings. In support, the factual allegations include direct quotations of, excerpts from, and citations to the attached Appendix, which contains affidavits, declarations, expert reports, and other materials, all of which contain evidence that Mr. Umaña expects to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

Also, Amended Claim XX contains allegations that direct appeal counsel were ineffective for failing to raise on appeal the violations of Mr. Umaña's rights to be present. Counsel's failures refer to the same "common core of operative facts" that formed the basis of the original Claim XX, and so "relation back will be in order." *Mayle,* 545 U.S. at 665.

20

Claim XXI of this Amendment relates back to Claim XXI of the Initial 2255 Motion. Claim XXI alleged that excessive security measures at trial biased the jury, depriving Mr. Umaña of a fair trial and sentencing, and that trial counsel were ineffective for failing to object accordingly. Mr. Umaña supported those allegations with factual pleading of what he expected to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

Amended Claim XXI alleges that excessive security measures at trial biased the jury, depriving Mr. Umaña of a fair trial and sentencing, and that trial counsel were ineffective for failing to object accordingly. In support, the factual allegations include direct quotations of, excerpts from, and citations to the attached Appendix, which contains affidavits, declarations, expert reports, and other materials, all of which contain evidence that Mr. Umaña expects to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

Also, Amended Claim XXI contains allegations that trial and direct appeal counsel were ineffective for failing to adequately object to or challenge, and to raise on appeal, the effect of the excessive security measures. Counsels' failures refer to the same "common core of operative facts" that formed the basis of the original Claim XII, and so "relation back will be in order." *Mayle,* 545 U.S. at 665.

And, Amended Claim XXI includes references, where necessary, to specific evidence that Mr. Umaña has reason to believe is in the sole possession of the Government or its agents, and is at least relevant to – and potentially dispositive of – the Claim, and the basis for that belief.

21

Finally, Amended Claim XXI includes references, where necessary, to specific evidence that Mr. Umaña is unable to obtain without leave of Court, and is at least relevant to – and potentially dispositive of – the Claim, and the basis for that belief.

Claim XXII of this Amendment relates back to Claim XXII of the Initial 2255 Motion. Claim XXII alleged that Mr. Umaña's convictions for use and possession of a firearm during and in relation to a crime of violence resulting in death are void in light of the supreme court's retroactive decision in *Johnson*. Mr. Umaña supported those allegations with factual pleading of what he expected to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

Amended Claim XXII alleges that Mr. Umaña's convictions for use and possession of a firearm during and in relation to a crime of violence resulting in death are void in light of the supreme court's retroactive decision in *Johnson*. It is substantially verbatim to the two amendments that this Court has previously allowed. In support, the factual allegations include direct quotations of, excerpts from, and citations to the attached Appendix, which contains affidavits, declarations, expert reports, and other materials, all of which contain evidence that Mr. Umaña expects to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

Claim XXIII of this Amendment relates back to Claim XXIII of the Initial 2255 Motion. Claim XXII alleged that Mr. Umaña was denied the effective assistance of counsel at the presentation to the Department of Justice in opposition to the authorization of a capital prosecution. Mr. Umaña supported those allegations with factual pleading of what he expected to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

Amended Claim XXIII alleges that Mr. Umaña was denied the effective assistance of counsel at the presentation to the Department of Justice in opposition to the authorization of a capital prosecution. In support, the factual allegations include direct quotations of, excerpts from, and citations to the attached Appendix, which contains affidavits, declarations, expert reports, and other materials, all of which contain evidence that Mr. Umaña expects to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

And, Amended Claim XXIII includes references, where necessary, to specific evidence that Mr. Umaña has reason to believe is in the sole possession of the Government or its agents, and is at least relevant to – and potentially dispositive of – the Claim, and the basis for that belief.

Finally, Amended Claim XXIII includes references, where necessary, to specific evidence that Mr. Umaña is unable to obtain without leave of Court, and is at least relevant to – and potentially dispositive of – the Claim, and the basis for that belief.

Claim XXIV of this Amendment relates back to Claim XXIV of the Initial 2255 Motion. Claim XXIV alleged trial counsel were ineffective for failing to adequately explain to their intellectually impaired, brain damaged, client the risks and benefits of a plea deal in this capital case. Mr. Umaña supported those allegations with factual pleading of what he expected to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

Amended Claim XXIV alleges that trial counsel were ineffective for failing to adequately explain to their intellectually impaired, brain damaged, client the risks and benefits of a plea deal in this capital case. In support, the factual allegations include direct quotations of, excerpts from, and citations to the attached Appendix, which contains affidavits, declarations, expert reports, and

other materials, all of which contain evidence that Mr. Umaña expects to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

Claim XXV of this Amendment relates back to Claim XXV of the Initial 2255 Motion. Claim XXV alleged that Mr. Umaña's death sentence was unconstitutionally imposed based on race and geography. Mr. Umaña supported those allegations with factual pleading of what he expected to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

Amended Claim XXV alleges that Mr. Umaña's death sentence was unconstitutionally imposed based on race and geography. In support, the factual allegations include direct quotations of, excerpts from, and citations to the attached Appendix, which contains affidavits, declarations, expert reports, and other materials, all of which contain evidence that Mr. Umaña expects to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

Also, Amended Claim XXV contains allegations that trial and direct appeal counsel were ineffective for failing to adequately object to or challenge, and to raise on appeal, the Government's use of race and geography in its charging decision. Counsels' failures refer to the same "common core of operative facts" that formed the basis of the original Claim XXV, and so "relation back will be in order." *Mayle,* 545 U.S. at 665.

And, Amended Claim XV includes references, where necessary, to specific evidence that Mr. Umaña has reason to believe is in the sole possession of the Government or its agents, and is at least relevant to – and potentially dispositive of – the Claim, and the basis for that belief.

24

Finally, Amended Claim XV includes references, where necessary, to specific evidence that Mr. Umaña is unable to obtain without leave of Court, and is at least relevant to – and potentially dispositive of – the Claim, and the basis for that belief.

Claim XXVI of this Amendment relates back to Claim XXVI of the Initial 2255 Motion. Claim XXVI alleged that the Government failed to meet its Vienna Convention obligations, and that trial counsel were ineffective for failing to protect Mr. Umaña' Vienna Convention rights. Mr. Umaña supported those allegations with factual pleading of what he expected to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

Amended Claim XXVI alleged that the Government failed to meet its Vienna Convention obligations, and that trial counsel were ineffective for failing to protect Mr. Umaña' Vienna Convention rights. In support, the factual allegations include direct quotations of, excerpts from, and citations to the attached Appendix, which contains affidavits, declarations, expert reports, and other materials, all of which contain evidence that Mr. Umaña expects to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

Also, Amended Claim XXVI contains allegations that direct appeal counsel were ineffective for failing to raise on appeal the Government's violations of the Vienna Convention. Counsel's failures refer to the same "common core of operative facts" that formed the basis of the original Claim XXVI, and so "relation back will be in order." *Mayle,* 545 U.S. at 665.

And, Amended Claim XXVI includes references, where necessary, to specific evidence that Mr. Umaña has reason to believe is in the sole possession of the Government or its agents, and is at least relevant to – and potentially dispositive of – the Claim, and the basis for that belief.

Finally, Amended Claim XXVI includes references, where necessary, to specific evidence that Mr. Umaña is unable to obtain without leave of Court, and is at least relevant to – and potentially dispositive of – the Claim, and the basis for that belief.

Claim XXVII of this Amendment relates back to Claim XXVII of the Initial 2255 Motion. Claim XXVII alleged that trial counsel were ineffective for failing to adequately preserve issues for appeal.

Amended Claim XXVII alleges that trial counsel were ineffective for failing to adequately preserve issues for appeal. However, Amended Claim XXVII has been amended to remove sub-claims (i), (iii), (v), (vii) and (ix). The remaining sub-claims are re-numbered accordingly.

Claim XXVIII of this Amendment relates back to Claim XXVIII of the Initial 2255 Motion. Claim XXVIII alleged that, because Mr. Umaña is brain damaged and suffers various mental impairments, his execution would be unconstitutional. Mr. Umaña supported those allegations with factual pleading of what he expected to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

Amended Claim XXVIII alleged that the Government failed to meet its Vienna Convention obligations, and that, because Mr. Umaña is brain damaged and suffers various mental impairments, his execution would be unconstitutional. In support, the factual allegations include direct quotations of, excerpts from, and citations to the attached Appendix, which contains affidavits, declarations, expert reports, and other materials, all of which contain evidence that Mr.

26

Umaña expects to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

Claim XXIX of this Amendment relates back to Claim XXIX of the Initial 2255 Motion. Claim XXIX alleged that the cumulative effect of counsel's ineffectiveness warrants relief.

Amended Claim XXIX alleges that the cumulative effect of counsel's ineffectiveness warrants relief. Necessarily, and by reference, Claim XXIX therefore also includes all additional evidentiary supports detailed and referenced in the aforementioned claims of ineffective assistance of counsel.

Claim XXX of this Amendment relates back to Claim XXX of the Initial 2255 Motion. Claim XXX alleged that the cumulative effect of the ineffective assistance of counsel and the Government's *Brady* violations undermine confidence in the result of Mr. Umaña's trial.

Amended Claim XXX alleges that the cumulative effect of the ineffective assistance of counsel and the Government's *Brady* violations undermine confidence in the result of Mr. Umaña's trial. Necessarily, and by reference, Claim XXIX therefore also includes all additional evidentiary supports detailed and referenced in the aforementioned claims of ineffective assistance of counsel.

This Amended Motion also contains a Claim LIX. Amended Claim LIX relates back to Supplemental Claim 59, which alleged that Mr. Umaña's alien-with-a-firearm conviction must be vacated based on *Rehaif*, and Mr. Umaña's death sentences accordingly must be vacated. Mr. Umaña supported those allegations with factual pleading of what he expected to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

27

Amended Claim alleges that Mr. Umaña's alien-with-a-firearm conviction must be vacated based on *Rehaif*, and Mr. Umaña's death sentences accordingly must be vacated. Amended Claim LIX is substantially verbatim to the amendment previously approved by this Court. In support, the factual allegations include direct quotations of, excerpts from, and citations to the attached Appendix, which contains affidavits, declarations, expert reports, and other materials, all of which contain evidence that Mr. Umaña expects to prove after full evidentiary development (which, in 2255 cases, may include discovery, expansion of the record under Habeas Rule 7, and an evidentiary hearing).

## STATEMENT OF RELEVANT FACTS

Prior to trial, Mr. Umaña alleged that intellectual disability prohibited the pursuit of a death sentence against him. The Court granted a hearing. Mental health experts for both parties testified about Mr. Umaña's intelligence and his adaptive deficits, which is his day-to-day performance in adapting to his environment. This Court opted not to resolve the conflict between the experts regarding Mr. Umaña's intelligence but held that trial counsel failed to meet their burden in proving adaptive deficits. The Court identified strengths in Mr. Umaña's behavior to deny adaptive deficits. The Supreme Court of the United States published *Hall v. Florida*, 572 U.S. 701 (2014), before Mr. Umaña's direct appeal was final. In *Hall,* the Court held that courts must follow mental health community standards to assess Intellectual Disability, including weighing weaknesses, not strengths to determine adaptive deficits.

At trial, the jury convicted Mr. Umaña for shooting and killing two brothers, Manuel and Ruben Salinas, at a restaurant in North Carolina, following an alcohol-fueled argument over what music should be played on the jukebox. Prior to trial, instead of allowing North Carolina to prosecute this crime under its murder statute, the federal government charged Mr. Umaña with

28

VICAR murder, connecting the shootings to Mr. Umaña's membership in a gang (Mara Salvatrucha, or MS-13) he had initially joined in his home country of El Salvador.

Faced with a primary crime that the jurors unanimously found "did not involve substantial planning" and resulted from an "emotionally charged argument" – *i.e.,* not the typical profile of a crime deserving of death – the foundation for the Government's case at penalty phase were two previously unadjudicated murders in Los Angeles, California, which the government supported with hearsay testimony from co-defendants and questionable identification and ballistics evidence.

Thus, this is a case in which presentation of a genuine case in mitigation could well have changed the outcome of the penalty phase. Unfortunately, through a combination of counsel's unreasonable decisions limiting their investigation, and the Government's concerted efforts to interfere with Mr. Umaña's efforts to avoid execution, the defense's entire mitigation investigation centered on a single source – Mr. Umaña's father, Rafael. Rafael is the only person the trial team ever spoke to who had known Mr. Umaña as an infant or child. Rafael told them a gentle story about their family which was poor but caring, about how Mr. Umaña's mother, Leticia, had deserted them when he was still an infant, but how he (Rafael) had protected Mr. Umaña, ensured that he always had a loving female caretaker, and shielded him from the ravages of the El Salvadoran civil war.

Contrary to the relatively rosy story Rafael told, Mr. Umaña's childhood had been tragic and traumatic, with Rafael as a principal architect of his son's misery. Trial counsel, and hence the jury, never got to hear the truth about Mr. Umaña's childhood, either because the trial team never sought, or the Government prevented access to (or both), other readily available and willing witnesses who had known Mr. Umaña when he was a child.

The true story is that Mr. Umaña born to a teenaged mother who was kept drugged, beaten

29

and trafficked by Rafael while pregnant, and who – again while pregnant – tried to poison herself and her unborn child to escape from Rafael's tortuous control. Mr. Umaña was raised in abject poverty, living in filth in a single room with half a dozen family members, and often going hungry except for the times he could feed himself by catching and killing local rodents. He was an abused child, beaten often and mercilessly by Rafael, who emotionally abused him as well. He was an abandoned child, who believed his mother had left him when he was an infant (because his father told him it was so, even though Rafael had actually banished her from the household). Mr. Umaña was an ill-clothed, ill-fed and neglected child, whom Rafael liked to torment by withholding food from him and eating in front of him.

Mr. Umaña was also a traumatized child. He was subjected to his father's frequent and unprovoked beatings. As a child, he watched in horror when his father beat his mother, punching her repeatedly in the face. He saw shootings and hangings and decomposing bodies outside his front door. At the age of eight, he shared a bed with his great grandmother, his only protector against Rafael, while she slowly died of stomach cancer.

Mr. Umaña was developmentally slow, abnormally forgetful, and unable to learn at home, in school or on the job, all indicators of low intellectual functioning. He failed third grade aged nine, again at the age of twelve, and yet again at the age of sixteen. His limitations made it impossible for him to advance in the few menial jobs he had as an adolescent.

Compounding his intellectual disability, Mr. Umaña showed significant evidence of brain damage and mental illness. Unable to learn beyond the third grade, Mr. Umaña's life is replete with stories of him hearing voices, seeing demons nearby him, and appearing "just not right". Adding to this already confusing and disturbing internal life, Mr. Umaña suffered extreme, debilitating, migraine headaches that blurred his vision and made him vomit. Already unable to

complete many multi-stepped physical tasks, at various times in his life Mr. Umaña was so disabled from controlling his body that he was incapable of blinking. Though he was very social and consistently sought the company of others (often to help him perform basic self-care, such as finding food or clothes), he was incapable of regulating his emotions, often veering wildly from one extreme reaction to another and back again.

Had trial counsel marshalled this evidence through the lay and expert witnesses, the jury would have heard a compelling case for life. This was the very type of evidence the Supreme Court has described as unqualified mitigating evidence. Not only would this evidence have provided the jurors with general reasons for wanting to spare Mr. Umaña's life, but it would also have provided them with an explanation for why this emotionally-damaged, intellectually limited young man had joined MS-13 in the first place – that is, to find support, protection, and acceptance missing through his childhood and adolescence. This evidence would also have helped counter the Government's characterization of Mr. Umaña as someone with a devil in his heart, a "killer among killers," who needed to be shown "American justice."

Moreover, had counsel fully investigated and prepared, they would have been able to seriously undermine the Government's case that Mr. Umaña committed the Greensboro homicides to protect and achieve status within his gang or that he was responsible for the California homicides that made up most of their case for death.

The people who knew Mr. Umaña – his extensive family and his many friends – would have told defense counsel, and the jury, everything they knew about Mr. Umaña and how he came to by trapped by his self-protective clinging to MS-13. That family and those friends were denied the opportunity to tell the jury about the Alejandro Umaña they knew by defense counsel's disinterest in asking them, and the Government's deliberate interference with counsel's ability to

do so even had they tried.

The jury could – should – have heard a very different story than the one counsel and the Government allowed them to hear. Had trial counsel fulfilled their constitutional duty, and the Government stayed within their constitutional limits, it is more than reasonably probable that Alejandro Umaña would not now be under a sentence of death.

**PROCEDURAL HISTORY**

Alejandro Umaña was accused of shooting and killing two men on December 8, 2007. The shooting happened in Greensboro, North Carolina, and state charges (pursued as a noncapital case) were initially brought there. Seven months later, on June 23, 2008, federal prosecutors charged Mr. Umaña in the Western District of North Carolina. The Greensboro shooting was charged as overt acts under a RICO conspiracy (8 U.S.C. § 1962(d) (Count 1)).

On September 23, 2008, the Government superseded the indictment adding capital counts under 18 U.S.C. § 1959 (VICAR murder) (Counts 22 and 24), and possession of a firearm in relation to crimes of violence under §§ 924(c) & (j)(1) (Counts 23 and 25). Crim. Doc. No. 276. The Government filed a notice of intention to seek the death penalty on the same day. Crim. Doc. No. 276.

On April 19, 2010, a jury returned a verdict finding Mr. Umaña guilty of all death eligible counts. They also found Mr. Umaña guilty on Count 1 (RICO conspiracy), Count 27 (illegal alien in possession of firearm, 18 U.S.C. § 922(g)(5), Count 28 (robbery affecting interstate commerce, 18 U.S.C. § 1951), Count 61 (conspiracy to commit witness tampering, 18 U.S.C. § 371), and Count 63 (witness tampering, 18 U.S.C. § 1512).

The penalty proceedings were bifurcated into eligibility and selection phases. At the eligibility phase, the Government alleged all four § 3591(a) gateway factors. On the VICAR

counts, the jury returned no finding on the first three intent-to-kill aggravators and found only the "grave risk of harm" to exist, Crim. Doc. No. 1044, 1046; on the § 924 counts it found intent to kill, Crim. Doc. No. 1045, 1047. The jury also found § 3292(c) aggravating factors of creation of a grave risk of death to others and multiple killings to exist.Crim. Doc. No. 1044-47.

At the selection phase, the Government alleged four more aggravators: (1) the purpose of the killing was to maintain the name and reputation of MS-13 and advance his position therein; (2) injury, harm, and loss was caused to the victim's family and friends ("victim impact"); (3) involvement in other serious acts of violence including (a) committing two prior unadjudicated murders on Fairfax Avenue, Los Angeles and (b) participating in and aiding and abetting in one additional unadjudicated murder in Lemon Grove park, Los Angeles; and (4) likelihood of committing criminal acts of violence in the future as evidenced by four sub-factors ("future dangerousness"). Crim. Doc. No. 1048-51. The Government's selection phase case relied heavily on hearsay evidence of Mr. Umaña's alleged culpability for the earlier unadjudicated murders in Los Angeles. The jury found that the Government established all aggravating factors.

Mr. Umaña alleged thirteen mitigating factors. After deliberation, the jury recommended that Mr. Umaña be sentenced to death on Counts 22-25. On July 27, 2010, this Court entered a judgment sentencing Mr. Umaña to death. The Court also imposed a life sentence on Count 1, and various sentences on the other counts all to run concurrent.

Mr. Umaña's appeal to the Fourth Circuit was affirmed by a divided panel. *United States v. Umaña*, 750 F.3d 320 (4th Cir. 2010). Fourth Circuit Judge Gregory dissented, concluding "that it is both wrong and unconstitutional for a death sentence to rest on unconfronted accusatory evidence." *Id*. at 369. Mr. Umaña's petition for rehearing en banc was denied on June 27, 2014, by an eight to five vote. Case No. 10-6, Doc. 143. On June 22, 2015, the United States Supreme

Court denied Mr. Umaña's Petition for a Writ of Certiorari.

Mr. Umaña filed a first Motion Under 28 U.S.C § 2255 to Vacate, Set Aside, or Correct Convictions and Sentences of a Person in Federal Custody on June 22, 2016. Mr. Umaña moved to Supplement/Amend his Initial 2255 motion (and filed a Supplemental/Amended Motion) on February 22, 2018. This Court denied the Motion to Amend in October of 2022 and ordered the Respondent to Answer the first 2255 Motions.

Respondent filed a Motion to Dismiss as a responsive pleading on March 2, 2023. Mr. Umaña files this Amended Motion Under 28 U.S.C § 2255 to Vacate, Set Aside, or Correct Convictions and Sentences of a Person in Federal Custody in accord with Federal Rule of Civil Procedure 15(a).

34

CLAIM I.    AS A RESULT OF THEIR FAILURE TO ADEQUATELY INVESTIGATE OR PRESENT READILY AVAILABLE MITIGATION EVIDENCE AT THE PENALTY PHASE OF HIS TRIAL, TRIAL COUNSEL DEPRIVED MR. UMAÑA OF THE EFFECTIVE ASSISTANCE OF COUNSEL TO WHICH HE WAS ENTITLED, IN VIOLATION OF HIS RIGHTS UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

All other claims and allegations in this Motion are incorporated into this claim by this reference.

## A. Introduction

A thorough mitigation investigation into the life of a capital defendant is the cornerstone of any penalty phase proceedings in his or her capital case. Under the Sixth Amendment, "[i]t is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all facts relevant to the merits of the case *and the penalty* in the event of conviction." *Rompilla v. Beard*, 545 U.S. 374, 387 (2005) (emphasis added) (quoting 1 ABA Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.))). This duty to investigate is particularly broad in a capital case, where counsel has an "obligation to conduct a thorough investigation of the defendant's background," *Wiggins v. Smith*, 539 U.S. 510, 522 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 396 (2000)), for "all reasonably available mitigating evidence," *id.* at 524 (ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("ABA Guidelines") 11.4.1(C), p. 93 (1989)). At the time of Mr. Umaña's trial in 2010, "[i]t is unquestioned that under the prevailing professional norms at the time," that obligation applied to his trial counsel. *Porter v. McCollum*, 558 U.S. 30, 39 (2009).

The purpose for imposing such an obligation on trial counsel in a capital case lies in the fundamental principles underlying Eighth-Amendment jurisprudence, that "the fundamental

respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender . . . as a constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) (internal citation omitted). Moreover, "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable," *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)), and that such evidence might "influence[] the jury's appraisal of [the defendant's] moral culpability," *Williams*, 529 U.S. at 398. Other factors recognized by the Supreme Court as constituting particularly relevant mitigation evidence include evidence of a defendant's turbulent family history and physical abuse by a parent, *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982), dysfunctional upbringing, brain damage, and borderline intellectual disability, *Williams*, 529 U.S. at 395-96.

Mr. Umaña is brain-damaged, mentally ill, and with low intelligence. He was raised in a toxic environment by a physically and emotionally abusive father who pushed him out on his own and into the arms of MS-13 as a late adolescent. All these well-recognized categories of mitigation played a formative role in Mr. Umaña's life and provided a compelling case for mitigation. But because trial counsel failed to investigate his childhood adequately, the jury never heard this evidence.

The Supreme Court has established a two-prong test by which a litigant demonstrates that trial counsel failed to provide effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668 (1984). First, one must show that counsel's performance was deficient – that is, it fell below reasonable professional norms at the time of trial. *Id.* at 688. One must also establish "prejudice"

36

– that is, there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome," *Id.* at 694, a standard less demanding than proof by a preponderance of the evidence, *id.*; *Williams*, 529 U.S. at 405-06. Mr. Umaña can establish both *Strickland* prongs.

Under the first prong, Mr. Umaña's trial counsel performed deficiently in conducting their investigation for the penalty phase. Despite the availability and willingness of family members and neighbors to talk about Mr. Umaña's childhood, the only family member the trial team interviewed for their life history investigation, and the only witness the trial team interviewed who had known Mr. Umaña or his circumstances as a child, was Mr. Umaña's father, Rafael Enrique Umaña (hereinafter referred to as Rafael).[4] Trial counsel had Mr. Umaña's mother, Leticia Ramirez's, address (*see* Appxs. 37, 47) but either failed to review the discovery to learn they had it; failed to provide it to their trial mitigation specialist; or failed to direct him to look for her there. This restricted the investigation of a capital client's childhood to one person, and at that, a person who abused and mistreated Mr. Umaña and had reasons to portray himself and his son's life in unrealistic and self-serving terms fell well outside the scope of prevailing professional norms at the time of Mr. Umaña's trial in 2010. Trial counsel's self-imposed limitation on the investigation had dire consequences. *See, e.g.*, *Porter*, 558 U.S. at 39.

---

[4] The trial team interviewed other witnesses and presented videos of four witnesses at the penalty phase, but none were family members. None of these witnesses knew firsthand any circumstances or details of Mr. Umaña's childhood. The trial team did not get any details about Mr. Umaña's life until age 15 from anyone other than Rafael. Appx. 36 at 4. Thus, no one could challenge the comparatively rosy picture Rafael painted of himself as a poor but loving father who cared for and protected his young son after Mr. Umaña's mother deserted the family. PPT 532-47.

By failing to seek out and interview other family members, neighbors, or friends, trial counsel failed to discover significant mitigating evidence and never touched upon it at the penalty phase. Critically, this evidence included that Mr. Umaña had been subjected to brutal, unrelenting physical abuse inflicted *by Rafael* himself throughout his childhood. Likewise, contrary to the story Rafael told the trial team (and had told Mr. Umaña all his life) – that Mr. Umaña's mother, Leticia Ramirez Diaz (Leticia), had abandoned him when he was an infant – trial counsel failed to learn that Rafael, in fact, had drugged, beaten, and prostituted Leticia while she was pregnant. *See* Declaration of Leticia Ramirez Diaz (Appx. 10) ¶¶ 41, 44, 45, 46. She was then expelled from his household and ultimately forced to return to El Salvador without Mr. Umaña, even though she begged to take care of him. *Id.* ¶¶ 61, 63. Despite her plea to see her child, Rafael did not let her see her infant and instead beat her and sent her away. *Id.* ¶ 61.

Additionally, by failing to either review the discovery to learn they had Leticia's address, provide that address to the mitigation specialist, or direct that he look for her there[5] while simultaneously relying solely on Rafael as the source of life-history information, the trial team failed to uncover rich details of even those topics the mitigation witnesses at trial talked broadly about – for example, the poverty in which Mr. Umaña was raised, considered extreme even by the standards of the poor neighborhood in which he lived; the tremendous loss he suffered at the age of eight with the death of his great-grandmother, who had been his only protector and source of comfort during his early years; his inability to succeed at school; that Mr. Umaña was two years older than they were led to believe; and the traumatic events Mr. Umaña witnessed, both of a

---

[5] Leticia Ramirez knew all of Rafael's family and could have put the mitigation specialist in touch with them and Mr. Umaña's brother Saul. Appx. 10; Appx. 22.

personal nature and as a result of the atrocities from the civil war being waged on the streets in front of his home in El Salvador.

These details of Mr. Umaña's life were powerfully mitigating. Taken alone or combined with the meager mitigating evidence counsel presented at trial, that as a teenager before joining MS-13, Mr. Umaña was a respectful, sweet, lonely, generous soul, there is a reasonable probability that the outcome of the sentencing hearing would have been different. Or, as demonstrated in Claim III, there is also a reasonable probability that the outcome of the *Atkins* hearing would have been different if counsel had conducted an adequate investigation as described herein.

These details of Mr. Umaña's life would also have informed and strengthened the opinions of the mental-health experts consulted pretrial. *See* Declaration of Dr. Olley (Appx. 28); Declaration of Dr. Merikangas (Appx. 27) ¶10. Supported by details of Mr. Umaña's actual life history, the opinions of these experts would have been far more convincing to the Court at the *Atkins* hearing, where information about Mr. Umaña's developmental milestones and intellectual and adaptive functioning was critical, *see* Decl. Dr. Olley (Appx. 28); Report of Dr. Martell (Appx. 236) and would likely have altered trial counsel's decisions as to whether and how to use mental-health experts at the penalty phase. Mr. Umaña's significant and specific history of being physically abused and exposed directly to traumatic sights would have informed opinions about his emotional and cognitive development. *See* Declarations of Dr. Stewart, Appxs. 215, 216; Declaration of Dr. Sapia, Appx. 214; Declaration of Dr. Sermeño, Appx. 237. His history of repeated head trauma, *in utero* exposure to toxins, and other physiological assaults would have informed opinions about brain damage. *See* Declaration of Dr. Merikangas, Appx. 27; Reports of Dr. Gur, Appxs. 29, 242; Declaration of Dr. Davies, Appx. 211; Declaration of Dr. Lugo, Appx. 212; Appx.243, Report of Dr. Shea at 11-13. Reports of his blinding headaches, episodes of seeing

39

demons on blank walls, dissociating, and hearing voices would have informed opinions about neurological defects and mental illness. *See* Declarations of Dr. Stewart, Appxs. 215, 216*.* The entire picture of his lonely, deprived childhood would have informed an expert's and the jury's understanding of why Mr. Umaña ultimately joined MS-13. *See* Declaration of Dr. Sermeño, Appx. 237 at ¶71. Thus, trial counsel's failure to conduct a reasonable life-history investigation significantly impacted the presentation of mental-health mitigation at the penalty phase, as well.

Turning to the second *Strickland* prong, but for trial counsel's deficient investigation into Mr. Umaña's life history, there is a reasonable probability that the outcome of his sentencing would have been different.

Trial counsel's deficient performance with regard to mitigation and the prejudice that stemmed from there extended beyond their failure to locate available witnesses. They failed to interview in depth even the witnesses they located and missed significant mitigation those witnesses had to offer. They failed to develop a coherent theme for mitigation during the penalty phase that would provide a compelling picture to the jury of Mr. Umaña's unique frailties. Lacking such a picture, they declined even to make an opening statement at the start of the penalty phase. PPT 15. And because they had not adequately prepared their expert witnesses nor thought through the areas on which their witnesses were likely to be cross-examined or their evidence rebutted, trial counsel opened Mr. Umaña's mitigation up to successful attacks by the prosecution. Had trial counsel been adequately prepared, none of this would have happened.

### B. Trial Counsel's Performance was Deficient

#### 1. Trial counsel's preparation to present mitigating evidence at the penalty phase of trial was inadequate and constituted deficient performance.

Trial counsel were aware that their client would almost certainly be convicted of the capital crime he had been accused of and confessed to. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

40

██████████████████████████████████████████████████

Nevertheless, following full discovery and an evidentiary hearing, at which trial counsel will testify and be cross-examined to answer any factual questions the parties or this Court may have about their decision-making, Mr. Umaña expects to demonstrate that trial counsel's performance in investigating Mr. Umaña's case in mitigation was woefully deficient and failed to meet contemporary professional standards in a host of ways.

These included the following:

Even though counsel appears to have understood the necessity for conducting a complete and broad-based life history investigation and indicated their plan to do so, they nevertheless failed to expand their efforts to interview people who could provide information about Mr. Umaña's early life beyond one person – his father, and confined their investigation about the rest of his life to a narrow set of sources. Many other witnesses, including Mr. Umaña's mother, whose address trial counsel possessed (*see* Appxs. 37, 47), and other close family members and people who knew Mr. Umaña and the family well, were readily available and certainly willing to talk to counsel and talked to the prosecution. Appx. 74; PPT 588; Def. Tr. Ex. 32 (Guatemalan Birth Certificate with interview summary on the back).

It was unreasonable and constituted deficient performance for counsel to fail to require their mitigation specialist to go to Mr. Umaña's mother's address or otherwise ask all the people that were interviewed about Mr. Umaña's extended family or otherwise thoroughly search for other family witnesses and not to rely on Rafael to determine who those witnesses should be or to accept Rafael's representations that other family members and friends would refuse to be interviewed.

It was unreasonable and constituted deficient performance for counsel to ignore the advice of their mitigation specialist to the extent that he advised that he should continue his efforts to find witnesses, instead of relying on the representations made by Rafael, as to the facts of Mr. Umaña's life and the availability of other witnesses to it.

It was unreasonable and constituted deficient performance for counsel to trust that the representations Rafael made about his supportive role in Mr. Umaña's life painted the full picture and to fail to consider that Rafael's historical account might have been self-serving or that his refusal to introduce the defense to any other family member, including refusing an interview with his wife, might have been to protect the favorable account he had given of himself. To the extent that trial counsel was concerned that Rafael was providing inaccurate information and stymying their efforts to find other family members, it was unreasonable and constituted deficient performance for them nevertheless to use him as their only source of information about Mr. Umaña's childhood.[6]

Trial counsel's decision to limit their investigation of Mr. Umaña's life history to one family member, including no one else who knew Mr. Umaña as a young child and otherwise depending on such a small group of lay witnesses, fell outside professional norms for a capital penalty phase investigation in 2010.

It was unreasonable and constituted deficient performance for trial counsel to delay the start of their life history investigation such that they were unprepared to offer any valuable input to convince the Government not to authorize this case to be tried capitally.

---

[6] During the initial May 2009 trip, counsel had reason to believe that Rafael would be an inadequate resource. PPT 521, 525-526. Although Rafael agreed to assist the investigator in finding non-family members, he would not introduce the investigator to Mr. Umaña's family.

It was unreasonable and constituted deficient performance that even after authorization, trial counsel took months to get its investigation into Mr. Umaña's childhood underway, losing precious time to find lay witnesses and prepare expert witnesses, so that the mitigation presentation at trial presented a very different impression of Mr. Umaña's life, family circumstances, challenges and hardships, and factors that affected his later mental and emotional health than could have been presented.

It was unreasonable and constituted deficient performance that even though trial counsel knew the importance of putting on a case in mitigation based on a thorough life-history investigation and knew there were important facts they were still unclear about and people they had not interviewed but were aware of, and even though they had been alerted by their mitigation specialist of his concerns in this regard, they failed to ask the Court for a sufficient continuance so they could complete their investigation.

It was unreasonable and constituted deficient performance that trial counsel failed to put in the time necessary to prepare their mitigation case. Trial counsel did not thoroughly interview and prepare the witnesses they located, so they missed even these opportunities to present a richer case in mitigation to the jury. For example, Monica Reyes, former girlfriend and mother of Mr. Umaña's child, was interviewed by the defense mitigation specialist, but primarily around the area of adaptive deficits and positive mitigation and thus missed symptomology unearthed by post-conviction counsel regarding potential mental health impairments and the poverty in which Mr. Umaña suffered. Declaration of Monica Tatiana Reyes (Appx. 12) ¶¶ 21-22; Def. Tr. Ex. 27.

It was unreasonable and constituted deficient performance that trial counsel failed to give their experts the materials those experts needed to provide opinions at sentencing that were personalized to Mr. Umaña's life experiences rather than general assertions about how someone

43

might have been affected by the life conditions and traumatic events that someone *like* Mr. Umaña *might* have experienced. Moreover, trial counsel failed to prepare their expert witnesses by not giving them adequate and available materials to work with or helping them to meet the cross-examination they were most likely to encounter. Post-conviction counsel has interviewed multiple lay witnesses who would have provided information about the trauma, neglect, poverty, and maltreatment Mr. Umaña experienced during his birth, childhood, adolescence, and young adulthood and have described behaviors consistent with the impairments and functional deficits Mr. Umaña suffered as a result. This, too, constituted deficient performance.

It was unreasonable and constituted deficient performance for trial counsel to have waived the opening argument at the penalty phase, (PPT 15), a critical point at which they could have set the stage for the evidence they were about to present.

### 2. Despite the fact that trial counsel were aware of the need to conduct a thorough and expeditious investigation and knew that doing so for a foreign-born defendant would take considerable time, they delayed most of their investigation for months.

Trial counsel had no strategic basis for failing to conduct a thorough investigation or seeking additional time to investigate and prepare for the penalty phase of the trial that they knew to be necessary here. As the following chronology demonstrates, counsel knew their obligations, knew they needed time to prepare, and intended to put on a full-scale history of Mr. Umaña's childhood, recognizing that such a history was key in mitigation.

By 2008, professional norms made clear that trial counsel has a "continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation or rebuts the prosecution's case in aggravation." ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 10.11(A), (rev. ed. 2003); *see also* ABA Guideline 1.1, history ("[I]t is imperative that counsel begin investigating mitigating evidence . . . *well before* the

prosecution has actually determined that the death penalty will be sought.") (emphasis added); ABA Guideline 10.2, comment. ("[E]arly investigation to determine weaknesses in the State's case and uncover mitigating evidence is a necessity, and should not be put off . . ."); ABA Guideline 4.1, comment. ("[T]he presentation to be made at the penalty phase [should be] integrated into the overall preparation of the case rather than being hurriedly thrown together.").

Initially, trial counsel seemed to understand these obligations. Mr. Umaña was federally indicted on four death-eligible counts on June 23, 2008. Crim. Doc. No. 3. A ████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████████████.

In August 2008, two days after the pre-authorization conference with the government, while working on another case in El Salvador, the trial mitigation specialist met with Mr. Umaña's father. The meeting lasted for at most an hour and a half and was the only undertaking the specialist completed for Mr. Umaña's case on this trip. Trial counsel Bryson had already made his presentation to the Department of Justice, hoping to persuade the Government not to seek death,

on August 11, 2008. Counsel had no mitigation information and was unprepared for the meeting with the DOJ.[7] The Notice of Intent to Seek Death was issued on September 23, 2008.[8]



. Aside from the brief introductory meeting with Mr. Umaña's father, no lay witness interviews were attempted or conducted until May 2009. PPT 518, 520.

[8] Neither Mr. McGough nor any other member of the defense team met with any other potential mitigation witness again until May 2009, when Mr. McGough interviewed one witness in New York City and then returned to El Salvador to conduct several additional interviews – none of whom was family members or neighbors, except Rafael.

46



Despite recognizing the need to (1) develop a thorough investigation, (2) the unique complications involved in the mitigation investigation abroad, and (3) the need to conduct the investigation expeditiously, trial counsel still delayed, waiting until May 2009 to make the first in-depth investigation trip to El Salvador and the first trip of any kind to interview witnesses in New York.

Counsel also did not get an expert to evaluate Mr. Umaña for brain functioning and intellectual disability until July 2009, ███████████████████████████

███████████████████████████████████████

On September 28, 2009, the Court granted a continuance of the October 9, 2009, trial date, setting a pre-trial *Atkins* hearing on November 30, 2009, and a jury trial on April 22, 2010, with jury selection to begin on March 12, 2010. Sept. 28, 2005 Status Hrg. at 13-14, 19. Although repeatedly recognizing their obligation to immediately conduct the mitigation investigation, trial counsel demurred, requesting no further continuances. A frantic and unprepared investigation followed, resulting in a bleak mitigation case. By the start of Mr. Umaña's trial, neither of the

47

attorneys who tried the case nor the investigator working for them had interviewed any family member other than Rafael or anyone who knew the details of Mr. Umaña's childhood.

This constituted deficient performance.

> **3. Trial counsel failed to conduct interviews of family and neighbors who knew Mr. Umaña and his family during his childhood despite having readily available means to approach them.**

Trial counsel had several means of finding and contacting lay witnesses in El Salvador.

### a. *M*r. *Umaña's mother, Leticia Ramirez, and brother, Saul.*

Contact information for Mr. Umaña's mother, Leticia Ramirez, was documented in discovery and produced by the Government early in the case. Appxs. 37, 47. The neighborhood address provided in this document ("Colonia 5 de Marzo") was one at which Ms. Ramirez had lived for 21 years and was the same address at which post-conviction counsel located her. Appx. 10. The documents produced in discovery by the Government included biographical information regarding Mr. Umaña, such as his actual date of birth of November 25, 1982, his father's name, mother's name as "Diaz [first surname] Ramirez [second surname] Leticia [name]," and mother's address at "Colonia 5 de Marzo." Appx. 47. Had counsel searched Colonia 5 de Marzo, they would have seen that this neighborhood only made up a two-block radius in Santa Ana. Appxs. 41, 42.

Mr. Umaña's full brother, Saul Osvaldo Umaña Ramirez, was incarcerated in a Salvadorian prison during the trial. Appx. 22 at ¶2. No one from the trial defense team ever visited Saul. Appx. 22.

### b. *Neighbors who Knew Mr. Umaña as a Child.*

Mr. McGough had other ways of finding members of the Umaña family and neighbors who knew Rafael and Mr. Umaña well as a child. On a four-day investigative trip to El Salvador in August 2009, Rafael took Mr. McGough to see the two specific locations (*mesónes*) where he had

48

lived with Mr. Umaña from the time Mr. Umaña was a young child. Appxs. 36, 38; PPT at 535.

One *mesón* was located near the hospital in San Juan de Dios in Santa Ana. PPT at 535, 537, 538.

Rafael also took Mr. McGough to the second *mesón* where Mr. Umaña grew up, located off the bypass next to a propane business called Tropigas. Appx. 36; PPT at 535.[9]

Mr. McGough could have found several witnesses at these two locations using basic investigation techniques like knocking on doors and going inside the *mesón*es,[10] how post-conviction counsel later found these witnesses.[11] Using this simple technique, post-conviction counsel located and was able to interview several people who provided detailed information about Mr. Umaña's early life, including the following witnesses:

Zoila Olano lived in the *mesón* called Danubio Azul and continues to live on that same street. Appx. 8 at ¶1-2. She met Mr. Umaña when she was about 12 years old, and he was a very

---

[9] Even if Mr. McGough felt constrained from talking to people at the *mesón* because Rafael was with him the first time, Mr. McGough returned to the *mesón* on a subsequent trip in November 2009 with the expert on intellectual disability, Dr. J. Gregory Olley, without Rafael. Dr. Olley, who testified at Mr. Umaña's *Atkins* hearing, would also have benefited greatly from speaking with people who had known Mr. Umaña as a child. Nov. 10, 2010, Atkins Hrg. Trans at 55 (Dr. Olley stating he went to the *mesón* with the investigator and "saw the outside door of the home"); Appx. 28 (Decl. Dr. Olley).

[10] Although counsel knew that Mr. Umaña lived in these two *mesónes* during several years of his childhood, neither the attorneys nor the investigator spoke to any of the neighbors. Appx. 26 (Declaration of Richard McGough) at ¶12.

[11] It is a misnomer to refer to people in the same *mesón* as "neighbors," a term that leaves a misleading impression. The *mesónes* in which Mr. Umaña grew up were one-story buildings with roughly 18 rooms, one room per family, only a few of which open to the street. Within the *mesón*, all the families shared a bathroom, shower, and washing area. Appx. 5 at ¶2. Some of the rooms within these *mesónes* did not even have walls that reached the sheet metal roof. As a result, everyone living in the *mesón* knew everyone else in a starkly intimate fashion. The people in Mr. Umaña's childhood *mesónes* were not neighbors in the sense that most Americans would think of them; they all knew Rafael and Mr. Umaña and the nature of the relationship between them.

49

young boy who had just come to live in the *mesón* with his family after living in Guatemala. *Id.* at ¶3. She described the poor living conditions, the poverty, and the violence in the *mesón*. Olano remains in touch with members of the Umaña family and could have helped introduce trial counsel to additional witnesses. *Id.* at ¶12.

Ana Julia Magaña de Sanabria, an elderly woman who has lived in her home across from the Danubio Azul for 30 years, provided post-conviction counsel with mitigating evidence. Appx. 13. Ana Julia continues to have contact with the Umaña family and could have assisted counsel in finding additional witnesses. *Id*. at ¶9-10.

Zoila Angelica Soriano is a nurse who lives two doors down from the Danubio Azul and has lived in that home for 20 years. Appx. 14 at ¶1, 4. She knew the Umaña family, including Mr. Umaña and his father and described for post-conviction counsel seeing members of the Umaña family with obvious mental impairments. *Id.* at 14. ¶ 5, 7.

Vilma Araceli Salazar de Argueta ("Araceli") lived in the *mesón* by the bypass for over 30 years. Appx. 1 at ¶31. For several years, including pretrial, Araceli set up tables outside the *mesón* facing the street. *Id.* at ¶7. She is there Monday through Saturday, selling breakfast and lunch. *Id.* Araceli's tables are in the picture that was in trial counsel's possession before the November 30, 2009 *Atkins* hearing, yet they inexplicably failed to interview her. Appx. 39 at p.1. When the post-conviction team first approached her, she was sitting outside the *mesón* at one of her tables selling food. When asked if she knew Mr. Umaña, she burst into tears since she had been desperately waiting to hear information about his case. Appx. 1 at ¶28. Had someone from the defense approached her, Araceli would have provided a rich history of Mr. Umaña's childhood, including utter neglect by his father, malnutrition, abuse, and his struggles in learning. *Id.*; *see also* Appx. 230 (Supplemental Decl. of Vilma Araceli Salazar de Argueta).

50

Vilma Elizabeth Torres de Cruz ("Vilma"), Araceli's mother, was also available and willing to talk to the post-conviction team about the extreme poverty in the *meson* and the violent and chaotic Umaña family. Appxs. 4, 5. She reported that Mr. Umaña's father was a drunk and a drug addict, who beat Mr. Umaña and deprived him of food as punishment. Appx. 4 at ¶11,14*; see also* Appx. 228. Rafael also abused his young partner, Yanira, who was approximately five years older than Mr. Umaña. Appxs. 1, 4, 36. Vilma could have also helped trial counsel find Mr. Umaña's mother and other family members.

Vilma's son, Melvin Cruz Torres, was born the same year as Mr. Umaña (in 1982) and was a friend. Appx. 2. He, too, was available and willing to talk to the post-conviction team about the store Rafael owned, which was within the cramped, approximately eight meters by eight meters (the equivalent of about 689 square feet) room that Mr. Umaña shared with his father and stepmother. He could have described Mr. Umaña's living conditions. The room stunk of feces from the rabbits the father raised and the pigeons he lured in. *Id* at ¶ 6,7. When Melvin's mother could, she gave Mr. Umaña a tortilla or some beans to eat because he was constantly without food *Id*. at ¶11. Melvin and Mr. Umaña saw horrific war violence, including lined up bodies that were "swollen, inflated, half-eaten by worms, on some of them you could see their ribs, or the bones in their faces." *Id*. at ¶16. Unlike Melvin, who grew up in extreme poverty but had a mother who looked after him, Mr. Umaña had no one and was more susceptible to joining a gang to survive.

Vilma's youngest daughter, Roxana Cruz Torres, also witnessed the physical abuse Mr. Umaña suffered at the hands of his father and was available and willing to talk to post-conviction counsel about what she knew about the Umaña family. Appx. 3. She had also witnessed the father selling drugs out of the *mesón* and being constantly drunk and drugged. *Id*. at ¶12-13.

51

Mr. Umaña's neighbor and friend, José Wilfredo Herrera Calderón, saw Mr. Umaña share a room with his father and teenage stepmother. José Herrera described Mr. Umaña's father "as loud, violent, a drunk, [who] gambled and got into fights." Appx. 219, Declaration of José Wilfredo Herrera Calderón. Mr. Umaña told José that he believed his father beat him for the sake of beating him. *Id* at ¶2. José's sister, Karla Herrera Calderón, saw Mr. Umaña struggle with simple academic work and repeatedly mess up a simple task of picking coffee beans. Appx. 220 at ¶ 4-6, Declaration of Karla Herrera Calderón.

Next door to the second *mesón* in which Mr. Umaña grew up, by the bypass, is a tire shop owned by Luis Martir Monroy. Appx. 7. Martir's family has always owned the *mesón* and the tire shop. He was available and willing to talk to post-conviction counsel and described Mr. Umaña as a neglected child, raised by a man with a horrible temper and a drug addict and dealer. *See also* Appx. 109 (Declaration of Roxana Marisol Ramírez neighbor also describing Mr. Umaña's childhood at the bypass *mesón*).

None of these readily available neighbors was contacted by any member of Mr. Umaña's defense team before trial. Had they been contacted, they would have been willing to share what they witnessed with the defense, testify to the matters described above, and introduce the defense team to family members other than Rafael.

### c. *Other Family Members.*

Several neighbors and Mr. Umaña's mother, Leticia Ramirez (as mentioned above), had contact with the Umaña family at the time of trial and would have been willing to put the defense team in contact with them. Had counsel done an adequate investigation or even thoroughly reviewed the discovery they possessed (*see* Appxs. 37, 47), they would have been able to talk to several members of his family who could have described multigenerational trauma as well as Mr.

52

Umaña's impaired functioning and childhood rife with poverty, abuse, neglect, and loss. All these witnesses and more were available before trial and would have been willing to speak to the defense team. These witnesses include:[12]

- Mr. Umaña's paternal grandmother, Ana Ruth Umaña Gonzalez, has been selling candies on the street at the corner of Avenida Independencia and 4a Calle Poniente in the center of Santa Ana for the past 20 years. Ana provided the post-conviction team with a generational history of poverty, hunger, abandonment, and violence. Contrary to the evidence reported by Rafael and presented at trial, she did not take responsibility for helping raise Mr. Umaña. Appx. 16.

- Paternal Aunt Reina Umaña provided the post-conviction team with relevant information regarding Mr. Umaña's intellectual deficits, including the fact that although her son, Geovanni, was born the same year as Mr. Umaña, he was several years ahead of him in school because Mr. Umaña repeated grades often. Appx. 19 at ¶15-17.

- Paternal Aunt Rosa Lilian Umaña Gonzalez described for post-conviction counsel Mr. Umaña's complete sense of bereavement and abandonment after her mother Francisca, Mr. Umaña's great-grandmother, passed away. Appx. 21 at ¶14.

- Paternal Cousin Lilian Tino lived in the Danubio Azul at the same time as Mr. Umaña; she explained that while the Umaña family was very poor, Mr. Umaña was worse off because after Francisca passed away, he had nothing. Appx. 15.

- Paternal Cousin Ronal Umaña, who now lives in Los Angeles, lived in the same room with Mr. Umaña in both the Danubio Azul and bypass *mesónes* and described the abuse and neglect to which Mr. Umaña had been subjected, as well as the abuse Rafael had subjected Mr. Umaña's mother to. He, too, explained how devastating Francisca's death was to Mr. Umaña. Appx. 20.

- Paternal Aunt Maria del Carmen Umaña Gonzalez, who now resides in Anaheim, described her father as an alcoholic who died young from an

---

[12] Significantly, and as will be discussed more fully in the discussion of the prejudice prong of this claim below, the accounts given by all these witnesses would have dramatically changed the picture of Mr. Umaña's childhood from that given by Rafael and provided a far more compelling case in mitigation.

alcohol-related illness. Appx. 17.

- Maternal grandfather Jose Alfredo Ortiz described his maternal abandonment and maltreatment. He explained that his son Saul was killed as a teenager by the death squads during the civil war and his own alcoholism. Appxs. 9, 225.

- Second cousin Edwin Esau Umaña described the family's circumstances in Escuintla, Guatemala, when Mr. Umaña was born, including Mr. Umaña's childhood sickness and their proximity to fertilizer warehouses and agricultural fields. Appx. 105b.

- Second cousin Gerardo Arriola Umaña described his family's poverty and the traumatic events they experienced during the war. He further explained the psychological problems that he and other family members suffer as a result. Appx. 107.

- Paternal Aunt Dora Umaña also described the family's living conditions in Escuintla when Mr. Umaña was born and his illness as a baby, including several months in which he was so ill that the family was concerned he was going to die. Appx. 111.

Trial counsel's failure to talk to these and other readily available and willing witnesses constituted deficient performance.

### d. Luis Ramos

Trial counsel could also have interviewed and obtained evidence supporting Intellectual Disability and mitigation from Mr. Umaña's Los Angeles codefendant, Luis Mario "Chipis" Ramos Mendez. The Los Angeles District Attorney convicted Mr. Ramos for the Fairfax homicides. Once incarcerated, the prosecutor in Mr. Umaña's case brought Mr. Ramos to North Carolina and tried to coerce him into testifying against Mr. Umaña. Mr. Ramos refused. Two Mara members beat Mr. Ramos up in the North Carolina jail. The prosecutor told the jury that the beating came from an order by Mr. Umaña, PPT at 898, even though, before trial, Mr. Ramos told the prosecutor that the beating had nothing to do with Mr. Umaña; the Mara members were just following the rules of the gang. Appx. 112 at ¶49. Mr. Ramos wanted Mr. Umaña's trial team to

54

talk with him in North Carolina. He would have helped with Mr. Umaña's investigation and trial. *Id.* at ¶53.

Mr. Ramos could have provided trial counsel with critical information, described in more detail below (section B.3.d) from Mr. Ramos's experiences attending night school with Mr. Umaña in El Salvador, traveling with him from El Salvador to the United States, and living with him in Los Angeles. Appx. 112. Trial counsel's failure to talk to Mr. Ramos constituted deficient performance because, had he been contacted, he would have been willing to tell them all the information in his declaration. *Id.* at ¶53.

### 4. Trial counsel failed to adequately prepare and present the little information that they did obtain during their mitigation investigation.

Even with the little information trial counsel did find, they failed to adequately interview witnesses and present mitigating evidence.

A video interview of Monica Reyes, Mr. Umaña's girlfriend in El Salvador and mother of his first child, was presented at trial. Def. Tr. Exh. 27. The interview was superficial, describing a young boyfriend-girlfriend relationship. Monica explained that she became pregnant at 16 and that Mr. Umaña helped her financially but left her soon after the birth of their son to come to the United States. *Id.* For many, such a story might be seen as a sign of Mr. Umaña's failure to take responsibility for his family rather than as mitigation.

Monica Reyes could have provided real mitigation, however. She could have described the extreme level of poverty in which Mr. Umaña lived at that time, the abuse he suffered, the signs and symptoms of his mental illness he was displaying at the time (seeing and hearing demons, for example), and his apparent intellectual deficiencies – all of which she described to post-conviction counsel and was willing to describe to trial counsel, had they inquired. Appx. 12.

She explained, for example, that when she knew Mr. Umaña, he was living in a tiny room with at least ten men where only one bed fit. *Id.* at ¶4. Although she was very poor and barely had food to eat herself, Mr. Umaña had even less, so she gave him rice and beans when she could. *Id.* at ¶3.

She described Mr. Umaña as unable to learn. *Id.* at ¶10. Although she was younger than him, she tried to teach him to read and write, but he was never any good at it. *Id*. at ¶9-10. Monica witnessed Mr. Umaña seeing things that no one else could see. She stated he "would tell me he saw demons and that they talked to him. I would make fun of him and tell him he was crazy because he had fallen out of a mango tree." *Id*. at ¶13.

Of equal significance, Monica provided the post-conviction team with her son's February 2004 certification of birth, which shows that Mr. Umaña was born in Guatemala in 1982. Appx. 12 at ¶6 & attachment. She explained to post-conviction counsel that Mr. Umaña had not been able to register their son's birth initially because he did not have a Salvadoran identification, which was why he had gotten a supplemental birth certificate – to enable him to get the identification card. *Id.* at ¶20. This would not have only provided context for Mr. Umaña getting a supplemental birth certificate but also put counsel on notice that he was born in Guatemala in 1982.

As with Ms. Reyes, counsel also failed to develop all readily available evidence from Wendy Alvarez, the mother of Mr. Umaña's other son, ███. In the penalty hearing, mitigation specialist Richard McGough testified and presented ███ birth certificate. PPT at 583, Def. Tr. Ex. 30. Mr. McGough spoke with ███ mother, Wendy Alvarez (who gave him the birth certificate), but he did not relay any of her experience with Mr. Umaña to the jury. When arrested, Mr. Umaña gave the address of her family home as his address. Appx. 269. Ms. Alvarez knew Mr. Umaña from late adolescence until he got arrested for this case and could have testified regarding

the quiet and happy times he spent trying to provide for his family away from MS-13. *See* Appx. 239, Declaration of Wendy Alvarez.

### 5. Trial counsel failed to adequately investigate Mr. Umaña's place and year of birth.

Even without contacting any of the above witnesses, many of whom knew that Mr. Umaña was born in Guatemala in 1982, trial counsel knew, or should have known, that Mr. Umaña was born in 1982 and questioned the location of his birth. Documents provided in discovery suggested Mr. Umaña was born in 1982. Appx. 46 at 4; Appx. 47 at 146 (PNC background, documenting the 1982 birth date). Moreover, when trial counsel could not locate a birth certificate in El Salvador, it would have been reasonable, given the tumultuous political landscape in El Salvador at the time of Mr. Umaña's birth, for counsel to have investigated further. Had counsel done so, they could have learned that Mr. Umaña's birth was registered in Guatemala. Appx. 36 at p. 2.

Aside from speaking to several of the above lay witnesses, trial counsel could have, but did not, seek the assistance of the Guatemalan Government to confirm the details of Mr. Umaña's birth, which were readily available. Post-conviction counsel received a certified copy of Mr. Umaña's registration of birth in Guatemala on November 25, 1982, leaving no doubt about where and when he was born. Appx. 43.

Failing to confirm the date and place of Mr. Umaña's birth, given the clues counsel had that existing information about his birth was inaccurate, constituted deficient performance. Trial counsel knew they were litigating an *Atkins* claim, where the defendant's age is of paramount importance. An Intellectual Disability showing requires proof of adaptive deficits within the developmental period. Mr. Umaña's age was integral to establishing when his developmental period ended.

The fact that Mr. Umaña was two years older than the trial team realized was also important in demonstrating his intellectual and adaptive deficits to prove his intellectual disability. For example, although the trial investigator interviewed a current principal at Centro Escolar Santa Ana California, where Mr. Umaña went to school as a child, about his school records, the principal answered the investigator's questions under the mistaken belief that Mr. Umaña was two years younger than he had been when he repeatedly failed to pass the third grade.

Post-conviction counsel could then go back and speak to a teacher, Ana Gladys Magaña, who has been at the school since Mr. Umaña was there. Appx. 6. Viewing his school records and knowing that he was actually two years older, Magaña could explain how highly unusual it was that Mr. Umaña had failed at that age. *Id.* at ¶19. As Magaña pointed out, it would also have been embarrassing for a 12-year-old child to be trying and failing third grade, surrounded by much younger children. *Id.* at ¶18. *See also* Appx.106, Declaration of Carlos Alcides Peraza.

Given that counsel believed Mr. Umaña was intellectually disabled and intended to (and did) put on an *Atkins* hearing, it was objectively unreasonable for them to fail to confirm their client's true date of birth when confronted with information tending to show he was two years older than they thought. As demonstrated below and in Claims II, III & IV, the failure to track down his actual date of birth was highly prejudicial.

### 6. Trial counsel failed to collect readily available records.

Trial counsel's failure to collect readily available records relating to Mr. Umaña's life and childhood constituted deficient performance. Records prepared contemporaneously with the events they document typically provide the best, surest, and least questionable means of demonstrating facts. Such documents also often contain information and clues as to other information a defense team will want to pursue.

Some of the many documents trial counsel failed to request and collect before trial included:

- Mr. Umaña's Guatemalan Registration of Birth (Appx. 43);

- Death records for Great-grandmother Tomasa Gonzalez Chicas (Francisca), which showed she died in 1991 from stomach cancer (Appx. 33);

- Death record of maternal uncle Saul Ramirez that showed he died from bullet wounds at age 14 (Appx. 34);

- Death records of paternal uncle Alejandro Antonio Umaña Cortez (Appx. 35);

- Death record of paternal cousin Henri Geovanni Ayala Umaña (Appx. 32);

- School records of Henry Geovanni Ayala Umaña, who was born the same year as Mr. Umaña but was three years ahead of him in the same school (Appx. 30).

Each of these records would have provided information that could have been used as mitigation at trial. Each of these records would also have opened a vein of inquiry that would have led to additional mitigating evidence.

**7. Trial counsel failed to file specific, formal discovery requests relating to the Government interviews of Mr. Umaña's family, failed to seek mitigating evidence and information about the whereabouts of potential mitigation witnesses, and failed to use the little they learned from the Government as the impetus to renew and enlarge their own search for mitigating evidence.**

On June 14, 2008, days before the federal indictment was issued, the Government had in its possession Mr. Umaña's birth certificate stating he was born in Guatemala in 1982. Appxs. 44, 46, 47. The prosecutors and the FBI agents involved in the case went to El Salvador in February of 2009 and interviewed Mr. Umaña's mother, Leticia Ramirez, and attempted to interview his father, Rafael. Appx. 48. The Government waited until the eve of trial to produce this information. Specifically, on March 9, 2010, days before jury selection, the Government produced an FBI 302

59

only stating that they had spoken to Mr. Umaña's mother. *Id*. On April 19, 2010, during the trial, the prosecution produced Mr. Umaña's Guatemalan birth certificate and a brief narrative describing the family's move to Guatemala and Rafael's use of false identification to register Mr. Umaña's birth. Appx. 44.

Although counsel knew, or should have known, before trial that the Government had information in its possession that would have assisted the mitigation investigation (*see* Appx. 26, ¶7), they failed to file a formal discovery motion. Trial counsel learned that the prosecution was already conducting their own investigation into Mr. Umaña's life history in El Salvador, sending FBI agents and local police to interview Mr. Umaña's family. Crim. Doc.689-1. Additionally, FBI Agent Attard had located and interviewed co-defendant Manuel "Chacua" DeJesus in prison in El Salvador in May 2008. *United States v. Ayala*, 08-cr-134-RJC (WDNC), Trial Trans, 01/13/10 at 38. Trial counsel should have requested any mitigating information collected from co-defendants. Further, the interview of Chacua indicates that the Government was probably aware of the mitigating information that Mr. Umaña's brother, Saul Umaña, was incarcerated in El Salvador at the time. *See* Appx. 74 (prosecutor's email noting that Mr. Umaña's mother admitted visiting Mr. Umaña and his brother in jail).

Trial counsel was aware that the FBI had interviewed Mr. Umaña's mother. Even after advising the Court of the interview with the mother and contact with the father, trial counsel did not file a specific discovery motion requesting this information. Crim. Doc. 689.

Moreover, during the November 30, 2009, *Atkins* hearing, trial counsel suspected that the Government had mitigating evidence regarding Mr. Umaña's family. Specifically, during a break, a prosecutor looked at a picture of Mr. Umaña's father and told trial counsel that the father was a

60

drug dealer. Appx. 49. On December 17, 2009, counsel emailed the prosecution and asked about this:

> [The AUSA] told me that our client's father was a drug dealer in El Salvador. We have not come across any indication of this in our review of discovery. We believe that such information in possession of the Government must be disclosed to the defense as it is potentially mitigating for the sentencing phase. For example, if our client was raised in an environment where his father was dealing drugs or was made to participate in same, this would be mitigating.
>
> The court's discovery order would require disclosure of such information to the defense as it would be "favorable to the accused and material either to guilt or to punishment". Therefore, we request disclosure of any material possessed by or known to the Government tending to show that Defendant's father is or was a drug dealer or was otherwise involved in criminal activity.

*Id.*

In response, one prosecutor stated that she did not "know that we have any evidence of such, more or less talk," but she did know that the father sold trinkets in the center of town and that Mr. Umaña's brother was in prison. *Id*. Another prosecutor responded that it "was rumored that he had sold drugs and that is the full extent of my knowledge on the subject. You have all discovery and reports that would shed any light on the subject." *Id*. Despite the Government claiming these were rumors, trial counsel should have filed a specific discovery motion to ensure they had all available documents in the Government's possession and all the information the Government had obtained. The fact that the prosecutor revealed that she had personal knowledge about the father as an offhand remark made during a break in court, as opposed to through a formal discovery mechanism, should have raised red flags that any informal disclosure would be less than complete. The singular 302 that was ultimately disclosed on the eve of trial regarding the Government's contact with Ms. Ramirez documented that two WDNC Assistant U.S. Attorneys, a Main Justice attorney, and an FBI agent all traveled to El Salvador to investigate in preparation for this trial. Appx. 48. Yet, the 302, which is just one page long, merely documents the identity

61

of the persons they spoke to. *Id.* It is inconceivable that so many federal prosecutorial authorities, including an FBI agent, would have traveled to El Salvador to conduct these interviews, yet nothing substantive was memorialized. Indeed, following full discovery and an evidentiary hearing, Mr. Umaña expects to demonstrate that FBI policy would have required documentation of the substance of the interviews and the retention of the agent notes. *Cf.* Legal Handbook for Special Agents, Printed 08/20/2003 at §7-13, Retention of Interview Notes (noting that an FD-302 is required "where the results of the interview may become the subject of court testimony"; also in such circumstances original notes must be maintained.).

Equally importantly, once the defense team had reason to believe that the Government had located Mr. Umaña's mother and spoken to her; had discovered that Mr. Umaña had been born in 1982 in Guatemala; had raised the specter that Rafael was a drug dealer; and that Mr. Umaña had a brother in prison in El Salvador; the team had a duty to pursue these leads further and performed deficiently when it failed to do so. Given that much of this information appeared to undermine Rafael's credibility, the team performed deficiently when it failed to search for additional witnesses who might be able to corroborate or provide a more accurate picture of Mr. Umaña's life than the one Rafael had painted.[13]

---

[13] Although the Government knew about Mr. Umaña's birth, they did not attempt to correct false information presented and relied upon during the *Atkins* hearing and the penalty phase of trial. *See* Claim VII.

C. **Trial Counsel's Failure to Adequately Investigate and present abundant, readily available mitigating evidence resulted in prejudice.**

1. **The contrast between the mitigation case the defense did put on and the mitigation case the defense could have put on was stark.**

a. *The mitigation evidence presented at trial.*

During the penalty phase of trial, the defense put on both lay and expert witnesses. The lay testimony consisted of video-recorded interviews with four witnesses. None of them could report about Mr. Umaña's daily life until he was about 15. The trial team mitigation specialist, Richard McGough, also testified. PPT at 513. Because Mr. Umaña's father, Rafael, had refused to testify in person at trial or to provide a video-recorded interview, Mr. McGough testified to the information he had learned from Rafael. PPT at 521.

Accordingly, the narrative the jury heard about Mr. Umaña's life from birth through age 15 consisted only of the accounts Rafael had provided. *See* Appx. 36 at ¶4. These were conveyed to the jury by the mitigation specialist.

Mr. McGough testified, based on what he had "learned" from Rafael, that Mr. Umaña was born in 1984 in El Salvador. PPT at 533. He provided no details about Leticia's physical condition, drug use while pregnant, prenatal nutrition or care, or any of the circumstances of the baby's delivery. He provided no information about the care Mr. Umaña received in the first months after birth.

Mr. McGough described that (according to Rafael), Leticia abandoned Rafael and Mr. Umaña, choosing to raise her other child by Rafael (Saul), but not young Mr. Umaña. PPT at 521-524. According to this account, Rafael had cared for Mr. Umaña and ensured that Mr. Umaña had mother-like figures in his life, like Rafael's own grandmother, Francisca, and after her death, other close female relatives. (The latter was not true, according to these female relatives who were

63

later interviewed by post-conviction counsel and confirmed Mr. Umaña was not cared for by any other family member.) Appxs. 15, 16, 17, 21 ¶14.

Relying on Rafael's descriptions, Mr. McGough told the jury that during Mr. Umaña's childhood, his father owned a small store, but he had been raised in poor conditions, describing those conditions as having been much like the conditions of other people around them. PPT 532-537.

Relying on Rafael's descriptions, Mr. McGough testified that Mr. Umaña was scared as a child because of the ongoing civil war in El Salvador, because Mr. Umaña had seen a dead body, and because Rafael insisted on locking everyone in his family into their room in the evening to keep them all protected. PPT 540-541.

Relying on Rafael's descriptions, Mr. McGough testified that Mr. Umaña had suffered two head injuries and that Rafael remembered running to the hospital next door with Mr. Umaña in his arms, that Mr. Umaña had required stitches, and that, after the fall, Mr. Umaña began having very bad headaches. He provided no additional details. PPT 537-539.

This was the sum and substance of the personal account of Mr. Umaña's entire childhood.

The remaining mitigation witnesses, whose testimony was presented in the form of videotaped interviews, testified that Mr. Umaña had worked diligently as an assistant to Coca-Cola delivery men for a few dollars a week and later had worked on a construction project, helping to build foundations for cell towers. Two witnesses, with whom Mr. Umaña lived while working on the cell-tower project, described him as generous and respectful. Def. Tr. Exhs 23.

As noted earlier, the video interview with Mr. Umaña's first girlfriend, Monica, focused on the fact that she and Mr. Umaña had been adolescent boyfriend and girlfriend, that she had

become pregnant with their child, that he had helped her financially for a period, but had then left for the United States and had left her and their child behind. Def. Tr. Exh. 27.

### b. *The case in mitigation the defense could have put on*.[14]

#### i. *In utero development, exposure to physiological assaults, difficult birth, loss of mother, and early exposure to familial violence.*

At trial, no witness provided mitigating evidence about problems that might have affected Mr. Umaña's development *in utero* or early infancy. Leticia, and other family members, could have provided the following account of this period of his life:

In 1982, at the time of her pregnancy with Mr. Umaña, his mother, Leticia, was living a life of destitution with Rafael and other members of the Umaña family in Guatemala. Appxs. 10, 217, 218.[15] *See also* Appxs. 105b, 111 (Decls. of Edwin Esau Umaña and Dora Umaña, describing conditions in Guatemala). The Umaña family "suffered greatly" in Guatemala, relying on handouts

---

[14] The mitigation evidence presented below is drawn from the declarations and other materials attached Appxs. 1-22, 30-35, 40, 44-45, 50-51 105b-07, 109-113, 217-30, 239, including of: Leticia Ramirez Diaz (Mr. Umaña's mother) – Appxs. 10, 217-18; Saul Osvaldo Umaña (brother) – Appx. 22; Ronal Umaña (paternal cousin)– Appx. 20; Zoila Olana (former neighbor) – Appx. 8; Monica Tatiana Reyes (former girlfriend) – Appx. 12; Melvin Cruz Torres (former neighbor) – Appx. 2; Lilian Tino (paternal cousin) – Appx. 15; Ana Julia Magaña de Sanabria (educator)– Appx. 13; Vilma Araceli Salazar de Argueta (former neighbor) – Appx. 1; Rosa Lilian Umaña Gonzalez (paternal aunt) – Appx. 21; Vilma Elizabeth Torres de Cruz (former neighbor) – Appx. 4; and Roxanna Torres Cruz (former neighbor) – Appx. 3. Mr. Umaña expects to present evidence consistent with this evidentiary proffer at a hearing. The case that could have been put on through lay witnesses and records follows. All this information could also have been used to great advantage to inform the opinions of the *Atkins* and other experts, who could have explained how this compelling life history would have had significant consequences for Mr. Umaña's later mental health. *See* Claims II, III, and IV, *infra*.

[15] Before meeting Rafael, Leticia grew up with torture and abuse from her alcoholic father and an overwhelmed mother to the degree that she left home at eleven. By thirteen, she was drugged and raped. At fourteen, she was pregnant by a fifty-year-old man. She met Rafael when she was pregnant and started a relationship with him after bearing her first child. Appxs. 10, 218. *See also* Appxs. 9, 225 (Decl. Jose Alfredo Ortiz) (Leticia's father, describing his chaotic upbringing and the dysfunctional environment in which Leticia was raised).

for food, often moving from shack to shack, sometimes with nothing more than a hole in the ground "for our necessities." They went hungry, slept on a borrowed truck tarp on the ground, and lived near "enormous" fertilizer warehouses. Appx. 105b at ¶12, 14, Declaration of Edwin Esau Umaña.

Rafael, then Leticia's common-law-husband, beat her at least once a week. Appx. 10 at ¶46. He took her to the train tracks or nearby fields for the beatings and punched her so much in the face that she looked like a monster. At Rafael's insistence, she began to prostitute herself during her pregnancy. *Id*. at ¶ 44. She traveled with Rafael's aunt and mother to Guatemala City, where the aunt found a private house so men could meet them there. Leticia gave all the money she earned to Rafael. Appx. 10 at ¶40.

Rafael would not countenance Leticia complaining, even when he brought other women home and had sex with them in front of her. *Id.* at ¶45. If she protested, he yelled and beat her. Rafael kept her drugged much of the time on Rohypnol (date rape) pills. Leticia believed he liked her to be helpless and drugged.

Leticia also self-medicated. She smoked marijuana so regularly and consistently that eventually, she could not do anything even washing clothes without first smoking. *Id.* at ¶48. Adding to Rohypnol and marijuana, Leticia regularly binge-drank alcohol while pregnant with Mr. Umaña. Three or more times a week, she would drink until drunk, often drinking eight or more beers at a time. She only stopped this destructive behavior when she was around seven months pregnant. *See* Declaration of Leticia Ramirez, Appx. 218 at ¶3-5.

Leticia was constantly hungry during her pregnancy. She ate anything she could find – green bananas from the nearby fields, little fish out of the pond, and cauliflower leaves she gathered in the market. Appx. 10 at ¶51.

Around the time she became pregnant with Mr. Umaña, she contracted malaria, became very sick, and had a high fever for days. *Id.* at ¶41. Even when not sick, Leticia reports a pregnancy fraught with great hardship, anxiety, sadness, and hunger. *Id.* at ¶52. Eventually, she was so desperate to escape Rafael that, even carrying her unborn child, suicide seemed her only option. So isolated was she from any family or friends that her suicide note was a request scrawled on the back of a random photograph begging someone please tell her mother she had died. Appx. 10 at ¶41.

Leticia forced herself to eat *Gamexane* tablets, an insecticide, hoping it would kill her. It did not. She was found and taken to the hospital, where her stomach was pumped and she was released to Rafael's care. Appx. 10 at ¶41-42; *see also* Appx. 40. Rafael and his family threw her out of their home, so for several nights still recovering from her ingestion of insecticide and amid pregnancy she slept on top of a grave in the local cemetery. Appx. 10 at ¶43.

At the time of Mr. Umaña's birth, he was in breach position, head up instead of down. Despite being warned of the dangers to her child a breach-birth posed, Leticia refused delivery by Cesarean section. The medical staff tried, unsuccessfully, to squeeze her abdomen to try and change his position, but he was born feet-first. Appx. 10 at ¶52-53. Leticia remembers that her baby had swallowed liquid in the birth canal that had to be removed with a suction bulb. *Id.* at ¶53.

The 18-year-old Leticia was still living with Rafael's family – having been allowed to return to the home after the sin of attempting to kill herself – when Mr. Umaña was born. Appx. 10 at ¶ 53. Despite her drug use (voluntary and otherwise), binge drinking, and suicide attempt, she tried her best to breastfeed her newborn. Just five days after giving birth, Rafael's family forced her to stop breastfeeding, denying her "permission" to feed her baby and instead making her spill

her breast milk on the ground rather than saving it for the baby. Appx.10 at ¶55. Instead, the family gave the newborn Alejandro rice water and a very cheap mix of flours. Appx. 15 at ¶4.

At the age of three months, Mr. Umaña developed a skin condition. Appx. 10 at ¶56. He broke out in red blotches, which kept getting bigger until all his skin had turned red. He looked skinned and raw. Leticia took him to the hospital, where they took samples of his skin, but when they failed to provide her with any explanation or treatment, she took him to a woman who instead told her the baby had the evil eye. The woman gave her some herbs to bathe Mr. Umaña in, and he eventually improved, but his recovery took months. *Id.*

During her pregnancy and immediately after, Leticia and her child lived in a "horrible," "dark and scary" room. *Id.* at ¶ 58. It was a small room, and she and the baby did not have that to themselves. Instead, they slept in the back of the room, partitioned off from the rest of the family. Appx. 10 at ¶ 58. There was no electricity, and the only sources of water were a ravine next to the building through which a river ran and a well behind the house. The bathroom was outside. *Id.* at ¶ 58.

According to Leticia, Rafael threw Leticia out of the family home/room when Mr. Umaña was eight months old. Rafael forbade her from taking young Mr. Umaña with her, but she left anyway out of sheer terror. Initially, Rafael occasionally brought the baby around to see Leticia, who was pregnant with their second child. After several months, however, Rafael told her she could no longer see her son. When she begged Rafael to let her see Mr. Umaña, he beat her. *Id.* at ¶ 61.

Leticia sought refuge with a woman named Maria, with whom she lived with her second child with Rafael, Saul. Leticia left Guatemala when Saul was about eleven months old and returned to El Salvador to live with her parents. *Id.* at ¶ 62-63. The Umaña family, including Rafael

68

and young Mr. Umaña soon followed, *id.* at ¶ 64, but the forced separation between mother and son continued.

In Leticia's absence, Mr. Umaña was raised by Rafael's elderly maternal grandmother (Mr. Umaña's great-grandmother), Tomasa Gonzalez Chicas ("Francisca"). Appxs. 10, 18, 20. Mr. Umaña's cousin, Ronal, who was eight years older than him, also lived with them. Appx. 20. The three, plus Rafael, all lived together in the same single room. Francisca seems to have done her best to take care of the two young children, but they rarely had enough money for food. As an infant, Mr. Umaña's diet consisted of rice water, and occasionally, a mixture of cheap flour. Appx. 15 at ¶4; Appx. 20 at ¶26.

While refusing to allow Leticia access to Mr. Umaña, Rafael nevertheless often sought her out when he needed money, bringing Mr. Umaña along. Appx. 20 at ¶20. If Leticia hesitated or refused to give him money, Rafael punched her in the face until she relented. Cousin Ronal was present when this happened and recalled the terror on Mr. Umaña's face as he tried to shield himself from witnessing these violent beatings. Ronal recalls Mr. Umaña burying his face in his hands, repeating over and over that he did not want to see this. Appx. 20 at ¶20.

This powerful mitigation would likely have evoked the juries sympathies as they came to understand Mr. Umaña's introduction into life. Armed with this information, trial counsel could also have enlisted the aid of pre- and perinatal experts to explain the likely physical effects of physiological assaults Mr. Umaña suffered *in utero* and as a young child and of the emotional and cognitive effects of believing he had been abandoned by his mother and seeing his father punch her in the face while he watched. Dr. Andres Lugo, M.D., M.P.H., M.S., FACMT, a toxicologist with knowledge of rural Central America, investigated the toxicological impact of alcohol, marijuana, Rohypnol, pesticide poisoning, fertilizer poisoning, and general lead poisoning on Mr.

69

Umaña's gestation and development. He concluded that any or all of these toxic events during gestation and the developmental period are entirely consistent with, and are possible causes of, the brain damage so readily identified by the numerous neurological tests and brain scans of Mr. Umaña. Appx. 212, Declaration Dr. Lugo. Dr. Ruben Gur, a psychologist with particularized expertise in neuroimaging and the biological bases of behavior, similarly confirms that the reduced metabolism in the corpus callosum that is apparent on scans of Mr. Umaña's brain is consistent with fetal exposure to alcohol and other toxins. Appx. 29 at 3, Neurobehavioral assessment by Dr. Gur; *see also* Appx. 242 (Dr. Gur report of MRI findings, noting "The corpus callosum findings, along with the low white matter volume overall, may also be consistent with fetal alcohol spectrum disorders or exposure to other teratogenic substances.").

Dr. Julian Davies, M.D., specializes in identifying and treating Alcohol-Related Neurodevelopmental Disorder (ARND). Based on his review of relevant records and other data including reports of Mr. Umaña's mother's history of drinking during his gestation, Mr. Umaña's severe functional brain impairments, and photographs of Mr. Umaña from his childhood Dr. Davies has provisionally opined that Mr. Umaña suffers from Static Encephalopathy/Alcohol Exposed, also known as Alcohol-Related Neurodevelopmental Disorder. Appx. 211, Declaration of Dr. Davies. As Dr. Davies will explain at a hearing, the resultant brain injuries to individuals such as Mr. Umaña, who were exposed to alcohol *in utero* are variable but can include severe functional limitations in many types of cognitive and emotional processes such as "lower IQ, ADHD (attention deficit/hyperactivity disorder), difficulties with judgment and impulse control, language and social difficulties, learning disabilities, visuospatial deficits, motor and coordination challenges, memory problems, and impairments in executive functions – 'higher-level' cognitive skills like flexibility, planning, organization, inhibition, judgment, and novel problem-solving."

70

*Id.* at 1-2. Dr. Davies will further explain that his review of the records and testing history "supports a finding of **severe functional brain impairments**." *Id.* at 5 (emphasis in original).

Dr. Pablo Stewart, M.D., similarly recognized many symptoms of neurodevelopmental disorder during his evaluation of Mr. Umaña. He attributed these symptoms to "numerous risk factors for cognitive impairment throughout his life, including exposure to teratogens and other toxins in the womb. . ." Appx. 215 at ¶9. Teratogens are the toxic substances produced by alcohol metabolism that degrade the developing nervous system in a fetus, causing the type of brain damage seen by Drs. Gur, Davies, and Lugo. *See* Appx. 29 at 3 (Report of Dr. Gur); Appx. 242 (Dr. Gur Report re: MRI results); Appx. 211 at 5-6 (Declaration of Dr. Davies); Appx.212 at 23 (Declaration of Dr. Lugo).

Armed with a complete social history, mental health professionals, including Dr. Stewart, Dr. Davies, Dr. Jennifer Sapia, and Dr. Selena Sermeño, could have testified consistent with their proffered declarations and reports, and as explained in more detail below in section iv and Claim II, how maternal abandonment and exposure to maternal mental illness and Rafael's physical and psychological abuse contributed to a picture of complex trauma that affected Mr. Umaña's cognitive development and had long-lasting effects on his ability to function in society, up to and including at the time of the offense. *See* Appx. 214 (Declaration of Dr. Sapia), Appx. 238 (Declaration of Dr. Sermeño); Appxs. 215, 216 (Declarations of Pablo Stewart, M.D.); Appx. 211 at 8 (Declaration of Dr. Davies); Appx. 29 at 3 (Report of Dr. Gur) (brain damage consistent with trauma history).

### ii. *Conditions of Poverty*

The trial mitigation specialist presented a superficial view of the conditions of poverty in which Mr. Umaña spent his early years, based on Rafael's representations. However, a fuller

71

account, as described by other family members and neighbors, provides a much more detailed and mitigated story:

The Umaña family left Escuintla, Guatemala, to return to Santa Ana, El Salvador, around 1985, when Mr. Umaña was about three or four years old. Appx. 10 at ¶ 63; Appx. 8 at ¶3. The civil war was still raging in El Salvador and did not officially end for another seven years. The family reunited with other family members who lived in one of the poorest areas in Santa Ana, in the Danubio Azul *mesón.* Appxs.. 15, 8. This *mesón* was next to the hospital and the train tracks. Danubio Azul was known for being more run down than other *mesónes* in Santa Ana. Only poor people live in *mesónes*, and the poorest of the poor lived in Danubio Azul. Appx. 15 at ¶6; Appx. 13 at ¶7-8; Appx. 107 at ¶4, 10-12; Appx. 20 at ¶9.

This *mesón* was big, taking up almost an entire block. Danubio Azul contained close to 20 single rooms. Appxs. 13, 20. Generally, an entire family occupied each single room. The rooms had roofs made from sheet metal, adobe walls, and dirt floors, and there was one communal shower and toilet for all the residents to share. Appx. 6 at ¶8; Appx. 13 at ¶8. The *mesón* where the Umañas lived was tiny, dark, damp, decrepit, and infested with rats. Appx. 20 at ¶9. The common area contained a basin where the families did their washing and metal drums that were used as stoves for cooking food. Some people simply cooked their food over firewood on the ground. Appx. 13 at ¶8. Rooms facing the front of the street were slightly bigger and in better condition than those facing the back, thus costing a bit more. Appx. 8 at ¶4-5. But Mr. Umaña and his entire family lived in the smallest, most run down, and cheapest rooms in the back. Aunts Dora, Reina, and Lilian lived in the small rooms near Mr. Umaña.[16]

---

[16] Their monthly rent was about 30 *colones* a month. (At the time of the Initial 2255 filing, one US dollar was equivalent to 8.75 *colones*. Currently, one US dollar is equivalent to 8.63 *colones*.)

Mr. Umaña, Rafael, Francisca, and Ronal lived together in one room in the *mesón*. There was little space, so Francisca shared the same bed with Mr. Umaña and Ronal. Appx. 15. The roof was riddled with holes, and when it rained the rooms flooded and the walls started to sink and crumble. Appx. 20. The wall in Mr. Umaña's room began to sink and crumble, and with each rain it got worse. One day the wall completely came crashing down, nearly crushing Ronal. Appx. 20. Even other poor people looked down on the people who lived in *mesónes*, and many avoided that particular *mesón.* Appx. 14. The Umaña family was part of the lowest class, and neighboring families did not allow their children to play with the Umaña children or any children from that *mesón. Id.*; Appx. 13.

Francisca was already elderly and frail when the family moved to the Danubio Azul *mesón*. Appx. 8. Neighbors noticed that Francisca was very ill, unable to speak, and bedridden. During this period, Rafael completely neglected Mr. Umaña. Francisca's daughter, Carmen, who had moved to the United States, sent small sums of money to her. Appx. 15. When Francisca had money, she bought the two boys little packages of rice pudding. Appx. 20 Often, this was all the boys ate for an entire day. *Id.*

Mr. Umaña and his family eventually moved from the dilapidated *mesón* Danubio Azul. Mr. Umaña, Rafael, Francisca, and Ronal moved into another *mesón* in Santa Ana located on Final 25th Calle Oriente. Appx. 4. Soon, other members of the Umaña family rented out rooms in the same *mesón*. Mr. Umaña and his family lived in a room that faced the street. They shared a space approximately eight by eight meters (the equivalent of about 689 square feet); it had a dirt floor, two beds, and a table. Rafael kept and bred large numbers of rabbits in the family's room. Appx. 2 at ¶ 6-7. He also trapped pigeons and kept chickens in a cage in the corner of the room. The

73

animal excrement covered the floor, filling their small room with a strong, fetid odor. Appx. 2 at ¶7.

Although this *mesón* was considered slightly better than the Danubio Azul *mesón*, this was still a place where the poorest people lived. Like the previous *mesón*, many families were packed into single rooms and shared common spaces. According to neighbors, however, even with their level of poverty and hunger, the Umaña family stood out because of their chaotic relationships with one another and the extreme hunger Mr. Umaña suffered because Rafael withheld food from him. Appxs. 1-5, 15.

Mr. Umaña and other children in the *mesón* often took to the streets in search of food. Appx. 2. They made slingshots to try and kill small animals, like iguanas, possums, and turtledoves. When they killed one of these tiny animals, they felt fortunate to have a little food to share with their families. *Id.* But many times, Mr. Umaña went without anything. He became so desperate that he asked his neighbors if they could spare some beans or rice. *Id.*; Appx. 4.

Ronal worked for a time at a nearby slaughterhouse. Appx. 20. The bosses and other employees knew how poor he was and took pity on Ronal and his family. Ronal's bosses allowed him to take home parts of the animal that did not sell; Ronal took various parts of the cows' innards home to his grandmother to cook. Rafael did not contribute financially to his family. When Mr. Umaña was young, Rafael mostly lived off the support his great-grandmother Francisca received from her daughter Carmen, who lived in the United States. Appx. 15.

Mr. Umaña's cousin, Edwin Esau Umaña, lived with the family in the *mesóns*. He told current post-conviction counsel how fourteen family members lived in a small room at one *mesón*. They slept on mats on the floor in a 5-meter by 2.5-meter room. At another, they had to fetch water from a public spout 200 meters away. Appx. 105b at ¶¶4-5.

74

Mr. Umaña's cousin's wife lived in the same *mesón* with him after they returned to El Salvador. She said Mr. Umaña was never "fully clothed. He was always barefoot, in swimming trunks, without a shirt, hairy and hungry," while his father and girlfriend sometimes had good food, clothing, and footwear. Appx. 109, Declaration of Roxana Marisol Ramírez.

Descriptions of this extreme level of poverty provided a very different picture of the circumstances in which Mr. Umaña spent his first eight years than the rosier picture Rafael had painted, failing as he did to mention that their homes were crowded, crumbling structures, that their living quarters were filled with animal excrement, and that Mr. Umaña never had adequate food. A jury would almost certainly have found this evidence from multiple sources close to the situation credible, humanizing, and mitigating.

Moreover, if this evidence had been supplied to experts in childhood health, development, and trauma, they could have placed the evidence in the context of what it meant for Mr. Umaña's physical, emotional, cognitive, and social development to grow up in circumstances of this sort. This, too, would have aided the jury in understanding Mr. Umaña's later actions.

Dr. Jenifer Sapia evaluated Mr. Umaña's background and determined he "experienced numerous prenatal and post-natal factors for cognitive impairment including the pervasive effects of extreme poverty and related factors." *See* Appx. 214 at p.6, Declaration of Dr. Sapia. She concluded that trauma from being raised in poverty and exposed to violence was consistent with neuropsychological evaluation exposing Mr. Umaña's inability to regulate emotion or modulate behavior under stress. His aberrant, dysfunctional childhood also took a toll on his ability to learn and to think through situations and caused him to be aware of very limited behavior alternatives, especially under stress. *Id.* at 19-21.

75

Dr. Selena Sermeño[17] came to similar conclusions when assessing Mr. Umaña's background. She realized, "Mr. Umaña is a severely traumatized man with limited cognitive abilities. The accumulation of traumatic events in his life, such as extreme poverty, . . . child abuse, constant war violence, intergenerational violence, lack of early childhood stimulation, abrupt maternal separation during a critical developmental period, subsequent loss of his paternal great-grandmother, head injuries, hunger, violent neighborhoods an absence of basic protective factors such as parental love, nutrition and a safe environment place Mr. Umaña at severe risk for incomplete and extremely poor decision making. These factors also rendered him extremely vulnerable to the influence of others in meeting his social needs and to failing to develop an appropriate process of decision making." Appx. 237, Declaration of Dr. Sermeño, ¶60. "Barely any of the conditions necessary for proper cognitive development were present in Mr. Umaña's life. The deck was stacked against him from the beginning. With so much exposure to toxic substances in utero, extreme familial poverty and resulting neglect, domestic and societal violence, Mr. Umaña never had a chance to develop his own sense of self and skills to make his own good decisions." *Id.* at ¶66.

### iii. *Loss of Francisca, his protector and second mother figure.*

At trial, defense counsel presented testimony through their mitigation specialist, indicating that Mr. Umaña had had a close relationship with his great-grandmother, Tomasa Francisca Gonzales Umaña, who died when he was about seven or eight years old. Because the details of this relationship between Mr. Umaña and Francisca were supplied only by Rafael, the trial account

---

[17] Dr. Sermeñotestified at trial but had not met or interviewed Mr. Umaña before her testimony. *See* PPT at 603, 618.

76

missed significant mitigating details about the critical role Francisca had played in Mr. Umaña's life, serving not just as a mother figure but as his protector against Rafael himself, who was a cruel caretaker (*see* subsection iv, *infra*) and who did little to ensure that Mr. Umaña was fed, clothed, or otherwise cared for. Other witnesses could have explained much more than was provided at trial.

For example, when Mr. Umaña was around eight years old, Francisca fell ill and was bedridden for many months before her death. Appx. 18. He and Ronal continued to sleep with Francisca despite her failing health. Appx. 20. The two boys cared for her as best they could, even though they were only children. *Id.* Ronal washed Francisca, emptied her bedpan when she could no longer walk, and tried to feed her. Francisca's abdomen became enlarged and swollen, and she looked neglected. Appx. 22. None of the adults cared for Francisca, even though her daughter, Rafael's mother, Ana had to walk through their room of the *mesón* on the way to hers. Appx. 20.

One night in 1991, when Mr. Umaña was nine years old, he was not allowed to sleep with Francisca; the next morning she died. Appx. 15. Lilian described how Mr. Umaña wailed and threw himself on Francisca's dead body. *Id.* at ¶18. Both boys were devastated by the loss. Appx. 20.

Francisca's cause of death is listed on her death certificate as stomach cancer. Appx. 33. Francisca may also have had parasites. Ronal recalled seeing large worms moving in the back of her legs. Appx. 20 at ¶18. Ronal pulled the worms out and was convinced that this was the result of *mal de ojo*, the evil eye. *Id.* The Umaña family members believed that Mr. Umaña's mother, Leticia, was responsible for Francisca's death, convinced that Leticia attempted to put a curse on Rafael, but that because Francisca was so frail, the curse went into her. *Id.* at ¶34.

77

After Francisca's death, no one cared for Mr. Umaña, even though members of Rafael's family lived in the same *mesón*. Appxs. 1, 4, 5. According to his aunt, Lilian, "Alejandro was left alone, disoriented, and neglected. From then on, Alex was left defenseless, without a stable place to stay." Appx. 21 at ¶14. Soon after Francisca's passing, Ronal left for the United States. Ronal knew a future in Santa Ana without his grandmother was bleak. His only chance at survival was to emigrate to the United States where his Aunt Carmen already resided. Appx. 20. Ronal believed he would die of starvation and neglect without Francisca's help. Ronal and Mr. Umaña were raised like brothers by Francisca. Appx. 20, ¶22. When she died and Ronal left for the United States, Mr. Umaña was left alone with Rafael.

Once Francisca died and Ronal left, Mr. Umaña was completely alone, with no one to help shield him from his father's brutality or provide for his basic needs. He essentially lived off the land. He ate what he could catch, pick, or find himself. He went through garbage looking for plastic to give to others for firewood. Appx. 15. Mr. Umaña and his older cousin Lilian did whatever they could to earn a little money. They sold water and cold drinks at soccer games and buckets of water at the cemetery for people who wanted to wash their loved ones' graves for five cents. They asked neighbors if they needed help taking their trash out. *Id.*

Mr. Umaña did not have money to buy clothes and often went shirtless, with shorts so big that he tied a rope around them so they did not fall off. Appx. 15. His clothes were filthy and in desperate need of washing. Appx. 3. When he was able to find shoes in the trash, they typically had large holes, and his toes stuck out of the front. Appx. 15, ¶26.

Mr. Umaña's cousins and neighbors teased him because of the way he looked. He had long, matted, unkempt hair typically covered in lice. Appxs. 2, 20. Too poor to buy the medication to get rid of his lice, Mr. Umaña and his friends taught themselves how to pick off the bugs with

combs. Appx. 2. But the bugs always came back. Appx. 20. His teeth did not come in correctly; they were separated, pointy and stained with "permanent grime."[18] Appx. 2 at ¶ 13. A neighbor recalled his front teeth were missing, and his remaining teeth were "rotten and broken." Appx. 3 at ¶ 11. Neighbors and family called Mr. Umaña *Peluca* (wig) and *vanpirin* (little vampire) because of his crazy hair and bizarre looking teeth. Appxs. 1-4, 8, 20.

There is a reasonable probability that at least one juror would have found mitigating the deep sense of loss Mr. Umaña experienced at this young age, particularly because no one stepped in to help this eight-year-old cope with the loss of his protector and sole source of comfort *and food*. The bare story of losing his great-grandmother that was conveyed at trial likely only reminded the jurors that Mr. Umaña's victims left behind bereaved children, and may have evoked scorn rather than sympathy; this fuller understanding of his loss would have been quite different.

Here, too, these details, in the hands of mental-health experts, could have provided a credible explanation for why Mr. Umaña eventually sought protection and survival by joining in a gang. *See, e.g.,* Appx. 237 at ¶71 (Decl. Dr. Sermeño: "With no emotional, social and financial safety net, Mr. Umaña was further highly vulnerable to the influence of others within gang culture who could offer him a sense of family and protection.").

### iv. Rafael's Physical and Emotional Abuse and Neglect; Mr. Umaña's search for employment and protection.

Rafael Enrique Umaña, Mr. Umaña's father, was described at trial as a caring, protective father. This was far from the truth. The rich, detailed, and very different account that family and

---

[18] Pointy and separated teeth are a symptom of congenital syphilis. *See* https://www.cdc.gov/ncbddd/birthdefects/surveillancemanual/quick-reference-handbook/congenital-syphilis.html

79

neighborhood witnesses could have told is tragic and much more highly mitigating. It provides not just a more accurate and painful sense of what Mr. Umaña experienced during his childhood, but also provides further bases for understanding why Mr. Umaña may have joined MS-13.

Once Ronal and Francisca were no longer around to protect and help Mr. Umaña, Rafael treated him in sadistic and abusive ways. Rafael beat Mr. Umaña with his hands, a belt, and a switch. Neighbors report having listened helplessly to the sounds of the lashes and Mr. Umaña's screams. Appx. 3. His cousin witnessed the beatings and said that Rafael would beat his son for anything – not coming home on time, getting wet in the rain, being dirty. Appx. 15. Rafael beat him as if he were a grown man, punching him with closed fists and leaving him bloody with bruises all over his body. Appx. 22; Appx. 219 (Mr. Umaña thought his dad sometimes beat him just to beat him); Appx. 230, Declaration of Vilma Araceli Salazar de Argueta at ¶9 ("Alex's father was brutal. He beat Alex over anything.").

Rafael had additional ways of torturing Mr. Umaña. One tactic was to deprive him of food. Sometimes Rafael ate openly in front of his son without offering him any. Other times, Rafael did not allow him inside the room while Rafael ate. Appx. 15.

When Rafael was not beating Mr. Umaña, he treated him like a nuisance or ignored him. Appx. 1 at ¶ 1; Appx. 4 at ¶ 12; Appx. 22 at ¶ 22; Appx. 219 at ¶3. Neighbors describe how Rafael was more interested in getting drunk and smoking marijuana than caring for his son. Appx. 7. A neighbor described Mr. Umaña as a "forgotten child." Appx. 4 at ¶ 24. After Mr. Umaña stopped attending school (when he was 12), a neighbor in the *mesón* often saw Mr. Umaña alone roaming the streets without anyone paying attention to him. Appx. 7 at ¶5. He was completely without guidance. Upset with how Rafael neglected his son, this neighbor told Rafael that his son needed

to be in school; Rafael simply brushed him and his comments off. Mr. Umaña had no caretaker and no protector. *Id.*

A young teenager named Yanira, who lived in the *meson*, moved in with Rafael and Mr. Umaña. She and Rafael, who was in his 30s at the time, began a romantic relationship. Appx. 3. Despite just being a few years older than Mr. Umaña, she was also abusive to him and set him up to get in trouble with his father. *Id.* at ¶9.

Rafael used the front part of their small room in the *mesón* to operate a little store. During the penalty phase of trial, the Government talked about this store and gave the false impression that Mr. Umaña had access to food because his father was a business owner. PPT at 630, 692. In actuality, the store was a partitioned area off their small room. Rafael sold small items like candy, rice, and beverages. Appxs. 1, 2, 4, 15. Mr. Umaña was not allowed to touch any items in his father's store, and his father would beat him if anything was missing. Yanira, who was also hungry and used items from the store to feed her siblings who also lived in the *meson*, frequently blamed Mr. Umaña when she was the one who took food from the store. Appxs. 4, 5. Neighbors heard Rafael screaming at him for stealing from his store. Appxs. 1-4. The scapegoating to which Yanira subjected Mr. Umaña was a far cry from the normal tensions between a brother and sister, as Rafael had euphemistically described the relationship to the trial team and the trial team presented to the jury.

Mr. Umaña wet the bed until he was almost 12 years old. Appx. 15 at ¶ 11. When Francisca was alive and able, she hid Mr. Umaña's soiled sheets from Rafael. *Id.* But without his protector, Rafael humiliated and beat his son for wetting the bed. *Id.*

Rafael was well-known in the community as a violent and unpredictable man. He drank with friends, sold drugs, started fights and threatened neighbors. Witnesses report that he was loud

and offensive, and many feared his erratic behaviors. His neighbors did their best to avoid him. Appxs. 1, 2, 8, 219. Rafael sold drugs out of his room even with Mr. Umaña present. Appx. 22. Drugs and guns were often in plain view on the bed. *Id.* Rafael's temper, drinking, and inability to pay the rent became so out of hand that the owner of the *mesón* finally kicked him out. Appxs. 2, 4, 7.

Mr. Umaña, by then a young teenager, went to live with his grandmother Ana in her room at the *mesón*. But she did not provide for him, preferring to look after her alcoholic adult son and his baby daughter. Appx. 2. Ana and Mr. Umaña eventually both left the *mesón*, and Mr. Umaña was once again left entirely to fend for himself. Appxs. 4, 5.

Witnesses report that life in El Salvador was bleak for many, and jobs were scarce, especially for young people. Appx. 7 at ¶8. Mr. Umaña and his brother Saul, who Leticia raised, worked as assistants for Coca-Cola drivers. Appx. 22. They had to take a bus early in the morning and wait to see if a driver would pick them up to work for the day. *Id.* When there was work, they earned very little. *Id.* If they worked long hours, six days a week, they could earn up to three or four US dollars. *Id.* at ¶32-33. However, there was no formal contract for the work, and the amount of payment was up to each driver, so sometimes they were paid even less than three or four dollars a week. *Id.*

As learned through post-conviction investigation, on November 1, 2001, El Salvador enacted a policy making it mandatory for every adult citizen, 18 years of age and older, to obtain a personal identification card, known as the *Documento Unico de Identidad*, or DUI. *Changes to and Implementation of the Sole Identity Document (Documento Unico de Identidad, DUI)*, July 10, 2008, https:www.justice.gov/sites/default/files/eoir/legacy/2013/11/07/slv102871.E.pdf (last accessed on June 21, 2016). To obtain a DUI, one had to submit an original birth certificate, Cedula

de Identidad Personal (the former personal identity card used in El Salvador), electoral card, driver's license, or passport. *Id*. A DUI was required to obtain legitimate employment, conduct business, get married or divorced, obtain a passport, and vote in elections. *Id.* Without the DUI, little could be done in any public sphere. Once Mr. Umaña reached his 18th birthday, he could not get a DUI because he did not have a birth certificate. Appx. 10 at ¶ 78. Mr. Umaña had been born in Guatemala, and his parents had never registered him as a Salvadoran citizen when they returned to Santa Ana. As a result, he could no longer obtain work because employers would not hire someone without a DUI. Appxs. 10, 22.

Because Mr. Umaña needed his parents' assistance to get the necessary documentation, Mr. Umaña was unable to obtain this identification card until 2004, after obtaining a birth certificate stating he was born in El Salvador. *See* Appx. 10 at ¶78; Appx. 12 at ¶20; Appx. 36, pp. 2-3.

Between 2001 and 2004, without his DUI, Mr. Umaña had trouble obtaining work. As video witnesses at his trial explained, Mr. Umaña found work in construction for a man hired to install telephone towers. Mr. Umaña worked with this man and his son in Metalio, Sonsonate, approximately 60 kilometers from Santa Ana. Most of the workers went home to their families on the weekends, but Mr. Umaña had nowhere to go. A nearby family befriended Mr. Umaña and allowed him to sleep on a hammock outside of their home. They had little means, but Mr. Umaña was so kind and gentle that the family came to adore him. Appx. 36; Def. Ex. 23-24. But after the work project was complete, Mr. Umaña returned to Santa Ana.

Homeless, without money, and without family support, Alejandro joined Mara Salvatrucha when he was 19 years old. Appxs. 2, 5. Impaired, and destitute, this seemed Mr. Umaña's only source of protection and companionship with people he knew, including his brother and cousins

Case 3:16-cv-00057-MOC    Document 148    Filed 03/24/23    Page 102 of 592

Eduardo and Geovanni. Appxs. 5, 15, 20. Mr. Umaña also sought refuge by sleeping in the doorsteps at the *mesón* La Fe where his girlfriend, Monica Reyes, and her family lived in extreme poverty next to an empty lot used as a garbage dump. Appxs. 223, 226, 229. Members of La Mara also lived in a room at La Fe. Appx. 226. Monica's cousin, Josselyn Reyes, would have testified that "the boys from the mara were kids from the area," and Alex "did not dress or walk like them," "he was mara because he hung out with the mara." Appx. 226. Yet, at trial, absent all this powerful context of Mr. Umaña's desperate childhood and adolescence, the jury heard Mr. Umaña joined the gang because he was interested in a girl.

Here again, the details of Mr. Umaña's young life matter in understanding his actions. He did not simply refuse to work or avoid his responsibilities when he turned 18. He faced real and substantial bureaucratic obstacles to gaining legitimate employment that he worked hard to overcome by obtaining day labor work whenever he could. This, too, would have further mitigated his life's account.

### v. *Repeated exposure to traumatic events.*

To their credit, trial counsel put some evidence before the jury of the types of traumatic events that Mr. Umaña would have been exposed to while living in Santa Ana during years when the Civil War in El Salvador was raging. However, the evidence presented by the defense was through an expert who had never met Mr. Umaña and testified only about the generalized types of traumas anyone living in El Salvador was likely to have encountered rather than focusing on traumatic events that Mr. Umaña himself witnessed. The Government was therefore easily able to persuade the jury that Mr. Umaña's experience was no different from any other Salvadoran citizen and did not explain why, or excuse the fact, that Mr. Umaña had "turned bad." The defense did not rebut this. Had trial counsel done the necessary mitigation investigation, they could have

explained to the jury the combined effect of the multiple forms of trauma Mr. Umaña witnessed at a young age, without the benefit of a caretaker to comfort or help him, or to be able to put these events into perspective.

If they had properly investigated, defense counsel could have presented a far more compelling case in mitigation to the jury and could have described for the jury specific traumatic events Mr. Umaña witnessed as a child, not only as a result of the Civil War, but also the traumatic accidents he witnessed on the bypass in front of his home, and the trauma he suffered both by being beaten regularly by this father and by watching, at a very young age, his father punch his mother in the face with closed fists.[19]

In addition to those personal traumatic events already described above, defense counsel could have presented the following in mitigation, as well:

The *mesón* was next to a tire shop and across a narrow street from the coffee fields. A bypass was eventually built, a portion of it where the coffee fields were torn up. Many bones and dead bodies – including the bodies of children – were discovered in those fields. Sometime after the age of eight, Mr. Umaña came across many of them; the coffee fields had been a place for bodies to be dumped during the war. Appxs. 1, 2, 22.

The bypass itself created a dangerous area, heavy with constant traffic and multiple accidents as a result. Frequent deaths and injuries resulted. People drove fast and recklessly. At

---

[19] Counsel's presentation at trial would also have been greatly enhanced by the testimony of a trauma expert who was acquainted with the facts of Mr. Umaña's life, who could have talked about the psychological effects of these multiple traumas on Mr. Umaña. Dr. Sermeño, a psychologist with "an interest in childhood trauma and moral development," (PPT at 603), testified at trial, but she had not met or interviewed Mr. Umaña, *id*. at 618. After meeting Mr. Umaña and uncovering his background, she provided a powerful declaration describing the all-encompassing impact of trauma in his life. *See* Appx. 237. At trial, the Government tried to exclude her testimony altogether because of her lack of personal knowledge.

one point, Mr. Umaña watched as several women were thrown out of cars from the impact of an accident. He and some others ran to try and help and pull out the women still stuck in the car. They were taken away by ambulance. Appx. 2. They also witnessed a man who rolled his pickup. Mr. Umaña and his childhood friend Melvin pulled the bleeding man out of the car. Melvin later learned that the man died in the hospital. *Id.*

The location of Mr. Umaña's *mesón* in the 25th Final Oriente saw a lot of violence during the war. A colonel who lived above the *mesón* not only shot down the street at guerillas but constantly threatened the children that he was going to bomb their *mesón*. Appxs. 1, 2, 20. The guerillas began to think people from the *mesón* were shooting at them instead of the colonel, so they returned rapid fire at the *mesón*. Appx. 2.

Once when Mr. Umaña was around eight years old, he and some friends found a male neighbor hanging from a big tree near the bridge; his eyes were bulging. *Id*. They watched the man's family members cut him down from the tree. *Id.*

Another time Mr. Umaña and his friend, Melvin, found several dead bodies piled in a ditch. Some of the dead bodies were still gripping their weapons; many were face up, and the bodies remained there for days. Appx. 2 at ¶16. The smell of the decomposing bodies filled the air; their bodies became "swollen, inflated, half-eaten by worms, on some of them you could see their ribs, or the bones in their faces." *Id*. Mr. Umaña and Melvin watched as the authorities finally came to gather what was left of the bodies. Authorities had feared an explosive might be placed nearby as a booby trap, so they took their time clearing them out. *Id.*

As Mr. Umaña's brother, Saul, explains, "there is no way to avoid the terrible effects of living through a civil war. Whether you like it or not, war affects you. I still have nightmares. If I see something terrifying in a movie, I think about the fact that I have seen much worse things in

front of me, real things." Appx. 22 at ¶ 9. Witnesses who lived near and around Mr. Umaña recalled that it was common practice for the death squads to decapitate people with machetes; heads or headless bodies were left lying in the streets. *Id.* People heard the wails and screams from victims who being hacked to death. Appx. 16. Grandmother Ana, with whom Mr. Umaña lived for a time, still recalls the "sounds of gunshots and the people screaming out of fear and pain. Many of these people died. It was horrible. We lived in a constant state of fear." *Id.* at ¶10.

Mr. Umaña and Luis Mario Ramos Mendez travelled from El Salvador to the United States together in 2004. Appx. 112. For a month, they hung on the outside of trains, bouncing along at dangerously high speeds, freezing in the wind at night and broiling during the day, getting robbed and often starving, and unable to sleep for days. Everyone else on the trains suffered too. They saw a man get his young son on the train, then slip and fall on the tracks and get run over in front of the boy. *See* Appx. 112 at ¶ 19-23.

Although trial counsel hired a trauma expert – Dr. Selena Sermeño – to testify at trial, she never met Mr. Umaña, and trial counsel did not provide her with information about these specific traumatic events Mr. Umaña had personally witnessed. Appx. 237 at ¶ 2, 18. Despite being given nothing to work with, counsel still called Dr. Sermeño to testify. The Government understandably objected and moved to exclude her testimony altogether, as what little she could offer was not based on her personal knowledge and was barely relevant. Even though the court denied the motion, the Government thoroughly undermined Dr. Sermeño's credibility by reminding jurors that all she offered was a description of life for virtually everyone living in El Salvador during the Civil War; nothing she said (which was the result of counsel's failure to provide her any of the necessary resources) made any reference to how the war impacted Mr. Umaña, the man whose fate the jury was tasked with deciding. PPT at 634.

Armed with these specific accounts of the horrific traumatic sights and events Mr. Umaña experienced as a young child and adolescent, an expert in trauma could have given a full account of the effects this chronic exposure to *these* events likely had on Mr. Umaña *personally*, and the Government would have had little ammunition to challenge it. *See* Appx. 214, Declaration of Dr. Sapia (recognizing that Mr. Umaña still exhibits symptoms of Post-Traumatic Stress Disorder); Appx. 237, Declaration of Dr. Sermeño (explaining the impact of chronic stress and war induced stress on Mr. Umaña's development); Appxs. 215, 216 (Declarations of Dr. Pablo Stewart regarding the impact of trauma).

For example, Dr. Stewart could have testified that Mr. Umaña's "history of chronic, unrelenting exposure to violence with the home and outside . . . are representative of the types of trauma experienced by individuals with PTSD." Appx. 215 at ¶12 (Decl. Pablo Stewart). This caused Mr. Umaña to live "in a constant state of fear," resulting in "hyperarousal, hypervigilance, anxiety, agitation, guardedness, paranoia, and sleeping difficulties." *Id.* As a result, he also suffers unwanted intrusive thoughts in the form of dissociative flashbacks, including flashbacks to the war atrocities he witnessed, such as the smell of dead bodies in the street. *Id.* at ¶ 13-14. Mr. Umaña reported to Dr. Stewart that he dealt with these events by trying "to pretend it was not happening." *Id.* at ¶ 15. Dr. Stewart characterized this response as both "childlike and integral to his survival." *Id.*

Dr. Jennifer Sapia would have explained that Mr. Umaña experienced at least seven[20] of the ten Adverse Childhood Experiences. *See* Appx.214 at 15-16, Declaration of Dr. Sapia. The

---

[20] Exposure to violence; exposure to parental substance abuse; exposure to untreated parental mental illness; loss of parent/separation of family; neglect of basic physical and emotional needs/lack of protection; physical abuse by father; emotional/verbal abuse and ridicule. Appx. 214 at 16.

"toxic stress" associated with these experiences "can result in prolonged activation of the stress response systems and can disrupt neurodevelopment." *Id.* at 15. Dr. Sapia could have explained that "[a]n inability to regulate emotions is the core of traumatic stress. Individuals with complex trauma histories, like Mr. Umaña, may struggle with self-regulation, controlling and expressing emotions, impulse control and the ability to think through consequences before acting." *Id*. at 20. This means they "can be very reactive and respond in ways that appear unpredictable, inappropriate, volatile, and extreme or intense, particularly under stress." *Id.* They can "react defensively and aggressively in response to perceived attacks." *Id.* Dr. Sapia would have explained that this is consistent with Dr. Gur's analysis of Mr. Umaña's PET scan, which "showed abnormalities in brain regions critical for regulating emotions and behavior." *Id.*

Likewise, as discussed above, Dr. Selena Sermeño came to similar conclusions when assessing Mr. Umaña background. She realized:

> Mr. Umaña is a severely traumatized man with limited cognitive abilities. The accumulation of traumatic events in his life, such as extreme poverty, . . . child abuse, constant war violence, intergenerational violence, lack of early childhood stimulation, abrupt maternal separation during a critical developmental period, subsequent loss of his paternal great-grandmother, head injuries, hunger, violent neighborhoods an absence of basic protective factors such as parental love, nutrition and a safe environment place Mr. Umaña at severe risk for incomplete and extremely poor decision making. These factors also rendered him extremely vulnerable to the influence of others in meeting his social needs and to failing to develop an appropriate process of decision making.

Appx. 237, Declaration of Dr. Sermeño, ¶60. "Barely any of the conditions necessary for proper cognitive development were present in Mr. Umaña's life. The deck was stacked against him from the beginning. With so much exposure to toxic substances in utero, extreme familial poverty and resulting neglect, domestic and societal violence, Mr. Umaña never had a chance to develop his own sense of self and skills to make his own good decisions." *Id.* at ¶66.

"The process of making choices when feeling threatened is also predicated upon the capacity for emotional regulation or the ability to maintain perspective under threat. Traumatic experiences in childhood and constant fear negatively impacts a person's capacity to regulate his feelings when feeling threatened." Appx. 237 at ¶67 (citing Appx. 29, Neurobehavioral Assessment of Mr. Umaña by Ruben Gur, Ph.D. (6/15/2016); Appx. 27, Neuropsychiatric Evaluation of Mr. Umaña by James Merikangas, M.D. (11/17/2009)); *see also* Appx. 244 at 5-6 (Report of Thomas Ward) (gang expert explaining that the shooting of two intoxicated males over the music on a jukebox would be detrimental to the gang; observing that Mr. Umaña's fellow gang members did not "back him up" in this spontaneous act).

### vi. *Evidence of low cognitive functioning and intellectual disability.*

Trial counsel's theories of defense included a pretrial attempt to bar the death penalty due to Mr. Umaña's Intellectual Disability and the presentation of limited evidence of brain damage to the jury at the penalty phase. However, due to their deficient investigation, counsel presented little evidence at Mr. Umaña's *Atkins* hearing to support the claim that he had adaptive deficits and low cognitive functioning. Counsel also presented little evidence to the jury demonstrating either the numerous potential etiologies of Mr. Umaña's brain damage or how that brain damage resulted in day-to-day impairment of functioning. Such evidence was readily available, as follows:

Regarding Mr. Umaña's low cognitive functioning, there should have been no question that Mr. Umaña was *unable* to advance in school. Mr. Umaña was unable to succeed at school, even in the lowest grades. Mr. Umaña's cousin Lilian, who is five years older than he is, attended the same school as Mr. Umaña. *Id.* Lilian recalled Mr. Umaña repeating grades several times and his overall inability to perform at an acceptable level. Teachers complained to Francisca that his homework was not complete. They worried about Mr. Umaña and wanted him to see a

90

psychologist because he was "not right." *Id.* at ¶14. His aunt Reina also recalled that people at the school would tell her mother Francisca that Mr. Umaña was doing poorly in school. Appx. 19. Mr. Umaña was unable to learn and did not understand. *Id.*; Appx. 230, Declaration of Vilma Araceli Salazar de Argueta at ¶2 ("Alex struggled to learn." He could not master basic addition or multiplication processes despite continuous instruction and help.).

While others he grew up with passed the third grade and went on to several more years of school, Mr. Umaña repeated grades often and did not advance past the third grade. Appxs. 19, 15, 2. Aunt Reina's son Geovanni was only three months older than Mr. Umaña but advanced in grades, while Mr. Umaña stayed behind. Appx. 19. School records from the Centro Escolar Santa Ana California show that while cousin Geovanni was in sixth grade, Mr. Umaña was in a remedial third grade class and was three of ten students who failed. Appxs. 30, 31, 106. People made fun of Mr. Umaña, who was not only much older than his years but was physically a bigger child. Appx. 19.

Vilma Araceli Salazar de Argueta was a neighbor of Mr. Umaña's and walked with him to school during third grade. She recalls how:

> Alex struggled to learn. I helped him with addition but it was difficult for him. Alex knew how to do some addition but if the numbers had more than one digit, he became confused with the steps. He started adding the higher digit numbers first. It was the same with multiplication. Alex knew how to multiply by five, but he could not memorize the higher numbers. He could not divide because he could not multiply. I tried to teach him, but he just stared at the paper and looked confused. Alex's writing was also very messy. We laughed and said that his letters were pateaditas because it looked like he was writing with his feet.

Appx. 230, Declaration of Vilma Araceli Salazar de Argueta at ¶2.

Mr. Umaña still struggled with third-grade academics at sixteen years old. His friend Luis Ramos attended night school with him (although Luis was finishing high school while Mr. Umaña worked on the third grade). Mr. Ramos saw Mr. Umaña struggle with his schoolwork. According

91

to Mr. Ramos, "He had difficulties processing and he did not understand. He wanted to learn but it was hard for him. I tried to help Alejandro with his homework but he would get confused and did not understand." He wanted to learn, but it was hard for him. He wanted to be smart like Mr. Ramos, but people called him "stupid" and "dumb," and he would be embarrassed. When schoolwork frustrated Mr. Umaña, he rejected it and asked why he had to learn those subjects. Appx. 112, Declaration Luis Ramos at ¶3, 30. Mr. Ramos saw something wrong with Mr. Umaña's brain, like it stopped developing at an early age. To Mr. Ramos, Mr. Umaña was simpleminded and did not analyze things. *Id.* at ¶37.

Mr. Umaña frequently stayed with the family of his friend, Jose Herrera. Jose's sister Karla Herrera Calderón, several years younger than Mr. Umaña, tried to let him work with her to write stories for school assignments. She found "Alex could not do it. He didn't know how to write a story. What he wrote was what a 5-year-old would write." Appx. 220, Declaration of Karla Herrera Calderon.

Ms. Calderon also worked with Mr. Umaña when the family harvested coffee beans. She remembered, "Alex was not good at gathering the coffee. He was slow and could only gather a little. He never understood which bean to pick. We would show him many times, but he would pick the bean that wasn't ripe. My mother took pity on him. She was a good worker and gave Alex a share of the coffee she gathered." Appx. 220, Declaration of Karla Herrera Calderon ¶6; *see also* Appx. 224, Declaration of Carlos Geovanni Herrera, ¶10 ("The rule was very clear that we should not pick the green beans because they are not yet ripe. We were told to pick only the red beans, which we called grapes. We would only be paid for picking the red beans. Alex kept picking the green coffee beans.").

Another neighbor, a parent of a friend of Mr. Umaña, Alfonso Cruz, tried to teach Mr. Umaña how to help in a carpentry shop. Mr. Cruz said,

> Alex had trouble understanding and was unable to learn the trade. He became easily frustrated when he did not understand something. He had a lot of trouble learning how to use a measuring tape. I took the time to try to explain how the measuring tape worked. I showed him what a centimeter was, what a meter was. I repeated the instructions over and over so that he could understand. Alex tried hard but he kept making the same mistakes. When he could not get it, he started to joke around with the measuring tape by swinging the end up and down like a yo-yo. I also used to have my children help me with sanding the pieces. Alex tried to help me sand. I explained to everyone that it was important they sanded in a straight line. My children learned how to sand right away. I had to tell Alex many times, but he still didn't do it properly. He kept sanding in different directions, so I had to have one of my kids do it over. When he couldn't do things, Alex became frustrated and gave up or started to joke around.

Appx. 222, Declaration of Alfonso Cruz, ¶5; *see also* Appx. 224, Declaration of Carlos Geovanni Herrera at ¶ 15; Appx.228 at ¶3, Supplemental Declaration of Vilma Elizabeth Torres de Cruz (Mr. Cruz's spouse). One of Mr. Cruz's children confirmed his description of Mr. Umaña trying to learn carpentry skills.

> When I was about 10 or 11 years old, my father taught me how to help him with carpentry. Alex and I sanded pieces of wood. Alex went all over the place. He asked me how he was supposed to do it. I showed him how to sand but he still got it wrong. My father asked me to fix Alex's mistakes and sand the wood correctly. I learned how to use the measuring tape and how to cut the wood. Alex did not know how to do it. Alex never learned how to do it.

Appx. 227, Declaration of Roxana Cruz Torres at ¶2; Appx. 230 at ¶7.

Since childhood, Mr. Umaña has had trouble remembering things. Appx. 19 at ¶17. Rafael explained to post-conviction counsel that when he sent him to the store to purchase an item, Mr. Umaña often forgot what he was there to buy. This made Rafael angry, as he thought his son was not paying attention. Appx. 18 at ¶19. Later, Rafael realized Mr. Umaña simply could not remember. When Rafael tried to explain something to his son, Mr. Umaña appeared lost in thought

93

and could not comprehend. *See also* Appx. 226, Declaration of Josselyn Guevara Reyes at ¶9 (Mr. Umaña could not be trusted to go to the store and get a requested item).

Mr. Umaña's cousin stated that Mr. Umaña frequently forgot to bring little objects for school projects and thus was unable to complete his schoolwork. Mr. Umaña forgot where he put things and, even as a young adult, put his shoes on the wrong feet. Appx. 15 at ¶14, 15. He hid money in his shoe, but quickly forgot this and looked all over for his money before finally finding the money when he put his shoes on. Appx. 12 at ¶14. When he was dating Monica, he asked her to read to him and help him learn how to read and write better than he did, although she was younger than him. She said he had great difficulty reading and writing and could not learn what she was trying to teach him. *Id.*; *see also* Appx. 219 at ¶17, Declaration of Jose Wilfredo Herrera Calderon (Mr. Umaña could not read or write; he constantly made the same mistakes writing despite correction; other kids made fun of him for pretending to read a newspaper; and he told Jose's dad "my brain is small.").

Mr. Umaña was unable to dress himself when Francisca was alive. Appx. 15 at ¶15. He put his shirts on backward or inside out; his shoes were often on the wrong feet, or he had two shoes that did not match. He did not appreciate anything was wrong, even when others tried to correct him. Mr. Umaña did not learn how to tie his shoelaces and instead tucked his laces on the insides of his shoes. Appx. 15 at ¶15.

Mr. Umaña acted younger than his age. Appx. 12 at ¶7. He loved watching cartoons. Appx. 12 at ¶8. At age sixteen, Mr. Umaña acted like he was twelve years old and comfortably hung around with his younger friend Luis "Chipis" Ramos. Even after Mr. Umaña joined the Mara a couple years later he still acted like a little boy. He loved watching cartoons and talked about them

94

all the time. In Los Angeles, at twenty-two, Mr. Umaña hung around with the fifteen-year-old skateboarders. Appx. 112 at ¶4, 10, 34.

He had trouble assessing situations and did not appreciate when it was time to be serious. Appxs. 12, 22, 219 (Declaration of Jose Wilfredo Herrera Calderon, Mr. Umaña loved watching cartoons as a teenager and joked around when others talked about a serious topic; he was "infantile."). Sometimes Mr. Umaña just did not make sense, and he struggled to learn simple concepts. His younger brother Saul and others tried to explain easier ways to do things, but Mr. Umaña was still unable to comprehend and got frustrated. People assumed Saul was the older brother because Mr. Umaña was so immature. Appxs. 12, 22. When Saul attempted to talk seriously with Mr. Umaña about the need to act maturely, Mr. Umaña did not appear to understand. Appx. 12 ¶11. An adult who allowed Mr. Umaña to stay in her home with her sons described a sixteen-year-old Mr. Umaña as "he still liked to play children's games. He played with my younger son Alfredo and daughter Karla. He liked to play ball, do races with the boys and watch cartoons. They would play school where Patty would be the teacher and do dictation. Alex was not able to do the dictation. They also played store where they would use pretend money to buy groceries. Alex had problems with this game also." Appx. 221, Declaration of María Lidia Calderón at ¶5; *see also* Appx. 224, Declaration of Carlos Geovanni Herrera at ¶11. One of the children that Mr. Umaña played with as a teenager, Josselyn Guevara Reyes, recalled, "Alex was different from the rest of the mara boys. He was like a big kid. My cousins and I were much younger than Alex, but he liked to play with us. When we saw Alex coming down the street we cheered. We were happy to see him, he was so playful. He acted just like one of us kids." Appx. 226, Declaration of Josselyn Guevara Reyes at ¶7, 8 (Mr. Umaña fixedly played with a spinning top at 16); *see also* Appx. 229, Declaration of Xiomara Reyes at ¶9.

Again, while this evidence is mitigating in its own right, in the hands of an expert in intellectual disability, it could also have been used to great effect to prove that Mr. Umaña had significant adaptive deficits. He could not succeed in school, he failed the third grade at the age of 12, he had substantial memory problems, he found it difficult to learn, and he was unable to engage in age-appropriate self-care. *See* Appx. 28 (Decl. Dr. Olley); Appx. 236 (Report Dr. Martell).

Evidence was also available to better support a diagnosis of brain damage, including evidence that Mr. Umaña has suffered several head injuries throughout his life, which, in addition to being red flags necessitating a full investigation into brain damage, would have corroborated the experts' findings in their testing, medical examination, and scans. For example, although trial counsel presented testimony of Mr. McGough of what he heard from Rafael regarding one prior head injury (PPT at 537), other witnesses could have corroborated and described the injuries that Mr. Umaña suffered in greater detail. When Mr. Umaña was about four or five years old, he suffered the first of at least three head injuries. Mr. Umaña was trying to reach an item high up on a cupboard but lost his balance, pulling the cupboard down onto his head. The impact lacerated his head, causing significant bleeding, and he lost consciousness. Appx. 19 at ¶13. Rafael took Mr. Umaña to the hospital located about a block away, where he received stitches to his deep head wound. Appx. 18 at ¶10. There is no record of any treatment for his loss of consciousness, either in the moment or as a follow-up.

Mr. Umaña suffered his second serious head injury shortly after, falling from the top of a tall mango tree. Appx. 20 at ¶31. His cousin Ronal watched Mr. Umaña fall to the ground, hitting the tree limb by limb. After he finally hit the ground, Mr. Umaña was disoriented, confused, and slow. Even though Mr. Umaña clearly had a large, open wound on his head and was bleeding

96

profusely, his father did not seek medical attention for him. *Id.* In addition to these childhood falls, as discussed *supra*, section iv, Mr. Umaña was also regularly beaten by Rafael.

Mr. Umaña's third known head injury occurred as an adult living in Georgia. He was involved in a car accident and hit his head on the dashboard. Hospital records show that he lost consciousness for an unknown duration of time. He was ultimately diagnosed with a closed head injury. Appx. 45, p.14.

From the time he was a child, Mr. Umaña suffered (and continues to suffer) from debilitating headaches. Appx. 50. As a child and an adult, the pain made him weep. In desperation, he would rub Vicks VapoRub or rubbing alcohol on his forehead. When it was available, he was given acetaminophen. Appxs. 16, 19. The Bureau of Prisons has confirmed these symptoms, diagnosing him with migraine headaches.  Appx. 50.

Finally, all the day-to-day impairments in Mr. Umaña's functioning described above could have been used, separate and distinct from the issue of Intellectual Disability, to illustrate to the jury how Mr. Umaña's brain damage negatively impacted his day-to -ay functioning. Absent this evidence of Mr. Umaña's functional impairments, the evidence of brain damage presented at the penalty hearing was nothing more than an abstract concept for the jury. As described in more detail in Claim II, the social history information described herein was necessary for an expert, such as Dr. Merikangas, to fully explain the import of Mr. Umaña's impairments on his day-today life, at the penalty hearing.

### vii. Other evidence of mental health problems.

A reasonable investigation would also have uncovered significant collateral information regarding other mental illnesses, including psychotic symptomology. Trial mitigation specialist Richard McGough reported to post-conviction counsel that Mr. Umaña would often lose focus,

97

start singing, or begin rapping during conversations, particularly when discussing a topic likely to cause him stress. Appx. 26. Despite McGough's observations, trial counsel failed to direct further investigation into these behaviors or secure an appropriate mental health evaluation to discern whether Mr. Umaña suffered from mental illness. *See* Claim II.

A reasonable pretrial investigation would have uncovered that, as a child, while living at the Danubio Azul *mesón*, Mr. Umaña told his cousin Lillian about things he saw and heard that did not appear to be there. Appx. 15. He believed he had seen a long-haired woman who called out to him in the dark. Mr. Umaña was frightened by the images he saw and the voices he heard. He asked his cousin if she saw these images as well. Despite others telling him nothing was there, he did not believe it. Mr. Umaña heard someone opening and shutting doors and blowing air on him. Lilian was frightened because Mr. Umaña truly believed this was happening. *Id.* at ¶13.

Mr. Umaña continued to see images that were not present to others, and these images terrified him. At times, he seemed to stare off, talking to things that were not visible. Appx. 12. Saul noticed something strange about his brother's behavior. Appx. 22. When others told Mr. Umaña these images were not there, he became insistent and drew what he saw as if this might convince others it was real. He drew demon-like images with horns and tongues sticking out. Appxs. 22, 155.

Mr. Umaña's friend, Jose Wilfredo Herrera Calderon, "saw him talking to himself and answering questions as if he were talking to someone." He would "laugh sarcastically as if he was disagreeing with the imaginary person he was talking with and he would get angry." One time, Jose "saw him sitting on the curb outside. He was rocking himself back and forth and talking to himself. His eyes were open and looked like he was in another place. He had a lost look on his face." Jose asked if he was ok. Mr. Umaña did not answer. "He seemed gone, absent." Other times,

Mr. Umaña saw a shadow no one else could see. Appx. 219 at ¶6, Jose Wilfredo Herrera Calderon. A younger friend, Josselyn Guevara Reyes, noticed Mr. Umaña talking to himself. "His eyes were looking up and rolling back and forth. He said things like 'no, no, who knows' as if he were answering someone's question. Sometimes, he started laughing while he was talking." Appx. 226, Declaration of Josselyn Guevara Reyes at ¶10.

Luis "Chipis" Ramos reported that Mr. Umaña's reality differed from Mr. Ramos's. Mr. Umaña saw things that no one else saw and heard (and listened to the guidance of) voices that no one else heard. Sometimes he stared at the wall, talking to himself "as though a spell had been put on him." He would tell Mr. Ramos he talked to an angel or devil. He also had visions and dreams that he believed were real, with important meaning, and that his visions and dreams could foresee the future. He often drew what he saw as proof that it happened. Appx. 112 at ¶38-40.

These lay descriptions of Mr. Umaña's odd behaviors would likely have been received as mitigating by jurors, who would recognize these visions and frightening hallucinations as likely signs of mental illness. A mental health expert could have testified to the jury, and they would have understood these to be signs and symptoms of a neurological disorder, psychotic episodes, or some other form of a break with reality. *See* Appxs. 215, 216, Declarations of Dr. Stewart (recognizing psychotic symptoms and other symptoms of neurologic disorder exhibited by Mr. Umaña). This, too, would have been highly mitigating.

**2. The prosecution could not have made the arguments it made in closing had trial counsel presented the full case in mitigation they had available.**

Because trial counsel failed to investigate, prepare, and present anything approaching a proper case in mitigation, the prosecution was free to tell the jury that Mr. Umaña was simply a cold, calculating, and unrepentant killer whose life experience did not mitigate his crime, nor give

99

the jury reason to impose a sentence less than death. PPT at 889. Without information specific to

Mr. Umaña's life, the Government's task was made easy.

The Government could argue that the mitigation the defense had presented applied equally

to all boys who had grown up in El Salvador at the same time as Mr. Umaña.

> Sure, grew up in a war-torn country. But with a lot of other people at the time. Not all that became murderers and MS 13 members.
>
> [ . . .]
>
> He had the life that other boys in El Salvador had at the time.

PPT at 836, 889.

> The prosecutor repeatedly asked the jury to compare Mr. Umaña to others, including the testifying informants who "grew up just like he did" but unlike him did not grow up to be killers.

PPT 888.

According to the Government "by every account [. . .] he had a normal life" pointing out:

"He had a father. He had women figures in his life. [. . .] And he worked and he was apparently

respectful when he worked. Had all these great attributes and all." *Id*. at 836. The Government told

the jury that it was not enough that the mitigation specialist wanted them to believe that this was a

"terrible life and he was just in a war-torn country and let's just make this sort of fit this [ ] square

peg in a round hole doesn't make it so." *Id*.

The Government went on to dismiss any evidence of brain damage because Mr. Umaña's

life history, as presented at trial, did not corroborate it:

> Ladies and gentlemen, that's irrelevant. What they want you to believe, they want you to make the leap, make the jump. The jump is, well, wait a second. It's this brain that made him do it. There's something wrong there that made him do it. Well, there's no evidence of that. His brain functioned fine when he was growing up. He's working. He's playing soccer. Nothing is wrong with him. All of a sudden his brain went bad? No, he went bad. All right. Ladies and gentlemen, his brain didn't go bad; he went bad.

100

PPT 838.

None of these arguments would have had any force if placed in the context of the mitigation case defense counsel could have put on had they conducted a professionally reasonable investigation.

### 3. There is a reasonable likelihood the jury would not have imposed death had jurors heard this full account of Mr. Umaña's life.

There can be little doubt that the jurors agreed with the Government's evaluation of the defense's case at the penalty phase since the majority rejected most of the mitigation factors:

- 0 found that he had suffered head injuries resulting in brain damage;
- 0 found that his childhood was marked by many factors that increased the risk of criminal activity later in life;
- 1 found that he did not have the benefit of schooling after third grade;
- 2 found that his early life experiences made him more susceptible to recruitment by MS-13;
- 3 found that his childhood was marked by factors that impeded his moral development;
- 4 jurors found that he grew up in poverty;
- 9 found that he was exposed to violence during the civil war;
- 12 found that he was raised without his own mother;
- 0 found any other mitigating factor.

Crim. Doc. 1048 at 4-6.

At the same time, the jury unanimously found as mitigating factors that the Greensboro shootings involved no substantial planning and resulted from an emotionally charged fight. Crim. Doc. 1048 at 4-6.

In other words, the jury understood the predicate crime as not being among the worst of the worst. This is exactly the type of situation in which the failure to have put on a genuine case in mitigation is the most prejudicial – because this is a jury to whom this mitigation is likely to have mattered.

101

Had defense counsel provided these jurors with the full array of mitigating evidence that was readily available – one that provided the jury with an accurate picture of Mr. Umaña's childhood and adolescence as sketched out above, it is virtually certain that most jurors would have found as mitigating factors that:

- his childhood was marked by factors that increased the risk of criminal activity in later life;

- he did not have the benefit of schooling after third grade, and did not have the mental capacity to progress beyond the third grade;

- his early life experiences made him more susceptible to recruitment by MS-13;

- his childhood was marked by factors that impeded his moral development;

- he grew up in poverty; and

- he personally was exposed to violence during the civil war.

It is also a virtual certainty that jurors would have found "other mitigating factors" that the defense could have suggested. These would have included:

- a childhood history of physical and emotional abuse;

- complete neglect by his father;

- the belief, fostered by his father, that his mother had abandoned him;

- extreme poverty;

- constant hunger;

- exposure to personal and public traumatic events;

- in utero exposure to toxins;

- head injuries;

- brain abnormalities;

- low I.Q. and adaptive deficits amounting to intellectual disability or at least

102

borderline intellectual disability that impacted his ability to function everyday.

All of these are factors the Supreme Court has singled out and identified as mitigating, *Wiggins*, 539 U.S. at 534-35; *Rompilla*, 545 U.S. at 390-91; *Penry I*, 492 U.S. at 322., and all of these could have been proven.

This mitigation testimony that the defense could have presented had trial counsel conducted a reasonable life history investigation turns on its head the self-protective and false assertions of Mr. Umaña's father, which trial counsel relied on and presented at trial. The history developed through adequate investigation dramatically changes the picture of the life Mr. Umaña experienced growing up. Mr. Umaña's mother poisoned him with alcohol, insecticides/pesticides, and unclean food and water during gestation. Mr. Umaña's father poisoned him with Rohypnol when he drugged his mother. Mr. Umaña's mother saw him malnourished and covered with a rash and crying before she left him as an infant. His father neglected, deprived, and abused him as a child and teenager. He ate lizards, small birds, and whatever edible trash he could gather while raggedly dressed and unable to follow lessons at school. By his late adolescence, he joined MS-13 to finally be safer, relatively well-fed, and have someone to look out for him (even if they manipulated him). This moving story of how Mr. Umaña came to pledge allegiance to MS-13 and their violent practices would have caused a juror, at least, to question whether he was the worst of the worst murderers, fit for the death penalty. There is a reasonable probability that, hearing this testimony, at least one juror would have been persuaded to vote for life instead of death.

Mr. Umaña's constitutional right to the effective assistance of counsel at the penalty phase was infringed. This Court should vacate his sentence and grant him a new penalty phase trial.

**CLAIM II.    TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO INVESTIGATE AND PRESENT AVAILABLE LAY WITNESS EVIDENCE BEARING ON MR. UMAÑA'S MENTAL**

103

**HEALTH; FAILING TO RETAIN ADEQUATE EXPERT ASSISTANCE; AND FAILING TO PREPARE THE EXPERTS THEY DID RETAIN IN SUPPORT OF COMPELLING MENTAL HEALTH MITIGATION THAT INCLUDED TRAUMA, INTELLECTUAL DEFICITS, BRAIN DAMAGE, AND MENTAL ILLNESS IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.**

All other claims and allegations in this Motion are incorporated into this claim by this reference.

Perhaps the most basic tenet in a capital case is that the jury be given the tools necessary to make a reasoned, informed, reliable decision about whether to impose the most serious punishment our law allows. Central to that decision is the consideration of any relevant evidence the defendant can offer in mitigation of punishment. And among mitigating factors, those related to the defendant's mental health have always been understood to be among the most significant he can present and a jury should hear. "If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, 'evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.'" *Penry v. Lynaugh*, 492 U.S. 302 (1989) (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)). For that reason, courts have long been reluctant to allow a death sentence to stand when the jury was deprived of basic information about the defendant's mental health problems.

This is such a case. Alejandro Umaña had a compelling mental health case to present at the penalty phase of his trial. Trial counsel, however, were not properly prepared to present it.

First, even though this Court did not find him to be intellectually disabled within the meaning of *Atkins v. Virginia*, 536 U.S. 304 (2002), and thus ineligible for the death penalty (Crim. Doc. 934, Trial Order, 03/29/10), Mr. Umaña still has serious intellectual deficits that have marked

104

his life. Although the Supreme Court has made clear that evidence about intellectual limitation is unquestionably mitigating, *see, e.g.*, *Penry*, 492 U.S. 302; *Tennard v. Dretke*, 542 U.S. 274 (2004) (evidence of intellectual deficit does not need to reach level of intellectual disability to be mitigating), the jury heard little to nothing about his deficits and how they impacted his day-to-day functioning.

Second, Mr. Umaña was exposed as a young child and youth to a level of trauma, in both his home and the society at large, that few of us could imagine: poverty, starvation, neglect, abuse, violence, and a constant fear for safety. Traumatic suffering affected his development and his entire life trajectory, yet the jury learned next to nothing about what he personally experienced during childhood and adolescence or, most critically, how it affected his later functioning and behavior.

Third, Mr. Umaña is brain damaged. While the sentencing jury heard that physical fact from the defense, (PPT at 720, testimony of Dr. Merikangas), it learned nothing of the ramifications of brain damage in his life – how it has likely affected his judgment, his reasoning, his behavior, and the direction his life took.[21]

Finally, Mr. Umaña has long exhibited behaviors that may be symptomatic of the above problems or other psychological ills. The jury – tasked with deciding if he was among the "worst of the worst" and thus deserving to die – heard nothing about these.

At an evidentiary hearing, Mr. Umaña expects to present testimony consistent with the attached affidavits, declarations, and reports, from Dr. Davies, Appx. 211; Dr. Lugo, Appx. 212; Dr. Puente, Appx. 213; Dr. Sapia, Appx. 214; Dr. Stewart, Appxs. 215, 216; Dr. Sermeño, Appx. 237, Dr. Nielsen, 238; Dr. Martell, Appx.236; Dr. Shea, Appx. 243; Dr. Gur, Appxs. 29, 242; Dr.

---

[21] That Mr. Umaña is brain damaged was also seriously contested by the prosecution's expert, a circumstance in which trial counsel's failures in this arena left them unprepared to respond.

Merikangas, Appx. 27; and Dr. Olley, Appx. 28, demonstrating the wealth of mitigating mental health evidence that trial counsel failed to investigate, develop, and/or present. Because a person's mental health is integral to who he is and what he has done, trial counsel's failure to investigate or present even one of the categories of evidence noted above could easily prejudice a defendant on trial for his life. Here, those failures were multiplied, and Mr. Umaña has been severely prejudiced as a result.

**A. Counsel's failure to investigate and present evidence of Mr. Umaña's serious intellectual deficits deprived him of the reliable determination of punishment to which he was entitled.**

Evidence about a defendant's intellectual impairments is undeniably mitigating in nature. Mr. Umaña's intellectual limitations directly relate to his moral culpability and whether he deserves the death penalty. *See Penry*, 492 U.S. at 322-23 (noting that Penry's intellectual deficits were relevant to whether he was "less able than a normal adult to control his impulses or to evaluate the consequences of his conduct"). Because trial counsel did not adequately investigate and understand or appreciate the full range of available expert mental health testimony and available witnesses who knew Mr. Umaña during different phases of his life, they were not in a position to make an informed decision about whether to present this evidence to the jury. As a result, trial counsel made the patently unreasonable and uninformed decision to preclude the jury from hearing about Mr. Umaña's low intellect, impaired functioning, and intellectual disability, Crim. Doc. 1015, and the jury that sentenced Mr. Umaña to die did so without hearing a wealth of readily available evidence regarding his intellectual impairments.

**1. Counsel should have presented the jury with the evidence of intellectual impairment available from the pretrial *Atkins* hearing.**

At the pretrial hearing on intellectual disability, trial counsel presented evidence supporting a claim of intellectual disability, including testing indicating that Mr. Umaña has significant

106

deficits in intellectual functioning. Trial counsel presented evidence of Mr. Umaña's IQ score of 66 on a Wechsler Adult Intelligence Scale-III (WAIS-III) (Spanish version published in Mexico) using the US norms and a non-verbal IQ of 53 on the C-TONI. Testifying at the pretrial hearing about Mr. Umaña's intellectual deficits were (1) Dr. John Gregory Olley, a neuropsychologist and expert on intellectual disability, (2) Dr. Ricardo Weinstein, a neuropsychologist, and (3) Dr. James Merikangas, a neuropsychiatrist. *Atkins* Hearing 11/30/09. All these defense experts agreed that Mr. Umaña met the definition of a person with an intellectual disability by having significant impairments in intelligence and adaptive functioning that originated in childhood. Appxs. 70, 72, 73; *Atkins* Hearing 11/30/09; *see also* Appx. 213 (Declaration of Antonio E. Puente, Ph.D.); Appx. 236 (Report of Dan Martell, Ph.D.); Appx. 28 (Declaration of Dr. Olley); Appx. 81 (Dr. Ricardo Weinstein's supplemental letter report).

Although this Court ruled that the evidence presented at the *Atkins* hearing did not carry the defendant's burden of proving that Mr. Umaña suffers from intellectual disability, *see* Doc. 934 (03/19/10), it is possible that Mr. Umaña's jury, hearing the same evidence this Court did, might have found that he was Intellectually Disabled.[22] But even if it did not, or was not given a chance to make such a determination, Mr. Umaña has significant limitations in intelligence, which remained mitigating, and each juror was entitled to weigh his evidence of intellectual limitation as a mitigating circumstance. Even if counsel did not present evidence on the ultimate conclusion (that Mr. Umaña is a person with Intellectual Disability), the facts indicating his low IQ and poor functioning should have been presented and explained as demonstrative of intellectual impairment

---

[22] *See, e.g., United States v. Hardy*, 644 F. Supp. 2d 749, 750 (E.D. La. 2008) (defendant entitled to present evidence of Intellectual Disability to the jury, even if Court denies pretrial *Atkins* motion); *United States v. Williams*, 2014 WL 1669107 (D. Haw. Apr. 25, 2014) (same).

in mitigation at sentencing. *See Penry*, *supra*. This and other evidence would have shown the jury that those who knew Mr. Umaña considered him limited and that at least one qualified expert found his IQ to be extremely low. Indeed, evidence was available to present to the jurors indicating that he is very near the lowest end of the population's IQ bell curve and that his day-to-day functioning suffered. Trial counsel did not, however, present most of this evidence at the penalty phase, and to the extent it was presented, it was not done with an explanation of intellectual deficits.

Furthermore, the jury heard from the defense about head injuries that Mr. Umaña suffered as a child, as well as about a Positron Emission Tomography (PET) scan that a defense expert said indicated brain damage, (PPT at 722), testimony of Dr. Merikangas), but neither was offered as a basis to explain Mr. Umaña's behavior or as a potential reason why Mr. Umaña might have intellectual deficits; etiology was a category of evidence that counsel failed to mention. *See* Appx. 27, Declaration of Dr. Merikangas (Dr. Weinstein's testing was necessary and relevant to Dr. Merikangas's testimony).

> **2. The sentencing jury did not hear additional, readily available evidence that Alejandro Umaña has substantial deficits in intellectual functioning that impact his daily functioning.**

As demonstrated in Claims I, III, and IV, trial counsel failed to investigate, develop, and present additional readily available evidence regarding Mr. Umaña's Intellectual Disability. Just as counsel should have presented that evidence to this Court at the pretrial *Atkins* hearing, counsel should have presented that evidence to the jury at the penalty phase. Separate and apart from this Court's pretrial ruling, Mr. Umaña's Intellectual Disability is a factor that counsel should have presented to the jury. The jury was also entitled to consider Mr. Umaña's low I.Q. and deficits in day-to-day functioning, regardless of whether they were sufficient to establish an Intellectual Disability diagnosis. *See Penry*, *supra*. Because trial counsel did not adequately investigate and

understand or appreciate the full range of available expert mental health testimony and available witnesses who knew Mr. Umaña during different phases of his life, they were not in a position to make an informed decision about whether to present this evidence to the jury.

A constitutionally reasonable investigation would have uncovered additional evidence of Mr. Umaña's low intellectual quotient. Mr. Umaña has been evaluated by three psychologists who administered six different psychological tests yielding seven different IQs in separate neuropsychological evaluations. Appx. 213 at ¶64, Declaration of Antonio E. Puente, Ph.D. (Two of those psychologists, Drs. Weinstein and Suarez, testified during a pretrial hearing on Intellectual Disability. PPT 11/30/09. The third tested Mr. Umaña in connection with these 2255 proceedings. Appx. 213 at ¶21.) Because of errors in scoring and test selection, the evaluations produced only two valid I.Q.s that met the Standards of Educational and Psychological Tests, the rigors of the scientific literature, and professional practice standards. Appx. 213 at ¶67. Both valid I.Q.s support a diagnosis of Intellectual Disability because those I.Q.s are at least two standard deviations below average and occur in the lowest 2.5% of the population. *See* DSM-5, § 319 (F79); APA 2013. Independent of the Intellectual Disability diagnosis, an I.Q. this low is mitigating by itself; counsel's decision not to use that evidence to persuade the jury to spare his life cannot be explained by any reasonable strategy.

Moreover, given that counsel had decided to present an *Atkins* argument, they necessarily had to explore evidence of Mr. Umaña's substantial deficits in a range of behaviors, as that evidence is a necessary element of the *Atkins* claim. *See Moore v. Texas*, 581 U.S. 1, 15-16 (2017) (describing medical community's focus on adaptive *deficits* as second prong of *Atkins* determination). However, this wealth of evidence was not presented either as part of an argument that Mr. Umaña's life should be spared due to the mitigating factor of Intellectual Disability or as

part of an argument that each adaptive deficit constitutes a separate and distinct mitigating factor, regardless of whether this Court or the jury found Mr. Umaña was Intellectually Disabled. Instead, what little the jury heard that might have been explained in terms of intellectual deficits was presented as Mr. Umaña *acting out* and *failing* rather than him being incapable of anything more.

For example, the jurors heard Mr. Umaña failed the third grade, but there was no evidence about why. Given the Government's portrayal of Mr. Umaña's life, it would certainly have been reasonable for the jurors to assume he was skipping school or was a troublemaker unwilling to learn[23]. Although the Spanish school records, admitted as exhibits, showed his attendance rate was above 90 percent for 1991 and 1992, the attendance rate was never discussed in the testimony, the exhibit was not translated into English, and the attendance portion of the report was cut off. Tr. Def. Ex. 18.

Counsel's failure to provide the jury with translated records also concealed from them that his failure was not about disciplinary issues. Instead, those records – had they been readable by the jurors – would have shown that Mr. Umaña did well in areas like cooperation, promotion of customs and beliefs, and practice of moral and civil values but failed in other more abstract and self-driven areas like responsibility, health and protection, initiative, self-confidence, and work habits. *Id.*; Appx. 6 at ¶16-17, Declaration of Ana Gladys Magaña; Appx. 112 at ¶3, Declaration of Luis Mario Ramos Mendez (Mr. Umaña wanted to learn, even in 3rd grade in night school at sixteen years old, "…but it was hard for him."); Appx. 1 at ¶21, Declaration of Vilma Araceli Salazar de Argueta ("Alex would ask me to help him with his homework. When I tried to explain

---

[23] As addressed in more detail in Claims 14-17, *infra*, Mr. Umaña is prevented from discovering and proving in this pleading how jurors viewed the (lack of) evidence from the defense. *See* Crim. Doc. 819 (Order prohibiting counsel from contacting jurors); Civ. Doc. 56 (Order denying 2255 counsel motion for leave to interview jurors).

110

things to him, he would get confused and did not understand; he did not get it."); Appx. 230 at ¶2 Supplemental Declaration of Vilma Araceli Salazar de Argueta. The jury did not hear this.

Nor did the jury hear that Mr. Umaña was still in the third grade at age twelve when he ended school completely, facts that several witnesses have corroborated during the post-conviction investigation. Appx. 4 at ¶ 23, Declaration of Vilma Elizabeth Torres de Cruz; Appx. 7 at ¶ 5, Declaration of Luis Mario Martír Monroy. Family and friends reported that Mr. Umaña went to first grade more than once and repeated third grade but then stopped because he was embarrassed and struggled. Appx. 19 at ¶16-17, Declaration of Reina Umaña; Appx. 21 at ¶12, Declaration of Rosa Lilian Umaña González; Appx. 4 at ¶23. While Mr. Umaña's cousins and friends passed each grade, Mr. Umaña continued to stay behind and was older and bigger than his classmates. Appx. 19 at ¶16-17. The school records show that Mr. Umaña's cousin Geovanni (who was also born in 1982) was in third grade in 1991 while Mr. Umaña was in the first grade; later, Geovanni was in the sixth grade in 1993, while Mr. Umaña was in a remedial combined first, second, and third grade class in 1994. Appx. 30 at 5, 14 (school records); *see also* Appxs. 6 at ¶12, 31 (teacher stating that if Mr. Umaña was born in 1982, he would have started school in 1989 instead of 1991) (school records).

Records would have further confirmed that Mr. Umaña's failures were not the result of attitude but inability. At age sixteen, Mr. Umaña, of his own volition, went to night school to try to complete third grade. He still struggled with his schoolwork because he could not understand it. Appx. 112 at ¶3, Declaration of Luis Mario Ramos Mendez. Other childhood friends, including Karla Herrera Calderón and Vilma Araceli Salazar de Argueta, saw Mr. Umaña struggle with simple academic work like addition and repeatedly mess up simple tasks like picking coffee beans. Appx. 220 at ¶6, Declaration of Karla Herrera Calderón; Appx. 230 at ¶2, Declaration of Vilma

111

Araceli Salazar de Argueta; *see also* Appx. 219 at ¶16, 17, Declaration of Jose Wilfredo Herrera Calderon (Mr. Umaña could not read or write; other kids made fun of him for pretending to read a newspaper; he told Jose's dad, "my brain is small.").

Relatedly, counsel failed to meet the prosecution's material misrepresentation of Mr. Umaña's written communication skills through its manipulation of the jail letter exhibit translations to make Mr. Umaña appear more educated than he was. *See* Claim VIII; Appx. 270; Appx. 268 (Decl. of Dr. Robin Riner); Appx. 238 at 5 (Report of Dr. Erik Nielson, noting that Mr. Umaña's songs are "simplistic," "highly repetitive," and "with little to distinguish it as a unique composition," which suggest "Mr. Umaña's artistic abilities and command of language are limited at best.").

At trial, counsel told the jury, without this readily available evidence, "And then after school, he – it's *really unclear what happens to him at that age*. Of course, we have the issue of how old he really was at that age. [. . .] Recent evidence *suggests* that perhaps he was actually born in 1982 and was actually older." PPT at 881 (emphasis added). Had counsel conducted the necessary investigation, it would have been clear to them – and to the jury – exactly what happened to him "at that age"; for a range of reasons far beyond his control, and explained in detail below, as well as in Claims I, III, and IV, Mr. Umaña lacked the intellectual capability to do anything but fail at school. It was counsel's deficient investigation that made true their lament that "it is really unclear" what happened to Mr. Umaña, and it was their deficient investigation that led to just one juror finding the mitigating factor that Mr. Umaña "did not have the benefit of schooling after third grade." Crim. Doc. 1048 at 4-6.

A reasonable investigation also would have uncovered deficits in self-care, each independently mitigating circumstances, regardless of whether Mr. Umaña convinced this Court

112

or the jury that he met an Intellectual Disability diagnosis. For example, Mr. Umaña's cousin saw Mr. Umaña had difficulty dressing himself and often went to school with mismatched shoes. Appx. 15 at ¶15, Declaration of Lillian Tino; *see also* Appx. 12 at ¶14, Declaration of Monica Tatiana Reyes. *See also* Claim I.B.3, B.6 (more fully describing the evidence of adaptive deficits that trial counsel failed to uncover); Claim III; Claim IV.

With this evidence, trial counsel could have presented the jury with a robustly supported argument that Mr. Umaña is Intellectually Disabled. However, even if trial counsel did not offer an expert opinion as to the ultimate conclusion that Mr. Umaña should be diagnosed with an intellectual disability due to the Court's pretrial ruling that Mr. Umaña did not meet his burden of proving Intellectual Disability, or even if the jury did not so find that Mr. Umaña was Intellectually Disabled having heard the *Atkins* evidence, trial counsel could have offered the information obtained from lay witnesses, described above and in Claim I, in support of numerous separate and distinct mitigating factors. In turn, this lay evidence also would have supported the substance of expert opinion, which should have been presented to the jury to explain Mr. Umaña's intellectual limitations.[24] Dr. Olley told post-conviction counsel that witnesses reported child-like and immature behavior by Mr. Umaña into late adolescence; that he did not realize when someone attempted to have a serious conversation with him; and that he could not learn to read and write. *See* Appx. 28 at ¶ 16-19 (Dr. Olley interpreting statements by Vilma Araceli Salazar de Argueta

---

[24] Dr. Merikangas testified that Mr. Umaña "had cognitive decline. In other words, his thinking was not as good as it should be" (PPT 728) and that "his brain is not functioning normally." PPT 737. His deficits made him "less able than normal people to control his conduct. He would be more subject to duress, that is control by others, who are perhaps smarter or more capable than he is. That he be more likely to be a -- lead, easily lead by stronger people." *Id*. The lay witness declarations provided in Claim I repeatedly gave concrete examples of Mr. Umaña's 'not good thinking,' his poorly functioning brain, and his inability to control himself or anyone else when stressed.

113

(Appxs. 1, 230); Monica Tatiana Reyes, Appx. 12; and Saul Osvaldo Umaña, Appx. 22 as providing evidence that supports diagnosis of intellectual disability). Mr. Umaña expects to present expert testimony at a hearing from mental health professionals, including Dr. Olley, Dan Martell, Pablo Stewart, Jennifer Sapia, and Selena Sermeño, consistent with their proffered reports, that each of these behaviors described by lay witnesses was a limitation on Mr. Umaña's life and qualified as mitigating evidence either with or without the label of intellectual disability attaching. *See* Appxs. 215, 216 (Dr. Stewart); Appx. 214 (Dr. Sapia); Appx. 236 (Dr. Martell); Appx. 237 (Dr. Sermeño).

Moreover, as described in greater detail below and Claim III, because of trial counsel's deficient investigation, the jury was deprived of additional evidence – above and beyond Dr. Merikangas's interpretation of the PET scan – showing the biologic bases of Mr. Umaña's impairments. *See* Appx. 29 at 3 (Dr. Gur's analysis of PET scan); Appx. 242 (Dr. Gur's analysis of MRI); Appx. 211 (Report of Dr. Davies regarding Alcohol Related Neurological Disorder); Appx. 212 (Report of Dr. Lugo regarding neurotoxin exposure).

Trial counsel's failure to interview those who knew Mr. Umaña's daily functioning during childhood and secure all necessary expert testing and consultation precluded their ability to make an informed, strategic decision about whether to present evidence of Intellectual Disability at the penalty phase and ultimately resulted in their deficient failure to present evidence of Mr. Umaña's low functioning to the jury.

### 3. Trial counsel's inadequate investigation of lay witness testimony regarding Mr. Umaña's adaptive behavior deficits prejudiced the defendant

Evidence of borderline intellectual functioning can be powerful mitigating evidence, and should have been presented to the jury. There was considerable evidence to present about

114

intellectual deficits – from those who saw Mr. Umaña's daily functioning[25] to experts who tested him[26] – and there is a reasonable probability that it would have tipped the balance at sentencing.

The United States Supreme Court has considered evidence of low intelligence that falls short of intellectual disability important mitigating evidence that the jury must be permitted to consider. *See Tennard v. Dretke*, 542 U.S. 274, 286-88 (2004) (holding that Tennard's low IQ is relevant mitigating evidence, even if it does not constitute mental retardation, and even if there is no showing of a nexus to the crime); *Smith v. Texas*, 543 U.S. 37 (2004) (finding evidence of 78 IQ to be mitigating evidence that the jury must be allowed to consider); *Wiggins v. Smith*, 539 U.S. 510, 535 (2003) (observing, with respect to individual with IQ of 79, that "Wiggins[']. . . diminished mental capacitie[s] further augment his mitigation case"); *Burger v. Kemp*, 483 U.S. 776, 779, 789, n. 7 (1987) (noting evidence that petitioner "had an IQ of 82 and functioned at the level of a 12-year-old child" could not have been excluded by the state court).

Evidence of Mr. Umaña's intellectual deficits would also have given the jury another way to consider his unreasoned and impulsive actions at the time of the crime and during the pretrial and trial proceedings. Many of Mr. Umaña's actions that appear threatening in nature can also be seen through the prism of someone not very bright (for example, as someone who explains the code at the same time he is purportedly trying to fool the reader, GPT at 583), terrified by events that he does not and cannot understand, whose lifetime of exposure to trauma and violence

---

[25] At an evidentiary hearing, Mr. Umaña expects to present a wealth of mitigating evidence regarding his impaired functioning, consistent with the lay witness affidavits proffered at Appxs. 1-22, 112, 217-230.

[26] At an evidentiary hearing, Mr. Umaña expects to present mental health expert testimony consistent with the expert opinions proffered at Appxs. 27-29, 211-216, 236-37, regarding Mr. Umaña's low intellectual functioning and its impact on his daily life.

combined with his damaged brain limits his capacity to respond in a reasoned manner and without violence and aggression. Evidence of Mr. Umaña's low intellectual functioning would have served as a powerful counter to such prosecutorial arguments as Mr. Umaña was playing a "cat and mouse game" with law enforcement officials and was much more "savvy" than he appeared. PPT at 896 (prosecutor's closing argument).

There is at least a reasonable probability that, had trial counsel done a full investigation into Mr. Umaña's life, and presented the breadth of evidence available indicating compromised intellectual functioning; had they presented the evidence offered at the pretrial hearing on intellectual disability altogether; and had they put on experts who could have told the jury how his particular deficits compare to the population at large and why his specific deficits are relevant to his daily functioning, at least one juror would have decided that death was not the appropriate punishment for him.

### B. Trial counsel's failure to investigate and present evidence of trauma deprived Mr. Umaña of a reliable sentencing determination.

Trial counsel rendered ineffective assistance of counsel by failing to investigate and present available evidence of Mr. Umaña's exposure to trauma. Trial counsel presented little evidence of traumatic events affecting Mr. Umaña's childhood, offered distorted and often inaccurate evidence of the brutality he witnessed and experienced, and failed to assess and present evidence of the impact of that trauma on Mr. Umaña. Further, trial counsel rendered deficient performance by failing to retain an expert on trauma for an individual assessment of Mr. Umaña.

Trial counsel presented to the jury an incomplete and misleading account of the trauma Mr. Umaña endured throughout his life in El Salvador. Witnesses testified that Mr. Umaña grew up during the Salvadoran civil war, but there was little to no evidence regarding his personal experiences or the war's impact on him. PPT 539. Trial counsel further presented misleading

116

evidence that Mr. Umaña was raised by loving, nurturing caregivers after his mother voluntarily left him. Perhaps most significantly, trial counsel neither investigated nor presented available evidence of trauma that included significant abuse and neglect within Mr. Umaña's household. At an evidentiary hearing, Mr. Umaña expects to present lay witness testimony consistent with the affidavits proffered at Appx. 1-22, 30-35, 40, 44-45, 50-51 105b-07, 109-113, 217-30, 239, and as summarized below, showing the wealth of trauma evidence available to trial counsel.

1. **The jurors were not told about the traumas suffered by Mr. Umaña in his own home as a child.**

Richard McGough, the defense mitigation specialist, testified that Mr. Umaña was raised by his father and other women in the family after his mother abandoned him. Mr. Umaña was raised in a primarily "mixed" neighborhood, not "exclusively poor or rich" in Santa Ana, El Salvador. PPT at 537. Because the investigator talked to only a single family member, Mr. Umaña's father, Rafael, he gave the jury a skewed and inaccurate picture of Mr. Umaña's life.

Contrary to what Mr. McGough related to the jurors, Mr. Umaña's father was a brutalizing force who assaulted and controlled those around him, including his son. *See, e.g.*, Appx. 1 at ¶15 Declaration of Vilma Araceli Salazar de Argueta, ("Alex's father was a bad, violent man. Quique was horrible. He terrorized everybody. He even scared babies and yelled at them."); Appx. 3 at ¶12-14 Roxana Cruz Torres, (describing Rafael as "very aggressive" and worse when he drank; when drunk, "he would go around looking for fight"; he sold drugs and "would shout and threatened my father in front of my family"); Appx. 4 at ¶18, Vilma Elizabeth Torres de Cruz, (Rafael was "unstable," with "a bad temper and he would get angry over any little thing"; for example, he drunkenly chased and threatened to kill Vilma's husband for using the electricity.); Appx. 5 at ¶4, Supplemental Declaration of Vilma Elizabeth Torres de Cruz, (She saw Rafael in a rage, beating his own uncle with a knife – the uncle was "beaten up and bruised for a long time.");

117

Appx. 219 at ¶2-3, José Wilfredo Herrera Calderón; Appx. 230, ¶9, Vilma Araceli Salazar de Argueta (supplement) ("Alex's father was brutal. He beat Alex over anything."). He mercilessly beat Mr. Umaña's mother, Leticia Ramirez so much so that she described her life with him as "pure hell." Appx. 10 at ¶ 38, Declaration of Leticia Ramirez-Diaz. Around the time she became pregnant with Mr. Umaña, Ms. Ramirez attempted suicide by ingesting pesticide. *Id.* at ¶41. *See* Claim 1, *supra*. When her son was about eight months old, Rafael forced her to leave the home and leave her baby in Guatemala with him. Appx. 10 at ¶61. Rafael told his son that his mother had abandoned him. Appx. 10 ¶ 79.

Neighbors, friends, and girlfriends were available to testify about the effects on Mr. Umaña of the loss of his mother and the narrative he was told about it. They would have told the jury how distraught he was as a youth and adolescent by her purported abandonment. He was raised for a time by his great-grandmother Francisca. Mr. Umaña and his cousin Ronal slept with Francisca in the same bed and continued to do so after being bedridden and in great pain until she succumbed to stomach cancer in 1991. Appx. 20 at ¶8, Declaration of Ronal Umaña and Appx. 33 (cemetery record). After her death, his Aunt Lilian reported, "When my mother died, Alex was little; he was left alone, disoriented, neglected. From then on Alex was left defenseless without a stable place to stay." Appx. 15 at ¶14, Declaration of Lilian Tino. Shortly after Francisca died, Ronal, who was raised with him like a brother, left for the United States to survive. Appx. 20 at ¶36.

After the death of Francisca, Mr. Umaña was left alone to be raised by Rafael. Rafael was an unstable alcoholic with a bad temper. Appx. 1, Declaration of Vilma Araceli Salazar de Argueta; Appx. 4, Vilma Elizabeth Torres de Cruz; Appx. 5, Vilma Elizabeth Torres de Cruz (supplemental); Appx. 105b Edwin Esau Umaña; Appx. 107 Gerardo Arriola Umaña; Appx. 109 Roxana Marisol Ramirez; Appx. 111 Dora Alicia Umaña Gonzalez; Appx. 112 Luis Ramos.

Rafael carried a weapon and terrorized his neighbors. Appx. 4 and Appx. 22, Declaration of Saul Osvaldo Umaña. He beat Mr. Umaña as if he were an adult, with fists and switches and in plain view of others. Appx. 22 and Appx. 3, Declaration of Roxana Cruz Torres. Neighbors saw and heard the severe beatings Rafael inflicted upon his son for minor infractions such as staying out too late, getting wet when it rained outside, being dirty, or wetting the bed (which he did until he was around 12 years old). Appx. 15 (Declaration of Lilian Tino) and Appx. 4. He was left with marks and bruises. Appxs. 1, 3, 22. As an additive punishment to beatings, Rafael withheld food from Mr. Umaña, sometimes eating right in front of him. Appxs. 4, 15.

Rafael and Mr. Umaña returned to El Salvador from Guatemala when Mr. Umaña was still very young; Ronal recalled living in Santa Ana and seeing Rafael demanding money from Mr. Umaña's mother, beating and punching her in the face until she handed over the money. Appx. 20 at ¶20. Ronal recalled that Mr. Umaña was pained by these violent interactions and would hold his head in his hands, insisting he did not want to see them. *Id.*

Soon after the death of Francisca, Yanira, a young girl who also lived in the meson, came to live in the room with Rafael. Yanira was approximately five years older than Alejandro, who was about eight or nine at the time. Appxs. 1, 4, 22. Rafael would also beat her regularly so neighbors heard the blows and screams coming from their room. Appx. 4 at ¶15.

Neighbors also described Mr. Umaña being hungry. One neighbor stated:

> Alex went hungry. He often went without eating. His family did not help him with food. I never heard anyone call him to eat. They just left him alone to find food on his own. He would go out to look for small animals like doves or iguanas or to pick mangos and ice-cream beans. Sometimes he would ask my mother if she could spare a tortilla. Alex broke our hearts.

Appx. 1 at ¶ 14. His cousin said Mr. Umaña had to go looking for food at a very young age. She recalled:

119

Alex would hunt pigeons and other birds for food. I would sometimes help him prepare the fire, as did my grandma Paca. Alex would look for a piece of plastic from the trash, and we would set fire to it using the firewood we gathered from the trees. Alex did not even clean the bird before eating it. He also ate iguanas and opossums. Alex would climb trees to pick fruit. He would eat the outsides of almonds, the part other people do not eat. He would climb mango trees and eat mangos to the point where he sometimes had sores in his mouth from the mango sap, or he would boil seeds in water and put ashes on them, "as a condiment," he said. Sometimes Alex also went fishing in the Sapoapa River, carrying off tiny fish to eat.

Appx. 15 at ¶24.

These are but some examples of the abandonment, neglect, and abuse that Alejandro Umaña endured from the time he was an infant through his teenage years. *See also* Appxs. 1-5, 36, 105, 107, 109, 111, 112, 219, 223, 229, 230. This kind of brutality affects a child's development, the wiring of his brain as he grows, and how he responds to the world around him. Appx. 214 at pp. 2-3, 6-7, 12-29, Declaration of Dr. Sapia at p. 28, ("Taking into account Mr. Umaña's significant developmental trauma, his symptoms of PTSD, superimposed on his intellectual deficits, would have had a profound impact on his perceptions of reality, decision making, reasoning and judgment and are therefore pertinent mitigating factors."); Appx. 243 at 12 (Report of Dr. Shea) ("It is known that repeated trauma during youth can have enduring effects upon both neurobiological and psychological development, altering adult behavioral patterns and emotional stability."); *id.* at 12 (regarding individuals like Mr. Umaña, with repetitive abuse histories: "[they] may act impulsively, do not adequately incorporate or reflect on the consequences of their actions and thus lack good consequential thinking . . .. In essence they and their actions are obtuse and unrealistic, clearly signs of frontal lobe deficits."). Although these events were essential to the defendant's life history and trajectory, the jury who had to decide his fate learned nothing about them due to the failures of trial counsel.

### 2. The jurors were not told about what Mr. Umaña personally witnessed and suffered on account of the civil war.

Although Mr. Umaña regularly witnessed atrocities as a child and adolescent because of the El Salvadoran Civil War, his jury learned nothing about these experiences or about the scars they left. The testifying mitigation specialist learned from Rafael and related to the jury that the defendant saw a single act of violence, a dead body near a coffee plantation. Rafael reported that he shielded his son from the war violence by ensuring he was inside at sundown, whether a mandated curfew was enforced. PPT at 540.

Yet this portrait was far from the real one. By the age of eight, Mr. Umaña regularly witnessed traumatic events from the war. Appx. 2, Declaration of Melvin Cruz Torres. Multiple bodies lined the nearby roads. The dead were often left to decompose in the open. Among those willing to testify to these traumatic events was Melvin Cruz Torres, a neighbor and childhood friend. He could have described the multiple dead bodies he and Mr. Umaña witnessed and the horrors they saw. Among them, for example, was the sight of a man they knew, hanging from a tree with his eyes bulging and his family coming to cut his body down. They saw bodies face up in a ditch decomposing, with some of the dead still holding their weapons. Maggots were eating their flesh, exposing facial and body bones, and the air was filled with the smell of rotting corpses. *Id.* at ¶16, 17. The jury should have heard the troubling fact that next to the *mesón* where Mr. Umaña lived was a coffee field where the dead bodies of children and adults were buried. When a bypass was built in that area, Mr. Umaña, about eight or nine years old, watched as the bodies and

121

remains were dug up and taken away. Appx. 1 at ¶22, 23, Vilma Araceli Salazar de Argueta and

Appx. 22 at ¶10, Declaration of Saul Osvaldo Umaña.[27]

Later, Mr. Umaña and Luis "Chipis" Ramos rode the train ("El Tren de la Muerte") from

southern Mexico to the United States, starving, freezing, not sleeping, being exposed to the

elements, and being robbed for more than thirty days. Appx. 112 at ¶19-23, Declaration of Luis

Mario Ramos Mendez. In one of many events, they ran to get on the train and saw a man, who had

pushed his son on the train, fall under it and get run over in front of the boy. *Id*.

There were numerous such facts and traumas that the sentencing jury should have heard

about the conditions under which Mr. Umaña lived. The trial team's utter failure to interview those

who knew him, along with their failure to tell the jury anything about how the brutal civil war

affected Mr. Umaña and his family personally,[28] was a gaping hole in the mitigation case and

amounted to constitutionally ineffective lawyering.

**3. Trial counsel failed to provide evidence from an expert on trauma who, properly informed about Mr. Umaña's actual experiences, could have testified about the effects of chronic trauma on his development and state of mind.**

In addition to failing to accurately portray what Mr. Umaña lived through in his home and

on account of the war, trial counsel failed to perform adequately in not presenting expert testimony

on the effects of these traumatic experiences on their client's development and overall functioning.

---

[27] The bypass became a dangerous area for cars, leaving Mr. Umaña a witness to numerous serious accidents. Appx. 2 at ¶18, Declaration of Melvin Cruz Torres.

[28] Indeed, the jurors were effectively misled by the defense's presentation, which told them the young Mr. Umaña was *less* affected than his peers because his father purportedly "protected" him to the point that he supposedly witnessed a single atrocity in all the years of the war. Unbeknownst to the mitigation specialist and counsel, this was patently false.

122

There is a reasonable probability that, but for the deficient performance of trial counsel in investigating and presenting evidence of trauma, the result of the penalty phase of trial reasonably would have been different. The evidence would have revealed that Mr. Umaña was exposed to multiple traumatic events starting at a young age within and outside the home.[29] Mr. Umaña witnessed many atrocities from the civil war. He was subjected to physical and emotional abuse, poverty, neglect, and malnutrition. This was vastly different from the life history presented to the jury.

At an evidentiary hearing, Mr. Umaña expects to present expert mental health testimony consistent with the expert reports and affidavits proffered at Appxs. 211-17, 236, 237, 28, 29, 242, and 243, demonstrating that an expert on trauma could have established that the multiple physical and emotional traumas that Mr. Umaña experienced – including an absent mother who he believed abandoned him, a father who brutalized him, a war that traumatized him and severe socio-economic deprivation – had profound effects on his psyche, development, and neurological abilities. A properly prepared expert could have testified that repeated trauma during youth, especially of the kind and duration that Mr. Umaña endured, is likely to have a deleterious impact on neurobiological and psychological development, literally influencing the development of the

---

[29] At an evidentiary hearing, Mr. Umaña expects to present a robust case regarding the trauma to which he was exposed, consistent with the proffered lay witness declarations and records at: Appx. 1-22, 30-35, 40, 44-45, 50-51 105b-07, 109-113, 217-30, 239, including: Leticia Ramirez Diaz (Mr. Umaña's mother) – Appxs. 10, 217, 218; Saul Osvaldo Umaña (brother) – Appx. 22; Ronal Umaña (paternal cousin– Appx. 20; Zoila Olana (former neighbor) – Appx. 8; Monica Tatiana Reyes (former girlfriend) – Appx. 12; Melvin Cruz Torres (former neighbor) – Appx. 2; Lilian Tino (paternal cousin) – Appx. 15; Ana Julia Magaña de Sanabria (educator)– Appx. 13; Vilma Araceli Salazar de Argueta (former neighbor) – Appxs. 1, 230; Rosa Lilian Umaña Gonzalez (paternal aunt) – Appx 21; Vilma Elizabeth Torres de Cruz (former neighbor) – Appxs. 4, 5, 228; Roxana Torres Cruz (former neighbor) – Appxs. 3, 227; and Jose Wilfredo Calderon, Karla Herrera Calderon, and Maria Lidia Calderon (former neighboring family) – Appxs. 219, 220, 221.

123

brain and ultimately affecting adult behavior. An expert who had become familiar with his history and interviewed Mr. Umaña would have told the jury that he exhibits behaviors consistent with such scars. Indeed, Dr. Selena Sermeño, a psychologist who focuses on childhood trauma, testified at trial, but she had not met or interviewed Mr. Umaña. PPT at 618. After meeting Mr. Umaña post-conviction and having been provided substantial collateral information regarding his unfortunate and horrific background, Dr. Sermeño provided a powerful declaration describing the all-encompassing impact of trauma in his life and finding that the many traumas rendered him extremely vulnerable to the influence of others in meeting his social needs and to failing to develop an appropriate process of decision making. *See* Appx. 237.

Dr. Jenifer Sapia, a psychologist, professor, and officer in the North Carolina National Guard, also met and evaluated Mr. Umaña with the benefit of the substantial collateral information developed in post-conviction. She concluded, based on the declarations, records, other mental health evaluations, and her clinical interview with Mr. Umaña, within a reasonable degree of psychological certainty, that Mr. Umaña has substantial cognitive impairments in addition to chronic and profound developmental trauma with symptomatology associated with Posttraumatic Stress Disorder (PTSD). Mr. Umaña has experienced at least seven of the ten Adverse Childhood Experiences shown to be long-lasting causes of many adverse life outcomes, including mental illness, substance abuse, and social malfunction. Considering Mr. Umaña's significant developmental trauma, his symptoms of PTSD, superimposed on his intellectual deficits, profoundly impacted his perceptions of reality, decision making, reasoning, and judgment. Appx. 214, Declaration of Dr. Jennifer Sapia.

The jury also should have heard that Mr. Umaña never received any mental health treatment to help mitigate the severity of his traumatic upbringing. An expert such as Dr. Sapia

124

could have explained the significance of both the chronic nature of his exposure to trauma and the absence of external support, both leaving him without time or resources to recover from the experiences and develop coping skills. An expert could have testified that individuals enduring such traumas have a greatly increased risk of cognitive and emotional deficits throughout adult life. *See* Appx. 237 at p. 2, Declaration of Dr. Sermeño. *See also* Appx. 243 at 12, Report of Dr. Shea (opining that Mr. Umaña's extensive trauma history "resulted in a developmental delay of significant proportions"; that "[i]ndividuals with such traumas have a greatly increased risk of cognitive and emotional deficits throughout adult life").

Additionally, properly prepared experts also could have addressed the interrelation between trauma and Mr. Umaña's other difficulties, including brain damage, cognitive impairment, and intellectual disability. For example, psychiatrist Pablo Stewart, who also has experience working with Central American refugees in the United States, evaluated Mr. Umaña in connection with these 2255 proceedings. In addition to opining on the effects of trauma on Mr. Umaña's life, Appxs. 215, 216, he explained how this trauma fit in the larger picture. Relying on the evidence described above and in Claims I, III, and IV, Dr. Stewart opined that, as a result of the synergistic effects of Mr. Umaña's PTSD, cognitive impairment, low I.Q., intellectual disability, and neurological deficits, Mr. Umaña's "ability to act intentionally and with premeditation and deliberation" was "impaired" "during the homicides in Greensboro and at any other time." Appx. 216, ¶9 (Decl. Pablo Stewart, M.D., 2021).

### 4. The failure to provide any evidence, much less expert testimony about trauma, prejudiced Mr. Umaña.

As noted above, the jury learned next to nothing about the abuse Mr. Umaña suffered from a violent father or the atrocities he witnessed and the terror he experienced due to the brutal civil war in El Salvador and the trip to the United States. Nor did they hear from an expert in trauma

125

about the likely effects of these experiences on his neurological capacity and developmental trajectory. If such evidence had been presented, there is a reasonable probability that at least one juror would have found relevant mitigating circumstances and determined that life in prison without parole was the more appropriate punishment.

The prejudice becomes more apparent when one considers what the jury heard. They were told that Rafael Umaña was a father who looked out for his son and shielded him from most of the violence of the ongoing war. PPT at 521 (testimony of Richard McGough). They were given a portrait of an upbringing that, while poor, was not marked by a lack of food or medical care, much less tainted by chronic violence. And the experts the jury did hear from were not able to speak about Mr. Umaña's actual experiences as a child or teenager, but rather to general horrors from the war that appeared to have largely passed this client by. PPT at 600 (testimony of Dr. Sermeño); PPT at 658 (testimony of Maria Santacruz Geralt). Missing from the penalty phase were accounts from those who knew him, his family, and his neighbors of how Mr. Umaña actually lived. The experts they did present relied on limited and misleading information provided by the mitigation specialist and never interviewed Mr. Umaña himself.[30] This left the jury with a seriously distorted picture of what this individual's life was really like.

---

[30] For example, Dr. Selena Sermeño testified as an expert on risk factors to the moral development of children from exposure to the effects of the war in El Salvador. She relied on the social history report prepared by the mitigation specialist (Appx. 36) and thus was limited to the history reported by his father and the few life history witnesses who did not know the client's trauma history. Trial counsel did not ask her to meet or evaluate Mr. Umaña for his personal experiences from the war or any other traumatic events. PPT at 618; *compare with* Appx. 237 (Dr. Sermeño's report, post-conviction, after having the opportunity to meet Mr. Umaña and review evidence of his traumatic youth); *see also* Appx. 214 (Declaration of Dr. Jennifer Sapia, regarding impact of trauma); Appxs. 215, 216 (Declarations of Dr. Pablo Stewart, regarding impact of trauma).

Dr. Maria Santa Cruz Geralt, a psychologist, testified about a study involving risk factors that made Salvadorans vulnerable to gang recruitment. PPT at 637. She was not asked to meet or

The effect of counsel's failures is also reflected in the jury verdict form. First, if they had adequately investigated his home life, they would have been able to offer the jurors additional and compelling mitigating factors to consider and weigh. But in addition, very few jurors found his earlier life experiences – as presented – mitigating, and *none* found any other "factor in his background" that might militate against a death sentence. Crim. Doc. 1048 at 4-6. This would have been highly unlikely, if not impossible if trial counsel and their mitigation specialist had investigated and presented evidence of his life and traumatization. Had they done so, there is at least a reasonable probability that the outcome of the penalty phase would have been different.

### C. Trial counsel's failure to investigate lay witness testimony supporting a claim of brain damage, to provide that evidence to their experts, to consult with their experts, or to insist on necessary testing deprived Mr. Umaña of a reliable sentencing determination.

At an evidentiary hearing, Mr. Umaña expects to present evidence consistent with the lay witness declarations proffered at Appxs. 1-22, 30-35, 40, 44-45, 50-51 105b-07, 109-113, 217-30, 239, proving that a wealth of evidence regarding Mr. Umaña's brain damage and its impact on his functioning was readily-available to trial counsel. Mr. Umaña further expects to present expert mental health testimony consistent with the expert reports and declarations proffered at Appxs. 26, 29, 211-216, 236-238, 242, 243, demonstrating the expert testimony that would have been available to trial counsel, and should have been presented to the jury, had trial counsel conducted a constitutionally-reasonable investigation.

---

evaluate Mr. Umaña to determine whether he even possessed the risk factors of which she spoke. Dr. Mark Cunningham (PPT 419) and Mark Bezy (PPT 697), experts in Bureau of Prisons (BOP) security procedures, explained that BOP was well equipped to address any security concerns.

127

### 1. Trial counsel failed to investigate or present available lay witness testimony establishing brain damage

The mitigation specialist testified that the father reported Mr. Umaña suffered at least one head injury as a child. PPT 537; Appx. 36. Trial counsel failed to investigate or present testimony from lay witnesses who could have provided corroboration for this and at least one more head injury as a child. Among the available witnesses was Mr. Umaña's Aunt Reina, who could have told the jury that she saw her nephew when he was little fall and hit his head after trying to climb to a cupboard, at which point he lost consciousness. Appx. 19 at ¶13. His cousin Ronal could have provided evidence about Mr. Umaña falling from a tree at about the age of five, hitting each limb as he fell, and his head bleeding. Appx. 20 at ¶ 31. Aunt Reina, paternal grandmother Ana Ruth Umaña, and neighbor Vilma Elizabeth Torres de Cruz could all have corroborated that he suffered debilitating headaches as a child, possibly from one of the falls. Appx. 4 at ¶22; Appx. 19 at ¶12; Appx. 16 at ¶20. His grandmother, Ana Ruth Umaña González, also could have provided testimony about the severity of his migraines (both as a child and an adult), the injuries to his head, and the inability of the family to get him to a doctor. Appx. 16 at ¶ 20. This and similar evidence from those who knew him was available had Mr. Umaña's counsel looked for it.

Also readily available had counsel looked was extensive evidence that Mr. Umaña was exposed to multiple assaults while *in utero.* His mother ingested drugs and alcohol, attempted suicide by ingesting Gamexane, suffered from malnutrition, was subjected to physical and emotional abuse, and was forced into prostitution that may have exposed her to sexually transmitted diseases, like syphilis. Appx. 10 at ¶40, 41, 44; Appx. 218 (Declarations of Leticia Ramirez Diaz). Post-conviction counsel has interviewed lay witnesses who describe Mr. Umaña's misshapen and separated teeth, rare skin conditions, and high fevers that could be evidence of congenital syphilis. Appx. 10 at ¶56; Appx. 15 at ¶34; Appx. 20 at ¶29 Additionally, Mr. Umaña

128

suffered from malnutrition, starting as early as infancy when he was fed a mixture of rice water and cheap flour instead of milk that has the nutrients necessary for proper brain development. Appx. 10 (Leticia Ramirez Diaz); Appx. 15 (Lilian Tino); Appx. 16 (Ana Ruth Umaña González). This information would have been extremely important for Dr. James Merikangas to possess to explain possible etiologies regarding his penalty phase testimony that Mr. Umaña does have brain damage. PPT 715, 720. *See also* Appx. 211 (Dr. Julian Davies, explaining effects of maternal alcohol consumption during pregnancy on brain development); Appx. 212 (Dr. Andres Lugo, explaining effects of toxic exposures during pregnancy on brain development); Appx. 29 (Dr. Gur explaining quantitative analysis of Mr. Umaña's PET is consistent with traumatic brain injury and FASD); Appx. 242 (Dr. Gur explaining volumetric analysis of Mr. Umaña's MRI is consistent with FASD and teratogenic exposure); Appx. 214 at p.6 (Dr. Sapia explaining the "numerous prenatal and post-natal risk factors" that Mr. Umaña experienced); Appx. 243 at 12 (Dr. Shea explaining that Mr. Umaña's frontal lobe damage "may be due to damage by genetic impacts possibly due to addiction of parents, or neurological illness or injury such as he may have suffered in his youth after his fall").

The absence of such testimony to support the expert diagnosis of brain damage was a critical omission at the sentencing phase allowing the prosecution to argue without answer that "There's nothing wrong with his brain. There's a couple experts. And it's not so much." PPT. 837-38, and "His brain functioned fine when he was growing up." *Id*. Mr. Umaña's brain did *not* "function fine" when he was growing up, when he was seen on numerous occasions seeing and hearing things that were not there, staring off into a distance, and struggling with dressing and grooming himself correctly. Appx. 15 (Lilian Tino); Appx. 22 (Saul Osvaldo Umaña); Appx. 12

129

(Monica Tatiana Reyes). If trial counsel had conducted a proper investigation, they could have gleaned this information that would have prepared them to support their case.

**2. Trial counsel failed to present to the jury available expert testing and testimony regarding brain damage.**

Trial counsel's impotent presentation of expert testimony regarding Mr. Umaña's brain damage was deficient in two separate but overlapping ways. First, despite having investigated and established that Mr. Umaña suffers from severe brain damage, trial counsel failed to present all evidence in their possession establishing this critical mitigating factor. Counsel's failure is without any reasonable strategic basis. Second, counsel failed to *investigate* available expert testimony regarding Mr. Umaña's brain damage that would have corroborated the evidence they *did* have but failed to present; established an accurate picture of both the causes and practical effects of Mr. Umaña's brain damage; and allowed them to mount a robust response to the Government's attempt to minimize Mr. Umaña's significant brain damage. Having failed to conduct an adequate investigation, counsel's decisions regarding their presentation of brain damage can have no reasonable strategic basis.

Counsel first retained Dr. Ricardo Weinstein to conduct neuropsychological testing. Dr. Weinstein's testing showed damage to Mr. Umaña's frontal lobe, the area in the brain responsible for executive functioning, which affected his judgment, impulsivity, and ability to make and carry out plans. Appx. 70 (pretrial report of Dr. Weinstein). At Dr. Weinstein's recommendation, counsel retained a neuropsychiatrist, Dr. James Merikangas, to review Dr. Weinstein's findings, to conduct a physical examination of Mr. Umaña, and to conduct a Positron Emission Tomography (PET) scan. Based on his evaluation, which included consideration of Dr. Weinstein's neuropsychological findings, Dr. Merikangas also concluded that Mr. Umaña suffered from brain damage to his frontal lobe. Appx. 72 (pre-trial report of Dr. Merikangas).

130

Although their neuropsychiatrist's analysis included reliance on the neuropsychological testing, counsel did not present Dr. Weinstein's testimony to the jury at sentencing and precluded Dr. Merikangas from discussing Dr. Weinstein's findings; nor did they obtain any other neuropsychological testing. Appx. 27 (Declaration of Dr. Merikangas). At a hearing, Mr. Umaña will demonstrate that additional neuropsychological testing would have further corroborated Mr. Umaña's brain damage. Mr. Umaña was evaluated by neuropsychologist Dr. Leo Shea in connection with these post-conviction proceedings. Appx. 243 (Report of Dr. Leo Shea). Dr. Shea's testing of Mr. Umaña demonstrates "significant limitations across the domain of complex attention, processing speed, diverse aspects of visual memory, all aspects of academic learning, higher level reasoning and the ability to rapidly analyze situations and generate effective, creative and accurate solutions to problems in the moment." *Id.* at 11. Mr. Umaña "is not an independent thinker." *Id.* "When placed under pressure he will tend to act impulsively." *Id.* Mr. Umaña "does not engage in the necessary consequential thinking that protects humans from making mistakes detrimental to their well-being and those of others." *Id.*

Dr. Shea would have explained to the jury that the frontal lobe deficiencies, seen in both his and Dr. Weinstein's pencil and paper neuropsychological testing, the PET scan, and the MRI, limit Mr. Umaña's "ability to effectively analyze, plan, organize and prioritize creative and effective solutions to problems especially when he is under time pressure or affected by [sic] sudden emotional stimuli." *Id.* at 11-12. Put simply, "Mr. Umaña's actions are those of an unthinking adolescent whose frontal lobes have not adequately developed." *Id.* at 12. This means that:

> While he will be able to do simple day-to-day activities, he will have significant difficulty when he has to shift perspective or respond rapidly to new or novel tasks. Under pressure he will be ineffective and will not create adaptive approaches to unexpected or sudden changes. People with his level of innate intellectual ability

131

function best on a routinized daily schedule with interactive involvement. Without this, they are tangential and surface thinkers who are easily influenced to respond to superficial pleasures and momentary satisfaction. They do not recognize or define long-term objectives and have a poor understanding of the long-term consequences of their actions.

*Id.* at 13.

By refusing to allow Dr. Merikangas to discuss neuropsychological testing findings, trial counsel stripped Dr. Merikangas of a substantial basis for his neuropsychiatric opinion regarding Mr. Umaña's brain damage and its consequential effects on behavior, and the jurors were left without the vital information that the damage Dr. Merikangas attested to had serious implications. Consequently, the jury did not learn that Mr. Umaña's frontal lobe damage would severely impair his executive functioning, including his ability to make reasoned choices and respond to stressful situations. Appx. 27.

Dr. Merikangas was the only testifying expert who had actually met and evaluated the defendant, but the utility of his presentation was badly undermined.

> During my testimony at Mr. Umaña's capital trial, I was not permitted to testify about my consideration of the . . . neuropsychological testing. . . .. I had already performed an evaluation based not merely on my analysis of the PET scan and my neurological examination of the defendant, but also based on my review of Dr. Weinstein's findings. Although I could draw a few conclusions based solely on the PET scan and my physical evaluation of Mr. Umaña, my opinion regarding brain damage was based on the comprehensive evaluation, including the neuropsychological testing. I was not permitted to testify that my findings regarding the PET scan were consistent with the neuropsychological test results.

Appx. 27 at ¶9. Most significantly, while Dr. Merikangas could identify Mr. Umaña as "brain-damaged," without relying on neuropsychological evidence, "I could not opine on how this damage affected Mr. Umaña's cognition and behavior." Appx. 27 at ¶10. If trial counsel had properly investigated and explained Mr. Umaña's background and had him thoroughly evaluated,

132

Dr. Merikangas or a similarly capable expert could have explained the impact of these deficits on Mr. Umaña's capacity and behavior.

Trial counsel rendered deficient performance by not presenting the neuropsychological testing results, whether through either or both of their chosen experts or a different qualified expert. Mr. Umaña expects to prove at a hearing, consistent with the expert reports and affidavits proffered in these proceedings, that numerous experts could have testified about Mr. Umaña's neuropsychological impairments (including those reflected in Dr. Weinstein's testing) and their significance on his functioning. *See* Appx. 27, 29, 211-215, 236-237.

For example, Dr. Stewart could have opined that "Mr. Umaña's brain does not function like the brains of peers of his age and background. Parts of his brain are either not working as they should or are not working at all." Appx. 216 at ¶8 (Dr. Stewart, 2021). Dr. Stewart could have explained that "Mr. Umaña's neurological deficits also impaired his ability to act intentionally and control his reactions at the time of the homicides." *Id.* ¶13. "While the neurological deficits would have independently limited Mr. Umaña's abilities in the restaurant, those deficits exacerbated by PTSD and his general cognitive deficits may have eliminated any option other than a primal response to what he saw as an extreme threat." *Id.*

Dr. Sapia could have testified that "The findings of Dr. Weinstein, Dr. Olley, Dr. Merikangas, Dr. Gur and Dr. Stewart, which include standardized testing, clinical interviews, QEEG, and Positron Emission PET imaging are consistent with my observations of Mr. Umaña's cognitive impairments, my knowledge of the manifestations of intellectual deficits as well as the neurocognitive effects of developmental trauma. They are consistent in explaining the effects of trauma on brain development and the ways it can manifest in poor emotional and behavioral modulation and hypervigilance, amongst other symptoms associated with PTSD. These prior tests

133

support impairments in the frontal lobes of the brain which are considered the command center and what is responsible for executive functioning abilities." Appx. 214, p. 28.

Dr. Shea could have testified to Dr. Weinstein's findings of "brain dysfunction in a generalized pattern with particular compromise to the frontal lobes," Appx. 243 at 6 (Dr. Shea report, summarizing prior evaluations), and to his own findings of frontal lobe deficiencies. *Id.* at 11-13.

And experts such as Dr. Olley or Dr. Martell, having reviewed the neuropsychological testing, extensive lay witness evidence, and evaluated Mr. Umaña's adaptive functioning, could have placed both the medical testing (such as that conducted by Dr. Merikangas) and the neuropsychological testing (such as that conducted by Dr. Weinstein and Dr. Shea) into a real world, day-to-day context. Dr. Olley or Dr. Martell could have explained to the jury that, for his entire life, Mr. Umaña has never functioned on a level comparable to his peers but instead has struggled to learn, struggled to hold all but the most menial of jobs, and has been consistently described as childlike and infantile, having interest in cartoons and other children's games, well into adulthood, and placed these functional limitations in the context of his impairments. Appx. 28 (Decl. Dr. Olley); Appx. 236 (Report Dr. Martell). *See also* Appx. 27 at ¶9 (Dr. Merikangas explaining that "A comprehensive evaluation is required, which included Mr. Weinstein's testing *and the social history of the client.*") (emphasis added).

The absence of neuropsychological evidence was seriously prejudicial to the case. Without the support of the neuropsychological testing and evidence regarding Mr. Umaña's functional limitations, Dr. Merikangas' testimony regarding the PET scan results was effectively rebutted by the Government's expert, Dr. Helen Mayberg, who testified that the results of the PET scan appeared to be normal. PPT at 762. The Government then fully exploited the minimal evidence of

134

brain damage presented by the defense. During its argument, the Government mocked the defense

expert's reliance on the PET scan, capitalizing on the absence of evidence:

> And then comes the grand finale. The grand finale of the mitigation. All the different colors on the screen. The brain. Now, we can see what's in his brain. That's the grand finale. There's the colors. Oh, boy, look at these colors. It looks interesting. There has to be something wrong. That's what they want you to believe. Common reaction. Nobody can just be a murderer the way he is. There's got to be something wrong.
>
> *There's nothing wrong with him*. He knows what he's doing. There's nothing wrong with his brain. There's a couple experts. And it's not so much, okay, your brain looks a little bit like this. My brain looks like this. Maybe there is some abnormalities. Whatever you believe on the experts, the government expert said there's nothing wrong with that scan. Another said, well, there's some abnormalities with the brain.

PPT at 837-38 (emphasis added).

Without any evidence that his brain damage actually *mattered* to Mr. Umaña's life or

functioning, the Government was able to dismiss it handily:

> What they want you to believe, they want you to make the leap, make the jump. The jump is, well, wait a second. It's this brain that made him do it. There's something wrong there that make him do it. *Well, there's no evidence of that*. His brain functioned fine when he was growing up. He's working. He's playing soccer. Nothing is wrong with him. All of a sudden his brain went bad? No he went bad. All right. Ladies and gentlemen, his brain didn't go bad; *he went bad.*

PPT at 837-38 (emphasis added). The prosecutor finally contended that the neurological evidence

of brain damage was "irrelevant" because there was no evidence of a connection to Mr. Umaña's

behavior. *Id.*

The prejudicial effect of the lack of evidence is found most clearly in the jury's unanimous

rejection of the mitigating circumstance that "Alejandro Enrique Umaña suffered from head

injuries early in life that resulted in damage to areas of the brain related to behavior." Crim. Doc.

148. A comprehensive presentation of Mr. Umaña's brain damage relying on all components of

135

an evaluation, including neuropsychological testing, and informed by witnesses to the defendant's behavior should and could have been presented by an expert in neurology like Dr. Merikangas (Appx. 27); a psychiatrist like Dr. Stewart (Appxs. 215, 216); an expert on trauma and the developmental impact of trauma like Dr. Sapia (Appx. 214); experts on neurotoxic exposure and brain development like Dr. Davies and Dr. Lugo (Appxs. 211, 212); experts on how brain impairments translate into deficits in daily functioning such as Dr. Olley and Dr. Martell (Appxs. 28 & 236); a neuropsychologist like Dr. Shea (Appx. 243); and an expert in neuroimaging, like Dr. Gur (Appxs. 29, 242), who will be discussed in more detail below.

Such a comprehensive presentation would have foreclosed the Government's mocking closing argument and belied the Government's experts' conclusions that there was "nothing wrong" with Mr. Umaña's brain or that there were only "some abnormalities" to his brain. There was, and is, something very "wrong" with Mr. Umaña's brain, something caused by his *in-utero* exposure to alcohol, Rohypnol, insecticides, and other toxins; by his living in a single room with his physically and emotionally abusive father; by his watching people all around him die and rot in the streets; by his feeding himself as a child with lizards cooked on burning plastic trays and pigeons he trapped in the street; by his repeated and untreated head injuries; by a life that was beset from conception by poisoning, abuse, neglect, and trauma. With a full and complete presentation of both the causes *and consequences* of Mr. Umaña's severely damaged brain, there is a reasonable probability at least one juror would have found the existence of that very mitigating factor.

A full and complete presentation would also have supported other mitigating findings. An abstract finding that Mr. Umaña suffers from "brain damage" does nothing to explain the circumstances of his crime or his irrational or unreasonable behavior before and during trial proceedings. An explanation of that behavior required an evaluation that took into account the

neuropsychological testing and anecdotal evidence. As argued above, Mr. Umaña will demonstrate at a hearing, consistent with his proffered expert reports and affidavits, that – properly prepared with the collateral evidence counsel had or should have acquired – such experts would also have testified that Mr. Umaña's ability to control his behavior and to make and carry out plans when under substantial stress is non-existent, and this would have been true at the time of the commission of the crime. *See* Appx. 27 (Dr. Merikangas's finding of brain damage); Appx. 29 (Dr. Ruben Gur describing effect of brain damage on behavior); Appx. 212 (Dr. Andres Lugo's findings of head injuries and toxic exposures as etiology for Mr. Umaña's neuropsychological damage); Appx. 211 (Dr. Julian Davies findings regarding FASD); Appx. 215, 216 (Dr. Stewart); Appx. 243 at 11-12 (Report of Dr. Shea). As a collective, such experts would have provided compelling evidence of Mr. Umaña's "history [] and condition," *Lockett*, 438 U. S. at 594, and "background [] or character." 18 U.S.C. § 3592(a)(8).

A full presentation showing the impact of frontal lobe damage additionally could have been used to rebut the aggravating factor that "the defendant killed Manuel Garcia Salina to protect and maintain the name and reputation of the criminal enterprise MS-13, and to advance his position and reputation within the criminal enterprise" Crim. Doc. 1048. For example, Dr. Stewart, who had access to a comprehensive investigation of Mr. Umaña's capacities, found:

> When he perceives a threat, Mr. Umaña lacks the capacity to follow through with a plan or even a previous train of thought; he will react. In my opinion, his emotional ability when stressed would prevent him from showing the dependability necessary for leadership. A more blunt assessment would be that any person following Mr. Umaña as a leader probably could not count on him to make any judgment, much less exercise good judgment, when presented with significant stress or threat.

Appx. 216 at ¶23. Had trial counsel prepared effectively, they could have informed the jury that Mr. Umaña's neurological and cognitive dysfunctions kept him from thinking about anything

while stressed and fearful; these problems prevented him from thinking about his status in the gang or the gang's status when facing what he felt was a serious threat.

Had trial counsel prepared Dr. Merikangas or a similarly capable expert, the jury could have heard that PTSD, cognitive deficits, low intelligence quotient, intellectual disability, and neurological deficits - individually and in combination impaired Mr. Umaña's ability to accurately perceive the severity of the threats posed in the restaurant, to appropriately modulate his reaction, and to instantly assess others' potential reactions to his actions. All these disorders, both individually and synergistically, significantly impaired Mr. Umaña's capacity to appreciate the wrongfulness of his conduct, conform his conduct to the requirements of the law, or act with specific intent or with premeditation and deliberation. Appx. 216 at ¶ 8-13, Declaration of Dr. Stewart. *See also* Appx. 214, p. 27-29, Report of Dr. Sapia (explaining how Mr. Umaña's "significant developmental trauma, his symptoms of PTSD, superimposed on his intellectual deficits, would have a profound impact on his perceptions of reality, decision making, reasoning and judgment and are therefore pertinent mitigating factors. . . . Research in neuroscience suggests impaired functioning in brain areas responsible for the threat detection response and emotion regulation account for many PTSD symptoms."); Appx. 243, Report of Dr. Shea (explaining how Mr. Umaña's brain damage and "extensive and horrific history of repeated and devasting physical and emotional abuse and socio-economic deprivation through his childhood and adolescence . . . negatively impacted his life.").

Evidence of brain damage can be powerful mitigation. Trial counsel clearly thought it important to their case, as they made some effort to present evidence of brain damage. That effort, though, was woefully insufficient, lacking both the number and type of experts needed to explain the multiplicious causes of damage to Mr. Umaña's brain and the real-life consequences of that

138

damage, and lacking the basic but necessary collateral reports from Mr. Umaña's family, friends, and acquaintances that such experts would have relied on for many of their opinions. Moreover, counsel's lack of understanding, investigation, and preparation of evidence of brain damage caused them to fail to explain to the jury just how Mr. Umaña's brain was so damaged and how that damage affected his ability to operate in the world capably, undermined their single witness on the issue and destroyed what little remaining credibility and power that evidence had. Had they presented all available lay and expert witnesses, there is a reasonable probability that the jurors would have determined that Mr. Umaña has brain damage and that it has affected his life, and that the outcome of the sentencing would have been different.

### 3. Trial counsel failed to adequately consult with their chosen mental health expert and unreasonably limited the evaluation and testimony of their only testifying expert who had examined Mr. Umaña.[31]

In July 2009, trial counsel retained Dr. Merikangas, a neurological expert, to evaluate Mr. Umaña to determine the cause and extent of Mr. Umaña abnormally functioning brain. Dr. Merikangas informed trial counsel in his November 17, 2009 report that he relied on neuropsychological testing as a basis for his opinion:

> Neuropsychological testing by Dr. Weinstein disclosed a full scale I.Q. of 66 with a non-verbal I.Q. of 53 on the C-TONI. Dr. Weinstein concluded that Mr. Umaña had a generalized pattern of brain dysfunction with particular compromise to the frontal lobes. . . . He has an abnormal neurological examination, abnormal neuropsychological test results, abnormal PET scan of the brain and an abnormal quantitative EEG.

---

[31] Mr. Umaña restates all facts, claims and allegations stated elsewhere in this motion, and incorporates them on this issue.

Appx. 72. A few weeks later, at the November 30, 2009, pretrial hearing on mental retardation, Dr. Merikangas testified that he relied on the neuropsychological testing of Dr. Weinstein as a part of his comprehensive neuropsychiatric evaluation. *Atkins* Hearing 11/30/09 at p. 265, 277, 279.

Counsel then decided to limit Dr. Merikangas's testimony at the sentencing hearing by ignoring his reliance on neuropsychological testing. Counsel made that decision without consulting Dr. Merikangas and without conducting a full investigation, as described above. Indeed, counsel never asked their expert about how the exclusion of such evidence might affect his credibility, how the lack of a comprehensive basis for his evaluation might be exposed to the jury, or how their case for establishing brain damage might be undermined. Nor did they adequately consider additional tests that could be done to support the evidence he was presenting.

In the sentencing trial, Dr. Merikangas was the only testifying expert who had evaluated the defendant. Pretrial, he had concluded in his report that:

> Mr. Umaña is a brain-damaged man with developmental cognitive impairments in the mentally retarded range. He has abnormal neurological examination, abnormal neuropsychological test results, abnormal PET scan of the brain and abnormal quantitative EEG. These brain impairments, to a reasonable degree of medical probability, render him less able to form executive judgments to control his impulses and modulate his behavior compared to normal individuals. These brain impairments stemming from early childhood are not his by choice, but are the result of environmental causes beyond his control.

Appx. 72 at 2. When it came to trial, however, counsel asked Dr. Merikangas not one question about his pre-trial report and made no effort to admit it for the jury's review.

Consequently, Dr. Merikangas's testimony was limited only to his physical examination and the results from the PET scan. He was therefore forced to acknowledge on cross-examination that you cannot look at a brain scan and tell somebody's IQ, what they are thinking about in this kind of scan, or very much at all about their behavior. PPT at 744-45. Thus, rather than

140

comprehensively explaining how *and why* Mr. Umaña's behavior was so impaired, Dr. Merikangas's testimony just tossed the label of "brain damage" stripped of all meaning.

Moreover, without any of the surrounding data and evidence that Dr. Merikangas relied upon, the Government's expert, Dr. Mayberg, could render inconsequential even that label, testifying that the PET scan gives no information about someone's behavior, and it would be "impossible" to conclude from the PET scan that the defendant "can't control his conduct" or that he is "controlled by others." PPT at 779.

Trial counsel's failure to adequately consult with Dr. Merikangas before deciding to disregard Dr. Weinstein's testing interfered with Dr. Merikangas' ability to explain to the jury how damage to Mr. Umaña's frontal lobe affected his executive function, judgment, and impulse control. This failure to consult with their expert led to decisions that sabotaged a central part of their mitigation case and as noted above, seriously prejudiced Mr. Umaña. Trial counsel rendered ineffective assistance of counsel by not pursuing a quantitative analysis of the PET scan. *See* PPT 787 (testimony of Dr. Mayberg).

In addition to failing to support their claim with neuropsychological testing and the evidence of lay witnesses, effectively rendering their expert's opinions inconsequential, trial counsel also rendered deficient performance by failing to investigate or to obtain a quantitative analysis of the PET scan. This analysis compares the results of Mr. Umaña's PET scan to a comparison group of healthy people. Untethered to any norms or objective standard by which he could measure the brain damage, Dr. Merikangas's trial testimony was rendered, as the Government derided it, a reading of a single scan containing colored pictures of the brain. PPT 766.

Counsel could – and had they consulted with their expert – hopefully, would have taken the necessary steps to support their chosen mitigation case. A quantitative analysis of the PET scan and its relative place amongst the population was something easily prepared by an expert such as Dr. Ruben Gur. For the post-conviction proceedings, Dr. Gur has conducted that analysis. Using the PET scan performed pretrial on Mr. Umaña, he performed a quantitative analysis using a standard regions of interest approach. From this analysis, Dr. Gur concluded, regarding Mr. Umaña's brain functioning:

> The results of measuring local glucose metabolism with PET show abnormalities in regions that are very important to regulating emotions and behavior. The most relevant finding is the reduced metabolism in the amygdale and hippocampus, combined with hyper-metabolism in cortical regions. As the amygdale activates in response to stressful or threatening environmental stimuli, such a pattern of activation indicates that Mr. Umaña has an inappropriately high level of cognitive control over emotion processing and experience while at a resting "default mode" state. Since regions that are hyperactive during the default mode become activated during a task or challenge, and vice versa. The abnormal resting state profile will compromise his ability to modulate his behavior under stress.

> Abnormally low metabolism in the temporo-limbic system, including in the amygdale, hippocampus and parahippocampal gyrus could lead to severe emotional dysregulation. A damaged amygdale will misinterpret danger signals and can become easily activated. When excited, the amygdale will issue false alarms that require intact frontal components of the limbic system for modulation. In Mr. Umaña's case, the cortex is already at a hyper-activated state. When Mr. Umaña's amygdale becomes activated, his frontal lobe is unable to exercise control as a normal frontal lobe would, because his "thinking brain" is already operating at full capacity in its hyper-vigilant state. *The frontal lobe is compromised in its ability to do its job to regulate the primitive emotional impulses emanating from the amygdala when the limbic system reaches its activated state* (the Kluver-Bucy syndrome).

> The corpus callosum is hypometabolic, which can lead to deficits in integrating verbal reasoning and analytic processing modes of the left hemisphere with intuitive, integrative and affect-related processing modes of the right hemisphere. Such white matter dysfunction would greatly impair speed of processing across cognitive and affective domains.

> Abnormally high metabolism in cortical regions most likely indicates compensatory hyper-vigilance of the "default mode" brain state, and the increased

142

activity in caudate, thalamus, and hypothalamus likely related to difficulties in controlling input from somatic system.

The etiology of these abnormalities is difficult to determine and require clinical evaluation and integration with history. Mr. Umaña's PET scan shows clear evidence of brain damage that is consistent with several causes, including brain injury. The reduced metabolism in the corpus callosum is also consistent with fetal exposure to alcohol or other toxins.

Appx. 29 (emphasis added). Dr. Gur's findings are highly significant and explain Mr. Umaña's behavioral problems; Mr. Umaña is significantly impaired in his ability to exercise "cognitive control over emotion processing and experience," particularly "in response to stressful or threatening environmental stimuli." Further, Dr. Gur plainly states that Mr. Umaña's "amygdala will issue false alarms," which his frontal lobe is unable to "modulate" or to "exercise control as a normal frontal lobe would." *Id*.

Counsel also did not pursue an MRI scan, an omission the prosecution and its expert, Dr. Helen Mayberg, (PPT 771), made much of at the sentencing hearing. An MRI would have confirmed Dr. Merikangas's and Dr. Gur's analyses of the PET scan. Dr. Gur's analysis of an MRI conducted in connection with these post-conviction proceedings demonstrates that Mr. Umaña's brain is diminutive, with intracranial volume that is more than 4.5 standard deviations below average. The MRI reflects significant volume loss across frontal and orbitofrontal regions, temporal (pole, superior/inferior temporal gyrus), and parietal (superior/inferior lobules) regions, and related low cerebellar volume. The hypotrophy he suffers suggests global dysfunction in brain systems that are important for regulating emotion and behavior. These abnormalities cause difficulties in regulating behavior and resisting impulses to act on motivations; they cause impulsive behavior because they are implicated in critical functions, including decision-making, memory, learning, verbal reasoning processes, and controlling and regulating emotions. Appx. 242 (Report of Dr. Gur).

143

Dr. Gur's conclusions regarding Mr. Umaña's brain functioning provide necessary and significant support for Dr. Merikangas' testimony that Mr. Umaña suffered from brain damage which, given the failures cited above, was sorely missing. Significantly, Dr. Gur's quantitative analysis of the PET scan and analysis of the MRI scan enabled him to identify the specific regions of the brain affected by the brain damage and, in turn, make informed conclusions about the likely effects of the brain damage on Mr. Umaña's cognitive and behavioral functions in times of stress. *Id*. Dr. Gur's conclusions, therefore, comport with and further reinforce the conclusions of the raft of experts and evidence that counsel declined to investigate, prepare or present at trial. *See* Appx. 212 (Dr. Andres Lugo's findings of head injuries and toxic exposures as etiology for Mr. Umaña's neuropsychological damage); Appx. 211 (Dr. Julian Davies's findings regarding FASD as etiology for Mr. Umaña's neuropsychological damage); Appxs. 215 & 216 (Dr. Pablo Stewart's findings regarding Mr. Umaña's neurological defects and cognitive impairments inhibiting his abilities during the homicides); Appx. 214, pp. 27-29 (Dr. Sapia preliminary conclusions); Appx. 243 (Dr. Shea's findings regarding brain damage).

The testimony of Dr. Mayberg, the Government's expert neurological witness, demonstrates additional prejudice from not seeking this testing. Dr. Mayberg testified that using quantitative analysis with data from healthy people to which you could quantitatively compare the defendant would be an "unbiased way" to measure whether a scan of the frontal lobe is abnormal. PPT at 772-773. She made this point to emphasize her testimony that without such an analysis, using a PET scan alone to identify long-standing damage from head injuries was impossible. *Id.* (As argued above, Dr. Gur provided that quantitative analysis in these post-conviction proceedings, proving the analysis was available and helpful.)

144

Mr. Umaña committed an emotional crime in response to a physical threat from an intoxicated stranger in a restaurant over music from the jukebox. In response to the threat of a fistfight, Mr. Umaña responded impulsively and senselessly by firing a gun and killing two strangers and wounding a third. None of the victims were members of a rival gang. His actions were counter to the gang's interest in avoiding police attention for superfluous actions unrelated to gang activity. *See* Appx. 244, Declaration of Thomas Ward. None of Mr. Umaña's fellow gang members acted like this were a gang fight. *Id*. This was precisely the type of crime that cried out for a reasoned explanation about why Mr. Umaña's ability to control his behavior under stress at the time of the crime was substantially impaired by brain damage. Had the jurors heard this evidence, some among them would have found relevant mitigating factors. There is a reasonable probability that, but for the deficient performance of trial counsel, had evidence derived from lay testimony, neuropsychological testing and analysis, a quantitative analysis of the PET scan, or an MRI scan been presented to the jury, the results of the proceeding would have been different.

### D. Trial Counsel's failure to investigate and present lay witness and expert testimony that Mr. Umaña exhibits behaviors consistent with mental illness deprived Mr. Umaña of a reliable sentencing determination

Because of their inadequate investigation, as stated above, trial counsel lacked the necessary collateral information to provide to an expert or the jury regarding Mr. Umaña's history of mental illness. Although several experts testified at Mr. Umaña's trial, none of those that testified were asked by trial counsel to evaluate Mr. Umaña for mental illness. Dr. Merikangas was the only testifying expert during the penalty hearing who interviewed Mr. Umaña, and he saw the defendant once for the specific purpose of a neurological examination. Trial counsel did not retain Dr. Merikangas to evaluate Mr. Umaña for mental illness but instead asked him to focus on neurological issues.

145

Trial counsel were not prepared to consider whether some of Mr. Umaña's strange behaviors might indicate mental illness. As noted above, their mitigation specialist conducted a poor social history investigation, limited in scope and largely dependent on a single family member, father Rafael Umaña, who was not a reliable source. Only one expert who testified at the penalty phase had even met their client. Counsel did not conduct the inquiry necessary to determine why Mr. Umaña may have exhibited odd behaviors (described below) and certainly provided no context or explanation for them to the jury.

Yet there were red flags that should have alerted counsel to consider mental illness. Although Mr. McGough testified at the penalty phase of the trial, trial counsel did not question him about the behaviors he witnessed by Mr. Umaña that could be consistent with mental illness. Mr. McGough believed that Mr. Umaña appeared "slow and paranoid." Appx. 26 at ¶8. Mr. McGough was concerned that when he and Mr. Umaña were "… in the middle of discussion about his case, he would suddenly break into songs and rap." Appx. 26 at ¶17; *see also* (Gov't Tr. Ex. 522 at 128, 04/23/08 Transcript of Flores interview). These and other behaviors led Mr. McGough to have "substantial questions about his mental illness." Appx. 26 at ¶17; *see also* Appx. 215, 216, Declarations of Dr. Stewart (identifying psychotic symptomology); Appx. 238 (Report of Dr. Erik Nielson, noting highly derivative nature of Mr. Umaña's raps).

Had trial counsel properly investigated, they would have discovered other behaviors that may be signs or symptoms of mental health impairments. At a hearing, Mr. Umaña expects to present lay witness testimony consistent with the declarations proffered at Appxs. 12, 15, 22, 112, 219, 226, demonstrating the additional evidence of mental illness that was available had counsel conducted a reasonable investigation. For example, Mr. Umaña's brother, cousin, mother of his child, and friends all report that Mr. Umaña spoke about seeing images and hearing voices. Appxs.

146

12, 15, 112, 22, 219, 226. His cousin Lilian recalled such comments when she and Mr. Umaña lived in the Danubio Azul *mesón*. If asked, she would have told trial counsel or the mitigation specialist about an incident in which Mr. Umaña insisted that he saw a "long haired woman" beckoning to him and was frustrated when his cousin did not see the same thing. He described hearing noises as if someone was opening and shutting doors and felt that someone was blowing air on him. Appx. 15 at ¶13. His girlfriend, Monica, (whom Mr. McGough interviewed, videotaped, and testified about; PPT 576) saw Mr. Umaña staring off and talking to things that were not there; not knowing what to make of it, she teased him and said falling from the mango tree must have made him crazy. Appx. 12 at ¶13.

Mr. Umaña's brother Saul realized something was off when Mr. Umaña described seeing demons and tried to draw the images to convince Saul and others that this was real. Appx. 22 at ¶37. In his late teens or early twenties, Mr. Umaña drew images of demons with horns and tongues sticking out. *Id.* He showed these images to his brother and others around him, and they told Mr. Umaña he was crazy. Mr. Umaña was insistent that what he saw was real and was not convinced otherwise. *Id.*; *see also* Appx. 219 at ¶6 (Jose Wilfredo Herrera Calderon, Mr. Umaña's friend, described him talking to himself and seeing a shadow that no one else could see); Appx. 226 at ¶10 (Josselyn Guevera Reyes, a friend, noticed that Mr. Umaña's "eyes were looking up and rolling back and forth. He said things like 'no, no, who knows' as if he were answering someone's question."); Appx. 112 at ¶38-40 (Luis "Chipis" Ramos's account that Mr. Umaña's reality was different; he saw and heard things that no one else saw or heard; took direction from these voices; stared at the wall talking to angels and devils (that only he saw); had visions and dreams he believed were real and foretold the future; and drew what he saw as proof it happened).

Further, had counsel thoroughly and effectively interviewed Mr. Umaña's family and friends, counsel would have learned of longstanding concerns about his behavior. Friends and family would have provided information about a family history of substance abuse and potential mental health impairments in Mr. Umaña's extended family. These include relatives who suffered from depression; drank to excess; exhibited odd behaviors consistent with mental illness, talked to themselves, and had trouble conversing. Appxs. 9, 17, 10, 22, 2, 7, 4, 5, 20, 14 and 8. As mental illness typically has a genetic component, running in families, such evidence should have been shared with an expert.

Mr. Umaña's letters from jail also should have raised red flags for the trial team. Among other things, Mr. Umaña expressed in these letters was his belief that he could predict natural disasters, that deceased relatives and friends visited him through dreams, and that his visions were real. *See* Gov't Tr. Ex. 169a, 176a.

Trial counsel's deficient investigation into Mr. Umaña's background and history hamstrung the development of evidence relevant to mental illness from the very beginning. Trial counsel should have investigated Mr. Umaña's behaviors, provided an expert with the extensive collateral evidence of those behaviors throughout his life, and presented both the evidence of the behaviors and their meanings to an expert and the jury. Mr. Umaña expects to prove at a hearing, consistent with the expert evidence proffered at Appx. 214-216, 236-237, that an expert provided with a full social history and the opportunity to evaluate Mr. Umaña would have been able to explain that these troubling behaviors and beliefs observed by the trial mitigation specialist, Mr. Umaña's friends and family, and reflected in his correspondence and songs were indicative of mental illness. Such an expert could have explained that individuals with psychotic symptomology have difficulty distinguishing what is real from what is delusional, and this impairs their ability to

148

form normal relationships or find community, making them vulnerable to victimization. *See, e.g.,* Appxs. 215 & 216 (Dr. Pablo Stewart discussing Mr. Umaña's psychotic symptomology); Appx. 214 at pp. 14, 25 (Declaration of Dr. Sapia discussing visions, delusions); Appx. 237 at ¶47, p. 14 (Declaration of Dr. Sermeño reporting Umaña's description of his visions). Had Mr. Umaña's counsel properly investigated and presented such evidence, there is a reasonable probability that the jury might have decided to spare his life.

**E. Had counsel properly investigated, developed and presented mitigation about Mr. Umaña's mental health impairments, there is a reasonable probability that at least one juror would not have found death to be an appropriate punishment for him.**

When considering the prejudice from trial counsel's deficient performance, the Court must consider cumulatively the evidence that was presented during the trial and sentencing proceeding in addition to the evidence that has been proffered in post-conviction proceedings. *See Williams v. Taylor*, 529 U.S. 362, 397 (2000). When the combined evidence of lay and expert testimony is considered as a whole, there is a reasonable probability that at least one juror would have voted to return a sentence of life imprisonment without parole instead of death.

Mr. Umaña's sentencing phase would have looked very different with the mental health evidence and testimony of experts that could have been offered, as described above. The jury heard virtually no lay evidence regarding Mr. Umaña's intellectual and adaptive limitations. But for counsel's ineffective investigation, however, the evidence would have shown that Mr. Umaña, without a doubt, left school after failing remedial classes in the third grade – at the age of twelve – after having made at least two prior unsuccessful attempts to master the third-grade material and having also repeated first grade more than once. The evidence would further have shown that it was highly unusual for anyone as old as twelve not to have completed the third grade. He was still frequently wetting his bed at the age of 10 or 12. In his later teens, he could still barely read and

149

write, despite his apparent desire to learn and the help he sought from his younger girlfriend. Combined with information the jury did learn at sentencing, such as his struggles in his menial jobs, this additional information would have provided the jury with a comprehensive picture of Mr. Umaña's deficits.

An expert could have placed that information in context and further explained that Mr. Umaña's IQ score put him in the bottom two percent of the population in intelligence.

This evidence of Mr. Umaña's intellectual disability, generally low intelligence, and his significant and disabling impairments in adaptive functioning would not only have been mitigating but would have countered the otherwise persuasive arguments by the government that Mr. Umaña was a savvy and clever schemer who led a notorious international gang. PPT 896. This evidence would have provided an accurate description of Mr. Umaña and could have helped to show that the government's overall portrayal of Mr. Umaña was inaccurate and misleading.

While trial counsel put on testimony at trial from a trauma expert, the evidence of trauma on which that expert relied was not personalized to Mr. Umaña. PPT 600(testimony of Dr. Sermeño). The only trauma described was that which anyone living through the civil war in El Salvador would have experienced and opened the defense up to a scathing response by the prosecution that the expert's testimony effectively suggested that any person who had grown up in El Salvador then had reason to kill, but the vast majority did not. PPT at 836 (prosecution closing). Armed with an actual history of Mr. Umaña's childhood, however, the expert's testimony about trauma would have been individualized and related not just to the effects of violence from the war but to the specific violent acts Mr. Umaña had witnessed (a neighbor hanging from a tree; decomposing bodies strewn in a ditch; a man who lived nearby shooting at passing militants and drawing their return fire towards his and Mr. Umaña's own living quarters). Appx. 237,

150

Declaration of Dr. Sermeño. The trauma expert could have also described the emotional and physical trauma young Mr. Umaña saw and suffered personally; women in an accident being thrown from their car; his father, Rafael, beating his mother in the face with closed fists; the frequent beatings Rafael inflicted on him for unpredictable reasons; and the emotional trauma caused by his great grandmother dying when he was eight, by his father withholding food from him, and telling him that his own mother had abandoned him. *Id.*

With these historical facts about Mr. Umaña's childhood as a backdrop, an expert in trauma could then have described the effects of complex and chronic trauma on Mr. Umaña's emotional and neurological development and functioning. Appx. 214, Declaration of Dr. Sapia. Dr. Sapia reviewed the traumas Mr. Umaña endured. She explained that trauma "would have had a profound impact on [Mr. Umaña's] perceptions of reality, decision making, reasoning and judgment" because "traumatic experiences profoundly affect the brain and change the way a person thinks, feels, and behaves, particularly in stressful situations." Traumatized people like Mr. Umaña "live in a different reality and it's much more than the memory of an event. Trauma takes away that sense of safety and individuals [with an extensive exposure to trauma] tend to view the world as a dangerous, hostile place." "[T]hey may see danger where there is none. The fear that is real and rational to individuals with trauma histories may not be perceived similarly by the rest of the world. These individuals experience intense psychological and physiological distress and arousal when feeling scared or threatened and can be very reactive. Moreover, individuals with [trauma disorders] tend to have problems with impulse control, decision making, and considering consequences of behavior, particularly during periods of acute stress." Appx. 214 at pp. 28-29.

Such testimony would have been mitigating, describing a man-child whose life was a constant battle against real and imagined enemies in a continual flight from real or imagined

151

danger. More than engendering sympathy for a man so affected, an expert in trauma could also have related these traumatic events and the damage they wreaked on Mr. Umaña to actions in Greensboro and even his decision at age 19 to join MS-13. This organization that would have offered him a degree of protection, safety, and camaraderie that had been missing from his dangerous daily life. *See* Appx. 237 at ¶71 (Declaration of Dr. Sermeño).

Mr. Umaña could also have presented a far more compelling case for brain damage, such as the coherent, comprehensive review of all the neuropsychological, psychological, and medical evidence available like the opinion provided by Dr. Stewart (Appxs. 215, 216), supported by the corroborating testimony of lay witnesses, by the neuropsychological testing results, by the findings of a neuropsychiatrist based on quantitative analysis of his PET scan and/or the MRI scan, and in conjunction with the testimony of the trauma expert on the neurological changes chronic trauma can have on a child's developing brain. The defense could have presented factually supported evidence not just that Mr. Umaña suffered from brain damage but that the damage had a profound effect on his behavior, resulting in impulsiveness and impaired his control and ability to make reasoned decisions, particularly in times of stress, such as the incident in Greensboro. Appx. 29 (Neurobehavioral Assessment by Ruben Gur, Ph.D.).

This evidence would have strongly supported the defense claim that Mr. Umaña suffered from brain damage that left him, among other things, unable to process turbulent, fast-moving events. Such evidence would have helped put his shooting at the restaurant in North Carolina into a wholly different context than it was presented at trial. This evidence could have supported a defense at the guilt phase and a statutory mitigator at sentencing. The jury would have heard that PTSD, cognitive deficits, low intelligence quotient, intellectual disability, and neurological deficits individually and in combination impaired Mr. Umaña's ability to accurately perceive the severity

152

of the threats posed in the restaurant, to appropriately modulate his reaction, and to instantly assess others' potential reactions to his actions. All these disorders, both individually and synergistically, significantly impaired Mr. Umaña's capacity to appreciate the wrongfulness of his conduct, conform his conduct to the requirements of the law, or act with specific intent or with premeditation and deliberation. Appx. 216 at ¶ 8-13, Declaration of Dr. Stewart. This evidence would also have helped humanize him in the eyes of the jury in ways that were more broadly mitigating and reduced the jury's perception of his moral culpability.

With a thorough, effective investigation, the jury would have heard from lay and expert witnesses and corroborating letters about Mr. Umaña's visions of dead relatives, predictions of natural catastrophes, bizarre dreams, imaginings, paranoia, and other behavior consistent with mental illness. The jury would have heard that Mr. Umaña had what appear to be visual and auditory hallucinations: he saw demons and other images things nobody else could see; he heard voices that no one else heard. He was so convinced these images were real that he drew what he saw as if to prove this was reality. *See* Appxs. 215, 216 (Declarations of Dr. Stewart). Evidence that Mr. Umaña had suffered from hallucinations, heard voices, and had visions and terrifying nightmares would also have supported a claim that he was mentally ill, exhibiting psychotic symptomology. *Id.* The jury also could have heard that such a person is not fit to be, and was not, a leader in MS-13 or any serious organization. *See* Appx. 244, Declaration of Thomas Ward.

Prejudice is further reflected in an analysis of the penalty phase verdict sheets. For example, the jury unanimously rejected the mitigating circumstance that "Alejandro Enrique Umaña suffered from head injuries early in life that resulted in damage to areas of the brain related to behavior." PPT 946. This would have been different if trial counsel had presented lay testimony corroborating his head injuries and their adverse effects, the results of neuropsychological testing

153

showing damage to his frontal lobe, a quantitative analysis of the PET and an MRI, which verified and supported Dr. Merikangas's conclusions.

Only a single juror found as a mitigating circumstance that Mr. Umaña "did not have the benefit of schooling beyond the third grade." Crim Docs. 1043-1047, 1050. If trial counsel had placed this mitigating circumstance in the context of a child repeatedly failing classes because of his intellectual limitations, the jury would have learned that Mr. Umaña did not decline the "benefit" of post-third-grade schooling but was *incapable of comprehending* post-third-grade schooling. That compelling evidence would have likely persuaded more than one juror. Moreover, had trial counsel presented expert testimony making the connection between Mr. Umaña's problems in school and his adaptive behavior deficits as a child and adult, the jury would have viewed him in a completely different light.

Nine jurors recognized that Mr. Umaña was "exposed to the violence of civil war in El Salvador at an early age," Crim Docs. 1043-1047, 1050, but again the jury was not given any individualized evidence, or expert testimony, detailing the specific traumas Mr. Umaña suffered and explaining how those traumas had a profound effect on Mr. Umaña as an adult. That Mr. Umaña lived through a civil war was an undeniable fact (though three jurors were unpersuaded of even that fact). That his experiences were mitigating depended upon the specifics and consequences of *his* experiences. Had the jury heard that evidence, the jury's findings surely would have been different.

The jury unanimously rejected the mitigating circumstance that Mr. Umaña's childhood was "marked by factors that increased the risk of criminal activity later in life." Crim Docs. 1043-1047, 1050. There is a reasonable probability that had the substantial evidence of the profound complex trauma, intellectual limitations, brain damage, and mental illness impacting Mr. Umaña's

154

development and behavior been adequately investigated and presented to the jury, the jury would have understood that circumstance as compelling.

In the sentencing trial, Dr. Merikangas was the only testifying expert who had evaluated the defendant. Dr. Merikangas' report stated:

> Mr. Umaña is a brain-damaged man with developmental cognitive impairments in the mentally retarded range. He has abnormal neurological examination, abnormal neuropsychological test results, abnormal PET scan of the brain and abnormal quantitative EEG. These brain impairments, to a reasonable degree of medical probability, render him less able to form executive judgments to control his impulses and modulate his behavior compared to normal individuals. These brain impairments stemming from early childhood are not his by choice, but are the result of environmental causes beyond his control.

Appx. 72. With the lay and expert evidence above, trial counsel could have presented an integrated, full-scale picture of a man whose life and mental health were far different from what the Government would have had the jury believe about him. Had they done so, the jury would have received compelling evidence establishing multiple mitigating circumstances that most jurors rejected and would have understood why many of the Government's aggravating circumstances were less compelling or actually undermined. In all, given the quantity and quality of evidence a reasonable investigation would have uncovered, and that counsel making reasonable strategic decisions would have prepared and presented to the jury, there is a reasonable probability the result of the sentencing hearing would have been different.

### F. Had counsel properly investigated, developed, and presented mitigation about Mr. Umaña's mental health impairments, there is at least a reasonable probability that the jury would have found he lacked the *mens rea* to be convicted of willful, intentional, deliberate, or premeditated murder.

The mental health evidence described above, including evidence of Mr. Umaña's brain damage, inability to process information, and lack of executive brain function, taken together with his mental illness and responses caused by exposure to chronic trauma, should have been

155

introduced as evidence in guilt-innocence to demonstrate that he lacked the *mens rea* – in the highly charged atmosphere of the restaurant in which the shootings took place – to have killed willfully, or with intent, deliberation, or premeditation. At an evidentiary hearing, Mr. Umaña expects to present expert testimony consistent with that proffered at Appx. 29 at p. 3 (Report of Dr. Gur) and Appx. 216 (Declaration of Pablo Stewart, M.D.), demonstrating the existence of such a defense. For example, as discussed above, Pablo Stewart would have been available to testify that Mr. Umaña's disorders (individually and collectively) impaired his ability to act with specific intent or premeditation and deliberation. Appx. 216 at ¶13.

Had the defense offered a mental health defense with the evidence they could have developed, there is a reasonable probability that the Government could not have proved the North Carolina crimes beyond a reasonable doubt under either a generic definition of murder or the North Carolina statutory definition.

This probability is underscored by the jury's unanimous findings of the mitigating factors at the penalty phase that the underlying offense was a result of no substantial planning and resulted from an emotionally-charged fight. Crim. Doc. 1048 at 4-6. Clearly, even without a mental health defense, the jury harbored doubts that Mr. Umaña's violent reaction in the restaurant was anything other than an emotional response to a highly volatile situation. Placed in context by expert mental health testimony, those doubts may have amounted to a different outcome at guilt-innocence.

But for trial counsel's failure to investigate and develop an accurate factual account of Mr. Umaña's tragic childhood and the signs and symptoms he had exhibited all his life of low intelligence, brain damage, and mental illness, which could have:

- supported a wide range of mitigating expert mental health evidence,
- explained his decision to join MS-13,

156

- put into context his impulsive reaction in shooting his two victims in North Carolina, and

- would have insulated the case in mitigation against the Government's attacks

there is a reasonable probability that the outcome of both the trial and the penalty phase hearing would have been different. This Court should vacate Mr. Umaña's convictions and sentence and grant him a new trial.

**CLAIM III.** **TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT ALL AVAILABLE EVIDENCE AND TO FULLY PREPARE THEIR EXPERTS AT THE PRETRIAL ATKINS HEARING DEPRIVED THE COURT OF THE FACTS NECESSARY FOR A RELIABLE DETERMINATION AND TO A FINDING THAT MR. UMAÑA CANNOT CONSTITUTIONALLY BE EXECUTED UNDER THE EIGHTH AMENDMENT.**

All other claims and allegations in this Motion are incorporated into this claim by this reference.

"[Intellectually disabled] defendants in the aggregate face a special risk of wrongful execution." *Atkins*, 536 U.S. at 321. Although mental deficiencies do not absolve an offender of criminal sanctions, mental deficiencies "diminish their personal culpability," and therefore, death is not a suitable punishment. *Id.* at 318, 321. After *Atkins*, an adequate inquiry into whether a defendant is intellectually disabled is necessary to comport with the Eighth Amendment. *Id*. at 321.

In this case, counsel failed to investigate, prepare, and present evidence demonstrating Mr. Umaña's low IQ and adaptive deficits during the developmental period, thereby preventing this Court from making an adequate determination as to Mr. Umaña's intellectual disability. At an evidentiary hearing, Mr. Umaña expects to present records and lay and expert testimony, consistent with the declarations, affidavits, and reports proffered at Appxs. 1-22, 27-29, 70-73, 105b-107,

157

108-113,213-230, 236-39, 242-46, 268, 270 and summarized below, demonstrating the wealth of lay information and expert opinion that was available to trial counsel to substantiate Mr. Umaña's Intellectual Disability.

"Clinical definitions of [intellectual disability] require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that become manifest before age 18." *Atkins*, 536 U.S. at 318. The *Atkins* Court recognized that although those who suffer from intellectual disability often can discern between right and wrong and are competent to stand trial, those individuals have diminished abilities to understand and process information, communicate, learn from mistakes and experiences, reason logically, control impulses, and understand the reactions of others. *Id.* Mr. Umaña falls squarely within the factors considered in *Atkins*, and had counsel conducted a full investigation, and properly presented the resulting evidence to this Court, there is a reasonable probability this Court would have found Mr. Umaña intellectually disabled.

### A. Counsel failed to investigate, present and prepare lay witness evidence that would have established that Mr. Umaña meets the criteria for intellectual disability as defined by *Atkins v. Virginia* and is ineligible for a sentence of death.

As documented in other sections of this Motion, and as will be proved at an evidentiary hearing, the post-conviction investigation revealed a wealth of mitigating evidence – never heard by this Court – which would also have supported a showing of adaptive behavior deficits consistent with intellectual disability. *See* Claims I.B.3, I.C.1.b, II.A.2, II.A.3., and VIII.D.

Post-conviction investigation has shown that Mr. Umaña's adaptive deficits were present in all aspects of his life during the developmental period. For example, trial counsel failed to discover and present critical anecdotal evidence about Mr. Umaña's inability to learn and his significant problems with memory. Beginning in his childhood, Mr. Umaña demonstrated a

158

diminished ability to learn. According to his Aunt Reina Umaña, he tried but could not learn and did not understand. "Alex was also forgetful. People from the school would tell my mother Alex was doing poorly with his schoolwork, but my mother could not help him." Appx. 19 at ¶ 17. Similarly, his paternal cousin, Lilian Tino, could have informed the Court: "Alex repeated grades many times. Alex did not do well in school. The teachers used to tell my grandma that Alex would eat in class and come without his homework. The complaints were never for fighting with other children. The teacher used to tell my grandma to take Alex to a psychologist, that Alex was not right." Appx. 15 at ¶14. Mr. Umaña's father told the trial mitigation specialist that Mr. Umaña was "forgetful" and could not go to the store and get requested items by the age of 7 or 8. He tried to apprentice at several jobs, including a shoe shop and tire shop, but he could not learn his duties. Appx. 36 at 4. He worked as a helper, loading soda from Coca-Cola trucks into stores, but he often made mistakes and had to have the tasks carefully explained. *Id*. at 8.

Lay witnesses also could have explained how Mr. Umaña has, since childhood, had difficulty understanding and processing complex information. Vilma Araceli Salazar de Argueta, a neighbor approximately two years his senior, could have testified about Mr. Umaña's educational challenges:

> I think Alex did not have the ability to learn in school. It was very difficult for him to learn. He would stutter when he tried to read and sometimes even when he spoke; we would bother him. Alex would ask me to help him with his homework. When I tried to explain things to him, he would get confused and did not understand; he did not get it.

Appx. 1 at ¶ 21. When he tried to work harvesting coffee beans, he could not apply instructions to pick only ripe red beans. His bags contained many unripe beans, which earned no money. Also, he picked two bags of beans when younger boys picked six or more. Appx. 219 at ¶ 24-25 (Declaration of José Wilfredo Herrera); Appx. 220 at ¶5-6 (Declaration of Karla Herrera

Calderón); Appx. 221 at ¶4 (Declaration of María Lidia Calderón); Appx. 224 at ¶8-13 (Declaration of Carlos Geovanni Herrera).

Throughout his childhood, Mr. Umaña struggled with basic academic skills, including reading and writing. Monica Tatiana Reyes, a former girlfriend of Mr. Umaña, recalled:

> Alex had difficulty reading and writing. Alex liked me to read to him and asked me to teach him to write. He told me he had not finished the third grade. He tried to read in front of me, but he became easily frustrated and embarrassed. . . . Alex also wrote poorly. Even when I explained things to him, he was still confused. For example, Alex would confuse 'b' and 'd.' I explained to him that it is the same little belly but on the other side. He also confused uppercase and lowercase.

Appx. 12 at ¶ 9-10. Around the time Mr. Umaña met Monica, he lived with a friend's family. The friend noticed that Mr. Umaña was not a good reader or writer. The friend's younger sister tried to play "school" with Mr. Umaña (he often played with younger children), but he could not write clearly and kept repeating the same mistakes. He only pretended to read. Appx. 219 at ¶16-17. The sister explained that Mr. Umaña once tried to help her write a story for a school assignment, but "what he wrote was what a 5 year old would write." Appx. 220 at ¶ 4. Mr. Umaña was at least fifteen years old. Mr. Umaña's friend, Luis "Chipis" Ramos, went to night school with Mr. Umaña. Mr. Ramos was twelve years old and in seventh grade, while Mr. Umaña was sixteen years old and in the third grade. Mr. Umaña could not do the academic work of a third grader. "He had difficulties processing and he did not understand. He wanted to learn but it was hard for him." He frustratingly demanded to know why he had to learn those third-grade subjects anyway. Appx. 112, at ¶ 2-3.

Others described Mr. Umaña as lacking fundamental academic, social, and self-help skills. Ms. Reyes, for example, could have related that:

> Alex was also forgetful and had trouble with simple things. He would often put each shoe on the wrong foot. Once, he put money for food in his shoe. When the

160

time came to pay, he could not find the money. He told me, 'I gave you the money.' Later, when he took off his shoes, he found the money.

Appx. 12 at ¶14.

Ms. Tino could have offered additional evidence of his deficits:

Alex was very forgetful. He would be asked to bring things like bottle caps or twigs to do projects, and he would forget to bring them. He did very poorly in school. He would forget things and did not understand what he was being taught. He hardly learned to read or write.

Appx. 15 at ¶ 14. Ms. Tino further noted:

[i]t frustrated my grandma that Alex could not dress himself. He would put his shirts on backwards [/inside out] and his shoes on the wrong feet. Even though we told him it was wrong, he would argue it was not. Sometimes he would go to school with mismatched shoes. Alex did not know how to tie his shoelaces, either. When my grandma told him to tie them, Alex would not tie them but tuck them inside his shoe.

Appx. 15 at ¶ 15.

Mr. Umaña's social skills were also significantly impaired. His brother Saul Osvaldo Umaña is the younger of the two but was much more mature than Mr. Umaña. Saul "gave Alex advice and told him what to do and how to do things." Appx. 22 at ¶ 40. Saul stated that Mr. Umaña "has more trouble understanding things than most people." *Id.* Ms. Reyes confirmed that Mr. Umaña missed social cues and that Alejandro "did not realize when people were having serious conversation. Alex would make jokes when it was inappropriate." Appx. 12 at ¶ 11. She also believed that Mr. Umaña's brother "Saul was the older one because he seems more mature than Alex." *Id.* at ¶12.

Mr. Umaña's challenges were well known to his friends, family, and associates but were not presented to this court when it mattered most. *See* Appx. 4 at ¶ 23 (outlining Mr. Umaña's departure from school at age 12 and the conditions in which he grew up); *see also* Appx. 7 at ¶ 5 (describing at age 12, Mr. Umaña "was not going to school, but was on his own roaming the streets

161

instead . . . . Alex was left without any guidance whatsoever."). However, had counsel conducted a reasonable investigation of Mr. Umaña's life history, the record would have shown that Mr. Umaña's deficits in adaptive functioning were readily apparent in the developmental period and beyond. Indeed, Mr. Umaña's deficits in functional academics were documented as recently as 2011 when the Federal Bureau of Prisons devised an Inmate Skills Development Plan for him. In compiling Mr. Umaña's educational history, the BOP stated that "intellectual deficits were noted," Mr. Umaña had not completed the third grade despite several attempts, and he had limited or no fluency in English. Appx. 245.

And, Mr. Umaña expects to demonstrate at a hearing that even his activities in the gang were demonstrative of adaptive deficits. *See* Appx. 244 (Report of Thomas Ward, Ph.D). Mr. Umaña expects to prove at a hearing that he joined MS-13 later than the average gang member, and, despite his advanced age, he was decidedly unskilled at conducting himself in a way that furthered the gang's objectives. Mr. Umaña's intellectual limitations prevented him from holding any leadership role. Appx. 244 at 2-4 (Report of Thomas Ward, Ph.D). To the gang, the fight over the jukebox in Greensboro would have been seen as personal, not gang, business, as it did not involve fighting a rival from another gang, acquiring or defending territory, a planned "green light," or any other "work" that either fought the enemy or brought in resources for the gang. *See id.* at 5-7. The fact that it was personal business is reflected in the fact that Mr. Umaña's dining companions did not back him up in the fight. *Id.* at 7. A significant norm or unwritten rule among MS-13 is that members should not engage in personal business that brings unwanted law enforcement attention to the gang. *Id.* at 6-7. Mr. Umaña violated that norm here. Once incarcerated, Mr. Umaña attempted to communicate with his fellow gang members, but had to ask another gang member for help identifying who to even write to (*id.* at 3), and when he tried to

162

write in code, placed the cypher for the code in the same envelope as the coded letter. GPT at 583, 605.

Moreover, because of trial counsel's oversights, this Court heard false evidence about Mr. Umaña's birth date, information which was critical to an accurate determination and understanding of Mr. Umaña's intellectual deficits and developmental delays. Mr. Umaña was born in 1982, not 1984, which magnifies how great his developmental delays were. Mr. Umaña was in fact 12 years old in 1994 when he was still struggling to pass the third grade. According to a teacher from the school that Mr. Umaña attended, Ms. Magaña, a 12-year-old third grader was extremely unusual in her experience; "Normally, a child passes third grade by age nine." Appx. 6 at ¶19.

The wealth of information described above and in Claims I, II, IV, VI, and VIII, about Mr. Umaña's developmental delays, including his inability to learn, was readily-available to trial counsel and should have been presented to this Court to demonstrate Mr. Umaña had adaptive deficits sufficient to support a diagnosis of Intellectual Disability.

**B. Had counsel properly prepared their expert witnesses, the result of the *Atkins* hearing would have been different.**

Had this and similar evidence from lay witnesses been provided to the defense experts, it would have significantly strengthened their findings of the adaptive deficits prong of intellectual disability. In addition, trial counsel possessed additional information regarding Mr. Umaña's intellectual functioning that they simply failed to present to this Court, or the jury, and could have developed even more persuasive evidence with reasonable investigation.

At the pre-trial hearing (*Atkins Hearing* 11/30/09), counsel presented standardized intelligence testing (through Dr. Ricardo Weinstein) demonstrating significant deficits in intelligence. The government presented an expert in the same hearing who produced independent intelligence testing that 'normalized' Mr. Umaña's intelligence. Crim. Doc. 932 at 284. This Court

163

did not resolve the conflict between the two sets of testing. (Crim. Doc. 934, Order (denying death penalty exclusion for intellectual disability)). Had trial counsel effectively and reasonably prepared the issue, they could have presented overwhelming evidence to establish deficient intelligence sufficient for diagnosing Mr. Umaña as Intellectually Disabled.

Trial counsel had, but failed to present additional testing to this Court, conducted by Dr. Weinstein just days *after* the *Atkins* hearing, on December 1, 2009, which further supported a finding of significant deficits in intellectual functioning. Dr. Weinstein reported to trial counsel the results of this testing:

> On the C-TONI 2, he obtained a Full Scale Score of 53, a Pictoral Score of 57 and a Geometric Score of 57. These scores are very consistent with the scores obtained in the C-TONI that he took in July 2009.
>
> On the Bateria III he obtained a GIA Score (equivalent to Full Scale IQ Score) of 59 at 95% Confidence Interval 55-62. His academic skills in Reading are at the 5th grade level, Spelling at the 3.5 grade and Math at the 3.2 grade.

Appx. 81 at p. 2. Trial counsel's expert on intellectual disability, Dr. John Gregory Olley, recently reviewed Dr. Weinstein's testing and concluded it was better suited to Mr. Umaña than the testing conducted by the Government's expert Dr. Enrique Suarez. Appx. 28 at ¶ 20.

Dr. Antonio Puente, a pre-eminent psychometrician, psychologist, professor, and consultant (*see* Appx. 246 Puente's CV), has prepared, developed norms for, translated, and published various intelligence and neuropsychological tests for decades. Dr. Puente reviewed all the raw data generated by testing Mr. Umaña. He compared the appropriateness of the tests, the norms applied, the raw data, and the scoring and interpretation. He found that Mr. Umaña falls within the scientifically and professionally accepted range of intellectual disability as defined by the standards and science of the profession. Appx. 213 at ¶21.

164

Three different psychologists (Drs. Weinstein and Suarez and trial; Dr. Shea in post-conviction) assessed Mr. Umaña four times over seven years using six different tests to assess his overall intellectual functioning. Appx. 213 at ¶42. The tests resulted in seven different IQ scores. *Id.* at ¶64. Although all three evaluators made scoring errors, only two of the three evaluators met the Standards of Educational and Psychological Tests, the rigors of the scientific literature, and professional practice standards. *Id* at ¶67. Those two, Dr. Weinstein producing a WAIS-III (Mexican) Full-Scale IQ of 60 and a CIONI 2 Full-Scale IQ of 58, and Dr. Shea producing a WAIS-IV (Spaniard) Full-Scale IQ of 66 and a CTONI 2 Full-Scale IQ of 68, satisfy Prong I of all versions (e.g., American Association on Intellectual and Developmental Disabilities, American Psychological Association, and World Health Organization diagnostic nomenclature) of Intellectual Disability. *Id.* at ¶ 68-75. Mr. Umaña, when administered a valid intelligence test that is properly normed and scored, shows an intelligence that is similar to others properly diagnosed with intellectual disability, and is well below the level required for an *Atkins* finding.

Regarding adaptive deficits, Dr. Olley has since reviewed the new declarations described above and in Claims I and II and found that the witnesses corroborated details of his previous testimony and provided information on factors supporting a diagnosis of intellectual disability that he was unaware of at the time of the pretrial proceedings. Appx. 28. Dr. Olley states that the knowledge that Mr. Umaña was born in 1982 and not in 1984 "strengthens the fact that Alejandro had significant learning struggles in school." *Id*. at ¶ 12. Overall, Dr. Olley finds that

> These declarations document Mr. Umaña's very significantly limited academic and social skills. They indicate very slow learning of self-care skills. . . . They []describe significant impairment in adaptive behavior that originated in childhood.

*Id*. at ¶ 18.

165

Post-conviction counsel also presented this lay witness and expert opinion evidence to Dr. Dan Martell, who, like Dr. Olley, determined that Mr. Umaña shows significant adaptive deficits consistent with a diagnosis of Intellectual Disability. Dr. Martell reviewed neurological and intelligence testing reports, anecdotal information, and school, police, and trial records and concluded that Mr. Umaña functions with very limited intellectual capacity. *See generally* Appx. 236, Report of Dr. Martell. Mr. Umaña suffered several neuro-developmental risk factors (including poverty, emotional and physical abuse, and toxin exposure), combined with subsequent environmental and neurological insults that exacerbated his fundamental brain impairment resulting in deficient intellectual capacity. *Id. passim.* This impairment resulted in a need for external support in all areas of his practical adaptive functioning; he had broad deficits in his social skills involving social cognition, awkward and shy social interaction skills, and impaired social judgment; and he showed impairments in intelligence, academic skills, attention, concentration, language, memory, and executive functioning. Had trial counsel sought all the underlying evidence Dr. Martell reviewed and presented an opinion similar to Dr. Martell's, there is a reasonable probability that Mr. Umaña would have been identified as intellectually disabled by the court before trial.

Finally, a reasonable investigation would have provided trial counsel with additional expert evidence showing this Court potential biological causes for Mr. Umaña's Intellectual Disability. For example, Dr. Ruben C. Gur's analysis of Mr. Umaña's PET scan demonstrated abnormalities in regions (including the amygdala) that are important for regulating emotions and behaviors and an abnormally low metabolism in the temporo-limbic system which "could lead to severe emotional dysregulation." Appx. 29 at p. 3. Had trial counsel obtained an MRI of Mr. Umaña's brain (like Dr. Merikangas recommended, PPT at 750), that MRI would have shown that Mr.

166

Umaña's intracranial volume is more than 4.5 standard deviations below average and that the hypotrophy he suffers suggests global dysfunction to brain systems that are important for regulating emotion and behavior. Appx. 242 Letter Report, Dr. Gur. Trial counsel further could have presented evidence from a fetal alcohol spectrum disorder expert, such as Dr. Julian Davies, that Mr. Umaña's mother's history of drinking during his gestation resulted in a profile consistent with Static Encephalopathy / Alcohol Exposed, also known as Alcohol-Related Neurodevelopmental Disorder (ARND), Appx. 211 (Report of Dr. Davies); *see also* Appx. 29 at p. 3 (Dr. Gur's opinion that PET results are consistent with ARND), and from an expert in neurotoxic exposures, such as Dr. Andres Lugo, that Mr. Umaña's exposure, during gestation and development, to alcohol, marijuana, Rohypnol, and pesticide, fertilizer, and general lead poisoning singularly or cumulatively could have caused the neurological damage revealed by the various neurological tests and scan of Mr. Umaña. Appx. 212 (Report Dr. Lugo). Finally, counsel could have presented evidence showing that the sheer terror of trauma that Mr. Umaña experienced as a child and adolescent is sufficient to cause brain damage and developmental delay. *See* Appx. 243 at 12, Report of Dr. Shea (opining that Mr. Umaña's extensive trauma history "resulted in a developmental delay of significant proportions"; Appx. 214 at 20 (Dr. Sapia regarding trauma's impact on the brain). While it is not necessary to prove etiology to establish a diagnosis of Intellectual Disability, these experts' opinions regarding Mr. Umaña's brain development nonetheless would have been helpful and informative to this Court's ultimate decision.

Trial counsel's failure to seek necessary collateral evidence to provide to their experts, seek all necessary expert opinion, and to prepare their experts for the *Atkins* hearing, deprived the Court of the full and complete raft of evidence that establishes that Mr. Umaña's IQ is within the range of intellectual disability, that he suffers from significant adaptive deficits, and that his impairments

were manifest before the age of 18. There is a reasonable probability that, but for counsel's deficient performance in investigating lay evidence of adaptive behaviors and preparing and presenting expert testimony, the result of the pretrial determination on intellectual disability would have been different.

**CLAIM IV. MR. UMAÑA IS A PERSON WITH INTELLECTUAL DISABILITY, AND HIS EXECUTION WOULD VIOLATE THE EIGHTH AMENDMENT IN LIGHT OF THE SUPREME COURT'S DECISION IN *HALL v. FLORIDA* AND ITS PROGENY.**

All other claims and allegations in this Motion are incorporated into this claim by this reference.

Although the *Atkins v. Virginia*, 536 U.S. 304 (2002), decision "did not provide definitive procedural or substantive guides" for how lower courts should determine intellectual disability, the Supreme Court's decision in *Hall v. Florida* made clear that the Constitution requires any standard to conform with scientifically- and medically-accepted clinical criteria. *Hall v. Florida*, 572 U.S. 701, 719-20 (2014). Because this Court denied *Atkins* relief without the guidance of the Supreme Court's *Hall* decision, its findings were inconsistent with mandatory standards. As detailed below, appellate counsel were ineffective for not raising this on direct appeal. However, appellate counsel were also prior 2255 counsel, and so could not have been expected to raise their own ineffectiveness due to their conflict of interest. As a result of that conflict, prior counsel withdrew from this case. *See* Civ. Docs. 94, 95, 96, 107. In light of the Supreme Court's decision in *Hall* and further evidence discovered during the post-conviction investigation, Mr. Umaña can demonstrate that he is a person with an intellectual disability and is thus exempt from execution.

The Supreme Court clarified in *Hall* that a state that "seeks to execute a man because he scored a 71 instead of 70 on an IQ test . . . misconstrues the Court's statements in *Atkins*." *Id*. at

168

724. The Court deemed unconstitutional a Florida statute containing a "rigid rule" imposing IQ cutoffs for intellectual disability. *Id.* The petitioner in *Hall* scored 71 on an IQ test. He argued he was intellectually disabled under the clinical definitions cited in *Atkins*, which indicated that an IQ score of up to 75 falls within the range of intellectual disability. *Id.* at 719. However, Florida law required an IQ score of 70 or below. The question presented in *Hall* was which standards governed, clinical standards or the statutory definition. The Court answered that the Constitution requires the determination of intellectual disability to accord with clinical standards established by the medical community. *Id.* at 719-24. Under *Hall*, this Court must look to "medical and professional expertise to define and explain how to diagnose the mental condition at issue." *Id.* at 710. The Court's determination of intellectual disability must be "consistent with the views of the medical community noted and discussed in *Atkins*." *Id.* at 711. If a court "disregards established medical practice" in rejecting a petitioner's claim of intellectual disability, its finding will be deemed unconstitutional. *Id.* at 712.[32]

### A. This Court's previous findings were made without the guidance of *Hall v. Florida* and thus do not preclude a determination in 2255 that Mr. Umaña has an intellectual disability.

In *Hall*, the statutory definition of Intellectual Disability that provided a hard cut-off IQ score conflicted with the medical definition that recognizes that the intellectual capability component of intellectual disability is, for various reasons, a range rather than a bright-line number. Thus, the conflicting statute had to fall. *Hall*, 572 U.S. at 710-14. But while *Hall* considered the statutory definition of intellectual capacity, the Court's underlying reasoning

---

[32] *Hall*, although addressing the first prong of an intellectual disability analysis (the IQ prong), applies with equal force to the determination of adaptive deficits. *Moore v. Texas*, 581 U.S. 1, 15 (2017).

169

necessarily must apply to all aspects of the diagnosis of intellectual disability; the beliefs manifest in the statutory or jurisprudential rule (and the application of those rules) must be subservient to the actual medical definitions. Thus, where the rule (or its application) defines the second *Atkins* prong – adaptive deficits – in a manner that conflicts with the medical definition, that rule (or application) would fail just as the IQ rule in *Hall* fell.

Although the Court did not apply this conclusion until *Moore v. Texas* in 2017, that conclusion is undeniable from a plain reading of *Hall*. *Moore v. Texas*, 581 U.S. 1, 5 (2017) ("As we instructed in *Hall*, adjudications of intellectual disability should be 'informed by the views of medical experts.'" (quoting *Hall*, 572 U.S. at 721)). Considering *Hall v. Florida*, therefore, much of the evidence this Court relied upon in denying Mr. Umaña's motion on intellectual disability was accorded too much weight or, in some cases, should not even have been considered.

As experts in intellectual disability have documented, adaptive strengths and limitations often coexist in persons with intellectual disabilities. A clinically appropriate determination of intellectual disability focuses on the adaptive deficits, not the strengths that may coexist with those deficits. *See* Appx. 236, p. 8 (Report of Dan Martell). In fact, persons with mild intellectual disabilities can function successfully – and independently – in a community by acquiring social and vocational skills adequate for minimum self-support. *See* Nat'l Acads. Scis., Eng'g & Med., *Mental Disorders and Disabilities Among Low-Income Children* 170-71 (Thomas F. Boat & Joel T. Wu eds., 2015), https://nap.nationalacademies.org/catalog/21780/mental-disorders-and-disabilities-among-low-income-children. During middle school, persons with mild intellectual disability develop "complex sentence structure, and their speech is clearly intelligible . . . . By adolescence, normal language fluency may be evident." Am. Psychological Ass'n, *Manual of Diagnosis and Professional Practice in Mental Retardation* 17-18 (John W. Jacobson and James

170

A. Mulick eds., 1996). Although vocational opportunities may be limited, "these people are generally able to fulfill all expected adult roles." *Id*.

People with mild intellectual disabilities are capable of living remarkably meaningful and fulfilling lives, including the capacity to live independently, work, and marry and have families. One British study that surveyed persons with intellectual functioning in the mild intellectual disability range found that "[a]lthough the mild intellectual impairment group were less likely to attain the following social outcomes than people with normal intellectual functioning, 67% had jobs, 73% were married, 62% had children and 54% owned their own homes. 12% participated in adult education." Ian Hall et al., *Social Outcomes in Adulthood of Children with Intellectual Impairment: Evidence from a Birth Cohort*, 49 J. Intell. Disability Res. 171, 171 (2005). Such individuals remain, however, intellectually disabled and with the same underlying diminished culpability identified in *Atkins*, and so subject to the same Eighth Amendment protections as similarly cognitively capable individuals with fewer adaptive strengths.

Before the Supreme Court's *Hall* decision, this Court focused its analysis on what it perceived to be Mr. Umaña's strengths rather than deficits, based on Mr. Umaña's self-reports and the testimony of correctional officers. Crim. Doc. 934 (filed 03/19/10). These sources are disavowed among experts in the field and inconsistent with scientifically- and medically-accepted clinical criteria; under *Hall* and its progeny, the analysis must comport with medical and scientific standards and disregard such evidence of strengths and focus on Mr. Umaña's demonstrable and considerable deficits.

### 1. Medically-accepted standards

According to medical community standards, information about a person's activity in a "highly structured and limited environment of prison is a *poor indicator* of one's functioning." J.

Gregory Olley & Ann W. Cox, *Assessment of Adaptive Behavior in Adult Forensic Cases: The Use of the Adaptive Behavior Assessment System-II*, in *ABAS-II: Clinical Use and Interpretation* 392 (Thomas Oakland and Patti L. Harrison eds., 1st ed. 2008) (emphasis added). "Many people with mental retardation perform better in the structured prison setting than in less structured settings." *Id*. The restrictive and structured environment of incarceration "makes it *impossible to assess* typical adaptive behavior." *Id.* at 386 (emphasis added). "Thus, reports from corrections officers or other observations of current functioning in prison are not valid indicators of level of adaptive behavior." *Id*.; *see also Moore v. Texas*, 581 U.S. 1, 16 (2017) ("Adaptive functioning may be difficult to assess in a controlled setting (e.g., prisons, detention centers); if possible, corroborative information reflecting functioning outside those settings should be obtained." (quoting DSM–V, at 38)); AAIDD, *User's Guide*, *Intellectual Disability: Definition, Classification, and Systems of Supports* 20 (11th ed. 2012) (counseling against reliance on "behavior in jail or prison")).

The AAIDD Manual also emphasizes that reports of an individual's behavior must be "evaluated in relation to contexts typical of the individual's age peers." AAIDD, *Intellectual Disability: Definition, Classification, and Systems of Supports* 53 (11th ed. 2010) ("AAIDD 2010 Manual"). When in an "atypical" environment, such as prison, the mental health professional must consider the controlled setting when interpreting adaptive behavior assessments. *Id*. For example, prison guards will likely have only observed an individual in a highly restricted setting, not an ordinary community setting. They may not have any experience interacting with people with intellectual disabilities. Guards may also be biased or subject to fears of reprisal. "Correctional officers and other prison personnel *should probably never* be sought as respondents to provide information regarding the adaptive behavior of an individual that they've observed in a prison

172

setting . . . . The main hesitation to involving prison personnel as respondents is related to the nature and contingencies of the prison setting. The prison setting is an artificial environment that offers limited opportunities for many activities and behaviors defining adaptive behavior." Marc Tassé, *Adaptive Behavior Assessment and the Diagnosis of Mental Retardation in Capital Cases*, 16 J. Applied Psych. 114, 119 (2009); *Moore*, 581 U.S. at 16[33] (correcting state court for relying on prison behavior evidence in adaptive deficits analysis); *see also* Appx. 28 at ¶ 21 (Dr. Olley's post-conviction declaration stating that there was no basis for Dr. Suarez's reliance on the jail officers and that the test clinicians and professionals use to determine significant deficits in adaptive behavior is based on adaption in the community, not in prison); *see also United States v. Wilson*, 170 F. Supp. 3d 347, 370 (E.D.N.Y. 2016) (finding prison evidence has reduced weight and granting relief following *Hall* remand).

Similarly, medical community standards warn of the unreliability of relying solely on self-reporting for determining a person's functioning for intellectual disability. *See, e.g.*, Tasse, *supra*, 119 ("Relying solely on the individual's self-report is fraught with problems."); AAIDD Manual at 51-52 ("Self-ratings of individuals . . . may contain a certain degree of bias and should be interpreted with caution when determining an individual's level of adaptive behavior . . . . [T]he authors of this *Manual* caution against relying heavily only on the information obtained from the individual . . . ."); Kay B. Stevens and J. Randall Price, *Adaptive Behavior, Mental Retardation, and the Death Penalty*, 6 J. Forensic Psych. Practice 1, 17 (2006) ("To accept a criminal

---

[33] More recently, the DSM-V also specifically states that "[a]daptive behavior may be difficult to assess in a controlled setting (e.g., prisons, detention centers)." American Psychiatric Association, Diagnostic and statistical manual of mental disorders (5th ed. 2013) ("DSM-V") at 38. Accordingly, the DSM-V calls on practitioners to evaluate adaptive behavior and obtain corroborating information outside those settings. *Id.*

defendant's self-report without skepticism is forensically naïve and constitutes a deviation from acceptable practice that may result in unreliable data." (emphasis added)); Keith Widaman & Gary Siperstein, *Assessing Adaptive Behavior of Criminal Defendants in Capital Cases: A Reconsideration*, Am. J. Forensic Psych., Vol. 27, Issue 2, at 5, 27 (2009) ("Courts should never use [self-report] assessments . . . as evidence in a high-stakes court proceeding that determines mental retardation."). In a post-conviction declaration, Dr. Olley also noted that the medical literature on intellectual disability emphasizes the inappropriateness of relying solely on the person's self-reporting of his own accomplishments. Appx. 28 at ¶22.

### 2. In light of *Hall v. Florida*, the Eighth Amendment prohibits Mr. Umaña's execution, notwithstanding the Court's pre-trial findings on his claim of intellectual disability.

On March 19, 2010, the Court denied Mr. Umaña's claim of intellectual disability. Crim. Doc. 934. The Court did not resolve intellectual functioning, and the adaptive functioning question "present[ed] particular difficulty." *Id*. at 5-6. The Court found no significant limitations, but in the area of functional academics, the Court found the evidence "mixed" and a "closer call" than most others. *Id*. at 14. In making this determination, this Court relied heavily on Mr. Umaña's self-reporting and the reporting by the jail guards. *Id.*

Although Mr. Umaña presented school records showing he struggled with academics and could not pass the third grade, the Court relied on Mr. Umaña's self-report that he dropped out of school because of a lack of supervision by his family. *Id*. at 13. The Court cited Dr. Suarez's testimony at the *Atkins* hearing, where he recounted Mr. Umaña's story that he stopped attending school because he lacked family support following the death of his grandmother (when he was eight years old). *Id.* (citing *Atkins* Hrg. at 307). This was interpreted as a willful, deliberate choice rather than an inability to master the content of his schooling. As detailed extensively in Claims I

174

and II and incorporated fully here by reference, post-conviction counsel discovered that rather than leaving school due to his great-grandmother's death, he struggled and had difficulty understanding the material taught. Mr. Umaña's school records corroborate this account, showing that his grades were consistently low, and he was placed in a remedial class despite good attendance. Appx. 31 (School Recs. For Mr. Umaña) at 3, Appx. 7 (showing an attendance percentage of 97 percent in 1992 and 91 percent in 1991).

The Court's presumption was also factually inaccurate: Mr. Umaña's great-grandmother died in June of 1991, Appx. 33, when Mr. Umaña was only eight years old and in the first grade. Appx. 31 at 2-3. Records prove that Mr. Umaña continued to attend the Santa Ana California school for another three years, finally dropping out in 1994. Appx. 31. In fact, Mr. Umaña returned to night school to try to finish third grade when he was approximately sixteen years old. He could not finish third grade even then. Appx. 112 ¶2, Declaration of Luis Ramos.

His early school records also show that Mr. Umaña was trying. Mr. Umaña had good attendance in 1991 and 1992. Appx. 31 at 3, 7. He also received good grades in personal relations and cooperation, promotion of customs and beliefs, and practice of moral and civil values but failed in other areas requiring abstract thought like responsibility, health and protection, initiative, self-confidence, and work habits. *Id*.; Appx. 6 at ¶16-17; Appx. 106.

The Court also relied on a jail guard's observations of Mr. Umaña's functioning while he was incarcerated, as related in the report and testimony of Dr. Enrique Suarez, the Government expert. Crim. Doc. 934 at 3. Dr. Suarez stated that he spoke to three jail officers who observed Mr. Umaña in the jail setting. *Atkins* Gov. Ex. A-3 at 19-22. Each officer reported that Mr. Umaña was able to function while incarcerated because he was able to dress himself independently, speak broken English, ask the guards to talk slowly, ask for supplies, exercise, use the telephone, clean

175

his cell, and order commissary items. *Id*. One non-Spanish speaking officer reported that he witnessed Mr. Umaña teaching another inmate Spanish by putting words on a paper and putting them up to his cell window so the other inmate could read them. *Id*. at 22. Another officer reported that Mr. Umaña could communicate that he had headaches and asked for request and grievance forms (but was unaware if Mr. Umaña asked for medical request forms). *Id*. at 21. Mr. Umaña refused to take medication for his tuberculosis because of headaches and nausea but changed his mind after being told about the risks and the length of time remaining on the medication. *Id*. at 10, 23. Mr. Umaña was also able to refuse meals to fast for Ramadan. *Id*. at 22.

All three officers stated Mr. Umaña was a respectful and cooperative inmate who appeared average compared to other inmates. *Id.* at 19-22. Dr. Suarez asked each of the officers their opinion on whether Mr. Umaña suffered from an intellectual impairment, and each answered in the negative. *Id*. at 20 (based on Officer McIntyre's observations, he "believe[d] that Mr. Umaña does not seem to have any intellectual impairment"); *Id*. at 21 (Officer Farley reported Mr. Umaña had "not exhibited any deficits or impairments in his functioning in jail."). Dr. Suarez emphasized Officer Holley's experience in working as a law enforcement officer at a special education school for children and adults, *Id.* at 21, and based on that experience, concluded that "Mr. Umaña does not exhibit any of the deficits seen in mentally retarded adults or special needs children." *Id*. at 23. Because these observations are not clinically relevant to determining whether Mr. Umaña had an intellectual disability, in light of *Hall*, they can no longer vitiate Mr. Umaña's *Atkins* claim. *See* Appx. 236, Report of Dr. Martell, p. 16.

The officers' reports about his ability to communicate specific needs, like getting supplies or letting them know he has a headache, do not give any reliable conclusion about Mr. Umaña's functioning outside of the institutional setting. His ability to do the things listed is not beyond the

176

capabilities of someone with mild mental retardation. *See Moore*, 139 S. Ct. at 670-71 (comparative strengths do not rule out intellectual disability).

As set forth in greater detail in Claim III above, if accepted professional and clinical standards are considered, as required by *Hall* and its progeny, Mr. Umaña can demonstrate that he meets the definition of a person with intellectual disabilities with significant impairment in intelligence and adaptive functioning that originated in childhood. Mr. Umaña expects to present evidence at a hearing consistent with the lay witness evidence, records, and expert reports proffered at Appxs. 1-22, 27-29, 70-73, 105b-107, 108-113, 213-230, 236-39, 242-46, 268, 270, including the reports of: Dr. Olley, Appx. 28 at ¶23-24; Dan Martell, Appx. 236 at 32-33; and Dr. Puente, Appx. 213 at ¶63, 75, demonstrating that Mr. Umaña is Intellectually Disabled and therefore, categorically excluded from the death penalty.

### B. Appellate counsel[34] were ineffective for failing to ensure that the Fourth Circuit ruled on counsel's challenge to this Court's pretrial *Atkins* determination and for failing to address the effect of *Hall*, which was decided while Mr. Umaña's direct appeal was still pending.

There is no question on the current record that it was appellate counsel's strategy to challenge this Court's *Atkins* determination on direct appeal. Although appellate counsel raised a lengthy challenge to the burden of proof applied by this Court at the *Atkins* hearing, *see* Brief for Defendant-Appellant, 09/03/2013, 10-6, App. Doc. 99, pp. 129-150, appellate counsel also argued that this Court's denial of *Atkins* relief was clearly erroneous, *Id.* p. 150 (Issue XII.D).

---

[34] This challenge to appellate counsel's deficient performance was not contained in Mr. Umaña's Initial 2255 Motion. As this Court is well-aware, Mr. Umaña's initial 2255 counsel were the same lawyers as his direct appeal counsel. *See* Civ. Docs. 94, 95, 96, 107. As such, they could not be expected to raise claims of their own ineffectiveness, and their conflict of interest deprived Mr. Umaña of the ability to raise this issue in the Initial 2255 motion. *Cf. Christeson v. Roper*, 574 U.S. 373, 378 (2015) ("Counsel cannot reasonably be expected to make such an argument, which threatens their professional reputation and livelihood."). *See also* Appxs. 231-235.

In affirming Mr. Umaña's sentences, however, the Fourth Circuit only addressed counsel's burden of proof argument and expressly held that Mr. Umaña "does not challenge the merits of the district court's findings with respect to" his *Atkins* claim. *United States v.* Umaña, 750 F.3d 320, 358-59 (4th Cir. 2014). Appellate counsel then filed a Petition for Rehearing En Banc, requesting review of the panel's denial of relief on other issues. App. Doc. 136, filed 05/07/2014.

Appellate counsel took no action to request that the Fourth Circuit consider and rule upon their argument that this Court's denial of *Atkins* relief was clearly erroneous. There can be no strategic basis for appellate counsel's failure to request that the Circuit consider and rule upon this issue, either in their Petition for Rehearing En Banc, or through another appropriate motion, to ensure that Mr. Umaña received his constitutional right to appellate review of this critical issue. To the extent that this Court may find that appellate counsel failed to preserve or otherwise waived a direct appeal challenge to this Court's pretrial *Atkins* ruling, appellate counsel's failure to adequately brief this issue in the Circuit at all necessary stages constituted deficient performance. Again, given that counsel's chosen strategy was to present a direct appeal challenge to the Court's *Atkins* ruling, there can be no strategic reason for counsel's failure to do so in a manner that ensured Mr. Umaña received a ruling from the appellate court on that challenge.

Appellate counsel also failed to take any steps to ensure that the Fourth Circuit considered the impact of *Hall v. Florida* on Mr. Umaña's direct appeal. The Fourth Circuit panel denied Mr. Umaña relief on April 23, 2014. 750 F.3d at 320. Mr. Umaña's Petition for Rehearing En Banc was filed on May 7, 2014. App. Doc. 136. The Supreme Court decided *Hall* on May 27, 2014. 572 U.S. 701 (2014). Mr. Umaña's rehearing petition was denied on June 27, 2014. App. Doc. 143.

Mr. Umaña expects to demonstrate at a hearing that appellate counsel knew that *Hall* (with a question presented directly relevant to this case) was pending in the Supreme Court, that oral

178

argument was held in March 2014, and that a decision was expected by the end of the Court's term, in June 2014. Despite this, at no time did appellate counsel request that the Fourth Circuit stay or hold Mr. Umaña's appeal in abeyance, pending the outcome of *Hall*. Nor did appellate counsel request to amend or supplement its Petition for Rehearing En Banc after the Supreme Court decided *Hall* to ensure not only that Mr. Umaña's *Atkins* challenge was considered but that it was considered under the Supreme Court's most recent precedent. Nor did appellate counsel request that the Fourth Circuit remand Mr. Umaña's case to the District Court for reconsideration of its ruling after *Hall* was decided. There can be no strategic reason for any of these failures when it was counsel's chosen strategy to litigate a challenge to this Court's pretrial *Atkins* ruling on direct appeal.

There is a reasonable probability that the outcome of Mr. Umaña's direct appeal would have been different had appellate counsel fully litigated Mr. Umaña's challenge to this Court's pretrial *Atkins* ruling in a manner that ensured it received consideration by the appellate court under all appropriate standards, including the Supreme Court's May 2014 opinion in *Hall*. At a bare minimum, effective appellate litigation would have ensured that either the Fourth Circuit or this Court (through a remand mechanism) would have considered Mr. Umaña's *Atkins* claim under the medicolegal norms articulated in *Hall* during Mr. Umaña's direct appeal. *Cf. Wilson*, 170 F. Supp. 3d at 347 (upon remand from the Second Circuit to reconsider, based on *Hall*, pretrial ruling denying federal capital defendant Atkins relief, reversing prior opinion and holding defendant intellectually disabled and ineligible for death penalty). There is a reasonable probability that, applying appropriate medicolegal norms, Mr. Umaña would have been found intellectually disabled. As demonstrated above, although *Moore v. Texas* was not decided until 2017, it was an inescapable conclusion from *Hall* that current medical standards must be applied to *all* prongs of

179

an intellectual disability determination. Mr. Umaña is entitled to relief.

**CLAIM V.  TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE AND PRESENT READILY AVAILABLE EVIDENCE CHALLENGING THE GOVERNMENT'S ACCOUNT OF MR. UMAÑA'S ROLE IN THE UNADJUDICATED CALIFORNIA MURDERS ALLEGED IN SUPPORT OF NON-STATUTORY AGGRAVATING FACTORS 4(A) AND (B), IN VIOLATION OF MR. UMAÑA'S RIGHTS UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.**

All other claims and allegations in this Motion are incorporated into this claim by this reference.

The Government faced a difficult task in trying to convince the jury that Mr. Umaña's case presented as "the worst of the worst" such that the law required he be sentenced to death. *See Roper v. Simmons*, 543 U.S. 551, 568 (2005); *Kansas v. Marsh*, 548 U.S. 163, 206 (2006) (Souter, J., dissenting). The jury unanimously found that his offense was significantly mitigated because it was unplanned and emotionally charged. *See* Crim. Docs. 1048-51, pp 5-6; *Williams v. Taylor*, 529 U.S. 362, 398 (2000) (explaining that whether "violent behavior was a compulsive reaction rather than the product of coldblooded premeditation" affects the assessment of moral culpability). Leading up to the Greensboro murders, there was evidence of an escalating altercation, threatening a fistfight, between Mr. Umaña's group and the victims. *See* GPT at 411-16 (Testimony of Abel Santos). The two groups exchanged words and shoves in the moments before the shooting. The victims had blood alcohol concentrations of .20 and .17 (GPT at 493 and 497), both of which were more than double the legal limit for driving in North Carolina, *see* N.C. GEN STAT. ANN. § 20-138.1. The Greensboro killings were not the type of crime that would typically warrant the death penalty. *Marsh*, 548 U.S. at 206 (Souter, J., dissenting) (commenting that "within the category of capital crimes, the death penalty must be reserved for 'the worst of the worst'") (citation omitted);

*Atkins v. Virginia*, 536 U.S. 304, 319 (Eighth Amendment jurisprudence "has consistently confined the imposition of the death penalty to a narrow category of the most serious crimes.").

To compensate for what may have otherwise been an underwhelming case for the death penalty, the Government relied heavily on evidence of three additional homicides in two separate cases in California. The "California murders" were two separate incidents from a few years before the Greensboro murders, in which three people had been killed. One took place on a busy street in Los Angeles (the "Fairfax Avenue shooting"), and the other took place at a public park in Los Angeles (the "Lemon Grove shooting"). The Government attributed these homicides to Mr. Umaña, even though the cases were founded largely on accusations by co-defendants and/or weak, untested identifications. Notably, the State of California never prosecuted Mr. Umaña past the charging stage for these homicides, so this penalty hearing was his first chance to test the Government's case.

These additional killings were central to the Government's case at the penalty phase. The first eight witnesses the Government called to testify during the penalty phase discussed nothing other than the California murders, and testimony regarding the California murders consumed nearly three-quarters of the Government's case for death. PPT at 16-261. The Government used the Fairfax Ave and Lemon Grove shootings to convey to the jury that Mr. Umaña had killed "over and over and over again" (PPT at 889), that he "kills who he wants to kill for his own reasons," (PPT at 834), and that "if it serves his needs he's going to do it again," (PPT at 835).

As discussed in further detail in the following sections, trial counsel were ineffective for failing to investigate and adequately challenge the Government's account of the Fairfax and

181

Lemon Grove shootings.[35] Information favorable to Mr. Umaña could have been discovered through independent investigation, and readily available exculpatory and mitigating information was available in the documents turned over to trial counsel in discovery. Trial counsel could have used that information to undermine the Government's highly damaging and weak allegations that Mr. Umaña was the shooter in the California murders. Counsel's anemic investigation and lack of preparation were objectively unreasonable, and, as discussed in further detail below, the readily available evidence was, for the most part, consistent with the defense theory that trial counsel chose to advance at trial, so they had no reason not to pursue it. Moreover, considering the central role these unadjudicated incidents played in the jury's decision to sentence Mr. Umaña to death, trial counsel's ineffective assistance was prejudicial.

### A. The Record Developed at the Penalty Phase Relating to the California Murders.

#### 1. The Lemon Grove shooting.

The Government essentially advanced four pieces of evidence to persuade the jury that Mr. Umaña was guilty of the unadjudicated Lemon Grove Park murder: 1) two identifications of Mr. Umaña that witness-victim Freddy Gonzalez made using photograph lineups before trial, 2) a double hearsay statement from Rene Arevalo to Los Angeles Police Detective Thomas Small that Mr. Umaña was the Lemon Grove shooter, 3) ballistics testimony regarding an alleged match between the .22 caliber bullet casing found at Lemon Grove Park and two casings recovered from the Fairfax Avenue shooting, combined with 4) statements from Mr. Umaña that he was at Lemon

---

[35] As discussed in Claims VI and VII, trial counsel's ineffective assistance was not the sole constitutional infirmity associated with the Fairfax and Lemon Grove shootings: the Government suppressed exculpatory information and presented false and misleading testimony to the jury relating to the incidents as well.

Grove Park around the time of the shooting. All four pieces of evidence could have been rebutted entirely or mitigated if trial counsel had performed the necessary investigation.

Detective Small was the Government's first witness during the selection phase of Mr. Umaña's sentencing trial. PPT at 90. The Government introduced its theory of the Lemon Grove shooting through Small and three testifying eyewitnesses: Roberto Ramos, Juan Lara, and Freddy Gonzalez. The Government's theory of the case was that these three eyewitnesses had been playing basketball in the park at night with Andy Abarca. While the four men sat relaxing on the bleachers afterward, Mr. Umaña and another person approached the basketball players and opened fire on them without warning. PPT at 100-01. Andy Abarca was killed, but the other three victims survived. PPT at 97.

Detective Small explained to the jury that Lemon Grove Park was disputed "turf" and the subject of a gang battle involving MS-13, JMK, and a gang known as the "The Perfect Criminals," which also went by "Tree Park Criminals," or "TPC" for short. *Id*. According to Small, the area is "heavily seeded with gang activity," and gang members would "mark [disputed turf] with graffiti . . . fight for it . . . and kill for it." PPT at 92-93. Small also testified that he recovered a .22 caliber bullet casing from Lemon Grove Park, which detectives later linked to the Fairfax Avenue shooting. PPT at 107.[36]

Detective Small further testified that he believed the motive for the attack was retaliatory because Freddy Gonzalez had robbed an MS-13 member several months before the shooting. *Id*. at 105-06. Freddy Gonzalez, therefore, was the intended target of the shooting. *Id.* at 107. Without

---

[36] Only semi-automatic or automatic pistols eject bullet casings when fired.  They eject one casing for each bullet fired. If the single .22 caliber bullet casing was related to the incident, the .22 caliber handgun was fired only once, which questions the accounts of two of the eyewitnesses and questions the materiality of the involvement of the .22 shooter.

providing a specific date, Small explained that at some point, Mr. Umaña and another individual named Geovani Rodas (aka Sin) became the main suspects in his investigation. *Id.* at 108. Small testified about a conversation with MS-13 gang member Rene Arevalo in Los Angeles County Jail.[37] *Id.* at 109. According to Small's testimony, Rene Arevalo looked at a photograph of Mr. Umaña and told Small, "that's your Lemon Grove shooter" (*Id*. at 110), even though Mr. Arevalo was not present at the Lemon Grove shooting himself. *Id*. at 117.

The bulk of Roberto Ramos's testimony was as an eyewitness and victim of the Lemon Grove Park shooting. Roberto Ramos explained that Freddy Gonzalez was a member of the TPC gang and discussed his conversations with the LAPD after the shooting. *Id*. at 134-35. He explained to police that he wanted to assist in the investigation, provided descriptions of the shooters, stated he was willing to meet with a sketch artist and said he could identify the shooters if shown their picture. *Id* at 135. He acknowledged that LAPD detectives showed him photographs on at least two occasions and that he never saw the shooter in those photographs, despite believing that he could identify the shooters. *Id*. at 135-36.

Juan Lara testified in a manner consistent with Roberto Ramos's testimony. *See id*. at 138-48. He provided a similar description of the shooting in Lemon Grove Park. He explained that he wanted to assist in the police investigation but could not identify anyone in the photographs the police showed him. *Id*. at 147.

---

[37] This interview is one of many that Mr. Umaña's post-conviction team has not had the opportunity to review. It appears that trial counsel neither reviewed nor requested that the prosecution turn over this interview. Post-conviction counsel has made multiple requests to the Government to produce this interview before filing Mr. Umaña's §2255 motion. Mr. Umaña filed a motion to compel the Government to disclose this interview and others pertaining to the California murders, *see* 16-cv-00057, Civ. Doc. 13, which this Court denied, Civ. Doc. 30.

The testimony of Freddy Gonzalez was the subject of substantial disagreement between the parties (*see* PPT at 7-9, 307-13, and 322-29). Freddy Gonzalez was "the only witness that identifi[ed] [Mr. Umaña] in some way as the shooter." PPT at 328. The Government argued for having Freddy Gonzalez identify Mr. Umaña in open court as the Lemon Grove shooter. *Id.* Ultimately, the Court determined that "the prior description of the criminal . . . is suspect," noted that "[t]he Court does not have confidence in the pretrial identification," and therefore, the Government was not allowed to ask Freddy Gonzalez to identify Mr. Umaña in open court. *Id.* at 327-28. But the Government was allowed to present Freddy Gonzalez's pretrial identifications of Mr. Umaña, leaving any questions of reliability up to the trial counsel to elicit. PPT at 328-29.

On the witness stand, Freddy Gonzalez testified to his version of what happened at the Lemon Grove shooting, stating that he only saw a single shooter. PPT at 317, 341. Freddy Gonzalez admitted to having prior felony convictions that included concealed weapons charges and a robbery of an MS-13 member. *Id.* at 314-15. He further admitted to being a member of the TPC gang and a rival of MS-13. *Id.* at 315.

Raffi Djabourian, the medical examiner at the Los Angeles Coroner's office, also testified. Dr. Djabourian performed an autopsy of Mr. Abarca's body and determined that the cause of death was multiple gunshot wounds. He recovered a bullet from Andy Abarca's body that was "medium caliber," indicating a nine-millimeter, .357, .38 caliber, or similar size. *Id.* at 154. The bullet recovered was a larger round than a .22 caliber bullet, meaning it could not have been fired from the same gun used in the Fairfax Avenue shooting. *Id.* at 155. The recovery of a medium caliber bullet from Andy Abarca's body suggested that two guns were used in the Lemon Grove shooting

185

or that the .22 caliber casing was already in the park before the shooting.[38] Police never recovered a firearm in connection with the Lemon Grove shooting.

### 2. The Fairfax Avenue Shooting

Regarding the Fairfax Avenue shooting, the Government alleged that Mr. Umaña was one of five MS-13 affiliates in a car in Los Angeles on July 27, 2005. Mr. Umaña was in the front passenger seat of a gold-colored Nissan Altima, Rene Arevalo was the driver, Luis Rivera was in one of the rear seats, Luis Ramos was in another, and Eddie Ruiz sat in the middle seat. As the MS-13 members drove down the road, two members of a "tagging crew" called "Posted on Fairfax" were on the sidewalk. PPT at 180-81, 187. The taggers flashed gang signs at Mr. Umaña and the four other people in the Nissan Altima. *Id.* Rene Arevalo pulled the car over to the side of the street, and several of the MS-13 gang members got out to confront or fight them, but Mr. Umaña shot them instead. *Id*. Two .22 caliber bullet casings were found at the scene, leading the detectives to believe someone shot the victims with a .22 caliber handgun. PPT at 174.[39] No firearm was ever recovered in connection with the Fairfax Avenue shooting either.

To make its case to the jury that Mr. Umaña was the shooter in the Fairfax Avenue incident, the Government relied almost entirely on the testimony of two LAPD detectives, including

---

[38] In the Government's closing argument, the Government noted the ballistics match between the casing found at Fairfax and that found at Lemon Grove Park. PPT at 831. And, to combat a potential defense argument against the significance of the match, the Government remarked, "it's just a coincidence story that – it's the same old story." *Id.* But, as Small testified, Lemon Grove Park was the site of a turf war between the MS-13 and the TPC gangs. An isolated casing in the park might not be unusual. In fact, according to a police report the Government provided to trial counsel, the victim's mother gave detectives another bullet fragment she found in Lemon Grove Park several days after the shooting. Appx. 259.

[39] As argued above, the firearm had to be a semiautomatic or an automatic to eject the bullet casings.

186

Detective Gene Parshall, who investigated the homicide. PPT at 169. Much of Parshall's testimony was based on his interrogations of the MS-13 gang members in the car with Mr. Umaña and charged with the Fairfax Avenue shooting. Specifically, Parshall testified to his interrogations of Luis Rivera, Luis Ramos, and Rene Arevalo, all three of whom were suspects and all three of whom blamed Mr. Umaña as the triggerman.[40] No other witness identified Mr. Umaña as the shooter, including two neutral eyewitnesses.

Parshall testified that he began investigating the Fairfax Avenue shooting on July 27, 2005. PPT at 170. From the crime scene location, he collected two .22 caliber bullet casings. PPT at 174. He discovered later that those .22 caliber casings matched a .22 caliber casing found at the scene of the Lemon Grove shooting. PPT at 178. Parshall recalled speaking with exactly one witness on the day of the shooting, who told him that the shooter was the driver of the car (Rene Arevalo). PPT at 196. Detective Parshall later spoke with someone he referred to only as "an individual" who provided him with information that he had heard about the Fairfax Avenue shooting from Luis Ramos. PPT at 177. This "individual" told Parshall that the shooting was related to MS-13. *Id.*

Parshall later interviewed Luis Rivera, who blamed Mr. Umaña as the shooter. PPT at 180-81. Parshall testified that after Luis Rivera, he interviewed Luis Ramos, who chose not to speak with him but instead asked for an attorney. PPT at 182. Parshall decided to put Luis Rivera and Luis Ramos together in a cell over the weekend so that he could record their conversation (PPT at 183). But Luis Rivera and Luis Ramos located and destroyed the recording device. PPT at 206.

---

[40] Both Luis Ramos and Rene Arevalo were brought to the Mecklenburg County Jail at the prosecution's request, but the prosecutor did not present either at trial. Appx. 260 (Rene Arevalo interrogation); Appx. 261 (Luis Ramos Interrogation).

Later, Luis Ramos came forward and "basically said the same thing that Luis Rivera had said." PPT at 184. Parshall testified that he also interviewed Rene Arevalo, who shared a similar story to Luis Ramos and Luis Rivera. PPT at 212-13.

The other LAPD detective who testified about the Fairfax Avenue shooting was Detective Barry Telis. His testimony was substantially the same as Parshall's. One additional fact introduced during Telis's testimony was that Rene Arevalo said the gun Mr. Umaña allegedly had during the Fairfax Avenue shooting was big, like a "freaking rifle." PPT at 239-40. Detective Telis later testified that Mr. Arevalo had clarified that the gun was of a similar size to his service pistol except that it was a revolver rather than a semi-automatic. PPT at 245. All other testimony regarding the Fairfax murder weapon was that it was a semi-automatic pistol, not a revolver, *see* PPT 215, 255-56, consistent with the shell casings recovered at the scene, PPT 174.

### 3. The alleged ballistics link between the two shootings.

Detectives never recovered a firearm from the Lemon Grove or Fairfax Avenue shooting. The detectives investigating the Fairfax Avenue and Lemon Grove crime scenes found .22 caliber casings at each location. There were two .22 caliber casings found at Fairfax Avenue and one .22 caliber casing found at Lemon Grove Park.[41] PPT at 174, 107. According to Small, "after requesting some analysis on the .22 caliber casing," he found it was linked to the two casings from the Fairfax Avenue shooting. PPT at 108-09. Small further testified, "[t]he casings were matched up and linked, one in the same gun." *Id*. at 109. Parshall testified to the same thing, as did Telis. PPT at 177-78, 238. Criminalist William Moore analyzed those casings. Moore testified that the .22 casings "possess individualizing features sufficient to identify them to having been fired in the

---

[41] The .22 caliber casing on the ground at Lemon Grove Park did not match the caliber of the bullet recovered from the victim's body. *See* PPT at 154-55.

188

same firearm." PPT at 259. He further stated that his "opinion [was] based upon the objective evidence presented to [him] as verified and validated by a second examiner." PPT at 259.

## B. The Post-Conviction Investigation

The post-conviction investigation uncovered multiple credible and persuasive pieces of evidence which seriously question the government's presentation of these alleged offenses. This evidence was available to trial counsel and would have undercut all or most of the Government's allegations about Mr. Umaña's role in the California murders, yet trial counsel unreasonably failed to discover and present it.

The government's primary witnesses for the Lemon Grove shooting was Mr. Freddy Gonzalez, who testified that he only saw one shooter at Lemon Grove Park, and identified Mr. Umaña as that shooter. PPT at 313, 341.

However, the jury did not hear that Mr. Umaña was actually the *third* person Freddy Gonzalez identified as the shooter, and he indicated far less confidence in his identification of Mr. Umaña than he did for the other two.

On December 29, 2005, years prior to Mr. Umaña's trial, but three months after the offense, Detective Small interviewed Freddy Gonzalez. Appx. 51 at 15. During that interview,[42] described more fully in section C, below, Freddy Gonzalez implicated Alex Montes in the Lemon Grove shooting. *Id*.

---

[42] Only the written statement and photographic lineup were presented to trial counsel. The interview where Freddy Gonzalez made the identification was recorded, but the Government did not turn over the recording until after the initial § 2255 petition was filed. Suppressing any exculpatory information in the recording, but not in the statement and lineup, was a violation of *Brady* and *Giglio* that prejudiced Mr. Umaña. *See* Claim VI.

189

In March 2006, viewing another photo lineup, Freddy Gonzalez told police that he recognized Geovani Rodas as the shooter. PPT at 108. This identification was strongly corroborated by one of the other victims, Juan Lara, who agreed that Geovani Rodas resembled the shooter. Appx. 51 at 23. Two additional non-testifying witnesses also implicated Geovani Rodas as the Lemon Grove shooter. *E.g.*, Appx. 51 at 9. In addition to the four separate positive eyewitness identifications, it has been shown that Geovani Rodas committed other shootings near Lemon Grove Park around the time that Mr. Umaña was alleged to have done so, *see* Appx. 56 at 9-10, and committed these shootings using the same caliber weapon as that which fired the bullet that was recovered from Andy Abarca's body. PPT at 154.

Finally, multiple sources indicated that the car driven by the shooter matched the description of the car driven by Geovani Rodas. *See* Appx. 69, Detective Small follow-up investigation report at 9, 11, and PPT at 112.

Because trial counsel unreasonable failed to investigate these events that the Government relied on so heavily in aggravation, trial counsel's defense of Mr. Umaña at the penalty phase lacked any of this information.

In addition, the two other testifying eyewitnesses and victims who had expressed confidence in their ability to identify the Lemon Grove shooter (Juan Lara and Roberto Ramos) were shown photographic lineups that included pictures of Mr. Umaña, but neither one selected him. PPT at 136, 146-147. The jury did not hear that those detectives showed these witnesses Mr. Umaña's picture.

Likewise, in connection with the Fairfax incident, compelling evidence never presented to the jury showed Mr. Umaña was not the shooter. Alex Barrera was one of Parshall's first leads in the Fairfax investigation. Alex Barrera repeatedly told Parshall that Luis Ramos was the shooter

190

in the Fairfax Avenue shooting, not Mr. Umaña. Alex Barrera also told Parshall that Luis Ramos gave him .22 caliber ammunition immediately following the Fairfax Avenue shooting. That .22 caliber ammunition was the same brand as the .22 caliber casings found on the ground at the scene of the Fairfax Avenue shooting. Appx. 262.

Luis Rivera was the first person to implicate Mr. Umaña as the shooter in the Fairfax Avenue shooting, and he was charged as an accomplice in that crime. During Luis Rivera's interview with Parshall, Luis Rivera initially denied any knowledge of the shooting and repeatedly denied knowing Luis Ramos. He appeared to be trying to protect or cover for Luis Ramos. Regardless, Parshall adopted the theory that Mr. Umaña was the shooter. Parshall, in turn, fed the story that Mr. Umaña was the shooter to the other two accomplices, Luis Ramos and Rene Arevalo, contaminating their statements. Govt Tr. Exh. 518; Appxs. 55, 274. (First Interrogation of Luis Ramos). Luis Rivera, Luis Ramos, and Rene Arevalo, the three accomplices in the Fairfax shooting, were the only people who implicated Mr. Umaña in the shooting.

Finally, information was available to trial counsel but not presented to the jury regarding the .22 caliber casings at the Lemon Grove and Fairfax Avenue shooting locations. The day after the Fairfax Avenue shooting, Alex Barrera had possession of .22 caliber ammunition that was the same brand as the .22 caliber casings found at the Fairfax Avenue shooting. Alex Barrera told the LAPD detectives that this ammunition was given to him by Luis Ramos. Alex Barrera further told the detectives that Luis Ramos was the Fairfax shooter, not Mr. Umaña. Alex Barrera gave this information to the police right after he was arrested with the ammunition in his pocket. Interestingly, Alex Barrera was arrested because he was committing robberies in Lemon Grove Park and other nearby locations. Appx. 263.

191

None of this information was adequately presented or argued to either the Court or the jury. Competent counsel would have presented all this information to the jury because it reveals how unreliable and weak the Government's evidence was against Mr. Umaña. Possessing this information would have made it highly unlikely that the jury would find Mr. Umaña committed non-statutory aggravators 4(a) and (b) beyond all reasonable doubt.

**C. Trial Counsel's Failure to Investigate and Present Readily Available Evidence Challenging the Government's Account of Mr. Umaña's Role in the Lemon Grove and Fairfax Shootings was Objectively Unreasonable.**

Trial counsel's performance fell below the reasonable standard of performance in a capital case. But for trial counsel's deficient performance, a reasonable probability exists that Mr. Umaña would not have been sentenced to death. *Strickland v. Washington*, 466 U.S. 668 (1984). In this case, trial counsel's failures to investigate and present readily available documents and information challenging the Government's evidence relating to the Fairfax Avenue and Lemon Grove Park shootings were so serious that they deprived Mr. Umaña of a reliable result at sentencing. *Id.* at 687; *Rompilla v. Beard*, 545 U.S. 374, 389-90 (2005).

**1. Trial counsel unreasonably failed to conduct an adequate, independent investigation into the California murders.**

Trial counsel had an obligation to determine whether "unadjudicated prior criminal conduct . . . is properly admissible at the penalty stage." ABA Guidelines 10.11 commentary; *Rompilla* 545 U.S. at 389. Trial counsel was first appointed to represent Mr. Umaña on the federal case on July 10, 2008. *See* Appx. 23, Declaration of Trial Counsel John Bryson. They were aware early in their representation that the Government would rely on allegations that their client had committed three murders in Los Angeles and the crimes in the federal indictment. The notice of intent to seek the death penalty, filed on September 23, 2008, alleged that Mr. Umaña had participated in "uncharged murders and other acts of violence," including the shootings at Fairfax Avenue and Lemon Grove.

192

*See* Crim. Doc. 273 at 4. By this point, the LAPD had been investigating the California murders for three years. LAPD detectives interviewed witnesses, ran records on suspects, developed theories of who committed the shootings, and followed various potential leads of investigation. When the Government filed the notice of intent to seek the death penalty, trial counsel was put in the unfair position of having to act as Mr. Umaña's attorney to test the government's case in those three *additional* homicides, starting at a delay of over three years since the Government began building its case.

█████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████ Despite that, nearly seven months passed before they retained and began using a fact investigator for the California murders. Appx. 25 at 3.

In between filing the notice of intent to seek death and hiring of Eric Lessard, a fact investigator in Los Angeles, trial counsel filed a motion to exclude the Government's non-statutory aggravators, including the California murders. Crim. Doc. 483. That motion was filed on April 24, 2009. *Id.* Since no factual investigation had been done then, the motion was based entirely on legal grounds and offered no factual support. *Id.* Trial counsel did not supply the Court with any factual information regarding the California murders until two days before the start of the trial when it filed a supplement to its motion to preclude the non-statutory aggravators. *See* Crim. Doc. 985.

Even at that late stage, there were glaring omissions of evidence highly favorable to Mr. Umaña and readily available to trial counsel but not presented on his behalf.[43]

Once retained, investigator Eric Lessard prepared an investigation plan that contained a list of witnesses to interview, documents to obtain, and a list of locations to visit. Appx. 25 at 5. Based on his substantial experience in investigating homicide cases in Los Angeles, Detective Lessard recognized from the very beginning that many documents were missing from the limited set of discovery that trial counsel provided him. *Id.* Specifically, Lessard noticed he was missing field interview cards, handwritten notes from detectives, original witness interview reports, and recorded interviews. *Id.* In Lessard's experience, the Government typically turns over those items to the defense in a Los Angeles homicide investigation. *Id.*[44] He believed those items to be "critical to a competent defense investigation," and he was accustomed to receiving them in the many California homicide cases he had worked on as a defense investigator. *Id.* Lessard informed the attorneys about the missing documents several times and recommended they serve a subpoena on the LAPD to obtain them. *Id.* Ultimately, trial counsel never served a subpoena, and Detective Lessard never received the documents he needed to review. *Id.* Instead, trial counsel had Detective Lessard focus most of his time and attention on finding just two witnesses, even though there were dozens of people with knowledge of the shootings at Fairfax Avenue and Lemon Grove Park and dozens of documents and items to be obtained. *Id.* at 2-3.

---

[43] The supplemental motion filed by trial counsel indicates they had reviewed a few police reports and the transcript of a preliminary hearing from the Fairfax shooting California State court case but little else on the California murders. Civ. Doc. 985.

[44] Mr. Umaña has twice requested these materials in post-conviction discovery and been denied. Civ. Docs. No. 13; 30; 36; 108.

194

It appears that trial counsel may have been hoping that the Court would grant its motion to preclude the non-statutory aggravators and would, therefore, not be required to do a thorough and competent investigation into the facts of the California murders. Appx. 25. Trial counsel, however, had no plan to investigate the California murders adequately if the Court denied the motion. Trial counsel, overwhelmed by the amount of discovery and the geographic scope of the case, was additionally carrying a "busy workload" of other state and federal cases and appellate work. Appx. 24 at ¶3-5. Even on the eve of trial, counsel remained ill-prepared to challenge the admissibility of the Fairfax Avenue and Lemon Grove shootings evidence adequately. At an evidentiary hearing, Mr. Umaña will demonstrate that they had not spoken to or reviewed statements of key witnesses, collected important, readily available records, or thoroughly examined the documents the Government turned over in discovery. Whether it was the massive amount of work this case presented or commitments to other cases, trial counsel went into the penalty phase without completing a thorough and competent investigation into the facts of the California murders. Appx. 25.

When the Court reached the admissibility of the California murders on the first day of the penalty phase (PPT at 4), it was imperative that trial counsel carefully review the documents submitted to the Court by the Government and submit their own documents and arguments for why the evidence was not reliable. Trial counsel failed in that task and instead submitted a two-and-a-half-page motion asking the Court to preclude five lines of objectionable testimony from the Fairfax Avenue shooting preliminary transcript from the California state case. Crim. Doc. 1002. Once the evidence was deemed admissible, counsel, having done very little to prepare for this eventuality, were confronted with the task of attempting to undermine the Government's case – through cross-examination of Government witnesses, rebuttal of Government testimony, and their

195

closing argument – without having done the foundational investigation and document review to meet the case against Mr. Umaña.

The defense theory that trial counsel ultimately advanced at the penalty phase demonstrates that they recognized the import of mitigating the damaging evidence about the prior unadjudicated murders. Trial counsel contested the California murder aggravators in their closing arguments (PPT at 843-49, 867-73), and they attempted to discredit the Government's evidence against Mr. Umaña regarding those shootings. In contrast, they did not argue against most of the other aggravators. *See, e.g.*, PPT at 841-42 (trial counsel arguing to the jury that they should go ahead and find the other aggravators but give them either no weight or "some weight but not a lot of weight"). Therefore, challenging the California murders was a focal point of trial counsel's defense theory at the penalty phase. Their failure to conduct an adequate investigation to mount that challenge cannot be characterized as an objectively reasonable strategy.

### 2. Trial counsel failed to obtain readily available records that could have significantly undermined the Government's case.

Trial counsel failed to obtain readily available documents, including, but not limited to, arrest records, court records, transcripts, probation reports, recorded interviews, forensics evidence, scientific evidence, and other tangible items that were helpful to Mr. Umaña's defense.

Significantly, Mr. Umaña expects to demonstrate that counsel failed adequately to interview witnesses to the Lemon Grove homicide, including Roberto Ramos. Post-conviction counsel interviewed Mr. Ramos while preparing to file their initial § 2225 motion. Mr. Ramos signed a declaration unequivocally stating that Mr. Umaña was *not* the shooter in Lemon Grove, nor was he even present among the shooters. *See* Appx. 11 at 7-8; Claim VI, *infra*. Reasonable trial counsel would have investigated and learned this information prior to trial.

Another disturbing example pertains to criminal records for Geovani Rodas. Geovani Rodas was identified as the shooter in Lemon Grove Park by the government's star witness, Freddy Gonzalez. Appx. 65. He was implicated by other witnesses as well. Appx. 56 at 9-10, appx. 69 at 11.

Because Freddy Gonzalez identified Geovani Rodas as the shooter in Lemon Grove Park and because Rodas was allegedly Mr. Umaña's accomplice in that shooting, trial counsel needed to gather as much information as they could about Geovani Rodas. Yet, trial counsel failed to do a basic criminal background check on Geovani Rodas. Had they done so, they would have discovered several publicly available records that cast serious doubt on Mr. Umaña's role in the Lemon Grove shooting. First, trial counsel would have learned that Geovani Rodas shot a man just one block from Lemon Grove Park two weeks after the Lemon Grove shooting. *See* Appx. 56 at 5-6 and 9-10. Second, trial counsel would have discovered that police arrested Geovani Rodas two weeks following that shooting (one month after the incident at Lemon Grove Park) with a .357 caliber handgun in his possession. Appx. 56.[45] In other words, readily available evidence established that within weeks of the Lemon Grove murder, Rodas engaged in criminal conduct mere blocks away from Lemon Grove Park that was substantially similar to the Lemon Grove shooting – he shot at someone. He had a handgun consistent with the caliber of ammunition removed from Abarca's body. Appx. 67. Gonzalez's prior identification of Rodas as the shooter was a "red flag" that trial counsel ought to investigate Rodas. Had trial counsel done so, they would have discovered Rodas's convictions for these other offenses. *Id.* Trial counsel's failure to

---

[45] Excerpts of the entire transcript are included with this petition due to local rules and file size limitations. A full copy of the transcript is available for review by the Government and the Court upon request.

investigate and obtain this exculpatory evidence of third-party culpability was objectively unreasonable.

Evidence of Rodas' involvement in the shooting and potential possession of the murder weapon could have been fully exculpatory of Mr. Umaña, and, presented properly, would not have implicated him as Rodas's accomplice. Mr. Gonzalez testified that there was only one shooter / one person with a gun and he identified another person, Alex Montes, as accompanying the shooter. PPT 340-341. Alex Montes and Geovani Rodas committing the crime together does not implicate Mr. Umaña.

### 3. Trial counsel unreasonably failed to use the information they received in discovery to challenge the Government's allegations about the Fairfax Avenue and Lemon Grove incidents.

Trial counsel had information that could have and should have been used to undermine the Government's allegations about Mr. Umaña's role in the Fairfax Avenue and Lemon Grove shootings. They missed critical information that could have persuasively rebutted the Government's evidence of Mr. Umaña's alleged participation in the Lemon Grove and Fairfax Avenue shootings.

#### a. *Trial Counsel unreasonably failed to use important information about the Lemon Grove shooting favorable to Mr. Umaña.*

##### i. *Trial counsel unreasonably failed to present evidence that the only witness who identified Mr. Umaña as the shooter, Freddy Gonzalez, also made prior statements and identifications implicating two others as the one Lemon Grove shooter.*

Three victims survived the Lemon Grove shooting and testified at Mr. Umaña's trial, but only Freddy Gonzalez implicated Mr. Umaña in the crime. PPT at 328 (the Court: "[Gonzalez] is the only witness that identifies the defendant in some way as the shooter."). As mentioned above, the Government's key witness Freddy Gonzalez unequivocally testified that he only observed one

shooter at Lemon Grove Park. PPT at 341 (Freddy Gonzalez: "I never saw it was two shooters. It's only one shooter that I saw with a gun."). Trial counsel completely failed to show that Freddy Gonzalez had identified two people other than Mr. Umaña as the "one shooter [he] saw with a gun." *Id.* Trial counsel's failure was objectively unreasonable, given that such evidence would have significantly impeached Gonzalez's identification of Mr. Umaña.

On December 29, 2005, Small interviewed Freddy Gonzalez. Appx. 51 at 15. During that interview,[46] Freddy Gonzalez wrote the following identification of Alex Montes being the Lemon Grove shooter:

Freddy Gonzalez
(In reference to suspect #4)

The night when they killed Andy I remembered the #4 photo was one of the guys that went to the park to shoot at us I saw this guy when I got to the park he saw me and he left in a hurry and he came back with one of his friends and he shot a pistol killing Andy



FREDDY Gonzalez
12-29-05.

Appx. 62. Although trial counsel possessed this written statement and the accompanied the photographic lineup, provided in discovery, trial counsel did not show this to the jury.

Later, Freddy Gonzalez identified Geovani Rodas as the shooter:

---

[46] Only the written statement and photographic lineup were presented to trial counsel. The interview where Freddy Gonzalez made the identification was recorded, but the Government did not turn over the recording until after the initial § 2255 petition was filed. Suppressing any exculpatory information in the recording, but not in the statement and lineup, was a violation of *Brady* and *Giglio* that prejudiced Mr. Umaña.

> For me the kid in number 5 the expressions of the face look like the kid the arrived at the park with a gun and shot at us and hit my friend and I remember that the gun he had was chrome.
>
> Freddy Gonzalez



Appx. 65. Trial counsel also failed to present Mr. Gonzalez's identification of Rodas, even though trial counsel had received it in discovery. *See* PPT 108 (testimony of Det. Small identifying "Rodus" as a potential suspect in the Lemon Grove shooting).

Freddy Gonzalez's identifications of Mr. Umaña, which were provided in discovery and introduced by the Government as exhibits at the penalty phase, were uncertain both in terms of Mr. Umaña's likeness to the shooter, as well as whether Freddy Gonzalez had seen Mr. Umaña on the day of the shooting or at some other time entirely. On December 29, 2005, Small showed Freddy photo lineup card No. 118737, which included a photograph of Umaña in the second position:

200

Freddy Gonzalez
(In reference to suspect #2)

The photo #2 looks like or resembles the guy who came to the park the day that they killed Andy- I remember seeing this guy but I'm not sure if he is the one that came that day to the park with a pistol and shot at us.



Gov. Exh. 507. Later, on April 15, 2008, Small showed Freddy another photograph array, marked ID:05-0629018, which also contained a photograph of Mr. Umaña in the fifth position. The translation of Freddy's comments read:

> My first impression was photo number five. The way that he has his hair is looks the same, but everything happened so fast that I'm not 100% sure. He came to the park, he seemed small and what I saw was the gun and after that I began to run.
>
> This is the first and last time that I saw the young man.
>
> Freddy Gonzalez



201

Gov. Exh. 506. (Small had previously shown Freddy a photograph of Mr. Umaña on December 29, 2005.)[47]

As noted by the Court on several occasions, the pre-trial identifications that Mr. Gonzalez made of Mr. Umaña raised many concerns that called their reliability into question. *See* PPT at 7, 327-28 (describing Gonzalez's pre-trial identification of Mr. Umaña as "tentative," lacking "indicia of trustworthiness," "suspect," and so unreliable that the Court stated it "does not have confidence in the pretrial identification."). Ultimately, however, the Court allowed the pretrial identifications to come into evidence, and trial counsel did not further object to their introduction or further move to preclude them from being admitted. PPT at 328.

Trial counsel made a brief reference to Alex Montes in the cross-examination of Freddy Gonzalez, but rather than confront him with his verbatim statements to the police, specifically that Alex Montes "went to the park to shoot at us" (Appx. 62 (LAPD photo ID report by Freddy Gonzalez) and that Alex Montes "shot a pistol, killing Andy" (*Id.*), the defense posed the following questions:

> Q. And so one of the people that you identified as being out there that night was Alex Montez, the same guy you had robbed, correct?
>
> A. That night, no, he wasn't there.
>
> Q. You never told the police he was out there?
>
> A. No not him.
>
> …

---

[47] *See* Appx. 240, Criminal Investigative Report by R. Robert Tressel, Criminologist Robert Tressel will testify that victims and witnesses of the Lemon Grove and Fairfax Avenue Shootings reviewed lineups with repetitive suspects and that "[t]hese lineups were not performed to existing standards that existed in 2005 and 2006." *Id.* at 11.

Q. Are you sure that you didn't tell Detective Small in a photo line-up on December 29, 2005, that Alex Montez, as somebody you identified in the photo line-up, as being the other person that he was in the park that night with the shooter?

…

Q. Okay. Isn't it true that you identified Alex Montez as being the second guy that came back with the shooter?

A. Yeah.

PPT at 338-40.

The questions posed by trial counsel exhibit a total miscomprehension of the facts of Freddy Gonzalez's interview. Freddy Gonzalez provided Small with a signed statement that unequivocally stated, "[t]he night when they killed Andy I remembered the #4 photo [Alex Montes] **was one of the guys that went to the park to shoot at** us I saw this guy when I got to the park **he saw me and he left in a hurry and he came back with one of his friends and he shot a pistol killing Andy**." Appx. 62. Stating that Alex Montes was merely "out there that night" and that he was "with the shooter" or even that "he came back with the shooter" was not an accurate summary of Freddy Gonzalez's signed statement to the police. *Id*. Gonzalez did not state that Montes was present at the shooting; he said was that Alex Montes "went to the park to shoot at us" and that Mr. Montes "shot a pistol killing Andy."[48] *Id*. At a hearing, Mr. Umana expects to present testimony from eyewitness identification expert Deborah Davis that identifying another

---

[48] The Government may attempt to argue that the "he" in Freddy Gonzalez's statement that "he shot a pistol killing Andy" refers to someone other than Alex Montes. That argument must fail because the original written statement by Freddy Gonzalez, which was in Spanish, does not contain the pronoun "he." When translating the statement, Los Angeles Police Officer Vargas added the pronoun "he," thereby interjecting ambiguity into an otherwise unambiguous statement that Alex Montes was the shooter. *Compare* Appx. 62, *with* Appx. 64 (showing the same identification, certified by a United States Courts interpreter).

203

person as the shooter created a probability that any memory and statement of Mr. Umaña as the shooter was unreliable.

Trial counsel's failure to confront Freddy Gonzalez with his actual statement, which explicitly identified Alex Montes as the single shooter and therefore exculpated Mr. Umaña, was objectively unreasonable. Indeed, trial counsel's cross-examination was particularly deficient (and prejudicial) because it portrayed Freddy Gonzalez's prior inconsistent statement in a light that made it seem consistent with his trial testimony, i.e., that he had previously said Alex Montes was merely "out there that night" accompanying Mr. Umaña. Trial counsel's deficient performance in cross-examining Freddy Gonzalez about his prior statement turned what should have been a devastating impeachment that exculpated Mr. Umaña into more fodder in service of the Government's case against Mr. Umaña. To make matters worse, trial counsel overlooked Freddy Gonzalez's identification of Geovani Rodas. Therefore, the trial counsel's performance was deficient for failing to introduce this photo lineup. *See Washington v. Murray*, 952 F.2d 1472, 1476 (4th Cir. 1991) (explaining that a failure of defense counsel to offer available exculpatory evidence to the jury is "obviously" deficient); *see also Nixon v. Newsome*, 888 F.2d 112 (11th Cir. 1989) (finding prejudicial, ineffective assistance of counsel where defense counsel failed to impeach a witness with prior statements that a person other than the defendant killed the victim). There was no legally sound strategy for trial counsel's failure to use available information to exculpate Mr. Umaña and impeach the only witness who testified that Mr. Umaña was the shooter.

> ### ii. Trial counsel unreasonably failed to present readily available evidence that key Lemon Grove witnesses Roberto Ramos and Juan Lara did not select Mr. Umaña's photograph during a pretrial photographic lineup.

From the discovery in trial counsel's possession, both Roberto Ramos and Juan Lara had looked at Mr. Umaña's photograph but did not identify him as the Lemon Grove shooter. On

204

December 30, 2005, Detectives interviewed Roberto Ramos, showed him a photo lineup labeled #118737 (which contained Mr. Umaña's photograph), and Roberto Ramos was "unable to identify" Mr. Umaña as the shooter. Appx. 51 at 15; *see also* Gov. Exh. 507 (photographic lineup labeled with number 118737). A few days later, Small interviewed Juan Lara and showed him a photographic lineup (number 118737), and Juan Lara made "no I.D." *Id*.

Trial counsel failed to present readily available evidence to the jury that Roberto Ramos and Juan Lara looked at Mr. Umaña's photograph and did not pick him out as the shooter. Both Roberto Ramos and Juan Lara were confident they could recognize the shooter if they saw him again. PPT at 135 and 146-147. Although trial counsel cross-examined Roberto Ramos and Juan Laura about the fact that they had been shown pictures by the investigating officers and did not recognize the shooter among those photographs included in the line-up, trial counsel failed to point out the most critical fact about these line-ups: Mr. Umaña's photograph was included in the line-ups shown to each of them. PPT at 135, 146-57. The discovery made it clear that those witnesses had seen photos of Mr. Umaña and did not identify him as the shooter. Trial counsel unreasonably failed to introduce these crucial facts into evidence. Because trial counsel failed to elicit this information on cross-examination, all they could say about the photo lineups in closing was, "I would argue to you . . . they showed [Ramos and Lara] the same ones they showed to Freddy Gonzalez, [] I would argue to you they're the same that included [Mr. Umaña's] picture on two occasions." PPT at 844. However, the notion that Ramos and Lara were both shown Mr. Umaña's photo did not have to be posed to the jury as a matter of conjecture or as a mere inference to be drawn; it was a demonstrable fact that could have been conclusively established if trial counsel had entered the relevant photo line-ups into evidence. Thus, the jury was left with the mistaken impression that Roberto Ramos and Juan Lara merely failed to identify the shooter in the photos

205

they were shown, rather than the more accurate – and exculpatory – account of the line-up: that Roberto Ramos and Juan Laura were explicitly shown photographs of Mr. Umaña and that neither of these witnesses identified him as the shooter. At a hearing, Mr. Umaña expects to present testimony from an eyewitness identification expert that this failure to identify Mr. Umaña as the shooter, after seeing a photograph of him, is evidence of his innocence of the Lemon Grove offense.

Trial counsel's failure to do so was objectively unreasonable since their cross-examination and argument evinced an effort to try and encourage the jury to rely on eyewitnesses other than Freddy Gonzalez. *E.g.*, PPT at 844.

### iii. Trial counsel unreasonably failed to present additional exculpatory statements regarding the Lemon Grove shooting.

The discovery disclosed to trial counsel contained statements made to LAPD that either directly exculpated Mr. Umaña or implicated persons other than Mr. Umaña in the shooting.

Edgar Gutierrez was interviewed by Small on October 18, 2005, approximately three weeks after the Lemon Grove shooting. He told Small he had spoken with Ranferic Vasquez (aka Blast), who "felt responsible for the shooting." Appx. 51, at 9. Vasquez had "direct knowledge" of the shooting. *Id.* at 12. Vasquez said that the shooter lived on Kenmore Avenue, where Mr. Umaña was never alleged to have lived. *See* PPT at 112. Furthermore, Vasquez claimed the shooter drove a black Honda Civic, a car that Mr. Umaña was never alleged to have driven.[49] This information was critical; not only was it exculpatory in that it implicated an entirely different third

---

[49] Geovani Rodas, however, did have a dark-colored Honda Civic. *See* Appx. 69, Detective Small follow-up investigation report at 11.

206

party in the Lemon Grove murder, but it also impeached Freddy Gonzalez's testimony. Consequently, trial counsel was ineffective for not eliciting the information through Small.

On April 24, 2006, Small interviewed Luis Rivera. Luis Rivera told Small that Mr. Umaña was not responsible for the Lemon Grove shooting and that it was done by two different MS-13 members who went by the names Capser and Trivilin. Appx. 51, at 26. Luis Rivera would later "remain steadfast" to his explanation of the events at Lemon Grove. *Id.* at 32. This evidence would have been particularly helpful to Mr. Umaña at trial since Luis Rivera blamed Mr. Umaña for the Fairfax Avenue shooting. *See* PPT at 180. Therefore, Luis Rivera had no motive to cover for Mr. Umaña and had every reason to inculpate him. Trial counsel was ineffective for not presenting this readily available information to the jury; there was no objectively reasonable purpose in failing to present such evidence as it was yet another piece of information that exculpated Mr. Umaña in the Lemon Grove murder.

On January 17, 2006, Small interviewed Alejandro Rodriguez (aka "Chocolate'). Appx. 69, at 10. Alejandro Rodriguez told Small that Mr. Umaña did not do the shooting, but that Geovani Rodas (aka Sin) was involved in the shooting and that he drove a black Honda, corroborating the information of Edgar Gutierrez. *Id*. Given that this evidence cast doubt on Mr. Umaña's involvement in the shooting, trial counsel's failure to present it to the jury constituted deficient performance. Once again, this was readily available, exculpatory information that trial counsel unreasonably failed to utilize at Mr. Umaña's trial.

### b. Trial Counsel unreasonably failed to use important information about the Fairfax shooting favorable to Mr. Umaña.

#### i. Trial counsel completely overlooked that key witness Alex Barrera identified Luis Ramos as the Fairfax Avenue shooter, not Mr. Umaña.

In discovery, there was an audio recording of an interview with MS-13 witness Alex Barrera from April 18, 2006, where Barrera told Parshall repeatedly that his friend Luis Ramos (aka "Chipis") was the shooter at Fairfax Avenue. *See* Appx. 52 at 30, 50, 54, 57, 77. This interview was vitally important, and trial counsel candidly admitted that they did not review it even though it was produced to them in discovery. Appxs. 23, 24.

During the interview, Alex Barrera told Parshall that on the day of the July 27, 2005 shooting, he got a call from Luis Ramos, who happened to be one of Alex Barrera's closest friends. Luis Ramos told Alex Barrera about a fight with a rival gang (the Fairfax Avenue shooting) and asked Alex Barrera to go to the crime scene. Appx. 52 at 30, 50. Alex Barrera went to Fairfax Avenue and saw the bodies on the ground and the police investigation. *Id*. at 13-14. Afterward, Alex Barrera met up with some MS-13 gang members, where they talked about the murder and the fact that Luis Ramos was the shooter. *Id*. at 30, 50, 54 ("Chipi did that murder"), 57 ("it was him [Chipis] that did that murder"), 77 "[T]he homeboys also told me that he [Chipis] committed the murder"). Alex Barrera confirmed that the day after the shooting, he saw Luis Ramos in a gold Altima, the same type of car used in the shooting. *Id*. 56-57. In response to questioning by Parshall, Alex Barrera said he knew Mr. Umaña but did not know anything to suggest he was involved in the shooting. Most importantly, Alex Barrera told Parshall that he was willing to testify under oath that Luis Ramos was the shooter. *Id*. at 121.

There was no strategic basis for failing to introduce this exculpatory evidence. It undermined the self-serving hearsay statements of Luis Rivera, Luis Ramos, and Rene Arevalo,

208

the only people that implicated Mr. Umaña. The audio recording of Alex Barrera's interview was produced in discovery well before trial. The disk was labeled "LAPD Alex Barrera Statement Audio."[50] Trial counsel never reviewed the recorded interview. Appx. 24 at 7. Counsel candidly admits that they were unaware of the interview at the time of trial and that it would have been helpful to them in their presentation during the penalty phase if they had known its contents. *Id*.

**D. Trial counsel unreasonably failed to present information and adequate arguments establishing that the neutral eyewitnesses who identified the car's driver as the Fairfax shooter and not Mr. Umaña were more reliable than the hearsay of Mr. Umaña's co-defendants.**

Trial counsel failed to use evidence in discovery that showed that the neutral eyewitnesses consistently provided valid information that the driver of the car in the Fairfax incident was also the shooter. Trial counsel argued but failed to fully develop all readily-available evidence supporting their argument, that Noe Bautista and Oscar Santiago saw the shooting in broad daylight and from opposite angles. Oscar Santiago was in his car driving southbound, in the same direction as the Nissan Altima, which the shooter got out of. Noe Bautista was on the sidewalk near the passenger side of the Nissan. Despite different points of view, the two disinterested parties saw the same thing: that the driver was the person who committed the shooting.

LAPD Officer John Maloney testified he was the first officer on the scene and took information from Noe Bautista. Trial counsel failed to elicit Noe Bautista's first statements to police immediately following the crime, that the driver was the shooter.[51] PPT at 161-162. Trial

---

[50] In discovery, the Government only produced the audio disk of the Spanish interview. The Government did not provide a transcription of the interview in either English or Spanish. Attached to this motion are portions of a certified English transcription. Appx. 52.

[51] The "time between crime and confrontation" is a significant factor in the reliability of an eyewitness's identification. *See Manson v. Brathwithe*, 432 U.S. 98, 114 (1977).

counsel could have used Maloney's crime scene statement form written at 3:07 p.m., showing that Noe Bautista was clear about what he had seen. Appx. 57 (Officer's Crime Scene Statement Form). Noe Bautista told Maloney that the victims and suspects were exchanging gang signs and yelling before Suspect #1 exited the car and began shooting. Noe Bautista provided Maloney with a description of the three suspects, said who exited the car, and told detectives that the driver of the Nissan Altima was the shooter. *Id*. Noe Bautista then repeated these statements to the detectives. PPT 196. On the day of the shooting, detectives also recorded that another witness, Oscar Santiago, stated that the driver was the person who committed the shooting. Appx. 54 (Fairfax Chronology) at 4 ("Santiago focused on the shooter who was also the driver of the suspect vehicle."). None of this evidence of Bautista's first statement to Officer Maloney or of Oscar Santiago's police statement was presented to the jury.

Trial counsel could have also presented that Noe Bautista was so confident he got a good look at the suspect that the LAPD requested that he meet with a forensic sketch artist. Noe Bautista met with a forensic sketch artist who prepared a composite sketch. Notably, the sketch of the Fairfax Avenue suspect does not resemble Mr. Umaña:



000156

210

Appx. 59.

In other words, trial counsel would have had a wealth of evidence to rebut the Government's portrayal of the neutral eyewitnesses as lacking confidence about what they saw. PPT 894. Those witnesses, on the day of the shooting and even months afterward, were clear that they saw the driver commit the shooting. If trial counsel had reviewed this discovery carefully, they would have been able to persuasively rebut the Government's contention that this eyewitness testimony was vague while the other suspects' statements were consistent. Doing so would have been entirely consistent with trial counsel's defense strategy at the penalty phase that the "best evidence was against Mr. Arevalo." PPT at 846, 871.

### E. Trial counsel did not present information that mitigated the circumstances of the Fairfax shooting.

Had trial counsel used evidence in discovery to their benefit, they could have made a compelling case that the victims were the aggressors in the Fairfax Avenue shooting. According to witness Noe Bautista, the victims not only flashed gang signs and yelled at the suspects, one of the victims threatened to kill the people in the car. Appx. 60. Noe Bautista described the victims running toward the Nissan Altima. *Id*. The car was not going fast as there was a lot of traffic on the street. Noe Bautista saw victim Gustavo Porras with a knife in his hand. *Id*.

Trial counsel had every incentive to mitigate the circumstances of the Fairfax Avenue shooting, but they relied on the police reports rather than the actual statements of the witnesses.[52] The police reports omitted the crucial fact that the victims threatened to kill the suspects in the car as they ran to them with a knife. *See* Appx. 57. Had trial counsel properly reviewed readily

---

[52] Trial counsel's cross-examination of Freddy Gonzalez regarding the pretrial identification of Mr. Umaña suffered from the same infirmity. *See supra*.

available documents, they would have known that the witness statements to the LAPD contained critical information that would have cast the incident in a much different light – that it was more akin to a two-sided confrontation than a drive-by shooting of victims who were caught unawares.

1. **Trial counsel unreasonably failed to present evidence that ballistics and other evidence provided in discovery linked Alex Barrera to both the Fairfax and Lemon Grove shooting.**

The day after the Fairfax Avenue Shooting, July 29, 2005, Alex Barrera was arrested near Lemon Grove Park for multiple armed robberies. Police found .22 caliber bullets in his pocket that were the same brand of bullets found at the Fairfax Avenue shooting scene. According to the arrest reports produced in discovery, several witnesses saw Alex Barrera with a gun at Lemon Grove Park. Appx. 58 at 2-3. The bullets led the Fairfax and Lemon Grove shooting detectives to believe that Barrera had information regarding both cases. *Id*.; *see also* Appx. 51 at p. 24. Alex Barrera told detectives that Luis Ramos gave him the .22 caliber bullets after the Fairfax Avenue shooting. Appx. 52, at 105-106. During the interview, the detectives pointed out the relevance of this information: "he had twenty-two-caliber rounds in his pocket … and his homeboys just did the shooting with a twenty-two-caliber same brand and everything." *Id*.

Trial counsel failed to present all pertinent information about the bullets, which rebutted the idea that Mr. Umaña and the .22 caliber handgun were uniquely linked to the Lemon Grove and Fairfax shootings. Similarly, trial counsel did not present that Alex Barrera had .22 caliber bullets that were consistent with bullets used in the Fairfax shooting and given to him by Luis Ramos, an accomplice in the Fairfax Avenue shooting. *Id*. At the time of his arrest, he was pulling off robberies in Lemon Grove Park and had the bullets in his pocket. Appx. 58. Because the Government used the shell casings evidence to argue that only Mr. Umaña could be the link between the Lemon Grove shooting and the Fairfax shooting, it was objectively unreasonable for

212

trial counsel not to use the evidence mentioned above to show that Alex Barrera or Luis Ramos could have left a shell casing in Lemon Grove Park. Having overlooked Alex Barrera's statements in discovery (Appxs. 23, 24), trial counsel's failure to do so was not the product of strategy but rather gross negligence.

**2. Trial counsel failed to object to foundationless, unreliable, double-hearsay statements that Mr. Umaña was the Lemon Grove shooter.**

On September 13, 2006, Small interviewed MS-13 member Rene Arevalo at the Los Angeles County jail. PPT at 109-110; Appx. 51 at 35. The interview was recorded. *Id.* (explaining that the reader should "refer to audiotape for more details"). During the interview, Small discussed the Lemon Grove shooting with Rene Arevalo and showed Rene Arevalo a variety of photographs that he had assembled during his investigation. *Id.* One of the photographs that Small showed Rene Arevalo was a photo of Mr. Umaña. *Id.* According to Small's notes, when he showed the photograph to Rene Arevalo, he said that Mr. Umaña was "the likely shooter." *Id.* Based on his interview, Small testified at the penalty phase as follows:

> Q. And did you also have occasion to interview an MS-13 member about the Lemon Grove Murder?
>
> A. Yes.
>
> Q. And who was that?
>
> A. Rene Arevalo. He's an MS-13 gang member. He was affiliated with Mr. [Umaña] on the [Fairfax] case. And he was in the county jail, Los Angeles County jail. I went over and interviewed Mr. Arevalo.
>
> . . .
>
> Q. Okay. But you interviewed him yourself; is that right?
>
> A. Yes.
>
> Q. And did you ask him about the Lemon Grove murder?

213

A. I did. I asked him if he had any information on other MS related shootings. I showed him some photographs. One photograph included Mr. Ramirez Umaña. And he said that's your Lemon Grove shooter.

PPT at 109-10. Trial counsel did not make any objection to the testimony. *Id.*[53]

Detective Small's testimony was highly objectionable. Although the Court had ruled that the Government could present certain evidence of the Lemon Grove shooting, the court prescribed a specific vetting process that required the Government to make a "threshold determination that evidence of unadjudicated conduct is reliable." Crim. Doc. 1000 at 11. Only after the Government "present[ed] to the court and to the defendant information it intends to introduce as unadjudicated conduct for a determination of reliability" would it be allowed to go to the jury. *Id*. But the Government never presented Rene Arevalo's statement to the court for this reliability determination, and the Court never ruled on the testimony. PPT at 6-7. The Court later noted that Rene Arevalo "wasn't present at the time the shooting occurred" and that there was "[n]o real basis for why he made that statement." PPT at 328. There was no objectively reasonable strategy for failing to object to this unfounded, inflammatory statement that directly and improperly implicated Mr. Umaña in the Lemon Grove shooting.

Nor did trial counsel elicit that Detective Small had informed Arevalo about the $75,000 reward for information leading to the identification, apprehension, and conviction of the person responsible for the Lemon Grove Shooting. *See* Appx. 51 (Lemon Grove Chronological Record)

---

[53] Trial counsel also failed to cross examine Detective Small about swearing to a California trial court that Arevalo "was responsible for providing one of the weapons used in the" Lemon Grove Park murders. *See* Appx. 264 (Points and Authorities and Declaration in Support of Ex Parte Application for Electronic Monitoring and Recording Conversations of Inmate Rene Arevelo, Booking No. 9059605.). Providing the weapon exposed Arevalo to liability as an accessory to murder which gave Arevalo reason to lie about the murders.

214

at 35. As part of their investigation, detectives obtained a $75,000 reward for information regarding the Lemon Grove Shooting. Appx. 51 at 34-35. At the interview with Arevalo, Detective Small informed Rene Arevalo about the reward and showed him numerous photographs of potential suspects. Appx. 51 at 35. Trial counsel could have elicited on their cross-examination of Detective Small that the $75,000 reward may have motivated Arevalo to pick Mr. Umaña as the shooter. There was no objective reason for not informing the jury of Arevalo's monetary interest in identifying Mr. Umaña.

### 3. Trial counsel failed to present readily available evidence that the LAPD detectives coached the Fairfax co-defendants' statements that implicated Mr. Umaña as the shooter.

At trial, the Government presented evidence through Parshall, that Mr. Umaña's co-defendants, Luis Rivera, Luis Ramos, and Rene Arevalo, all corroborated one another and all consistently told police that Mr. Umaña was the Fairfax shooter. PPT at 221-22. Transcripts of Luis Rivera's and Rene Arevalo's interrogations were introduced by the Government at trial, and Luis Ramos's interrogation was only summarized by Parshall. What the transcripts reveal is that Parshall took Luis Rivera's version of what happened, provided that to the other two co-defendants, and then warned the others that they could be blamed as the shooter if they did not provide a statement that was consistent with Rivera's account of the shooting. The two co-defendants unsurprisingly followed Parshall's lead and parroted Luis Rivera's account of the Fairfax Avenue shooting.

Parshall first interviewed Luis Rivera, who said that the MS-13 members were on the way to the beach on the day of the Fairfax shooting. Appx. 66, at 70. Rene Arevalo was driving, Mr. Umaña was in the front passenger seat, he was in the back with crutches, Eddie Ruiz was also in the back seat, and finally, a person named "Unico" was in the car also. *Id*. at 69. Luis Rivera said

215

that Mr. Umaña did the shooting and was now in New York. *Id.* at 73. Eventually, Luis Rivera told Parshall that "Unico" was at his house and was dating his sister. *Id*, Part 2 of Interrogation of Luis Rivera Transcript at 56. Detectives arrested the person Luis Rivera called "Unico" and determined him to be Luis Ramos (aka Chipis).[54] Luis Ramos was brought in for questioning.

Parshall testified that on the first day of questioning, Luis Ramos denied knowledge of the Fairfax Avenue shooting and "clammed up," invoking his right to counsel. PPT of 205; Appx. 55, at 68. What was not brought out in evidence at trial was that during that initial interrogation, Parshall provided Luis Ramos with all of the details that Luis Rivera had given the detectives: (1) Luis Ramos was heading to the beach in a Nissan Altima with his friends on Fairfax Street (*Id.* at 28-30); (2) Luis Ramos was in the car with someone who had crutches (Luis Rivera) (*Id.* at 35-36); (3) Luis Ramos got out of the car because he thought maybe there was going to be a fight or something (*Id.* at 41); and (4) Wizard (Mr. Umaña) was the shooter and that he ran away to New York. *Id.* at 49. The lengthy interrogation was nothing more than the detectives' play-by-play of their theory of the case based on what Luis Rivera had told them and ignoring the evidence they had that Luis Ramos was the shooter. *Id* at 1-69; *e.g.*, ("Tell him we already know, we already know he was there. We already know he was in the car. We already know that someone else shot, Wizard is the shooter[.]").

Furthermore, the detectives repeatedly threatened Luis Ramos that if he did not talk and corroborate their story, Luis Ramos would be the one blamed for the shooting and spend many years in prison. *Id.* at 32-33 ("We know you were there, but I know that information that you, your involvement [. . .] is very minimal. [. . . .] So if you want to take all the blame for what happened,

---

[54] Luis Rivera continuously denied knowing anyone who went by the name "Chipis" to Parshall. Appx. 66 at 56, 75.

216

then you'll go to court and, and there will be a charge of homicide against you. You're going to go to prison for many years. Do I make myself clear?"); *see also id.* at 51 (Since Mr. Umaña is in New York "and you participated in this homicide -directly or indirectly, then you have to, the, the prosecutor will make [SIC] charges against you.").

Parshall testified only that Luis Ramos "clammed up" on the first interview and was not cross-examined on all the details that he coached Luis Ramos to say. He then testified that Luis Ramos fully corroborated Luis Rivera's story, stating:

> Basically [Ramos] said the same thing that Mr. Rivera had said, you know, about the gold [A]ltima. Driving on Fairfax. That Moe was the driver. That Umaña, or Wizard, had gotten out and shot the victims. And he talked about the -- he identified the same people being in the back seat of the car. And he described the confrontation with the two victims. PPT at 184.[55]

Trial counsel failed to elicit on cross-examination that Luis Ramos merely repeated to Parshall the same information that Parshall had told Luis Ramos less than a week earlier: they were going to the beach in Nissan Altima (Appx. 55, at 14, 20); Luis Ramos was in the car with Luis Rivera who had crutches (*Id.* at 28); one guy got out of the car with a crutch thinking there would be a fight (*Id.* at 28-29); and that Wizard (Mr. Umaña) did the shooting and was now in New York (*Id*. at 18). Moreover, trial counsel failed to elicit that Luis Ramos had a strong incentive

---

[55] In 2007, Detective Parshall and another detective interrogated Edward Arch, a suspect in a murder, and coerced a confession from Arch that fit the detectives' theory of the case. After being in pre-trial custody for three years, a California judge dismissed the case against Arch, finding, in part, that Detective Parshall coerced the confession. During the interrogation, like the case here, Detective Parshall told Arch what he believed happened and promised leniency if Arch corroborated the story. *See* Joel Rubin and Jack Leonard, *Los Angeles Judge Finds Confession Was Coerced, Frees Murder Defendant*, L.A. Times (Feb. 11, 2011), available at: http://articles.latimes.com/2011/feb/18/local/la-me-lapd-confess-20110218.

217

to corroborate the version of the shooting that Parshall told him – to avoid being charged with the incident himself.

The interrogation of Rene Arevalo – a month after Luis Rivera and Luis Ramos were arrested – involved the same type of tactics as Luis Ramos's. Before Rene Arevalo provided any information or the detectives even read him his Miranda rights, during the first 23 pages of the transcript, the detectives supplied him with numerous details about what they believed happened during the shooting. Gov. Ex. 518 at 1-23. The detectives were "not saying that [Arevalo] shot anybody," but someone else did. *Id.* They told Rene Arevalo that he was driving his car down Fairfax Avenue and going to the beach with his friends when some "knuckleheads" started throwing hand signs at them. *Id*. at 19-20. They told Rene Arevalo that he stopped the car, three guys in his car got out, a confrontation took place, and one of them pulled out a gun and shot the victims. *Id.* at 20-21. They told Rene Arevalo that one of the passengers had crutches. *Id*. at 21. And the detectives made it clear that they didn't think Arevalo did the shooting. *Id.* at 22. Parshall told Rene Arevalo that people were saying that the driver was the shooter, but the other guys in the car said it was someone else. *Id*. at 25-26.

The detectives then narrowed down who got out of the car and whom they suspected of being the shooter. The detectives told Rene Arevalo that two guys were in custody and had already given these details: "they named [Arevalo], they named the shooter, they named the other guy, Negro [aka Eddie Ruiz] that was [in] the car, okay." *Id*. at 30. Rene Arevalo certainly knew his two MS-13 friends, Luis Rivera and Luis Ramos, were in custody. Parshall told Rene Arevalo the shooter was not in custody, and the officers were "trying to find out where he is." *Id*. at 30. Given that Luis Rivera and Luis Ramos were in custody, that Eddie Ruiz was just "the other guy that was in the car" and not the person the police were looking for, and that the police did not believe that

218

Rene Arevalo was the shooter, then that left only one person – Mr. Umaña. After narrowing this down for Rene Arevalo, Parshall pulled out a photograph and said, "do we got the right guy?" *Id*. at 40. Rene Arevalo said yes. *Id*.

Again, just like with the Luis Ramos interrogation, trial counsel did not cross-examine the detectives about providing Rene Arevalo with their theory of the case and threatening Rene Arevalo that if he did not corroborate the story of Luis Rivera and Luis Ramos, then Rene Arevalo would be blamed as the shooter. Indeed, Telis testified that Rene Arevalo told them the following details, all of which they gave to Rene Arevalo while he was being held for questioning: Rene Arevalo and his friends were driving down Fairfax; they were on their way to the beach; Rene Arevalo was driving; two people on the sidewalk were flashing gang sings; Mr. Umaña and two other people got out of the car; and Mr. Umaña shot the two victims. PPT at 239-30. Telis did not mention, to Arevalo or the jury, that Ramos described Arevalo coaxing and commanding Mr. Umaña into shooting by yelling 'Pegale! Pegale!' (or 'Hit them! Hit them!') after Umaña got out of the car but before he allegedly shot. Appx. 265.

Interestingly, Rene Arevalo challenged his statements' validity during California State Court proceedings. He argued that his statements should be suppressed partly because the detectives fed him their theory of the case before him even being Mirandized. Appx. 68, at 11 (Detectives "coerced him into making a statement by running their case down to him including things stated by others."). Rene Arevalo further claimed that the detectives presented an option either to accept their theory or be blamed as the shooter. *Id*. at 11-12. Parshall testified at the California suppression hearing. Counsel had a transcript of these proceedings but unreasonably failed to cross-examine him on this issue. PPT 216.

There was no reasonable strategic basis for not confronting the testifying detectives about their methods of passing along Luis Rivera's explanation of the events from one witness to another and then testifying under oath that the stories were "consistent among all the interviews" and "those facts never changed." PPT at 222. The defense theory regarding the Fairfax Avenue shooting was that the other suspects' statements were unreliable and self-serving. PPT 871 ("So how trustworthy is that? How trustworthy are any of these three statements from Luis Rivera, Luis Ramos, and Rene Arevalo? They're all self-serving. They're all minimizing their own responsibility or completely avoiding any responsibility. It's totally unreliable."). Confronting the detectives with their interrogation techniques would have strengthened the defense that these other suspects were threatened with more severe punishment if they did not blame Mr. Umaña. The transcripts of the interrogations – which clearly show that the detectives provided Luis Ramos and Rene Arevalo with their theory of the case and supplied them with details from Luis Rivera's statement – were available early on in discovery. Counsel, however, overlooked the suggestive nature of the detectives' interrogation techniques. The failure of counsel to subject the detectives to meaningful adversarial testing regarding their interrogation methods was not a reasonable strategic decision entitled to deference but rather attributable to their failure to be adequately prepared for trial.

4. **Trial Counsel unreasonably failed to object to Detective Parshall's opinion testimony that he believed Mr. Umaña's co-defendant when he implicated Mr. Umaña even though the Court ruled that the evidence was inadmissible and ordered it redacted.**

During a side-bar conference, trial counsel brought up an issue about the Government's desire to introduce the transcripts of Detective Parshall's interrogation of Rene Arevalo, where he gave his opinion that Rene Arevalo was telling the truth about Mr. Umaña's involvement in the Fairfax shooting. PPT at 168. Counsel quoted Parshall's comment to the Court: "I believe you

220

because I do this for a living. I interview people. I know when people are lying. I know when people are telling me the truth." *Id*. The Court immediately agreed that the evidence was objectionable and asked the prosecutor to "strike" and "sanitize" that portion of the transcript. *Id*. The prosecutor pledged to the Court that she would make the necessary redaction. *Id*. at 168-169. The transcript looked like this before the sanitization:

```
        DETECTIVE PARSHALL:   I believe you because I do
    this for a living, I interview people.   I know when
    people are lying.   I know when people are telling me
    the truth.   I can see you're a very genuine person.
                                                        142

        LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376
```

scanned

```
        I can tell by your eyes and your mannerisms, okay.   I
    -- I, you know, I regret you being in the situation,
    but you know you got --
```

Appx. 53, Transcript of Arevalo at 142-43.

The Government then "sanitized" the transcript and provided the jury with the following:

221

DETECTIVE PARSHALL: I believe you because I do this for a living, I interview people. I know when people are lying.

I can see you're a very genuine person.

142

LYNDEN J. AND ASSOCIATES, INC. (800) 972-3376

00

scanned

I can tell by your eyes and your mannerisms, okay. I -- I, you know, I regret you being in the situation, but you know you got --

Gov. Exh. 518.

The Government redacted precisely one sentence of the improper paragraph and kept the detective's belief that Rene Arevalo was honest because the detective has the experience to know what honest is. The Government redacted "I know when people are telling me the truth" but left the meaning of the objectionable statements undisturbed and allowed the jury to see Parshall's inadmissible statements that he believed Rene Arevalo because Parshall "do[es] this for a living" that Parshall "knows when people are lying" and that he thought Rene Arevalo was a "very genuine person" because of his "eyes and his mannerisms." *Id*. This constituted impermissible vouching for the credibility of a witness and intruded on the jury's role of being the sole judge of credibility. Clearly, there was no reasonable strategy in precluding evidence that trial counsel thought was objectionable and then failing to double-check to ensure the objectionable evidence did not go to the jury. *See also* Claim 10.

The transcript of Luis Rivera (Gov. Exhibit 520) and Rene Arevalo (Gov. Exhibit 518) were admitted into evidence. PPT at 221, 230. Those transcripts repeatedly included the detectives'

222

personal beliefs about Mr. Umaña's guilt. Counsel did not file a motion *in limine* to exclude, move to strike, or object to this prejudicial information.[56] Thus, the jury was repeatedly exposed to the detectives' personal beliefs that Mr. Umaña was the shooter in Fairfax Avenue. Along with repeatedly telling suspect Rene Arevalo the theory of the case, the detective's tone throughout the transcripts that went to the jury was that he believed Mr. Umaña was the shooter and believed in the credibility of the other suspects:

> "I can see what your temperament is. I can see what your personality is all about. You don't seem like the guy that did that."

Gov. Ex 518 at 19. (The detective took this tone even knowing that Arevalo commanded Umaña to shoot during the event by yelling "Pegale! Pegale!" Appx. 265. The transcripts continued,

> "I'm out for the truth here, okay? So I think I got most of the truth from you."

Gov. Ex 518 at 46.

Trial counsel had previously objected to nearly identical statements and succeeded in getting a ruling from the judge that precluded them from being admitted into evidence. *See* PPT at 168-69. Therefore, trial counsel did not have any objectively reasonable strategy for not lodging the same objection to other, similar evidence.

---

[56] Although counsel technically objected when the Government offered these transcripts into evidence, that objection referred to trial counsel's general, continuing objection to the admission of the California murders evidence. PPT at 221, 230.

**5. Trial counsel unreasonably failed to object to and rebut the Government's evidence that the .22 caliber bullet casings were fired from one firearm in violation of the Fifth, Sixth, and Eighth Amendments.**

An essential piece of evidence in the Government's sentencing case was the alleged ballistics match between a .22 caliber bullet casing found at the scene of the Lemon Grove shooting with two .22 caliber bullet casings found at the scene of the Fairfax Avenue shooting. The match between the bullet casings and evidence that Mr. Umaña was present at both shooting locations when they occurred was circumstantial evidence that he was the shooter in both instances – which was one of the most significant issues of dispute between the parties during the penalty phase. *See* PPT at 6. Criminalist William Moore was qualified as an expert in "ballistics firearms analysis" without objection from trial counsel. PPT at 247. He testified that the .22 caliber casings from both locations were fired from the same exact gun, an automatic, based on "the objective evidence presented to me and validated by a second examiner." PPT at 255, 259. After not objecting to his qualification as an expert, trial counsel briefly cross-examined Mr. Moore, confirming his opinion that the casings were fired from the same firearm and pointing out some of the criticisms of toolmark identification in general. PPT at 259-60.

Trial counsel unreasonably failed to challenge Mr. Moore's qualification as an expert in this field. His explanation of qualifications was as follows:

> My training as it relates to the formal education as a firearms examiner took place approximately two years into my assignment to the firearms analysis unit. It was at that time that we received new computer imaging equipment courtesy of the Bureau of Alcohol, Tobacco and Firearms. This equipment, known as the NIBIN equipment, was able to capture digitized images of cartridge cases and bullets, providing them to a national database so they could be compared to like images in that database for a subsequent inclusion as possible candidates of similar origin and perhaps the solution of crimes.
>
> Later on, approximately 2004, my training began in earnest, studying case evidence and bullet evidence, culminating in a series of practical exams which allowed me to begin doing firearms examination in full in January of 2006.

224

PPT at 246-47. Mr. Moore also testified that his work is reviewed by "others" and that review was "part of the procedure within the laboratory." *Id.* at 247.

The Government presented no evidence about whether Mr. Moore's "training in earnest" was consistent with national standards or practices of certifying organizations, such as the Association of Firearm and Toolmark Examiners (AFTE). *Id.* The Government did not ask whether Mr. Moore had ever attempted certification by the AFTE or whether his laboratory was certified by any organization. *Id.* His statement of qualifications lists his education as a Bachelor of Arts in biology. Mr. Moore testified that he could only begin doing firearms examinations "in full" in January 2006. His firearms reports and worksheets show that he started work on this case around December 23, 2005, before he was fully qualified by LAPD standards. He completed his report on January 17, 2006, the same month and year he was fully qualified. There was no evidence that he had ever performed a firearm-toolmark analysis, much less an accurate one, before his work in this case. In sum, Mr. Moore was qualified as an expert without the Government having to show evidence of his expertise and without objection from trial counsel.

Trial counsel should have moved to exclude this evidence because the field of firearms and toolmarks identification is not based on sufficiently reliable methods to satisfy the threshold requirements for admissibility under Rule 702 of the Federal Rules of Evidence. Rule 702(c)'s requirement that the testimony is "the product of reliable principles and methods" essentially codifies *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Under *Daubert*, the trial court considers whether the theory has been tested; subjected to peer review and publication, analyzed for its known or potential rate of error; and accepted generally by the relevant scientific or expert community. At the time of Mr. Umaña's trial, the premise underlying firearms and toolmark identification – that firearms leave unique marks on ammunition components – had never been

225

validated.[57] Further, toolmarks analysis has not been subjected to peer review designed to detect "substantive flaws in the methodology," *Daubert*, 509 U.S. at 593. Instead, unlike the three studies, most studies analyzing the toolmarks discipline are published in the AFTE Journal, a trade publication without a rigorous peer review process. *United States v. Tibbs*, No. 2016-CF1-19431, 2019 WL 4359486, at *7-9 (D.C. Super. Sep. 05, 2019) (criticizing the AFTE Journal's peer-review process as "open" instead of double-blind, limited in access to non-members, and "dominated by financially and professionally interested practitioners").[58]

As for the known or potential error rate of toolmarks identification, a 2009 report by the National Academy of Forensic Science ("2009 NAS Report") noted there was "no statistical foundation for estimation of error rates." Nat'l Research Council, *Strengthening Forensic Science in the United States: A Path Forward* 154 (1009); Appx. 241, p. 4 (Report by John Nixon).[59]

---

[57] At the time of Mr. Umaña's trial – and in the years since – there was never a firm statistical empirical foundation for the claim that firearms leave unique toolmarks on ammunition components such that a firearms examiner can make a positive "match" based on such toolmarks. *See* Adina Schwartz, *A Systemic Challenge to the Reliability and Admissibility of Firearms and Toolmarks Identification*, 6 Colum. Sci. & Tech. L. Rev. 2 (2005) (discussing lack of adequate statistical empirical foundations for firearms and toolmarks identifications).

[58] *See* Nicholas D. K. Petraco et al., *Addressing the National Academy of Sciences' Challenge: A Method for Statistical Pattern Comparison of Striated Tool Marks*, 57 J. Forensic Scis. 900 (2012); L. Scott Chumbley et al., *Validation of Tool Mark Comparisons Obtained Using a Quantitative, Comparative, Statistical Algorithm*, 55 J. Forensic Scis. 953 (2010); Tasha P. Smith et al., *A Validation Study of Bullet and Cartridge Case Comparisons Using Samples Representative of Actual Casework*, 61 J. Forensic Scis. 939 (2016). *But see* PASC Report pg 111-12 n. 335 (explaining that the Smith study did not validate firearm analysis because it consisted of interdependent comparisons within a set rather than independent comparisons, involved a small number of examiners, and examined whether examiners can associate spent ammunition with a particular make of a gun, not a particular gun).

[59] In a subsequent report by the President's Council of Advisors on Science and Technology issued after in 2016 after Mr. Umaña's trial ("2016 PCAST Report"), the authors identified only one study on toolmarks identification that they considered valid, a 2014 study conducted by the University of Iowa's Ames Laboratory ("Ames study"), which reported an error rate of around 2 percent. President's Council of Advisors on Sci. & Tech., Forensic Science in Criminal Courts:

226

Finally, toolmarks analysis has not been generally accepted within the broader scientific community, and defendants have successfully challenged similar evidence in courts nationwide. *See, e.g.*, *United States v. Green*, 405 F. Supp. 2d 104 (D. Mass. 2005) (Memorandum and order re: Motion to exclude ballistics testimony) (recounting problems inherent in firearm and toolmark identification and prohibiting firearms examiner from testifying that the match he found allows for identification "to the exclusion of every firearm in the world"); *Sexton v. State*, 93 S.W.3d 96 (Tex. Crim. App. 2002) (firearms identification testimony held inadmissible where expert testified that toolmarks on shell casings had been made by the same magazine, even though, because no weapon had been recovered, expert had only compared the toolmarks on the casings and had not examined the suspect magazine); *cf. Ramirez v. State*, 810 So. 2d 836 (Fla. 2001) (toolmarks expert's identification of the expert's knife as the murder weapon, to the exclusion of all others, was unreliable and inadmissible).

The Government's evidence would not have met the *Daubert* standard, as the underlying premise of firearm and toolmark identification lacks an adequate statistical, empirical foundation to be considered scientifically valid. At a minimum, there is a reasonable probability that under a *Daubert* analysis, the Government's expert would have been precluded from testifying definitively that the shell casings were fired from the same weapon. *See, e.g.*, *United States v. Green*, 405 F. Supp. 2d 104 (D. Mass. Dec. 20, 2005); *Sexton v. State*, 93 S.W.3d 96 (Tex. Crim. App. 2002); *cf. Ramirez*, 810 So. 2d 836 (Fla. 2001).

---

Ensuring Scientific Validity of Feature-Comparison Methods 110-11 (2016) (discussing the study and comparing it to other invalid studies). But, as John Nixon, a ballistics expert, will testify, the error rate of the Ames study rises to 50 percent after accounting for nonreturned and inconclusive results. Appx. 241, p. 5; *see also Tibbs*, 2019 WL 4359486, at *18 (D.C.Super. Sep. 05, 2019) (concluding after expert testimony that the error rate for the Ames study may be as high as 34.76%).

Trial counsel also unreasonably failed to cross-examine Mr. Moore on the basis of his expert opinion. While trial counsel did elicit some criticism of the toolmark analysis field and the fact that Mr. Moore's opinion was subjective (PPT at 259), trial counsel missed the more significant point that Mr. Moore presented absolutely no support for his conclusions that each gun creates individual and unique marks on a cartridge. PPT 260. Further, Mr. Moore generally discussed firing pin impressions, ejector marks, and chamber marks as things that can be used to determine a match, but he did not say which, if any, of those characteristics led to his conclusion in this case. PPT at 259-260. He did not testify about, nor was he cross-examined on, how many points of agreement he found between the different casings or any other specific findings that he made. His testimony, in its entirety, was a general explanation of the process of toolmark identification and his conclusion that the bullets, in this case, matched. His testimony lacked any scientific analysis or bases for that conclusion. Mr. Moore's underlying report concluded that the .22 caliber casings found at Lemon Grove Park and Fairfax Avenue match is similarly vague and unsupported. The report states that "[t]he Item #3 cartridge case (05 06 29018 [Lemon Grove Shooting]) was fired from the same firearm that fired the Item #1 and Item #2 cartridge case (05 07 23188 [Fairfax Avenue Shooting)." *See also* Appx. 266, Microscopic Confirmation Report, ("DR 05-07 23188 #1, 2 and DR 05-06 29018 #3 were fired by the same firearm."). As Mr. Nixon's report notes, the 2009 NAS Report broadly criticized crime lab reports as "lacking in that what was produced constituted only the conclusions section of a true scientific report," which in its entirety "should be sufficiently comprehensive that an unrelated qualified practitioner could read

228

it, understand it, and reproduced the work, obtaining the same results & conclusions, if need be." The Moore report, in this case, suffers from these infirmities identified by the 2009 NAS Report.[60]

Finally, trial counsel failed to retain and present their own expert evidence to rebut Mr. Moore's conclusory testimony. Had trial counsel retained an expert to challenge the (lack of) scientific analysis that led to Mr. Moore's opinion on the ballistics evidence, they could have presented that expert at a *Daubert* hearing and, if necessary, at trial. Expert testimony that there was no scientific basis for the conclusion that the casings were fired from the same firearm would have enabled trial counsel to prevail at a *Daubert* hearing or in challenging the Government's evidence in front of the jury. Trial counsel's questions on cross-examination demonstrate that their defense theory was consistent with the idea that toolmark identification testimony is not sufficiently supported by empirical data to be reliable, therefore, they had no reasonable strategy for not objecting to or properly rebutting the Government's expert testimony.

For the post-conviction proceedings, John Nixon, a ballistics expert, analyzed the firearms toolmark comparison issues in Mr. Umaña's case and the scientific validity of the field. Mr. Umaña expects that Mr. Nixon will testify, consistently with his report, Appx. 241, at an evidentiary hearing and explain that firearms toolmarks comparisons are unreliable and unsupported by systematic scientific study and evaluation. Appx. 241, p. 5. Further, Mr. Nixon points to additional concerns with the discipline and forensic science laboratories generally identified by the 2009 NAS Report. Appx. 241, p. 4-7. Mr. Nixon's report also notes that Mr. Moore – like many forensic science practitioners – has a degree in a field unrelated to firearms or ammunition engineering,

---

[60] In contrast, an LAPD Firearm Report, Appx. 262, in which Mr. Moore compares the expended bullet jacket fragment from the Lemon Grove Shooting with two firearms recovered at other crimes, describes the points of commonality and the differences, and provides detailed descriptions of relevant characteristics.

which counsel could have used to rebut Mr. Moore's qualification as an expert. Appx. 241, pg. 10. Ultimately, the comparison photographs in Mr. Moore's laboratory bench notes were thumbnails, and the poor resolution and quality of the photographs prevented Mr. Nixon from analyzing Mr. Moore's work and conclusions. Appx. 241, p. 8.

The evidence of the matching shell casings was vital to the Government's case because it was a major basis upon which the Court relied in permitting the evidence of the California murders to be introduced at sentencing. PPT at 6. It also corroborated Freddy Gonzalez's tenuous identifications of Mr. Umaña as the Lemon Grove shooter and the presumptively unreliable accomplice testimony that Mr. Umaña was the shooter in the Fairfax Avenue shooting, meaning that Mr. Umaña's presence was much more suspicious than it would have otherwise been. The Government argued the importance of the ballistics evidence in closing arguments by encouraging the jury to adopt the alleged match as proof of Mr. Umaña's guilt in the Lemon Grove and Fairfax Avenue shootings. PPT at 813, 876. Similarly, the Fourth Circuit used the ballistics evidence to reject Mr. Umaña's "legitimate arguments" that the evidence against him in relation to the Fairfax Avenue shooting was unreliable. *See United States v. Umaña*, 750 F.2d 320, 348-49. Because the ballistics was so important to the Government's ability to introduce evidence of three additional homicides against Mr. Umaña at the penalty phase, and because the evidence of those three additional homicides undoubtedly played a role in the jury's decision to condemn him to death, Mr. Umaña suffered prejudice.

**6. Trial counsel were ineffective for failing to request a jury instruction that would have properly explained to the jury how they should regard the "presumptively unreliable" hearsay statements from MS-13 accomplices that were introduced through professional law enforcement witnesses.**

Instructions that educate the jury to consider the testimony of the defendant's accomplices with caution and care have long been utilized and approved. *See Cool v. United States*, 409 U.S.

100, 103 (1972). Instructions are most appropriate when most evidence against the defendant is in the form of accomplice testimony. *See, e.g.*, *Tillery v. United States*, 411 F.2d 644 (5th Cir. 1969). Where there is minimal evidence to corroborate the accomplice's testimony, or the accomplice's testimony is weak or contradicted, "a crucial evidentiary situation" exists where the instruction has increased legal significance. *Id*. at 648. Because accomplice testimony "often constitutes the decisive influence in a jury's decision . . . the jury must ponder the veracity of an accomplice's damaging testimony in its proper light." *Id.*

The overwhelming majority of the Government's case against Mr. Umaña, as it pertains to the Fairfax Avenue shooting, came from the testimony of Parshall. PPT 169-221. Parshall's testimony consisted mainly of hearsay, i.e., things that Mr. Umaña's co-defendants in the Fairfax Avenue shooting had said while in Parshall's custody. Those co-defendants, Luis Rivera, Luis Ramos, and Rene Arevalo,[61] all made self-serving statements, implicating Mr. Umaña. Luis Ramos and Rene Arevalo's statements were made after LAPD detectives coached them into agreeing with Luis Rivera's story. *See* Claims 6. and 7.A. The statements of other witnesses contradicted their statements. Noe Bautista and Oscar Santiago both saw the driver, Rene Arevalo, do the shooting (PPT at 196, 215), and Alex Barrera (whose statements were never introduced at trial) told Parshall that Luis Ramos had done the shooting and provided him with leftover .22 caliber ammunition from the shooting. Appx. 52, Barrera transcript 105-06. Therefore, even though the statements implicating Mr. Umaña were of a sort that the Supreme Court has determined to be "presumptively unreliable" (*Lee v. Illinois*, 476 U.S. 530, 541 (1986)), they were

---

[61] Importantly, the prosecutor had Luis Ramos and "Mo" Arevalo shipped to the Mecklenburg County Jail to prepare for the trial yet the prosecution presented neither of them to the jury. Appx. 260 (Arevalo), Appx. 261 (Ramos).

231

presented to the jury through the filter of a veteran homicide detective with decades of experience in investigations and testifying in front of a jury and not presented from declarants of the statements, who were available.

The only instruction given to the jury at the penalty phase on evaluating witness credibility was a reference to the original jury instructions from the guilt/innocence phase of the trial. While the Court instructed on accomplice testimony at the first phase of the trial (GPT at 1146-47), that instruction did not cover the situation presented at the penalty phase. At the penalty phase, LAPD detectives testified extensively about the statements made to them by Mr. Umaña's accomplices. And in at least one situation, Small testified about a statement made to him by accomplice Rene Arevalo, who had heard the statements from another accomplice. *See* PPT at 110 (Detective Small testifies that Rene Arevalo told him, "[T]hat's your lemon grove shooter."); *and* Appx. 51, at 35 (indicating that Rene Arevalo's statement that Mr. Umaña was the likely shooter was told to him "by one of the arrestees involved with him in the [Fairfax] double homicide"). The jury had no instruction on treating these extensive statements by accomplices introduced through professional witnesses. Because there was little evidence showing that Mr. Umaña was the shooter in either California murder other than hearsay testimony of accomplices and other unreliable sources, it was objectively unreasonable for trial counsel to fail to ask the Court for a jury instruction that the detectives' testimony about what accomplices told them was to be treated in the same careful and cautious manner as if the accomplices themselves were giving the accomplice testimony. Given trial counsel's repeated efforts to minimize the reliability and importance of the testimony of the MS-13 accomplices, Luis Rivera, Luis Ramos, and Rene Arevalo, the failure to ask for such an instruction constituted deficient performance.

232

### 7. Mr. Umaña Was Prejudiced by Trial Counsel's Deficient Performance.

The Fairfax Avenue and Lemon Grove shootings were a central part of the Government's case for death. Not only were they the basis of a two-part non-statutory aggravating factor, but they were also the basis of the Government's sentencing theme that Mr. Umaña was deserving of death because he was a relentless killer, someone who had killed "over and over and over again," (PPT at 889), that he "kills who he wants to kill for his own reasons," (PPT at 834), and that "if it serves his needs he's going to do it again." PPT at 835. ████████████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████████ There was readily available discovery that would have called into serious question the admissibility of this evidence and painted a substantially different picture from the one presented to the jury – namely, that Mr. Umaña was not a remorseless killer responsible for additional homicides in California, but instead was only culpable for his involvement in the Greensboro offense, which the jurors themselves found to be unplanned and the result of an emotionally charged situation. *See* Docs. Nos. 1048-51, pp 5-6. Suppose trial counsel had presented this readily available evidence and used what they possessed to undermine the Government's witnesses. In that case, there is a reasonable probability that at least one juror would have weighed the case differently and that the outcome of the proceeding would have been different.

#### a. *The Prior Unadjudicated Offenses Were Central to The Government's Case.*

The Government devoted nearly three-quarters of its penalty phase testimony to the California murders (202 out of 278 pages). Compare PPT at 90-270, 313-323, 329-341 (witness

testimony regarding California murders) with PPT at 277-291, 342-404 (witness testimony unrelated to California murders).

In closing argument, when talking about the Greensboro murder, the Government repeatedly and relentlessly tied it to the California incidents. The thrust of the Government's argument was that although the Greensboro murder, on its face, did not appear to be a particularly aggravated capital murder, it had to be understood in the context of the fact that Mr. Umaña had committed multiple prior murders – that is, the Greensboro murder was part of a larger pattern that demonstrated that Mr. Umaña was the type of remorseless killer who would undoubtedly kill again unless the jury sentenced him to death. PPT 823-824 ("And you know the story, ladies and gentlemen, about a dispute over a juke box in a restaurant in Greensboro. A dispute over some music. But what wasn't known at the time was that [Mr. Umaña] had killed before. He had killed before and had earned his respect . . . by killing."); PPT at 825 ("But it didn't matter to [Mr. Umaña]. None of that mattered to [Mr. Umaña] because he had killed before. And he was going to kill again that night and he did kill that night, ladies and gentlemen."); PPT at 826 ("And ladies and gentlemen, what's – what's he automatically do? Well, hey, I've seen – I've done this before. I know what I have to do."); PPT at 828-29 ("And we know he's killed before. We know in July '05 what he did. We know on Fairfax, busy place in Los Angeles …"); PPT at 829 ("[W]e heard the statements from the witnesses. You heard what – the other MS players that were in the car [sic]. Everybody pointed to [Mr. Umaña]."); PPT at 834 ("He kills who he wants to kill for his own reasons, ladies and gentlemen . . . .And he's not going to stop"); PPT at 839 ("He chose to go to LA, join up with the MS and murder people in LA, Fairfax Avenue and Lemon Grove."); PPT at 893-94 ("And it was about a choice to keep killing."); PPT 889 ("[Mr. Umaña]'s a killer. He's shown it over and over and over again."); PPT at 894 ("The facts, as the officer told you, were

234

consistent across the board. This is how we pulled up. This is what happened. And man, he went off. Sound familiar? They flipped off the gang and he went off . . . just like he did in Greensboro. That's a consistency you need to consider. Same thing with [Lemon Grove] park."); PPT at 895 ("So they'd like you to discount that evidence, but let me ask you this. Gustavo Porras, one of those little spray painting tagger guys . . . he was shot between the eyes. His friend Jose Herrera turned to run and he was shot square in the back of the head."); *Id.* ("And that murder, those murders, all of those murders, whether you want to talk about LA or [Greensboro] a murder transforms a living person . . . into a corpse."); PPT at 896 ("The uncharged murders. You just think about the evidence you heard and about the consistencies between those.").

The Government also repeatedly spoke during closing arguments using a first-person narrative, purporting to share Mr. Umaña's internal thoughts and beliefs. The purpose of this rhetorical device was to contradict Mr. Umaña's statements that he was not the shooter in the California murders (which were introduced into evidence by the Government as trial exhibit 522) by baselessly speculating about Mr. Umaña's intentions and motivations. PPT at 827 ("I know what I did to those two guys. I saw them fall right there. I know they were dead because I know what dead is. I've killed before."); PPT at 828-829 ("I'm the Wizard. I earned my respect. You can't do this to me. This is the answer. This is the answer (indicating). It's called it's your day for execution. As he walked out of the car, pulled out the gun. Boom, right in the head to Jose. And hey, what's his friend doing? He's running. Gustavo, sure, he's running. Didn't matter. Hey, I'm a good shot. Boom, right in the back of the head."); PPT at 829-30 ("And what happens later? Well, we're in LA with my MS buddies and, hey, there's some business that has to be done . . . Lemon Grove. Hey what are you telling me? I'm the Wizard. You're telling me Lemon Grove is controlled by some other little gang? I'm Wizard from the MS 13. We need to go out and we need

235

to take care of that park and we need to take care of the people in that park. And that's what he did . . . it doesn't matter if you're going to run when I pull out that gun because I'm going to hit you. I'm going to hit you and you're going to fall and then I'm going to hit you again, as happened to Andy, right in the back of the head. And hey, I might have missed a couple, but I got somebody that night. And I made them run. I made them fear. I made them see what Wizard is all about.").

These frequent and repeated references to the California murders in the Government's closing demonstrate how central they were to its case for death. As documented above, however, there was a wealth of readily available information upon which trial counsel could have relied to discredit the Government's evidence of the unadjudicated murders. Had trial counsel properly made use of this evidence, there is a reasonable probability that at least one or more jurors would have rejected the Government's contention that Mr. Umaña was involved in the Fairfax Avenue and Lemon Grove shootings and failed to find the relevant non-statutory aggravating factors beyond a reasonable doubt. Moreover, absent those factors, there is a reasonable probability that one or more jurors would have weighed the case differently and that Mr. Umaña would not have been sentenced to death. Absent those other unadjudicated murders, there is a reasonable probability that at least one juror would have concluded that the Greensboro murder, judged on its own terms and not as part of a larger pattern of alleged conduct, was not sufficiently aggravated to outweigh the mitigating evidence and justify a death sentence. As even the Government conceded implicitly, the Greensboro murder did not appear to rise to the level of a crime deserving of a death sentence, which is why it spent its closing argument relentlessly bootstrapping the Fairfax Avenue and Lemon Grove murders to the case and its argument for death.

### b. *There is a Reasonable Probability That If Trial Counsel Had Presented Readily Available Exculpatory or Otherwise Mitigating Evidence*

236

***Relating to Mr. Umaña's Role in the Lemon Grove and Fairfax Incidents, at Least One Juror Would Have Voted Differently.***

The alleged California murders likely made the difference between life and death. They effectively presented the sentencing jury with three additional killings whose facts were significantly more aggravated than the unplanned, alcohol-fueled, emotionally charged shootings that were charged in the indictment. *United States v. Umaña*, 750 F.3d 320, 369 (4th Cir. 2014) (Gregory, C.J., dissenting) (explaining the California murders were "in many ways more serious" than the Greensboro ones). For example, the victims in the Fairfax Avenue shooting were teenagers. The shooting occurred on a busy street in Los Angeles and called to mind the kind of indiscriminate gangster drive-by shooting that is frightening for anyone living in a large city. The Lemon Grove shooting was an example of four men relaxing after a game of basketball when suddenly, they were fired upon by an unprovoked assassin. Andy Abarca, the Lemon Grove victim, had no gang affiliation or desire to cause problems. He never said a word to the shooter that gunned him down in his neighborhood park.

Mr. Umaña had not been punished for the California murders. The homicide investigations were wide open. The jury almost certainly reached its sentencing decision in part based on a desire to punish Mr. Umaña for the California shootings and the offense he was actually charged with in Federal court.

The decision of the Fourth Circuit on direct appeal also illustrates how damaging the evidence was and how weak the evidence would have been if subjected to adequate adversarial testing. On direct appeal, Mr. Umaña argued that his constitutional rights were violated during the penalty phase of his trial due to the extensive (unreliable) hearsay testimony that was used against him, blaming him for committing the California murders. Although the three-judge panel denied his appeal, a lengthy dissent focused squarely on the admission of the hearsay testimony without

237

Mr. Umaña's ability to challenge that testimony through cross-examination. *Umaña*, 750 F.3d at 368-369 (Gregory, C.J., dissenting). Five judges on the Fourth Circuit voted for Mr. Umaña's petition for rehearing *en banc*, and there was another lengthy dissent, beseeching the Supreme Court to grant a petition for *certiorari. United States v. Umaña*, 762 F.3d 415 (2014) (Gregory, C.J., dissenting). The dissent correctly pointed out that "the basis for [the California murders] accusation was weak and would have withered under the scorching sunlight of cross-examination). So, too, would the evidence have "withered" had Mr. Umaña been effectively represented by counsel.

Trial counsel had the opportunity to investigate and present readily available evidence and had compelling exculpatory and mitigating evidence that should have been used to undermine the Government's allegations about Mr. Umaña's role in the Fairfax Avenue and Lemon Grove incidents. Had they conducted an adequate investigation and adequately reviewed the critical information that was turned over to them, they would have been able to challenge the admissibility of the California murders evidence effectively. Even assuming the evidence was admitted, trial counsel could have persuasively and effectively discredited the evidence in the eyes of the jury.

### c. *Regarding the Lemon Grove shooting, numerous failings resulted in prejudice against Mr. Umaña.*

By his pretrial identifications, Freddy Gonzalez gave the most compelling evidence that Mr. Umaña was involved in the Lemon Grove shooting. But this is only because the inadequate preparation by trial counsel allowed his testimony to be presented in a vacuum, without any reference to the two other people he had picked out as the shooter, and without the contradictory testimony from more credible witnesses, Juan Lara and Roberto Ramos, who did not select Mr. Umaña as the shooter. Mr. Umana expects to present testimony at a hearing from an eyewitness

238

identification expert such as Deborah Davis that failing to select a suspect is evidence of that suspect's innocence.

Overlooking Freddy Gonzalez's identification of Geovani Rodas was particularly prejudicial because, around the time of the Lemon Grove shooting, Geovani Rodas was on a crime spree, shooting and robbing people in Lemon Grove Park, and carrying a handgun that was consistent with the bullets retrieved from the deceased victim of the Lemon Grove shooting. Further, Alex Barrera was arrested near Lemon Grove Park, two days after the Fairfax offense, with the same ammunition from Fairfax in his pocket. He said the ammunition was given to him by Luis 'Chipis' Ramos, a co-defendant in Fairfax. And Barrera had been doing robberies in Lemon Grove Park, that day of arrest. Appx. 58. Clearly, Barrera could have dropped the ammunition in Lemon Grove Park that was found months later after the shooting.

Counsel's failure to avail themselves of the various ways in which they should have impeached Gonzalez's testimony was prejudicial not only because it would have ruined any credibility Gonzalez had with the jury but because it may have caused this Court to preclude the identifications of Mr. Umaña altogether; in other words, the jury would have heard that none of the three eyewitnesses identified Mr. Umaña as the shooter and that the Government's argument about "how Freddy picks [Mr. Umaña] out twice," PPT at 830-31, was utterly unreliable and undeserving of weight.

The Fourth Circuit's decision on direct appeal supports how the Freddy Gonzalez pretrial identification evidence prejudiced Mr. Umaña. The Fourth Circuit stated, "Freddie Gonzalez . . . identified Umaña in open court." *United States v. Umaña*, 750 F.3d 320, 349 (4th Cir. 2014). That never happened; to the contrary, the District Court precluded Freddy Gonzalez from making an in-court identification. PPT at 328. It is insightful that at least two respected federal appellate judges,

239

with abundant legal training and experience and an opportunity to review the record carefully, were misled by the testimony in the transcript. It calls into question how the jury perceived Freddy Gonzalez's testimony in real time and lends itself to the conclusion that Freddy Gonzalez's testimony played a central role in its deliberations.

LAPD interviewed dozens of people in the wake of the Lemon Grove shooting. Witnesses Luis Rivera and Alejandro Rodriguez gave statements that Mr. Umaña was not involved in the Lemon Grove shooting. Edgar Gutierrez told police he had spoken to someone who "felt responsible" for the shooting and knew the shooter. Trial counsel failed to cross-examine Detective Small on his interactions with these witnesses. The combination of Freddy Gonzalez's identifications of people other than Mr. Umaña, knowledge that Juan Lara and Roberto Ramos did not pick out Mr. Umaña as the shooter, and statements from three additional witnesses saying that Mr. Umaña was not at fault for the killing in Lemon Grove Park, would have carried more weight than the testimony of a twice-felon, rival gang member who could not keep his story straight about who was the shooter. Mr. Umaña expects to present testimony at a hearing from eyewitness identification expert Deborah Davis that Gonzalez's purported identification was unreliable for a host of factors including but not limited to the fact that he identified others as the shooter and that law enforcement made promised to Gonzalez to entice his identification.If the jury had been presented with a complete account of the Lemon Grove evidence, or if the Court had decided to preclude Freddy Gonzalez's pretrial identifications, there is a reasonable probability that one or more jurors would have found that the Government failed to prove beyond a reasonable doubt that Mr. Umaña committed the Lemon Grove murder. Consequently, there is a reasonable probability that one or more jurors would have weighed the case differently and that the outcome of the proceeding would have been different.

240

> ***d. During the presentation of the Fairfax evidence, there were also numerous failings that also resulted in prejudice against Mr. Umaña.***

Alex Barrera's identification of Luis Ramos as the shooter, the fact that he had been given .22 caliber ammunition immediately following the shooting, and the fact that he was willing to testify against Luis Ramos in court were never provided to the Court in support of a motion to preclude the Fairfax Avenue shooting from being introduced at the penalty phase of trial. Combining Barrera's testimony with the two civilian eyewitnesses who both told police that the shooter was not Mr. Umaña and having an expert on eyewitness identification such as Deborah Davis, Ph.D., explain that Freddy Gonzalez's statements and memory are unreliable because he identified others as the shooter, along with the fact that law enforcement made promised to Gonzalez to entice his identification, would have entirely changed the balance of the evidence concerning the Fairfax Avenue shooting, and there is a reasonable probability that the outcome of the proceeding would have been different. It would have greatly militated toward excluding the Fairfax Avenue evidence. It would have been solid grounds for requesting an evidentiary hearing on whether the self-serving and contradicted statements of Mr. Umaña's co-defendants could be used against him to put him to death.

With three contradicting stories about the identity of the shooter, only self-serving accomplice testimony implicating Mr. Umaña, contradictory testimony from neutral eyewitnesses, and the statement of Alex Barrera that he was willing to come to Court to testify that Luis Ramos was the shooter, there is a reasonable probability that the Court would have found the Fairfax evidence too unreliable to justify use in the proceeding where Mr. Umaña's life was at stake. Indeed, Barrera's statements to Parshall that Luis Ramos was the shooter and that he had the same brand of ammunition used in the Fairfax Avenue shooting would have directly undermined the basis of the Court's ruling that the Fairfax Avenue evidence was sufficiently reliable to be

admitted. PPT at 6. Even if the Fairfax evidence was allowed in at the penalty phase, the effective use of this information and appropriate jury instruction about how the accomplice testimony introduced through the detectives should be treated would have significantly undercut the statements of the other MS-13 co-defendants Luis Ramos, Luis Rivera, and Rene Arevalo which was the only direct evidence that Mr. Umaña did the shooting.

Had trial counsel effectively represented Mr. Umaña in his capital sentencing trial, they would have presented a wealth of documentation and information that exculpated him of the California murders or, at the very least, thoroughly impeached the Government's account of the incident as one that was solved with a relatively straightforward investigation that quickly identified a clear suspect and perpetrator. But for the grave mistakes of trial counsel, there was at least a reasonable probability that one juror may have decided that death was unnecessary for Mr. Umaña.

The Government's evidence of Mr. Umaña's alleged involvement in the California murders was weak. *United States v. Umaña*, 762 F.3d 415 (2014) (Gregory, C.J., dissenting). Trial counsel failed to investigate and present readily available evidence that would have, at best, exculpated Mr. Umaña and, at worst, thoroughly discredited the credibility of the witnesses and the quality of the evidence such that it was reasonably probable that one or more jurors would have found that the Government failed to prove beyond a reasonable doubt that Mr. Umaña committed these other crimes. The unadjudicated murders were at the core of the Government's argument to the jury that Mr. Umaña deserved death. But for trial counsel's deficient performance in failing to challenge the California murders adequately, there is a reasonable probability that Mr. Umaña would not have been sentenced to death.

242

**CLAIM VI. THE GOVERNMENT FAILED TO DISCLOSE EXCULPATORY, IMPEACHMENT, AND MITIGATING INFORMATION IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.**

All other claims and allegations in this Motion are incorporated into this claim by this reference.

Disclosure of exculpatory, impeachment, and mitigating information is part of the constitutional guarantee of a fair trial. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150, 154 (1972). The law requires the government to disclose such information when it is "material" to guilt or punishment. *Brady*, 373 U.S. at 87; *Giglio*, 405 U.S. at 154. Evidence material to punishment includes mitigation evidence related to the charged crimes, aggravation evidence, and other mitigation such as evidence about the defendant's background, character, history, and mental condition. Evidence is "material" if there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). To satisfy the "reasonable probability standard," there must be "a probability sufficient to undermine confidence in the outcome." *Id*. Significantly, the materiality of the suppressed evidence must be considered collectively rather than item by item. *Kyles v. Whitley*, 514 U.S. 419, 435 (1995) (holding a *Brady* violation is demonstrated "by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict").

Because *Brady* and *Giglio* impose constitutional obligations on the prosecution, *Brady* and *Giglio* material must be disclosed regardless of whether the defendant explicitly requests the evidence. *Kyles v. Whitley*, 514 U.S. 419, 432-33 (1995); *United States v. Bagley*, 473 U.S. 667, 682 (1985). In death penalty cases, the undisclosed facts may be material to the punishment phase alone. *See, e.g.*, *Strickler v. Greene*, 527 U.S. 263, 290 (1999); *Jackson v. United States*, Case

243

#:1:09-cv-01039-RC, ECF Doc. Nos. 174 & 175 (E.D. Tex. 5/26/2013) (death sentence vacated where Government inadvertently failed to turn over evidence of client's schizophrenia).

Recognizing that it is sometimes difficult to assess the materiality of evidence, the Supreme Court has counseled that prosecutors should err on the side of disclosure. *Kyles*, 514 U.S. at 439; *see also United States v. Agurs*, 427 U.S. 97, 108 (1976) ("The prudent prosecutor will resolve doubtful questions in favor of disclosure."). Accordingly, the Government has an affirmative duty to disclose exculpatory, impeachment, and mitigating information in possession of the members of the prosecution team, which includes federal, state, and local law enforcement officers and other Government officials participating in the investigation and prosecution of the criminal case against the defendant. *Kyles*, 514 U.S. at 437-438; *see also United States v. Antone*, 603 F.3d 566, 569 (5th Cir. 1979) (facts known to state law enforcement personnel imputed to federal prosecutors when "the two Governments . . . pooled their investigative energies to a considerable extent."). Moreover, "the duty to disclose is ongoing." *Pennsylvania v. Ritchie*, 480 U.S. 39, 60 (1987).

## A. The Government violated *Brady* and *Giglio* regarding the unadjudicated murders used as non-statutory aggravating factors at the penalty phase.

Based on information learned as part of the postconviction process, Mr. Umaña expects to prove at a hearing, and following discovery, that the Government did not comply with its obligation to disclose material exculpatory and/or impeachment information regarding the unadjudicated murders used at the penalty phase as non-statutory aggravating factors. Some of the evidence was discovered during the postconviction investigation and in informal discovery after filing the initial § 2255 petition. For example, the Government failed to disclose information that contradicted the account of the 2005 shooting at Lemon Grove Park in Los Angeles, California. The Government's failure to disclose this information to trial counsel was prejudicial because it would have provided compelling evidence that someone other than Mr. Umaña was the shooter

244

and would have demonstrated that the evidence relating to the California murders was unreliable. Thus, there is a reasonable probability that, had the information been disclosed to the defense, the result of the proceeding would have been different.

      **1.   The Government violated *Brady* and *Giglio* by failing to disclose exculpatory information about one of its testifying eyewitnesses who was prepared to exclude Mr. Umaña as the Lemon Grove shooter affirmatively (*Brady* suppression).**

Post-conviction counsel for Mr. Umaña spoke with Government witness and victim Roberto Ramos while preparing to file the initial § 2225 petition. What Ramos had to say about his participation in Mr. Umaña's sentencing proceedings undermines confidence in the outcome of the proceedings. Ramos is unequivocal that Mr. Umaña was not one of the persons he saw commit the shooting at Lemon Grove Park:

> 27. The day I testified, I entered the courtroom and passed by the defendant [Mr. Umaña]. We both looked at each other. When I saw him, I thought that something was wrong because *the defendant was not one of the guys I saw the night of the shooting*. I did not give the prosecutor a sign as he had instructed me because the defendant was not at the park. Since he did not receive a sign from me, the prosecutor did not ask me if I could identify the defendant as the shooter. If I had been asked by the prosecutor if the defendant was one of the shooters, I would have answered that he was not. Even though it had been five years since the shooting, *I was confident that the defendant was not one of the shooters*.
>
> 28. I was then asked questions by the defense attorney. I was waiting for the defense to ask me if the defendant was one of the shooters. If they had asked me, I would have told them the truth that their client was not one of the shooters.
>
> 29. After my testimony, the prosecution wanted to know if the defendant threatened me as I walked by. I told him the truth that I did not feel threatened by the defendant. To me, there was nothing intimidating about the defendant. After my testimony, I expected a follow-up question about whether the defendant was in fact one of the shooters, but he did not ask me that question. *It was strange to me that they did not want to know if they had the right person*.
>
>   [. . .]
>
> 31. After I testified, I talked to Juan about the fact that the defendant in the courtroom in court was not one of the guys who shot at us. But Juan did not want

245

to talk about the case or anything related. He was done. The defendant got a raw deal. Maybe he was doing some other bad stuff, but *he definitely was not one of the Lemon Grove Park shooters. The defendant did not look anything like either one of the shooters*.

32. The Lemon Grove shooters are still out there somewhere. Maybe they are dead or in jail, but certainly not because of this case. They got away with shooting us, and worst of all with Andy's murder.

Appx. 11, Ramos Dec. at 7-8 (emphasis added).

As one can tell from the declaration, before calling Roberto Ramos to the witness stand, the Government met with him to prepare his testimony. *Id*. at pp. 6-7. During the meeting, the Government instructed Ramos that if he could identify Mr. Umaña in court as the Lemon Grove shooter, he should signal the prosecutor during direct examination. *Id.* at 7. Because Ramos was confident that Mr. Umaña was not one of the shooters, he never gave any such sign to the prosecutor. *Id*. Consequently, it appears that the Government deliberately refrained from asking Ramos to make an in-court identification to avoid having its witness testify to the exculpatory fact that Mr. Umaña was not one of the Lemon Grove Shooters. This prior exchange between Ramos and the prosecution before his testimony, and the fact that upon seeing Mr. Umaña in court, Ramos was sure he was not one of the shooters at Lemon Grove Park, was never disclosed to the defense.

### 2. The Ramos information constituted material exculpatory and impeachment evidence (*Brady* favorability).

The undisclosed exchange between Ramos and the prosecutor was exculpatory. Ramos expressed confidence in his ability to identify the shooters from the first day he met with the police. *See* Appx. 51 at 12 (Detective Small writes that Ramos "would be able to recognize the suspects if he saw them again. Ramos is willing to meet with a forensic sketch artist."); *see also* PPT at 135. Out of more than one dozen witnesses interviewed by Detective Small and other investigating officers, Ramos was the only person noted to have confidence in his ability to identify the shooter.

246

Appx. 51 at 12. Because of his confidence and prior familiarity with the shooter, when Ramos failed to signal the prosecutor that he could identify Mr. Umaña, the prosecutor learned that Ramos was a vital, exculpatory witness. Appx. 11.

Moreover, Ramos's exculpatory information also constituted critical impeachment information, as it would have materially undermined the testimony of another witness, Gonzalez, who testified that Mr. Umaña was the shooter. *Bagley*, 473 U.S. at 676 ("Impeachment evidence . . . falls within the *Brady* rule."). The information was exculpatory for those two reasons, and the prosecutor was obligated to turn it over to the defense. Crim. Doc. 186.

### 3. The nondisclosure of the Ramos information was prejudicial (*Brady* materiality).

The nondisclosure of the Government's agreement with Ramos and the fact that Ramos could not testify that Mr. Umaña was one of the shooters was prejudicial and undermined confidence in the outcome of Mr. Umaña's case. Ramos was not simply unable to identify Mr. Umaña; instead, Ramos was prepared to affirmatively exclude Mr. Umaña as the Lemon Grove shooter. Appx. 11, Ramos Dec at 7. Had this information not been suppressed, trial counsel would have elicited this exculpatory information and presented it to the jury. Because the prosecutor never disclosed his discussion with Ramos, the defense could not demonstrate to the jury that one of the Lemon Grove victims and one of the Government's principal witnesses were certain that Mr. Umaña was not the shooter.

Moreover, there is a reasonable probability that if Ramos's exculpatory testimony had been presented to the jury, the outcome of the proceedings would have been different. As noted in Claim V, the Government's case for the death penalty primarily relied on the accusation that Mr. Umaña "had killed before." PPT at 823. Knowing that the Greensboro shootings were unplanned and a result of an emotionally charged fight, the Government emphasized to the jury that Mr. Umaña's

247

alleged acts in California were cold and calculated. For example, although Mr. Umaña never claimed to be one of the two shooters at the park, the prosecutor painted a vivid picture of a premeditated and deliberate killing for the jury.

> Lemon Grove Park where people play basketball. Where Andy Abarca plays and lives and plays basketball. He's not a gang member. He's a real estate broker. And he was very successful at it. And his other friends. You heard from some of his friends who were there that night playing basketball. It didn't matter to Wizard because wait a second, you had not respected me. And I came there to do a job.

> And it doesn't matter if you're going to run when I pull out that gun because I'm going to hit you. I'm going to hit you and you're going to fall and then I'm going to hit you again, as happened to Andy, right in the back of the head. And hey, I might have missed a couple, but I got somebody that night. And I made them run. I made them fear. I made them see what Wizard is all about. What the MS 13 is all about.

PPT at 830. The testimony of one of the victims confidently stating that Mr. Umaña did not commit this calculated murder would have changed the outcome of the case.

Moreover, Freddy Gonzalez was the *only* witness to identify Mr. Umaña as the park shooter. PPT 328. Even the Court found Gonzalez's "prior description of the criminal" to be "suspect" and acknowledged that his responses to the six-packs photo identification line-ups were "less than certain." PPT 327-28 ("The Court does not have confidence in the pretrial identification. . . ."). Ramos was the more credible witness: Ramos was an unbiased, civilian, non-gang-member witness who expressed confidence in his ability to identify the shooter correctly from the very first moment he spoke with the police. PPT at 122; Appx. 51 at 12. He indicated that he had seen the shooter on a previous occasion which added to his ability to make a correct identification. Appx. 51 at 12. By contrast, Gonzalez was a two-time convicted felon (PPT at 338), a member of MS-13's rival gang in the Lemon Grove Park area (PPT at 315), he had recently robbed an MS-13 member (PPT at 337), and he believed that he was the intended target of the shooting. Appx. 51 at

248

15. Gonzalez's felony convictions on their own reduced his credibility (*see* Federal Rule of Evidence 609), but the fact that his conviction was for the robbery of an MS-13 gang member and that his gang (TPC) was a rival of MS-13 made his testimony very likely to be biased against an MS-13 member such as Mr. Umaña. None of these concerns of bias applied to Ramos. Moreover, there is no indication that Gonzalez indicated confidence in his ability to identify the shooter during his initial interview with the police. Thus, there is a reasonable probability that, had the jury learned of Ramos's exculpatory information, one or more jurors would have credited Ramos's testimony affirmatively excluding Mr. Umaña as the shooter in the Lemon Grove shooting, and the Government would have failed to prove the relevant aggravating factor beyond a reasonable doubt.

The Government's failure to disclose this exculpatory and impeachment information undermines the confidence in the outcome of Mr. Umaña's trial. Had the Government disclosed that Ramos excluded Mr. Umaña as the Lemon Grove shooter, "the trial would have been transformed from a one-sided presentation of the prosecution's case into a battle between competing eyewitness testimony," meaning there is a "'reasonable probability' that a jury would have reasonable doubt as to [the defendant's] guilt." *Stitts v. Wilson*, 713 F.3d 887, 894 (7th Cir. 2013).

As the Supreme Court itself has recognized: "If . . . one of only two eyewitnesses to a crime had told the prosecutor that the defendant was definitely not its perpetrator and if this statement was not disclosed to the defense, no court would hesitate to reverse a conviction resting on the testimony of the other eyewitness." *United States v. Agurs*, 427 U.S. 97, 113 (1976). Ramos could have affirmatively excluded Mr. Umaña as the shooter at trial, and by not giving a sign to the prosecutor during his testimony, he indicated as much. (At the very least, the prosecution was aware that Ramos could not identify Mr. Umaña as the shooter, which would have constituted

material impeachment information.) His testimony would have been substantially more credible than that of Gonzalez, who was the only person who identified Mr. Umaña as the shooter. PPT at 328. No one else made an identification. This evidence was exculpatory and material; its disclosure was necessary for a fair trial, and the failure to turn it over "undermines confidence in the outcome of the trial." *Bagley*, 473 U.S. at 678.

> **B. The Government violated *Brady* and *Giglio* by failing to turn over numerous recorded interviews that contain exculpatory and/or impeachment statements regarding Mr. Umaña's involvement in the Lemon Grove and Fairfax shootings.**

> **1. The Government suppressed exculpatory and/or impeachment statements by witnesses to the Lemon Grove Park Shooting.**

As noted in the initial § 2255 petition, postconviction counsel filed a motion for discovery, *see* 16-cv-00057, Civ. Doc. 18, seeking video and audio recordings of witness interviews not provided to trial counsel. The motion included the following non-exhaustive list of video/audio recordings by LAPD that were not turned over:

| Witness | Tape # | Date |
|---|---|---|
| Elger Barrios | 376049(A) | 09/29/2005 |
| Roberto Ramos | 376049(B) | 09/29/2005 |
| Freddy Gonzalez | 376050 (audio) | 09/29/2005 |
| Freddy Gonzalez | 376898 (video) | 12/29/2005 |
| German Suarez[62] and his wife | 376051 | 09/29/2005 |
| Juan Lara | 376385 | 10/18/2005 |
| Erick Lopez | 376382 | 01/07/2006 |
| Alejandro Rodriguez[63] | 371938 | 01/07/2006 |
| Alejandro Rodriguez | 357881 | 04/24/2006 |

---

[62] German Suarez is also referred to as H. Suarez. This is most likely due to the Spanish pronunciation of the letter "G."

[63] A.k.a. "Chocolate."

250

*See* 16-cv-00057, Civ. Doc. 18. After filing the initial § 2255 petition, the Government provided tapes 376049(B), 376050, 376898, and 376385. These tapes contained exculpatory and impeachment evidence that effective trial counsel would have used to challenge the admission of Freddy Gonzalez's prior identification of Mr. Umaña and undercut Freddy Gonzalez's testimony.

### 2. Since produced audiotapes show that Gonzalez was not confident in his ability to identify the shooter and that he only identified Mr. Umaña after coaching by detectives.

Audio recordings produced by the Government after filing the initial § 2255 petition reveal consistent hesitation from Freddy Gonzalez about identifying the shooter. In Gonzalez's first meeting with detectives on September 29, 2005, hours after the shooting, Gonzalez repeatedly told LAPD Detectives Thomas Small and Elizabeth Estupinian that he could not see the face of the shooter because it happened so quickly. When the detectives asked if he would be willing to meet with a police sketch artist, he responded that he "[d]ont think I could remember his face and tell you . . . how his face – nothin' like that." Civ. Doc. 36 at 225.[64] He repeated, "I didn't see him that good to tell you the truth," when detectives showed him pictures of MS-13 gang members, and he could not identify the shooter in the booklets he reviewed. Civ. Doc. 36 at 233. Rather than get a good look at the shooter, Gonzalez told the detectives that as soon as he saw the gun, he started running and did not look back. Civ. Doc. 36 at 211-212, 221-223, 231. Any identification he could make from the booklets would be "going by just the hair, you know, not the face, just the hair." TK. The Government knew that Gonzalez repeatedly expressed hesitation about identifying the shooter in an interview with detectives the night of the shooting and subsequent interviews.

---

[64] Nothing in the provided discovery indicates Gonzalez met with a sketch artist.

251

The December 29, 2005, video recording, produced after filing the first § 2255 petition, demonstrates that Gonzalez did not initially identify Mr. Umaña. Detectives first presented Gonzalez with a photo lineup containing Alex Montes, and he identified him as coming with the shooter. Civ. Doc. 36 at 287-289. Next, detectives showed Gonzalez a photo lineup that included Mr. Umaña. Gonzalez told the detectives he did not recognize anyone on the photo card, but Detective Small would not accept that answer:

| | |
|---|---|
| Det. Small: | Anybody that's close or similar? |
| Gonzalez: | Close, maybe this one right here, the one in the middle. |
| Det. Small: | Number two? |
| Gonzalez: | Yeah. Other than that no, I don't recognize him. |
| Det. Small: | Okay |
| Gonzalez: | Mm-hm. |
| Det. Small: | Um, the guy that walked up and drew the gun, had you ever seen that guy in the park before? |
| Gonzalez: | Never, never before. |
| Det. Small: | Okay. |
| Gonzalez: | Ever the first time I see that guy. That's why it's so hard for me to [. . .] recognize his face 'cause it happened so quick. You know what I mean? |
| Det. Small: | Okay |
| Gonzalez: | It's hard for me to recognize his look – his face in my – my brain. And I can't. I just can't [. . .] recognize his face." |

Civ. Doc. 36 at 311-313.

252

At trial, Freddy Gonzalez testified that he was "sure" of his identification of Mr. Umaña as the Lemon Grove shooter. PPT at 331. Later in the questioning, the Government asked Gonzalez if he "indicate[d] to [the detective] at any point that [he wasn't] 100 percent sure, or what was [his] statement to [the detective] about that?" *Id.* at 333-34. Gonzalez responded, "That was – it was – it was the guy." *Id.* at 334. On cross-examination, trial counsel questioned Gonzalez about his written comments on the photo identification reports, in which he expressed uncertainty about whether Mr. Umaña was the shooter. *Id.* at 335-36.

### 3. The Gonzalez information constituted material exculpatory and impeachment evidence.

If the Government had produced these audio recordings to trial counsel, trial counsel could have used them to impeach Freddy Gonzalez's testimony identifying Mr. Umaña as the Lemon Grove shooter. Trial counsel sought to discredit Gonzalez's pretrial identification of Mr. Umaña using the evidence that the Government did provide trial counsel. PPT at 335-40. With the audio recordings, effective trial counsel would have questioned Gonzalez about his statements right after the shooting that he was not confident he could identify the shooter and Gonzalez's initial statement on December 29, 2005, that no one in the photo lineup that included Mr. Umaña's photo looked like the shooter. The Government's failure to disclose this exculpatory and impeachment information undermines the confidence in the outcome of Mr. Umaña's trial.[65] There is a

---

[65] Because of the since produced audiotapes and amount of evidence identified as not produced, post-conviction counsel maintains there is a good faith basis to believe additional evidence was not produced relating to the Lemon Grove and Fairfax murders. By way of example, documents in discovery indicate that witness Alejandro Rodriguez told LAPD that Mr. Umaña was not in Lemon Grove Park on the night of the shooting. *See* Appx. 69 at 11-12. The Government has not produced the remaining recorded interviews despite a standing order to produce all exculpatory and impeachment material. Crim. Doc 186.

reasonable probability that, but for the Government's failure to disclose the recordings, the result of the sentencing phase would have been different.

Although the Government's evidence regarding the unadjudicated murders was weak, those offenses were central to the Government's argument in support of a death sentence. *See* Claim V, *supra*. The Government's failure to disclose this exculpatory and/or impeachment information, especially Ramos's inability to identify Mr. Umaña as a suspect and the audio recordings of detectives' interviews with Gonzalez, undermines the confidence in the outcome of Mr. Umaña's trial. Had the Government disclosed this evidence, trial counsel could have presented non-cumulative impeachment evidence of inconsistencies in the Government's case, Gonzalez's identification of Mr. Umaña as the shooter, and even exculpatory evidence to the jury affirmatively excluding Mr. Umaña as a participant in either of the unadjudicated murders. Either way, there is a reasonable probability that if this information had been presented to the jury, one or more jurors would have concluded that the unadjudicated murders were not proved beyond a reasonable doubt, and the outcome of the proceedings would have been different.

### C. The Government Failed to Disclose Material Mitigation Evidence Obtained from Alejandro Umaña's Mother

Based on information learned as part of the postconviction process, Mr. Umaña has a good faith basis to assert that the Government did not comply with its obligation to disclose material mitigation information for purposes of the penalty phase. Specifically, the Government failed to disclose information provided by Mr. Umaña's mother, Leticia Ramirez, regarding the background, character, and history of Mr. Umaña. The failure to disclose this information was prejudicial because had it been disclosed, there is a reasonable probability that the outcome of the proceeding would have been different.

254

### 1. The Government suppressed statements made by Mr. Umaña's mother during an interview with the prosecution.

Defendants are clearly entitled to discovery of mitigating evidence under *Brady*. "Evidence relevant to a statutory mitigating factor would certainly be, for the defendant, 'favorable' evidence pertaining to punishment in that it may justify a sentence of life imprisonment as opposed to death." *United States v. Beckford*, 962 F. Supp. 748, 811 (E.D.Va.1997) (citing *Brady*, 373 U.S. at 87). These mitigating factors include aspects of the defendant's background or character or any other circumstance of the offense that mitigates against imposition of the death sentence. 18 U.S.C. § 3592(a)(8).

In an interview conducted as part of the post-conviction investigation, Ms. Ramirez stated that she was interviewed twice by the Government and provided information regarding Mr. Umaña's background. Appx. 10. During the interview, the Government learned, and surely documented, constitutionally relevant mitigating information about Mr. Umaña's background, including that he was born in a country and a year different than what was presented in Court, the father's criminality, and social history information that contextualized Mr. Umaña's joining the gang.[66] Appx. 75 (prosecutor's notes from interviewing Leticia Ramirez). These are all factors that mitigate against imposition of the death sentence.

According to Ms. Ramirez, the first time she was visited by the Government, she gave them information about the family moving to Guatemala from El Salvador during the civil war and that Mr. Umaña was born in Guatemala. Appx. 10 at ¶81[67]; *see also* Appx. 44.

---

[66] The suppression of Mr. Umaña's birthplace prevented trial counsel from reaching out to Guatemala for consular assistance. *See* Claim XXVI.

[67] For a more complete description of the trauma Ms. Ramirez went through during her pregnancy with Mr. Umaña in Guatemala *see* Appxs. 10, 218. A hearing is appropriate to determine the full

255

81. One day, a man who spoke Spanish came to talk to me about my son Alejandro. He lied to me and sweet-talked me into talking to him. He talked to me about religion and said he wanted to help Alejandro. The man talked to me about praying and said he wanted to evangelize Alejandro. I told this man many of the things I am including here in this declaration, and I gave him a copy of my son's Guatemalan birth certificate. I do not remember that man's name.

Appx. 10 at ¶ 81.

82. Later on, two people came looking for me. They were a man and a woman who said they were from the FBI. The woman was an interpreter. They took me to a hotel where there were six or seven people who interviewed me; two of them were women. The blond woman asked me several questions about Alejandro's life for about an hour through an interpreter. The woman sat in front of me across the table. It was very formal. I also told her some of the things that are in this declaration, including the fact that [Mr. Umaña's father] sold drugs and that he was the one who got my sons Alejandro and Saul involved in that business. I told them about the fact that Alejandro did not have identification and had nothing here. They also asked me questions about Guatemala. I asked those people if I was going to see my son again and they told me no, probably not. I felt devastated.

83. The people from the United States Government tricked me. They led me to think that, by talking to them, I could help my son.

*Id.* at ¶ 82-83. Leticia explained that she told the prosecution that Mr. Umaña was unable to work

to provide for himself because of his lack of papers. *Id.* As she explained:

78. I believe my son Alejandro's problems were the papers. He had no form of identification, and he could not get a job to survive. My son wanted to work but he needed a Salvadoran ID card called *Documento Único de Identidad* [Sole Identity Document (*DUI* for the Spanish initials)]. Once he turned 18, they required a form of identification in order for him to get work. For many years he did not have an ID because he was born in Guatemala, and we never registered him as a Salvadoran citizen. Years later, I tried to help my two sons, Alejandro and Saul, to obtain their Salvadoran documents and I went to Guatemala to get their birth certificates. In the end, I was unable to help them get their documents because of the many obstacles we had to go through, like obtaining declarations and paying fees. I knew it was very important to Alejandro to obtain proper documentation; I even offered to sell my sewing machine that I use to earn a living so I could help him.

extent of the information the Government received and documented during these interviews with Ms. Ramirez.

256

*Id*. at ¶ 78. This information was not known by the defense at the time of trial. The Government knew that the defense did not have this information and simply remained silent.

### 2. The Government has not disclosed statements made by Ms. Ramirez regarding her son's background.

The Government produced in discovery materials that indicated that they had interviewed Ms. Ramirez, but no recordings, reports or any other documentation or record of the interviews.

In March of 2010, days before jury selection, the Government produced an FBI 302 in discovery that indicated the lead prosecutor and various other agents travelled to El Salvador in February 2009. Appx. 48; *see also* Appx. 26, ¶14. During that trip, they "interview[ed] [] UMAÑA's mother, LETICIA DIAZ." *Id*. Counsel informally requested those materials (just 15 days before trial) but received (10 days before trial) only the prosecutor's notes from *the* interview,[68] which she represented was the only documentation because "it was not a long conversation". Appx. 74; *see also* Appx. 75. Following full discovery and an evidentiary hearing, Mr. Umaña expects to demonstrate that *all* interviews with Ms. Ramirez would have been formally documented per FBI policy at the time. *Cf*. Legal Handbook for Special Agents, Printed 08/20/2003 at §7-13, Retention of Interview Notes (noting that an FD-302 is required "where the results of the interview may become the subject of court testimony"; also in such circumstances

---

[68] As stated above, Ms. Ramirez recalls meeting with agents to discuss her son on at least two separate occasions. It would appear that the interview by an unidentified man in her home, Appx. 10 at ¶ 81, was performed by "local police". Appx. 75. Even if that is the case, it does not excuse the Government from its constitutional obligation to disclose all favorable evidence. *E.g. Kyles v. Whitley*, 514 U.S. 419, 437 (1995) ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.").

original notes must be maintained.). As such, the prosecutor's "scan" of "her notes", Appx. 74, in no way satisfies the Government's *Brady* obligations.[69]

Nothing regarding the contents of the interview was in the report. When trial counsel requested reports regarding the interview, noting that they had not been able to find Ms. Ramirez for purposes of preparing their mitigation case, the prosecutor responded there were no reports and summarized her recollection of the interview that had occurred more than a year prior. The prosecutor's revelation of the content of her interview with Ms. Ramirez was so dismissive and incomplete as to only have been intentional. Describing the interview, the prosecutor explained:

> There is no 302 because it was not a long conversation. I did find my notes which I will send to you. There's not a lot there but she did say something that I didn't write down but which I recall. She said she and Umaña's dad separated shortly after Alejandro's birth and that Umaña's dad took Alejandro with him. She was upset about this and made efforts to see Alejandro as much as possible. She thinks his dad turned Alejandro against her. She continued to keep up with him through family members - someone mentioned a newspaper article about him to her. As I recall she visited he and his brother in jail when they were incarcerated. She cried at some point while we were speaking to her.

Appx. 74.

The prosecutor's handwritten notes were even less insightful:

---

[69] Moreover, the prosecutor provided the scan of her notes on April 2, 2010, just ten days before the start of trial. Appx. 75. While a *Brady* violation occurs whether or not the prosecution acts in bad faith, it is worth noting that the Government's concealment of this obviously favorable evidence until just days before trial smacks of bad faith.

258

Appx. 75, p. 3.

According to the prosecutor, all Ms. Ramirez could tell her (and so, via this belated disclosure, the defense) was that (1) she "mother lives in Santa Ana – but during war went to Guatemala – came back here" (2) Alejandro was born in Guatemala, (3) "Saul saw [Mr. Umaña] selling drugs", and, (4) the cryptic "Became involved w/ Mara over papers." Appx.75. The Government's tardy production made no mention of her horrific childhood abuse; the devastating effects of the war on her and her family; her husband – Mr. Umaña's father – using drugs, violence and fear to force her into sex work, and her attempted suicide (while pregnant with Mr. Umaña) by ingesting poison to escape him; Mr. Umaña's dangerous birth; her flight from Guatemala, leaving Mr. Umaña with his abusive and violent father, and all the many traumas and abuses she suffered, she observed Mr. Umaña suffering, and that she herself visited on her son. The sparse, single page of notes, failed to accurately record the incredibly mitigating information that Ms.

259

Ramirez provided to the Government, but actively mischaracterized her interview in a way that obscured her importance as a defense witness.[70][71]

Subsequently, during trial, the Government produced a one-page report dated April 13, 2010, prepared by Carlos Alberto Moreno from the Transnational Anti-Gang Task Force.[72] Appx. 44. In the report, Moreno stated that on June 14, 2008, he interviewed Ms. Ramirez and obtained from her a Guatemalan birth certificate for Mr. Umaña. According to Moreno, Ms. Ramirez said she went to live with Mr. Umaña's father and his family in Guatemala during the civil war before Mr. Umaña's birth. Appx. 44, p. 6. With this information, Moreno sought Mr. Umaña's records from the Guatemalan Government. *Id. See also* Appx. 47 ("We respectfully request through this letter that you provide us with "certified photocopy of the birth certificate of ALEJANDRO ENRIQUE RAMIREZ UMAÑA or UMAÑA RAMIREZ", resident of Barrio San Miguelita, 21

---

[70] It is also notable that the only person from the Government to hand over any notes was the same prosecutor that was asking the questions. Ms. Ramirez recalls approximately six to seven people in the hotel room including an interpreter, an FBI agent, and the prosecutor asking the questions. Appx. 10 at ¶ 82. Agents are trained to write reports that truthfully and thoroughly set forth the facts of interviews but the only report by the agent in the room was a one-line statement that Ms. Ramirez was interviewed. It is unusual that with several people participating in the interview of Ms. Ramirez, only one-half of a page of lined paper notes was produced.

[71] Susan Conrad, the prosecution's linguist, testified in the co-defendants' trial that she interpreted for this trip. Co-Defendant Trial NT 01/14/10 at 522. Failing to disclose her presence during the interviews of Leticia Ramirez denied trial counsel the chance to examine Ms. Conrad about the mitigating contents of the interview of Mr. Umaña's mother.

[72] The Task Force is a partnership between the PNC in El Salvador and the FBI, where officers from both agencies work together. *See* Description of MS-13 National Gang Task Force from the FBI website at https://www.fbi.gov/about-us/investigate/vc_majorthefts/gangs/gangs_ms13taskforce (last reviewed on June 14, 2016); *See also* Oct. 10, 2007 "Going Global on Gangs" from the FBI website at https://www.fbi.gov/news/stories/2007/october/ms13tag_101007 (last reviewed on June 14, 2016). The existence of this partnership confirms, if there was any doubt, that evidence obtained by the PNC is imputed to the Government, and so subject to *Brady*. *Kyles*, *supra*.

and 23 Avenida Independencia, casa No. 6, Santa Ana, the son of Rafael Enrique Umaña and Leticia Ramirez, born between 01/01/1981and11/25/1985.").

Again, the minimal information produced by the Government is devoid of any description Mr. Ramirez provided about Mr. Umaña's life, birth or gestation, or her own tortuous existence at the time. Indeed, despite Moreno clearly acting upon information provided in that interview to try and track Mr. Umaña's birth, *see* Appx. 44, if his report is to be believed Ms. Ramirez made no mention of *why* Mr. Umaña was born in Guatemala, and why his birth was not accurately recorded there. *See* Appx. 10 at ¶ 54 (explaining how Mr. Umaña's father insisted his birth be registered with a different father).

Moreno's notes also contain no information about Mr. Umaña's father being a drug dealer (a fact also conspicuously absent from the prosecutor's notes). This oversight is particularly egregious given that trial counsel specifically requested any information that the Government had regarding Mr. Umaña's father being a drug dealer. In a December 17, 2009, email, trial counsel asked the prosecutors about an off-the-record statement made by one of the Assistant United States Attorneys working on the case:

> [The AUSA] told me that our client's father was a drug dealer in El Salvador. We have not come across any indication of this in our review of discovery. We believe that such information in possession of the Government must be disclosed to the defense as it is potentially mitigating for the sentencing phase. For example, if our client was raised in an environment where his father was dealing drugs or was made to participate in same, this would be mitigating.
>
> The court's discovery order would require disclosure of such information to the defense as it would be "favorable to the accused and material either to guilt or to punishment". Therefore, we request disclosure of any material possessed by or known to the Government tending to show that Defendant's father is or was a drug dealer or was otherwise involved in criminal activity.

Appx. 49. In response, one prosecutor – the same prosecutor who had interviewed Ms. Ramirez less than ten months earlier – emailed back that she did not "know that we have any evidence of such, more or less talk" but she did know that the father sold trinkets in the center of town and that Alejandro's brother was in prison. *Id*. In the same email exchange, the prosecutor who had told defense counsel about the father's drug-dealing past, responded "[i]t was rumored that he had sold drugs and that is the full extent of my knowledge on the subject. You have all discovery and reports that would shed any light on the subject." *Id*.

The prosecution's answer to the request for information was inaccurate, if not misleading.

> [A]n incomplete response to a specific request not only deprives the defense of certain evidence, but also has the effect of representing to the defense that the evidence does not exist. In reliance on a misleading representation, the defense might abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued.

*Bagley*, 473 U.S. at 682.

The Government's failure to disclose mitigation evidence regarding these matters was a blatant disregard for Mr. Umaña's constitutional right to present mitigating evidence. The Government was well aware of the fact that trial counsel had been unable to find Mr. Umaña's mother, and they were on notice that trial counsel believed that information about the father being a drug dealer was mitigating evidence, but the Government failed to disclose that Mr. Umaña's mother had provided the Government with the very information that the defense sought and that was relevant to Mr. Umaña's constitutional right to present mitigating evidence at his capital trial.

**3. Ms. Ramirez's statements regarding Mr. Umaña's upbringing and struggles in life were material because they directly contradict the Government's closing remarks that Mr. Umaña "by every account" had a "normal life."**

The information provided by Ms. Ramirez is material for several reasons. As stated by trial counsel, information that the person that raised Mr. Umaña was a drug dealer and influenced him

demonstrates that he was raised in a poor environment without proper guidance, which had significant consequences on Mr. Umaña's social, emotional, and psychological development. *See* Appx. 237, Declaration of Dr. Sermeño; Appx. 214, Declaration of Dr. Sapia. The jury never heard any of this. Instead, the jury heard that Mr. Umaña was raised by what appeared to be a loving father who would lock his family in their home to protect them from the violence during the civil war. The Government embraced this imagery of a father taking responsibility for his son, and raising him to have, what appeared to be "by every account," a "normal life." PPT at 836.

The Government also had crucial mitigation information about the significance of his lack of papers and how that affected his trajectory in a place like El Salvador. The lack of adequate papers regarding his identity, in part, explains Mr. Umaña's difficulties in being able to utilize available institutional resources and obtain proper employment, and why he ultimately resorted to membership in a gang to survive. As Ramirez stated:

> 78.    I believe my son Alejandro's problems were the papers. He had no form of identification, and he could not get a job to survive. My son wanted to work but he needed a Salvadoran ID card called Documento Único de Identidad [Sole Identity Document (DUI for the Spanish initials)]. Once he turned 18, they required a form of identification in order for him to get work. For many years he did not have an ID because he was born in Guatemala, and we never registered him as a Salvadoran citizen. Years later, I tried to help my two sons, Alejandro and Saul, to obtain their Salvadoran documents and I went to Guatemala to get their birth certificates. In the end, I was unable to help them get their documents because of the many obstacles we had to go through, like obtaining declarations and paying fees. I knew it was very important to Alejandro to obtain proper documentation; I even offered to sell my sewing machine that I use to earn a living so I could help him.

Appx. 10 ¶ 78. The jury only heard that the lack of identification prevented Mr. Umaña from playing soccer. PPT at 565. They heard that he eventually obtained a supplementary birth certificate in his early twenties which stated he was born in El Salvador. *Id*. at 534. And he joined the gang because of a girl. *Id*. at 593. What the jury received was thus a materially incomplete and misleading understanding of the significance of Mr. Umaña's lack of proper papers. Had the jury

263

been provided with accurate information on this matter that explained the mitigating nature of this issue, there is a reasonable probability that the outcome of the proceeding would have been different.

The prosecution was able to take advantage of the fact that the defense did not understand the prosecutor's cryptic notes stating "[b]ecame involved w/ Mara over papers" and argued to the jury that Mr. Umaña "wasn't some young, deprived kid" but an adult who joined a gang for something as petty as getting the attention of a girl. PPT 836. The Government emphasized the fact that Mr. Umaña was in the position he was in because of "choices." PPT 892-93 ("Those are choices. And he had every chance. Along the way, members of the jury, he had every chance to say no just like anybody does. It wasn't about a chance; it was about a choice. And that's why we're here to hold him accountable. It's for those choices."). His gang affiliation was a damning fact on which the Government relied to urge the jury to vote for death. The undisclosed information would have helped give the jurors a mitigating context about Mr. Umaña's path to joining a gang: not out of "choice" but out of a lack of other means to survive, the need for family, and the need for identity that was not otherwise available to him. Indeed, even when Mr. Umaña sought an escape from poverty through soccer, he could not, because he did not have the money or the papers. The lack of identification closed off the avenues for Mr. Umaña that could have changed the trajectory of his life. Not having proper Government identification was not something he chose. It was a situation he was put in due to circumstances outside of his control, circumstances that included the torture and abuse of his mother, and his own father's violence and criminality.

Mr. Umaña was dependent on his caregivers to straighten out the issues of his papers, but his caregivers were either missing from his life or were the ones who caused the problem in the first place. The choices made by other people, the people who were supposed to care for him as a

child, had set his life on a course that he was incapable – through a wretched combination of bureaucracy and intellectual impairments – of changing.

### 4. Ms. Ramirez's statements regarding Mr. Umaña's background were material to Mr. Umaña's claims on intellectual disability.

The information about Mr. Umaña's age was also material to the pretrial hearing on *Atkins v. Virginia*, 536 U.S. 304 (2002). The Court heard information to determine if Mr. Umaña met the three prongs of intellectual disability: (1) significantly subaverage intellectual functioning (IQ of about 70 or lower); (2) significant limitations in adaptive functioning; and (3) onset before age eighteen. The defense and Government experts both worked under the assumption that Mr. Umaña was born in El Salvador in 1984. *See* Appxs. 70, 71, 72, 73.

Although the Government had already obtained Mr. Umaña's true birth certificate with the date of birth of 1982, instead of 1984, and had already interviewed his biological mother, they again said nothing. As set forth more fully below in Claim VII, information regarding Mr. Umaña's date of birth was material to the Court's determination on intellectual disability. For example, it mattered whether Mr. Umaña flunked third grade twice at the age of 12 instead of the age of 10. Mr. Umaña's age affected the experts' testimony and the Court's decision process and fact-finding on whether Mr. Umaña was eligible for the death penalty.[73]

The prosecution allowed its own expert witness to rely on the wrong date of birth, sat at the hearing knowing the Court was relying on false facts, and allowed the false facts to work against Mr. Umaña. The Government hid these material facts until well after the hearing and the

---

[73] The relevance of these facts to the expert testimony and Court's fact-finding are explained in detail in Claim III and are incorporated by reference here.

265

Court's denial of Mr. Umaña's motion. There is a reasonable probability that had the jury known about the information, the outcome of the proceeding would have been different.[74]

**CLAIM VII   THE GOVERNMENT PRESENTED FALSE AND MISLEADING EVIDENCE, AND ASKED JURORS TO RELY ON THIS EVIDENCE, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.**

All other claims and allegations in this Motion are incorporated into this claim by this reference.

### A.  Introduction and Summary of Argument

Mr. Umaña was denied due process because the Government knowingly presented misleading, inaccurate, and prejudicial testimony.

Prosecutors violate due process by presenting material testimony that is false, creates a false impression, or by allowing false testimony to stand uncorrected. *See, e.g., Giglio v. United States*, 405 U.S. 150, 159 (1972) (failing to correct false testimony violates due process); *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (failing to correct testimony that creates a false impression, though not perjured, violates due process); *Mooney v. Holohan*, 294 U.S. 103, 112 (1935) (presenting knowingly false testimony violates due process). Due process is equally offended by

---

[74] Mr. Umaña cannot plead this, or any other claim, regarding the Government's failure to disclose material exculpatory and impeachment information with any more particularity at this time because the factual bases for such claims rests on information known only to the Government. Prior to and after filing his § 2255 Motion, Mr. Umaña attempted to obtain this information through motions for discovery of exculpatory, impeachment, and mitigating information. *See* Docs. 18, 36 (Mr. Umaña's motions for discovery). This Court denied both requests. Docs. 68, 108 (Court orders denying discovery). If evidence is disclosed that supports additional *Brady* claims Mr. Umaña will plead them at the appropriate time. If appropriate information appears during an evidentiary hearing, counsel will apprise the Court of the impact of that information on the pending legal claims.

direct statements which are untrue and the eliciting of testimony which "taken as a whole" gives the jury a "false impression." *Alcorta v. Texas*, 355 U.S. 28, 31 (1957).

To prevail on a claim of prosecutorial misconduct, Mr. Umaña need only establish three elements: (1) the testimony in question was false or, taken as a whole, gives a false impression; (2) the Government knew or should have known the testimony was false; and (3) the testimony was material. To establish materiality, one must demonstrate "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103, (1976).

### B. During the *Atkins* Hearing, the Government Knew, or Should Have Known, Based on Records and Interviews of Witnesses that the Court was Relying on Information that was False or Left a False Impression.

At the November 30, 2009, pretrial hearing held under *Atkins v. Virginia*, 536 U.S. 304 (2002), the Court received information to determine if Mr. Umaña met the three prongs of intellectual disability: (1) significantly subaverage intellectual functioning (IQ of about 70 or lower); (2) significant limitations in adaptive functioning; and (3) onset before age eighteen. The defense and Government experts both worked under the assumption that Mr. Umaña was born in El Salvador in 1984. *See* Appxs. 70-73.

Mr. Umaña's age and birthplace were false as presented to the Court. Specifically, more than a year prior to the hearing, the Government obtained a copy of Mr. Umaña's birth certificate and therefore knew Mr. Umaña was born in 1982 in Guatemala, not in 1984 in El Salvador. Def. Tr. Exh. 32; Appxs. 46-47. There should have been no doubt that the 1982 birth certificate was accurate. The circumstances of Mr. Umaña's birth were confirmed when Corporal Moreno of the PNC (Salvadoran National Police), working as part of a Task Force in conjunction with the FBI, interviewed Mr. Umaña's mother on June 14, 2008. Appx. 44 at 6. *See also* Appx. 10 ¶ 81. *Cf.*

Appx. 75 (April 2, 2010, email from Assistant US Attorney disavowing existence of any records of the 2008 interview, including but not limited to the documents in Appxs. 44 and 47.). Even if (and this is unlikely) the Task Force had kept the content of the PNC interview with Ms. Ramirez secret from the prosecutors prosecuting Mr. Umaña, it is now established that the prosecutors themselves met with Ms. Ramirez the week of February 1, 2009. Appx. 48. And, it is now established that Ms. Ramirez told those prosecutors that Mr. Umaña was born in Guatemala. Appx. 75 at 2.[75]

The Government knew that the information presented at the *Atkins* hearing was false. By the time of the hearing, the prosecutor's office possessed Cpl. Moreno's records detailing the truth of Mr. Umaña's place and date of birth (records that those same prosecutors denied the existence of when asked by defense counsel) and had themselves confirmed those truths during their own interview of Ms. Ramirez months before the hearing. Appx. 75. Nevertheless, the government permitted their expert (whom they had also apparently misled as to the truth of Mr. Umaña's birth, given that their expert testified as to the wrong information) to provide false and misleading testimony without correction.[76]

---

[75] Trial counsel's ineffective failure to conduct an adequate investigation to learn the circumstances of Mr. Umaña's birth and obtain his Guatemalan birth certificate independently from the Government is addressed in Claim I. Having failed to conduct this investigation, trial counsel was in no position to object to the Government's material misrepresentation of Mr. Umaña's age or correct any of the experts' misapprehension. Regardless of where this Court finds the ultimate fault lies – with the Government for failing to disclose the birth certificate and presenting false evidence of age at the *Atkins* hearing or with the defense for failing to conduct an adequate investigation – Mr. Umaña was prejudiced as demonstrated in Claim I and below.

[76] Because the Government's *Atkins* expert was retained by the Government, Mr. Umaña is unable to interview him to confirm whether he knowingly provided false testimony or whether he was misled by prosecutors. Thus, discovery and/or a hearing are required to determine the extent of the Government's deception.

The information about Mr. Umaña's age was material to the Court's findings on adaptive functioning. There is a reasonable probability that the outcome of the *Atkins* hearing would have been different if Mr. Umaña's correct age had been properly disclosed. The Court made its ruling based on the adaptive functioning which revolves around information of Mr. Umaña's functioning as a child up to the age of eighteen. His age mattered to the experts' testimony and how the Court evaluated the evidence. For example, for the functional academics factor, the defense presented evidence that Mr. Umaña repeated third grade twice, ultimately failed at the age of 10, and dropped out of school. Atkins Hrg, Nov. 30, 2009, Hrg. at 49. The Government countered with testimony and argument that Mr. Umaña appeared to be on par with the rest of his classmates. *Id.* at 93; *see also* Appx. 31 at 5. That false testimony and argument was material.

During an interview with postconviction counsel, a schoolteacher from Santa Ana at the time Mr. Umaña was schooled there reviewed Mr. Umaña's school records. Based on Mr. Umaña's true date of birth, he would have started first grade in 1989. Appx. 6 at ¶12. Thus, Mr. Umaña completed first grade in 1991 when he was 9, rather than 7. Even then his performance was below the norm. It was "very unusual" for a nine-year old to be in first grade. *Id.* at ¶ 13. Moreover, Mr. Umaña's grades suggested that his 1991 completion of first grade was the result of having to repeat the grade at least once. *Id.* at ¶ 13-14.

Mr. Umaña's records, when viewed knowing his true age, show that his academic performance was actually far worse than believed by the two experts at trial. Despite having good attendance, *id.* at ¶ 16, in 1994, he was in "integrated education", a remedial class for "children who have not yet passed the first level (first, second and third grade). *Id.* at ¶ 18. These are children who are older than usual. *Id.* They are often embarrassed to be in a class with younger children; they are underperforming children." *Id.* at ¶ 19. Mr. Umaña, at the time he was in the remedial

269

class, was 12 years old but had not passed third grade. "This is very unusual. Normally, a child passes third grade by age nine." *Id.*

It is now clear that Mr. Umaña and his cousin, Geovanni, "were born the same year, but Geovanni was 'much further ahead in school.'" Appx. 28, ¶ 12. Geovanni's mother, Aunt Reina, describes Mr. Umaña suffering just as the teacher predicted:

> Alex repeated grades several times. There came a time when he was the oldest child in the classroom. He was embarrassed, because not only were the kids in his class younger, but he also stood out physically from the rest. His cousins made fun of him, and Alex did not want to go to school anymore. Alex had learning problems. He tried, but he did not have the ability to learn and did not understand. Alex was also forgetful. People from the school would tell my mother Alex was doing poorly with his schoolwork, but my mother could not help him.

*Id.*; *see also* Appx. 19 at ¶¶16-17.

Knowing now that Mr. Umaña was two years older than he believed when he testified, the defense expert, Dr. J. Gregory Olley, confirmed that Mr. Umaña was more impaired than he suspected during his testimony in 2009:

> In 2009, I was working under the assumption that Alejandro was two years younger than his actual age. The fact that he is two years older than what I originally believed strengthens the fact that Alejandro had significant learning struggles in school.

Appx. 28 ¶ 12. The Government's expert, Dr. Enrique Suarez, downgraded the importance of the dropping out at third grade. Atkins Hrg Nov. 30, 2009, at 307-08. That testimony was based on the false "fact" that Mr. Umaña was born in 1984, not 1982. It is not clear whether the prosecutors misled their own expert as to Mr. Umaña's true age so as to mislead the jury, or if Dr. Suarez made the misleading decision himself. That answer can only be found with discovery and a hearing.

Because of the false information about Mr. Umaña's age, Dr. Suarez was also led to provide misleading testimony about other areas of Mr. Umaña's childhood. For example, Dr. Suarez testified that Mr. Umaña stopped going to school because his grandmother died. *Id*. But his age

270

tells a different story. Mr. Umaña was just eight years old when his grandmother died. Appx. 20 at ¶36; Appx. 33 at 2. However, school records demonstrate that Mr. Umaña first left school at the age of twelve while he was still in third grade. Appx. 6 at ¶19. And, Mr. Umaña had enrolled in night school when he was sixteen, long after the death of his grandmother. *See* Appx. 112 at ¶2-3, Declaration of Luis Ramos.

Dr. Suarez also testified that the fact that Mr. Umaña started working at the age of 10 was inconsistent with someone who was intellectually and adaptively impaired. *Atkins* Hearing Transcript at 309. But based on the accurate birthday, Mr. Umaña started working sometime after the age of 12. *See* Appx. 22 at ¶32, Declaration of Saul Osvaldo Umaña; Appx. 224 at ¶ 2, 8, Declaration of Carlos Geovanni Herrera.

As a consequence of the Government's deceptive failure to correct the witnesses, the Court relied on the false birthday in denying Mr. Umaña's motion. For example, the Court concluded that the functional academics factor was a "close call." Crim. Doc. 934 at 13. However, agreeing with the Government, the Court found that although Mr. Umaña repeated third grade, he did not appear to have the lowest grades in the class, and it was not unusual for children in El Salvador to drop out of school to go to work. Crim. Doc. 934 at 13. The fact that Mr. Umaña was actually twelve years old when he failed the third grade – a fact that a teacher with actual experience in the very school Mr. Umaña attended confirms is "very unusual" – materially undermines this conclusion. Appx. 6 at ¶13, Declaration of Ana Gladys Magaña (It was "very unusual" for Mr. Umaña a 9-year-old, to be graduating from first grade.). In fact, it establishes the opposite: that Mr. Umaña's adaptive functioning was *not* normal given his actual age, and he displayed clear adaptive deficits with respect to, at the very least, functional academics.

271

The United States Attorney is the representative not of an ordinary party to a controversy, but of the people, and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. *Jencks v. United States*, 353 U.S. 657, 668 (1957) ("[T]he interest of the United States in a criminal prosecution '. . . is not that it shall win a case, but that justice shall be done . . . .'" (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935))).

In this case, where an execution is at issue, the failure of the United States Attorney to live up to these obligations should not be lightly excused. This is particularly true here, where the material information at issue would have, if timely disclosed to the defense and properly presented to the Court, precluded a capital prosecution altogether. *See* 18 U.S.C. § 3596(c) ("A sentence of death shall not be carried out upon a person who is mentally retarded."). Thus, there is a "reasonable likelihood that the false testimony could have affected the" outcome. *Agurs*, 427 U.S. at 103. This Court should so find and vacate Mr. Umaña's sentence.

### C. At the Guilt and Penalty Phase, the Government Presented Misleading Evidence and Argument that Mr. Umaña "Earned" His MS-13 Tattoo by Killing People

"The government commits a *Napue* violation 'when the government introduces false or misleading testimony or allows it to go uncorrected, even though the government knew or should have known that the testimony was false.'" *United States v. Ausby*, 916 F.3d 1089, 1092 (D.C. Cir. 2019) (per curiam) (*quoting United States v. Straker*, 800 F.3d 570, 602 (D.C. Cir. 2015)); *see also Boyd v. French*, 147 F.3d 319, 329 (4th Cir. 1998).

Government witness Alexander "Gorillon" Granados testified on cross-examination that a gang member must earn the right to tattoo the letters "MS" on his body by killing someone. GPT at 913. He repeated this testimony on re-direct. GPT at 920. This testimony was, at best, misleading, if not actually false. Mr. Umaña expects to prove at a hearing that the Government knew this testimony – which gave the jury the false impression that Mr. Umaña had earned his

272

tattoo by killing *before* the Greensboro and the L.A. murders – was false because it was contradicted by all the other evidence regarding the MS letters presented at both this and the codefendants' trial.

There was more than a likelihood that the Government's knowing use of false testimony could have influenced the jury, *Napue*, 360 U.S. at 271, because the Government exploited it to argue that Mr. Umaña was a respected, notorious killer for MS-13, rather than a brain-damaged, intellectually disabled man who could not regulate or control disproportionate fear generated by non-life-threatening confrontations of everyday life, *see* Claims I and II. This false evidence allowed the Government to raise the specter of prior murder(s) despite the fact that the Court had specifically precluded allegations that Mr. Umaña had killed prior to the unadjudicated murders in Los Angeles. *See* Doc. No. 1021 at 10-11 (finding that allegations of murder prior to the Los Angeles murders were inadmissible because the evidence was "entirely hearsay" from anonymous declarants and Mr. Umaña was acquitted of the charge).

The Government repeatedly used Granados's false testimony in closing argument at both the guilt and penalty phases of trial. *See* GPT at 1156-57, 1170-71, 1183; PPT at 824, 892. At penalty-phase closing, the Government argued that "not every gang member is a killer" but Mr. Umaña is. GPT at 889. As proof, the Government reminded the jury "how deep into MS Stiler was," and yet even he had "no evidence of killing" against him. *Id.* Concluding its comparison for the jury, the Government asked, "Is MS bad? Sure is . . .. Are they violent? Yes. But of everything you've heard about from both sides and all their cross-examination, he's [Mr. Umaña] the only killer." *Id*. at 888. At penalty, the Government's theme in support of executing Mr. Umaña was to compare Mr. Umaña to other members of MS-13, insisting that there are relatively "good" members of that gang, whereas Mr. Umaña was one of the worst. *Id.* at 888-89.

273

The (false) evidence and argument that Mr. Umaña proudly wore a tattoo as a trophy to commemorate the many killing(s) he had committed was given to the jury precisely for them to speculate on just how terrible a person, deserving of the death penalty, Mr. Umaña was. There is a reasonable likelihood that this powerful, highly prejudicial, and false evidence and argument "could have affected the judgment of the jury." *Agurs*, 427 U.S. at 103.

**1. The Government knew or should have known that Grandos's testimony that Mr. Umaña's MS tattoo meant he had killed before was false and misleading.**

At the guilt phase of Mr. Umaña's trial, Alexander Granados was cross-examined about the rules of MS-13. GPT at 912-13. After explaining some of the rules, Granados testified that to "earn the letters" – meaning tattooing the letters "M" and "S" on your body – you are required to kill someone. GPT at 913. The prosecution re-directed Mr. Granados and immediately asked him what he meant by the statement he made regarding "earning the two letters":

Q. You mentioned in response to one of the questions about earning the two letters.

A. Yes.

Q. And what did you mean by this?

A. In order to earn the two letters, you have to kill someone.

Q. And what are the two letters you are talking about?

A. About MS.

Q. Okay. And when you say earning the letters, does that mean placing them on your body?

A. Yes.

GPT at 920.

This testimony was, at very least, misleading if not outright false. First, the Government presented contradictory testimony in the trial of Mr. Umaña's co-defendants three months prior to Mr. Umaña's. There, the Government's long-time, undercover MS-13 informant, Rony Lopez,

274

testified that the MS letters are earned by "put[ting] in work for the gang," or when you "rob people," or when you do "just different types of crimes." *United States v. Rosales Lopez, et al.*, 08-cr-00134-RJC Doc. No. 1080, at 567-68. Mr. Lopez never suggested that an MS tattoo had to be earned through killing someone.

Second, the Government's expert on the rules, history and structure of MS-13 – Det. Frank Flores – testified at length in both Mr. Umaña's trial and the trial of the co-defendants, and much of his testimony was explaining MS-13 tattoos and their significance. *See* GPT at 70-85; 08-cr-00134, Crim. Doc. 1466 at 107-117. Nowhere in the co-defendants' trial did Det. Flores suggest that the MS tattoo indicated the wearer had killed. 08-cr-00134, Crim. Doc. 1466 at 107-117. In Mr. Umaña's trial, Det. Flores went into great detail about numerous MS-13 tattoos and described their meanings. *Id*. He was specifically asked about the tattoos of the letters "M" and "S" and the head of Julio Rosales (Stiler), and all he said about them was that "There's a letter M beside the letter S there . . . M-S, representative of Mara Salvatrucha. I would consider that a gang tattoo for Mara Salvatrucha." GPT at 71. Det. Flores also looked at Mr. Umaña's tattoos, noting that it was not simply a tattoo of the letters M and S, but rather a Spanish phrase that read "no pude mas homeboys" or "I couldn't anymore home boys" in English. GPT at 80-81. He testified that there is "specific emphasis on the letters M and S" in the word "mas." *Id*. But Det. Flores never testified that Stiler, Mr. Umaña or any other of MS-13 member would have been required to kill to "earn" and wear a "MS" tattoo. The fact that the Government refrained from asking their expert about this supposed hidden meaning when that expert did not volunteer it himself raises a reasonable inference that the Government avoided this line of questioning with Det. Flores knowing he would have contradicted Granados's testimony.

Third, the Government introduced into evidence a set of rules regarding membership in MS-13. GPT at 59-61. Det. Flores testified that the rules were very important to MS-13 and that they were common for all of MS-13's "cliques." GPT at 61. Nowhere within those rules presented by the Government is there anything about killing to earn the MS tattoo. *See* Gov. Exh. 15a, translated MS-13 Rules.

Fourth, Stiler had a very prominent MS tattoo on his forehead, which the Government introduced in multiple exhibits in Mr. Umaña's trial. *See* Gov. Exh. 7 and 8, photographs of Stiler's MS tattoo on his forehead. And at Stiler's own trial, there was abundant discussion about that MS tattoo, but never any implication that Stiler had killed to earn the tattoo. Only at Mr. Umaña's trial, three months after Stiler's and the other co-defendants, did the Government offer the new (and relentlessly argued) theory that Mr. Umaña "earned those letters" and that he "earn[ed] them by killing." GPT at 1170; *see* also GPT at 1156-57, 1171, 1183; and PPT at 824, 892.

Current counsel consulted a well-known gang expert and professor of Anthropology at theUniversity of Southern California, Thomas Ward, about gang culture and the gang testimony presented against Mr. Umaña. Appx. 244. Professor Ward spent sixteen years associating with MS-13 members and teaches and writes about gang culture to this day. *Id.* at 7. Professor Ward told current counsel, and would have told trial counsel and the jury, that:

> This claim that a member of the gang must commit a murder in order to get a tattoo of the gang's initials is what is often called an 'urban myth,' an exaggeration intended to inflate the status of a particular gang member and/or her/his gang.
>
> In sixteen years of research with over 400 members of the MS gang, not one gang member ever mentioned to me this unwritten rule. In addition, rational reflection of this claim would show it to be patently ridiculous. First, if this were true, the number of MS gang-related homicides would be much higher than the actual numbers found in law enforcement records. And second, it would be difficult, if not impossible for the fellow members of the gang to ensure that a homicide had been committed by a gang member before he got a gang tattoo. Over 20 years of fieldwork experience with members of the MS-13 gang has revealed that most members get a tattoo of their

276

gang's name in order to show their affiliation and dedication to the gang, usually without getting permission beforehand, and never after committing a homicide or attempted homicide in order to get permission to get this tattoo.

*Id.* Both the government prosecutor and their 'expert' Det. Flores knew or should have known that Granados's testimony was misleading at best, and likely actually false. The Constitution obligated the government to correct this false testimony.

Instead of correcting Granados's misleading (or actually false) testimony Government exploited it to weave a story about Mr. Umaña's history and role in MS-13 that was compelling but untrue: that Mr. Umaña's MS tattoo was evidence that he had killed before Greensboro (and the alleged but unproven L.A. murders, *see* Claim V). *E.g.*, GPT at 1170. The Government therefore violated its duty to be faithful to the nation's "overriding interest that 'justice shall be done.'" *Agurs*, 427 U.S. at 111.

### 2. There is a reasonable likelihood that the false testimony could have affected the judgment of the jury.

It is true that defense counsel did not object to, or cross-examine, Grandos's misleading (at least) testimony. That failure is addressed in Claim XI as a further instance of counsel's ineffectiveness. However, that ineffectiveness does not excuse the Government's violation of its duty to be faithful to the nation's "overriding interest that 'justice shall be done.'" *Agurs*, 427 U.S. at 111. The Government not only failed to correct Granados, but actively and deliberately used his misleading testimony to argue for a death sentence. *See DeMarco v. United States*, 928 F.2d at 1077 (11th Cir. 1991) ("The prosecutor's argument to the jury capitalizing on the perjured testimony reinforc[es] the deception of the use of false testimony" and relief is required, notwithstanding defense counsel's failure to react to the false testimony.) Such is the case here.

The theme that Mr. Umaña "earned" his tattoo by killing was central in the Government's arguments to the jury at both stages of the trial. The Government repeatedly made direct reference

277

to Mr. Umaña having earned his MS tattoo by killing at the guilt and penalty phase. The Government also made numerous references to the idea that Mr. Umaña had earned the tattoos without explicitly saying he earned them by killing but knowing that the only evidence at trial about how one earns the MS tattoo is by murder.

At the guilt phase the Government relied on the false and misleading evidence to support its allegation that Mr. Umaña committed the Greensboro murders to maintain his position in the gang or "in furtherance" of the gang – he killed to "earn" the respect of his gang. The evidence at trial, as the jury unanimously found at the penalty phase, however, demonstrated that the shooting was a result of a fight that had no substantial planning – it was an unplanned act and committed under emotionally charged circumstances. Doc. at 1048 at 4-6. The victims had blood alcohol levels of .17 and .20. GPT at 497, 493. However, to portray this murder as having been committed to maintain gang status or in furtherance of the gang, the Government prominently seized on the false and misleading tattoo:

> And the evidence has shown, ladies and gentlemen, that on that day, December 8th, 2007, Wizard of the Novena showed that he earned the big letters: The big M and the big S. And he earned them by respect. And he earned them with a .45. And he maintained his respect and maintained his status in the gang that night by showing Manuel and Ruben what the MS 13 is all about.

GPT at 1157; *see also* GPT at 1170 ("Wizard earned those letters. He earned them by, as the witnesses said, you earn them by killing. So you don't disrespect me. I earned this MS. I earned this MS."); GPT at 1171 ("Is it so hard to identify that tattoo? If you've seen that once, I think you remember . . . [H]e wants you to remember that . . . that means a lot to him. He's earned that."). The Government argued, basically, that earning and wearing the tattoo like a badge compelled Mr. Umaña to kill for the gang, falsely countering the perception of Mr. Umaña as defending himself from a threat that his broken brain exaggerated. *See* Claims I and II.

278

For the penalty phase, the Government also used the false testimony to compare Mr. Umaña to other MS-13, creating the idea that, while all gang members are "bad", Mr. Umaña was the worst of them all. "[N]ot every gang member is a killer" but Mr. Umaña is. PPT at 889. As proof, the Government reminded the jury "how deep into MS Stiler was," and yet even he had "no evidence of killing" against him. *Id.* at 100. Concluding its comparison for the jury, the Government asked, "Is MS bad? Sure is . . . Are they violent? Yes. But of everything you've heard about from both sides and all their cross-examination, he [Mr. Umaña] is the only killer." *Id.* at 889.

The Government again used the false evidence to support its otherwise weak evidence regarding the California murder aggravators and calculated to inflame the passions of the jury and scare the jurors to decide for a sentence of death. The Government's evidence to meet the non-statutory aggravator of prior unadjudicated acts of violence was based on the Lemon Grove and Fairfax Avenue murders. As set forth elsewhere in this motion, the evidence of these murders was weak. *See* Claims V, VI, X, XII. In fact, some allegations that Mr. Umaña had killed prior to the unadjudicated murders in Los Angeles were specifically precluded by the Court.

Rather than attempting to prove its case beyond a reasonable doubt as to those murders, the Government relieved itself of its burden of proof by using Granados's false testimony in closing argument at both the guilt and penalty phases of trial. *See* GPT at 1156-57, 1170-71, 1183; PPT at 824, 892. By doing so, the Government misled the jurors into believing that there were additional murders that Mr. Umaña had committed even prior to the California shootings, despite this Court's ruling precluding that evidence, *see* Doc. No. 1021 at 10-11, for which Mr. Umaña had "earned" the MS tattoo. Again, the Government returned to its theme from guilt-phase closing, seizing upon the false testimony to argue for Mr. Umaña's execution by comparing Mr. Umaña to

279

other members of MS-13, insisting that there are relatively "good" members of that gang, whereas Mr. Umaña was one of the worst. PPT at 888-89. Throughout, the Government relied on the false testimony to present Mr. Umaña as boasting of his murders. *See* PPT at 824 ("He had earned those two letters on his forehead, and he earned them by killing."); PPT at 892 ("He earned those tattoos. You heard how he got those tattoos. He earned those tattoos."); PPT at 902 ("His tattoo says it all.").

A new trial is required if the false or misleading evidence "could . . . in any reasonable likelihood affect [] the judgement of the jury." *Giglio v. United States*, 405 U.S. 150, 154 (1972) (quoting *Napue*, 360 U.S. at 271). Given that the Government exploited this false evidence to bolster the flawed and unreliable evidence of Mr. Umaña's alleged prior murders, to justify its different treatment of members of the same gang, and to portray Mr. Umaña as a proud and unrepentant MS-13 killer, there is a "reasonable likelihood" that false evidence "could have affected" the jury's judgment.

### D. During the Penalty Phase, the Government Presented and Argued False and Misleading Evidence Relating to the Lemon Grove and Fairfax Shooting .

The Government presented evidence regarding the unadjudicated California murders that it knew or should have known to be false or misleading. The Supreme Court has "consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair." *United States v. Agurs*, 427 U.S. 97, 103 (1976); *see also Kyles v. Whitley*, 514 U.S. 419, 432 n.7 (1995). In these circumstances, the Supreme Court has "applied a strict standard of materiality, not just because they involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process." *Agurs*, 427 U.S. at 104. Thus, where the Government knowingly presents, or fails to correct, false testimony, relief is required where "there is a reasonable likelihood the false evidence could have affected the judgment of the jury."

280

*Id.* The Government repeatedly presented false evidence in support of its non-statutory aggravator, that Mr. Umaña had committed murders previously.

### 1. Lemon Grove Park

The Government argued to the jury that Mr. Umaña was the Lemon Grove shooter based on the testimony of a single eyewitness, Freddy Gonzalez.

The Government's false and misleading evidence began during the court's consideration of whether to permit Gonzalez to identify Mr. Umaña. The Government argued that the court should permit Gonzalez to identify Mr. Umaña before the jury because "when he was interviewed he said, I will never forget that face. If I can – you know, I will never forget that face." PPT at 326. But Gonzalez said no such thing. Although the Court prohibited the Government from permitting Gonzalez to make an in-person identification because of concerns with the accuracy, the Court allowed the Government to introduce Gonzalez's prior identifications.

At trial, Gonzalez testified about two identifications he made to police of Mr. Umaña being the person who shot and killed the two victims at Lemon Grove Park. The first identification was, he testified, from a photo line-up:

Q:  And the person you picked is on the other side, is that the person that you picked that resembled the person?

A:  Yes.

Q:  *Were you sure of it or what was your statement to him at that time?*

A:  *Yeah, it was him.*

Q:  And the person you circled, was the person you previously testified about someone pulling out a gun when you held your hands up?

A:  Yes.

Q:  *Was that the person you saw?*

A:  *Yes.*

PPT at 331-32 (emphasis added).

The Government continued to the second (tentative) identification of Mr. Umaña, again from a photo lineup, and again eliciting testimony from Mr. Gonzalez to the effect that he was sure of his pretrial identification of Mr. Umaña as the one shooter:

> Q:      What were you saying in that statement [referencing Gov. Exh. 506]?
>
> A:      That the guy in photo number five [Mr. Umaña] was the guy.
>
> Q:      Did you indicate [] at any point that you weren't 100 percent sure, or what was your statement [] about that?
>
> A:      *That was – it was – it was the guy.*
>
> Q:      *Now you mentioned – when you say the guy, the shooter?*
>
> A:      *On picture, [sic] yes.*

PPT at 333-34 (emphasis added).

The prosecutor's direct examination of Gonzalez violates the basic tenet of *Napue*, which prohibits "soliciting false evidence" and requires the prosecutor not to "allow[] it to go uncorrected when it appears." 360 U.S. at 269. The Government knew that before his testimony confidently identifying Mr. Umaña, Mr. Gonzalez had in fact identified no less than three other people as the one shooter. Despite knowing this, the Government nevertheless deliberately elicited testimony from Mr. Gonzalez that he was, and always had been, confident in his identifications. PPT at 331-34. That the confidence – expressed for the first time by the witness five years after the shooting – was misleading, if not false, given Gonzalez's repeated statements otherwise between the time of the incident and the trial.

Audio recordings produced by the Government after filing the initial § 2255 motion reveal consistent hesitation about identifying the shooter. Civ. Doc. 36, Exh. 20. In Gonzalez's first meeting with detectives on September 29, 2005, hours after the shooting, Gonzalez repeatedly told

282

LAPD Detectives Thomas Small and Elizabeth Estupinian that he could not see the face of the shooter because it happened so quickly. *Id.* at 23, 32. When the detectives asked if he would be willing to meet with a police sketch artist, he responded that he "[d]ont think I could remember his face and tell you . . . how his face – nothin' like that." *Id.* at 23.[77] He repeated, "I didn't see him that good to tell you the truth," when detectives showed him pictures of MS-13 gang members, and he could not identify the shooter in the booklets he reviewed. *Id.* at 31. Rather than get a good look at the shooter, Gonzalez told the detectives that as soon as he saw the gun, he started running and did not look back. *Id.* at 9-10, 21, 26-27. Any identification he could make from the booklets would be "going by just the hair, you know, not the face, just the hair." *Id.* at 32. .

The December 29, 2005, audio recording, also produced after filing the first § 2255 motion, further demonstrates that Gonzalez did not initially identify Mr. Umaña. Civ. Doc. 36, Exh. 21(a). Detectives first presented Gonzalez with a photo lineup containing Alex Montes, and he identified him as coming with the shooter. *Id.* at 37-38. Next, detectives showed Gonzalez a photo lineup that included Mr. Umaña. Gonzalez told the detectives he did not recognize anyone on the photo card, but Detective Small would not accept that answer:

Det. Small:     Anybody that's close or similar?

Gonzalez:      Close, maybe this one right here, the one in the middle.

Det. Small:     Number two?

Gonzalez:      Yeah. Other than that no, I don't recognize him.

Det. Small:     Okay

Gonzalez:      Mm-hm.

---

[77] Nothing in the provided discovery indicates Gonzalez ever met with a sketch artist.

283

| | |
|---|---|
| Det. Small: | Um, the guy that walked up and drew the gun, had you ever seen that guy in the park before? |
| Gonzalez: | Never, never before. |
| Det. Small: | Okay. |
| Gonzalez: | Ever the first time I see that guy. That's why it's so hard for me to . . . recognize his face 'cause it happened so quick. You know what I mean? |
| Det. Small: | Okay |
| Gonzalez: | It's hard for me to recognize his look – his face in my – my brain. And I can't. I just can't . . . recognize his face." |

Civ. Doc. 36, Exh. 21(b) at 12-13. In the accompanying Photo Identification Report, Gonzalez stated he was "not sure if [Mr. Umaña] is the one." Gov. Ex. 507. Three years later, when Gonzalez was again interviewed about the incident, he stated "everything happened so fast I'm not 100% sure." Gov. Ex. 506. The audio recording also revealed Mr. Gonzalez was in custody during the December 29 photo line-up. The police promised to help with his case if he would "help us". Discovery Motion Exh 21(b) at 10.

Despite knowing that Mr. Gonzalez had, thus far, been *un*able to identify Mr. Umaña in his many statements to police, the Government nevertheless asked him at trial whether he was able to confidently identify Mr. Umaña. That line of questioning could not have been intended for Mr. Gonzalez to prevaricate before the jury; rather, the questions were clearly designed to bolster Gonzalez's credibility in the eyes of the jury and for a good reason. Mr. Gonzalez was the only witness that identified Mr. Umaña as the shooter.

The Government knew Mr. Gonzalez had previously been unable to identify Mr. Umaña with any reliability and that he had been promised "help" if he participated.[78] Mr. Gonzalez cast aside his uncertainties in the intervening years and would now, if asked, confidently identify Mr. Umaña. His expressions of confidence, and the Government's knowing elicitation of that sudden confidence, violated the Government's duty to seek justice and not convictions at any cost. *Jencks v. United States*, 353 U.S. 657, 668 (1957) ("[T]he interest of the United States in a criminal prosecution '. . . is not that it shall win a case, but that justice shall be done . . . .'" *(quoting Berger v. United States*, 295 U.S. 78, 88 (1935))). Had the jury known about Gonzalez's prior misidentifications, statements expressing doubt about his identification of Mr. Umaña, and the promises made in exchange for his help, there is a reasonable probability that the outcome of the proceeding would have been different.[79]

### 2. Fairfax

Regarding the Fairfax shooting, the Government knew that Detective Gene Parshall provided false or misleading information regarding the case against Mr. Umaña. Specifically, Parshall testified that co-defendants Luis Rivera, Luis Ramos, and Rene Arevalo all corroborated one another and all consistently stated that Mr. Umaña was the Fairfax shooter. PPT at 221-22.

---

[78] Additionally, as demonstrated in Claim V, the Government knew that other witnesses to the Lemon Grove homicide had either ruled out Mr. Umaña when shown photographic arrays and/or had identified individuals other than Mr. Umaña.

[79] In the initial § 2255 motion, then-counsel disclaimed that Mr. Umaña could not plead this, or any other claim, regarding the Government's failure to correct false or misleading information with any more particularity at this time because the factual bases for such claims rest on information known only to the Government. Since filing his § 2255 Motion, Mr. Umaña obtained some of the requested audio recordings of LAPD detectives' interviews, including an audiotape of their interview of Gonzalez the night of the shooting and on December 29, 2005.

That was not true. The transcripts[80] of the co-defendants' interrogations reveal that Detective

Parshall took Luis Rivera's version of what happened, gave it to the other two co-defendants, and

then warned the others that they could be blamed as the shooter if they did not tell the same story.

*See* Claim V. Even though Parshall provided the suspects with many of the relevant details,

including that Mr. Umaña was the shooter, Parshall instead testified that the other suspects

corroborated Rivera's story, stating:

> Basically [Ramos] said the same thing that Mr. Rivera had said, you know, about the gold [A]ltima. Driving on Fairfax. That Moe was the driver. That Umaña, or Wizard, had gotten out and shot the victims. And he talked about the -- he identified the same people being in the back seat of the car. And he described the confrontation with the two victims.

PPT at 184.

Parshall also testified that although he initially believed Rivera lied during his

interrogation, Parshall changed his mind after Ramos and Arevalo confirmed that Rivera never got

out of the car. PPT 201-202.

---

[80] The transcripts of the Arevalo and Rivera transcripts were admitted and provided to the jury. However, the way they were provided did nothing to fix Det. Parshall's testimony. As noted above, Parshall took Rivera's statement and gave the details to Arevalo and Ramos for them to recite under duress. The Government admitted the transcript of the Arevalo interview (Tr. Ex. 518, PPT at 230) and the transcript of the Rivera interview (Tr. Ex. 520, PPT at 220-21). But the text of Ex. 520 identifies the interviewee as Ramos. Tr. Ex. 520; *see also* PPT at 221 (Parshall identifies exhibit 520, stating, "[i]t's actually Luis Rivera's. My interview with Luis Rivera. Although it says Ramos, it's Rivera.") Consequently, when the jury reviewed the transcript during deliberations, it is reasonable to expect at least some would have concluded that Ramos's story was markedly analogous to Parshall's description of Rivera's story, thereby enhancing the incorrect belief that the three had independently corroborated each other. Moreover, the transcripts admitted did not include the various transcripts and recordings of conversations in which the co-defendants first gave different stories, and then agreed to tell their final versions after being coached by Parshall.

286

The transcripts of the interviews indicate that Parshall's testimony was false. It cannot be disputed that the suspects confirmed several facts to the detectives only after those facts were fed to them by the same detectives and only after they threatened the suspects with harsh penalties if the suspects did not corroborate that the story being fed to them. The jury was misled into believing that the consistency between the accounts given by Rivera, Ramos, and Arevalo provided these witnesses' statements with certain indicia of reliability when, in fact, the opposite was true: the statements were similar because they were the product of coaching and threats.

The Government emphasized the misleading information to rebut the defense's claim that the suspects' statements were unreliable. At closing, the prosecution argued:

> Here's what's significant, and you've got the transcripts. . . . And Arevalo's interviewed at a totally different time. And they point out some inconsistencies about who was sitting in the middle, who was sitting on this side. *The facts, as the officer told you, were consistent across the board.* This is how we pulled up. This is what happened. And man, he went off.

PPT at 894. The Court also relied on the detectives' account of the investigation when later denying a Motion for New Trial:

> As the Court recognized in its previous ruling, cross-examination of Detectives Parshall and Telis revealed that Rivera's, Ramos', and Arevalo's statements were somewhat self-serving in that each attempted to minimize his own involvement in the shooting. The statements were also inconsistent with respect to some details, such as who exited the automobile and whether they did so in the middle of Fairfax Street or after the Altima had pulled over the side of the road. However, each statement identified the defendant as the shooter and gave details of the shooting that were largely corroborative of each other and of the eyewitness account given by Bautista. Detective Parshall's accuracy in relating these statements to the jury was further ensured by the fact that the defendant was able to cross-examine him with his prior testimony in a state court proceeding.

Order Denying Motion for New Trial (Crim Doc 1165 at 10).

The "corroboration" between the suspects was material because, without it, it would have been nothing more than self-serving statements by gang members who had every incentive to point

287

the finger at someone other than themselves. The jury, however, had little reason to doubt the detectives' accounts of the witnesses' statements. Had the jury known that the consistency of these witnesses' statements was not the product of independent corroboration but rather the consequence of witness coaching and threats to prosecute the witnesses as the shooter if they did not each tell the same version of the story, there is a reasonable probability that it would have undermined confidence in the outcome.

### 3. Materially Misleading and False Evidence in Mr. Umaña's Interrogation Transcript

The transcript of Mr. Umaña's interrogation also included a string of falsehoods about the Los Angeles investigation that detectives used as an interrogation ruse.[81] Regarding the Fairfax homicides, detectives repeatedly falsely told Mr. Umaña that bystanders or eyewitnesses (not just the accomplices) identified him as the shooter. Gov. Ex. 522 at 6, 39-40, 73, 112, 143-44. In reality, only accomplices implicated Mr. Umaña as the shooter, and only after those accomplices were arrested and threatened with being charged as the shooter. The detectives also falsely told Mr. Umaña that the victims were both juveniles, ages 16 and 17 (*id.* at 68), when their actual ages were 17 and 20. (Gov. Exhs. 523, 525).

Regarding Lemon Grove, the detectives repeatedly falsely told Mr. Umaña that an accomplice named "Sin" talked to the detectives and implicated Umaña in the shooting. Gov. Ex.

---

[81] Mr. Umaña acknowledges that this Court previously denied him leave to amend/supplement his 2255 Motion to include the falsehoods in the interrogation transcript. Civ. Doc. 131. Nonetheless, Mr. Umaña includes these allegations here. *Napue* claims are *Brady* claims. *See United States v. Agurs*, 427 U.S. 97, 103-04 (1976) (describing three types of *Brady* claims, including presenting evidence the prosecution knew or should have known was false). Thus, this Court cannot consider the materiality of each instance of misleading or false evidence in a vacuum but must consider the materiality of the prosecution's falsehoods cumulatively as with any other *Brady* claim. *See, e.g.*, *Kyles v. Whitley*, 514 U.S. 419, 421 (1995).

522 at 167, 171, 181-82, 207. The detectives repeatedly falsely told Mr. Umaña that bystanders or eyewitnesses at Lemon Grove Park also identified him as the shooter (Gov. Exh. 522 at 160-62, 170-71, 212, 226-27), and that other people verified he was there (Gov. Exh. 522 at 186). In reality, the Government's evidence consisted of victim Freddy Gonzales tentatively identifying Mr Umaña as well as identifying multiple other people potentially as the shooter (Gov. Exhs. 506, 507; Claims 5 & 6, *supra*); and ballistics evidence purportedly "linking" (*see* Appx. 241 (John Nixon Report)) a .22-caliber casing from the Lemon Grove Park scene to two .22-caliber casings found at the Fairfax Avenue scene. Although police may be allowed to lie to defendants to elicit a confession, *see Frazier v. Cupp*, 394 U.S. 731 (1969), prosecutors may not lie to juries to secure a conviction, *Napue v. Illinois*, 360 U.S. 264 (1959). The jury had no way of independently verifying whether the detectives' factual assertions to Mr. Umaña during the interrogation were true or not, and the lies that detectives told Mr. Umaña went straight to the heart of the question before the jury – whether to believe the self-serving, hearsay statements of Mr. Umaña's codefendants and the tentative identification by Freddy Gonzales (both of which were, according to the lies in the interrogation transcript, corroborated by neutral eyewitnesses).

As explained in detail in Claim V and incorporated by reference here, the Government repeatedly presented false and/or misleading evidence to meet its burden of proof regarding the non-statutory aggravator of prior unadjudicated acts. The combination of this misconduct violated Mr. Umaña's Fifth, Sixth, and Eighth Amendment rights and reasonably affected the judgment of the jurors.

289

**CLAIM VIII.** **TRIAL COUNSEL FAILED TO ADEQUATELY OBJECT TO AND MITIGATE EVIDENCE OF JAIL LETTERS IN VIOLATION OF THE FIRST, FIFTH, SIXTH, AND EIGHTH AMENDMENTS.**

All other claims and allegations in this Motion are incorporated into this claim by this reference.

During trial the Government introduced over 200 pages of jail correspondence between Mr. Umaña and his co-defendants. Gov. Exh. 150 – 177. Trial counsel's performance in litigating the admission of these jail letters and failure to place the contents of the letters in proper perspective was objectively unreasonable and prejudiced Mr. Umaña. Admission of the letters was unduly prejudicial because it unfairly painted Mr. Umaña as a coarse person with repugnant religious and political views, in violation of the First, Fifth, Sixth and Eighth Amendments. The sheer volume of this material – over 200 pages of exhibits all told – along with the Government's misinterpretation of the writings and emphasis on the misinterpretation in closing all but guaranteed an unreliable verdict based on passion, not reason. *See Darden v. Wainwright*, 477 U.S. 168 (1986) (holding a fundamentally unfair capital sentencing process violates due process); *Dawson v. Delaware*, 503 U.S. 159 (1992).

For this claim, Mr. Umaña relies on the translations, by the government, of the letters in question without agreeing that the letters were properly or validly translated. Mr. Umaña makes this claim based on the letters as the jury saw and heard them and does not verify that the English presentation of these letters are correct or even represents his thoughts, as written in Spanish. On the contrary, as will be demonstrated below, the government's translations of the letters were materially misleading and inaccurate.

From mid-2008 until trial in March 2010, the Government intercepted letters written by Mr. Umaña and his co-defendants. The letters, written in extremely poor and varyingly illegible

290

script and mainly in Spanish, were largely long, rambling missives to co-defendants reassuring them of his allegiance to, and glorifying, MS-13; complaining about his predicament; reporting on jail events (such as a fight with another inmate); trying to keep up on gang-related gossip (who was in what clique and so on); and badmouthing certain individuals (such as "Nene," testifying gang member Rony Lopez) and groups ("rivals," the "police," the "Government," and so on). A few contained quasi-religious references to the "devil" and "beast." Some sections of the letters were written in code, by way of syllable transposition, or number, letter or symbol substitution. All were grossly misspelled (including the coded sections), arbitrarily capitalized and punctuation-free, without clearly delineated sentences or paragraphs and laden with profanity and slang.

On the first day of trial, April 12, 2010, through an exhibit list, the Government identified the specific letters it intended to introduce at either the guilt or penalty phase. *See* Crim. Doc. 986 at 8-10 (describing exhibits 151-163, 165-177 as "Jail Mail Letter" with an identifying "JMU" number). On April 14, 2010, these exhibits were conditionally admitted (subject to a later relevance determination) during the testimony of the Government's translator, Susan Conrad. GPT at 596-600; *see also* GPT 959. The actual letters were marked for identification with a number. A full translation of the contents of the letters were marked for identification with the number and the letter "a." And selections of the translated letter were marked for identification with the number and the letters "b" or "c." *Id*.

The day after conditional admission, trial counsel orally objected to the actual admission of the correspondence. GPT at 959-968. Trial counsel cited Federal Rule of Evidence 403 and 404, and explained "there's a variety of extremely prejudicial, unfairly prejudicial material," and "[i]t's going to take going through each letter, I think, one at a time because there's different specific reasons why there's prejudicial material in each of those letters." GPT at 960.

291

After taking evidence to establish authenticity and foundation, the Court instructed the Government to produce the letters for review. The Government complied, explaining that it would provide the "selections pulled from the translations . . . which it suggests are relevant." GPT at 1039. The Government initially provided the Court with Exhibits 161-170. Although it is unclear from the record, it appears the Government provided the Court with just the "b" or "c" selections of each exhibit.

The next day the Government added Exhibit 160 but withdrew Exhibit 170 for admission as to guilt. *See* GPT at 1061 (the Court confirming Exhibit 170 "will not be introduced as well."). Another letter, Exhibit 157a, had already been admitted, over a halfhearted objection to the lack of foundation. GPT at 901.

After the Court's review, trial counsel was provided with the opportunity to object to each letter the Government sought to introduce at the guilt phase. GPT at 1047-54. Trial counsel made only perfunctory objections addressed to each letter as a whole, generally citing grounds of relevance, undue prejudice, and future bad acts as grounds to preclude the admission of the entirety of each letter. *Id*.

In response, the Government argued that the "selections from the letters" were needed to "prove the enterprise, continuing involvement in the enterprise, running the enterprise, making sure that gangs are still coordinated, who the members are, sending information regarding the continued running of the gang, and the continued organization of the gang. … And the selections of these letters prove -- would support that." GPT at 1056.

The Court made an oral ruling that "having considered the substance of the letters in light of the proffered reasons for the admissibility, I find that the probative value is not substantially outweighed by unfair prejudice, except with respect to letters number 167 and 169." GPT 1061.

As to Exhibit 160, the Court stated, "I believe that the excerpt that the Government intends to publish is highly probative." GPT at 1061.

Although the Government had been identifying only the "selections" as "relevant," GPT at 1039, and trial counsel "assumed" that the Government "were offering just the selections," GPT at 1054, the Government moved to admit, without any objection, both the full translations and the selections of the letters. GPT 1127-28.  As such Exhibits 157, 157a, 157b, 158, 158a, 158b, 158c, 160, 160a, 160b, 161, 161a, 161b, 162, 162a, 162b, 163, 163a, 163b, 165, 165a, 165b, 166, 166a, 166b, 168a, and 168b, were admitted into evidence during the guilt phase of trial.  Even though all these exhibits were available during deliberations, the Government only published Exhibits 161b, 163b, 166b, and 168b during the guilt phase. GPT at 1138.

At penalty phase, the Government moved to admit Exhibits 152, 153, 158, 171, 172, 174, 175, 176 and 177. PPT at 299, 349. Trial counsel offered little resistance. Instead of identifying and challenging the contents of each exhibit, trial counsel objected to the "one" where "there's some racial description," PPT at 293, and lodged a general objection to all letters that "it's unreliable evidence under 3593(c) and that the probative value is outweighed by unfair prejudice, misleading the jury and confusing the jury, as well as authenticity." PPT at 306. The Court admitted these exhibits, finding each to be "probative on the issue of future dangerousness and deal, in general, with attempts to run MS from inside prison, to intimidate and control potential witnesses, to engage in acts of violence, and direct acts of violence." PPT at 299. As examples, the Court noted Exhibit 158 "talks about being Mara to the day we die," and Exhibit 174 "talks about putting a light  on certain cooperating witnesses." *Id*. The Court, however, admitted Exhibit 152 only after the Government claimed to have redacted a "racial comment."  Thus, the letters, full translations, and selections were admitted into evidence and later released to the jury.  The

293

Government, however, failed to request that Exhibit 170 be entered into evidence – even though, as discussed below, the Government quoted from the exhibit during closing argument.   PPT at 349-50, 377, 943. Only Exhibits 153, 153b, 158, 158c, 172, 172b, 174, 174b, 175, and 175b were published to the jury. PPT at 376-77.

Trial counsel's performance with regard to these letters was ineffective at every critical step of the proceedings, beginning with an abject lack of preparation evidenced throughout all pre-trial portions of the record.

Trial counsel had a duty to review and evaluate the entirety of the case file, which included an estimated 8,000 documents requiring translation that could have contained material inculpatory or exculpatory information. Counsel first failed to obtain proper and timely translations in order to facilitate review and evaluation or request a remedy from the court in the event that they could not obtain proper and timely translations. Trial counsel were well aware of their obligation and in fact, highlighted the importance of this review for the court in their motion for a continuance[82].

---

[82] "Defense counsel needs to be able to understand the evidence in this case in order to adequately represent Defendant. Defense counsel has been given over 7,900 pages of documents and 327 minutes of audio recordings that they cannot understand because they do not speak Spanish. Without an ability to understand this information, defense counsel have no way of knowing how to prepare to defend against the introduction of this evidence. Additionally, defense counsel will never know whether any of this evidence contains exculpatory material. Defense counsel is left to beg the Government to share its translations. Even were the Government willing to share everything they have, it appears that they have not translated the majority of this information and apparently have no intention to do so, at least not for this trial. This circumstance denies Defendant due process of law. At a minimum due process requires Defendant to be able to know what the evidence against him will be. The government is not required to request the court for permission to have Spanish documents or audio recordings translated, but because Defendant is indigent he must seek approval from the court." Crim. Doc. 689, Defendant's Renewed Motion for Continuance.

Although the discovery and translation process was ongoing throughout pre-trial proceedings, the record indicates that at least a portion of the letters the Government sought to use were not provided to trial counsel until shortly before trial. GPT at 967-68.

Mr. Umaña will show at a hearing that trial counsel were not aware of the full content of the letters and unprepared to conduct the required legal analysis. It is unacceptable for trial counsel to fail to review critical parts of discovery material simply because they are in a foreign language. Had the letters been in English, and contained unassailable proof of innocence, it would be clear ineffectiveness for trial counsel not to have utilized that information. The fact that these particular letters required an additional step of translation does not diminish counsel's duty and is functionally equivalent to failing to conduct a complete review of the file. *See Rompilla v. Beard*, 545 U.S. 374 (2005).

Counsel not only failed to investigate to adequately educate themselves on the content of the letters but also failed to perform reasonably in preventing the letters from being introduced as evidence, or, alternatively, ensuring that the letters received proper redaction and/or accompanying jury instructions.

Counsel had ample opportunity to address the evidentiary value of the letters pre-trial and yet did not address the issue at all until trial had begun. In fact, the Court expressed frustration with the parties for bringing the matter up late in trial and not briefing the issue. *See* GPT at 965-66:   "It would have been nice if the attorneys had spotted this issue and could have briefed it. …

295

It is pretty hard to deal with it on a blanket basis and therefore I'm kind of surprised to be put in this situation at 4 o'clock on a Thursday by counsel on both sides who are experienced and could have anticipated this and given me a better -- you know, an earlier opportunity to look at this and make a ruling.").

Finally, defense counsel acted unreasonably by failing to object when the prosecutor, during rebuttal closing argument, read from a letter (Exhibit 170) that was never moved into evidence.

### A. Trial counsel's performance was objectively unreasonable.

#### 1. Counsel unreasonably failed to object to Ms. Conrad's testimony

Defense counsel initially overlooked the obvious and primary objection that the Government's expert, FBI Analyst Susan Conrad, was not qualified to translate documents.

Ms. Conrad, a language analyst, did not testify that she was appropriately certified as a translator. See GPT 568-72. She explained to the trial court that she served as a language analyst, and interpreted frequently and even though she did some contract work on "document translation," the majority of her work is some form of interpretation. *Id.*

The U.S. Supreme Court has recognized, in the context of the use of interpreters and translators in federal trials, that there is a difference between the profession of "interpreter" and that of "translator." *See Taniguchi v. Kan Pacific Saipan, Ltd, 132 S. Ct. 1997, 182 L. Ed. 2d 903*

*(2012)*("[b]ased on our survey of the relevant dictionaries, we conclude that the ordinary meaning of 'interpreter' does not include those who translate writings."). In making its determination, the Supreme Court relied on "relevant professional literature [which] draws a line between interpreters, who are used for oral conversations, and translators, who are used for written communications." *Id.* at 2004. Trial counsel failed to recognize and object to Ms. Conrad's experience as an interpreter qualifying her as a translator[84].

"The most widely accepted certification for translators in the United States is run by the American Translators Association (ATA). To become certified, a translator must sit for an exam in which they translate two passages of 300 words each. The test is blinded and scored by two separate ATA examiners, and test[takers] must receive 17 or fewer error points to pass the exam. The current pass rate is less than 20%. Certified translators must complete 20 continuing education hours every three years and remain members of the American Translators Association." Appx. 270, Declaration of Translator Haag.

There was no testimony that Ms. Conrad was ever certified by or had any association with the American Translators Association. Even to the extent that the court was prepared to afford Ms. Conrad's translations the same deference it would have afforded a certified and duly sworn court translator, the translations would not have met the requirement rules for hearsay exceptions and

---

[84] Even assuming, arguendo, that Ms. Conrad was utilized solely as an interpreter, her testimony would not have been proper as such because she did not adhere to any of the standards governing official court interpreters, enumerated in Fed. R. Evid. 604.

should not have been admitted.[85] Counsel's failure to raise this meritorious challenge was also

ineffective.

### 2. Trial counsel failed to request redaction of the letters and limiting instructions

The letters the Government introduced contained a multitude of irrelevant and prejudicial

statements, including: (1) religiously inflammatory remarks; (2) politically inflammatory remarks;

and (3) generally coarse language (including sexual innuendo and profanity) and other improper

topics. At the least, counsel should have required the government to redact the letters regarding

---

[85] *See United States v. Zhu*, 854 F.3d 247, 259 (4th Cir.2017), "Our analysis of whether an interpreter's translation constituted hearsay is governed by *Vidacak*, in which we considered whether the out-of-court statements of an interpreter constituted hearsay where he was translating for a criminal defendant who was being interviewed by an immigration officer. See 553

F.3d at 351-52. We explained that "except in unusual circumstances, an interpreter is no more than a language conduit and therefore his translation does not create an additional level of hearsay." *Id*. at 352 (internal quotation marks omitted). Further, we recognized "a narrow exception that is applied where the particular facts of a case cast significant doubt upon the accuracy of a translated confession." Id. (internal quotation marks omitted). *See also United States v. Shibin*, 722 F.3d 233, 248 (4th Cir. 2013) ("[I]nterpreted testimony might be unusable without the interpreter's presence," if "the particular facts of a case cast significant doubt upon the accuracy of a translated [statement]." (internal quotation marks omitted)).
In order to determine if this "narrow" exception applies, *Vidacak* identifies four factors for district courts to consider: "1) which party supplied the interpreter; 2) whether the interpreter had a motive to mislead or distort; 3) the interpreter's qualifications and language skills; and 4) whether actions taken subsequent to the conversation were consistent with the statements translated." 553 F.3d at 352 (internal quotation marks omitted)." Here, the translator was an agent employed by the Government, who was not qualified as a translator and who significantly altered and 'cleaned up' incoherent stream of consciousness ramblings while translating.

these elements, and requested the appropriate accompanying instructions, both of which trial counsel was legally entitled to do.[86]

### a. *Religiously inflammatory remarks.*

Several of the admitted jail letters contained references to the "Beast" and the devil. *See* Govt. Tr. Exhs. 161a at 3; 161b ("We are and we always will be the Mara until God in heaven and the Beast come to remove us from this earth, they are going to have to hear us."); Govt. Tr. Exhs. 166a at 2; 166b ("I greet you in honor of the big hood with my claw on my forehead, the other on my heart, hoping that when you receive this letter the Beast has you enjoying good health, happiness and cheer"); Govt. Tr. Exh. 177a ("Anyway, I'm fine now, thanks to the Beast. You know the devil's always with us. But first of all, it's an honor for me to hope, before the two great big letters, that the Beast is with you. . . . They have no idea who the Beast is. And I'll never leave this crazy life until the devil comes for me. . . . And fuck the cops. They have no idea

---

[86] Considering that the Government only ever requested to admit "selections," from the letters, defense counsel had no reason to permit the entirety of these damaging letters to be moved into evidence. *See* GPT at 1039 ("MS. ROSE: And the Government has attached to the exhibits, Your Honor, the selections pulled from the translations that it submits to the court … it would wish to publish. So the Government selected those portions which it suggests are relevant."): GPT at 1054 ("MS. ROSE: I will only say, Your Honor, that we and the defense has copies of selections that we've pulled from those. Some selections are relevant for sentencing. Some we would contend are relevant for sentencing. Some we would contend are relevant for the guilt phase."); GPT at 1054-55 ("MS. ROSE: Those [selections] would be the only thing that the Government would publish, or would seek to publish."); GPT 1055 ("MS. ROSE: Yes. And there are some selections, the ones we are also offering at sentencing -- I mean, the guilt, that I think are more probative for sentencing that I wouldn't produce to the jury."); GPT at 1056 ("And so all of the statements that the Government would offer at this stage, relate to his membership in MS, his allegiance to MS. And the fact that he wants – the controlling of the other gangs -- this trial has been about respect, it's been about control. And the selections of these letters prove -- would support that.").

299

who the Beast is.").[87]  Read in context, these references indicate that "the Beast" has a deity-like significance for Mr. Umaña and his correspondents. The term is used where a conventional writer of Christian faith might invoke "the Lord," and is often understood as a reference to the devil (indeed, the author of Govt. Tr. Exh. 177, directly equates "the Beast" with "the devil").

But evidence that "prove[s] nothing more than [the defendant's] abstract beliefs" may not be admitted at the penalty phase of a capital trial. *Dawson v. Delaware*, 503 U.S. 159, 167 (1992). Such evidence, at its core, concerns the defendant's exercise of his speech, religious exercise, and associational rights, and is protected by the First Amendment. Admission of "abstract beliefs" evidence – where it has no relevance to any sentencing issue – is impermissible, particularly where "one is left with the feeling that the . . . evidence was  employed simply because the jury would find the[] beliefs morally reprehensible." *Id*. Thus, the repeated quasi-religious references in the letters should have (and easily could have) been redacted from the exhibits, just as the Court required the Government to do for a racially inflammatory comment. PPT at 300-01 (admitting letter subject to redaction of racial references).

### b.   *Politically inflammatory remarks.*

The letters also contained countless expressions of general anti-government, anti-police, and anti-imperialist political sentiment. These, like the "Beast" references, were totally irrelevant "abstract beliefs" admitted in violation of *Dawson* and 18 U.S.C § 3593(c) that effective counsel would have required to be redacted.

---

[87] Exhibit 170, which was not admitted into evidence, but from which the Government read during rebuttal closing argument also contains similar "Beast" references.  See Exhibit 170a at 3, 170c ("[The song is] called 'One More Day with the Beast.' One more day has now begun and I thank the Beast that we keep on standing here with a joint of weed and belonging to my gang.")

### c. *Anti-government or anti-imperialist beliefs.*

The vast majority of the letters include references which could be construed as anti-government, either by expressing frustration with the specific legal and law enforcement directly affecting Mr. Umaña, or in the abstract sense of voicing criticism of American imperialism. A few striking examples include:

> [God has caused natural disasters like earthquakes in various countries like Haiti, Guatemala, and El Salvador.] All this has happened in the smallest and poorest countries, right? **Can you imagine the earthquake that's coming directly to the USA, which is a rich country, one that discriminates, and one of murderers? Up to this time, they have not paid for the damage and humiliation this country has caused to neighboring countries.** It is not going to be the only one earthquake because the earth is going to tremble. It is also going to be because in the aftermath most other countries are going to create a huge war against them that they are not expecting, and this is all starting in 2 thousand11. Remember this date: January 11th, 11:11 am or 11:12 am or 11:13 2011 US. We are still going to be here when we experience that. The walls of these jails are going to open up, and we will be free. It will be up to us if we stay in this country or not.

> . . . . [T]he other two years, 2012 and 2013, are when these little Americans are going to be humiliated by all Hispanics from Central America, South America, and Latin America, especially by prisoners, drug dealers, mafias, and gangbangers. Four points that Earth has and on which the USA has not counted; therefore, we are going to have the pleasure and the privilege to mock them, even though they keep us locked up at this time. USA fears death. They only fight with the Hispanic Americans' balls which are the ones that go to the front to gain respect or to give their lives . . . .

Exhibit 176a (emphasis added.) This was possibly delusional but also quintessential political speech, at the core of the First Amendment's protections, *Morse v. Frederick*, 551 U.S. 393, 403 (2007) – and it had no business coming into evidence in this case.

Mr. Umaña's views of the United States' role in international politics was not on trial – at least, not until the Government improperly made it so. *See* PPT 899 (prosecutor's closing argument compelling the jury to bring "American justice" to this foreign-born defendant). Obviously, its probative value (zero) was outweighed by the high risk of unfair prejudice. Indeed, the Court found

a similar letter to be inadmissible on precisely these grounds. *See* Crim. Doc. 998 at 6 n.2 (excluding Exhibit 169 because it "contain[ed] a lengthy diatribe accusing the United States of subjugating Latin-Americans and predicting their violent uprising"). As with the "Beast" references, "one is left with the feeling that [this political material] was employed simply because the jury would find these beliefs morally reprehensible." *Dawson*, 503 U.S. at 167. This letter too, could have and should have been redacted.

### d. Defiance towards police.

Along similar lines, the letters expressed distrust of, and defiance towards, the police, casting the matter essentially as a struggle of "my people" against a powerful oppressor:

> [T]hat's why my people are never in peace here because the cops are always after people with my background. Fuck the cops, that trash is always killing the homeboys from my country. And how do they want you to change when even the authorities go around spilling blood. They are just the same, they just have paramilitary authorization, and they are a legal part of the Government, and in larger quantities. . . .
> . . . . We don't give a fuck about the enemy and the fucking cops. And also, fuck them because the Salvatrucha will remain here . . . .

Exhibit168a; *see also* Exhibit 161a at 3, 161b ("We need to figure out what's up with these fucking assholes that want to lock up our best warriors who are controlling those fuckers who keep making up things."); Exhibit 161a at 3("They are always looking for rivals and police because these fuckers keep making up a lot of things and locking up my homies."). Though perhaps crudely put, the expressive choices here give voice to "otherwise inexpressible emotions," *see Cohen v. California*, 403 U.S. 15, 25-26 (1971), related to the widespread perception of Salvadorans that police are involved in criminal activity, fail to protect the public, and are involved in death squads. *See, e.g.*, Juan Fogelbach, *Gangs, Violence, and Victims in El Salvador, Guatemala, and Honduras*, 12 San Diego Int'l L.J. 417, 455-58 (2011).

302

Again, this is core political speech – unnuanced and immoderate though it may be. *See Cohen*, 403 U.S. at 26 (the First Amendment protects "not only informed and responsible criticism but the freedom to speak foolishly and without moderation"). Whether Mr. Umaña feels the police are "always killing the homeboys from my country" and "locking up my homies," Exhibits 168a & 161a, have nothing to do with any "attempt[] to run MS from inside prison" or "to intimidate and control potential witnesses." *See* PPT 299. Neither does it amount to an attempt to "engage in acts of violence" or "direct acts of violence." *Id*. These remarks simply do not fall into any of the categories the Court found to be relevant "in general"; indeed, they are quite unlike the examples the court gave of probative statements. *See* PPT 299-300 ("being Mara until the day we die" and "putting a light on" certain witnesses). As such, these and all similar references should have been redacted by effective counsel. *See Wisconsin v. Mitchell*, 508 U.S. 476, 485-86 (1993) ("a defendant's abstract beliefs, however obnoxious to most people, may not be taken into consideration by a sentencing [jury]").

### e. Coarse language and other remarks.

The letters also contained countless instances of bad language and profanity with no conceivable relevance and significant risk of unfair prejudice, especially when referring to the United States Government and law enforcement. This included liberal usage of descriptors like "asshole," "fuck, "fuckers," "fucking," "motherfuckers," "sons of bitches," "bitch," "bitching," "shit," "full of shit," "bullshiting," which were repeatedly present in all of the letters.

In a similar vein, the letters contained homophobic,[88] sexist remarks, sexual innuendo and sexually charged anecdotes. *See* Exhibits 152a (discussing a female guard in a objectifying,

---

[88] The terms "fags" and "faggot" are used throughout the letters.

derogatory manner), 160a (recalling conversation with a "Griselda" in which he tells her he has a "new stick" and describes "great whippings [she got] from me")  & 162a (making lewd comments about another "homie's girl" that he had "jacked off to her" many times and asking  for "a photo of your sister"), 174a (discussing not "lending" "Salvadorian women" to "anyone").

There were also several references to poverty. Exhitit 160a (". . . I don't have anything on my account and they won't give me envelopes with the 6 cents I have"), 152a (he could not afford to "send her anything" for her birthday); 172a (asking for money). These statements raised the inferences that Mr. Umaña was not only poor but also lacked anyone on the outside willing to help him financially. *See United States v. Socony Vacumm Oil Co.*, 310 U.S. 150, 239 (1940) ("appeals to class prejudice are highly improper and cannot be condoned").

Finally, some of the admitted statements suggested that Mr. Umaña was indifferent to receiving the death penalty.   *See* Exhibit 158a ("we have to prepare ourselves if they say it's for life or they are going to inject our balls"); 162a at 4 ("I don't care if I even have to pay with my life. I will face it."). This presented the "intolerable danger that the jury [would] choose to minimize the importance of its role" by rationalizing away the "gravity of its task" – that is, its decision would hardly represent a "truly awesome responsibility," *Caldwell v. Mississippi*, 472 U.S. 320, 333, 341 (1985), if the defendant himself "[didn't] care" about the outcome. Trial counsel should have sought to excise these comments prior to admission of the letters.

**B. Trial counsel unreasonably failed to object to the full translations of the letters being released to the jury during deliberations.**

In addition to failing to request redaction of the letters, trial counsel was ineffective for failing to object to the full translation exhibits -- rather than just the selection exhibits -- being introduced into evidence and released to the jury during deliberations. The government sought to introduce only selections from the letters and only selections were admitted, but in front of the

304

jury, the government filed and presented the full letter along with the selection. GPT 1039, 1056. These full letters went to the jury as exhibits during deliberations.

The discussion of admissibility of the letters focused on the "selections," that is the "b" or "c" exhibits, and not the full translation "a" exhibits. Indeed, the Government only provided the former, and not the latter, to the Court for review deeming only those "relevant."

Indeed, it was in the context of the "selections" and the Government's proffer regarding the selections that the Court admitted the exhibits. *See* GPT at 1061 ("I believe that the excerpt that the Government intends to publish is highly probative."). In light of the Government's proffered reasons for admitting the selections and the Court's careful consideration of just the selections, failure to object to the admission of the full letter "a" exhibits was unreasonable. There simply was no legitimate reason that the jury should have been exposed to the additional non-relevant information as well as a double dose of the selections. In other words, especially considering the danger of the unfair prejudice, the full letters on top of the selections was simply cumulative, overly prejudicial and failed to comport with the court's order.

**C. Trial counsel unreasonably failed to object to the Government reading a letter during closing argument that was never ruled upon, nor introduced at trial.**

Although it appears the Government intended to introduce Exhibit 170 into evidence during trial, it failed to do so. During the guilt phase, the exhibit was not addressed by the Court because the Government said it would not be moving to introduce it until sentencing. *See* GPT at 1055 (Government informing court that "Exhibit 170 is a sentencing" document); GPT 1061 (the Court indicating that Exhibit 170 "will not be introduced" based on the Government's representation that they "were going to offer 170 at sentencing"). But the Government never

305

moved to admit Exhibit 170 at sentencing. *See* PPT at 349 (moving other letters into evidence); PPT 943 (the Court, court clerk and trial counsel confirming that Exhibit 170 was not admitted).

Despite the exhibit not having been admitted, and without objection, the Government quoted from the letter at length during rebuttal closing argument during the penalty phase. The Government argued:

> You all saw a lot of letters that the defendant had written. I want to share one with you. … This one is called -- it's got a title. One more day with the beast. Do you remember who the beast is? It's tattooed on his body. It's in his heart. It's the devil. It goes like this:
>
> "One more day has now begun and I thank the beast that we keep on standing here with a joint of weed and a fully loaded gun, ready and prepared to go out into the streets like I have always planned. I don't know the fate of this day, but let me tell you, I'm still here in this world and belong to my gang. Mara Salvatrucha 13 is what I belong to. Day by day I go out into the streets to look for those F'ing gangs and the only thing I find is the F'ing police who want to arrest and F with my gang. That is the risk I take every day with these F'ing good for nothings and these F'ing police who want to finish off the destiny of my gang. But I tell them it can't be done yet because now we have come to control. Because we have come to belong to Mara Salvatrucha 13, to represent so all these fags can listen to us and know that they don't have to play and that they have to respect the Mara Salvatrucha. Damn F'ing good for nothings and that F'ing authority. They will have to suck up to us and even though they don't believe it, the Mara Salvatrucha has to triumph. On the streets or in the prisons, we are always going to control."
>
> That's his message to you. Those are his words, his thoughts and his message to you. It's his challenge to you. He's mocking justice.

PPT at 900-01.

Trial counsel's failure to object to the reading this letter was unreasonable and prejudicial. It is well settled that it is improper for a prosecutor to argue facts not in evidence. *See United States v. Certified Envtl. Servs., Inc.*, 753 F.3d 72, 95 (2d Cir. 2014) (Government concedes comment referencing "facts not in evidence, was improper"); *Macias v. Makowski*, 291 F.3d 447, 452 (6th Cir. 2002) ("It is thus 'improper for a prosecutor, during closing arguments, to bring to the attention of the jury any purported facts that are not in evidence and are prejudicial.'") (quoting *Byrd v.*

*Collins*, 209 F.3d 486, 535 (6th Cir. 2000)); *United States v. White*, 222 F.3d 363, 370 (7th Cir. 2000) ("Argument referencing facts not in evidence is clearly improper, and we conclude that the prosecutor engaged in misconduct in making the challenged statement."). This letter was not admitted in evidence, overtly prejudicial and could have been kept out by a simple objection that trial counsel failed to make.

### D. Trial Counsel unreasonably failed to mitigate the jail letters.

#### 1. The code was unsophisticated and could be written by a child.

Although trial counsel was aware months before trial that the Government would be presenting evidence of coded jail letters, and possibly testimony of a "cryptanalysis," *see* Crim. Doc. 689 at 6-7, they failed to adequately investigate the code. With investigation and consultation, trial counsel could have explained that the codes in the letters were simple and could have been produced by a child or an uneducated, brain damaged defendant from El Salvador. Simple internet research, consultation with a "cryptanalysis," or similar expert would have allowed counsel to cross-examine the Government's witnesses, or present their own witnesses, to demonstrate the letter, number or symbol substitution code used was no more complex than games children play.

In fact, the number substitution code used in the letters was a child game commonly played in El Salvador called "Murcielago." As explained in a Highlights for Children article, "murcielago" is the Spanish word for "bat," and "Salvadoran children write messages to each other in a code they also call murcielago." Marcia Popp, *Secret code: a secret code from El Salvador*, 62 Highlights for Children, 7 (2007). This "bat code" just substitutes a number for each letter of the word murcielago. *Id*. As shown below, an FBI Laboratory Report of Examination provided to trial counsel over six months before trial documents the use of this code:

307

The following key was used to decrypt the enciphered portions of Item Q1:

| Plaintext | M | U | R | C | I | E | L | A | G | O | B | D | F | H | J | K | N | P | Q | S | T | V | W | X | Y | Z |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ciphertext | 1 | 2 | 3 | 4 | 5 | 6 | 7 | X | 9 | 0 | B | D | F | H | J | K | N | P | Q | S | T | V | W | | Y | Z |

[*Note: On various occasions, ciphertext character "1" was also used to encrypt plaintext character "N"; and ciphertext character "5" was used to also encrypt plaintext character "S". The ciphertext character for plaintext character "X" was not used.*]

*See* Appx. 77 at 8. Significantly, this is the code used in two of the Government's exhibits introduced at trial. *See* Exhibit 163 and 170.

Further, even though the codes were simple, trial counsel failed to present evidence or otherwise inform the jury that many of the recipients could not understand the contents of the code. *See e.g.* June 29, 2010 Sentencing Transcript Castellon, at 100 (Officer William Hastings testifying that "some of the defendants honestly – were not – didn't get a lot of the codes, didn't understand them when they were sending letters."); Exhibit 172b ("I wrote to him in this fashion, but I don't know if he was able to read it because he has not responded to me.").

Moreover, trial counsel was unreasonable for failing to present evidence that the use of codes in the letters did not show any high degree of skill. Prior to the *Atkins* hearing, trial counsel provided several letters and the FBI Laboratory Report of Examination to Dr. Olley. The report documented several of the "codes" used in the letters, such as number and letter substitution, and syllable and word transposition. *See* Appx. 77. Dr. Olley later testified at the hearing that the use of code was "not incompatible with mental retardation," Atkins Hrg Nov. 30, 2009 at 137, and could have been done by an 11 year old. *Id*. 138. *See also Id*. 70-71 (the transposition of syllable code is "similar to Pig Latin, except simpler," and its "something that children do in El Salvador"); *see also* Appx. 70 at p. 5 (Mr. Umaña scored in the bottom 2% of the norms for 'digit-symbol coding,' any coding he performed was bound to be slow and easy for most people). Counsel unreasonably failed to present this or similar testimony at trial.

### 2. The writing in the letters was poor.

The original Spanish letters were exceptionally poorly written – the handwriting is a sloppy mix of print, cursive, English, Spanish, and a vast quantity of the grossly misspelled words are illegible or generally unintelligible. There is no adherence to spacing or formatting, no sentence or paragraph structures and every single letter is arbitrarily capitalized and almost entirely punctuation free.

One defense interpreter, who was not called as a witness, described the original Spanish letters for counsel; "you might not find much sense in them since Alejandro does not separate words, repeats his thoughts over and over, has gross misspelling errors, follows no sequence of thought, jumping from one issue to the other, and writes guided by the phonetic sound of words." Atkins Hrg. Def. Exh 12 Even the Government's expert testified that the author of the letters was a "very poor writer" as to "punctuation," GPT at 605, and that "at first" she found the letters "difficult to read." GPT at 605-06.

However, Ms. Conrad's translations, which were relied upon by the Court in its admissibility determinations (and in the *Atkins* hearing), utilized by the Government during the trial and submitted to the jury as evidence, had no apparent errors in spelling, punctuation, grammar or sentence structure. The original Spanish versions of these documents were stream of consciousness gibberish without sentence structure, paragraph breaks, any understanding or use of grammar and constant misspelling, phonetic spelling. Counsel recognized the importance of mitigating and contextualizing the letters by valid or proper translation. In their August 19 Motion for a Continuance, counsel stated:

> While Defendant's attorneys have received most of the English translations of these recordings, they have received just a few of the Government versions of these translations. Comparison of the two versions reveal that the Government translations are strikingly different and substantially more inculpatory than the

309

translations that Defendant had received from his translator. Yet there are many more Government translations Defendant has yet to receive.

Crim. Doc. 661 at 3, Defendant's Motion to Continue (08/19/09) (Ex. Parte).

Despite being acutely aware of the "striking" nature of this problem, trial counsel inexplicably failed to secure and present their own expert or translations of these letters, to illustrate the dichotomy for the jury. An expert such as Dr. Robin Riner, a professor of Language Anthropology, could have explained how the translations misrepresented Mr. Umaña and very significantly misconstrued his psychological and cognitive state. Dr, Riner explained that even though a translator must make decisions about how to translate a document, those choices should allow the reader to experience the original thoughts within the realm of the receiving culture that is – with a 'culturally acquired sense of correctness.' This process should not involve bias and should not significantly change the representation of the original author. Appx. 268 (Dr. Riner's report).

As Dr. Riner explains, Ms. Conrad violated these ideas and engaged in obvious bias by adding punctuation, adding paragraph breaks, changing the capitalization of words (the original had random words capitalized), engaging in the selective translation of slang words, and correcting grammatical errors and misspellings/phonetic spellings of words. These acts by Ms. Conrad:

> constitute standardizing Mr. Umaña's language, which means converting it so that it resembles Standard Spanish and Standard English in the translations. This standardization misrepresents both the Spanish dialect Mr. Umaña uses, as well as the style of his speech. It formalizes language that is otherwise very informal.

Appx. 268, Declaration of Dr. Riner. Ms. Conrad's changes to Mr. Umaña's original writing serve to standardize Mr. Umaña's language and misrepresent the original text. Standardizing or "cleaning up" one's language leads to false assumptions about the original writer's character, intention, and mental state. While some of the changes by Ms. Conrad may not

310

change the referential meaning of the text (i.e., the "dictionary definition" of the words) – though in some cases they do – often they change what linguists refer to as the indexical meaning of the text. Indexical meaning is the socially informed meaning of an utterance or word. Dr. Riner concluded:

> The changes made to Mr. Umaña's language in the translations misrepresent his cognitive state, as his disorganized syntax is altered through the translator's addition of punctuation and paragraph breaks and the transformation of his sentences into standard grammar. His letters in fact read like stream of consciousness rambling, not standard written language as they are presented in the translations.

Appx. 268, Declaration of Dr. Riner.

An expert in rap lyrics, such as Dr. Erik Nielson, could have further explained that Mr. Umaña's "songs" in the letters are simplistic, highly repetitive, lacking in unique composition. Appx. 238 at 5, Report of Dr. Erik Nielson. Dr. Nielson observed, about Mr. Umaña's written song "Un Dia Mas Con La Bestia," that "as it progresses, it loses its musical or poetic qualities, and by the end, even the handwriting loses structure; it becomes erratic, enlarged, and sloppy, eventually to the point where it no longer falls within the lines of the page. This, along with the frequent spelling errors and highly derivative content, suggests that Mr. Umaña's artistic abilities and command of language are limited at best." *Id.*

The Government read this particular poem to the jury and argued, in essence, that this was not a poem but instead a literal threat. "That's his message to you. Those are his words, his thoughts and his message to you. It's his challenge to you. He's mocking justice." PPT at 882. Had the letter contained the rhythm and rhyme scheme of the Spanish version, the hyperbolic nature of the content would have been clear to the jury. Translated into English, however, the letter lost most of the signifying markers that would have illustrated for the jury that this was a piece of creative

writing. Therefore, in failing to object to the use of the poem or, at a minimum, highlight the manner in which the translation changed the meaning of the writing, trial counsel unreasonably failed to mitigate the government's persuasive argument that the letter represented a literal "challenge." Id.

Counsel failed to point out, to the Court or to the jury that the translation of Mr. Umaña's letters misrepresented or mischaracterized him at a very basic level. He could not coherently, in writing, express thoughts, plans, schemes or organizational ideals in his Spanish stream of consciousness letters, yet after transformation by Ms. Conrad he (to the jury) is clearly expressing malicious thoughts. Trial counsel was obliged to make sure the jury saw Mr. Umaña, his abilities, capacity, and actions to judge his moral culpability. Trial counsel failed that obligation when allowing Ms. Conrad and the prosecution to misrepresent Mr. Umaña in the translated, cleaned up, letter exhibits. *See* Appx.78 (translation of Mr. Umaña's writing with non-standard spelling, capitalization and word spacing as reflected in the source). *Atkins* Hearing, Def. Exh. 12.

Furthermore, Ms. Conrad made substantive changes within the letters according to her subjective understanding of the meaning. Modifying the document in accordance with the translator's own personal opinion is expressly forbidden by the accepted standards of professional translation, and it is especially egregious when a source or "glossary" for those opinions is not disclosed to the jury. Appx. 270, Declaration of Translator Haag. Trial counsel unreasonably failed to object to Ms. Conrad's "translations" and secure appropriate expert testimony to explain to the Court and the jury that Ms. Conrad's translations were not an accurate representation of Mr. Umaña's literacy, communication skills, cognitive abilities, and internal thought processes.[89]

---

[89] In *United States v. Garcia*, 752 F.3d 382, 386 (4th Cir. 2014), this Court vacated the verdict and remanded a case for a new trial, in which an FBI Special Agent "testified during trial as to the

### 3. Evidence that Mr. Umaña was not threatening Luis Ramos (aka Chipis) in a letter.

The Government claimed that the letters contained "orders" to "get Chipis." PPT 898, 900. One of the letters introduced by the Government, Exhibit 152a, however, contained a note to Chipis that according to an FBI language analyst, Edgar Cortes, was a "plea for help," and not a "veiled threat." Appx. 76. Trial counsel unreasonably failed to direct the jury's attention to and present evidence of Mr. Umaña's "call for help through commiseration and old friendship." *Id*.

Language Analyst Conrad consulted Cortes about the message to Chipis in Exhibit 152a. The "Umaña-speak" was giving her "headaches," and she wanted to make sure he was not "communicating a threat" against Chipis. Appx. 76. She provided Cortes the full text as written in Spanish. Cortes noted the "horrible text" and he retyped it in the "proper Spanish transcription." *Id*. Cortes summarized the message as "a letter between 2 old friends, who have teased and joked with each other in the past." *Id*. As to "the tone of this letter," Cortes said, "it strikes me as an (sic) Umaña's plea for help, not as a veiled threat." *Id*. Cortes, concludes the email: "I don't consider this is a threat, but actually quite the opposite: **this is a call for help through commiseration and old friendship. <u>Umaña's scared to death.</u>**" *Id*. (emphasis in original). Trial counsel unreasonably

---

meaning of coded references in several of the calls used by the conspirators when discussing drug trafficking over the phone." Defense counsel repeatedly challenged the Agent's "melding of her fact and expert opinion testimony...and the absence of foundations for many of her specific interpretations." *Id.* at 388. This Court held that the "safeguards adopted by the district court to avoid the substantial risk of prejudice inhering in the jury's receipt of the decoding expert's testimony were inadequate." *Id.* at 385. This Court noted that the district court failed to adequately safeguard against a strong likelihood of jury confusion between the Agent's testimony as a fact and expert witness.

failed, not only to mention or publish this part of Exhibit 152a, but also to call Cortes to properly

place the message in context.[90]

### 4. Evidence of Mr. Umaña's belief in God in the letters.

Although Mr. Umaña's religious beliefs should not have been an issue, trial counsel

unreasonably failed to use the contents of the letters to rebut the Government's argument that Mr.

Umaña had "the beast" or devil "in his heart." PPT 900.

For example, in sharp contrast to the non-admitted "Beast" passage that the prosecutor read

during closing argument, another letter admitted during trial contained the following prayer:

> Reach out for the Lord for
>
> He doesn't care about your color or what you have caused
>
> Only, but only praising the Lord, my brother, I tell you with all my heart. This is a new very inspired song coming from this heart, brother. I ask you to pay close attention to the words of this song and you will see how it has the blessing that the Lord has delivered in every heart. Regardless of your color, the Lord doesn't show a preference for any nation.
>
> He doesn't care whether you are a white or brown Hindu or Chinese or what you have caused. Whatever it is, my brother, it will be forgiven. The only thing He wants from you is to have you on His side so you and your family can be forgiven for all your sins.
>
> For that reason, I am asking you to come close to the Lord and kneel down and sing with me for all your sins. This is your prayer.
>
> In the name of Jesus.
>
> Father in Heaven, I come to you in humble prayer. I hope you can hear me in the Kingdom of Heaven, and I hope you can forgive me for all the offenses and all the sins that, in your view, I could have caused.

---

[90] Trial counsel also unreasonably failed to object to the Government improperly characterizing Mr. Umaña's intentions. This Court has made clear that a witness who didn't participate in a conversation cannot testify about the conversation's meaning unless she is qualified as an expert. *United States v. Johnson*, 617 F.3d 286, 293 (4th Cir. 2010); *United States v. Hassan*, 742 F.3d 104, 136 (4th Cir. 2014) (citing *United States v. Min*, 704 F.3d 314, 325 (4th Cir. 2013)).

314

Father, please I ask you to have mercy and not punish me with your rage,
Father, please I ask you to mercy and not send me to Hell.
Father, please I ask you to have mercy, to show compassion and bless my
soul so it can rest.

Father, please I ask you to have mercy and show me the way so I can walk
and heal myself by my children's side, and also by the Lord's side, together
with my family and the people who worship you, Father in Heaven

Please have mercy

In Jesus Christ's name AMEN
Alej. E. U.

Exhibit 152a.

Many other letters also contained pro-Christian greetings, instead of expressing allegiance

to the Beast. *See* Exhibit 153a ("I hope the Almighty Creator of Heaven and Earth is keeping you

in good health and some brother, one of those who has a heart in his chest regardless of his

homeland."); 163a ("Look, before anything else, Merry Christmas, brother, with all my heart.");

172a ("I hope that when you receive this humble letter our Creator will have you enjoying good

health"); 174a ("I hope you are blessed by God and in good health when you receive this letter.").

While reasonable trial counsel would have objected to the government using Mr. Umaña's exercise

of religion against him, once faced with the "beast" allegations, trial counsel unreasonably failed

to bring these passages to the attention of the jury (and to present other evidence) to rebut the

Government's claim that Mr. Umaña had the "Beast" in his heart.

### E. The failure to adequately object to and mitigate the jail letter evidence was prejudicial.

Trial counsel's failure to adequately object to and explain the jail letters unfairly prejudiced

Mr. Umaña. The non-redacted content of the letters was patently prejudicial. The repeated

references to the "Beast" painted Mr. Umaña as a devil worshiper, a belief system which is certain

315

to cast him as "morally reprehensible" to most people. *See Dawson*, 503 U.S. at 167. It also constituted a direct "appeal to religious symbols and beliefs" that "improperly appeal[] to the jury's passions and prejudices." *Cunningham v. Zant*, 928 F.2d 1006, 1019-20 (11th Cir. 1991); *see also Bennett v. Angelone*, 92 F.3d 1336, 1346 (4th Cir.1996) (condemning "religiously charged arguments as confusing, unnecessary, and inflammatory"); *United States v. Roach*, 502 F.3d 425, 436 (6th Cir. 2007) ("'[c]ourts universally condemn' the injection of religion into legal proceedings") (quoting *Hicks v. Collins*, 384 F.3d 204, 223 (6th Cir.2004)).

The political they-will-get-theirs sentiments were at least polarizing, if not downright frightening, to any typical United States audience. Such an audience, like the jurors here (all United States citizens), would likely infer that Mr. Umaña harbored hostility towards their country, regarded them as "rich," discriminat[ory]" "murderers" that were going to get what was coming to them through "humiliat[ion] by all Hispanics." Ex. 176a. It is hard to imagine that this could have any effect other than inflaming the passions of the jurors (who would quite understandably feel wrongly maligned). Indeed, the Court rejected the admission of another letter with a political "diatribe" precisely because it was "inflammatory." Crim. Doc. 998 at 6 & n.2. But Mr. Umaña's views of the United States's role in international politics was not on trial – at least, not until the Government improperly made it so. As with the "Beast" references, "one is left with the feeling that [this political material] was employed simply because the jury would find these beliefs morally reprehensible." *Dawson*, 503 U.S. at 167.

The jury was also likely to find the large volume of obscene, racist, homophobic, and derogatory language "morally reprehensible." And in many cases the jury was not exposed to the improper material just once, but twice. *See e.g.* Exhibit 176a and 176b (containing much of the same political diatribe). Significantly, even the racially charged reference to a "fucking black guy"

that the Court had the Government redact came in *three-fold* by the introduction of the full translation. The Government did redact the reference to the "fucking black guy" from the "selections" version of Exhibit 152a, but the reference was not redacted from the "full translation" version of Exhibit 152a, which also was admitted. Thus, while the Court was concerned about one inflammatory "fucking black guy" reference, the jury was actually exposed to three "fucking black guy" references. *See* Exhibit 152b at 2, 3, 5.

Although the content and mass of the letters was prejudicial enough, the Government's emphasis on the letters in arguing for death further prejudiced Mr. Umaña. The Government directly appealed to the religious passions of the jury by reading the non-admitted "Beast" letter to the jury, claiming that Mr. Umaña had the "devil" in his heart. PPT 900 ("[H]e sent a few words to us. This one is called -- it's got a title. One more day with the beast. Do you remember who the beast is? It's tattooed on his body. It's in his heart. It's the devil."). These arguments were left unanswered because trial counsel failed to either object to the use of Mr. Umaña's exercise of religion against him or to direct the jury's attention to the fact the letters also contained evidence of Mr. Umaña's devotion to God and pro-Christian beliefs.

The Government also repeatedly paraphrased and quoted the letters in an appeal to nationalistic passions, while at the same time highlighting Mr. Umaña's anti-authority beliefs:

> And it's his writing. It's his belief. And you have many of his letters and you can read those letters. We put more in at the sentencing phase. But, you know, the hood is large and worldwide. The Government may not accept it, but they have to put up with it because we're always going to listen to the Mara Salvatrucha and they're never going to be able to break us up no matter what they do. No matter what they do. No matter where I'm at. We are the Mara Salvatrucha. Born to control and make others understand that no other hood, much less the F'ing cops can stop us. Now they have arrested us and they think they finished us off. Ha ha ha. How many times does he say that in his letters? Ha ha ha. They're wrong. …

> Day by day I go out into the streets to look for those F'ing gangs and the only thing I find is the F'ing police who want to arrest and F with my gang. That is the risk I

317

take every day with these F'ing good for nothings and these F'ing police who want to finish off the destiny of my gang. But I tell them it can't be done yet because now we have come to control. Because now we have come to belong to Mara Salvatrucha 13, to represent so all these fags can listen to us and know that they don't have to play and that they have to respect the Mara Salvatrucha. Damn F'ing good for nothings and that F'ing authority. They will have to suck up to us and even though they don't believe it, the Mara Salvatrucha has to triumph.

PPT 833-34, 901.

In addition to an emphasis on the inflammatory content of the letters, the Government used them to argue against finding factors of mitigation (such as brain damage and no schooling beyond the third grade) and for aggravating factors (such as future danger). *See* PPT 833 ("And that, ladies and gentlemen, is certainly evidence of future dangerousness. And you didn't hear any evidence that that will stop in federal prison versus the local jail. That he's not going to have the ability to communicate. He's Wizard. He's smarter than that. They break my code, I'll do a new code. If they try to read my mail, I'll put a message out to one of my other MS buddies in jail, he'll put a message to someone else and we'll take care of that problem."); PPT 896 ("Just like the codes, just like his letters. This isn't some brain damaged individual over here. He's cold, he's calculating, and he's very savvy. And I think you saw that in his letters. He's very, very savvy."); PPT 900 ("And you remember as he wrote in code, as he gave all these ciphers, he knew the Government was reading his mail. That's why he wrote in ciphers and code. That's how he sent these messages about get Moe, get Chipis, organize this gang out there, organize this gang out here. He wrote that in code."). Indeed, potentially because the prosecution admitted cleaned up, organized and invalidly translated letters which portrayed Mr. Umaña as capable of communicating clearly in writing, only one juror found that Mr. Umaña "did not have the benefit of schooling beyond the third grade," even though that fact was undisputed. Crim. Doc. 1048 at 5.

318

Considering the cumulative effect of the inflammatory content of the non-redacted letters, the substantial volume introduced, the failure of the trial attorneys to present verbatim or valid translations of the letters and the Government's emphasis on the letters during closing, there is a reasonable probability that at least one juror might have struck a different balance if trial counsel had properly litigated this matter and excluded this material from the trial. *Wiggins v. Smith*, 539 U.S. 510, 537 (2003).

### F. Appellate Counsel Were Ineffective for Failing to Raise the Court's Erroneous Admission of the English Translations on Direct Appeal

Direct appeal counsel were ineffective for failing to raise on direct appeal the Court's erroneous admission of the English translations of jail letters. While trial counsel's litigation of the jail letters generally fell short of effective representation, counsel nevertheless did enough to preserve this issue for appeal. And, even if they did not, the Court possessed – and failed to uphold – its independent duty to ensure translations are accurate.

As the administrator of the trial, it is the Court's responsibility to inquire whether the parties are able to stipulate to a single interpretation. *See*, *e.g.*, *United States v. Font-Ramirez*, 944 F.2d 42, 48 (1st Cir. 1991) ("It is advisable for a trial judge to obtain a stipulated transcript"); *United States v. Llinas*, 603 F.2d 506, 509 (5th Cir. 1979) (noting that the court and the parties should make an initial effort to stipulate to a transcript that satisfies all sides); *United States v. Gonzalez*, 365 F.3d 656, 660 (8th Cir. 2004), cert. granted, judgment vacated on other grounds, 543 U.S. 1107 (2005) ("[L]ike our sister circuits, we believe that whenever the parties intend to introduce a transcript at trial, they should first try to produce an official or stipulated transcript, one which satisfies all sides" (internal citations omitted)).

The importance of accurate translations at trial is obvious: inaccurate translations of critical evidence risk the fundamental fairness of the trial. *United States v. Mata*. 181 F.3d 93

319

(4th Cir. 1999) (quoting *Valladares v. United States,* 871 F.2d 1564 at 1566 (11th Cir.1989) ("The ultimate question is whether any inadequacy in the interpretation made the trial fundamentally unfair.").)

The importance of accurate translations is illustrated in Court Interpreter's Act, which provides:

> If any interpreter is unable to communicate effectively with the presiding judicial officer, the United States attorney, a party (including a defendant in a criminal case), or a witness, the presiding judicial officer shall dismiss such interpreter and obtain the services of another interpreter in accordance with this section.

18 U.S.C. §182 (e)(1).

Section 182 is mandatory, and directs that the *court* has responsibility to ensure the accuracy of interpretations, without notice from either party.

Here, however, counsel did provide the Court with notice that the translations of the jail letters – prepared by a Government agent – were inaccurate to the point of bias. As early as August 19, 2009, well before the beginning of the trial, counsel moved to continue trial based, in part, on the inaccuracies of the Government's translations:

> While Defendant's attorneys have received most of the English translations of these recordings, they have received just a few of the Government versions of these translations. Comparison of the two versions reveal that the Government translations are strikingly different and substantially more inculpatory than the translations that Defendant had received from his translator. Yet there are many more Government translations Defendant has yet to receive.

Crim. Doc. 661 at 3, Defendant's Motion to Continue.

The Court's failure to protect Mr. Umaña's rights as outlined above by failing to respond to counsel's clear notice that the Government's translations were inaccurate. This issue was, therefore, preserved for appeal.

320

Where there is a "reasonable probability that the neglected claim[s] would have succeeded on appeal, [] counsel's failure to raise the claim f[alls] outside the range of reasonably competent assistance." *Claudio v. Scully*, 982 F.2d 798, 799 (2d Cir. 1992). Here, as post-conviction investigation has revealed, the Government's translations are riddled with inexplicable and highly prejudicial "errors". *See*, *e.g.*, Appx. 270, p. 3 (detailing specific mistranslations). Following full process, including discovery and a hearing, Mr. Umaña expect to prove extensive harmful and highly prejudicial errors were throughout the Government's translations. Given that the translations of Mr. Umaña's jail letters were integral to the Government's penalty phase arguments in favor of death, the translation of his letters in a manner falsely suggesting his aggression, lack of remorse, or antipathy towards his accusers, affected the "fundamental fairness" of the trial. Appellate counsel's failure to raise this issue on appeal deprived Mr. Umaña of his Fifth, Sixth and Eighth Amendment rights to the effective assistance of counsel.

## CLAIM IX. TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL BY NOT SUBMITTING MR. UMAÑA'S NOTE OF APOLOGY IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.

All other claims and allegations in this Motion are incorporated into this claim by this reference.

Trial counsel rendered ineffective assistance of counsel by not responding to the Government's evidence that Mr. Umaña concealed a shank on his person the day he was brought to court for jury selection. The same day the shank was discovered, Mr. Umaña wrote a note explaining and expressing remorse for his actions. Trial counsel's failure to introduce the note was objectively unreasonable and prejudicial.

**A. Trial counsel's failure to introduce Mr. Umaña's apology note was objectively unreasonable.**

On the first day of jury selection, Mr. Umaña was found in possession of a shank when he was searched at the Mecklenburg County Jail, before being transported to the federal courthouse.

Prior to any questioning of the venire, the Court called United States Marshal Russell Lashley to place the incident on the record. VDT 3. Marshal Lashley testified that, as part of a standard search before producing individuals for court, he discovered a shank on Mr. Umaña's person. VDT 4. The shank was in a protective sheath made of postage stamps and attached to his penis with a rubber band. VDT 5. Based on the discovery of the shank, as well as on information Marshall Lashley claimed he received from a jail letter allegedly written by Mr. Umaña that mentioned possession of a shank and an unconnected statement by a case agent that Mr. Umaña had desire to "do harm to a correctional officer," Marshal Lashley requested to place Mr. Umaña in "a waist chain and handcuffs." VDT 8-11. The Court took the matter under advisement and did not grant Lashley's request but admonished, "the Court will not have toleration with respect to any outbursts, any demonstrations, and conduct by the defendant that causes any alarm to the marshals would be something of paramount concern to the court." VDT 14. After the Court's admonishment and during voir dire, Mr. Umaña wrote a note in Spanish and gave it to trial counsel at the end of the day. In the note, Mr. Umaña clumsily attempted to explain that he would not use the shank to attack any witness or court personnel but wanted it for his own protection from rival gang members. Mr. Umaña asked for forgiveness and promised it would not happen again. The following is verbatim translation of Mr. Umaña's writing by a Federal Court certified translator with the non-standard spelling, capitalization, and word spacing of the note accurately represented:

> about the officer that is a lie at no time hav I wanted tudo
> that thing about the officer But about the blaid I acept that I

322

> had it but it is for some protection against me I'm a gang
> member and I have gang member enemies from different
> gangs and that is why I had it with m e I am isolated
> and many think that I am in that condition because I
> am talkin about somebody and for that Reeson I had
> it with meal though it is I who is being juged but
> I cant be trusting of any of the inmates I didnt have the blade
> to hert any other person I am in this case and I would be an
> idiot to cause somothr problem being in this situation
> and I Apologize to you all for this what happened will not happen a gain

Appx. 78; *see also* Claim VIII (explaining how misleading translations of Mr. Umaña's writings made him seem capable of communicating clearly).

During the penalty phase, the Government called Marshal Lashley to testify about the incident and introduced the shank, sheath, and rubber band into evidence. PPT 359-63. Trial counsel's cross-examination of Marshal Lashley was minimal: Lashley confirmed that the knife never made it to the federal courthouse; that Mecklenburg County jail houses rival gangs; that Mr. Umaña did not resist the search or confiscation of the shank; that he was not in a "position to say whether this item was possessed for self-defense or some other purpose;" and that the shank was four inches long. PPT 367-68. Trial counsel presented no other evidence directly related to the incident. Trial counsel's failure to introduce the note into evidence was objectively unreasonable.

### B.  Mr. Umaña was prejudiced by trial counsel's failure to introduce the note.

The shank evidence had a considerable influence on the penalty phase. As the Court stated when denying the motion for a new trial, "The evidence of the defendant's possession of the knife while in the transportation process to come to federal court was compelling in itself, as reflected by the jury's visible reaction when the deputy testified." Crim. Doc. 1165 at 22. And the Government emphasized the shank evidence and trial counsel's failure to respond meaningfully to the evidence during closing argument. The Government argued, "Do we still

323

recover shanks? Yes. And do you think he's ever going to stop? Has there been any evidence that he will stop?" Later, the Government even argued (improperly) that Mr. Umaña brought the "shank" to court to attack the jurors:

> But they say he did it to fight off rivals. Over here at the federal courthouse. There were a lot of rivals in the courthouse. You know who the rivals were? They're the marshals. Those are his rivals. The judge is his rival. I'm his rival. Anybody in this courtroom is a rival. You're his rival.

PPT 898-99.

Introducing and explaining the note would have significantly rebutted the Government's claims and would have placed the incident in a context that the jurors could have understood: Namely, Mr. Umaña believed he faced credible threats in prison from rival gangs, so he kept a shank to protect himself in the event he was attacked[91]. Properly interpreted, Mr. Umaña's note directly reduces the "compelling" dangerous nature of the shank evidence and rebuts the Government's arguments. It explains the shank was for protection against other gangs, not to attack the jury; he did not want to hurt anybody; it would not happen again; and establishes that he felt remorse. Moreover, had counsel performed effectively, the jury also would have known that Umaña has Intellectual Disability, PTSD, cognitive deficits, low intelligence quotient, and neurological deficits that independently and in combination impair his ability to accurately perceive the severity of threats. *See* Claim II. The jury would have also known that, as a result of his trauma history, he is developmentally delayed in his ability to differentiate threat and safety in the world around him. *See id.* This too would have explained both Mr. Umaña's actions in bringing the shank, and the nature of his child-like apology that he never meant to hurt anyone.

---

[91] There is no evidence in the record of Mr. Umaña fighting with other gangs while incarcerated pre-trial.

In other words, there was evidence – both the apology note itself, and the apology note in combination with the mental health evidence described in Claim II – that directly undermined and contradicted the Government's emotionally-charged argument that Mr. Umaña was uncontrolled, escalating, and would never "stop," yet trial counsel inexplicably failed to present it. Not only did the note's content mitigate the shank evidence and counter the Government's argument of future danger, it also supported other mitigating theories.

Presenting the note as written demonstrates Mr. Umaña's poor writing skills. *See* Claim VIII. The note also shows Mr. Umaña's inability to reason, poor decision-making, impulsivity, lack of knowledge of how to seek help if he thought he was in danger, feelings of isolation and paranoia, remorse for having caused a disturbance, and his pledge that he would attempt to better his behavior. *See* Claim II. Such evidence of Mr. Umaña's mental impairments was inherently mitigating. Specifically, Mr. Umaña wrote:

> I'm a gang member and I have gang member enemies
> from different gangs and thatis why I had it with m e I am isolated
> and many think that I am in that condition because I am talkin

Appx. 78.

Putting aside the graphic problems of breaking lines mid-word and not using any punctuation to corral thoughts, Mr. Umaña, in this passage, goes from being a gang member and having enemies to being isolated and being seen as a potential informant – two distinct lines of thought with no separation or demarcation. This writing, without purifying translation, is difficult to follow and certainly provides no credibility or authority for the author. Mr. Umaña's writing, without purifying translation, is murky, cloudy, and not supportive of the idea that he could accurately or convincingly direct anyone through letters or that he could be a threat of future dangerousness because of his writing. *See* PPT at 299-305 (trial court admits the jail letters after

325

finding they are relevant to a prediction of future dangerousness); PPT at 492, 500 (Government cross-examination suggesting that Mr. Umaña could be threat through letters even in a maximum-security facility.)

Additionally, introducing Mr. Umaña's properly translated note would have mitigated the damage caused by the improperly translated jail letters which were introduced at varying parts of the trial. As discussed more fully in Claim VIII above, letters allegedly written in Spanish by Mr. Umaña were intercepted by the Government before trial. These letters were translated into English and significantly "cleaned up" before being introduced against him at trial – punctuation and line breaks were added, spelling and grammar were corrected and numerous stylistic changes were made. Claim VIII, *supra*. This had the effect of changing the overall tone of the letters and making them appear far more sophisticated, literal and dangerous than they actually were. Given that trial counsel had failed to appropriately contextualize those letters by securing the appropriate expert testimony, introducing the apology note would have been the only available method of providing the jurors with an accurate view of Mr. Umaña's actual mental and intellectual capacity, which had potential to affect every aspect of the jury's consideration.

Specifically, in closing argument, the government implored the jury to give death because Mr. Umaña wrote about his gang from his prison cell, (*see* PPT 833-34), and wrote to threaten witnesses and possibly give orders, PPT 896-900. *But see* Appx. 244, Report of Thomas Ward (Mr. Umaña would not be a leader in his gang); Appx. 216 at ¶23, Decl. Pablo Stewart, M.D. (Mr. Umaña would be a bad leader due to his impairments). Had the jury seen Mr. Umaña's apology note, authentically translated, revealing the confusing, disordered thought, and stream of consciousness dictates, there is more than a reasonable possibility that a juror or jurors would have rejected the idea that Mr. Umaña could be an effective villain from behind bars, and there is

326

a "reasonable probability that at least one juror might have struck a different balance." *Wiggins v. Smith*, 539 U.S. 510, 537 (2003).

**CLAIM X. MR. UMAÑA WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE PENALTY PHASE OF TRIAL, IN VIOLATION OF HIS RIGHTS UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, WHEN HIS ATTORNEYS ALLOWED UNRELIABLE AND UNFAIRLY PREJUDICIAL EVIDENCE THAT MR. UMAÑA HAD COMMITTED MURDERS IN EL SALVADOR TO BE CONSIDERED BY THE JURY, EVEN AFTER THE COURT HAD PRECLUDED THE GOVERNMENT FROM INTRODUCING THIS EVIDENCE.**

All other claims and allegations in this Motion are incorporated into this claim by this reference.

At the penalty phase, the Government sought to introduce evidence that Mr. Umaña had committed additional murders in El Salvador. Crim. Doc. 1021 at 2-3. Trial counsel sought its exclusion.

The Court found the allegations were acquitted conduct, and the evidence of the murders was based on anonymous witnesses. The Court concluded evidence of the alleged El Salvador murders was inadmissible, noting that the evidence lacked "sufficient indicia of trustworthiness to be admitted" and that admission of the evidence would cause "unfair prejudice to [Mr. Umaña]'s ability to defend the case." *Id*. at 7-8. In addition to its oral ruling, the Court followed up with a written order, explaining more the problematic nature of the evidence:

> It is almost entirely hearsay evidence of conduct for which the defendant was acquitted, based in part upon a finding that these statements – proffered here as reliable evidence – lacked credibility. It does not appear that any eyewitness will offer live testimony to corroborate these statements. Moreover, many of the declarant witnesses remain anonymous. The anonymous quality of these witnesses not only undermines the Court's assessment of their accuracy and truthfulness, but it also unfairly limits the defendant's ability to uncover any impeachment evidence that may exist. For these reasons, the Court finds that the government's proffered evidence of the El Salvador murder lacks sufficient indicia of reliability and its

327

probative value is outweighed by a danger of unfair prejudice to the defendant. Thus, this evidence is inadmissible.

Crim. Doc. 1021 at 10-11.

Despite this clear ruling from the Court, the Government nevertheless sent out with the jury, during deliberations at the penalty phase, a transcript of Mr. Umaña being interrogated by Los Angeles police detectives about the California killings in which he is also interrogated about the El Salvador murders. *See, e.g.*, Gov. Tr. Ex. 522 at 58 (entire page in English discussing allegations of El Salvador conduct). Although trial counsel litigated the separate and distinct issue of whether Mr. Umaña's statement should be suppressed in its entirety, *see* Claim 19, trial counsel did not object to the introduction of this lengthy transcript nor ask for the portion that referred to murders in El Salvador to be redacted. It appears trial counsel was simply unaware that this highly prejudicial and unreliable evidence they had fought so hard to keep out successfully was in this document that then was sent to the jury – without even the benefit of the explanation that Mr. Umaña had been acquitted of these crimes.

Allowing this evidence to get into the hands of the jury constituted deficient performance. This Court itself recognized how highly prejudicial evidence of these murders was. But for trial counsel's failure to have the objectionable sections of it redacted prior to the transcript being sent out with the jury, there is a reasonable probability that the outcome of sentencing would have been different. *Strickland v. Washington,* 466 U.S. 664 (1984).

In his Supplemental/Amended 2255 Motion (Civ. Docs. 69/71 at Claim 35), Mr. Umaña attempted to raise the allegations that the prosecution's case – both at guilt and

328

penalty – was replete with inadmissible other crimes and bad character evidence above and beyond the acquitted El Salvador conduct raised in the initial 2255 Motion. Mr. Umaña acknowledges that the Court denied him leave to supplement to include allegations regarding these other crimes and bad character evidence. *See* Doc. 131. However, Mr. Umaña will discuss that evidence (and counsel's deficient performance in allowing it to go before the jury) here as it remains relevant to both the deficient performance and prejudice prongs of the *Strickland* analysis regarding the acquitted El Salvador conduct and, as will be discussed in Claim 12, to the pattern and practice of prosecutorial misconduct in this case. This Court should vacate the death sentence and order a new sentencing hearing.

### A. Trial Counsel performed deficiently by not reviewing the transcripts and redacting the precluded, prejudicial information before it was presented to the jury.

When the Government sought admission of evidence of murders Mr. Umaña had purportedly committed in El Salvador for which there was no reliable evidence and of which Mr. Umaña had been acquitted, trial counsel wisely moved to exclude it. This Court agreed with trial counsel, finding the evidence unreliable and unduly prejudicial. That should have been the end of the matter.

The Government, however, later moved a transcript into evidence during the penalty phase that contained the same unreliable, prejudicial accusations.[92] This time, trial counsel raised no objection. This transcript showed the exchange between Mr. Umaña and LAPD detectives when

---

[92] On direct appeal, Mr. Umaña contended that the Government had engaged in prosecutorial misconduct by moving the admission of this transcript without notifying the Court that it contained this same offending material that had already been excluded. In its majority opinion, the Fourth Circuit never addressed this issue, although in dissent, Judge Gregory indicated his belief that the Government had improperly introduced the murders through "an evidentiary backdoor." *United States v. Umaña*, 750 F.3d 320, 364 (4th Cir. 2014) (J. Gregory, *dissenting*).

329

he was asked about having committed the California murder. *See e.g.* Gov. Ex. 522 at 58. Within this long document, however, were strong accusations the Government made during the course of this interrogation about Mr. Umaña's involvement in murders in El Salvador. There is no question that the transcript that was introduced contained the offending materials. It was described by Judge Gregory, dissenting from the grant of relief on this claim on direct appeal, when raised as a claim of prosecutorial conduct:

> Finally, and most problematic, the government introduced evidence linking Umaña to murders in El Salvador, even though this evidence had been ruled as inadmissible and even though Umaña had no chance *364 to confront his accusers. At sentencing, the government sought to introduce evidence that Umaña had committed violent crimes, including homicide, in El Salvador. Specifically, the government wanted to call an El Salvadoran prosecutor to testify. The district court denied the government's motion, concluding that the evidence "lacks sufficient indicia of reliability" and that "its probative value is outweighed by a danger of unfair prejudice." J.A. 3232.

> Incredibly, in spite of the district court's clear ruling, the government introduced a transcript as evidence in which a United States law enforcement officer is quoted as saying "I know he's done stuff in El Salvador," J.A. 4301, "[w]e know . . . that they were looking for you for homicide also in El Salvador," J.A. 4316, and "[w]e know that he's, he's a violent, violent guy. We know that he's wanted in El Salvador . . . for many violent crimes . . . I know he's a shooter. I know he's an enforcer. I know he's a gangster," J.A. 4315. Through an evidentiary back door left wide open, the government snuck in testimony that "lacked consistency and credibility," per the district court, but had enough prejudicial value that the government made its entire case at sentencing about Umaña's past uncharged homicidal conduct.

*United States v. Umaña*, 750 F.3d 320, 363-64 (4th Cir. 2014) (J. Gregory, dissenting).

Trial counsel appears to have missed the fact that this transcript contained all of these prejudicial statements about criminal events in El Salvador.

But it was trial counsel's job to keep such evidence away from the jury, and their failure to object to the jury seeing these improper passages was simply deficient. The transcript contained numerous instances where law enforcement officers referred to extraneous acts of murder and violence this Court had ruled inadmissible, thereby circumventing Mr. Umaña's right to be judged

330

"solely on the basis of evidence [properly] introduced at trial." *Taylor v. Kentucky*, 436 U.S. 478, 485 (1978).

**B. Trial counsel had no reasonable strategy for failing to review the transcripts and prevent the jury from relying on the inadmissibly and highly damaging evidence.**

Trial counsel had moved for the preclusion of evidence that specifically related to El Salvador murders (*See* Crim. Doc. 1021 at 2-3), and they had also moved for the suppression of Mr. Umaña's statements which is where the vast majority of the information concerning El Salvador homicide was contained. Crim. Doc. 490. Thus, they had no strategic reason for failing to ask to have the objectionable portion of this transcript excluded from evidence by having it redacted.

On the contrary, trial counsel's failure to review and ensure necessary redaction of Mr. Umaña's interrogation transcript to excise references to the acquitted El Salvador conduct appears to be one piece of a larger picture in which trial counsel abdicated their role to ensure that the jury reached a reasoned, moral, and individualized sentencing determination based only on evidence that was relevant, reliable, and admissible. The government's penalty phase exhibits contained much more bad act and character evidence than just the El Salvador acquitted conduct described above.

First, the exhibits contained evidence regarding two more homicides and a non-fatal shoot out. *See* Gov Ex. 520 at 64-65 (Luis Rivera interrogation transcript[93] included statements that Mr. Umaña had been involved in "2 other Homicides" in Los Angeles--at "Hollywood and Garfield"

---

[93] The defense lodged "the same objections that have been made earlier in the case" (*id*.) as to the reliability and admissibility of any evidence about the Fairfax homicides. *See, e.g.*, PPT at 3-8, 77-79; Crim. Doc. 1021.

and "Western and Fountain."); Gov. Ex. 522 at 135-39 (Umaña's interrogation transcript included statements regarding his involvement in an unrelated "shoot-out" with the White Fence gang in Los Angeles in retaliation for White Fence's non-fatal shooting of Luis Rivera).

Second, the transcript of Mr. Umaña's interrogation also included a string of falsehoods about the Los Angeles investigation that detectives used as an interrogation ruse.[94] Regarding the Fairfax homicides, detectives repeatedly falsely told Mr. Umaña that bystanders or eye-witnesses (and not just the accomplices) identified him as the shooter. Gov. Ex. 522 at 6, 39-40, 73, 112, 143-44. In reality, only accomplices implicated Mr. Umaña as the shooter, and only after those accomplices had been arrested and threatened with being charged as the shooter themselves. The detectives also falsely told Mr. Umaña that the victims were both juveniles ages 16 and 17 (id. at 68), when their actual ages were 17 and 20. (Gov. Exs. 523, 525).

Regarding Lemon Grove, the detectives repeatedly falsely told Mr. Umaña that an accomplice named "Sin" talked to the detectives and implicated Umaña in the shooting. Gov. Ex. 522 at 167, 171, 181-82, 207. The detectives repeatedly falsely told Mr. Umaña that bystanders or eye-witnesses at Lemon Grove Park also identified him as the shooter (Gov. Ex. 522 at 160-62, 170-71, 212, 226-27), and that other people verified he was there (Gov. Ex. 522 at 186). In reality, the Government's evidence consisted of victim Freddy Gonzales tentatively identifying Umaña and multiple other people (Gov. Exs. 506, 507; Claims 5 & 6, *supra*); and ballistics evidence purportedly "linking" (*see* Appx. 241 (John Nixon Report)) a .22-caliber casing from the Lemon

---

[94] During their April 23, 2008 interrogation, Det. Flores and Det. Parshall also repeatedly stated their opinions as to Mr. Umaña's veracity and culpability in the Fairfax and Lemon Grove homicides. *See, e.g.*, Gov. Ex. 522 at 32-33, 38, 45, 47, 59, 69, 105, 110-12, 125-26, 165, 174, 211-12, 228, 230, 233. *Cf. Umaña*, 750 F.3d at 349-50 (on direct appeal in this case, counsel litigated a related claim that detectives' statements in Umaña's interrogation transcript constituted "improper government vouching").

Grove Park scene to two .22-caliber casings found at the Fairfax Avenue scene. While police may be allowed to lie to defendants to elicit a confession, *see Frazier v. Cupp*, 394 U.S. 731 (1969), prosecutors may not lie to juries to secure a conviction. *Napue v. Illinois*, 360 U.S. 264 (1959). The jury in this case had no way of independently verifying whether the detectives' factual assertions to Mr. Umaña during the interrogation were true or not, and the lies that detectives told Mr. Umaña went straight to the heart of the question before the jury – whether to believe the self-serving, hearsay statements of Mr. Umaña's codefendants and the tentative identification by Freddy Gonzales (both of which were, according to the lies in the interrogation transcript, corroborated by neutral eyewitnesses).

Finally, the interrogation transcripts of both Umaña and Los Angeles codefendant Rene Arevalo contained extensive statements regarding Mr. Umaña's purported bad character. During their interrogation of Umaña, detectives repeatedly commented on Mr. Umaña's character and reputation: "They all were afraid of you. They all had respect for you because you were good with the gun"; "People talk about him. He's a legend"; "[Y]ou know, and I know he's done stuff in El Salvador"; "I know you have a reputation"; "We know that he's wanted in El Salvador . . . for many violent crimes"; "And we know about … about your past, your time in El Salvador that they were looking for you for homicide." Gov. Exs. 522 at 44, 58-60, 167, 176. During Arevalo's interrogation, Arevalo opined about Mr. Umaña's character and reputation for violence: Umaña "is like the kind of guy that if you say something, he'll probably shoot you too"; "he's real into the devil"; "he must do that [shootings] because that's what he was brought over here to do"; when another accomplice acted nervous after the shooting, Umaña "told him, 'Don't be a pussy'"; he would not "hesitate" or "think about it" "twice" before doing something to you. Arevalo even

333

indicated that Umaña would try to retaliate by killing his whole family. PPT at 930; Gov. Ex. 518 at Bates 10558-59, 10598-99, 10615, 10619-20, 1067.

Trial counsel failed to object and/or ensure necessary redactions were made to prevent the jury from reading this irrelevant, unreliable, and in some cases demonstrably false evidence when the exhibits were supplied to the jury. PPT at 819, 929-30, 943-44 (Court instructs jury it can review exhibits, in electronic or hard-copy format, during deliberations). There can be no strategic reason for counsel to have allowed *any* of the evidence in these exhibits to be presented to the jury, after having fought to limit the evidence that the Government could present in aggravation. In the totality of these circumstances, the only reasonable explanation is that counsel missed the fact that the exhibits contained this objectionable other crimes evidence and police lies bolstering the prosecution's theory of the case.

### C. Mr. Umaña suffered prejudice from the introduction of improperly admitted evidence that he had murdered people in El Salvador.

The references to Mr. Umaña having committed murders in El Salvador that trial counsel allowed the jury to read were highly damaging to Mr. Umaña's case at penalty phase. Gov. Ex. 522 at 44 ("O.K. And, you know, and I know he's done stuff in El Salvador"); *Id*. at 58 ("[W]e know. . . about your past, . . . that they were looking for you for homicide also in El Salvador."); *Id*. at 76 ("What about all these ones in El Salvador that he's wanted for?"); *Id*. at 60 ("People talk about him. He's a legend."); *Id*. at 136 ("I know he's done a ton of shootings. . . ."); *Id*. at 174 ("Ask him [to] . . . tell us about all the murders that he's done. . . . And if he says he's never done any murders . . . then we don't believe that.").

The evidence of murder and violent acts in El Salvador was "the worst kind of bad evidence." *Wong v. Belmontes*, 558 U.S 15, 26 (2009). And the implications that Mr. Umaña had killed someone in El Salvador fit in with the government's theme in closing argument that Mr.

334

Umaña had killed "over and over and over again." PPT at 889; *see e.g.* PPT 832-33 ("He had killed before and had earned his respect . . . by killing."); ("He had killed before and had earned his respect . . . by killing."). Furthermore, the evidence that Mr. Umaña had killed in El Salvador corroborated for the jury, the otherwise unfounded statement that Mr. Umaña had earned his "MS" tattoos by killing people. *See e.g.* PPT at 824 ("He had earned those two letters on his forehead and he earned them by killing."); GPT at 1156-57, 1170, 1171, 1183; *and* PPT at 824, 892.

Trial counsel allowed the jury to consider evidence that Mr. Umaña had killed a person in El Salvador when the Government had no credible or reliable evidence of this, and Mr. Umaña had been acquitted of this crime *which the jury was never even informed of,* and one must assume jurors relied on that information during their deliberations. If even one juror was swayed by virtue of this improper evidence that had been ruled inadmissible by the Court then Mr. Umaña suffered prejudice. Given the fact that the El Salvador murder evidence was "the worst kind of bad evidence" and that it was woven in with the Government's themes during closing argument, there is a reasonable probability that one of the jurors relied on it in determining whether Mr. Umaña received life or death.

The prejudice becomes even more clear when considered in the totality of the circumstances described above. The government exhibits also contained allegations about two other California homicides, a non-fatal California retaliation shooting, a plethora of police lies inflating the strength of the government's case against Mr. Umaña for the Fairfax and Lemon Grove homicides, and other allegations about Mr. Umaña's bad character and general propensity to violence. Pretrial, *in limine*, this Court carefully considered the reliability of the Government's proffered evidence of unadjudicated conduct and explicitly limited the information the

335

Government could present to prove non-statutory aggravation. PPT at 3-8; Crim. Doc. 1000 at 11-12; Crim. Doc. 1021. However, the Government's unredacted exhibits wholly circumvented this Court's order.

Counsel performed deficiently as a result of which Mr. Umaña was prejudiced. This Court should find that his right to the effective assistance of counsel was abrogated, vacate his sentence of death, and grant him a new sentencing hearing.

**CLAIM XI. TRIAL COUNSEL WAS INEFFECTIVE AT ALL PHASES OF TRIAL FOR FAILIING TO CHALLENGE AND REBUT THE FALSE AND MISLEADING EVIDENCE AND ARGUMENT PRESENTED BY THE GOVERNMENT THAT MR. UMAÑA "EARNED" HIS MS-13 TATTOO BY KILLING PEOPLE IN VIOLATION OF MR. UMAÑA'S RIGHTS UNDER THE FIFTH, SIXTH AND EIGHTH AMENDMENTS.**

All other claims and allegations in this Motion are incorporated into this claim by this reference.

Government witness Alexander Granados testified that the rules of MS-13 dictated that one can only earn the right to tattoo the letters "MS" on one's body by killing someone. GPT 920. The testimony was inadmissible for a number of reasons, and trial counsel's failure to adequately challenge and rebut it constituted ineffective assistance of counsel.

**A. Trial counsel's failure to adequately challenge Alexander Granados's testimony was objectively unreasonable and constituted deficient performance.**

Alexander Granados was a cooperating MS-13 member who testified for the Government at trial. During his cross-examination, trial counsel asked whether he had told police that MS-13 members had to kill someone after they were initiated into the gang. GPT at 913. Granados's answer – that "you earn the two letters" when you kill someone – was non-responsive to trial counsel's yes or no question about what Alexander Granados had told police. GPT at 913-14. Trial counsel did not object to the response that Alexander Granados blurted out nor did he move to

336

strike the testimony. *Id*. A few minutes later, trial counsel concluded his cross-examination and the prosecutor took over questioning Alexander Granados. GPT at 920. The very first question posed by the prosecutor was "you mentioned in response to one of the questions about earning the two letters . . . what did you mean by this?" *Id*. Alexander Granados responded that "to earn the two letters, you have to kill someone." *Id.* Trial counsel raised no objections to this line of questioning, or to Granados's response, despite the fact that this topic was irrelevant, unfairly prejudicial, and improper evidence of prior bad acts under Federal Rule of Evidence 404(b). The initial statement by Alexander Granados was non-responsive to trial counsel's question, and trial counsel should have objected on that ground and moved to strike the inflammatory testimony. Indeed, it is axiomatic that trial counsel has a duty to raise all proper objections and challenges to inadmissible and/or unduly prejudicial evidence. *See* ABA guidelines 10.8, commentary (requiring trial counsel to ensure a complete record is made regarding all objections).

Moreover, the testimony (on both cross-examination and during re-direct) was irrelevant. Relevance is defined as that which has a tendency to make a fact of consequence to the litigation more or less probable. Fed. R. Evid. 401. The statement that tattoos are earned by killing people was irrelevant to any issue at trial; there was no allegation that Mr. Umaña had earned his tattoo by virtue of his role in the Greensboro killings. To the extent that Mr. Umaña's specific tattoo was relevant, it was only to show evidence of his membership in MS-13 (the alleged criminal enterprise). Introduction of the tattoo for that limited purpose did not open the door to evidence that the tattoo also signified that Mr. Umaña had necessarily killed someone in order to "earn" that tattoo. Furthermore, the evidence as presented was not specific to Mr. Umaña, but rather a general statement about the rules of MS-13 – a general statement that was contradicted by other sources, including the Government's primary undercover informant, Rony Lopez. Indeed, Rony Lopez

337

testified about the meaning of that MS tattoo at the trial of Mr. Umaña's co-defendants, including Julio Rosales Lopez (aka Stiler). His sworn testimony was that the MS letters are not earned only if one commits a killing, but rather also when you "put in work for the gang," or when you "rob people," or when you do "just different types of crimes." *United States v. Rosales Lopez, et al.*, 08-cr-00134-RJC Doc. No. 1080, at 567-68. Thus, contrary to Granados's testimony, having an MS tattoo did not mean one had killed someone to earn that particular tattoo.

Moreover, Mr. Umaña expects to demonstrate at a hearing that the aforementioned testimony from the Rosales Lopez trial was available to trial counsel. Competent counsel should have been aware of Rony Lopez's testimony regarding the rules of MS-13 and been prepared to impeach Granados on his contradictory, prejudicial testimony. Trial counsel's failure to use that prior testimony to impeach Granados and otherwise rebut the Government's contention regarding the meaning of the MS tattoo was objectively unreasonable. Similarly, given that trial counsel was on notice that Mr. Umaña's tattoos were likely to be admitted into evidence for the more limited purpose of establishing his membership in MS-13, counsel failure to independently investigate the meaning of the tattoos – including seeking and securing the assistance of a gang and/or tattoo expert – constituted deficient performance. Had counsel done so, it was clear that Granados's testimony could have easily been rebutted and shown to be false.

Current counsel consulted a well-known gang expert and professor of Anthropology at University of Southern California, Thomas Ward, about gang culture and the gang testimony presented against Mr. Umaña. Professor Ward spent sixteen years associating with MS-13 members and teaches and writes about gang culture to this day. Professor Ward told current counsel, and would have told trial counsel and the jury, that:

> This claim that a member of the gang must commit a murder in order to get a tattoo of the gang's initials is what is often called an 'urban myth,' an exaggeration intended to inflate the status of a particular gang member and/or her/his gang.
>
> In sixteen years of research with over 400 members of the MS gang, not one gang member ever mentioned to me this unwritten rule. In addition, rational reflection of this claim would show it to be patently ridiculous. First, if this were true, the number of MS gang-related homicides would be much higher than the actual numbers found in law enforcement records. And second, it would be difficult, if not impossible for the fellow members of the gang to ensure that a homicide had been committed by a gang member before he got a gang tattoo. Over 20 years of fieldwork experience with members of the MS-13 gang has revealed that most members get a tattoo of their gang's name in order to show their affiliation and dedication to the gang, usually without getting permission beforehand, and never after committing a homicide or attempted homicide in order to get permission to get this tattoo.

Appx. 244 (Declaration of Thomas Ward).

Even if relevant, the statement was substantially more unfairly prejudicial than it was probative. Fed. R. Evid. 403. Reference to Mr. Umaña's tattoo was made throughout trial as a means of identifying him, and the Government introduced close-up photographs of the tattoo as an exhibit. Gov. Ex's 21-24. The idea that Mr. Umaña earned that tattoo by killing someone invited the jury to baselessly speculate on when, where, how and how many people Mr. Umaña had killed in the past.

Finally, the testimony was objectionable because it constituted unnoticed and improper evidence of prior bad acts in violation of Federal Rule of Evidence 404(b). The Government had already established that Mr. Umaña had tattoos of the letters "MS" on his body. GPT at 80-83 (admitting numerous exhibits of photographs of Mr. Umaña's tattoos). Therefore, the testimony that an MS-13 member has to kill to earn the right to put the MS tattoos on his or her body meant only one thing in the minds of the jury – that Mr. Umaña had committed prior murders to earn those tattoos. Evidence of prior bad acts requires notice to the defense prior to trial, and it must be relevant for some purpose other than the character of the defendant. Fed. R. Evid. 404(b). Because

this evidence was neither noticed nor did it go to motive, plan, intent, etc., it was inadmissible and trial counsel's objection would have been sustained. Thus, failure to raise this challenge constituted deficient performance.

**B. Trial counsel's failure to object to the inadmissible and inflammatory testimony was objectively unreasonable.**

One of trial counsel's defenses at trial was that even if there was sufficient evidence implicating Mr. Umaña as the shooter in the Greensboro case, those shootings were not done in furtherance of MS-13 but for some other purpose. *See e.g.* GPT at 1189 ("I would strongly and vehemently disagree with anyone that says that [the victims] were murdered for the purpose of increasing someone's position in MS 13."). Indeed, trial counsel went to great lengths to try and distinguish "missions" that were carried out for MS-13 purposes from the spontaneous and unrelated Greensboro killings with which Mr. Umaña was charged. Trial counsel cross-examined both Frank Flores and Rony Lopez about the fact that "missions" are to benefit MS-13 (GPT at 100 and 730), and that drawing unnecessary attention from the police for doing something that is not a "mission" is against MS-13 rules. GPT at 741-42. Trial counsel then argued this point in closing noting that "[t]his was not a mission. If this was a mission, that is you have to go out and kill them, all right, that would be murder in the aid of racketeering. That would be someone who went out and had to do something to maintain or increase their position." GPT at 1190.

Rebutting the notion that MS-13 gang members can "earn" the ability to wear "MS" tattoos by killing people was thus in keeping with the defense strategy. Indeed, the implication of the tattoo evidence was that *any* killing could be in furtherance of the gang because killing anyone was a way to "earn" an MS tattoo, which in turn would help one increase or maintain one's status within MS-13. Thus, challenging the testimony about the meaning of the MS tattoo would have been entirely consistent with, and in service of, trial counsel's defense strategy because it would

340

have established that the Greensboro shooting was not motivated by a desire to "earn" another MS tattoo, but rather was genuinely an unrelated incident that was not committed in furtherance of MS-13. In light of this, trial counsel's failure to adequately challenge the tattoo evidence was objectively unreasonable.

### C. Mr. Umaña was prejudiced by trial counsel's deficient performance.

Mr. Umaña suffered prejudice from trial counsel's failure to adequately challenge the improper testimony and argument that MS tattoos are only earned by committing a murder. The Government successfully exploited this testimony – without objection – throughout the guilt and penalty phases of trial to present materially misleading and false argument to the jury that not only had Mr. Umaña killed before, but that he had done so in order to further the purposes of MS-13. *See* Claim VII, *supra.* The prosecutor argued:

> And the evidence has shown, ladies and gentlemen, that on that day, December 8th, 2007, Wizard of the Novena showed that he earned the big letters: The big M and the big S. And he earned them by respect. And he earned them with a .45. And he maintained his respect and maintained his status in the gang that night by showing Manuel and Ruben what the MS 13 is all about.

GPT 1157.

By constantly interchanging the themes of respect and MS tattoos as rewards for killing, the Government emphasized the impermissible and prejudicial inference that Mr. Umaña's MS tattoo constituted independent and reliable evidence that he had "earned" his tattoos by killing people for MS-13. *See* GPT at 1170 ("Wizard earned those letters. He earned them by, as the witnesses said, you earn them by killing. So you don't disrespect me. I earned this MS. I earned this MS."); GPT at 1157 ("[H]e earned the big letters … And he earned them with a .45"); GPT at 1156 ("[Mr. Umaña] had earned his respect in the MS 13. He had earned it and he wore it proudly on his body, on his back, on his chest, right between his eyes."); GPT at 1157 ("[Mr. Umaña]

341

showed that he earned the big letters: The big M and the big S."); GPT at 1171 ("Is it so hard to identify that tattoo? If you've seen that once, I think you remember . . . He wants you to remember that . . . that means a lot to him. He's earned that.").

Reasonable trial counsel would have objected to this argument, when this improper evidence and line of argument had prejudicial implications at both the guilt phase and penalty phase of the trial. For example, Mr. Umaña was charged in the indictment with the offense of 18 U.S.C. §1959. That offense required the Government to prove not only that Mr. Umaña committed the Greensboro murder, but that the murder was carried out to maintain or further his position within MS-13. The actual evidence that the Greensboro shooting was related to an MS-13 "mission" or was otherwise in furtherance of the gang, however, was weak at best. Granados' testimony about the exclusive meaning of the MS tattoo was thus the very definition of evidence that is "unfairly prejudicial": it was prejudicial because it allowed the jury to find a requisite element of the § 1959 charge for which there was otherwise insufficient evidence, and it was unfair because that testimony also happened to be *utterly false.* Moreover, the § 1959 charge was one of the capital counts, which compounded the prejudice because a finding of guilt on this count exposed Mr. Umaña to the penalty of death.

Mr. Umaña was also unfairly prejudiced at the penalty phase. The evidence regarding the MS tattoos allowed the jury to draw the unfair and prejudicial inference that even prior to the Greensboro murder and the unadjudicated California offenses introduced in the penalty phase proceeding, Mr. Umaña had already committed additional murders in order to "earn" his tattoo. Indeed, during its closing argument, the Government invited the jury to draw those very inferences. PPT at 824 ("He had earned those two letters on his forehead and he earned them by killing."); PPT at 892 ("He earned those tattoos. You heard how he got those tattoos. He earned those

342

tattoos."); PPT at 902 ("His tattoo says it all."). Thus, the jury was not only allowed, but was actively encouraged, to believe that his tattoos constituted independent and reliable evidence of additional murders that he had carried out earlier in his life, and that this should be taken into consideration in weighing whether Mr. Umaña should be sentenced to death. There could hardly be a more unduly prejudicial factor that one could inject into a capital jury's sentencing deliberations than the notion that the person on trial was guilty of multiple homicides for which he had not been previously punished. Trial counsel's failure to properly challenge and rebut such evidence and argument was objectively unreasonable, and there is a reasonable probability that if such improper evidence and argument had not been presented to the jury, at least one juror would have balanced the scales differently and the outcome of the penalty phase proceeding would have been different.[95]

### CLAIM XII. THE GOVERNMENT VIOLATED MR. UMAÑA'S RIGHT TO A FAIR TRIAL BY ENGAGING IN A PATTERN OF MISCONDUCT IN WHICH IT REPEATEDLY INTRODUCED INADMISSIBLE EVIDENCE TO THE JURY, IN DIRECT VIOLATION OF, OR BY CIRCUMVENTING THE

---

[95] As explained more fully in Claim V, trial counsel was also unreasonable for failing to properly investigate and challenge the Government's evidence regarding the unadjudicated murders in California, as there was readily available, compelling evidence that either exculpated Mr. Umaña entirely, or significantly impeached the Government's evidence such that there was a reasonable probability that one or more jurors would have concluded that the Government failed to prove those unadjudicated California murders beyond a reasonable doubt. Consequently, but for trial counsel's ineffectiveness, the jury would have been presented with a radically different case at the penalty phase – that is, one in which: 1) there was no evidence suggesting that the MS tattoo indicated Mr. Umaña had committed prior murders; 2) the weakness of the Government's case on the unadjudicated California murders was thoroughly exposed; and 3) the Greensboro murder was properly understood as an unplanned event that was not premeditated, but rather the result of an emotionally charged situation. When combined with the readily available mitigation evidence that trial counsel could have presented to the jury, *see* Claims I & II, there is a reasonable probability that the outcome of the penalty phase proceeding would have been different. *See also* Claim XXIV & XXX.

**COURT'S ORDERS, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.**

All other claims and allegations in this Motion are incorporated into this claim by this reference.

Long ago, the Supreme Court cautioned that "[i]t is as much [the prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger v. United States*, 295 U.S. 78, 88 (1935). Often cited, the *Berger* case stands for the idea that while it is the job of the United States Attorney to "strike hard blows" to ensure that "justice will be done," it must not strike "foul ones" to "win a case." *Id.* At Mr. Umaña's trial, the Government violated this maxim by repeatedly introducing evidence in its trial exhibits that the Court had previously ruled inadmissible. Because trial counsel did not carefully review and ask for these exhibits to be redacted, the jury was exposed to and permitted to rely on numerous impermissible forms of evidence when making the decision of ultimate importance to Mr. Umaña: whether he lives or dies. The Government's surreptitious introduction of inadmissible evidence to the jury violated Mr. Umaña's rights under the Fifth, Sixth, and Eight Amendments.[96]

**A. The prosecution's trial exhibits contained various references to evidence that the Court had ruled to be impermissible and therefore inadmissible.**

**1. Unreliable evidence that Mr. Umaña had killed people in El Salvador went to the jury despite the fact that he was acquitted in El Salvador and the Court had ruled it inadmissible.**

To prove the non-statutory aggravating factor that Mr. Umaña had engaged in a pattern of violence, the Government attempted to introduce evidence that he had participated in the murder

---

[96] To the extent that trial counsel unreasonably failed to adequately challenge the Government's misconduct, trial counsel's deficient performance constituted ineffective assistance of counsel and has also been alleged in this Motion.

of Jamie Samayoa in El Salvador. Crim Doc. 1021, at 2-3. The Court considered the issue factually and legally and came to the conclusion that the evidence was inadmissible in Mr. Umaña's capital sentencing trial. *Id*. at 10-11. The Court entered a written order to that effect, and the matter was discussed on multiple occasions outside the presence of the jury. *Id*.; PPT at 7; PPT at 78. The Government professed to understand the Court's ruling, stating that "the Government will not ask about El Salvador." PPT at 78.

Despite the Court's orders and the Government's stating that it understood those orders, the Government introduced exhibits containing explicit reference to Mr. Umaña committing murders in El Salvador. For example, in the transcript of Mr. Umaña's interrogation, the agents repeatedly assert that Mr. Umaña committed murders in El Salvador, both when talking among themselves and during questioning. Gov. Ex. 522 at 44 ("O.K. And, you know, and I know he's done stuff in El Salvador"); Id. at 58 ("[W]e know. . . about your past, . . . that they were looking for you for homicide also in El Salvador."); Id. at 76 ("What about all these ones in El Salvador that he's wanted for?"); Id. at 136 ("I know he's done a ton of shootings. . . ."); Id. at 174 ("Ask him [to] . . . tell us about all the murders that he's done. . . . And if he says he's never done any murders . . . then we don't believe that."). The Government's introduction of this "backdoor"[97] evidence of the El Salvador murders was not merely a "hard blow"; it was a "foul one." *Berger*, 295 U.S. at 88

### 2. The Government introduced to the jury inflammatory racial remarks in Mr. Umaña's jail letters that the Court precluded.

On April 21, 2010, the parties discussed which jail letters written by Mr. Umaña could be fairly introduced in the penalty phase. PPT at 300. The Court had specific concerns about the racial

---

[97] *See United States v. Umaña*, 750 F.3d 320, 364 (4th Cir. 2014) (J. Gregory, *dissenting*).

345

commentary in Gov. Ex. 152 and asked the Government to redact it to prevent "the potential for injecting race into [the jury's] deliberation." *Id.* The Government accordingly produced a redacted version of Exhibit 152b. Upon reviewing the redacted version, the Court ruled, "[w]ith that redaction, the Court will find that the probative value outweighs any unfair prejudice, confusion of issues and misleading the jury." PPT at 301.

Although the Government redacted the racial comment in Exhibit 152b, the Government failed to redact the fully translated version of Exhibit 152a. Thus, the Government presented to the jury the very racial comment that concerned the Court ("fucking black guy") when it moved to introduce both Exhibit 152a and Exhibit 152b. PPT 349-50, 941. And to make matters worse, the non-redacted full translation makes other references to the "fucking black guy." Gov. Ex. 152a at 2, 3, 5. Again, the Government's end-around the Court's redaction ruling was a "foul" blow.

      **3. The Government introduced improper opinion evidence that Mr. Umaña's accomplices were telling the truth about Mr. Umaña being the shooter in a non-statutory aggravator alleged against him (the Fairfax Avenue shooting), in direct violation of the Court's order.**

During a side-bar conference, trial counsel brought up the Government's desire to introduce the transcripts of Detective Parshall's interrogation of Rene Arevalo, in which the detective gave his opinion that Arevalo was telling the truth about Mr. Umaña committing the Fairfax Avenue shooting. PPT at 168. Trial counsel moved to preclude the objectionable statements and quoted Detective Parshall's comment to the Court: "I believe you because I do this for a living. I interview people. I know when people are lying. I know when people are telling me the truth." *Id.* The Court immediately agreed that the evidence was objectionable and ordered the prosecutor to "strike" and "sanitize" that portion of the transcript. *Id.* The prosecutor pledged to the Court that she would make the necessary redaction. *Id.* at 169. The transcript looked like this prior to the sanitization:

346

scanned

> DETECTIVE PARSHALL: I believe you because I do this for a living, I interview people. I know when people are lying. I know when people are telling me the truth. I can see you're a very genuine person.
>
> 142
>
> LYNDEN J. AND ASSOCIATES, INC. (800) 972-3376

scanned

> I can tell by your eyes and your mannerisms, okay. I -- I, you know, I regret you being in the situation, but you know you got --

Appx. 53 at 142-43.

The Government then "sanitized" the transcript and provided the jury with the following:

> DETECTIVE PARSHALL: I believe you because I do this for a living, I interview people. I know when people are lying.
>
> I can see you're a very genuine person.
>
> 142
>
> LYNDEN J. AND ASSOCIATES, INC. (800) 972-3376
>
> 00

scanned

> I can tell by your eyes and your mannerisms, okay. I -- I, you know, I regret you being in the situation, but you know you got --

Gov. Ex. 518.

That is, the Government redacted exactly one sentence of the improper paragraph ("I know when people are telling me the truth") and kept the detective's belief that Arevalo was honest because the detective had the professional experience to distinguish when someone was telling the

347

truth or lying. Despite its redaction, the Government left the meaning of the objectionable statement undisturbed and allowed the jury to see that Detective Parshall believed Arevalo because he "do[es] this for a living," he "knows when people are lying," and he thought Arevalo was a "very genuine person" based on his "eyes and his mannerisms." *Id*. The failure to fully redact the transcript was yet another foul blow.

### 4. The Government's introduction of the above evidence was part of a pattern and practice to introduce otherwise inadmissible evidence through its exhibits.

In his Supplemental/Amended 2255 Motion (Civ. Doc. 71 at Claim 35), Mr. Umaña attempted to raise the allegations that the prosecution's exhibits were replete with additional inadmissible other crimes evidence, bad character evidence, and material falsehoods puffing up the strength of the Government's case, above and beyond the acquitted El Salvador conduct raised in the initial 2255 Motion. Mr. Umaña acknowledges that the Court denied him leave to supplement to include these allegations, which are discussed in more detail in Claim 10, *supra*. *See* Civ. Doc. 131. However, considering the totality of the circumstances – including the misconduct raised in the initial 2255 and the other instances of misconduct regarding the exhibits described more fully above in Claim 10 – there can be no question that the Government's admission of the unredacted (or not fully redacted) exhibits was part of a larger strategy to circumvent this Court's orders restricting the evidence it could present in aggravation. *See* PPT at 3-8; Crim. Doc. 1000 at 11-12; Crim. Doc. 1021 (Court's rulings and orders restricting the Government's aggravation).

### B. The Government elicited an unreliable, double hearsay statement that Mr. Umaña was the shooter in the Lemon Grove murder, without proffering the statement to the Court for a reliability finding.

Prior to allowing evidence of unadjudicated conduct, the Court instructed the Government to submit copies of discovery materials, including transcripts, statements, reports, or other

348

documents that form the basis of the Government's proffer. This proffer was necessary because as the Court explained in its order admitting some evidence of unadjudicated conduct, the Government "must demonstrate reliability prior to its admission before a capital sentencing jury," Crim. Doc. 1021 at 7, and must make a "threshold showing that the evidence of unadjudicated conduct bears sufficient indicia of reliability before it may be submitted to the sentencing jury." *Id*. at 8. Based on the Government's proffer and submission of supporting evidence, the Court ruled that statements that Rene Arevalo made to Los Angeles detectives regarding *the Fairfax Avenue* shooting (in which Arevalo was a suspect) were admissible. *Id*. 8-9. The Government, however, did not proffer any statements Arevalo made regarding *the Lemon Grove* shooting.

Despite the Government being on notice that evidence of unadjudicated conduct had to be ruled upon by the Court prior to being presented to the jury, the Government elicited testimony from Los Angeles Police Department Detective Small about an accusation that Arevalo made regarding the Lemon Grove murder. According to Detective Small, when shown a photograph of Mr. Umaña, Arevalo "said that's your Lemon Grove shooter." PPT 110.

The Government's elicitation of Detective Small's testimony violated the procedure mandated by the Court because the Government failed to first proffer that testimony and receive a ruling regarding its admissibility prior to eliciting it from the witness. The Government's failure to follow the Court's order was significant; the Court later noted that Arevalo "wasn't present at the time the shooting occurred" and that there was "[n]o real basis for why he made that statement," PPT at 328, so there is a reasonable probability that the Court would have precluded that evidence if the Government had properly proffered that testimony to the Court outside the presence of the jury, as the Court had previously ordered it to do.

349

**C  Mr. Umaña was prejudiced by the Government's many foul blows.**

The prejudicial effect of the evidence admitted by the Government's unfair tactics is more thoroughly discussed in other claims. *See* Claims VIII, X. But it must be remembered that there was a reason the Court excluded evidence of the El Salvador murders, racist comments, agent vouching and unreliable accusations – the Court itself recognized that such evidence was unreliable and unduly prejudicial, and therefore should play no role in the jury's sentencing determination. Yet, the Government deliberately and repeatedly brought before the jury excluded or otherwise improper evidence. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 646-47 (1974) (multiple repeated and deliberate instances of prosecutorial misconduct reviewed together). The Government's repeated backdoor practices designed to get improper evidence before the jury, "was pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential." *Berger v. United States*, 295 U.S. 78, 89 (1935). In short, the Government's misconduct violated Mr. Umaña's Fifth, Sixth, And Eighth Amendment rights to a fair capital trial.

**D.  Counsel Were Ineffective.**

Counsel's failure to object, request limiting and/or curative instructions, or otherwise raise and preserve the Government's improper conduct denied Mr. Umana his right to effective assistance of trial counsel, in violation of the Fifth, Sixth and Eighth Amendments. Counsel's failure to properly raise and litigate these issues at trial constitutes deficient performance, and but for counsel's errors, there is a reasonable probability of a different outcome in both the guilt phase and the penalty phase.

To the extent that counsel could have raised the above-described errors on appeal, counsel's failure to do so constitutes ineffective assistance of counsel in violation of the Fifth,

Sixth and Eighth Amendments. There is a reasonable probability that the results of Mr. Umaña's appeal would have been different had counsel raised this issue.

**CLAIM XIII.** **TRIAL COUNSEL DEPRIVED MR. UMAÑA OF EFFECTIVE ASSISTANCE IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS WHEN THEY FAILED TO ASK FOR A CONTINUANCE OF HIS INTELLECTUAL DISABILITY PRETRIAL HEARING AND THE CAPITAL TRIAL DATE.**

All other claims and allegations in this Motion are incorporated into this claim by this reference.

Trial counsel rendered ineffective assistance by not requesting a motion to continue the April 12, 2010 trial proceedings or the November 2009 pre-trial hearing on intellectual disability under *Atkins v. Virginia*, 536 U.S. 304, 321 (2002). Trial counsel were unprepared and presented an inadequate explanation of Mr. Umaña's intellectual disability, an inadequate mitigation case, and an inadequate defense against the Government's case. Counsel's failure to request a continuance was objectively unreasonable and prejudiced Mr. Umaña.

Jury selection for Mr. Umaña's trial began on March 22, 2010, twenty-one (21) months after his federal indictment. The guilt phase portion was a complicated case involving approximately 70 counts in an over 100-page indictment naming 26 co-defendants. As of March 5, 2009, more than a year before Mr. Umaña's trial, approximately 40,000 pages of discovery and 400 hours of recorded conversation had been provided to the defense. Crim. Doc. 445 at 1. Mr. Umaña's trial was severed from his co-defendants' trial. Citing the voluminous discovery, complex nature of the case, and delays in translation, Mr. Umaña's co-defendants obtained a continuance of their trial to January 2010. Mr. Umaña received just three more months of pretrial preparation time than his co-defendants. July 6, 2009 Status Conference (Oral Order to continue

trial to Jan. 11, 2010). Unlike his co-defendants, Mr. Umaña was facing the death penalty, which necessarily entails different time and preparation.

In addition to the significant amount of discovery involving a complex multi-actor guilt phase of trial, Mr. Umaña's counsel was also responsible for the complicated and time-consuming task of investigating and preparing for the penalty phase of trial. This included the mitigation investigation into Mr. Umaña's life in a foreign country and the investigation into two additional alleged murders (with three victims) in a different state. By the time of the pretrial *Atkins* hearing and the trial, it was evident that trial counsel was unprepared. *See* Appx. 23 at ¶6, Declaration of John Bryson; *see also* Appx. 24 at ¶5, Declaration of Mark Foster (counsel lacked sufficient time to effectively prepare for trial).

Despite knowing they had not completed their investigation and were unprepared, counsel requested no continuances following the Court resetting the *Atkins* hearing and trial date one time. There were several reasons competent counsel would have requested another continuance. Specifically, Mr. Umaña's attorneys had not undertaken an adequate investigation into Mr. Umaña's life history; they learned new information that was critical to mitigation but did not have time to investigate and present; and on the eve of trial, they received discovery that rebutted the Government's aggravating factors, which they did not have time to review adequately.

**A. Although trial counsel had an incomplete and inaccurate life history of Mr. Umaña, counsel failed to request an additional continuance of the *Atkins* hearing and trial.**

The trial was originally set for October 9, 2009. On September 22, 2009, following two prior denied motions to continue, trial counsel filed their third motion to continue, arguing that they were unprepared to effectively assist Mr. Umaña in both an *Atkins v. Virginia*, 536 U.S. 304,

321 (2002), claim, and at trial. Crim. Docs. 571, 662, 689. In seeking the continuances for the

*Atkins* hearing and trial, counsel advised the Court:

> Defendant's mitigation investigator has been unable, on his own, to locate and interview any of Defendant's immediate family members in order to arrange for adaptive behavior interviews and assessment by a mental retardation expert. Defendant's father, although interviewed by the mitigation investigator is, at this point, reluctant to submit to further interviews regarding Defendant's adaptive behavior deficits or to travel to the United States for Defendant's trial.[98]

Crim. Doc. 689 at 4. Counsel also noted they were "grossly unprepared to represent their client in

the capital matter." *Id*. at 1. The Court found trial counsel's request to be *nonfrivolous* and set the

pre-trial hearing on *Atkins* for November 30, 2009, and the trial date for April 12, 2010, with jury

selection on March 22, 2010. Sept. 28, 2009 Status Hrg. at 11, 13-14, 19.

### 1. The defense was inadequately prepared to present the *Atkins* claim at the time of the hearing.

When the Court agreed to continue the date for the *Atkins* hearing by two months, trial

counsel responded they would like additional time for the *Atkins* hearing because of the ongoing

mitigation investigation in El Salvador but ultimately stated they could "live with" the date

proposed by the Court. *Id*. at 13. As noted in the motion to continue, to establish that Mr. Umaña

is intellectually disabled and ineligible for the death penalty:

> [C]ounsel must investigate to determine whether evidence exists showing that Defendant has significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18. In order to properly assess Defendant's adaptive skills and their manifestation prior to age 18, Defendant's attorneys must have a mental retardation expert interview family, friends, coworkers, etc., to administer adaptive behavior deficit testing.

---

[98] Mr. Umaña incorporates by reference Claim VII wherein he pleads the Government violated his constitutional rights by failing to disclose mitigating evidence and presenting false or misleading evidence.

Crim. Doc. 689 at 3. Before this Court granted the motion, counsel advised they could not find family members in order to conduct the adaptive behavior assessments. *Id*. at 4.

By the time of the November 30 hearing, counsel remained in the same position as they were when they filed the motion for a continuance. Counsel had not yet interviewed any family member or person knew Mr. Umaña's daily life during his childhood other than the unreliable father. Crim. Doc. 689 at 4. Counsel, however, did not make another request for a continuance even though they did not have sufficient evidence from Mr. Umaña's childhood – evidence that is fundamental to a determination of intellectual disability. Experts must consider risk factors that may be a cause for the diagnosis, such as poverty, lack of parental childbearing, neglect, abuse, alcohol and drug use during pregnancy, and trauma. Appx. 28. It is also important to gather anecdotal evidence of adaptive functioning through lay witness interviews to show the adaptive skills and their manifestation before age 18. *See Atkins*, 536 U.S. at 318, Appx. 236 at p. 32, Declaration of Dr. Martell. The burden was on the defense to prove that Mr. Umaña met the *Atkins* prongs of intellectual disability, yet counsel did not have the foundation to prepare the experts and present the claim to the Court.

There was no reason not to seek a continuance. The attorneys knew they needed more time for the *Atkins* hearing but believed that the Court would reject any additional motion for more time. Appxs. 23, 24. The Court, however, had previously found the same circumstances to be a non-frivolous reason to grant a continuance. Moreover, counsel could have informed the Court of the current state of the investigation so that the Court would have had all the relevant information before it (as well as preserved any denial for review). There was no reason for trial counsel not to make an additional request, especially when trial was not set to begin until months later.

**2. By trial, counsel remained inadequately prepared to present a mitigation case -- and learned new information that showed that their mitigation case**

354

**was incomplete and inaccurate -- but continued to proceed with trial without further investigation.**

Following the *Atkins* hearing, trial counsel failed to properly represent their capital client when they did not seek to continue the trial date set for April 12, 2010, with jury selection to begin on March 22, 2010. Little of significance had changed between the pre-trial hearing and the trial date. The defense team had yet to interview anyone who had knowledge of Mr. Umaña's daily life as a child other than Mr. Umaña's undependable father. Counsel had not interviewed any other immediate family members.

The failure to request a continuance became more problematic after counsel became aware of additional information confirming that their mitigation case was incomplete and inaccurate. In March of 2010, before jury selection, the Government informed counsel that it interviewed Mr. Umaña's mother, Leticia Ramirez. Counsel had not interviewed Ms. Ramirez and knew only limited information about her from Mr. Umaña's father, Rafael. The mother gave information to the Government that was contrary to the thin life history counsel was able to develop through the father. Specifically, trial counsel learned the following from the Government: Mr. Umaña was not born in El Salvador but in Guatemala; the mother did not abandon Mr. Umaña as an infant, but he was taken away from her; and Ms. Ramirez had tried to have contact with Mr. Umaña as much as possible. Appx. 74. The prosecutor also provided counsel with her own handwritten notes from the interview with the mother stating, in part, "[b]ecame involved w/ Mara over papers." Appx. 75; *see* Claim VI, VII, *supra*.

In an email, the prosecutor also provided the following summary of what the prosecutor remembered from the interview with Ms. Ramirez from more than a year prior:

> There is no 302 because it was not a long conversation. I did find my notes which I will send to you. There's not a lot there but she did say something that I didn't write down but which I recall. She said she and Umaña's dad separated shortly after

355

Alejandro's birth and that *Umaña's dad took Alejandro with him*. She was upset about this and made efforts to see Alejandro as much as possible. She thinks his dad turned Alejandro against her. *She continued to keep up with him through family members* - someone mentioned a newspaper article about him to her. As I recall she visited he and his brother in jail when they were incarcerated. She *cried* at some point while we were speaking to her.

Appx. 74.

The new information put the attorneys on notice that critical facts about their client's childhood were inaccurate. Counsel also learned there may have been alternative reasons for Mr. Umaña to have joined a gang in the first place and that those were mitigating in nature. Although the prosecutor's notes were cryptic ("[b]ecame involved w/ Mara over papers"), counsel was on notice that the mother appeared to know information about this important point. Furthermore, even if Mr. Umaña's mother was not the person who raised him, counsel was now on notice she cared for him, and she continued to keep up with his life through other family members. Yet counsel failed to investigate these issues further because of a lack of time.

Trial counsel states in a post-conviction declaration that he believed then and continues to believe that "speaking to the mother of a capital defendant is vital to a mitigation case." Appx. 23 at ¶7. Counsel knew the information that the mother could provide was important yet did not attempt to obtain time from the Court so that they could investigate. Although they did not believe the Court would continue the trial date again after it had done so once before, counsel did not explain to the Court what they had learned and why it was significant to their case. Appxs. 23, 24.

Adequate representation required requesting a continuance of the trial. That is particularly true in this case, where the mitigation case for Mr. Umaña was thin and inaccurate, and mitigation means the difference between a life and death sentence. *See Code v. Montgomery*, 799 F.2d 1481, 1485 (11th Cir. 1986) (finding counsel ineffective for failing to move for a continuance to interview and present an available witness). Moreover, this new information went to the core of

356

the death penalty case in that "the fundamental respect for humanity underlying the Eighth Amendment … requires consideration of the character and record of the individual offender … as a constitutionally *indispensable* part of the process of inflicting the penalty of death." *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) (emphasis added). Counsel was required to request a continuance if the basis for not exploring Mr. Umaña's background and character was based on lack of time.

Mr. Umaña was prejudiced by trial counsel's failure to request a continuance. Had counsel requested and obtained a continuance of the trial, they would have been able to speak to Mr. Umaña's mother, who would have provided them with important details about Mr. Umaña's life. Specifically, counsel would have learned that during her traumatic pregnancy with Mr. Umaña, she tried to kill herself by drinking pesticide; that she got drunk through her seventh month and took Rohypnol, a potent sedative, frequently; that she contracted malaria; that she ate small fish and crabs from a polluted, trash-strewn river; and that fights with Mr. Umaña's father, grandmother, and aunt caused her to sleep outside many nights. Appx. 218, Declaration of Leticia Ramirez. These traumas had serious implications for Mr. Umaña's mental and physical health. *See* Appx. 212 at pp. 19-23, Declaration of Dr. Lugo (Pesticide poisoning, alcohol, Rohypnol, malaria, and other toxicity provide a probable etiology or the neuropsychological damage revealed in scans of Mr. Umaña's brain and neuropsychological testing.); Appx. 211, Declaration of Dr. Davies (diagnosing Mr. Umaña with Fetal Alcohol Spectrum Disorders: Static Encephalopathy / Alcohol Exposed, also known as Alcohol-Related Neurodevelopmental Disorder (ARND), which resulted from his mother's drinking alcohol during gestation); Appx. 29, Neurobehavioral Assessment by Dr. Gur (p. 3, "The reduced metabolism in the corpus callosum is also consistent with fetal

357

exposure to alcohol or other toxins"); *see generally* Appx. 237, Declaration of Dr. Sapia (regarding impact of trauma); Appx. 237, Dr. Sermeño (same); Appxs. 215, 216, Dr. Stewart (same).

Trial counsel also would have heard for the first time that the person they had relied for all information, Mr. Umaña's father Rafael, drugged, beat, and prostituted Mr. Umaña's mother. Appx.10; *see also* Appx. 20, Declaration of Ronal Umaña at ¶20, 32 (independently describing Rafael abusing Mr. Umaña's mother).

Furthermore, Ms. Ramirez would have also explained the significance of the prosecutor's note "[b]ecame involved w/ Mara over papers:"

> I believe my son Alejandro's problems were the papers. He had no form of identification and he could not get a job to survive. My son wanted to work but he needed a Salvadoran ID card called Documento Único de Identidad [Sole Identity Document (DUI for the Spanish initials)]. Once he turned 18, they required a form of identification in order for him to get work. For many years he did not have an ID because he was born in Guatemala and we never registered him as a Salvadoran citizen. Years later, I tried to help my two sons, Alejandro and Saul, to obtain their Salvadoran documents and I went to Guatemala to get their birth certificates. In the end, I was unable to help them get their documents because of the many obstacles we had to go through, like obtaining declarations and paying fees. I knew it was very important to Alejandro to obtain proper documentation; I even offered to sell my sewing machine that I use to earn a living so I could help him.

Appx. 10 at ¶78. This would have helped give the jurors a mitigating context about Mr. Umaña's path to joining a gang – i.e., that his parents' actions had made finding employment difficult and that he needed to survive.[99] His lack of identification closed off the avenues for Mr. Umaña that could have changed the trajectory of his life. But counsel never learned this, and they were never able to present this information to the jury.

---

[99] The jury also should have learned about other aspects of Mr. Umaña's life that might have made his initial entry into a gang more comprehensible, such as the need for protection and an escape from the nightmare of his home life. Given how central the "gang" theme was to the Government's case, it was unreasonable for the defense not to have put it in context for the fact finders.

Counsel should have requested a continuance of the trial upon learning the additional information. Their decision not to request one was unreasonable. As stated in Claims I, II, III, *supra*, the failure of counsel to interview Ms. Ramirez and other family members to develop an adequate mitigation case undermines the reliability of the outcome of Mr. Umaña's trial.

**B.  Trial counsel received a significant amount of discovery immediately prior to trial. Because of a lack of time, they could not review and use the discovery in preparation for trial, prejudicing Mr. Umaña.**

Counsel were also unprepared to effectively represent Mr. Umaña in defense of the non-statutory aggravators 4(a) and (b) relating to the Los Angeles murders. The Government alleged that Mr. Umaña was the shooter during two homicides in Los Angeles, California. Mr. Umaña had never been tried for much less convicted of those crimes, he was never appointed counsel, and he did not receive any process in California. Thus, this was a case that required investigation from scratch. These murders occurred in July and September of 2005, three years before his federal indictment for the Greensboro shooting and almost five years before trial.

On the eve of trial, the Government produced voluminous discovery. The discovery productions by the Government did not come with an index of the documents included. Starting a month before jury selection and during trial, the Government produced over 20,000 pages of discovery. Thousands of those documents related to the unadjudicated Los Angeles murders, including statements made by witnesses to those murders. Because of the voluminous discovery received by counsel on the eve of trial, they could not adequately prepare their defense and missed reviewing clearly available information in the discovery. *See* Claim V, supra.

Had counsel requested and obtained a continuance of the trial based on the need for time to review additional discovery, counsel would have been able to utilize information that was

clearly favorable to Mr. Umaña and that would rebut the Government's aggravators. Counsel's lack of preparation was evident and prejudiced Mr. Umaña as stated in Claim V, supra.

Had Mr. Umaña's counsel asked to continue the *Atkins* hearing and the trial date and based their requests on reasonable explanations and supporting facts, there is a reasonable probability that they would have received the necessary time to prepare, and the outcome of Mr. Umaña's case would have been different.



Case 3:16-cv-00057-MOC    Document 148    Filed 03/24/23    Page 380 of 592



Case 3:16-cv-00057-MOC     Document 148     Filed 03/24/23     Page 381 of 592



Case 3:16-cv-00057-MOC     Document 148     Filed 03/24/23     Page 382 of 592





Case 3:16-cv-00057-MOC     Document 148     Filed 03/24/23     Page 384 of 592





367



368



369









373







376





378



379





Case 3:16-cv-00057-MOC     Document 148     Filed 03/24/23     Page 400 of 592





383





385



386



387





389



390



391



392







Case 3:16-cv-00057-MOC     Document 148     Filed 03/24/23     Page 414 of 592



396









400



401



402



Case 3:16-cv-00057-MOC    Document 148    Filed 03/24/23    Page 422 of 592



404



405



406



407



**CLAIM XVII.** **TRIAL COUNSEL FAILED TO RAISE A TIMELY CHALLENGE TO THE COMPOSITION AND SELECTION OF THE GRAND AND PETIT JURY VENIRES IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.**

All other claims and allegations in this Motion are incorporated into this claim by this reference.

    **A. Trial Counsel's Failure to Raise a Timely Challenge to the Composition and Selection of the Grand and Petit Jury Venires Constituted Deficient Performance.**

Trial counsel "has essentially an unqualified" right to inspect and copy jury lists to determine whether the venire was drawn in compliance with statutory and constitutional law. *Test v. United States*, 420 U.S. 28, 29-30 (1975). *See also* 28 U.S.C. § 1867(f); *United States v. Curry*, 993 F.2d 43, 44 (4th Cir. 1993) ("Under *Test*, Curry was entitled to inspect, reproduce, and copy

408

the master jury list to support a motion for a new trial based upon a substantial failure to comply with the provisions of 28 U.S.C. §§ 1861-68 ('the Act') in selecting the grand or petit jury."). Investigating the records and procedures used for jury selection is a standard component of competent performance by defense counsel in a capital case precisely because it allows counsel to ensure the grand and petit juries are composed according to statutory and constitutional standards:

> Counsel should consider, along with potential legal challenges to the procedures for selecting the jury that would be available in any criminal case (particularly those relating to bias on the basis of race or gender), whether any procedures have been instituted for selection of juries in capital cases that present particular legal bases for challenge. Such challenges may include challenges to the selection of the grand jury and grand jury forepersons as well as to the selection of the petit jury venire.

ABA Guideline 10.10.2, reprinted at 31 Hofstra L. Rev. 1049, Iss. 4 (2003).

Challenges to the venire are waived unless made before trial. *See United States v. Webster*, 639 F.2d 174, 180 (4th Cir. 1981) (declining to address an untimely challenge to the composition of the jury wheel); 28 U.S.C. § 1867(a); Fed. R. Crim. P. 12(b)(3). Thus, where counsel do not utilize their right to access the venire composition procedures, or the actual venire composition itself, they deprive themselves of any ability to ensure the constitutionality of the venire.

"[C]counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Given that counsel are provided specifically with broad access to jury lists and clear direction to pursue challenges to the selection of grand and petit venire, the decision to ignore that clear direction and make no effort to investigate the grand and petit jury selection process must be reasonable based on the surrounding facts and circumstances of the case. *See, e.g.*, *Hollis v. Davis*, 912 F.2d 1343 (11th Cir. 1990) (in a cause and prejudice analysis, finding counsel's decision not to examine the venire composition procedures was deficient performance because Alabama's systemic exclusion of venire-members on the basis of race was well-known.)

409

Counsel also knew, or should have known, that questions of race and national identity were inherent in the prosecution's case. *See* Claim XXV, *supra*. *See* PPT 899 (prosecution closing argument) And counsel knew they intended to address race and national identity issues in their mitigation arguments. Thus, counsel had every reason to use their statutory right to access the venire-composition procedures to ensure the venire was properly composed. Mr. Umaña expects to prove, following discovery and at a hearing, that counsel never even considered examining the venire procedures for the possibility of challenges based on discriminatory composition. The *lack* of a decision to investigate does not constitute a strategic decision and so cannot by definition be a reasonable decision. Counsel's failure to exercise their right to investigate the procedures by which the venire in this case was composed constitutes deficient performance.

**B. Trial counsel's failure to challenge the jury selection processes for the grand and petit juries prejudiced Mr. Umaña, because the under-representation of distinct groups violated his Fifth, Sixth, and Eighth Amendment rights.**

Had trial counsel timely raised a challenge to the grand and petit jury venires, Mr. Umaña could have established that the process which brought about his indictment and conviction violated his rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution. The Sixth Amendment guarantees criminal defendants "a speedy and public trial, by an impartial jury." Courts have interpreted this language to require that the panels from which petit juries are selected be drawn from a "fair cross section" of the community where the proceedings are held. *See, e.g.*, *Taylor v. Louisiana*, 419 U.S. 522, 527 (1975). In jurisdictions where a grand jury system is employed, the fair cross section requirement also applies to that process. *See Castaneda v. Partida*, 430 U.S. 480, 509-10 (1977) (Powell, J., dissenting); *Alexander v. Louisiana*, 405 U.S. 625, 635-637 (1972) (Douglas, J., concurring). A prima facie violation of the fair cross section requirement exists when:

410

> [T]he group alleged to be excluded is a "distinctive" group in the community; . . . the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and . . . this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979).

In addition to the Sixth Amendment fair cross section requirement, the equal protection/due process clause of the Fifth Amendment prohibits the discriminatory composition of the panel from which a grand jury is drawn if the drawing produces disproportionately unrepresentative results. *Castaneda*, 430 U.S. at 493-94. Proving a *prima facie* showing of discrimination under the equal protection clause involves an analysis similar to the fair cross section inquiry. A claimant must show "the procedure employed resulted in substantial underrepresentation of his race or identifiable group" by demonstrating: 1) the group is a "recognizable, distinct class, singled out for different treatment under the laws, as written or as applied"; 2) the group was underrepresented in the grand jury process over a significant period of time; and 3) the selection procedure "is susceptible of abuse or is not racially neutral." *Id*. at 494.

Mr. Umaña has reviewed the Plan for the Random Selection of Grand and Petit Jurors in the United States District Court for the Western District of North Carolina 2007-2009, the general population and voter registration demographics for the relevant counties, and data compiled from the Juror Qualification Questionnaires released to appellate counsel. Mr. Umaña expects to prove at a hearing and following discovery that had counsel exercised their right to access the Plan for the Random Selection of Grand and Petit Jurors in the United States District Court for the Western District of North Carolina 2007-2009 (Jury Plan) and provided that plan to a relevant expert, counsel would have been able to establish the plan creates a systemic underrepresentation of

411

distinct groups, including but not limited to African-Americans, Hispanics/Latinos, and Asians in the grand and petit venires.

Jeffrey Martin is an expert in statistics and employed as a consultant on statistical and actuarial issues, including the statistics of federal and state jury lists. As a qualified expert, he has reviewed the Jury Plan, various juror data from the trial, and the District and Division's demographics. He has provided a report of his findings, attached to this Motion. Appx. 273. As Mr. Martin[112] explains in detail and would have explained to counsel before Mr. Umaña's trial, the venire selected in Mr. Umaña's case displays absolute[113] *and* comparative[114] disparities in racial makeup from the local population from which it was selected. *Id.* at 3-6.

More specifically, for the group completing the first questionnaire, "the Absolute Disparity for Black or African-American persons is 5.39% under-representation" while "the Absolute Disparity for Hispanic or Latino persons is 1.86% under-representation." *Id.* at 4. That means, in absolute numbers, the venire selected in Mr. Umaña's trial underrepresented the Black or African American population by 5.39% and the Hispanic or Latino population by 1.86%. For the group completing the second questionnaire, the disparities drop slightly to 3.66% for Black or African-American persons and 1.75% for Hispanic or Latino persons. *Id.*

---

[112] Or a similarly trained and experienced expert would have explained.

[113] "Absolute Disparity [] is the difference between the percent representation of a group in the population and the percent representation of the same group in the jury list." Appx. 273, ¶ 40

[114] "Comparative Disparity (also known as Relative Disparity), or the rate at which a group is under-represented or over-represented, treats smaller groups in the same way that it treats larger groups. That is, Comparative Disparity takes into account the relative size of the distinctive group. If there is 50% Comparative Disparity under-representation, it reflects that half of the group is missing whether from a larger group…" Appx. 273, ¶ 45.

Looking at Comparative Disparity, the results are all the more stark. For the group completing the first questionnaire, "Black or African-American persons" are "20.70% under-represented". As Mr. Martin explains, "one-fifth of the group of Black or African-American persons is missing." The second questionnaire group drops slightly to "14.05% under-representation". *Id.* at 4.

Hispanics and Latinos are even more greatly excluded. For the first questionnaire group, the comparative disparity for "Hispanic or Latino persons is 57.68% under-representation." *Id.* Even for the seemingly slightly more representative second questionnaire group, the Hispanic or Latino underrepresentation remains well above 50%, with "54.32% under-representation." Mr. Martin's finding is startling: "more than half of the group of Hispanic or Latino persons is missing."

For both questionnaire groups, the data is stark and conclusive: the underrepresentation of both Black or African American and Hispanic or Latino persons "is not the result of random factors, chance, or luck, but is the result of a systematic process that under-represents" both population groups.

The systemic exclusion of non-white populations from Mr. Umaña's venire violated the Sixth Amendment fair cross-section requirement, *Duren*, 439 U.S. at 364, and the Fifth Amendment equal protection clause, *Castaneda*, 430 U.S. at 493-94.

Mr. Umaña also expects to prove, following discovery and an evidentiary hearing, that the Grand Jury selected in Mr. Umaña's case was also composed in a manner that systemically excluded persons on the basis of race. The membership of the Grand Jury and the population it was selected from are not available to Mr. Umaña absent an order from this court. However, the language of the Jury Plan establishes a *prima facie* case of exclusion. As Mr. Martin notes, "[t]he

Jury Plan states that "Grand jurors in the Charlotte Division will be drawn equally from the Charlotte and Statesville Division master wheels." *Id.* at 6. Assuming that language means Grand Jurors were drawn in equal numbers from the two master wheels, the Jury Plan necessarily results in significant underrepresentation of minority populations.

If the two areas' demographics were similar, an equal drawing from both areas would be expected to result in similar proportions of the various racial groups consistent with their populations. However, the demographics of the two areas are significantly different. "Black or African-American persons make up 26.05% of the Charlotte Division and make up 6.72% of the Statesville Division. Hispanic or Latino persons make up 3.23% of the Charlotte Division and make up 1.99% of the Statesville Division." *Id.* at 7. Combined, "[t]he jury eligible population in the Charlotte and Statesville Divisions is 19.13% Black or African-American persons and 2.79% Hispanic or Latino persons." *Id.* However, because of the massive population disparity between the two areas ("[t]he jury eligible population in the Charlotte Division (875,305 persons) is 79.50% larger than the Statesville Division (487,639 persons)"), drawing Grand Jurors "equally" from the two wheels "would, by itself, lead to an under-representation of Black or African-American persons of 2.75% on an Absolute Disparity basis and a 14.37% under-representation on a Comparative Disparity basis." *Id.* Similarly, the plan "would, by itself, lead to an under-representation of Hispanic or Latino persons of 0.18% on an Absolute Disparity basis and a 6.30% under-representation on a Comparative Disparity basis." *Id.* Moreover, underrepresenting either racial group in either wheel would exacerbate these disparities.

As addressed at multiple points above, under a *per se* prejudice standard, counsel's failure to investigate the question of racial exclusion from Mr. Umaña's venire resulted in a venire that systemically underrepresented the Black or African American and Hispanic or Latino populations.

414

Mr. Umaña has, therefore, established a violation of his right to counsel under the Fifth, Sixth, and Eighth Amendments.

As Mr. Martin notes, further data – which may only be accessed by order from this court – is required to establish systemic race-based exclusion from the Grand Jury. However, given the language of the Jury Plan in operation at the time, Mr. Umaña has established a *prima facie* case of systemic exclusion. Following discovery and a hearing, he expects to prove that systemic exclusion and so also the violation of his Fifth, Sixth, and Eighth Amendment rights to counsel. As noted at multiple points above, this court may require proof of prejudice to establish Mr. Umaña's ineffectiveness claim. Proof of "different result" prejudice is ordinarily near impossible. *Weaver*, 137 S. Ct. at 1911. Here, to prove "different result" prejudice, a hearing would be required in which every jury-eligible resident of the two areas was questioned as to their likely 2010-views to establish that a non-exclusive Jury Plan would have resulted in a differently composed Grand Jury and venire.

Given the efforts needed to prove such a claim, assuming prejudice is not established *per se* in light of the massive systemic race-based exclusions established above, Mr. Umaña must only be required to show that the systemic exclusion of eligible jurors on the basis of race undermined the "fundamental fairness of his trial." *Id.* This he has done.

The fair cross-section requirement not only helps preserve generalized engagement with the administration of justice but also provides the necessary protection of basic impartiality. *Taylor*, 419 U.S. at 530 ("'[T]he broad representative character of the jury should be maintained, partly as assurance of a diffused impartiality and partly because sharing in the administration of justice is a phase of civic responsibility.'") quoting *Thiel v. Southern Pacific Co.*, 328 U.S. 217, 227 (1946) (Frankfurter, J., dissenting). Consequently, "[r]estricting jury service to only special

415

groups or excluding identifiable segments playing major roles in the community cannot be squared with the constitutional concept of jury trial." *Taylor*, 419 U.S. at 530.

Moreover, where fair cross-section violations excluded "identifiable segments" of the population that are identifiable by race or national origin, equal protection is also violated. *See, e.g.*, *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954), *supplemented sub nom. Brown v. Bd. of Educ. of Topeka, Kan.*, 349 U.S. 294 (1955) (applying the standards of the equal protection clause of the Fourteenth Amendment to the Fifth Amendment). And specifically in this case, because Mr. Umaña is Latino, and because the Jury Plan systemically (comparatively) underrepresented the Hispanic and Latino populations by over 50%, Mr. Umaña was effectively denied trial by a jury of his peers.

In all, Mr. Umaña was prejudiced by his counsel's failure to investigate and challenge the Jury Plan, which systemically excluded eligible jurors on the basis of race and national origin. He was therefore denied the effective assistance of counsel as protected by the Fifth, Sixth, and Eighth Amendments.

## CLAIM XVIII. THE PROSECUTION ENGAGED IN RACIAL DISCRIMINATION IN ITS EXERCISE OF PEREMPTORY STRIKES, AND TRIAL COUNSEL UNREASONABLY FAILED TO ADEQUATELY OBJECT TO THESE UNCONSTITUTIONAL STRIKES.

All other claims and allegations in this Motion are incorporated into this claim by this reference.

Of the qualified venire members from which the jury was selected, the prosecution used peremptory strikes to remove 66 percent of the African-Americans (8 out of 12) who could have served. This discriminatory use of peremptory strikes violated the Equal Protection and Due Process Clause of the Fifth Amendment. Trial counsel objected to the Government's persistent

elimination of African-Americans, citing to *Batson v. Kentucky*, 476 U.S. 79 (1986). The Court required the Government to explain the basis of its strikes. But once the Court concluded that the Government had produced facially race-neutral reasons, trial counsel pressed the matter no further. VDT 1505-10532. Trial counsel's failure to claim that the Government's reasons were pretext for purposeful discrimination or make any other attempt to prove intentional discrimination violated Mr. Umaña's Sixth Amendment right to effective assistance of counsel.

### A. Trial counsel failed to argue that the Government engaged in purposeful discrimination.

The "Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008) (internal quotation marks omitted). The Supreme Court provided a three-step process for determining when a strike is discriminatory:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Snyder*, 552 U.S., at 476–477 (internal quotation marks and brackets omitted). As to the third step, a "movant may show purposeful discrimination by demonstrating that the opposing party's explanation is mere pretext for racial discrimination." *Davis v. Baltimore Gas & Elec. Co.*, 160 F.3d 1023, 1026 (4th Cir. 1998). "[F]ailure to argue pretext constitutes a waiver of his initial [*Batson*] objection." *Id.* at 1027. *See also United States v. David*, 83 F.3d 638, 641 n.5 (4th Cir. 1996) ("The important distinction between forfeiture and waiver is that if a defendant waives a right (which is waivable), he cannot later raise an objection on the grounds that the failure to provide him with the waived right is error.").

Trial counsel made nine *Batson* objections to the Government's peremptory strikes. VDT at 1505-32 (Jurors 7, 53, 95, 103, 104, 157, 191, 289, 309). On each occasion, the Court asked the

Government to explain its reasons for the strike, *id.*, thereby establishing the first step in the *Batson* process.

After hearing from the Government, the Court found the reasons provided were race-neutral. Thus, the second *Batson* step was completed. On most occasions, counsel failed to move to the third and final step in the process, making no effort to show the Government's reasons were pretextual.

Regarding Jurors 289 and 104, counsel declined to address the third step. VDT at 1507. Regarding Jurors 157, 309, 7, and 191, counsel did challenge the Government's representation of Juror 309's answers on one question before the court's (non) pretext ruling. But, counsel declined to address the third *Batson* step for any of the four. *Id.* at 1514-15. Regarding Juror 153, counsel again declined to address the third step despite the court engaging in a protracted review of the juror's answers and noting "I think this is a close call on this one" before finding the Government's reasons were race-neutral. *Id.* at 1517-22. Regarding Juror 95, counsel again declined to address step three after the court made its "race-neutral" finding. *Id.* at 1529. Regarding Juror 103, after the court "denied" the *Batson* challenge, defense counsel made no effort to address the third step. *Id.* at 1532.

Having made nine *Batson* objections, counsel made no effort to actually present full and adequate *Batson* arguments for any. Counsel's failure to actually apply the third *Batson* step suggests their *Batson* challenges were merely *pro forma*. Whatever the reason, though, review of the record now confirms that had counsel made some effort to fully litigate their *Batson* challenges, there is a reasonable probability some or all of the Government's strikes would have been denied as pre-textual.

From just the numbers, it is apparent that the Government disproportionately exercised peremptory challenges against African American jurors. According to the race-data contained in Appx. 273 (Jeffrey Martin's report), the venire as a whole, based on the answered questionnaires, was 81.73% white, 21.32% Black or African American.[115] Were the Government's strikes proportional with the make-up of the jury, the Government should have targeted only three African American jurors. In fact, of the Government's fifteen peremptory strikes,[116] nine were against African American jurors,[117] or 60% of the Government's strikes.[118] That is, the Government's peremptory strikes targeted African Americans three times more than would be expected based on the racial composition of the venire. "Happenstance is unlikely to produce this disparity." *Miller-El v. Cockrell*, 537 U.S. 322, 342 (2003).

If numbers alone – even those so stark as these – are insufficient to reveal the pretext behind the Government's strikes, the fact that the Government treated differently jurors who gave similar answers leaves no doubt. For example, Juror 330 reported that he would support the death penalty only in limited cases of extreme brutality or premeditation. He was open to considering LWOP

---

[115] The group completing the first questionnaire totaled 659 people, with 77.46% white and 20.66% Black or African American. The group completing the second questionnaire totaled 407 people, with 75.37% white and 22.39% Black or African American. Therefore, of the total 1066 people, 81.73% were white and 21.32% were Black or African American.

[116] Jurors 7, 53, 68, 95, 103, 104, 157, 191, 203, 231, 289, 309, 328, 503, and 911.

[117] Jurors 7, 53, 95, 103, 104, 157, 191, 289, 309

[118]

and death. Alternate Juror 22 indicated that death is an acceptable punishment in some cases, unacceptable in others. Indeed, during voir dire Alternate Juror 22 equivocated between the two possible sentences to the point that the Government noted that he had "hesitated". Alternate Juror 89 provided similarly measured responses. VDT 301. Juror 202, a white male, also said he only believed "in the death penalty in certain cases," VDT 869, suggested death was only appropriate in the extreme example of the murder of a "law enforcement" officer, VDT at 870, and announced "I wouldn't say that I'm an advocate for the death penalty." VDT at 869. All were selected.

Juror 191 reported that their religious beliefs tilted against the death penalty. But, the juror insisted, "I can be open", that they believed it is, "my civic duty to do what the judge asked me to do" and "it would be my civic duty to be open-minded." Similarly, while Juror 104 reported in their questionnaire that they would always vote for LWOP in a case of murder and racketeering, during voir dire they clarified that they did not actually agree or disagree with the death penalty. They also insisted at voir dire that they would lean towards death for what they termed "a serial killer," i.e. someone "who could not be rehabilitated and will cause a threat and potentially kill again and has killed numerous people before." They also suggested that people such as "Scarface" (a violent gang leader) should get death. Given that Mr. Umaña's history of (allegedly) killing people before because of his membership in MS-13 was a key part of the Government's case, Juror 104's removal was not only a disparate reaction compared to similarly opinioned white jurors, but that removal deprived the Government of a juror who reported opinions actually favoring the Government.

Juror 95 also reported that, while it would be "very difficult either way", choosing between death and LWOP, and did not like choosing someone's penalty, she would consider both sentences "depending on the details." VDT 324.

In all, the Government removed various Black or African American jurors who gave voir dire answers similar to answers given by white jurors who were selected. *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005) ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step.").

This pattern of race-*favoring* peremptories did not appear in a vacuum. Rather, North Carolina prosecutors struggled with the implementation of *Batson* and its requirement to not excuse jurors on the basis of race. After all, the Racial Justice Act, enacted in 2009, "was the General Assembly's recognition of *Batson*'s ineffectiveness in this state." *State v. Robinson*, 846 S.E.2d 711, 716 (2020). Expert evidence established across North Carolina and in all capital cases for inmates on the state's death row as of July 2010, "African-American jurors were more than two times as likely to be struck as all other jurors." *Id.*at 717, citing Catherine M. Grosso & Barbara O'Brien, *A Stubborn Legacy: The Overwhelming Importance of Race in Jury Selection in 173 Post-Batson North Carolina Capital Trials*, 97 Iowa L. Rev. 1531 (2012). One obvious factor causing such a disparate race-based treatment of jurors, "prosecutors across North Carolina attended a 'Top Gun' training, which taught them how to articulate facially race-neutral reasons for striking African-American jurors …." *Id.* "Instead of training on how to comply with *Batson v. Kentucky*, and its mandate to stop discrimination in jury selection, North Carolina prosecutors received training in 1995 and 2011 about how to circumvent *Batson*." *Id.*

At least one of the prosecutors, Assistant U.S. Attorney Jill Rose, was a state prosecutor from leaving law school to 1999, and so would have been a recipient of that training, either in

421

person or via internal office implementation of that training.[119]  Moreover, following full discovery and an evidentiary hearing, Mr. Umaña expects to prove that Assistant U.S. Attorney Rose was not the only Assistant U.S. Attorney at that time who had joined the Department of Justice after serving as a prosecutor in the North Carolina state system, and so who too would have been exposed to that same training.

Given all the surrounding circumstances – the gross disparity in the numbers of African American jurors removed compared to composition of the venire, the disparate treatment of racially diverse jurors who provided substantially similar voir dire answers, and the general pattern and practice – based on specific *Batson*-avoiding training – of North Carolina prosecutors at the time, counsel had more than enough evidence to establish one or more *Batson* violations by the Government, had counsel actually conducted full and proper *Batson* challenges. *Snyder*, 552 U.S. at 478 (requiring all the circumstances be considered in at the third step of the *Batson* process).

### B.  Mr. Umaña suffered prejudice

The Fourth Circuit recognizes that "the prejudice component of the *Strickland* analysis may be presumed if the nature of the deficient performance is that of a structural error." *Bell v. Jarvis*, 236 F.3d 149, 165 (4th Cir. 2000) (en banc majority). And intentional discrimination in the exercise of peremptory strikes is structural. *See Batson*, 476 U.S. at 100; *Miller-El v. Dretke*, 545 U.S. 231, 251-52 (2005); *Williams v. Woodford*, 396 F.4d 1059, 1069-70 (9th Cir. 2005) ("A *Batson* violation is structural error for which prejudice is generally presumed"); *Tankleff v. Senkowski*, 2135 F.3d 235, 248 (2d Cir. 1998) ("Because the effects of racial discrimination during

---

[119] Mr. Umaña expects to prove, through discovery and at a hearing, that either Assistant U.S. Attorney Rose attended the training while serving as a state prosecutor, or that her office had received and had implemented materials from that training.

voir dire 'may persist through the whole course of the trial proceedings,' we hold that a *Batson/Powers* claim is a structural error that is not subject to harmless error review."). Thus, prejudice should be presumed.

Should the court conclude that Mr. Umaña must prove that there is a reasonable probability that, but for counsel's failure to conduct an adequate voir dire, the result of trial would have been different, *e.g. Weaver*, *supra*, such a requirement is impossible to meet, both at this pleading stage and once Mr. Umaña is required to prove his plausible allegations. Just as in Claims 16 and 17, *supra*, such *proof* would require a hearing inquiring of every struck juror their views on the death penalty at the time of trial to determine whether their presence on the jury would have affected the verdict. Such a process would be ridiculously unfeasible. *Weaver*, 137 S. Ct. at 1911 (noting the impossibility of proving "different result" prejudice where counsel's ineffectiveness caused a structural error). Thus, should this court require Mr. Umaña to prove prejudice, he meets that burden here by pleading a plausible argument that the *Batson* violations detailed above undermined "the fundamental fairness of the proceeding." *Id.* This he has done; as detailed in Claim 15, *supra*, exclusion of jurors on the basis of race violates basic principles of due process and equal protection, which inherently results in an unfair and unequal jury.

Counsel's failure to adequately raise and present *Batson* challenges to the Government's racially motivated peremptory strikes violated Mr. Umaña's his Fifth and Sixth Amendment rights, and the Fifth Amendment rights of the non-white citizens of this District. That violation created a fundamentally unfair jury. Mr. Umaña was therefore denied his Fifth, Sixth and Eighth Amendment right to the effective assistance of counsel.

### CLAIM XIX. TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL BY NOT INVESTIGATING AND INTRODUCING AVAILABLE MENTAL HEALTH EVIDENCE TO CONTEST THE ADMISSIBLITY AND

423

**CREDIBILITY OF MR. UMAÑA'S STATEMENTS TO LAW ENFORCEMENT OFFICERS IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.**

All other claims and allegations in this Motion are incorporated into this claim by this reference.

On April 23, 2008, Los Angeles police detectives interrogated Mr. Umaña while he was jailed on the Greensboro shootings. Mr. Umaña made incriminating statements which, at a minimum, placed him at the scene of each of the Los Angeles murders. Trial counsel's failure to secure and present expert assistance to challenge the admissibility of these statements pre-trial and to contest the credibility these statements during trial was objectively unreasonable and prejudiced Mr. Umaña.

On April 24, 2009, trial counsel filed a motion to suppress these statements claiming that Mr. Umaña did not knowingly and voluntarily waive his *Miranda* rights, and that the "use of promises and trickery" rendered the statements involuntary. Crim. Doc. 491 at 3. These arguments were based primarily on the detectives repeatedly promising Mr. Umaña that his statements would not "affect" his pending North Carolina state case, and any statement would not "cost" him anything. In support of the motion trial counsel did not submit any evidence but quoted from a translated transcript of the interrogation.

On August 26, 2009, the Court held an evidentiary hearing on the suppression motion. The Government called Detective Frank Flores and introduced the entire transcript of the interrogation. August 26, 2009, Motion Hearing, at 46, 71. Flores admitted making comments that Mr. Umaña had "nothing to lose by talking" about the Los Angeles murders but asserted that Mr. Umaña understood his *Miranda* rights. *Id*. at 65-66. Trial counsel did not call any witnesses and did not introduce any exhibits relating to the *Miranda* and voluntariness motions. *Id*. at 73.

424

The Court denied the motion to suppress, but not without hesitation. The Court commented that the detectives "appear to have misrepresented to [Mr. Umaña], certain investigative facts that may have impacted his statements to them." *Id*. at 80. The Court also indicated that the totality of the circumstances "gives me more pause," *id*. at 101 and noted several factors "that tend towards showing some degree of coerciveness." *Id*. at 102. But ultimately, the Court did "not find a violation of the *Miranda* rights," and "the defendant's will was not overborne [and] his capacity for self-determination was not critically impaired." *Id*. at 102-03.

Appellate counsel raised this issue on appeal, but the Fourth Circuit denied it, agreeing with the Court's finding of no *Miranda* violation, and holding that the statements were voluntarily made "[c]onsidering the entirety of the interrogation." *United States v. Umaña*, 750 F.3d 320, 344-45 (4th Cir. 2014).

At the motion hearing, however, trial counsel failed to present all the relevant, and available, information to show that Mr. Umaña's statement was not voluntary and he did not validly waive his *Miranda* rights.

In El Salvador, the police frequently brutalized Mr. Umaña for associating with a gang. This experience with law enforcement made Mr. Umaña vulnerable to police coercion and overreach and was relevant to the Court's determination of the voluntariness of his statements. *United States v. Pelton*, 835 F.2d 1067, 1071-72 (4th Cir. 1987); *United States v. Boone*, 245 F.3d 352, 362 (4th Cir. 2001); *United States v. Moore*, No. 5:14-CR-56, 2015 WL 93659, at *4 (W.D.N.C. Jan. 7, 2015).

Mr. Umaña's close friend, Luis Ramos, saw Mr. Umaña tortured by the police in El Salvador. Mr. Ramos told current counsel "the police beat Alejandro terribly and they would leave him with visible bruises and welts. He was constantly in pain because the police beatings happened

425

so frequently. One of the torture methods the police used was to beat the soles of your feet. There were times that Alejandro could barely walk because his feet were so badly beaten." The police harassed Mr. Umaña until he left El Salvador. Appx. 112 at ¶13, Declaration of Luis Mario Ramos Mendez. Before trial, the prosecutors brought Mr. Ramos to the jail where Mr. Umaña awaited trial. Mr. Ramos wanted to talk to trial counsel. Appx. 112 at ¶50, Declaration of Luis Mario Ramos Mendez. Trial counsel ineffectively failed to talk to Mr. Ramos, identify Mr. Umaña's history with the police and present that history to support the Suppression Motion.

Mr. Umaña's girlfriend, Monica Reyes, knew the police frequently beat and harassed Mr. Umaña in El Salvador. She saw them pick him up when he wasn't doing anything. He waited, outside her home, for her to get ready for a party and the police took him away. He did nothing but wait for her and he was imprisoned. Appx. 12 at ¶16, Declaration of Monica Reyes. Mr. Umaña's experience with law enforcement rendered him susceptible to police coercion but trial counsel failed to discover and present Mr. Umaña's vulnerability.[120] *See also* Appx.239 at ¶12, Declaration of Wendy Alvarez (she also saw police arrest Mr. Umaña for having tattoos).

---

[120] Mr. Umaña is brain damaged, mentally ill and possesses a low I.Q. *See* Claims I - IV. Trial counsel would have rendered ineffective assistance by relying Mr. Umaña to provide notice of legally relevant facts on this or any issue.



The suggestion from Dr. Weinstein, that Mr. Umaña showed neurological dysfunction led trial counsel to engage Dr. Merikangas and request a neuropsychiatric evaluation. The evaluation consisted of a neurological physical examination, a P.E.T. (Positron Emission Tomography) scan and a C.T. (Computed Tomography) scan. Appx. 72, Report Dr. Merikangas, (11/17/09). All three methods of examination revealed signs of brain dysfunction. Dr. Merikangas concluded:

> Alejandro Umaña is a brain-damaged man with developmental cognitive impairments in the mentally retarded range. He has an abnormal neurological examination, abnormal neuropsychological test results, abnormal PET scan of the brain and an abnormal quantitative EEG. These brain impairments, to a reasonable degree of medical probability, render his less able to form executive judgments to control his impulses and modulate his behavior compared to normal individuals.

*Id*.; see also Appx. 29, Neurobehavorial Assessment by Dr. Gur.

Further, Dr. Olley, a psychologist and educator who ran the University of North Carolina School for Developmental Disabilities Education and Research also evaluated Mr. Umaña pretrial. Dr. Olley concluded Mr. Umaña showed a significant impairment in intelligence and clear deficits in conceptual skills at the least. Appx. 73.

Luis Mario Ramos Mendez saw Mr. Umaña's cognitive short comings first-hand in El Salvador and the United States. Mr. Ramos told 2255 counsel "Something was wrong with Alejandro's brain; he had disabilities. It was like his brain had stopped developing at an early age. Alejandro was very simple-minded, and he did not analyze things. People who knew Alejandro

427

realized that something was wrong with him. They would ask what was wrong with him and say it seemed like he had a screw loose." Appx. 112 at ¶37, Declaration of Luis Mario Ramos Mendez; *see also* Appx. 26 at ¶8, 17, Declaration of Richard McGough (trial mitigation specialist described Mr. Umaña as "mentally slow" and having no appreciation of the circumstances he faced.).

Trial counsel had Dr. Merikangas' and Dr. Olley's reports in hand by mid-November, about two months after the trial court orally denied the Motion to Suppress but five months prior to trial. They could have had Mr. Ramos statements as well; he was in the same jail as Mr. Umaña prior to trial. Nevertheless, trial counsel failed seek Mr. Ramos' statements and failed to incorporate Dr. Merikangas' and Dr. Olley's conclusions into a further argument for suppression. Appx. 73, Dr. Olley Psychological Evaluation (11/18/09).

The statements by Ramos and conclusions in the reports directly supported trial counsel's arguments to suppress Mr. Umaña's statements. Trial counsel argued that Mr. Umaña's statement was involuntary due to the trickery, deception, deceit, and improper influence of the police officers. Motion To Suppress, (Crim. Doc. 491 04/24/09), PP. 6, 17; NT Mot to Suppress Hearing, 08/26/09 at 92-98. His cognitive weakness, low intelligence and problems handling concepts, and experience with law enforcement in El Salvador exaggerated Mr. Umaña's vulnerability to trickery, deception, deceit, and undue influence and should have been argued to the Court. Trial counsel was ineffective for not supporting their argument with this readily available expert opinion and testimony.

Significantly, these two defense experts later testified at the *Atkins* hearing (on cross-examination by the Government) specifically that Mr. Umaña probably did not understand his *Miranda* rights. *See* Atkins Hrg. at 83 (Dr. Olley stating "I think he probably did not understand his *Miranda* rights"); *id*. at 195 (Dr. Weinstein stating "I expressed my concern to them over the

fact that he probably did not understand his Miranda rights"). Trial counsel's failure to produce evidence of intellectual deficits and explain how those deficits interfered with Mr. Umaña ability to knowingly and intelligently waive his *Miranda* rights and to voluntarily make a statement was objectively unreasonable.[121] Had trial counsel provided the Court with the readily available evidence of Mr. Umaña's intellectual disability and mental impairments – *see* Claims II, III, IV -- there is a reasonably probability that Mr. Umaña's statements would have been suppressed. *See Blackburn v. Alabama*, 361 U.S. 199 (1960) overruled on other grounds by *Jackson v. Denno*, 378 U.S. 368, 377 (1964) ("mental incapacity" relevant to the voluntariness of a confession.); *Fikes v. Alabama*, 352 U.S. 191 (1957).

In the alternative, the testimony and reports from Drs. Merikangas, Olley and Weinstein clearly expose error by the Court in denying the Motion to Suppress. The Court found that Officer Flores did not violate *Miranda* and Mr. Umaña's will was not "overborn," regarding the waiver of rights because the interrogation was "conversational." NT 08/26/09; Suppression hrg at 102. Drs. Olley, Weinstein and Merikangas, each independently and after reviewing the others' conclusions, found Mr. Umaña intellectually disabled; he struggled with conceptual skills and showed deficient executive functions. Appx. 70, 72, 73. Importantly, each doctor conducted a clinical interview; they talked with Mr. Umaña and gathered sufficient background material from him to be satisfied in their conclusions. Mr. Umaña conversed with them, but they still found him compromised and intellectually disabled. *See also* Appx. 215, Declaration of Dr. Stewart at ¶7; Appx. 216 at ¶6; Appx. 237, Declaration of Dr. Sermeño at ¶37, 73. The Court's conclusion that the interrogation

---

[121] Counsel's deficient performance includes failing to request a continuance of the motion hearing to present such evidence and failing ask for reconsideration once the Government elicited evidence contradicting the Court's earlier ruling.

429

with Detective Flores was conversational and therefore voluntary was error. Mr. Umaña's intellectual difficulties prevent him from understanding and using or applying information (*see* Appx. 112, Declaration of Luis Ramos, ("Alejandro was very simple-minded, and he did not analyze things,")) but the difficulties do not prevent him from taking part in conversation. The trial court erred in refusing to suppress Mr. Umaña's statement because the interrogation was "conversational."

Moreover, trial counsel unreasonably failed to use expert testimony to question the reliability of the statements during trial. *See Crane v. Kentucky*, 476 U.S. 683, 688 (1986) ("because questions of credibility, whether of a witness or of a confession, are for the jury, the requirement that the court make a pretrial voluntariness determination does not undercut the defendant's traditional prerogative to challenge the confession's *reliability* during the course of the trial") (quotations omitted). The failure of trial counsel to present evidence of Mr. Umaña's intellectual deficits to give context to the statements was prejudicial because not only did the Government claim that the statements supported Mr. Umaña's participation in the Los Angeles murders, but they also used them to rebut mitigating factors, such as lack of education and brain damage. For example, the Government argued:

> And you heard a little about the defendant's statements to law enforcement in April of '08. If you get a chance to look at that, look at the cat and mouse game he played. The brain damaged guy over there, he played an awesome cat and mouse game with the investigators. Yeah, I was there. Pulled it out of my pants. I don't know. I shot it. Read it.
>
> Just like the codes, just like the letters. This isn't some brain damaged individual over here. He's cold, he's calculating, and he's very savvy. And I think you saw it in his letters. He's very, very savvy.

430

PPT at 896-97.[122]

Trial counsel had evidence to directly rebut the Government's arguments and did not use it. When questioned by the Government at the *Atkins* hearing Dr. Olley expressly stated that he "would not characterize" the interview as a "cat and mouse between the defendant and the investigators." Atkins Hrg. at 83. Instead, Dr. Olley offered his opinion that the transcript of the interrogation showed Mr. Umaña to be "extraordinarily unsophisticated," and "he was quite inarticulate and naïve." *Id*. at 83-84. Thus, had the jury been presented with Dr. Olley's testimony or other readily available expert testimony about Mr. Umaña's intellectual deficits and mental impairments, there is a reasonable probability that at least one juror would have struck a different balance and that the outcome of the proceeding would have been different. *Wiggins v. Smith*, 539 U.S. 510, 537 (2003).

**CLAIM XX. MR. UMAÑA WAS DEPRIVED THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL, DUE PROCESS AND A FAIR TRIAL BY THE DENIAL OF HIS RIGHT TO BE PRESENT AT EVERY STAGE OF THE PROCEEDINGS, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.[123]**

All other claims and allegations in this Motion are incorporated into this claim by this reference.

---

[122] As demonstrated in Claim VIII, neither the codes nor the letters were sophisticated.

[123] Undersigned counsel maintains, as alleged in Claim 31 of the Supplemental/Amended 2255 Motion, that Mr. Umaña was incompetent at the time of trial, *see* Civ. Docs. 69, 71, as a result of the intellectual disability, brain damage, and mental illness described at length in this motion. See Claims 1-IV. By continuing to litigate this claim raised by prior counsel, current counsel does not concede Mr. Umaña's competence at any stage of these proceedings. However, counsel acknowledges this Court's finding, Civ. Doc. 85, that Mr. Umaña possesses no right to competency at this point in his litigation. *See also* Mot for Stay, Civ. Doc 82.

A person charged with a felony has a fundamental right to be present at every stage of the trial. *Illinois v. Allen*, 397 U.S. 337, 338 (1970). This includes the right to be present during the jury selection process. *Diaz v. United States*, 223 U.S. 442, 455 (1912). The right of presence derives from the Confrontation Clause of the Sixth Amendment and the Due Process Clauses of the Fifth and Fourteenth Amendments. *United States v. Gagnon*, 470 U.S. 522, 526 (1985). The Eighth Amendment includes a right to fair trial and penalty processes and a fair, rational, non-arbitrary penalty. *United States v. Higgs*, 353 F.3d 281, 332 (4th Cir. 2003), *see also* 18 U.S.C.A. § 3595(c)(1).

**A. Mr. Umaña was denied the right to be present and the right to effective assistance of counsel during the jury selection process, in violation of the Fifth, Sixth, and Eighth Amendments.**

More than a year after jury selection, the Court revealed that it excused fifty-four jurors for cause outside of Mr. Umaña's presence. Mr. Umaña's personal absence from the dismissal of these jurors was complete. Mr. Umaña was never informed about the contents of the Juror Questionnaires – only the attorneys were permitted to see them. *See* Crim. Doc. 672 at 1 ("The attorneys are under orders to maintain the confidentiality of any information they learn in the course of reviewing these questionnaires."); VDT at 19-20 ("only the Court and the attorneys for both sides will have seen your answers."). Moreover, although the Court stated that "the obvious 'for cause' jury challenges . . . need to be discussed at a final pretrial conference," August 26, 2009, Motion Hearing, at 119, such a discussion was never held.

An accused's absence during jury selection denies "the defendant an opportunity to 'give advice or suggestions to his lawyer concerning potential jurors.'" *United States v. Rolle*, 204 F.3d 133, 136 (4th Cir. 2000) (quoting *United States v. Camacho*, 955 F.2d 950, 953 (4th Cir.1992) (citation omitted)). In fact, "a defendant's presence at voir dire is of utmost importance." *Id.*

432

> [T]he defendant has unique knowledge which is important at all stages of the trial, including voir dire. At the voir dire he may, for example, identify prospective jurors that he knows. He may also have knowledge of facts about himself or the alleged crime which may not have seemed relevant to him in the tranquility of his lawyer's office, and thus may not have been disclosed, but which may become important as the individual prejudices or inclinations of the jurors are revealed. He may also be a member of the community in which he will be tried and might be sensitive to particular local prejudices his lawyer does not know about.

*Camacho*, 955 F.2d at 956 (quotations omitted). Thus, "[a] defendant's absence during the impaneling of the jury certainly frustrates the fairness of the trial." *Id.* at 953. *See Cohen v. Senkowski*, 290 F.3d 485, 489 (2d Cir. 2002) ("pre-screening of prospective jurors is a material stage of trial at which the defendant has a constitutional right to be present."); *Gomez v. United States*, 490 U.S. 858, 873 (1989) ("'the trial commences at least from the time when the work of empaneling the jury begins.'") (quoting *Lewis v. United States*, 146 U.S. 370, 374 (1892) and *Hopt v. Utah*, 110 U.S. 574, 578 (1884)); *see also* FED. R. CRIM. P. 43(a) (providing the right to "be present . . . at every stage of the trial, including the impaneling of the jury").

### 1. Mr. Umaña's right to be present during jury selection was violated.

The use of juror questionnaires and the removal of jurors for cause based solely on the questionnaires violated Mr. Umaña's right to be present in two ways. First, Mr. Umaña was totally absent from the pre-voir dire removal of jurors. He did not know the contents of the questionnaires, he was not consulted about the proposed challenges, and the Court excused the prospective jurors without a hearing or any other notification. Thus, Mr. Umaña had no "opportunity to 'give advice or suggestions to his lawyer concerning potential jurors.'" *Rolle*, 204 F.3d at 136 (quoting *Camacho*, 955 F.2d at 953).

Second, Mr. Umaña's right to be present was violated by the Court's order for the attorneys "to maintain the confidentiality of any information they learn in the course of reviewing these questionnaires." Crim. Doc. 672 at 1. The 23-page questionnaires, however, contained a wealth of

433

important information as to the potential biases of the prospective jurors that were rarely mentioned during voir dire. Because the trial attorneys could not and did not share the questionnaire information with Mr. Umaña, this process again denied the "opportunity to 'give advice or suggestions to his lawyer concerning potential jurors.'" *Rolle*, 204 F.3d at 136 (quotations omitted).

### 2. The denial of this right was prejudicial.

Mr. Umaña's complete exclusion from voir dire prejudiced him. Fifty-four prospective jurors were excused, and all jurors were selected, outside of Mr. Umaña's presence. Considering that this was a capital trial, the denial of Mr. Umaña's right to be present during jury selection cannot be deemed harmless. The violation of this fundamental right warrants a new trial. *See Hopt*, 110 U.S. at 577 ("the action of the court in permitting the trial in his absence of these challenges of jurors was so irregular as to vitiate all the subsequent proceedings"); *United States v. Gay*, 522 F.2d 429, 435 (6th Cir. 1975) ("the total absence of a record of the proceedings in which the changes in the makeup of the jury occurred requires us to assume prejudice").

Should the court require Mr. Umaña to prove that there is a reasonable probability that, but for counsel's failure to protect his right to be present, the result of trial would have been different, *Weaver*, 137 S. Ct. 1899 (requiring proof of prejudice for ineffective assistance claim based on failure to prevent a structural error), such prejudice is impossible to meet at this pleading stage and in the circumstances of this case, as such proof would require a re-do of the entire jury selection with Mr. Umaña's presence. However, as detailed in Claim XIV, *supra*, prejudice in a situation such as this may also be established through a showing that counsel's deficient performance undermined "the fundamental fairness of the proceeding." *Weaver*, 137 S. Ct. at 1911. Unlike a non-capital trial, the jurors who sat on Mr. Umaña's case would make a determination not only as

to his guilt, but also as to whether he would live or die as part of their legally binding sentence. As such, it was critical that Mr. Umaña participate during jury selection so that he could make informed decisions with his counsel about who would be sitting on the jury that would literally determine whether he lived or died. If the right to presence is to mean anything, presence during the selection of the twelve people who will decide whether a defendant lives or dies must be recognized as fundamentally unfair. In short, Mr. Umaña was deprived of his Sixth Amendment right to effective counsel for counsel's failure to protect his Fifth, Sixth and Eighth Amendment rights to be present at the selection of his jury.

**B. Mr. Umaña was denied his right to presence and right to effective assistance of counsel throughout the proceedings because he was not provided with an effective mechanism to participate in his capital trial, to communicate with trial counsel, and to assist in his defense, in violation of the Fifth, Sixth and Eighth Amendments.**

Mr. Umaña was denied the right to presence and effective assistance of counsel for a second reason. Due to language barriers and intellectual disability, Mr. Umaña was effectively prevented from participating in his trial and communicating with and assisting in his defense. This, too, prejudiced the outcome of his case.

Born in Guatemala and raised in El Salvador, Mr. Umaña speaks only Spanish. The Spanish language has different dialects. As the Government language expert testified, "it's very helpful to know those differences in dialects." GPT at 608. While "Hondurans and Salvadorans have very similar dialect," "a Mexican will sound quite different." *Id*. Because Mr. Umaña has a Central American dialect, with an El Salvadoran subdialect, the Government used an "an expert in language in the Central American dialect" to interpret his recordings and writings. GPT at 572. This expert testified that Mr. Umaña had a poor vocabulary and his "own speak [and] idiolect." GPT at 605. Mr. Umaña is also uneducated and unfamiliar with the American legal system. Appx.

435

26 at ¶8, 16-17 (Declaration of Richard McGough); Appx. 72, Declaration of Dr. Merikangas (conclusion paragraph).

Additionally, Mr. Umaña suffers from brain damage and has deficits in intellectual functioning. He has frequent and severe migraine headaches as shown at his *Atkins* hearing, when he began throwing up during a fifteen-minute break. Crim Doc. 932. at 285; Appx. 72, Declaration of Dr. Merikangas. Trial counsel explained that the "migraines" were "painful," "customary," and "[i]t's pretty normal for him to throw up quite a bit." *Id*.[124]

Because neither of Mr. Umaña's trial counsel spoke Spanish, Mr. Umaña had no way of directly communicating with anyone on his legal team during court proceedings. Nor was an interpreter provided for this purpose. While interpreters were generally present in the courtroom, their role was primarily focused on interpreting the testimony of witnesses, arguments of counsel, and pronouncements by the Court. The record does not show that any measures were taken to ensure that Mr. Umaña could communicate with counsel while the proceedings were taking place. And nothing indicates that Mr. Umaña could hear and understand the courtroom interpreter.

"If the right to be present is to have meaning," it is "imperative that every criminal defendant . . . possess 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding.'" *U. S. ex rel. Negron v. State of N. Y.*, 434 F.2d 386, 389 (2d Cir. 1970) (quoting *Dusky v. United States*, 362 U.S. 402 (1962) (*per curiam*)). Here, Mr. Umaña's inability to communicate with counsel with a rational degree of understanding means that he was effectively

---

[124] At the *Atkins* hearing, although trial counsel represented that "[Mr. Umaña] feels okay, and is ready to keep going," the Court did not address Mr. Umaña personally to determine the accuracy of counsel's representations. Crim Doc. 932. at 285.

436

prevented from participating in his own defense, in violation of the Fifth, Sixth and Eighth Amendments.

### C. Counsel Were Ineffective.

To the extent that counsel failed to protect Mr. Umaña's rights to be present at, and participate in, critical stages of his capital trial, their failure denied Mr. Umana his right to effective assistance of trial counsel, in violation of the Fifth, Sixth and Eighth Amendments. Counsel's failure to properly raise and litigate these issues at trial constitutes deficient performance, and but for counsel's errors, there is a reasonable probability of a different outcome in both the guilt phase and the penalty phase.

To the extent that counsel could have raised the above-described juror misconduct and exposure to extraneous evidence on appeal, counsel's failure to do so constitutes ineffective assistance of counsel in violation of the Fifth, Sixth and Eighth Amendments. There is a reasonable probability that the results of Mr. Umaña's appeal would have been different had counsel raised this issue.

**CLAIM XXI. THE OVERWELMING NUMBER OF SECURITY MEASURES DEPRIVED MR. UMAÑA OF A FAIR TRIAL AND SENTENCING, AND AN IMPARTIAL JURY IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.**

All other claims and allegations in this Motion are incorporated into this claim by this reference.

Following full discovery and an evidentiary hearing, Mr. Umaña expects to demonstrate that the security measures within and outside the courtroom influenced the verdict in his trial. These measures include, but are not limited to, treating the jurors as anonymous, the leg shackling of Mr. Umaña during trial, VDT at 13, █████████████████████████

█████, and the extra-ordinary security protocols, including an unusually large law enforcement presence in the courtroom, courthouse, and surrounding areas. *Cf.* Appx. 253 (*Security is tight for MS-13 trial in Charlotte today*, Charlotte Observer, January 12, 2010 ("[A] guard stood watch on the roof of the federal courthouse" for the codefendants' trial.)); Appx. 255 (*MS-13 gang members guilty,* Charlotte Observer, January 27, 2010 (describing the "extraordinary security" and "heightened security at the federal courthouse" for the codefendants' trial: "Spectators had to pass through two metal detectors. The identities of jurors were kept secret. And a large tent was put up behind the courthouse, preventing outsiders from seeing when the defendants arrived and left.").)

A basic principle defining the right to a fair trial is that a criminal defendant is entitled to a verdict based only upon the evidence introduced at trial. *Holbrook v. Flynn*, 475 U.S. 560, 567 (1986); *Taylor v. Kentucky*, 436 U.S. 478, 485 (1978); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (holding that the verdict must be based upon the evidence developed at trial "regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies"). To ensure that right, courts must guard against "intrusion of factors into the trial process that tend to subvert its purpose." *Estes v. Texas*, 381 U.S. 532, 560 (1965). Specifically, courts should prevent "the atmosphere in and around the courtroom [becoming] so hostile as to interfere with the trial process, even though . . . all the forms of trial conformed to the requirements of law." *Id*. at 561; *see also Woods v. Dugger*, 923 F.2d 1454, 1456-57 (11th Cir. 1991).

Based on the charges and his conduct, Mr. Umaña understands some precautions were necessary. But the measures taken were excessive and not enough was done to minimize the hostile atmosphere they created. For example, unlike other cases involving treating jurors as anonymous, the jury never received a non-prejudicial reason for empaneling an anonymous jury. *Accord United*

438

*States v. Dinkins*, 691 F.3d 358, 378 (4th Cir.2012) ("[T]o protect a defendant tried by an anonymous jury from having the jury conclude that the defendant is a dangerous person from whom the jurors must be protected, courts customarily provide the jury a non-prejudicial reason for their anonymity"); *United States v. Hager*, 721 F.3d 167, 188 (4th Cir. 2013) ("the district court told the panel that the reason they were identifying them by numbers in court, as opposed to by name, was 'to protect [them] from contact in the media or other persons, curiosity seekers and the like, to protect [them] from unwanted publicity and to insure that no outside information [was] communicated to [them] through th[e] process and the trial.'"). As such, the jury was left to assume that the reason for anonymity was for its own safety.

Further, the prosecutor improperly exploited the added security measures by arguing: "But they say he did it to fight off rivals. Over here at the federal courthouse. There were a lot of rivals in the courthouse. You know who the rivals were? They're the marshals. Those are his rivals. The judge is his rival. I'm his rival. Anybody in this courtroom is a rival. You're his rival." PPT at 898-99. Combined with the extraordinary security measures, this argument would have left jurors feeling that Mr. Umaña represented a danger to them, and that their safety was at risk. Thus, Mr. Umaña alleges that because of the hostile atmosphere that pervaded the trial in his case, jurors and some witnesses alike were affected. Mr. Umaña alleges that he can demonstrate both actual and inherent prejudice based on the totality of circumstances in his case, and that he is entitled to postconviction relief.

Moreover, to the extent trial counsel agreed to or failed to object to circumstances that created the hostile atmosphere, counsel's conduct was objectively unreasonable and prejudiced Mr. Umaña. There can be no strategic basis for failing to minimize the security measures to which the jury was exposed in a case such as this, where trial counsel knew that the government was

alleging Mr. Umaña's future dangerousness as a non-statutory aggravating circumstance. To the extent that Mr. Umaña must demonstrate prejudice to prevail on this claim, by showing that the security measures actually impacted the jurors deliberations he is prevented from doing so by this Court's order preventing him from having contact with the jurors. If such juror contact remains prohibited, an evidentiary hearing is necessary to allow Mr. Umaña the opportunity to develop this claim. *See* Claim XV.

To the extent that counsel could have raised the effects of the excessive security measures on appeal, counsel's failure to do so constitutes ineffective assistance of counsel in violation of the Fifth, Sixth and Eighth Amendments. There is a reasonable probability that the results of Mr. Umaña's appeal would have been different had counsel raised this issue.

**CLAIM XXII. MR. UMAÑA'S SENTENCEs OF DEATH MUST BE VACATED BECAUSE HIS CONVICTIONS FOR USE AND POSSESSION OF A FIREARM DURING AND IN RELATION TO A CRIME OF VIOLENCE RESULTING IN DEATH ARE VOID IN LIGHT OF RETROACTIVE SUPREME COURT PRECENT JOHNSON AND *DAVIS*.**

All other claims and allegations in this Motion are incorporated into this claim by this reference.

In Mr. Umaña's initial 2255 motion, he pled this Claim as follows:

In Counts 23 and 25 Mr. Umaña was sentenced to death pursuant to 18 U.S.C. § 924(c) & (j). Crim. Doc. 1049, 1051. This provision authorizes imposition of a death sentence if an individual commits a murder with a firearm in the course of committing a "crime of violence" as defined by 18 U.S.C. § 924(c)(3). Counts 23 and 25 relied on the offenses of conspiracy to participate in a racketeering enterprise in violation of 18 U.S.C. § 1962 as charged in Count 1, and murder in aid of racketeering in violation of 18 U.S.C. § 1959 as charged in Count 22, as constituting "crimes of violence." But the recent, and retroactive, Supreme Court case of *Johnson*

*v. United States*, 135 S.Ct. 2551 (2015), has changed the way "crime of violence" is defined in such a manner that neither of these offenses now qualifies as a "crime of violence." As such, Mr. Umaña's convictions on Counts 23 and 25 are void, and his death sentences on all counts must be vacated.

Moreover, the verdict form and instructions called for a general verdict as to the "crime of violence." Each § 924(c) & (j) count provided: "As to [the specific count], charging the defendant with use of a firearm in relation to crime of violence resulting in the death of [victim], in violation of 18 U.S.C. § 924(c) & 924(j)(1), we, the jury, unanimously find the defendant" guilty or not guilty. *See* Crim. Doc. 1043 at 2. The instructions similarly did not ask the jury to state the alleged "crime of violence" that had been committed. *See* GPT at 1250 (stating "[y]ou must be unanimous in your verdict as to which crime of violence, if either, that the defendant used a firearm during and in relation to," but not requiring the jury to state during which offense a firearm was used); GPT at 1219-20 ("where the indictment uses the word 'and,' you may consider it as 'or'"). Thus, if either conspiracy to participate in racketeering or murder in aid of racketeering no longer survive the constitutionally vague problems of *Johnson*, all of Mr. Umaña's death sentences must be vacated. *See Griffin v. United States*, 502 U.S. 46, 53 (1992) (concluding that the "language" and "holding" of *Stromberg v. California*, 283 U.S. 359, 368 (1931) stands for the principle that, "where a provision of the Constitution forbids conviction on a particular ground, the constitutional guarantee is violated by a general verdict that may have rested on that ground").

**A. In light of _Johnson_, Mr. Umaña's convictions under 18 U.S.C. § 924(c) cannot be sustained because racketeering conspiracy and murder in aid of racketeering fail to qualify as "crimes of violence"[125]**

Mr. Umaña's § 924(c) convictions for using a firearm in relation to a "crime of violence" are void because the "crime of violence" element cannot be satisfied here. The alleged offenses of racketeering conspiracy and murder in aid of racketeering do not qualify as "crimes of violence" as a matter of law.

Under § 924(c)(3), "crime of violence" is defined as follows:

> (3)   For purposes of this subsection, the term "crime of violence" means an offense that is a felony and –
> (A)   has an element the use, attempted use, or threatened use of physical force against the person or property of another, or
> (B)   that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3). The first clause – § 924(c)(3)(A) – is commonly referred to as the force clause. The other – § 924(c)(3)(B) – is commonly referred to as the residual clause. _See United States v. Fuertes_, 805 F.3d 485, 498 (4th Cir. 2015).

The determination of whether an offense qualifies as a "crime of violence" under § 924(c)(3) "does not consider the 'particular facts disclosed by the record of conviction.'" _Id_. (quoting _James v. United States_, 550 U.S. 192, 202 (2007)). Instead, the § 924(c)(3) crime of violence determination employs the "categorical" or "modified categorical" approach depending on the applicable alleged statute. _Id. See also United States v. McNeal_, 818 F.3d 141, 152 (4th Cir. 2016) ("In determining whether an offense is a crime of violence under either clause [of §

---

[125] In order to sustain a conviction and its accompanying death sentence under 18 U.S.C. § 924(j), one must first have been convicted for using a firearm in relation to a crime of violence under 18 U.S.C. § 924(c). Thus, if Mr. Umaña could not have been found guilty under 924(c), his sentence under 924(j) must fail, as well.

442

924(c)(3)], we utilize the categorical approach, which focuses solely on the elements of the offense, rather than on the facts of the case."); *United States v. Naughton*, 621 Fed. App'x. 170, 177-78 (4th Cir. Sept. 2, 2015) (the § 924(c)(3) inquiry "does not permit our review of the conduct underlying Naughton's conviction, but allows us to consider only 'the statutory definition of the [] crime and the fact of conviction to determine whether the conduct criminalized by the statute, including the most innocent conduct, qualifies as a "crime of violence"'") (quoting *United States v. Royal*, 731 F.3d 333, 341-42 (4th Cir. 2013)).

This approach requires that courts "look only to the statutory definitions – i.e., the elements – of a defendant's [offense] and not to the particular facts underlying [the offense]" in determining whether the offense qualifies as a "crime of violence." *Descamps v. United States*, 133 S. Ct. 2276, 2283 (2013). In addition, under the categorical approach, an offense can only qualify as a "crime of violence" if all of the criminal conduct covered by a statute – "including the most innocent conduct" – matches or is narrower than the "crime of violence" definition. *United States v. Torres-Miguel*, 701 F.3d 165, 167 (4th Cir. 2012). If the most innocent conduct penalized by a statute does not constitute a "crime of violence," then the statute categorically fails to qualify as a "crime of violence."

Moreover, not just any application or threat of physical force will do. The offense must "contain an element that there be the intentional employment of physical force against a person or thing." *Garcia v. Gonzales*, 455 F.3d 465, 468 (4th Cir. 2006) (interpreting identical language in 18 U.S.C. § 16). And "physical force" means violent force – that is "strong physical force," which is "capable of causing physical pain or injury to another person." *Johnson v. United States*, 559 U.S. 133, 140 (2010).

443

As discussed in the next sections, racketeering conspiracy and murder in aid of racketeering fail to qualify as "crimes of violence" under the applicable categorical or modified categorical approach. Neither offense can qualify under the residual clause because it is void for vagueness under the most recent *Johnson* decision. In *Johnson*, the Supreme Court struck down the Armed Career Criminal Act's (ACCA) residual clause (18 U.S.C. § 924(e)(2)(B)(ii)) as unconstitutionally vague. 135 S. Ct. at 2557. Under *Johnson*, § 924(c)'s materially indistinguishable residual clause (§ 924(c)(3)(B)) must similarly be stricken as unconstitutional. *See United States v. Davis*, 204 L. Ed. 2d 757 (2019). Likewise, each alleged offense categorically fails to qualify as a "crime of violence" under the remaining force clause of § 924(c)(3)(A), because neither has an element requiring the intentional use, attempted use, or threatened use of violent physical force. Therefore, a conviction cannot be constitutionally sustained under § 924(c) for Counts 23 and 25.

### 1. Section 924(c)'s residual clause is unconstitutionally vague.

In *Johnson*, the Supreme Court decided that the ACCA's residual clause ("otherwise involves conduct that presents a serious potential risk of physical injury to another") is unconstitutionally vague. The decision equally applies to the parallel "crime of violence" definition in § 924(c)(3)'s residual clause, because § 924(c)(3)(B) suffers from the same two flaws that compelled the Supreme Court to declare the ACCA residual clause void for vagueness. Using § 924(c)(3)(B) to categorize a predicate conviction as a "crime of violence," therefore, violates due process.

Indeed, the Ninth Circuit in *Dimaya v. Lynch*, 803 F.3d 1110 (9th Cir. 2015), and the Seventh Circuit in *United States v. Vivas-Ceja*, 808 F.3d 719 (7th Cir. 2015), have already struck down an identical residual clause – 18 U.S.C. § 16(b) – as unconstitutionally vague in light of

444

*Johnson*.[126] The rationale of *Dimaya*, *Vivas-Ceja*, and *Gonzalez-Longoria* applies equally to the determination of whether an offense qualifies as a "crime of violence" under 18 U.S.C. § 924(c). Relying on the same reasoning of *Dimaya* and *Vivas-Ceja*, two district courts recently found that the § 924(c) residual clause was void for vagueness. *See United States v. Lattanaphom*, 159 F.Supp.3d 1157, (E.D. Cal. 2016); *United States v. Edmundson*, 153 F.Supp.3d 857, (D. Md. Dec. 30, 2015). This Court should do the same.

### a. *Johnson expressly overruled the "ordinary case" approach to determining whether a felony qualifies as a "crime of violence."*

In *Johnson*, the Supreme Court "began its analysis of the vagueness question by noting that the [ACCA] residual clause mandates the use of a two-step framework [under the categorical approach], to determine whether a crime is a violent felony." *Vivas-Ceja*, 808 F.3d at 721 (citing *Johnson*, 135 S. Ct. at 2557, 2562). "In the first step, the court must determine 'the kind of conduct that the crime involves in the ordinary case' as opposed to the facts on the ground in the defendant's prior case." *Id*. (quoting *Johnson*, 135 S. Ct. at 2557). The second step is also dependent on the ordinary case. Specifically, the "court must gauge whether that ordinary case of the crime presents a serious potential risk of physical injury." *Id*.

The Supreme Court held that these "two features of the residual clause conspire to make it unconstitutionally vague." *Johnson*, 135 S. Ct. at 2557. To begin with, the Court held that it is impossible for a sentencing court to even get past the first step because there is too much uncertainty about what constitutes the ordinary case of a crime. *Id*. The Court concluded that the "the residual clause offers no reliable way to choose between [] competing accounts of what

---

[126]So did the Fifth Circuit in *United States v. Gonzalez-Longoria,* 813 F.3d 225, 235 (5th Cir. 2016), but the case is now pending rehearing en banc. *See United States v. Gonzalez-Longoria*, 815 F.3d 189 (2016).

445

'ordinary' . . . involves." *Id*. at 2558. Specifically, the Court explained that a statistical analysis of reported cases, expert evidence, Google, and gut instinct are all equally unreliable in determining the "ordinary case." *Id*. at 2557.

The Court then held that the second step of the residual clause is equally flawed because there is too much "'uncertainty about how much risk it takes' [i.e., the quantum of risk] before a court can conclude that the 'ordinary case' of a crime is serious enough to be a violent felony." *Vivas-Ceja*, 808 F.3d at 722 (citing *Johnson*, 135 S. Ct. at 2558). To be clear, the Court's reasoning on the second step did not turn on the type of risk, i.e. "serious potential risk of physical injury." Rather, like the first step, it also turned on the doomed "ordinary case" inquiry: "It is one thing to apply an imprecise 'serious potential risk' standard to real-word facts; it is quite another to apply it to a judge-imagined [ordinary case] abstraction." *Johnson*, 135 S. Ct. at 2558. With these words, the Court conveyed that the constitutionality of the ACCA residual clause would not have been in question if the statute had required the jury to determine the risk based on the individual facts in the case. *Id*. The Court explained that it was not doubting the constitutionality of any statute which "require[s] gauging the riskiness of conduct in which an individual defendant engages on a particular occasion." *Johnson*, at 2561 (emphasis added). However, because under the ACCA residual clause, the quantum of risk had to be assessed based on the ordinary case, the clause was constitutionally doomed. The Court held that such indeterminacy, unpredictability, and arbitrariness inherent in the "ordinary" case analysis is more than the "Due Process Clause tolerates." *Id*. at 2558.

Thus, *Johnson* not only invalidated the ACCA residual clause, but it invalidated the "ordinary case" analysis and statutory provisions that compel such an analytical framework. In

446

other words, the only way to apply the residual clause is to use the "ordinary case" analysis, and the "ordinary case" analysis is impossible to apply in a constitutional manner.

### b. *Johnson means that § 924(c)(3)(B) is unconstitutionally vague.*

The statutory phrase at issue in this case is essentially the same as the ACCA residual clause.[127] To be sure, 18 U.S.C. § 924(e)(2)(B)(ii) and 18 U.S.C. § 924(c)(3)(B) are not identical.[128] But the differences have no impact on the constitutional analysis. Although the risk at issue in the ACCA is a risk of injury, and the risk at issue in Section 924(c) is a risk that force will be used, this difference is immaterial to the due process problem and has no impact on the *Johnson* decision.[129] The Court's holding did not turn on the type of risk, but rather how a court assesses

---

[127] Courts regularly compare the similarities between the residual clause in the ACCA to the clause at issue here. Although the comparison tends to specifically address 18 U.S.C. § 16(b), that statute is identical to § 924(c)(3)(B). *See, e.g., Chambers v. United States*, 555 U.S. 122, 133 n.2 (2009) (citing circuit splits on § 16(b) in the context of a residual clause case because § 16(b) "closely resembles ACCA's residual clause") (Alito, J., concurring). *See also United States v. Ayala*, 601 F.3d 256, 267 (4th Cir. 2010) (relying on an ACCA case to interpret the definition of a crime of violence under § 924(c)(3)(B)); *United States v. Aragon*, 983 F.2d 1306, 1314 (4th Cir. 1993) (same); *United States v. Keelan*, 786 F.3d 865, 871 n.7 (11th Cir. 2015) (describing the ACCA residual clause and § 16(b) as "analogous"); *Roberts v. Holder*, 745 F.3d 928, 930-31 (8th Cir. 2014) (using both ACCA cases and § 16(b) cases to define the same "ordinary case" analysis); *United States v. Sanchez-Espinal*, 762 F.3d 425, 432 (5th Cir. 2014) (despite the fact that the ACCA talks of risk of injury and § 16(b) talks of risk of force, "we have previously looked to the ACCA in deciding whether offenses are crimes of violence under § 16(b)").

[128] In pertinent part, the ACCA residual clause defines a "violent felony" as an offense that "otherwise involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B)(ii). Section 924(c)(3)(B) defines a crime of violence as one that "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

[129] *See Vivas-Ceja*, 808 F.3d at 722 ("§ 16(b) substitutes 'substantial risk' for the residual clause's 'serious potential risk.' Any difference between the two phrases is superficial. Just like the residual clause, § 16(b) offers courts no guidance to determine when the risk involved in the ordinary case of a crime qualifies as 'substantial.'"); *Jimenez-Gonzales v. Mukasey*, 548 F.3d 557, 562 (7th Cir. 2008) (noting that, "[d]espite the slightly different definitions," the Supreme Court's respective analyses of the ACCA and § 16(b) "perfectly mirrored" each other). *See also United States v.*

447

and quantifies the risk.[130] *See Welch v. United States*, 136 S. Ct. 1257, 1262, (2016) ("The residual clause failed not because it adopted a 'serious potential risk' standard but because applying that standard under the categorical approach required courts to assess the hypothetical risk posed by an abstract generic version of the offense.").

The two-step process is the same under both the ACCA and § 924(c). Both statutes require courts first to picture the "ordinary case" embodied by a felony,[131] and then decide if it qualifies as a crime of violence by assessing the quantum of risk posed by the "ordinary case." The Fourth Circuit held exactly as such in *United States v. Avila*, 770 F.3d 1100, 1107 (4th Cir. 2014) in construing § 16(b):

> [E]very set of conceivable facts covered by first-degree burglary does not have to present a serious risk of injury for it to qualify as a crime of violence. It is sufficient if "the conduct encompassed by the elements of the offense, in the ordinary case, presents a serious potential risk of injury to another." *James*, 550 U.S. at 208, 127 S. Ct. 1586. As long as an offense is of a type that, by its nature, presents a substantial risk that physical force against the person or property of another may be used, it satisfies the requirements of 18 U.S.C. § 16(b).

---

*Coronado-Cervantes*, 154 F.3d 1242, 1244 (10th Cir. 1998); *United States v. Kirk*, 111 F.3d 390, 394 (5th Cir. 1997); *United States v. Bauer*, 990 F.2d 373, 374 (8th Cir. 1993) (describing the differences between the statutes as "immaterial" and holding that U.S.S.G. § 4b1.2, which uses the ACCA language, "is controlled by" a decision that interprets § 16(b)).

[130] Of course, many federal and state criminal laws include "risk" standards that employ adjectives similar to those in the ACCA and § 924(c), such as "substantial," "grave," and "unreasonable." And the Supreme Court in *Johnson* said it did not mean to call most of these into question. But, as Justice Scalia's majority opinion observed, that is because the vast majority of such statutes require gauging the riskiness of conduct in which an individual defendant engages on a particular occasion; in other words, applying such a standard to "real-world conduct." 135 S.Ct. at 2561. By contrast, the ACCA's residual clause, and § 924(c)(3) too, require it to be applied to "an idealized ordinary case of the crime," an "abstract inquiry" that "offers significantly less predictability." *Id*. at 2558.

[131] Indeed, the Fourth Circuit has directly applied the "ordinary case" inquiry to the § 924(c) residual clause. See *Fuertes*, 805 F.3d at 500 n.6; *Naughton*, 621 Fed. Appx. at 178 (applying the ordinary case inquiry to § 924(c)(3)(B)).

448

*Id. Avila* controls here because § 16(b) and § 924(c)(3)(B) are identical.[132] Thus, as Judge Grimm explained in *Edmundson*, the "§ 924(c) residual clause suffers from exactly the same double indeterminacy as the ACCA residual clause." *Edmundson*, 153 at 861 , . Moreover, the Seventh and Ninth Circuits recognized the same in invalidating § 16(b), the identical twin to § 924(c)(3)(B), as void for vagueness under *Johnson*. *See Vivas-Ceja*, 808 F.3d at 723; *Dimaya*, 803 F.3d at 1117.[133]

Moreover, in litigating *Johnson*, the Government, through the Solicitor General, agreed that the phrases at issue in *Johnson* and here pose the same problem. Upon recognizing that the definitions of a "crime of violence" in both § 924(c)(3)(B) and § 16(b) are identical, the Solicitor General stated:

> Although Section 16 refers to the risk that force will be used rather than that injury will occur, it is equally susceptible to petitioner's central objection to the residual clause: Like the ACCA, Section 16 requires a court to identify the ordinary case of the commission of the offense and to make a commonsense judgment about the risk of confrontations and other violent encounters.

*Johnson v. United States*, S. Ct. No. 13-7120, Supplemental Brief of Respondent United States at 22-23 (available at 2015 WL 1284964 at *22-*23) (March 30, 2015). The Solicitor General was

---

[132] Other courts likewise require the ordinary case analysis when the statutory language of § 16(b) (and thus § 924(c)(3)(B)) is at issue. *See, e.g., Keelan*, 786 F.3d at 871 (adopting "ordinary case" analysis for § 16(b)); *United States v. Ramos-Medina*, 706 F.3d 932, 938 (9th Cir. 2012) (citing *James* as the source of the "ordinary case" analysis required by § 16(b)); *Van Don Nguyen v. Holder*, 571 F.3d 524, 530 (6th Cir. 2009) (considering § 16(b) and concluding that "[t]he proper inquiry is one that contemplates the risk associated with the proscribed conduct in the mainstream of prosecutions brought under the statute."); *United States v. Sanchez-Garcia*, 501 F.3d 1208, 1213 (10th Cir. 2007) (same).

[133] While the Fourth Circuit has yet to reach the merits of whether § 16(b) or § 924(c)(3)(B) are unconstitutionally vague, in the successive § 2255 context, it has held that it is not "implausible that § 16(b), too, is unconstitutionally vague." *In re Hubbard*, ___ F.3d ___, 2016 WL 3181417, *6 (4th Cir. June 6, 2016).

449

right. Section 924(c)(3)(B) and the ACCA are essentially the same and contain the same flaws. This Court should hold the Government to that concession.

Section 924(c)(3)(B), like the ACCA residual clause, thus requires the "ordinary case" analysis to assess the risk involved in a predicate offense, and how risky that ordinary case is. *Fuertes*, 805 F.3d at 500 n.6; *Avila*, 770 F.3d at 1107; *Ayala*, 601 F.3d at 267; *Van Don Nguyen*, 571 F.3d at 530; *Sanchez-Garcia*, 501 F.3d at 1213. Since these are the identical analytical steps that brought down the ACCA residual clause, § 924(c)(3)(B) cannot survive constitutional scrutiny under the due process principles reaffirmed in *Johnson*. As a consequence, the residual clause cannot be used to support a conviction under § 924(c). *See Welch*, 136 S. Ct. at 1259 (holding that *Johnson* is a "substantive decision" that has "retroactive effect" in "cases on collateral review").

### 2. Conspiracy to commit racketeering in violation of § 1962(d) categorically fails to qualify as a crime of violence under the force clause.

The offense of conspiracy to commit racketeering, in violation of 18 U.S.C. § 1962(d), can never qualify as a "crime of violence" because the full range of conduct encompassed in the elements of the offense fails to satisfy the force clause. A federal conspiracy is merely "an agreement among two or more persons to achieve an unlawful object . . . the carrying out of the substantive crime." Sand and Siffert, *Modern Federal Jury Instructions*, 19-3S. Unlike traditional conspiracy, the racketeering conspiracy statute contains "no requirement of some overt act or specific act." *United States v. Cornell*, 780 F.3d 616, 624 (4th Cir. 2015) (quoting *Salinas v. United States*, 522 U.S. 52, 63 (1997)). Instead, a racketeering conspiracy may "exist even if a conspirator does not agree to commit or facilitate each and every party of the substantive offense." *Salinas*, 522 U.S. at 63. Thus, to secure a conviction for a racketeering conspiracy, the Government need not allege or prove the actual completion of a single racketeering act by the defendant or any member of the conspiracy. *See Cornell*, 780 F.3d at 624 ("The partners in the criminal plan need

450

only 'agree to pursue the same criminal objective,' regardless of whether that criminal objective is ever started or carried out.") (quoting *Salinas*, 522 U.S. at 63); *United States v. Corrado*, 286 F.3d 934, 937 (6th Cir. 2002) ("[Section] 1962(d) requires no 'overt act or specific act' in carrying the RICO enterprise forward."); *United States v. Loveland*, 825 F.3d 555__, 557 (9th Cir. 2016) ("Conspiracy means an *agreement* to commit a crime, not *commission* of the crime.") (emphasis added).

Because an overt act is not an element of the offense, the alleged racketeering conspiracy offense does not involve the use, attempted use, or threatened use of any physical force – let alone any violent physical force – required under the force clause. The Fourth Circuit's decision in *United States v. White*, 571 F.3d 365, 369 (4th Cir. 2009), is directly on point. In that case, at issue was whether the defendant's conspiracy to commit a North Carolina offense of robbery with a dangerous weapon was a "crime of violence" under the ACCA. Just like a racketeering conspiracy, North Carolina conspiracy requires an agreement to commit a substantive crime without any overt act. *White*, 571 F.3d at 368. Although the Fourth Circuit held that the conspiracy qualified as a "crime of violence" under the now-defunct ACCA residual clause (18 U.S.C. § 924(e)(2)(B)(ii)), the court, without hesitation, also held that the conspiracy is not a "crime of violence" under the ACCA's nearly identical force clause. *Id.* at 369 ("Applying a categorical analysis to the Conspiracy Offense, we first observe that it does not have 'as an element the use, attempted use, or threatened use of physical force against the person of another.'") (citing 18 U.S.C. § 924(e)(2)(B)(i)).

The Fifth Circuit reached the same conclusion in *United States v. Gore*, 636 F.3d 728 (5th Cir. 2011). Relying on *White*, the Fifth Circuit held that a Texas offense of conspiracy to commit an aggravated robbery did not meet the force clause: "A factfinder could convict a defendant of

conspiracy to commit aggravated robbery by concluding that there was an agreement to (1) commit robbery and (2) engage in one or more of the acts enumerated in the aggravated robbery statute, without finding that physical force against the person of another was actually used or that there was an attempted or threatened use of such force. Accordingly, conspiracy to commit aggravated robbery does not come within the definition of 'violent felony' in [the ACCA force clause]." *Id*. at 731 (emphasis added).

Post-*Johnson*, the Fourth Circuit as well as the Seventh Circuit have reinforced that conspiracies do not have a required element of violent force. *See United States v. Melvin*, 621 Fed. Appx. 226 (4th Cir. 2015) (relying on *White* to find that conspiracy to commit North Carolina robbery with a dangerous weapon does not qualify as an ACCA "violent felony" under the force clause); *United States v. Gonzalez-Ruiz*, 794 F.3d 832, 836 (7th Cir. 2015) (finding that conspiracy to commit armed robbery fails to qualify as an ACCA "violent felony" post-*Johnson*). Likewise, Judge Grimm of the District of Maryland, relying on the Fourth Circuit's decisions in *Melvin* and *White*, recently found that conspiracy fails to constitute a "crime of violence" under the 18 U.S.C. § 924(c) force clause. *See Edmundson*, 2015 WL 9311983, at *2 (finding that conspiracy to commit Hobbs Act robbery fails to qualify as a "crime of violence" under the force clause).

None of these decisions turned on the object of the conspiracy, whether that was robbery or armed robbery. Nor did the courts find or even hint that the robbery or armed robbery offenses themselves – which were the objects of the conspiracies – did not have an element of violent physical force. Whether or not the robbery offenses independently had an element of violent physical force was beside the point. Rather, these decisions reflect that regardless of the object of the conspiracy, conspiracy itself fails to qualify as a "crime of violence" under the force clause

452

because the act of conspiring is not the use, attempted use, or threatened use of violent physical force.

These decisions are consistent with the plain language of the force clause, which includes the inchoate offense of attempt, but not conspiracy. Because Congress included an inchoate offense in the force clause, it certainly knew how to write a statute that also included the inchoate offense of conspiracy. But it chose not to do so. Therefore, it is plain that the alleged racketeering conspiracy offense categorically fails to qualify as a "crime of violence" under the force clause. And because the jury entered a general verdict, without having the jury announce which crime of violence the offense rested upon, Mr. Umaña's convictions on Counts 23 and 25 must be vacated. *See Stromberg*, 283 U.S. at 368.

### 3. The offense of murder in aid of racketeering, in violation of § 1959(a)(1) also does not categorically satisfy the force clause.

Even though it is enough that racketeering conspiracy is not a crime of violence, neither is murder in aid of racketeering. Many "racketeering activities" do not have an element of the intentional use, attempted use or threatened use of violent physical force against a person or property. *See generally* 18 U.S.C. § 1961(1) (defining "racketeering activity"). Thus, whether a § 1959(a)(1) offense constitutes a crime of violence for § 924(j) purposes rests on whether the element of "murder" categorically requires the intentional use, attempted use, or threatened use of violent physical force against a person or property. It does not.

The generic definition of "murder" does not satisfy the force clause. Examples of "murders" that do not involve the intentional use, attempted use, or threatened use of violent physical force are endless. *See generally* 2 Wayne R. LaFave, Substantive Criminal Law § 14.2 (2d ed. 2003) (listing "opening, on a cold winter day, a window next to the bed of a helpless sick person;" "perjur[ing] an innocent man into the electric chair;" "nag[ing] another, whom he knows

453

to have heart trouble, into some death-producing exertion;" advising "a blind man at the edge of a precipice … that it is all clear ahead;" falsely shouting, "'Your son is dead' into the ears of a woman he knows to have a heart condition;" and a parent failing "to rescue his imperiled infant, such as one who is drowning face-down in the bathtub" as examples of murder); *United States v. Fleming*, 739 F.2d 945, 947-48 (4th Cir. 1984) (murder conviction upheld when an intoxicated defendant drove at excessive speeds, sometimes against traffic, and lost control on a sharp curve); *State v. Snyder*, 311 N.C. 391, 392-94 (1984) (murder conviction upheld when an intoxicated defendant drove into intersection against light and at speed of 60-70 miles per hour).

Moreover, while Mr. Umaña contends that consideration of only the "generic" definition of murder is permissible, even if the Court were to look to the murder statute alleged in the indictment, North Carolina General Statute § 14-17, or the different means of murder alleged (first degree murder, first degree felony murder and second degree murder), the statute and these different means still do not meet the force clause. By its plain terms the full reach of N.C. St. § 14-17 (2007) does not require the intentional use of violent physical force. Moreover, the statute has been applied to "recklessness of consequences," *State v. Wilkerson*, 295 N.C. 559, 581 (1978), but "a reckless use of force does not satisfy" the force clause. *United States v. Vinson*, 805 F.3d 120, 125 (4th Cir. 2015).

As to the different degrees of North Carolina murder, first degree murder can be based on intentional poisoning, even without an intent to kill. *See State v. Johnson*, 317 N.C. 193, 200-02 (1983) (first-degree murder where the defendant "intentionally caused poison to be placed into or enter the body" and the poisoning proximately caused death); *see also State v. Evangelista*, 319 N.C. 152, 158 (1987) (evidence that defendant "deprived the infant of liquids and thereby caused his death" would support a conviction for first degree murder). But poisoning "involves no use or

454

threatened use of force." *See Torres-Miguel*, 701 F.3d at 168-69. Second degree murder can be met by reckless conduct that results in death. *See Snyder*, 311 N.C. at 396 (evidence "was sufficient to support a finding that the defendant's acts evidenced recklessness of consequences"). And felony murder can be based on any number of felony offenses that do not satisfy the force clause, including North Carolina common law robbery, which the Fourth Circuit has specifically held to be not a crime of violence under the force clause. *See United States v. Gardner*, 823 F.3d 793, 803 (4th Cir. 2016) (holding "North Carolina common law robbery does not necessarily include the use, attempted use, or threatened use of force capable of causing physical pain or injury to another.") (quotations omitted). Thus, the alleged murder in aid of racketeering offense also categorically fails to qualify as a "crime of violence" under the force clause.

### B. Mr. Umaña's claim is cognizable under § 2255(a).

A federal prisoner may obtain relief under 28 U.S.C. § 2255(a) if his conviction "was imposed in violation of the Constitution or laws of the United States," or is in excess of this Court's jurisdiction. Mr. Umaña's conviction violates the Due Process Clause of the Fifth Amendment, violates federal law, and exceeds this Court's jurisdiction. This Court therefore should grant him relief under § 2255(a).

First, for all the reasons explained above, Mr. Umaña's convictions on Counts 23 and 25, the § 924(j) charges, violate due process because they depended on the unconstitutionally vague residual clause.

Second, as also explained above, racketeering conspiracy and murder in aid of racketeering categorically cannot satisfy § 924(c)(3)'s force clause. Mr. Umaña's indictment therefore failed to state an offense under § 924(j), and Mr. Umaña now stands convicted of an offense that is no longer criminal. Given this, his conviction violates the laws of the United States and results in a

455

fundamental miscarriage of justice. This is precisely the type of error that is cognizable under § 2255(a). *See Davis v. United States*, 417 U.S. 333, 346-47 (1974) (holding that when an intervening decision establishes that a prisoner was convicted of "an act that the law [no longer] make[s] criminal," "such a circumstance 'inherently results in a complete miscarriage of justice and presents exceptional circumstances' that justify relief under § 2255").

Third, Mr. Umaña's conviction exceeds this Court's jurisdiction because not only did the indictment fail to state a § 924(c) offense, it affirmatively alleged conduct that is outside that statute's reach. That is, Counts 23 and 25 of the indictment alleged that Mr. Umaña used or carried a firearm during or in relation to a racketeering conspiracy or murder in aid of racketeering, offenses that, as discussed above, categorically cannot qualify as a "crime of violence" for purposes of § 924(j). In turn, a § 924(j) conviction can never be sustained based on these underlying offenses, no matter what the facts are.

Simply put, Counts 23 and 25 altogether fail to state a § 924(j) offense. Mr. Umaña's convictions on these counts are therefore a legal nullity that were entered in excess of this Court's jurisdiction, and must be vacated. *See United States v. Brown*, 752 F.3d 1344, 1347 (11th Cir. 2014) (a jurisdictional defect exists "when the indictment affirmatively alleges conduct that does not constitute a crime at all because that conduct falls outside the sweep of the charging statute"); *United States v. Barboa*, 777 F.3d 1420, 1423 n.3 (10th Cir. 1985).

### 1. Mr. Umaña's invalid § 924(j) convictions also invalidate his death sentences on Counts 22 and 24.

In addition to having been sentenced to death for two counts of §924(j), Mr. Umaña was also sentenced to death for murder in aid of racketeering in Counts 22 and 24. Crim. Docs. 1048, 1050. But the invalidation of Mr. Umaña's death sentences for his § 924(j) convictions requires that he be resentenced on the murder in aid of racketeering convictions as well.

Section § 2255(b) provides:

> If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

28 U.S.C.A. § 2255(b). As stated by the Fourth Circuit, this "language 'confers a broad and flexible power to the district courts to fashion an appropriate remedy.'" *United States v. Stitt*, 552 F.3d 345, 355 (4th Cir. 2008) (quoting *United States v. Hillary*, 106 F.3d 1170, 1171 (4th Cir.1997)) (other quotations omitted). But the Fourth Circuit has explained that "[t]he 'most appropriate remedy' … 'is to put § 2255 defendants in the same boat as direct appellants, i.e., to permit resentencing.'" *Id*. (quoting *Hillary*, 106 F.3d at 1172). As such, this Court's remedy must not conflict with the Fourth Circuit's "admonition that the defendant be placed in the 'same position' as if there was no error." *Id*. at 356.

Mr. Umaña cannot be placed in the same position as if there was no error, without a new sentencing phase proceeding where he would face just two, instead of four, death eligible counts. In addition to the fact it is easier to defend against two, as opposed to four death eligible counts, the record in this case shows at least a reasonable likelihood that the inclusion of the unconstitutional § 924(j) counts influenced the jury's decision to sentence him to death. The instruction for the § 924(j) counts affirmatively stated, "I instruct you that racketeering conspiracy and murder in aid of racketeering are crimes of violence." GPT 1249. Placing a judicial label of "crime of violence" on the other death eligible offense is prejudicial by itself, and the term would not have appeared in the instructions if not for the invalid § 924(j) counts.

But even worse, the invalid "crime of violence" label directly spilled over to the selection phase. The first aggravating factor alleged was essentially the dispositive element of the murder in

aid of racketeering offense. *Compare* Crim Doc. 1048 at 7 ("The defendant killed Ruben Garcia Salinas and Manuel Garcia Salinas to protect and maintain the name and reputation of the criminal enterprise MS-13, and to advance his position and reputation within the criminal enterprise."); *with* GPT at 1245 ("[T]he purpose of the defendant, or someone aided and abetted by the defendant, in committing the murder was to maintain or increase position in the enterprise."). Instead of determining on its own the aggravating weight of this factor, the jury was previously instructed that such conduct was a "crime of violence." Thus, this Court can only follow the Fourth Circuit's admonishment that "the defendant be placed in the 'same position' as if there was no error," *Stitt*, 552 F.3d at 356, by ordering a new penalty phase that is not corrupted by the inclusion of invalid death eligible counts.

Judicial affirmance of the remaining death sentences also violates the Sixth Amendment. As the Supreme Court recently made clear in *Hurst v. Florida*, 136 S. Ct. 616 (2016), the Sixth Amendment requires that a jury, and not the court, determine whether a defendant should be sentenced to death. *Hurst*, 136 S. Ct. at 624. The Court was unequivocal: "The Sixth Amendment protects a defendant's right to an impartial jury. This right required Florida to base [the defendant's] death sentence on a jury's verdict, not a judge's factfinding." *Id*.

After *Hurst*, any death sentence rendered by a court is unconstitutional. An appellate or post-conviction court that finds non-structural error in the defendant's death sentence therefore must remand for a new penalty phase before a jury. It may not engage in post hoc reweighing, or otherwise make its own determination about whether the defendant deserves a death sentence. To the extent any prior Supreme Court decisions, such as *Brown v. Sanders*, 546 U.S. 212, 224-25 (2006), *Stringer v. Black*, 503 U.S. 222, 237 (1992), or *Clemons v. Mississippi*, 494 U.S. 738, 745-

458

46 (1990), authorized such judicial refashioning of a compromised death sentence, *Hurst* necessarily overrules them.

What is more, given the unparalleled need for reliability in capital sentencing, allowing Mr. Umaña's death sentence on Counts 22 and 24 to stand despite the jury's exposure to the invalid count and its prejudicial elements would implicate the Eighth Amendment. The Supreme Court's decision in *Johnson v. Mississippi*, 486 U.S. 576 (1988), provides an instructive analogy. There, the Court held that when a prior conviction used as aggravation in support of a death sentence has subsequently been overturned, the defendant's death sentence violates the Eighth Amendment. As the Court explained, "[t]he fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a special need for reliability in the determination that death is the appropriate punishment in any capital case." *Id*. at 584 (citations and internal quotations omitted).

Because the petitioner's prior conviction in *Johnson v. Mississippi* was invalid, the Court deemed it "apparent that the [prior] conviction provided no legitimate support for the death sentence imposed on petitioner." *Id*. at 585. Equally apparent, the Court said, was "that the use of that conviction in the sentencing hearing was prejudicial." *Id*. And while the prosecutor had repeatedly pointed to the prior conviction in his closing argument, the Supreme Court said the now-voided conviction's use as aggravation would have violated the Eighth Amendment no matter what. "Even without express argument, there would be a possibility that the jury's belief the petitioner had been convicted of a prior felony would be 'decisive' in the 'choice between a life sentence and a death sentence.'" *Id*. (quoting *Gardner v. Florida*, 430 U.S. 349, 359 (1977)).

459

The same principles apply here. The unconstitutional § 924(j) convictions had a profoundly prejudicial impact on Mr. Umaña's case as a whole, and undermines confidence in his death sentences on Counts 22 and 24.

Mr. Umaña likely was prejudiced even before his case reached the jury. When the Department of Justice considered whether to authorize the death penalty against Mr. Umaña, it was presented with an indictment alleging not two, but four capital offenses, including two § 924(j) counts. The Department's capital-case review process was skewed by the presence of the unconstitutional charge just as the jury's sentencing decision was skewed in *Johnson v. Mississippi*. Thus, this Court should vacate Mr. Umaña's sentence in its entirety and order that he be resentenced before a jury on Counts 22 and 24 alone.

In light of *United States v. Davis*, 139 S. CT. 2319 (2019),
Mr. Umaña amended this Claim as follows:

The Supreme Court in *Johnson* invalidated as unconstitutionally vague the risk/residual clause of 18 U.S.C. §924(e)(2)(B). *Johnson (Samuel) v. United States*, 576 U.S. 5 9 1 , 135 S. Ct. 2551, 2563 (2015). Applying the due process principles recognized in *Johnson*, the Supreme Court in *Davis* invalidated as unconstitutionally vague the risk/residual clause of 18 U.S.C. §924(c)(3)(B). *Davis*, 139 S. Ct. at 2323-24, 2336. *Davis* is supplemental authority that interprets *Johnson*. However, in the event the court determines *Davis* is a new rule, *cf. Coleman v. United States*, 2018 WL 5315216 (W.D. N.C. 10/26/2018) (Order), Mr. Umaña seeks permission to supplement and amend Claim 22 to add this new Constitutional authority.

Mr. Umaña was convicted, inter alia, of two counts of using a firearm during and in relation to a crime of violence, under 18 U.S.C. §924(c) and (j)(1). The predicate "crime of violence" offenses categorically do not meet the elements/force clause of §924(c)(3)(A) and, under *Davis*, cannot be premised on the risk/residual clause of §924(c)(3)(B). As a result, Mr. Umaña's

§924(c) convictions violate due process, the Constitution and laws of the United States, result in a miscarriage of justice, and were entered in excess of the Court's jurisdiction. Thus, his unlawful §924(c) convictions and sentences must be vacated under 28 U.S.C. § 2255(a). With those counts vacated, Mr. Umaña's remaining death sentences on Counts 22 and 24 also must be vacated.

## C. Relevant Background

Mr. Umaña was charged, as relevant, with:

Count 1: Conspiring to conduct and participate, directly and indirectly, in the affairs of a racketeer influenced corrupt organization (RICO conspiracy), with various racketeering acts occurring in Guilford and Mecklenburg Counties, for a period of time including December 8, 2007, under 18 U.S.C. §1962(d);

Count 22: "[M]urder[ing] Ruben Garcia Salinas, in violation of North Carolina General Statute Sections 14-17" in aid of racketeering, on or about December 8, 2007, in Guilford and Mecklenburg Counties, under 18 U.S.C. §1959(a)(1) and §2;

Count 23: Use and possession of a firearm during and in relation to a crime of violence, to wit Counts 1 and 22, resulting in murder, on or about December 8, 2007, in Guilford and Mecklenburg Counties, under 18 U.S.C. §924(c) and (j)(1);

Count 24: "[M]urder[ing] Manuel Garcia Salinas, in violation of North Carolina General Statute Sections 14-17" in aid of racketeering, on or about December 8, 2007, in Guilford and Mecklenburg Counties, under 18 U.S.C. §1959(a)(1) and §2;

461

Count 25: Use and possession of a firearm during and in relation to a crime of violence, to wit Counts 1 and 24, resulting in murder, on or about December 8, 2007, in Guilford and Mecklenburg Counties, under 18 U.S.C. §924(c) and (j)(1);

Count 27: Being an unlawful alien in possession of a firearm, on or about December 8, 2007, in Guilford and Mecklenburg Counties, under 18 U.S.C. §922(g)(5);

Count 28: Committing or aiding and abetting Hobbs Act robbery, in Mecklenburg County, on or about December 8, 2007, under 18 U.S.C. §1951 and §2.

Third Superseding Indictment (Crim. Doc. 623), at 1-25, 47-53. For both §924(c) counts (Counts 23 and 25), the indictment alleged two predicate offenses as the qualifying "crime of violence": "conspiracy to participate in a racketeering enterprise and murder in aid of racketeering," as set forth in Counts 1, 22, and 24. *Id*.

At trial, the jury found Mr. Umaña guilty of the above offenses, with a notable exception: on the VICAR murder counts (Counts 22 and 24), the jury did not specify whether it found Mr. Umaña committed the murders as a principal or instead aided and abetted the murders. The verdicts indicate the jury found he was guilty of "murder of [the victim] in aid of racketeering, in violation of 18 U.S.C. §1959, *or aiding and abetting in that offense, in violation of 18 U.S.C. §2*." Guilt Phase Verdict (Crim. Doc. 1043) (emphasis added). The Court had instructed the jury that Mr. Umaña could be found guilty on the VICAR counts under either theory, and that guilt may be established without proving "defendant personally did every act constituting the offense."

462

GPT,[134] at 1242-45. And the Court did not give an instruction that, to be convicted of aiding and abetting, the government had to prove Mr. Umaña had advanced knowledge that a confederate would use or carry a firearm during the dispute that led to the victims' death. *Cf. Rosemond v. United States*, 572 U.S. 65, 67, 81-82 (2014).

The jury verdict also did not specify whether jurors found first-degree murder, second-degree murder, felony-murder, or conspiracy to commit murder – either under federal law or under North Carolina law. Guilt Phase Verdict (Crim. Doc. 1043). The jury had been instructed, however, on each of those theories. GPT, at 1235-38 (North Carolina first- degree murder, felony murder, second-degree murder, and conspiracy to commit murder), 1219- 21 & 1237-39 (conspiracy to commit murder), 1245-46 (North Carolina murder definitions applied to VICAR murder charge), 1249 & 1251 (federal murder).

Finally, the jury verdict did not specify, on the §924(c) counts (Counts 23 and 25), which predicate offense or offenses jurors found Mr. Umaña had used the firearm during and in relation to. Guilt Phase Verdict (Crim. Doc. 1043). The Court had instructed the jury that the §924(c) counts (Counts 23 and 25) could be premised on using a firearm in relation to the RICO conspiracy (Count 1) *or* in relation to the VICAR murders (Counts 22 and 24). [135] GPT, at 1248-

---

[134] Located at Crim. Doc. 1258, No. 3:08-cr-00134-RJC-DSC-2 (W.D.N.C.).

[135] Specifically, the Court instructed:

> To find that the defendant used a firearm during and in relation to a crime of violence, you must be convinced beyond a reasonable doubt that: One, the defendant committed the crime alleged in count one, that is, racketeering conspiracy, or the crime alleged in count twenty-two, that is, murder of Ruben Garcia Salinas in aid of racketeering. I instruct you that racketeering conspiracy and murder in aid of racketeering are crimes of violence. Two, that the defendant knowingly used a firearm during and in relation to the crime of violence. And three, that the defendant caused the death of a person through the use of the firearm in the course of violating 18, U.S.C., Section 924(c)... Now, the indictment alleges two different crimes of violence, that is,

51.

Thus – based on review of the indictment, jury instructions, and verdict (*Shepard* documents[136]) – the least culpable conduct upon which jurors premised their findings was: guilty of RICO conspiracy (Count 1); guilty of using the firearm during the RICO conspiracy generally, which conspiracy led, among other things, to the murders of the Manuel and Ruben Garcia Salinas (Counts 23 and 25 with RICO conspiracy as the predicate); guilty of aiding and abetting a confederate in the VICAR murders of Manuel and Ruben Garcia Salinas (Counts 22 and 24); but not proof beyond a reasonable doubt that Mr. Umaña used the firearm himself or had prior knowledge a firearm would be used in the dispute that led to the VICAR murders of Manuel and Ruben Garcia Salinas (that is, not proof beyond a reasonable doubt that his use of the firearm included VICAR murders as the predicates to Counts 23 and 25).

### D. The §924(c) Convictions Must Be Vacated Because Neither Predicate Offense Is Categorically a Crime of Violence.

Conviction for using a firearm during and in relation to a crime of violence requires nexus to a predicate "crime of violence." 18 U.S.C. §924(c), (c)(3). Under §924(c)(3), "crime of violence" is defined as:

> (3) For purposes of this subsection, the term "crime of violence" means an offense that is a felony and –
>
> (A) has as an element the use, attempted use, or threatened use of

---

racketeering conspiracy as alleged in count one and murder in aid of racketeering as alleged in count twenty-two. You must be unanimous in your verdict as to which crime of violence, if either, that the defendant used a firearm during and in relation to. GPT, at 1249-50.

[136] When analyzing whether an offense meets the force/elements clause or risk/residual clause, courts may a consider a narrow range of sources: the statutory elements, charging documents, jury instructions, plea agreements, factual basis from the plea colloquy transcript, or "some comparable judicial record of this information." *Shepard v. United States*, 544 U.S. 13, 16, 26-28 (2005) (majority op. & Thomas, J., concurring); *Taylor v. United States*, 495 U.S. 575, 602 (1990).

physical force against the person or property of another, or

(B)     that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

Under *Davis*, 139 S. Ct. at 2323-24, 2336, the risk/residual clause (§924(c)(3)(B)) is invalid, as unconstitutionally vague in violation of due process.  And the elements/force clause (§924(c)(3)(A)) does not categorically encompass Mr. Umaña's predicates.  Thus, his §924(c) counts lack the necessary elements of nexus to a qualifying "crime of violence."

**1.  The risk/residual clause of §924(c)(3)(B) is unconstitutional, and thus convictions resting thereon violate due process.**

Mr. Umaña's §924(c) convictions cannot rely on the risk/residual clause definition of crime of violence.  The Supreme Court in *Johnson*, invalidated as unconstitutionally vague the risk/residual clause of 18 U.S.C. §924(e)(2)(B).  *Johnson (Samuel) v. United States*, 576 U.S. 5 9 1  (2015).  Applying the due process principles recognized in *Johnson*, the Supreme Court in *Davis* invalidated as unconstitutionally vague the risk/residual clause of 18 U.S.C. §924(c)(3)(B).  *Davis*, 139 S. Ct. at 2323-24, 2336.

**2.  The force/elements clause of §924(c)(3)(A) does  not categorically encompass Mr. Umaña's predicate offenses.**

Mr. Umaña's §924(c) convictions cannot rest on the force/elements clause, as Mr. Umaña's predicates are not categorically crimes of violence.  Neither predicate – conspiring to engage in a RICO under 18 U.S.C. §1962(d), or murder in violation of North Carolina General Statutes §14-17 in aid of racketeering under 18 U.S.C. §1959(a)(1) – categorically qualifies as a crime of violence under §924(c)(3)(A).

Section 924(c)(3)(A) defines a crime of violence as a felony that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another."

465

When interpreting the substantially identical §924(e)(2)(B)(i) (ACCA) force/elements clause, the

Supreme Court held "the phrase 'physical force' means violent force – that is, force capable of

causing physical pain or injury to another person."[137] *Johnson (Curtis) v. United States*, 559 U.S.

133, 140-41 (2010); *United States v. Middleton*, 883 F.3d 485, 490 (4th Cir. 2018). Moreover,

when interpreting the substantially identical force/elements clause in 18 U.S.C. §16(a), the

Supreme Court held the "use … of physical force against the person … of another" requires

"actively employ[ing]" force with "a higher degree of intent than negligent or merely accidental

conduct." *Leocal v. Ashcroft*, 543 U.S. 1, 9-10 (2004).  The elements/force clause requires

"intentional employment of physical force against a person or thing." *Garcia v. Gonzalez*, 455

F.3d 465, 468 (4th Cir. 2006).  Reckless conduct – even reckless conduct causing serious physical

injury with a deadly weapon – does not suffice.  *Id.*; *see also United States v. Begay*, 934 F.3d

1033, 1040 (9th Cir. 2019); *Middleton*, 883 F.3d at 490-93.

When analyzing whether an offense satisfies the elements/force clause, the court uses an

elements-based categorical approach.  *See Davis*, 139 S. Ct. at 2328, *quoting Leocal*, 543 U.S. at

7.  The elements clause "requires us to look to the elements . . . of the offense of conviction, rather

---

[137] Courts "normally presume that the same language in related statutes carries a consistent meaning." *Davis*, 139 S. Ct. at 2329, *citing Sullivan* v. *Stroop*, 496 U. S. 478, 484 (1990).  Thus, analysis of identically phrased risk/residual clauses in 18 U.S.C. §§16(b), 924(c)(3)(B), and 924(e)(2)(B)(ii) carries authoritative weight.  *See id.*; *Sessions* v. *Dimaya*, 584 U. S. , 138 S. Ct. 1204 (2018); *Johnson (Samuel)* v. *United States*, 576 U. S. , 135 S. Ct. 2551, (2015).

The ACCA force/elements clause and the §924(c) force/elements clause are identical, except that ACCA omits the phrase "or property" and calls a qualifying crime a "violent felony"; while §924(c)(3)(A) includes the phrase "or property" and calls a qualifying felony a "crime of violence." *See* 18 U.S.C. §924(c)(3), (e)(2)(B).

Additionally, the 18 U.S.C. §16(a) force/elements clause is identical to the §924(c) force/elements clause, except that §16(a) applies to misdemeanors as well while §924(c)(3)(A) applies only to felonies. *See* 18 U.S.C. §16(a), §924(c)(3).

than to the particular facts relating to petitioner's crime." *Leocal*, 543 U.S. at 7.  Under this "elements-based categorical approach," courts "look to whether the statutory elements of the offense necessarily require the use, attempted use, or threatened use of physical force." *United States v. Simms*, 914 F.3d 229, 233 (4th Cir. 2019) (en banc).  "When a statute defines an offense in a way that allows for both violent and nonviolent means of commission, that offense is not 'categorically' a crime of violence under the force clause." *Id.*

Because examination of the conviction does not involve analysis of its underlying facts, the court must presume the conviction rested upon the "least of the acts criminalized" by the statute. *Moncrieffe v. Holder*, 569 U.S. 184, 190-91 (2013).  If the "least of the acts criminalized" by the statute of conviction has an element requiring the "use, attempted use, or threatened use of physical force against the person or property of another," then the offense categorically qualifies as a crime of violence.  If not, the inquiry ends and the offense does not categorically qualify as a crime of violence.  *See United States v. Torres-Miguel,* 701 F.3d 165, 167 (4th Cir. 2012); *United States v. Diaz-Ibarra*, 522 F.3d 343, 348 (4th Cir. 2008) ("[W]e look only to the statutory definition of the . . . crime and the fact of conviction to determine whether the conduct criminalized by the statute, including the most innocent conduct, qualifies as a 'crime of violence.'" (citation omitted)).

If necessary, courts may employ the modified categorical approach, and consult a select few documents to help "'determine what crime, with what elements,' formed the basis of a defendant's conviction." *United States v. Mathis*, 932 F.3d 242, 264 (4th Cir. 2019), *quoting Mathis v. United States*, 136 S. Ct. 2243, 2249 (2016).  These *Shepard* documents are generally limited to the indictment, jury instructions, and verdict form. *See Shepard*, 544 U.S. at 25-26. In these cases, the modified categorical approach "acts not as an exception [to the categorical approach], but instead as a tool," and the inquiry is similarly confined to the elements of the crime

and not the facts of the case. *Descamps v. United States*, 570 U.S. 254, 263 (2013).

Under the modified categorical approach, an offense cannot qualify as a §924(c) predicate unless the *Shepard* documents establish with "certainty" that the defendant was "necessarily" convicted of an offense that meets the elements-based test for "crimes of violence." *Shepard*, 544 U.S. at 21. "[P]lausibility or even likelihood" that the defendant was convicted of a qualifying "crime of violence" is not enough. *United States v. Clay*, 627 F.3d 959, 967 (4th Cir. 2010). This high bar protects against the kind of "evidentiary enquiries into the factual basis for the conviction" – enquiries the Sixth Amendment requires jurors alone make – that the categorical approach was designed to avoid. *Shepard*, 544 U.S. at 20; *see also Fuertes*, 805 F.3d at 498.

When it cannot be conclusively determined that the defendant was convicted of an offense with elements that categorically qualify as a "crime of violence," the court must assume conviction rested on the "least serious" offense criminalized by the underlying statute. *See United States v. Chapman*, 666 F.3d 220, 228 (4th Cir. 2012); *see also United States v. Vann*, 660 F.3d 771, 774 (4th Cir. 2011) (en banc); *Ortiz v. Lynch*, 796 F.3d 932, 935 (8th Cir. 2015).

Here, careful examination of Mr. Umaña's predicates shows those offenses are defined in "way[s] that allow[] for both violent and nonviolent means of commission," *Simms*, 914 F.3d at 233, do not have as a necessary element the non-negligent use of violent physical force against another, and thus are not categorically crimes of violence under the elements clause.

### 3. RICO conspiracy categorically is not a crime of violence under the elements clause.

This Court, and the government, have previously determined RICO conspiracy under 18 U.S.C. §1962(d) does not qualify as a crime of violence under the elements clause. In the 2255 proceeding for one of Mr. Umaña's co-defendants, this Court held that "Racketeering conspiracy [under §1962(d)] does not have as an element the use, attempted use, or threatened use of physical

468

force." Order, *Sandoval v. United States*, No. 3:16-cv-337-RJC, ECF Doc. 11, at 1, 4 (W.D.N.C. 12/31/19), *citing United States v. Simms*, 914 F.3d 229, 233-34 (4th Cir. 2019) (en banc); *United States v. Jones*, 935 F.3d 266, 269-70, 271, 274 (5th Cir. 2019) (per curiam); *United States v. Davis*, 785 Fed. Appx. 358, 359, 360 & n.2 (9th Cir. 2019) (unpub. memorandum).

RICO conspiracy requires no overt act of violence – no actual "use, attempted use, or threatened use of physical force," *see* §924(c)(3)(A). Conviction under §1962(d) requires only "an enterprise affecting interstate commerce existed," "defendant knowingly and intentionally agreed with another person to conduct or participate in the affairs of the enterprise," and "defendant knowingly and willfully agreed that he or some other member of the conspiracy would commit at least two racketeering acts."[138] *United States v. Mathis*, 932 F.3d 242, 258 (4th Cir. 2019), *quoting United States v. Mouzone*, 687 F.3d 207, 218 (4th Cir. 2012). Racketeering acts need not include violence. For example, racketeering may include acts of bribery, counterfeiting, theft, embezzlement, or fraud. *See* 18 U.S.C. §1961(1), (5), §1962(c), (d). And "a defendant can conspire to violate RICO and violate [Section] 1962(d) without himself committing or agreeing to commit the two or more acts of racketeering activity." *Mathis*, 932 F.3d at 260, *citing Mouzone*, 687 F.3d at 218, and *Salinas v. United States*, 522 U.S. 52, 65 (1997).

As a result, courts have consistently held that merely conspiring – even when conspiring to commit a target offense that would be a crime of violence – categorically fails to meet the force/elements clause.[139] "This is so because to convict a defendant of [conspiracy], the

---

[138] The Court's jury instructions comported with these elements. GPT, at 1220.

[139] *See United States v. Davis*, 903 F.3d 483, 485 (5th Cir. 2018) ("conspiracy offense does not necessarily require proof that a defendant used, attempted to use, or threatened to use force") *aff'd in part by Davis*, 139 S. Ct. at 2324-25, 2336 (affirming vacatur of §924(c) convictions predicated

469

Government must prove only that the defendant agreed with another to commit actions that, if realized, would violate the [target crime]. Such an agreement does not invariably require the actual, attempted, or threatened use of physical force."[140] *Simms*, 914 F.3d at 233-34. Accordingly, RICO conspiracy under §1962(d) categorically is not a crime of violence under the §924(c)(3)(A) elements clause. This conclusion alone requires vacatur of Mr. Umaña's §924(c) convictions.

### 4. Murder in violation of North Carolina G.S. §14-17 in aid of racketeering is not categorically a crime of violence under the elements clause.

For multiple reasons, VICAR murder in violation of N.C. Gen. Stat. §14-17 is not categorically a crime of violence under the elements clause. Mr. Umaña acknowledges, in January 2017, this Court denied his unopposed motion to hold the 2255 action in abeyance pending decision by the Supreme Court in *Lynch v. Dimaya*, No. 15-1498, and by the Fourth Circuit in *United States v. Simms*, No. 15-4640, and *United States v. Ali*, No. 15-4433.[141] *Umaña v. United States*, 229 F.Supp.3d 388, 390-91, 397 (W.D.N.C. 1/25/17). In doing so, the Court reasoned that one of Mr. Umaña's predicates – VICAR murder – categorically was a crime of violence.

Mr. Umaña respectfully suggests recent guidance from the Fourth Circuit justifies revisiting the Court's prior analysis. In *United States v. Mathis* (2019), the Fourth Circuit analyzed

---

on conspiring to commit Hobbs Act robbery); *In re Matthews*, 934 F.3d 296, 301 (3d Cir. 2019) (government concedes conspiring to commit Hobbs Act robbery does not meet §924(c) elements clause); *United States v. Ledbetter*, 929 F.3d 338, 360-61 (6th Cir. 2019) (government concedes conspiracy to commit Hobbs Act robbery not a crime of violence under elements clause).

[140] The Court's jury instructions on RICO conspiracy indicated no proof of violence was necessary: "The government does not have to prove that any racketeering acts were actually committed at all, or that the defendant agreed to personally commit any such acts, or that the defendant agreed that two or more specific acts would be committed." GPT, at 1225.

[141] *Dimaya* and *Simms* have been decided, while *Ali* remains pending in the Fourth Circuit.

470

several §924(c) counts predicated on VICAR offenses that incorporated state-law crimes. 932 F.3d at 263-67. The court's analysis indicated courts must consider whether the state-law offense can be committed without use of force. *See id.* at 266-67. If it can, then the VICAR count that incorporates that state-law crime is categorically not a crime of violence under §924(c)(3)(A) and cannot supply the predicate "crime of violence" for a §924(c) conviction. *See id.*

For example, the Fourth Circuit analyzed whether "VICAR by committing kidnapping in violation of Virginia law, Virginia Code § 18.2-47" was categorically a crime of violence. *Id.* at 249, 264, 266-67. The court examined the elements of the state-law crime: "seizing or taking another person 'by force, intimidation, or deception' with the intent to deprive that person of his or her liberty." *Id.*, *citing* Va. Code §18.2-47(A). Noting that "by force, intimidation, or deception" were means of committing kidnapping, and not elements of alternative offenses, the court concluded Virginia kidnapping "may be committed in a non-violent manner through deceptive means" and cited Virginia case law affirming kidnapping convictions committed by deception without physical force. *Id.* Thus, defendants' VICAR offense predicated on Virginia kidnapping categorically was not a crime of violence. *Id.*

Additionally, since January 2017, the Supreme Court and Fourth Circuit have provided further guidance in interpreting the elements clause of §924(c)(3)(A) and (e)(2)(B)(i) (ACCA). The force/elements clause requires violent physical force, which is "force capable of causing physical pain or injury," including force sufficient to overcome a victim's resistance during a robbery, but not the slight amount of force involved in offensive touching or unwanted contact (as in a common law battery). *Stokeling v. United States*, 139 S. Ct. 544, 550, 552-54 (2019), *citing Johnson (Curtis)*, 559 U.S. at 139-40. Similarly, the Fourth Circuit has instructed de minimis force or offensive touching (such as that level permissible for the misdemeanor crime of

471

domestic violence definition at issue in *Castleman*) does not meet the elements clause. *See United States v. Middleton*, 883 F.3d 485, 490 (4th Cir. 2018). Moreover, use of physical force against the person of another requires a level of non-negligent, non-accidental intentionality, both as to use and as to causation of injury. *See id. Accord Leocal v. Ashcroft*, 543 U.S. 1, 9-10 (2004). Causing physical injury does not necessarily mean use of violent physical force. *Middleton*, 883 F.3d at 490. "[A] crime may result in death or serious injury without involving the use of physical force" if the "crime does not have as an element the intentional causation of death or injury." *United States v. Battle*, 927 F.3d 160, 166 (4th Cir. 2019), *citing Middleton*, 883 F.3d at 490-93.

Mr. Umaña's *Shepard* documents do not reveal whether he was convicted of first- degree murder, second-degree murder, felony-murder, or aiding and abetting murder – either under federal law or under North Carolina law; and the jury was instructed on each of these theories. GPT, at 1235-39, 1245-46, 1249 & 125; Guilt Phase Verdict (Crim. Doc. 1043). If any of these offenses can be committed without proof, as an element, of violent physical force, then Mr. Umaña's VICAR murder counts do not categorically qualify as crimes of violence.

### a. Starvation theory

Murder under North Carolina General Statutes §14-17 is not categorically a crime of violence. Murder requires no use of violent physical force when accomplished by deprivation, starvation, or dehydration. *See, e.g.*, *State v. Evangelista*, 353 S.E.2d 375, 378-81 (N.C. 1987); *State v. Cheeks*, 833 S.E.2d 660, 673-78 (N.C. Ct. App. 2019).

Section §14-17 is an indivisible statute, presenting an indivisible list of means for committing first and second degree murder. To determine whether an alternatively phrased statute sets forth elements (of different offenses) or instead means (of committing one offense), courts must consult "authoritative sources of state law," including the language of the statute itself,

472

pertinent state court decisions, and – if state law fails to provide clear answers – record documents from defendant's conviction. *Mathis*, 136 S. Ct. at 2256. As to a statute's text, statutory alternatives may be "drafted to offer 'illustrative examples,'" in which case the alternatives would be different means of committing the offense. *Id.* Finally, "a statute may itself identify which things must be charged (and so are elements) and which need not be (and so are means)." *Id.*

N.C. Gen. Stat. §14-17, as it existed during indictment and conviction, lists various means of committing murder. N.C.G.S. §14-17 (2007).[142] The statute provides first degree murder is murder "perpetrated *by means of* a nuclear, biological, or chemical weapon of mass destruction as defined in G.S. 14-288.21, poison, lying in wait, imprisonment, starving, torture, or by any other kind of willful, deliberate, and premeditated killing." *Id.* (emphasis added). According to the statute, "by means of … starving" is one means of committing a "kind of willful, deliberate, and premeditated" first degree murder. *Id.*

---

[142] At all relevant times, North Carolina General Statute §14-17 provided:

A murder which shall be perpetrated by means of a nuclear, biological, or chemical weapon of mass destruction as defined in G.S. 14–288.21, poison, lying in wait, imprisonment, starving, torture, or by any other kind of willful, deliberate, and premeditated killing, or which shall be committed in the perpetration or attempted perpetration of any arson, rape or a sex offense, robbery, kidnapping, burglary, or other felony committed or attempted with the use of a deadly weapon shall be deemed to be murder in the first degree, a Class A felony, and any person who commits such murder shall be punished with death or imprisonment in the State's prison for life without parole as the court shall determine pursuant to G.S. 15A– 2000, except that any such person who was under 18 years of age at the time of the murder shall be punished with imprisonment in the State's prison for life without parole. All other kinds of murder, including that which shall be proximately caused by the unlawful distribution of opium or any synthetic or natural salt, compound, derivative, or preparation of opium, or cocaine or other substance described in G.S. 90–90(1)d., or methamphetamine, when the ingestion of such substance causes the death of the user, shall be deemed murder in the second degree, and any person who commits such murder shall be punished as a Class B2 felon.

N.C.G.S. §14-17 (eff. June 14, 2007 to Nov. 30, 2012).

Further indicating the first-degree statutory list consists of means and illustrative examples (not elements of different offenses), North Carolina law, does not require the prosecution to specify in the indictment under which theory or means it intends to establish murder. "A murder indictment in the [general, short] form prescribed by N.C.G.S. § 15-144 will support a verdict finding the defendant guilty of first degree murder upon any of the theories set forth in N.C.G.S. § 14-17." *State v. Clark*, 386 S.E.2d 191, 194 (N.C. 1989). "The State is not required at any time to elect a theory upon which it will proceed against the defendant on the charge of first degree murder, and it is proper for the trial court to submit the issue of the defendant's guilt of that charge to the jury on each of the theories of first degree murder supported by substantial evidence presented at trial." *Id.*, *citing State v. Strickland*, 298 S.E.2d 645 (1983). The prosecution is not required to decide under which theory or means it plans to establish first-degree murder; it need not plead the theory or means in the indictment, nor inform defense counsel in a bill of particulars. *State v. Garcia*, 597 S.E.2d 724, 732 (N.C. 2004). For example, the prosecution is not required to disclose whether it plans to prove murder by means of "felony murder" or instead by means of "premeditation [and] deliberation." *Id.* Similarly, proof of means, such as starvation, suffices to prove malice required for first-degree murder, without necessity of re-proving additional elements the law presumes starvation establishes. *See, e.g.*, *Evangelista*, 353 S.E.2d at 378-81; *Cheeks*, 833 S.E.2d at 677-78 (proof of starvation implies malice "by law"; "separate showing of malice is not necessary") (quoting *State v. Smith*, 524 S.E.2d 28, 40 (N.C. 2000)). Thus, §14-17's list does not contain different crimes, but means of committing one offense. Section 14-17 is indivisible.

Under North Carolina law, some means for commission of murder require no proof of non-negligent use of violent physical force. For example, first degree murder requires no proof of violent physical force when committed by deprivation, starvation, or dehydration. Inaction is

enough.  *E.g.*, *Evangelista*, 353 S.E.2d at 378-81; *Cheeks*, 833 S.E.2d at 673-78.  This applies both under a "murder by means of starving" theory, *Cheeks*, 833 S.E.2d at 673-78, and under a "murder by willful, deliberate, and premeditated killing" theory, *Evangelista*, 353 S.E.2d at 378-81.

For example, in *State v. Cheeks*, defendant, who was the primary caretaker of his three children, was convicted of murder based on his *inaction* or lack of sufficient action when he did not feed his four-year-old stepson, who had neurological issues and was developmentally delayed, enough for several weeks or months.  *Cheeks*, 833 S.E.2d at 664, 667-69.  In the victim's last few months of life, the defendant typically fed the victim only once a day, the victim lost a substantial amount of weight, and no one (defendant or his wife) sought medical care for him.  *Id.* The victim ultimately died of malnutrition and dehydration.  *Id.*  At a bench trial, defendant was found guilty of first degree murder.  *Id.*  The trial court made no findings that defendant ever used force or violence on the victim; instead "starving [the victim] was the proximate cause of the child's death," and defendant was culpable for "failure to take any action to seek medical help, through any means possible, for [the child] as the child wasted away from lack of nutrients needed for themaintenance of life."  *Id.*  Defendant appealed on sufficiency of evidence grounds.  *Id.* at 673-78. The Court of Appeals held the prosecution was not required to prove, as a separate element, that defendant had a legal duty to feed the victim.  *Id.* at 676-77.  And no separate or additional proof of malice was required, because "murder by starving 'impl[ied] the requisite malice.'"  *Id.* at 677-

Being present during starvation and doing nothing was legally sufficient.  Inaction with fatal consequences is legally sufficient for North Carolina first degree murder.

The inaction necessary to cause death through starvation or dehydration is also legally sufficient to sustain conviction for murder under a "willful, deliberate, and premeditated killing"

theory. *Evangelista*, 353 S.E.2d at 378-81.  During a three-day standoff with police, defendant barricaded himself and his family members in a train car. *Id.* at 378-79.  Defendant did not accept offers of food and water and did not provide sufficient sustenance to his eight-month- old nephew, who died of dehydration during the standoff. *Id.*  A jury convicted defendant of first degree murder of his nephew under a "willful, deliberate, and premeditated killing" theory (along with other charges related to the standoff). *Id.* at 379-81.  On appeal, he challenged the trial court's denial of his motion to dismiss the charge of first degree murder. *Id.*  The state supreme court held the evidence was sufficient to submit first degree murder to the jury – both under a "by means of starving" theory, and under a "willful, deliberate, and premeditated killing" theory.[143] *Id.*  There was no evidence defendant used force or violence on the child. *See id.* at 378-81.  Instead, doing nothing during starvation – inaction with fatal consequences – was legally sufficient.

The Fourth Circuit's reasoning in *Mathis* again is instructive.  The court considered whether "VICAR in violation of 18 U.S.C. § 1959 by committing murder in violation of Virginia law, Virginia Code § 18.2-32" was categorically a crime of violence, particularly because Virginia murder could be committed by means of poison.  932 F.3d at 264-65.  Although a defendant need not directly touch (much less use physical force on) the victim to poison him, the Fourth Circuit rejected defendants' distinction between direct and indirect action. Instead, *action* was what was important:  "'physical force is simply force exerted by and through' human action and that, therefore, a person need not 'directly' touch his victim to exert 'physical force.'" *Id.*, *citing United*

---

[143] In the unlikely event first degree murder under N.C. Gen. Stat. §14-17 (2007) is somehow construed to be a divisible statute, *Evangelista* demonstrates that the amount of force necessary to convict for "willful, deliberate, and premeditated killing" is still the low bar of inaction required to convict for starvation murder. *Evangelista*, 353 S.E.2d at 378-81.

476

*States v. Castleman*, 572 U.S. 157, 170-71 (2014), and *In re Irby*, 858 F.3d 231, 236, 238 (4th Cir.

2017). "[S]o long as an offender's use of physical force [that is, human action], whether direct or

indirect, could cause a violent result, the force used categorically is violent." *Id.*

The Fourth Circuit indicated in *Mathis* that human action, whether direct (like shooting

someone) or indirect (like slipping poison into someone's food), is the touchstone for "use … of

physical force." *See Mathis*, 932 F.3d at 264-65. While the Fourth Circuit overlooked the

shortcomings of applying the *Castleman* analysis (of a dissimilar, misdemeanor crime-of-

domestic-violence elements clause) when interpreting the felony crime of violence elements clause

in §924(c),[144] even under the Fourth Circuit's *Mathis* rule, North Carolina murder under §14-

---

[144] As an earlier panel of the Fourth Circuit acknowledged, *Castleman* – interpreting non-identical language from the definition of misdemeanor crime of domestic violence under §921(a)(33)(A) – is little aid when analyzing the felony level violence defined in the force/elements clause of §924(e)(2)(B)(i). *United States v. Middleton*, 883 F.3d 485, 490 (4th Cir. 2018). For similar reasons, *Castleman* is no guide to interpreting §924(c)(3)(A).

The definition at issue in *Castleman* was a misdemeanor offense that "has, as an element the use or attempted use of physical force," *see* §921(a)(33)(A); while ACCA and §924(c)(3)(A) both define violent felonies that have "as an element the use, attempted use, or threatened use of physical force *against* the person [or property] of another," *see* §924(c)(3)(A) & (e)(2)(B)(i).

The Supreme Court held in *Leocal*, when interpreting the substantially identical crime of violence definition in 18 U.S.C. §16(a), that the phrase "physical force *against the person or property of another*" has special significance. *Leocal* 543 U.S. at 9 (emphasis in original). This difference alone removes *Castleman* from the equation.

But moreover, as Chief Judge Gregory explained, the Supreme Court explicitly stated that *Castleman* does not control the analysis in ACCA (and, consequently, also §924(c)). *Middleton*, 883 F.3d at 490. In *Castleman*, while permitting the common-law, de minimis definition of force to apply for misdemeanor crimes of domestic violence, the Court also noted it had "declined to read the common-law meaning of 'force' into ACCA's definition of 'violent felony,' because we found it a 'comical misfit with the defined term.'" *Id.*, *citing Castleman*, 134 S. Ct. at 1410. Thus, misdemeanor crime of domestic violence "accepts de minimus force, but the ACCA, by contrast, requires violent force." *Id.*

---

477

categorically is not a crime of violence. As *Cheeks* and *Evangelista* demonstrate, inaction – neglect with fatal consequences – is enough for first-degree murder in North Carolina, under either a "by means of … starving" theory or a "willful, deliberate, and premeditated killing" theory. *See Evangelista*, 353 S.E.2d at 378-81; *Cheeks*, 833 S.E.2d at 673-78. But inaction is not the *Leocal*-required non-negligent (or the Fourth Circuit required "intentional employment" of, *Garcia*, 455 F.3d at 468) "use … of physical force against the person … of another." *Accord United States v. Del Carmen Gomez,* 690 F.3d 194, 201-03 (4th Cir. 2012) (statute failed to meet elements clause because defendant can be guilty "by committing an affirmative act or by neglecting to act"); *United States v. Scott*, 954 F.3d 74, 87 (2d Cir. 2020) ("New York first-degree manslaughter is not a crime of violence under the force clause of ACCA because it can be committed by inaction"). Because North Carolina first degree murder includes inaction with fatal consequences, it does not categorically require proof as an element of violent physical force. *See Leocal*, 543 U.S. at 9-10; *Battle*, 927 F.3d at 166; *Middleton*, 883 F.3d at 490-93; *Garcia*, 455 F.3d at 468.

### b. *Felony murder theory*

Felony murder theory under North Carolina law likewise does not categorically require non-negligent use of violent physical force. For example, an accidental killing during a kidnapping by fraud/deception or burglary by fraud/deception satisfies North Carolina first-degree murder, but does not require, as an element, the use of violent physical force.

---

Additionally, causing death or injury does not categorically require the use of violent physical force. *Middleton*, 883 F.3d at 490-93. *Castleman* analyzed a specific intent crime involving "intentionally or knowingly caus[ing] bodily injury." *Id.* "*Castleman* did not abrogate the [Fourth Circuit's causation rule] that 'a crime may result in death or serious injury without involving the use of physical force'" if the "crime does not have as an element the intentional causation of death or injury." *United States v. Battle*, 927 F.3d 160, 166 (4th Cir. 2019). Thus, language in *Mathis* equating causation of injury to use of physical force appears to be incorrect. *See Mathis*, at 264-65.

Section 14-17 lists as first degree murder any killing "… committed in the perpetration or attempted perpetration of any arson, rape or a sex offense, robbery, *kidnapping*, *burglary*, or other felony committed or attempted with the use of a deadly weapon." N.C.G.S. §14-17 (2007) (emphasis added). Felony murder is merely another means of committing first degree murder. *See State v. Garcia*, 597 S.E.2d at 732 (prosecution not required to specify in indictment or in bill of particulars whether it plans to prove murder by means of "felony murder" or instead by means of "premeditation [and] deliberation"). *See also, supra*, pp. 14-16.

"The felony murder rule was promulgated to deter even accidental killings from occurring during the commission of or attempted commission of a dangerous felony." *State v. Richardson*, 462 S.E.2d 492, 498 (N.C. 1995). Even an accidental killing during a listed felony constitutes first-degree murder. *Id.* "Accident" is not a permissible defense to first-degree felony murder unless "predicated upon the absence of an unlawful purpose." *State v. York*, 489 S.E.2d 380, 390 (N.C. 1997). "[T]he defense of accident is unavailable if the defendant was engaged in misconduct at the time of the killing." *State v. Yarborough*, 679 S.E.2d 397, 407 (N.C. App. 2009), *PDR denied*, 693 S.E.2d 143 (N.C. 2010). Even a struggle over a weapon, that accidentally goes off and results in death, during a burglary constitutes first-degree murder. *Id.* at 407-08.

Thus, an *accidental* killing that occurs during a kidnapping or burglary qualifies as North Carolina first degree murder. But it does not qualify as a "crime of violence," as crimes of violence require "a higher degree of intent than negligent or merely accidental conduct." *Leocal*, 543 U.S. at 9-11. "[A] crime may result in death or serious injury without involving the use of physical force" if the "crime does not have as an element the intentional causation of death or injury." *Battle*, 927 F.3d at 166, *citing Middleton*, 883 F.3d at 490-93. Moreover, kidnapping and burglary can be accomplished without use of violent physical force.

Like kidnapping under Virginia law – which "may be committed in a non-violent manner through deceptive means" and thus does not categorically qualify as a crime of violence under the elements clause, *Mathis*, 932 F.3d at 266-67 – kidnapping under North Carolina law can be accomplished by fraud or trickery, without violent force. "The offense of kidnapping, as it is defined in G.S. 14-39, includes an unlawful restraint whereby one person's freedom of movement is restricted due to another's fraud or trickery." *State v. Sturdivant*, 283 S.E.2d 719, 729 (1981). False and fraudulent representations may constitute a substitute for force. *State v. Jackson*, 305 S.E.2d 703, 714 (1983). "[A]s to kidnapping," "consent obtained or induced by fraud or by fear is not consent." *State v. Sexton*, 444 S.E.2d 879, 903-04 (N.C. 1994). Thus kidnapping under North Carolina law does not categorically require use of violent physical force under the elements clause. *Cf. Mathis*, 932 F.3d at 266-67.

Similarly, burglary under North Carolina law may be accomplished through fraud, tricks, or deception. *State v. Wilson*, 223 S.E.2d 311, 315-16 (N.C. 1976), *citing State v. Henry*, 31 N.C. 463 (1849). North Carolina burglary requires "breaking and entering during the nighttime of a dwelling or sleeping apartment with intent to commit a felony therein." *Id.*, *citing State v. Mumford*, 227 N.C. 132, 41 S.E. 2d 201 (1947). A "breaking" may be actual or constructive. *Id.*

A constructive breaking occurs, for example, when "some process of law is fraudulently resorted to for the purpose of obtaining an entrance" or "some trick is resorted to to induce the owner to remove the fastening and open the door." *Id.*, *quoting Henry*, 31 N.C. 463. "[W]hen no fraud or conspiracy is made use of or violence commenced or threatened *in order to obtain an entrance*, there must be an actual breach of some part of the house." *Id.*, *quoting Henry*, 31 N.C. 463 (original emphasis). As burglary may be accomplished through a constructive breaking using

480

fraud, deception, or trick – instead of through an actual breaking using force or violence – it does not categorically require use of violent physical force.

Neither kidnapping nor burglary by fraud, tricks, or deception require use of violent physical force; nor does an accidental death. But an accidental death while committing kidnapping or burglary by fraud, tricks, or deception qualifies as first degree murder under North Carolina law. *See* N.C.G.S. §14-17; *Sexton*, 444 S.E.2d at 903-04; *Wilson*, 223 S.E.2d at 315-16; *York*, 489 S.E.2d at 390; *Richardson*, 462 S.E.2d at 498; *Yarborough*, 679 S.E.2d at 407-08 (accidental discharge that results in death during burglary constitutes first-degree murder). As North Carolina first-degree murder can be satisfied by accidental death, during a kidnapping by fraud or deception or a burglary by constructive breaking using fraud or deception, it does not categorically require non-negligent use of violent physical force.

### c. *Reckless conduct and reckless causation*

North Carolina law also permits a murder conviction when reckless conduct causes death, such as when a non-violent sale of a controlled substance results in death. This, categorically, is not a crime of violence.

North Carolina Gen. Stat. §14-17 (2007) provides that second degree murder includes drug distribution that causes death: "All other kinds of murder, including that which shall be proximately caused by the unlawful distribution of opium or any synthetic or natural salt, compound, derivative, or preparation of opium, or cocaine or other substance described in G.S. 90–90(1)d., or methamphetamine, when the ingestion of such substance causes the death of the user, shall be deemed murder in the second degree." Once again, this is a means of committing general murder, not a separate offense. *See, supra*, pp. 14-16.

But the Fourth Circuit has held that illegal sale of a controlled substance (alcohol),

consumption of which results in unintended death, does not satisfy the ACCA force/elements clause. *Middleton*, 883 F.3d at 488-93 (use of violent force must not be conflated with causation of injury) & *id.* at 493 (Floyd, J., concurring) (reckless conduct does not satisfy the force/elements clause). A homicide conviction for selling the controlled substance (involuntary manslaughter under South Carolina law) "does not fit the ACCA's force clause because it can be committed through a non-violent sale." *Id.* at 493. Similarly, North Carolina second degree murder does not categorically require use of force, as it can be accomplished through non-violent sale of a controlled substance, consumption of which results in death. *See* N.C.G.S. §14-17 (2007); *Middleton*, 883 F.3d at 488-93.

North Carolina's murder statute also applies to "recklessness of consequences," *State v. Wilkerson*, 295 N.C. 559, 581 (1978), but "a reckless use of force does not satisfy" the elements clause, *United States v. Vinson*, 805 F.3d 120, 125 (4th Cir. 2015), nor does a reckless causation of injury. *Battle*, 927 F.3d at 166; *Middleton*, 883 F.3d at 490-93. As North Carolina murder can be committed by reckless conduct or reckless consequence (reckless causation of death), North Carolina murder does not require as an element the use of violent physical force.

#### d. Generic murder

The generic definition of murder also can be committed without proof, as an element, of the *Leocal*-required non-negligent use of violent physical force. Reckless indifference (second degree) murder does not qualify as a crime of violence under the elements clause. *United States v. Begay*, 934 F.3d 1033, 1037-41 (9th Cir. 2019). The §924(c) elements clause requires intentionality, and "[r]eckless conduct, no matter how extreme, is not intentional." *Id.*

Similarly, the Fourth Circuit has held that "a crime may result in death or serious injury without involving the use of physical force" if the "crime does not have as an element the

482

intentional causation of death or injury." *United States v. Battle*, 927 F.3d 160, 166 (4th Cir. 2019); *Middleton*, 883 F.3d at 490-93 (majority op.) & 493 (Floyd, J., concurring).  Intentional conduct (like an intentional sale of alcohol), which recklessly causes death or injury, does not have as an element the use of violent physical force.  *See Battle*, 927 F.3d at 166; *Middleton*, 883 F.3d at 490-93 (majority op.) & 493 (Floyd, J., concurring).  The "malice aforethought" for second degree murder requires only conduct that is "reckless and wanton and a gross deviation from a reasonable standard of care, of such a nature that a jury is warranted in inferring that defendant was aware of a serious risk of death or serious bodily harm." *United States v. Fleming*, 739 F.2d 945, 947–48 (4th Cir. 1984), *quoting United States v. Black Elk*, 579 F.2d 49, 51 (8th Cir. 1978).  Therefore, second degree murder, reckless indifference murder, or an intentional act that recklessly causes death does not categorically qualify as a crime of violence under the elements clause.

Here, Mr. Umaña's VICAR murder counts encompass both the generic definition of murder and the North Carolina statutory definition.  Because generic murder can be committed without necessarily proving the use of violent physical force, VICAR murder does not categorically require intentional use of violent physical force.  *See* §1959(a); *Begay*, 934 F.3d at 1038-41; *Battle*, 927 F.3d at 166; *Middleton*, 883 F.3d at 490-93.

### e.  Poisoning

Mr. Umaña respectfully disagrees with the Fourth Circuit's analysis of this issue in *Mathis*, 932 F.3d at 264-65, and *In re Irby*, 858 F.3d 231; and maintains that murder by poisoning does not require proof of violent physical force.  As discussed above, Mr. Umaña respectfully suggests *Mathis* and *Irby*'s reliance on *Castleman* is misplaced.  *See, supra*.

### f.  Aiding and Abetting

Mr. Umaña's convictions for VICAR murder may have rested on aiding-and- abetting

liability. Jurors were instructed they could find him guilty on those counts for aiding and abetting. GPT, at 1242-45. And the jury verdict does not disclose which theory jurors found proven beyond a reasonable doubt. Guilt Phase Verdict (Crim. Doc. 1043).

The government has routinely conceded that conspiring to commit a crime of violence does not qualify as a crime of violence under the elements clause because it does not necessarily require proof of violent physical force. *See, supra*, pp. 10-11.

The proof necessary for conviction of conspiracy is similar to – and just as minimal and categorically non-violent as – the proof necessary for conviction of attempting a crime of violence or aiding and abetting a crime of violence. All three require intent and minimal conduct, which need not include any actual use, attempt use, or threatened use of violent physical force. *Compare United States v. Camara*, 908 F.3d 41, 46 (4th Cir. 2018) (conspiracy elements: unlawful agreement to commit offense, defendant's knowing and willing participation, and overt act in furtherance of); *with Rosemond v. United States*, 572 U.S. 65, 71 (2014) (elements of aiding and abetting: intent to facilitate commission of offense, and affirmative act in furtherance thereof).

With no appreciable difference in the proof required for these three types of inchoate offenses – conspiracy, attempt, and aiding-and-abetting – there is no appreciable reason for treating conspiracy offenses as *not* crimes of violence, while treating attempt offenses and aiding-and-abetting offenses as crimes of violence. Aiding and abetting a crime of violence can be proven without necessarily proving that defendant used, attempted to use, or threatened to use violent physical force. Thus, aiding and abetting VICAR murder – Mr. Umaña's convictions on Counts 22 and 24 – does not categorically qualify as a crime of violence.

### E. The §924(c) Convictions Must Be Vacated Even if Only One Predicate Is a Crime of Violence.

Even if one of the §924(c) predicates (VICAR murders) constitutes a crime of violence,

484

while the other (RICO conspiracy) does not,[145] the §924(c) convictions must be vacated.

### 1. The categorical/modified categorical approach compels relief.

The Court must apply the categorical or modified categorical approach to determine which predicate offense(s) formed the basis for Mr. Umaña's §924(c) convictions. But here, even after examining *Shepard* documents, it is impossible to conclude the jury convicted Mr. Umaña solely of using a firearm during and in relation to a crime of violence (e.g., VICAR murder as principal), rather than convicted him of using a firearm during and in relation to a non-crime of violence (RICO conspiracy). Complicating matters, his conviction for VICAR murder rested on alternative theories: the Court instructed he could be convicted of VICAR murder either as the shooter/principal, or as an aider and abetter of the shooter – without a *Rosemond*[146] instruction that he knew ahead of time that the shooter intended to use a firearm. Thus, his indictment, trial jury instructions, and verdict form render it possible the jury convicted him of RICO conspiracy

---

[145] This Court has previously indicated as much, holding that RICO conspiracy is categorically not a crime of violence in *Sandoval v. United States*, No. 3:16-cv-337-RJC, ECF Doc. 11, at 1, 4 (W.D.N.C. 12/31/19), and reasoning that VICAR murder is a crime of violence in a previous order in this proceeding, *Umaña v. United States*, 229 F.Supp.3d 388, 390-91, 397 (W.D.N.C. 1/25/17).

[146] *Rosemond v. United States*, 572 U.S. 65, 67, 81-82 (2014). In *Rosemond*, there were factual issues as to who actually used the firearm – defendant or someone associated with defendant – which is why the government prosecuted defendant using both a principal theory (defendant was the shooter) and an aiding-and-abetting theory (defendant abetted the shooter). *Id.* at 67-68, 83. When the government does this, the Court held, it must prove defendant knew ahead of time a firearm would be employed in the crime. *Id.* at 67, 81-82.

Similarly here, the government recognized there were factual issues as to who was the shooter, and thus prosecuted Mr. Umaña under a theory that he was the principal or an aider and abettor. *See* GPT, at 1242-45; Guilt Phase Verdict (Crim. Doc. 1043). An aiding and abetting theory on VICAR murder necessarily requires an aiding and abetting theory for use of a firearm during and in relation to a crime of violence, if the crime of violence is aiding and abetting VICAR murder. And when aiding and abetting a firearm offense is alleged, the government must prove defendant's knowledge ahead of time that the firearm would be employed. *Rosemond*, 572 U.S. at 67, 81-82.

(MS- 13 conspiracy) that led to the deaths of Manuel and Ruben Garcia Salinas (Count 1), *aiding and abetting* VICAR murders without use of the firearm nor knowledge ahead of time that a firearm would be used (Counts 22 and 24), and using a firearm during and in relation to the RICO conspiracy generally (such as during meetings or other racketeering acts of robbery or extortion, such as those that occurred within 24 hours after the shooting as charged in Count 28), which conspiracy did result in the murders of Manuel and Ruben Garcia Salinas (Count 23 and 25).[147]

The Supreme Court and Fourth Circuit have made clear that to determine whether an offense qualifies as a "crime of violence" under the §924(c) force/elements clause, the court must "employ the categorical approach or the modified categorical approach." *United States v. Fuertes,* 805 F.3d 485, 498 (4th Cir. 2015); *United States v. Bryant*, 949 F.3d 169, 172 (4th Cir. 2020); *see also United States v. Simms*, 914 F.3d at 233, 239, 241 (4th Cir. 2019) (*en banc*); *Davis*, 139 S. Ct. at 2328, 2329.

Under this approach, courts can only look to whether the statutory elements – not the facts of the case – meet the crime of violence definition. *Simms*, 543 U.S. at 233; *Shepard v. United States,* 544 U.S. 13 (2005); *Descamps v. United States*, 570 U.S. 254 (2013); *United States v. Vann*, 660 F.3d 771 (4th Cir. 2011) (*en banc*); *United States v. Chapman,* 666 F.3d 220 (4th Cir. 2012) (*en banc*). If the statutory crime is divisible, the court can review certain *Shepard* documents to

---

[147] This proposition has record support: trial counsel explicitly argued to the jury that Mr. Umaña was present but not the shooter. GPT, at 1183-87. The government recognized there were factual issues as to who was the shooter and thus prosecuted Mr. Umaña under a theory that he was either the principal or an aider and abettor to the shooting. *See* GPT, at 1242-45; Guilt Phase Verdict (Crim. Doc. 1043). Mr. Umaña in no way waives his argument that the Court's analysis is restricted to the categorical/modified categorical approach. He merely points out that there is evidentiary, record foundation – and not hypothetical speculation – for his argument that the *Shepard* documents do not conclusively show jurors found him guilty of using a firearm during VICAR murder.

determine whether the defendant was "necessarily" convicted of an offense that qualifies as a "crime of violence." *Descamps*, 570 U.S. at 261, 262. When the *Shepard* documents do not conclusively establish the elements of which a defendant was "necessarily" convicted, the court must assume the defendant was convicted of the "least serious" of the disjunctive elements. *Vann*, 660 F.3d at 775; *Chapman,* 666 F.3d at 228.

The categorical approach applies equally to jury trials and guilty pleas. As the *en banc* Fourth Circuit clarified in *Vann,* similar to guilty pleas*,* "in trials by jury, it has been established that a defendant convicted under a conjunctively charged indictment cannot be sentenced – in the absence of a special verdict form identifying the factual bases for conviction – to a term of imprisonment exceeding the statutory maximum for the 'least-punished' of the disjunctive statutory conduct." 660 F.3d at 774.

The categorical/modified categorical approach is not limited to prior convictions. In Fuertes, the Fourth Circuit explicitly said both apply to the "crime of violence" element in the instant §924(c) offense. 805 F.3d at 498. In *Bryant*, the Fourth Circuit applied the modified categorical approach to §924(c)'s "crime of violence" element. 949 F.3d at 172. The *Bryant* court reiterated, "To determine whether an offense qualifies as a crime of violence under the force clause of § 924(c)(3)(A), 'we apply the categorical approach or the modified categorical approach, depending on the nature of the offense.'" *Id*. (internal citations omitted). This is consistent with *Chapman*, in which the Fourth Circuit applied the modified categorical approach to an instant offense when the offense had alternative elements. *Chapman*, 666 F.3d at 227-28. "The modified categorical approach is simply a tool for implementing the categorical approach." See Bryant, 949 F.3d at 173 (internal citations omitted). Just as the categorical approach applies to §924(c), so too does the modified categorical approach. And when attempting to determine which predicate

487

supplied the crime of violence in question in the instant §924(c) offense, if the *Shepard* documents are inconclusive, *Vann* requires the court to find the predicate was the least serious alternative element – the non-crime of violence of RICO conspiracy.

Here, the *Shepard* documents do not conclusively establish Mr. Umaña's §924(c) convictions rested on VICAR murders. *See* Crim. Docs. 623, 1043; GPT, at 1213-61. Mr. Umaña was charged under §924(c) in the conjunctive: with use of the firearm during and in relation to RICO conspiracy (Count 1) and murder in aid of racketeering (Counts 22 and 24). Jurors were instructed they could premise conviction on using a firearm during and in relation to the RICO conspiracy (Count 1) *or* during and in relation to VICAR murder (Counts 22 and 24). GPT, at 1248-51. The verdict form did not disclose on which predicate jurors premised conviction. Guilt Phase Verdict (Crim. Doc. 1043). Therefore, this Court must assume the §924(c) convictions rested on the least of the predicate offenses – RICO conspiracy. *See Vann*, 660 F.3d at 775; *Chapman,* 666 F.3d at 228.

Additionally, the verdict form did not indicate jurors found Mr. Umaña guilty of murder as the shooter. Jurors were instructed they could find Mr. Umaña guilty on Counts 22 and 24 if "the defendant, or someone aided and abetted by [him], committed murder." GPT, at 1245; *see also id.* (instructing on fourth element: "the purpose of the defendant, *or someone aided and abetted by the defendant*, in committing the murder was to maintain or increase position in the enterprise"); *see generally id*. at 1242-45. The verdict form indicates his convictions on the VICAR murder counts (Counts 22 and 24) rested on either theory: that he was the shooter, "or aid[ed] and abet[ted] in that offense, in violation of 18 U.S.C. §2." Guilt Phase Verdict (Crim. Doc. 1043). Jurors did not receive a *Rosemond* instruction, so it is impossible to conclude jurors made a finding that Mr. Umaña aided and abetted with knowledge ahead of time that a firearm

488

would be employed. *Cf.* 572 U.S. at 67, 81-82. Thus, review of *Shepard* documents does not conclusively establish jurors found Mr. Umaña guilty of using the firearm in his commission of VICAR murders. To the contrary, jurors may have found him guilty of aiding and abetting VICAR murder without knowledge that a firearm would be used; not guilty of using a firearm during VICAR murder; and guilty of using a firearm during the broader RICO conspiracy.

Because the *Shepard* documents do not conclusively show which predicate his §924(c) convictions rested on, the Court must assume the §924(c) convictions rested on the least culpable conduct*, see Vann*, 660 F.3d at 775; *Chapman,* 666 F.3d at 228, which was: guilty of RICO conspiracy (Count 1); guilty of using the firearm during the RICO conspiracy generally, which conspiracy led, among other things, to someone murdering Manuel and Ruben Garcia Salinas (Counts 23 and 25 with RICO conspiracy as the predicate); guilty of aiding and abetting a confederate in the VICAR murders of Manuel and Ruben Garcia Salinas (Counts 22 and 24); but not proof beyond a reasonable doubt – and no jury finding – that Mr. Umaña used the firearm, or had (*Rosemond*) prior knowledge that a firearm would be used, in the VICAR murders of Manuel and Ruben Garcia Salinas. There was no jury finding that Mr. Umaña's use of a firearm included Mr. Umaña using a firearm during VICAR murders as the predicates to Counts 23 and 25.

As *Shepard* documents do not reveal a jury finding that Mr. Umaña used the firearm during and in relation to VICAR murders, the Court must presume that his convictions rested on the least culpable conduct. That is, his §924(c) convictions rested on RICO conspiracy.

### 2. Relief is Required Because the Jury's General Verdict Relied on an Unconstitutional Ground.

A general verdict which "may have rested" on a constitutionally invalid ground must be set aside. *Stromberg v. California*, 283 U.S. 359, 367-68 (1931); *see also Griffin v. United States*, 502 U.S. 46, 53-54 (1991); *Boyde v. California*, 494 U.S. 370, 380 (1990), *quoting Bachellar v.*

489

*Maryland*, 397 U.S. 564, 571 (1970).  In accordance with this constitutional principle, several courts have granted relief – without conducting a harmless error analysis – when §924(c) convictions were premised on more than one predicate offense and the verdict may have rested on the unconstitutional residual clause definition.  *E.g.*, *Wainwright v. United States*, No. 19-62364-CIV-COHN, 2020 U.S. Dist. LEXIS 63247, at **38-43 (S.D. Fl. 4/6/20); *United States v. Berry*, No. 3:09-CR-00019, 2020 WL 591569, at *3 (W.D. Va. 2/6/20); *Wilson v. United States*, No. CR 98-00975, 2018 WL 5928150, at *2 (C.D. Cal. 6/4/18); *United States v. McCall*, 3:10CR170-HEH, 2019 U.S. Dist. LEXIS 165744, at **15-16, 19-20 (E.D. Va. 9/25/19) ("jury may have found [defendant] guilty of VICAR based on conspiracy liability"); *United States v. Lettiere*, No. CV 16-157-M-DWM, 2018 U.S. Dist. LEXIS 118284, at **6-13 (D. Mont. 7/16/18) (*Shepard* documents do not show how defendant was necessarily convicted of robbery, and instead show he was convicted of robbery or extortion).  Likewise, the Fourth Circuit has warned that use of a special verdict form, in which the jury must indicate the predicate crime of violence for §924(c) counts, is the proper way to ensure the government receives harmless-error review of any *Johnson* error. *See United States v. Hare*, 820 F.3d 93, 105-06 (4th Cir. 2016).

Here, the Constitution forbids premising Mr. Umaña's §924(c) convictions on RICO conspiracy as the qualifying crime of violence. RICO conspiracy does not meet the §924(c)(3)(A) force/elements clause and solely meets the §924(c)(3)(B) risk/residual clause.  Due process is violated when a §924(c) conviction relies on the risk/residual clause.  *Davis*, 139 S. Ct. at 2323-24, 2336.  Moreover, RICO conspiracy – membership in Mara Salvatrucha 13 – constitutes racial, religious, and political affiliation in a marginalized group of Salvadoran immigrants who express unpopular political views. *Zant v. Stephens*, 462 U.S. 862, 885 (1983). These are quintessential categories upon which conviction cannot be premised.  *Id.*  Thus, the

490

Constitution "forbids conviction on a particular ground": the ground that RICO conspiracy – membership in the Salvadoran immigrant gang MS-13 – is the qualifying crime of violence under the risk/residual clause for Mr. Umaña's §924(c) convictions. *See id.*; *Griffin*, 502 U.S. at 53-54. The jury instructions permitted jurors to premise the §924(c) convictions on this unconstitutional ground. GPT, at 1248-51. And the jury returned a verdict indicating the §924(c) convictions "may have rested" on the unconstitutional ground. Guilt Phase Verdict (Crim. Doc. 1043). Mr. Umaña's §924(c) convictions must be vacated.

To counsel's knowledge, the Fourth Circuit has decided only one unpublished, per curiam case in which the §924(c) conviction was predicated on more than one crime, at least one of which is not a crime of violence under *Davis*, and the jury returned a general verdict: *United States v. Steward*, 793 Fed. Appx. 188, 189-90 (4th Cir. 2019) (unpub. per curiam). In *Steward*, defendant-appellant did not argue that *Davis* error in the presence of ambiguous predicates constituted *Stromberg* error or any other type of structural error. *See* U.S. Suppl. Br. 10/1/19 at 5-6 ("Defendant offers no argument that the error here counts as structural error"), *United States v. Steward*, No. 15-4422 (4th Cir.). Moreover, the §924(c)-count (count 3) predicates encompassed the same "coextensive" conduct: Hobbs Act robbery (count 2) and conspiracy to commit the exact same Hobbs Act robbery (count 1). *Id..* Thus, there was no *Stromberg* error in *Steward*.

Here, in contrast, Mr. Umaña's predicates were not coextensive. The RICO conspiracy was wide-ranging and encompassed more conduct than the single shooting incident that resulted in the VICAR murders. Mr. Umaña was accused of extorting or robbing drug dealers, participating in planning meetings, handling and inspecting gang members' firearms, and himself carrying or sharing a firearm with other gang members. Indeed, jurors saw undercover/informant video evidence of Mr. Umaña (allegedly) handling firearms at meetings. And jurors convicted him of

firearm possession generally (in a different county than the location of the shooting) and of extorting a drug dealer (in a different county than the location of the shooting). *See* Counts 27 and 28, Third Superseding Indictment & Guilt Phase Verdict (Crim. Docs. 623, 1043). Unlike in *Steward*, where the conspiracy predicate was coextensive with the substantive-offense predicate, here Mr. Umaña's RICO conspiracy was wide ranging and broader than the single shooting incident that resulted in the VICAR murders. Mr. Umaña's convictions must be vacated.

### 3. Due process and constitutional jury trial rights compel relief.

The jury did not explicitly or implicitly find use of a firearm during and in relation to Mr. Umaña's commission of VICAR murder (or aiding and abetting VICAR murder).

The jury instructions indicated jurors could premise the §924(c) convictions (Counts 23 and 25) on finding use of a firearm during RICO conspiracy or use of a firearm during VICAR murder. The verdict form did not disclose which fact (which predicate with nexus) the jury found. The finding of guilt on Counts 22 and 24 did not equate to a finding that Mr. Umaña used a firearm during the VICAR murders, because jurors were permitted to find guilt on Counts 22 and 24 if Mr. Umaña aided and abetted the VICAR murders. And the jury's finding that Mr. Umaña aided and abetted VICAR murder did not necessarily include a finding that he aided and abetted with knowledge that a firearm would be used, because the jury was not instructed to consider whether he had knowledge (or prior knowledge) that a firearm would be used in the VICAR murders. *Cf. Rosemond*, 572 U.S. at 67, 81-82.

Thus, the jury did not explicitly or implicitly find use of a firearm during and in relation to Mr. Umaña's commission of VICAR murder (or aiding and abetting VICAR murder). If the Court finds that Mr. Umaña's §924(c) convictions rested on using a firearm during and in relation to VICAR murders, then that amounts to a judicial factual finding of an element of an offense

492

and of a fact that increases the mandatory minimum. Both kinds of judicial fact-findings are prohibited by due process and the Sixth Amendment. *Alleyne v. United States*, 570 U.S. 99, 103 (2013); *Apprendi v. New Jersey*, 530 U.S. 466, 469, 497 (2000). Additionally, due process, the Sixth Amendment, and the Eighth Amendment would be violated because Mr. Umaña is entitled to a jury finding, based solely on the evidence, of proof beyond a reasonable doubt as to every element of the offense, particularly in his capital case. *Hurst v. Florida*, 136 S. Ct. 616, 618 (2016); *Ring v. Arizona*, 536 U.S. 584, 589 (2002); *Apprendi*, 530 U.S. at 476-77; *United States v. Gaudin*, 515 U.S. 506, 514 (1995); *Victor v. Nebraska*, 511 U.S. 1, 5 (1994); *Chandler v. Florida*, 449 U.S. 560, 574 (1981); *In re Winship*, 397 U.S. 358, 364 (1970).

The Eleventh Circuit acknowledged this problem when considering a *Johnson* challenge to a §924 conviction premised on multiple predicates:

> The way Gomez's indictment is written, we can only guess which predicate the jury relied on. It's possible that we can make a guess based on the PSI or other documents from Gomez's trial or sentencing. But <u>Alleyne</u> expressly prohibits this type of "judicial factfinding" when it comes to increasing a defendant's mandatory minimum sentence.

*In re Gomez*, 830 F.3d 1225, 1228 (11th Cir. 2016), *citing Alleyne*, 133 S. Ct. at 2155.

Here, Mr. Umaña's (alleged) use of a firearm *during and in relation to VICAR murder* is a fact jurors did not explicitly find; and it is not implicit in any of the jury's findings based on the Court's instructions. Any finding he used the firearm during and in relation to VICAR murder constitutes a prohibited judicial factual finding. At best, the jury instructions and verdict form permit no more than guesswork as to what jurors actually found. Judicial guesswork is no substitute for Mr. Umaña's jury trial and due process rights. Because a finding that Mr. Umaña used a firearm *during and in relation to VICAR murders* was not made, explicitly or implicitly, by the jury, his §924(c) convictions must be vacated.

### 4. The Davis violations are structural error and compel relief.

The *Davis* violations here are structural. They fundamentally infected the trial with unfairness and vitiated Mr. Umaña's due process and jury trial rights. Structural error occurs when effects of error are too hard to measure or error signals fundamental unfairness. *McCoy v. Louisiana*, 138 S. Ct. 1500, 1511 (2018).

The Government's theory that the RICO conspiracy – membership in the Salvadoran-immigrant gang MS-13 – constituted a crime of violence pervaded all aspects of trial and infected jurors' guilt-phase and penalty-phase deliberations. Mr. Umaña's MS-13 membership and Salvadoran origin were an overwhelming and persistent theme of the evidence presented, an explicit element of most of the charged offenses (RICO conspiracy, VICAR murders, alien with a firearm, Hobbs Act robbery), and two of the four non-statutory aggravating factors (gang-related killing and future dangerousness). The constitutional error of including RICO conspiracy as a §924(c) predicate signaled fundamental unfairness because the entire case focused on the existence of the MS-13 "enterprise" and its involvement in firearms and other crimes using weapons. This evidence – of an extensive conspiracy in North Carolina – vastly overshadowed the small amount of evidence showing Mr. Umaña affiliated with the North Carolina cliques for only a small amount of time.

The allegations underlying the RICO conspiracy affected the whole framework of the trial and rendered the trial fundamentally unfair with respect to the §924(c) convictions. *See also Weaver v. Massachusetts*, 137 S. Ct. 1899, 1908 (2017). The possibility that §924 convictions could be based on the RICO conspiracy affected the "entire conduct of the trial from beginning to end," because the Government only had to connect Mr. Umaña to MS-13 membership generally. *See Arizona v. Fulminate*, 499 U.S. 279, 309-10 (1991). And by producing a prejudicial volume

of immigrant-gang evidence throughout trial, the government only had to connect Mr. Umaña to a small amount of gang activity or mere membership in MS-13 more broadly to obtain conviction for the §924(c), RICO, and VICAR counts. The error here was intrinsically harmful and requires automatic reversal of the §924(c) convictions. *See Weaver*, 137 S. Ct. at 1905; *United States v. Davila*, 569 U.S. 597, 611 (2013); *Neder v. United States*, 527 U.S. 1, 7 (1999).

### 5. Harmless error analysis compels relief.

Assuming harmless error applies, and it is Mr. Umaña's position that it does not, but that the *constitutional* Davis-error is controlled by the principles discussed above, Mr. Umaña is still entitled to relief because the *Shepard* documents demonstrate a reasonable probability jurors rested Mr. Umaña's §924(c) convictions on use of a firearm during the RICO conspiracy (Count 1), and not in relation to aiding and abetting the VICAR murders (Counts 22 and 24). *See Hedgpeth v. Pulido*, 555 U.S. 57, 58 (2008) (per curiam), *citing Yates*, 354 U.S. 298 (applying *Brecht v. Abrahamson*, 507 U.S. 619 (1993), harmless error standard in the context of *non-constitutional* instructional error).

Here, there is a reasonable probability, but for the *Davis* error, the verdict would have been different. There is a reasonable probability Mr. Umaña's §924(c) convictions rested on RICO conspiracy as the predicate. The jury was presented with complicated evidence of a drunken, heated dispute involving multiple men (about twelve in all). As soon as shots fired, everyone scattered. Out of the dozens of people in the restaurant that evening – many of whom were disinterested bystanders not affiliated with either group – the prosecution presented only one witness who claimed Mr. Umaña was the shooter. One would expect a shooter to distance himself from a "hot" weapon used in a murder, so Mr. Umaña's possession of the firearm afterward is not indicative he was the shooter. MS-13 members who turned state's witness, such as Ronny "Nene"

495

Lopez and Juan "Mariachi" Vela Garcia, had insurmountable credibility issues: they "honestly" cooperated while watching their friends indicted for crimes calling for decades in prison – crimes that they too had committed. But, in contrast to this assailable witness testimony, video evidence showed Mr. Umaña possessed a firearm at some points in the conspiracy. And if he wasn't the trigger man the night of the shooting, he was certainly there, participating, and egging on the shooter. Jurors comfortably could find him guilty of aiding and abetting that shooting that resulted in the deaths of Ruben and Manuel Garcia Salinas, and possessing a firearm at various other times in the RICO conspiracy, without believing he was definitely the shooter. After all, the Court's instructions and verdict form told jurors they weren't required to make that call.[148] There is a reasonable probability jurors would not have found, beyond a reasonable doubt, Mr. Umaña used a firearm in the melee-turned-shooting.

While the Fourth Circuit has indicated that harmless error can be found when the two §924(c) predicates are *entirely coextensive, see United States v. Steward*, 793 Fed. Appx. 188, 189-90 (4th Cir. 2019) (unpub. per curiam), the RICO conspiracy Mr. Umaña was convicted of participating in was not coextensive with the single shooting incident that resulted in the VICAR murders. Mr. Umaña's case is more like *United States v. Jones*, 935 F.3d 266 (5th Cir. 2019) (per curiam). When the RICO-conspiracy predicate and other predicates are not coextensive, and the

---

[148] Jurors were instructed they could find Mr. Umaña guilty on Counts 22 and 24 if he "or someone aided and abetted by [him], committed murder," and the VICAR "for purpose of" element included "the purpose of the defendant, or someone aided and abetted by the defendant, in committing the murder was to maintain or increase position in the enterprise." GPT, at 1245. Jurors found him guilty on an aiding and abetting theory: guilty of "murder of [the victim] in aid of racketeering, in violation of 18 U.S.C. §1959, *or aiding and abetting in that offense, in violation of 18 U.S.C. §2*." Guilt Phase Verdict (Crim. Doc. 1043). And jurors were told using the firearm during the RICO conspiracy or during the VICAR murders would suffice for guilt on the §924(c) charges (Counts 23 and 25). GPT, at 1249.

496

RICO conspiracy encompasses a broader range of conduct, there is a reasonable probability of a different outcome without the *Davis* error. *See Jones*, 935 F.3d at 272-74.

Here, that is precisely the case. The RICO conspiracy that Mr. Umaña was convicted of participating in was wide-ranging and encompassed far more conduct than the single shooting incident. As explained above, there is a reasonable probability jurors could not unanimously agree on whether Mr. Umaña's use of the firearm included the shooting. And the Court's instructions told jurors they did not have to make that call: he could be found guilty of firearm possession generally (at other times during the RICO conspiracy), and *aiding and abetting VICAR murder* (without knowledge ahead of time that a firearm would be used, *see, supra*, footnote 13). There is a reasonable probability jurors premised their §924(c) verdicts on RICO conspiracy rather than the VICAR murders.

### F. Vacatur of the §924(c) Convictions, and of the VICAR Murder Sentences, Is Required Under §2255

For the above reasons, Mr. Umaña's §924(c) convictions (Counts 23 and 25) violate due process because they rely on the unconstitutionally vague residual clause in §924(c)(3)(B). Thus, his §924(c) convictions violate the Constitution or laws of the United States and result in a miscarriage of justice, cognizable under 28 U.S.C. §2255(a). *See Davis v. United States*, 417 U.S. 333, 346-47 (1974) (when intervening decision establishes that prisoner was convicted of "an act that the law [no longer] make[s] criminal," "such a circumstance 'inherently results in a complete miscarriage of justice and presents exceptional circumstances' that justify relief under § 2255"). Additionally, as the indictment charged conduct that was not criminal, this Court lacked jurisdiction of the §924(c) counts alleged in the indictment. Thus, Mr. Umaña's §924(c) convictions were a legal nullity entered in excess of this Court's jurisdiction. *See United States v. Brown*, 752 F.3d 1344, 1347 (11th Cir. 2014) (jurisdictional defect exists "when the indictment

497

affirmatively alleges conduct that does not constitute a crime at all because that conduct falls outside the sweep of the charging statute"); *United States v. Barboa*, 777 F.3d 1420, 1423 n.3 (10th Cir. 1985). To the extent prior counsel could have raised this claim previously, counsel's failure to do so was ineffective. Mr. Umaña's §924(c) convictions and sentences must be vacated.

Moreover, vacating the unconstitutional convictions in Counts 23 and 25 also necessitates vacating the death sentences imposed on Counts 22 and 24.

In *Johnson v. Mississippi*, 486 U.S. 578 (1988), the Supreme Court held that where a jury imposed a sentence of death, having considered as aggravation a conviction that is later vacated, the defendant is entitled to a new sentencing hearing. The Court reasoned that a sentence of death imposed under such a circumstance is inconsistent with the Eighth Amendment's prohibition against cruel and unusual punishment because "the jury was allowed to consider evidence that had been revealed to be materially inaccurate." *Id*. at 579. The Supreme Court conducted a similar analysis in *United States v. Tucker*, 404 U.S. 443, 449 (1972), a non-capital case. In *Tucker*, the Court affirmed the judgment of the Ninth Circuit ordering resentencing after two prior convictions known to the sentencer were later invalidated. *Id*. at 593. Finding the sentence was imposed "at least in part on misinformation of constitutional magnitude," the Court declared that it would be "callous to assume, now that the constitutional invalidity of the respondent's previous convictions is clear, that the [sentencer] will upon reconsideration 'undoubtedly' impose the same sentence." *Id*. at 447, 449 n.8.

The determinative factor is whether the invalidated conviction was known to, and possibly considered by, the sentencer. When a defendant has been convicted and sentenced on multiple counts, and one of the convictions is later determined to be invalid, the defendant must be resentenced on the remaining valid counts, unless it is established that the sentencer did not rely on

498

the invalid count in imposing the sentence. *See James v. United States*, 476 F.2d 936, 937 (8th Cir. 1973) (citing *Tucker*). Where it "appear[s] possible that [the sentencer] might have relied in part on an unconstitutional conviction," the defendant must be resentenced. *Id. See also Bourgeois v. Whitley*, 784 F.2d 718, 721 (5th Cir. 1986); *Jerkins v. United States*, 530 F.2d 1203, 1204 (5th Cir. 1976); *United States v. Pinkney*, 551 F.2d 1241, 1246 n.37 (D.C. Cir. 1976).

For example, the Fifth Circuit followed this rationale in *United States v. Causey*.185 F.3d 407, 411-12, 423 (5th Cir. 1999). The defendants were convicted and sentenced to death on three federal capital charges. *Id*. Following reversal of one of the convictions, the court ordered resentencing on the two remaining convictions because there was no way to determine whether the jury had been influenced to impose death by the invalidated third conviction. *Id*.

The principle that a sentence must be vacated if it could have been influenced by an invalid conviction applies with greater force in the case of jury sentencing, because the court can never determine with certainty what factors influenced the jury. *Cf. Wren v. United States*, 540 F.2d 643, 644 (4th Cir. 1975) ("In short, to terminate further inquiry, the district judge must be able to say either from recollection or reconstruction that had he known at the time of sentencing that the earlier convictions were invalid, he would have nevertheless imposed the same sentence.'") (quoting *Gardner v Florida*, 430 U.S. 349, 359 (1977)).

The interest in resentencing is also heightened where, as here, "[t]he fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a special 'need for reliability in the determination that death is the appropriate punishment' in any capital case." *Johnson,* 486 U.S. at 584 (citation omitted). "The decision to exercise the power of the State to execute a defendant is unlike any other decision citizens and public officials are called upon to make." *Mills v. Maryland,* 486 U.S. 367, 383 (1988).

499

"The *possibility* that [a defendant's] jury conducted its task improperly certainly is great enough to require resentencing." *Id.* at 384 (emphasis added). Even absent any express argument by the prosecutor to consider the invalid conviction, "there would be a possibility that the jury's belief that petitioner had been convicted of a prior felony would be 'decisive' in the 'choice between a life and a death sentence." *Johnson*, 486 U.S. at 586. This *possibility* is inconsistent with the Eighth Amendment's "special need for reliability in the determination that death is the appropriate punishment." *Id*. at 584 (internal quotations and citations omitted).

Under the possibility standard, resentencing is required when there is a possibility that an invalid conviction influenced even a single juror's weighing or penalty-selection decision. *Johnson*, 486 U.S. at 586; *Kubat v. Thieret*, 867 F.2d 351, 373 (7th Cir. 1989) (finding a violation of Eighth and Fourteenth Amendment based on "substantial possibility that one or more" jurors was influenced by erroneous jury instruction); *cf. Wiggins v. Smith*, 539 U.S. 510, 537 (2003) (to satisfy *Strickland* prejudice, petitioner must show "a reasonable probability that at least one juror would have struck a different balance"); *Buck v. Davis*, 137 S. Ct. 759, 776 (2017) (same).

Like *Johnson* consideration-of-invalid-conviction error, *Wiggins*, *Buck*, and ineffective-assistance cases require resentencing where a constitutional error may have affected even a single juror's decision to recommend death. Notably, though, the standard for establishing prejudice in the *Johnson/Tucker* context is less stringent than the standard for establishing prejudice in the ineffective-assistance context. Under *Johnson/Tucker*, a capital defendant must show only a *possibility* that an invalid conviction affected at least one juror's penalty determination, whereas a capital defendant claiming *Wiggins* error must show a *reasonable probability* that counsel's deficiency did so. "A 'reasonable probability' [for purposes of an ineffective-assistance claim] is a higher standard than *Johnson*'s 'possibility.'" *Powell v. Kelly*, 531 F. Supp. 2d 695, 732 n.40

500

(E.D. Va. 2008).

Here, there are myriad reasons why, individually and in combination, there is more than a possibility that at least one juror's weighing and penalty-selection decision would have been different without the unconstitutional §924(c) convictions.

During deliberations, the jury considered materially inaccurate evidence that Mr. Umaña was guilty of two counts of using a firearm during a crime of violence, when in fact those §924(c) convictions were unconstitutional. There is no basis upon which to conclude the jury's death sentences were not based in part on Mr. Umaña's two additional counts of death-qualifying convictions under §924(c), (j). Those convictions composed two of the four death sentences imposed and undoubtedly garnered substantial discussion and affected deliberation on the remaining counts. *Cf. Causey*, 185 F.3d at 411-12, 423 (reversal of one capital count required reversal of other two capital counts, as there was no way to determine jurors had not been influenced by the invalid conviction when considering sentence on the other two capital counts). There is at least a possibility jurors found each death-eligible count more aggravating because they found Mr. Umaña had committed three other death-eligible counts as well. There is also at least a possibility that, if jurors found the (unconstitutional) §924(c) counts more aggravating, for whatever reason, that additional aggravation of those unconstitutional counts affected jurors' weighing and selection on the VICAR murder counts.

During the death eligibility stage, the jury found Mr. Umaña's mental state for the VICAR murder counts (Counts 22 and 24) was the *least culpable* death-eligible mental state: reckless disregard for life. Crim. Docs. 1044, 1046. But for the §924(c) counts, the jury found Mr. Umaña's mental state was the *most culpable*: intentional killing. Crim. Docs. 1045, 1047. That alone requires vacatur of the VICAR murder sentences. While intentional killing is typically

associated with first-degree murder, reckless disregard is typically associated with less culpable homicide. Jurors factually found Mr. Umaña's VICAR murders entailed a lesser mental state and a less culpable form of homicide than the §924(c) counts. This finding shows there is more than a possibility, without the more culpable §924(c) counts, at least one juror's weighing and penalty-selection would have been different.

Similarly, jurors believed Mr. Umaña's death-eligible mental state regarding the §924(c) counts was much more culpable than his mental state regarding the VICAR murder counts. This indicates jurors gave special aggravating weight to those two §924 counts of conviction. Mr. Umaña would not be the first federal capital defendant whose jury found that conviction, in and of itself, for using a firearm in connection with a crime of violence was a factor weighing heavily in favor of a death sentence. *See, e.g.*, *United States v. Allen*, 406 F.3d 940, 941 (8th Cir. 2005) (en banc) (in armed bank robbery resulting in death, defendant convicted of 18 U.S.C. §2113 (a) & (e) and §924(c) & (j), but sentenced to death on only the §924(c) & (j) count). Here, Mr. Umaña had two of those unconstitutional §924(c) convictions weighing heavily in favor of a death sentence. There is more than a possibility, without them, at least one juror's weighing and penalty-selection would have been different

In the penalty-selection stage, jurors unanimously found as mitigating the facts and circumstances that tended to support that the killings were committed with reckless indifference: the murders "did not involve substantial planning," "occurred during an emotionally charged argument," and were "a result of [Mr. Umaña's] indoctrination into the ways and thinking of MS-13." Selection Verdicts, at 5-6 (Crim. Docs. 1048-1051). Jurors, however, gave special aggravating weight to the §924(c) counts, as reflected in the death-eligible mental state findings (most culpable on the §924(c) counts and least culpable on the VICAR murder counts). The most

502

logical way to understand the penalty-phase verdicts is that jurors added special weight and culpability to the charge that Mr. Umaña intentionally used a firearm repeatedly throughout his membership in MS-13 (throughout the RICO conspiracy), but any use of the firearm during the incident with Manuel and Ruben Garcia Salinas was less culpable and showed mere reckless disregard for life, during a heated argument without substantial planning. Without the unconstitutional §924(c) convictions, jurors would not have been exposed to or been able to channel as aggravating circumstances, the charge that Mr. Umaña intentionally used a firearm repeatedly throughout his membership in MS-13 (throughout the RICO conspiracy). Even the §922(g) count (Count 27) charged firearm possession in a narrower fashion, on only one occasion. Without this damaging aggravation – firearm use throughout his MS-13 membership (the RICO conspiracy) – channeled solely through the unconstitutional §924(c) convictions, there is more than a possibility at least one juror's weighing and penalty-selection would have been different.

During the guilt-phase instructions, the Court explicitly informed jurors, "that racketeering conspiracy and murder in aid of racketeering are crimes of violence." GPT, at 1249. But the Court's explicit label of VICAR murder as a heinous crime – one the law calls a "crime of violence" – added aggravating weight to the VICAR murder counts in the weighing decision. Additionally, RICO conspiracy – simply being in the gang – according to the Court's instruction, was a "crime of violence." Had the unconstitutional §924(c) counts properly been excluded, no instruction defining VICAR murder and RICO conspiracy as heinous "crimes of violence" would have been given. Thus, without the §924(c) counts, there is a possibility at least one juror would have weighed and selected differently.

This "crime of violence" label then spilled over into the penalty-selection stage, as the first aggravating factor alleged was a dispositive element in the VICAR murder: whether the

503

murders were committed to protect and maintain the name and reputation of MS-13 and advance Mr. Umaña's position and reputation within MS-13. *See* GPT, at 1245; Selection Verdicts, at 1 (Crim. Docs. 1048-1051). But rather than independently determine the weight to give this factor, jurors had already been instructed by the Court that committing homicide in furtherance of the gang (VICAR murder) constituted a specially heinous type of crime, a "crime of violence." Similarly, jurors were asked to consider whether Mr. Umaña's membership in MS-13 alone carried aggravating weight or factored into the future-dangerousness aggravator. Selection Verdicts, at 3-4 (Crim. Docs. 1048-1051). Instead of independently determining what weight to give Mr. Umaña's gang membership, the Court had already instructed that gang membership – RICO conspiracy – was a heinous type of crime, a "crime of violence." Jurors were therefore left to conclude, based on the Court's §924(c) instructions, that VICAR murders and gang membership (RICO conspiracy) should both receive substantial aggravating weight, based on the Court's instruction that those offenses were "crimes of violence." Had the unconstitutional §924(c) counts properly been excluded, no instruction defining VICAR murder or RICO conspiracy or both as a "crime of violence" would have been given, and there is a possibility at least one juror would have weighed and selected differently.

Alternatively, "[a]n invalidated sentencing factor (whether an eligibility factor or not) will render the sentence unconstitutional by reason of its adding an improper element to the aggravation scale in the weighing process *unless* one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances." *Brown v. Sanders*, 546 U.S. 212, 220-21 (2006) (original emphasis). "This test is not … an inquiry based solely on the admissibility of the underlying evidence." *Id.* "If the presence of the invalid sentencing factor allowed the sentencer to consider evidence that would not otherwise have been before it, due

504

process would mandate reversal without regard to the [*Sanders*] rule." *Id.* Additionally, "skewing that could result from the jury's considering *as aggravation* properly admitted evidence that should not have weighed in favor of the death penalty" gives rise to constitutional error "where the jury could not have given aggravating weight to the same facts and circumstances under the rubric of some other, valid sentencing factor." *Id.*

Here, initially, Mr. Umaña's unconstitutional §924(c) convictions are not mere invalidated sentencing factors. Instead, they were the highest level of aggravation: additional death-qualifying homicide convictions. The fact of two additional (§924(c)) counts of death-qualifying conviction was itself evidence that would not have otherwise been before the sentencer. Thus, due process and the Eighth Amendment require reversal of the VICAR murder sentences.

Similarly, on the §924(c) counts, jurors found the most culpable death-eligible mental state of intentional killing. In contrast, on the VICAR murders, jurors found the least culpable death-eligible mental state of reckless disregard for life. Jurors also unanimously found as mitigating that the killings occurred during a heated, emotional argument, without substantial planning, due to Mr. Umaña's indoctrination into the rules of MS-13. Jurors thus gave special aggravating weight to the §924(c) counts based on their most culpable death-eligibility mental state finding. As discussed in detail above, the most logical way to understand the penalty-phase verdicts is that jurors added special weight and culpability to the charge that Mr. Umaña intentionally used a firearm repeatedly throughout the RICO conspiracy, but any use of the firearm during the incident with Manuel and Ruben Garcia Salinas was less culpable. Without the unconstitutional §924(c) convictions, jurors would not have been exposed to or been able to channel as aggravating circumstances, the charge that Mr. Umaña intentionally used a firearm repeatedly throughout the RICO conspiracy. Even the §922(g) count charged firearm possession

505

in a narrower fashion, on only one occasion.  As this damaging form of aggravation was channeled

solely through the unconstitutional §924(c) convictions, constitutional error infected all Mr.

Umaña's death sentences.  *See Brown v. Sanders*, 546 U.S. at 220-21.

Finally, the Constitution and federal law guarantee Mr. Umaña a jury finding on weighing

and a jury finding on sentence-selection, free of constitutional error.  Mr. Umaña's right to a jury

determination – rather than appellate reweighing or harmless-error reweighing – is guaranteed by

Due Process, the Sixth Amendment, and the Eighth Amendment.

The Supreme Court held in *Ring v. Arizona* "that capital defendants 'are entitled to a jury

determination of any fact on which the legislature conditions an increase in their maximum

punishment' – in particular, the finding of an aggravating circumstance." *McKinney v. Arizona*,

707-08 (2020), *quoting Ring*, 536 U.S. 584, 589 (2002).  In *Hurst v. Florida*, the Supreme Court

"applied *Ring* and decided that Florida's capital sentencing scheme impermissibly allowed 'a

sentencing judge to find an aggravating circumstance, independent of a jury's factfinding, that is

necessary for imposition of the death penalty.'" *Id.*, *quoting Hurst*, 577 U.S. 92, 136 S. Ct. 616,

618 (2016).  States are not constitutionally required to mandate that juries, rather than judges,

weigh aggravation and mitigation or make the ultimate sentencing decision.  *Id.*  Thus, states that

permit trial-judge weighing or sentence-selection may engage in appellate reweighing.  *Id.* at 706.

But when a state mandates certain trial, capital sentencing, and appellate procedures, it

creates Fourteenth Amendment life and liberty interests in those procedures, which are protected

under federal due process.  *Evitts v. Lucey*, 469 U.S. 387, 393 (1985); *Hicks v. Oklahoma*, 447

U.S. 343, 346 (1980); *Ford*, 477 U.S. at 428-29.   "[I]t would be unthinkable that the same

Constitution would impose a lesser duty on the Federal Government." *Bolling v. Sharpe*, 347 U.S.

497, 500 (1954).  Thus, where federal statutory law mandates certain trial, sentencing, or appellate

506

procedures, there is also a federal due process life and liberty interest in that procedure. Here, federal statutory law creates a due process life and liberty interest in jury factual findings on weighing and sentence selection, whether in the first instance or after the mix of the sentencing package has been altered by vacatur of some counts of conviction.

Under the Federal Death Penalty Act, Mr. Umaña has the right to jury weighing of aggravation and mitigation and a *jury fact-finding* as to the ultimate sentence-selection. Unless the defendant and government both waive jury, the weighing of aggravation and mitigation and the ultimate sentence-selection decision all rest with the jury. 18 U.S.C. §3593(b), (d), (e). Although the jury's penalty-selection decision is called a "recommendation," the trial court must ("shall") impose whatever sentence the jury unanimously selects. 18 U.S.C. §3593(e), §3594.

Because the Federal Death Penalty Act provides Mr. Umaña the right to a jury determination on weighing aggravation and mitigation, and a jury determination on his penalty selection, appellate reweighing and harmless-error analysis are inapplicable, inappropriate, and violative of due process, and the Sixth and Eighth Amendments. Instead, if there is constitutional error in the penalty selection process, remand for resentencing by jury is required.

Relatedly, the Fourth Circuit has fully endorsed the sentencing package doctrine. *United States v. de Jesus Ventura*, 864 F.3d 301, 309 (4th Cir. 2017). "'[W]hen a defendant is found guilty on a multicount indictment, there is a strong likelihood that the [sentencer] will craft a disposition in which the sentences on the various counts form part of an overall plan,' and that if some counts are vacated, 'the [sentencer] should be free to review the efficacy of what remains in light of the original plan.'" *Id.* Here, if any of Mr. Umaña's counts of conviction are vacated, then application of the sentencing package doctrine is appropriate and necessary. Every aspect of Mr. Umaña's original sentence – from findings on aggravation and mitigation, findings on weighing,

507

and findings as to ultimate penalty selection – was conducted by the jury. If any counts of conviction are vacated, this holistic approach requires the original sentencer – a jury – to review the efficacy of what sentences remain. *See United States v. Stitt*, 552 F.3d 345, 355-56 (4th Cir. 2008).

The government did not request to waive jury during the penalty phase, *see* 18 U.S.C. §3593(b)(3) (permitting waiver of jury with both parties' consent); and the government argued to the jury that its findings on Counts 22, 23, 24, and 25 should be interrelated, co- dependent, and consistent. *E.g.*, GPT, at 1172. Thus, if relief – in the form of vacating some counts of conviction or sentence – is granted, the government should be estopped from taking a different litigation position at this juncture and arguing the remaining counts and/or sentences are should not be disturbed or may be reweighed without a jury.

For the reasons discussed above, Mr. Umaña's §924(c) convictions and sentences (Counts 23 and 25) must be vacated. Mr. Umaña's remaining death sentences on the VICAR murder counts (Counts 22 and 24) also must be vacated.

In light of *Borden v. United States*, 141 S. Ct. 1817 (2021).
Mr. Umaña amended this Claim as follows:

### G. Supplemental authority demonstrates the Government's procedural default arguments are wrong.

The Government previously argued that Mr. Umaña had procedurally defaulted his *Johnson/Davis* claim by failing to raise it at trial in 2010 or in direct appeal. Civ. Doc. 101, at 8-10. Mr. Umaña replied that alleged default does not apply because (1) he raised the claim timely (Civ. Doc. 104, at 16); and (2) avenues of cause exist, including novelty/unavailability of the claim under *Reed v. Ross*, 468 U.S. 1 (1984), prior to the *Johnson* and *Davis* decisions. Civ. Doc. 104, at 17-20. The Fourth Circuit has vindicated Mr. Umaña's position in *In re Thomas*, 988 F.3d 783, 788-90 & n.4 (4th Cir. 2021).

508

As Mr. Umaña previously stated, cause for alleged default exists if a claim "is so novel that its legal basis is not reasonably available to counsel." *Ross*, 468 U.S. at 16; Civ. Doc. 104, at 17-20. A claim is deemed unavailable when it results from a "clear break with the past" in a new Supreme Court case falling into these categories:

> First, a decision of this Court may explicitly overrule one of our precedents. Second, a decision may overturn a longstanding and widespread practice to which this Court has not spoken, but which a near-unanimous body of lower court authority has expressly approved. And, finally, a decision may disapprove a practice this Court arguably has sanctioned in prior cases.

*Ross*, 468 U.S. at 17 (cleaned up, citations omitted). "By definition, when a case falling into one of the first two categories is given retroactive application, there will almost certainly have been no reasonable basis upon which an attorney previously could have urged a state court to adopt the position that this Court has ultimately adopted." *Id.*

The Fourth Circuit, in *Thomas*, held that "*Davis* (1) announced a new rule of constitutional law (2) made retroactive to cases on collateral review (3) by the Supreme Court (4) that was previously unavailable." 988 F.3d at 786-90 & n.4 (citing 28 U.S.C. §2255(h)(2)). The Fourth Circuit held *Davis* was a "new" constitutional rule because it was not dictated by precedent; applied retroactively; and was unavailable prior to the *Davis* decision. *Id.*

Here, at minimum, Mr. Umaña's alleged default is excused under *Ross* due to novelty/prior unavailability of this claim. *Cf. id.* Put simply, if a *Johnson/Davis* claim meets the strict criteria for successor authorization under §2255(h)(2) for a movant who was convicted in 2011, it likewise meets the *Ross* criteria of a new retroactive rule that is a clear break from the past for a movant who was convicted in 2010 and whose conviction became final in 2015 before *Johnson* and *Davis* were decided. *Thomas* has clarified that the Government's default argument is wrong.

509

### 1. Supplemental authority demonstrates the Government's conduct-based approach arguments are wrong.

For both §924(c) counts (Counts 23 and 25), the indictment alleged two predicate offenses as the qualifying "crime of violence": "conspiracy to participate in a racketeering enterprise and murder in aid of racketeering," as set forth in Counts 1, 22, and 24. Third Superseding Indictment (Crim. Doc. 623), at 1-25, 47-53; Civ. Doc. 91, at 3. The jury was not required to select or identify upon which predicate it premised the §924(c) convictions. GPT 1248-1251.[149]

As to both predicates, the Government repeatedly made arguments imploring a conduct-based analysis (Civ. Doc 101[150]), rather than the elements-based categorical approach required by precedent. *Davis* and *Leocal* require the elements-based categorical approach when analyzing the elements clause of 18 U.S.C. §924(c)(3)(A). *United States v. Davis*, 139 S. Ct. 2319, 2327 (2019)

---

[149] "GPT" refers to Guilt Phase Transcript, Crim. Doc. 1258, No. 3:08-cr-00134-RJC (W.D.N.C.).

[150] The Government tried to transform the N.C. Gen. Stat. §14-17 VICAR murder into a "knowing[] murder" by citing vague charging language (Civ. Doc. 101, at 2), while ignoring the actual statutes and jury instructions. "Knowing," "knowingly," or "knowledge" are nowhere in 18 U.S.C. §1959 or N.C. Gen. Stat. §14-17. The jury instructions never instructed on federal or generic or "knowing[]" murder, and instead instructed broadly on N.C. Gen. Stat. §14-17 under theories/means of first degree premeditated murder, first degree felony murder, second degree murder, and conspiracy to commit murder. GPT 1235-1238, 1246.

The Government tried to transform Conspiracy under 18 U.S.C. §1962(d) into a non-Conspiracy crime by citing conduct-based overt acts. Civ. Doc. 101, at 2, 17-19.

The Government tried to alter the analysis in §924(c) and definition in §924(c)(3)(A) by citing alleged conduct and conduct-based §924(j) enhancements. Civ. Doc. 101, at 2-4. But conduct is not the question, and analyzing §924(j) puts the cart before the horse. Whether the predicate offense categorically qualified as a crime of violence – that is, whether there was even a §924(c) violation – is the primary question. Section 924(j), after all, requires an answer to the §924(c) question first: (j) applies only when "A person who, *in the course of a violation of subsection (c)*, causes the death of a person…" (emphasis added). Conduct used to answer a sentencing question does not answer that primary question: does the predicate offense categorically require proof as an element of the targeted use of violent physical force.

510

(rejecting Government's "newly minted case-specific theory" for analyzing §924(c)(3)(B) residual clause); *Leocal v. Ashcroft*, 543 U.S. 1, 7 (2004) (18 U.S.C. § 16's elements clause and residual clause "language requires us to look to the elements and the nature of the offense of conviction, rather than to the particular facts relating to petitioner's crime"). Recent precedent *Borden* underscores the Government's error:

> To decide whether an offense satisfies the elements clause, courts use the categorical approach. Under that by-now-familiar method, applicable in several statutory contexts, the facts of a given case are irrelevant. The focus is instead on whether the elements of the statute of conviction meet the federal standard. Here, that means asking whether a state offense necessarily involves the defendant's "use, attempted use, or threatened use of physical force against the person of another." §924(e)(2)(B)(i). If any – even the least culpable – of the acts criminalized do not entail that kind of force, the statute of conviction does not categorically match the federal standard, and so cannot serve as an ACCA predicate.

*Borden v. United States*, 141 S. Ct. 1817, 1822 (2021) (Kagan, J.) (citations omitted). The Government's conduct-based approach has, once again, been rejected by the Supreme Court.

### 2. Supplemental authority demonstrates RICO conspiracy is not categorically a crime of violence.

As to the predicate offense of RICO conspiracy, recent precedent makes clear: RICO conspiracy, even with the parenthetical sentencing enhancement contained in 18 U.S.C. §1963(a), is not categorically a crime of violence under the §924(c) elements clause. *United States v. Simmons*, 11 F.4th 239, 261 (4th Cir. 2021) (maj. opinion), *id.* at 279 (Richardson, J., concurring); *United States v. Capers*, 20 F.4th 105, 111-12, 118-21 (2d Cir. 2021) ("Even where the substantive crime that is the object of a conspiracy necessarily requires the use of force, a conspiracy to commit it does not.").

511

### 3. Supplemental authority demonstrates N.C. Gen. Stat. §14-17 VICAR murder is not categorically a crime of violence.

Turning to N.C. Gen. Stat. §14-17 VICAR murder, recent precedent shows this is not categorically a crime of violence under the elements clause.

This Court, in its January 25, 2017 order denying Mr. Umaña's unopposed motion to stay proceedings, analyzed generic murder and murder under N.C. Gen. Stat. §14-17. *Umaña v. United States*, 229 F. Supp. 3d 388 (W.D.N.C. 2017). As to generic murder, this Court stated the offense has two elements: unlawful killing, and malice aforethought. *Id.* at 392-93. This Court reasoned that unlawful killing amounted to (direct or indirect) application of force, and the *Leocal*-required *mens rea* was supplied by the element of "malice aforethought." *Id.* at 393-94. This Court reasoned that "malice aforethought" can be inferred from one of three "theories"[151]: "'intent to kill,' 'intent to commit a dangerous felony,' and 'reckless and depraved indifference to serious dangers posed to human life.'" *Id.* at 394 (citing *United States v. Marrero*, 743 F.3d 389, 401 (3d Cir. 2014)). And such intent, this Court reasoned, was a higher, more culpable mens rea than criminal negligence or criminal recklessness. *Id.* at 394-95. "Together, the elements of generic murder categorically require the 'use . . . of physical force against the person . . . of another,' as those terms have been interpreted by the U.S. Supreme Court." *Id.* at 395. That is, death (even if not intended), with malice aforethought (supplied by intent to commit a dangerous felony or reckless

---

[151] This Court was precise in defining these as theories (or means of committing one offense) as opposed to elements (of different offenses): "The definition of generic murder adopted by the Third Circuit does not change the elements of common law murder; it identifies theories that supply the mens rea for 'malice aforethought.'" *Umaña*, 229 F. Supp. 3d at 393 (citing *Schad v. Arizona*, 501 U.S. 624, 648 (1991) (Scalia, J., concurring in part and concurring in judgment) (noting that different theories can supply the mens rea of "malice aforethought," including "an intention to kill or grievously injure, knowledge that an act or omission would probably cause death or grievous injury, an intention to commit a felony, or an intention to resist lawful arrest")).

depraved indifference) establishes the use of force with the concomitant *Leocal*-required *mens rea*, this Court reasoned.

So too, this Court continued, with North Carolina murder. "North Carolina law recognizes only one crime of murder – an unlawful killing of another with malice aforethought, express or implied."[152] *Id.* at 395 (citing *State v. Hunt*, 582 S.E.2d 593, 597 (N.C. 2003)). Honing in on first degree felony murder, this Court stated, "the malice element is satisfied by the intent to commit the unlawful felony. Thus, 'malice aforethought' for a first-degree murder conviction requires the State to prove that [either] the defendant had a specific intent to kill the victim, an actual intent to poison, imprison, starve, torture, or lie in wait for the victim, *or an actual intent to commit the underlying felony, during the course of which an unlawful killing occurred.*" *Id.* at 396 (emphasis added) (citing *State v. Jones*, 538 S.E.2d 917, 923-25 (N.C. 2000)). Once again, death (even if

---

[152] North Carolina murder is an indivisible crime listing various theories (means). North Carolina first degree murder is one crime, regardless which theory (means) the prosecution pursues: "Premeditation and deliberation is a theory by which one may be convicted of first degree murder; felony murder is another such theory. Criminal defendants are not convicted or acquitted of theories; they are convicted or acquitted of crimes." *State v. Thomas*, 386 S.E.2d 555, 560-61 (N.C. 1989) (citations omitted) (holding on remand defendant may be tried and convicted of "first degree murder on all theories and on all lesser homicides which may be included under any theory and supported by the evidence"). "A murder indictment in the [general, short] form prescribed by N.C.G.S. § 15-144 will support a verdict finding the defendant guilty of first degree murder upon any of the theories set forth in N.C.G.S. § 14-17." *State v. Clark*, 386 S.E.2d 191, 194 (N.C. 1989), *citing State v. Bush*, 221 S.E.2d 333 (N.C. 1976), *death sentence vacated*, 429 U.S. 809 (1976). "The State is not required at any time to elect a theory upon which it will proceed against the defendant on the charge of first degree murder, and it is proper for the trial court to submit the issue of the defendant's guilt of that charge to the jury on each of the theories of first degree murder supported by substantial evidence presented at trial." *Id.*, *citing State v. Strickland*, 298 S.E.2d 645 (N.C. 1983). The prosecution is not even required to decide under which theory or means it plans to establish first-degree murder: it need not plead the theory or means in the indictment, nor inform defense counsel in a bill of particulars. *State v. Garcia*, 597 S.E.2d 724, 732 (N.C. 2004).

unintended and entirely accidental[153]), with an implied *mens rea* of malice aforethought supplied by intent to commit a felony, satisfies use of force with the concomitant *Leocal*-required mens rea, this Court reasoned. *Id.* at 396-97.

All other means of commission "with malice aforethought" "'remain[] murder as at common law, but [are] classified by [§ 14-17] as murder in the second degree[.]'" *Id.* at 396 (citing *State v. Hunt*, 582 S.E.2d 593, 597 (N.C. 2003), *State v. Davis*, 290 S.E.2d 574, 588 (N.C. 1982)). "'[M]alice aforethought' may be proved by the intentional performance of an inherently dangerous act 'in such a reckless manner as to reflect knowledge that injury or death would likely result.'" *Id.* at 396-97 (citing *State v. Rich*, 527 S.E.2d 299, 304 (N.C. 2000)). Death, with non-accidental commission of an inherently dangerous act, satisfies use of force with the concomitant *Leocal*-required mens rea, this Court reasoned. *Id.* at 396-97.

*Borden*, however, has clarified that this Court's 2017 analysis demonstrates the offense is *not* a crime of violence. If an offense has an implied mental state disembodied from the application of the force, then the offense is not categorically a crime of violence under *Borden*.

The *Borden* plurality held the ACCA elements clause ("has as an element the use … of physical force against the person of another," §924(e)(2)(B)(i)) "expresses a kind of directedness or targeting," because "[t]he phrase 'against another,' when modifying the 'use of force,' demands that the perpetrator direct his action at, or target, another individual." *Borden*, 141 S. Ct. at 1825-26. The clause requires that the state crime have an element requiring that the defendant targeted

---

[153] *State v. York,* 489 S.E.2d 380, 390 (N.C. 1997); *State v. Richardson*, 462 S.E.2d 492, 498 (N.C. 1995); *State v. Yarborough*, 679 S.E.2d 397, 407-08 (N.C. App. 2009), *cert. denied*, 693 S.E.2d 143 (N.C. 2010).

514

or directed his force specifically at the victim. *Id.*; *see id.* at 1827 ("[B]ecause his conduct is not opposed to or directed at another – he does not come within the elements clause. He has not used force 'against' another person in the targeted way that clause requires."); *see id.* at 1829 ("The very question here is whether the statutory language Congress enacted requires that force be directed at, rather than just happen to hit, an object."). Justice Thomas concurred, applying slightly different reasoning that the phrase "use of physical force" "has a well-understood meaning applying only to *intentional* acts *designed* to cause harm." *Id.* at 1835 (Thomas, J., concurring in judgment) (citation omitted; emphasis added). Accordingly, under the rationales of the *Borden* plurality and concurrence, the state crime must require as an element that the defendant directed or targeted the violent force at (or "against") the victim. Otherwise, it is not categorically a violent felony under the elements clause.

As *Borden* clarifies, an implied *mens rea* of malice aforethought – which does not require targeting the violent force specifically at the victim – does not satisfy the elements clause. That's not just Mr. Umaña's understanding of the holding in *Borden*; it is the *Borden* dissenters' and the Government's understanding of it too.

The four-member *Borden* dissent acknowledged that "[u]nder the Court's decision, even second-degree murder and some forms of manslaughter may be excluded from ACCA. That is because, in many States, some forms of second-degree murder and manslaughter do not require intent or knowledge." *Borden*, 141 S. Ct. at 1856 (Kavanaugh, J., dissenting).

The Government has conceded, in a different case, that the reasoning this Court articulated in its January 25, 2017 analysis means the offense is not categorically a crime of violence under *Borden*. In *United States v. King*, the Government acknowledged that identical reasoning regarding

515

an implied mental state, articulated by the Eighth Circuit prior to *Borden*, demonstrated that the

offense was not categorically a crime of violence after *Borden*. The Government explained:

> In his concurrence to the denial of Ross's and King's petition for rehearing the original panel opinion, Judge Colloton summarized how kidnapping resulting in death could be understood to satisfy the force clause:
>
>> Because a kidnapper must act intentionally, the kidnapping must cause a death, and death cannot be caused without applying force, it follows that the use of force is an element of kidnapping resulting in death. No paradigm shift by the Supreme Court is necessary to avoid a "nonsensical" or "absurd" result in this case. The imaginative hypotheticals propounded on behalf of the appellants overlook that when a perpetrator commits an intentional kidnapping, ***a culpable scienter with respect to the deadly consequences is supplied by the law based on the underlying felony***, and causing death through the indirect application of force counts as "use" the same as applying force directly. **As with an offender who commits felony murder, a defendant convicted of kidnapping resulting in death does not cause the death innocently or by accident in the eyes of the law.**
>
> *United States v. Ross*, 977 F.3d 1295, 1296 (8th Cir. 2020) (Colloton, J., concurring in denial of rehearing en banc) (emphasis added). Despite the persuasiveness of this argument, **after *Borden* the Government now respectfully submits that any mens rea imputed by law onto the underlying felony does not satisfy the force clause**.

United States Suppl. Brief, at 11, *United States v. King & Ross*, Nos. 18-2800, 18-2877 (8th Cir.),

filed 3/30/2022 (CM/ECF Entry ID 5142173) (*italics in Government's original*; **bold supplied by**

**Umaña**). That is, *mens rea* for the killing, when "supplied by the law based on the underlying

felony," does not satisfy the elements clause after *Borden*. *Id.*

The crux of *Borden* – the Government said – was that an implied mental state will not

satisfy the elements clause's mens rea:

> While *Borden* does not resolve what level of mental culpability will satisfy the force clause, the plurality opinion's understanding of the force clause's requirement of the "use of physical force against the person of another," clarifies that an implied mental state will not suffice.
>
> The plurality begins with the parties' agreement that the requisite use of force must be "volitional" or "active." *Borden*, 141 S. Ct. at 1825 (citing *Voisine v. United States*, 579 U.S. 686, ---, 136 S. Ct. 2272, 2279-81 (2016)); *see also Leocal*,

543 U.S. at 9 (holding that "'use' requires active employment"). From there, the plurality concludes that the term "against" means that the active use of force must be in some manner directed toward the person the force is used against. *Id*. at 1826. That requirement of directedness leads the plurality to conclude that reckless conduct does not satisfy the force clause because such conduct need not be "opposed to or directed at" anyone. *Id*. at 1827.

It is the same requirement of directedness that forecloses the reliance here on a legally implied mental state.

*Id.* at 16-17.

"Malice aforethought" implied by commission of a felony does not satisfy the *Borden* requirement of active, volitional force directed against or targeted at the victim. *See id.*; *Borden*, 141 S. Ct. at 1825-27. Because commission of a felony is one theory (or indivisible means[154]) of committing generic murder and North Carolina murder, these offenses do not categorically satisfy the §924(c)(3)(A) elements clause, as clarified by *Borden*.

Similarly, for North Carolina second degree murder, malice aforethought may be proven by intentional, non-accidental performance of an inherently dangerous act "'in such a reckless manner as to reflect knowledge that injury or death would likely result.'" *Umaña*, 229 F. Supp. 3d at 396-97. Thus, it too does not satisfy the *Borden* requirement of active, volitional force directed against or targeted at the victim. *Borden*, 141 S. Ct. at 1825-27.

However, second degree murder can also be proven with a less culpable mens rea, which also does not satisfy the elements clause under *Borden*. Second degree murder can be proven by reckless conduct that results in death. *State v. Snyder*, 317 S.E.2d 394, 395-96 (N.C. 1984) (evidence "was sufficient to support a finding that the defendant's acts evidenced recklessness of consequences and 'total disregard for human life'" malice necessary for second degree murder,

---

[154] *See*, *supra*, footnotes 3 and 4.

even "'though there may be no intention to injure a particular person'" (citations omitted)). A second degree murder conviction will be affirmed, even if jurors found only the mental state of "recklessness of consequence." *State v. Rich*, 527 S.E.2d 299, 302-03, 306-07 (N.C. 2000). It also may be proven by "culpable negligence" that is "accompanied by 'an act which imports danger to another [and] is done so recklessly or wantonly as to manifest depravity of mind and disregard of human life.'" *Id.* at 304 (quoting *State v. Trott*, 130 S.E. 627, 629 (N.C. 1925)); *see also State v. Mapp*, 264 S.E.2d 348, 355 (N.C. Ct. App. 1980) (second-degree murder conviction can be based on "culpable negligence evidencing malice"); *State v. Roop*, 122 S.E.2d 363, 365 (N.C. 1961) ("Culpable negligence, from which death proximately ensues, makes the actor guilty of manslaughter, and under some circumstances guilty of murder"). Culpable negligence is shown by "wilful, wanton, or intentional" "violation of a safety statute which results in injury or death," even if the injury or death is unintended. *Roop*, 122 S.E.2d at 365. Culpable negligence is also shown if the defendant *inadvertently or unintentionally* violated a safety statute with "recklessness of probable consequences of a dangerous nature, when tested by the rule of reasonable prevision, amounting altogether to a thoughtless disregard of consequences or of a heedless indifference to the safety of others." *Id*. Second degree murder is even satisfied when defendant, while drunk, told a second intoxicated person to take the wheel of the car and "get away," and the driver then drove "in breach of three separate statutes … and with reckless disregard of the public safety," and killed a person in a traffic collision. *Trott*, 130 S.E. at 629. Second degree murder by drug distribution may also be proven through intentional sale with unintended death: "a wrongful act intentionally done without just cause or excuse demonstrating a willful disregard of the rights of others." *State v. Liner*, 391 S.E.2d 820, 822-23 (N.C. Ct. App. 1990) (cleaned up); *see also State v. Parlee*, 703 S.E.2d 866, 868-70 (N.C. Ct. App. 2011); *State v. Barnes*, 741 S.E.2d 457, 465-66 (N.C. Ct. App.

518

2013). *Borden* clarifies that all these examples mean §14-17 is not categorically a crime of violence.

While second degree murder may require volitional, non-accidental action; it does not require active, volitional force directed against or targeted at the victim. Thus, under *Borden*, it is not categorically a crime of violence. *Borden*, 141 S. Ct. at 1856 (Kavanaugh, J., dissenting) ("Under [*Borden*], even second-degree murder and some forms of manslaughter may be excluded from ACCA.").

Even if viewed through the lens of VICAR (and Mr. Umaña reiterates his position that is not the right approach (*cf.* Civ. Doc. 104, at 13)), the offense is not categorically a crime of violence. This Court did not instruct the jury on the definition or elements of generic murder, only the definition and elements of N.C. Gen. Stat. §14-17 under theories/means of first degree premeditated murder, first degree felony murder, second degree murder, and conspiracy to commit murder.[155] GPT 1235-1238, 1246. Additionally, committing felony murder or reckless murder, or committing a voluntary act that results in death (§14-17 theories of murder) – even if done with the purpose of maintaining or increasing one's position in the enterprise – is not categorically a crime of violence. A defendant can intend to do one risky but non-violent thing for the gang, and as a result accidentally, negligently, or recklessly injure, kill, or apply force to someone. Intent to commit a felony (such as burglary) or intentionally committing an act (such as drive drunk) – even if done for the purpose of maintaining or increasing one's position in the enterprise (for example, burglarizing a rival's stash house for the enterprise, or chauffeuring gang members while

---

[155] Conspiracy, even to commit murder, is not categorically a crime of violence. *Capers*, 20 F.4th at 121 ("Even where the substantive crime that is the object of a conspiracy necessarily requires the use of force, a conspiracy to commit it does not.").

intoxicated for the enterprise) – still does not supply the *Borden*-required volitional force directed against or targeted at the victim. N.C. Gen. Stat. §14-17, even if viewed through the lens of VICAR, does not categorically qualify as a crime of violence under *Borden*.

Moreover, *Borden* reinforces the arguments Mr. Umaña made that reckless offenses, including homicide with a *mens rea* of extreme recklessness, do not categorically satisfy the elements clause. Civ. Doc. 22/24, at 338-39; Civ. Doc. 91, at 8, 22-24.

Accordingly, *Borden* clarifies that N.C. Gen. Stat. §14-17 VICAR murder is not categorically a crime of violence. *Borden* demonstrates – as the Government agreed in *King* – that the implied mental states this Court analyzed in its January 25, 2017 order mean Mr. Umaña's offense does not categorically qualify as a crime of violence under the elements clause. *Borden* also demonstrates Mr. Umaña's other arguments were correct. N.C. Gen. Stat. §14-17 VICAR murder does not categorically require what the elements clause does: volitional force directed against or targeted at a victim.

## CLAIM XXIII. MR. UMAÑA WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE PRESENTATION TO THE DEPARTMENT OF JUSTICE IN OPPOSITION TO THE AUTHORIZATION OF A CAPITAL PROSECUTION, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.

All other claims and allegations in this Motion are incorporated into this claim by this reference.

Mr. Umaña was denied effective assistance of counsel during a critical stage in his pretrial proceedings. Just one month after his attorney was appointed to represent him on these federal charges, that same attorney was required to go before a team of prosecutors interested in seeking the death penalty for Mr. Umaña to make a case for why they should exercise their discretion not

to seek death.[156] Counsel repeatedly told the representatives of the Government that he had done nothing to prepare for the meeting and beseeched them to postpone the meeting in order to make the inquiries into Mr. Umaña's mental health issues and the mitigating circumstances of his childhood in war-torn El Salvador. NT 07/28/08 at 10 (initial appearance). His request was denied due to perceived concerns about scheduling and other issues that paled in comparison with the interest that Mr. Umaña had at stake – his right to life.

Mr. Umaña was charged with death-eligible federal offenses on June 23, 2008. Crim. Doc. 3. The same attorney that had been representing him on the state court charges, John Bryson, was appointed to the federal case on July 10, 2008. Appx. 23. Mr. Umaña would later be appointed a second attorney, as required by Federal law, on October 3, 2008. *See* 18 U.S.C. § 3005. Shortly after his appointment, Mr. Bryson learned that his opportunity to convince the Department of Justice not to seek the death penalty against Mr. Umaña was set for August 11, 2008, leaving him just under a month to prepare. Having only a few weeks to prepare to present to the Department of Justice why his client should not face execution, trial counsel expressed his concern about the extremely tight time frame and explained that he believed that Mr. Umaña was suffering from mental health issues and because he was raised in El Salvador, preparing a mitigation presentation before the August 11 hearing was unrealistic. *See* Appx. 79. The Government responded on July 29, refusing to reschedule the meeting, citing scheduling issues as the primary reason that the meeting could not be delayed:

> We have given your request serious consideration but unfortunately cannot accommodate that request. As you may be aware Judge Conrad is faithful to the speedy trial clock and is very mindful of his docket. As such, it is likely that, were

---

[156] As argued in Claim XXV, those prosecutors arbitrarily exercised discretion to seek the federal death penalty when their counterparts in other districts in the state would not have sought death.

we to delay the [death penalty] process, the RICO prosecution will go to trial right around the time we would be superseding the indictment. This would no doubt create heartburn for the judge and substantial problems for us. The most significant being that a verdict on the RICO count may create a double jeopardy issue on the DP case.

Appx. 80.



Trial counsel was aware that he would be much better able to present information that would save his client from facing the death penalty if he could intelligently speak to the mitigating characteristics of his client. But he could not retain a mental health expert or conduct an international investigation into the mitigating circumstances of his client's life without sufficient time or funds. Since he did not secure funding or have the time necessary to properly investigate Mr. Umaña's background, trial counsel attended the authorization meeting without mitigation information from El Salvador, without information on Mr. Umaña's cognitive impairment, and

522

was constricted to explaining what little he knew about the facts underlying the offense that took place in Greensboro, and exploring whether DOJ would accept a plea to life in prison. Appx. 36 (mitigation specialist's trial report noting investigation did not begin until May 2009). Attending that meeting without requesting a continuance of Mr. Umaña's court date to assuage the concerns of the United States Attorney about the Court's schedule and the speedy trial clock was deficient. Even if a continuance would not have been granted, trial counsel was obligated to preserve the record with objections for appeal. See ABA Guidelines 10.8(B)(2) and commentary.

Counsel, therefore, wasted his opportunity to convince the committee that they should not seek the death penalty. He was not only ill-prepared to make an adequate presentation to the authorization committee, but he was unwilling or neglected to move the Court for a continuance or at least make a record that he needed one. The decision of the Government to seek the death penalty against Mr. Umaña was the most important legal decision Mr. Umaña had ever faced. Both because he failed to move for the continuance and because he could not give a full and adequate presentation as to why his client should not face capital charges, his performance was deficient. There is a reasonable probability that if Mr. Bryson had been adequately prepared for the authorization hearing, he could have presented substantial mitigating factors that would have convinced the Department of Justice to try Mr. Umaña's case non-capitally. With adequate preparation, trial counsel could have presented to the Department of Justice the substantial mitigating evidence (including evidence of poverty, trauma, mental illness, intellectual disability, and brain damage) described elsewhere in this motion. *See* Claims I, II, III, IV. The rushed timeline of the authorization meeting therefore prejudiced Mr. Umaña by depriving him of the kind of "extraordinary efforts on behalf of the accused" necessary at "every stage of the proceedings." ABA Guidelines 1.1.

**CLAIM XXIV. TRIAL COUNSEL RENDERED DEFICIENT PERFORMANCE FOR FAILING TO ADEQUATELY EXPLAIN TO THEIR INTELLECTUALLY IMPAIRED, BRAIN DAMAGED CLIENT FROM EL SALVADOR THE RISKS AND BENEFITS OF A PLEA DEAL IN THIS CAPITAL CASE, THEREBY VIOLATING RIGHTS GUARANTEED HIM BY THE FIFTH, SIXTH AND EIGHTH AMENDMENTS.**

All other claims and allegations in this Motion are incorporated into this claim by this reference.

On August 29, 2009, Assistant United States Attorney Jill Rose agreed to have a conversation with trial counsel regarding a plea deal for Alex Umaña that began with various conditions: Mr. Umaña had to tell all that he knew about MS-13 and to testify in cases against MS-13 members. In addition to cooperating, Mr. Umaña had to enter a plea of admission for crimes he was alleged to have committed in Los Angeles.

Trial counsel presented the circumstances of this initial potential offer to Mr. Umaña on September 18, 2009, but failed to adequately explain the risks and benefits of going to trial, including the possibility that the prosecution could use a raft of hearsay evidence against him regarding the California murders. Mr. Uma declined to accept the deal.

Trial counsel rendered deficient performance by not adequately conveying to their client the risks and benefits of accepting a plea bargain in this case. In refusing to accept the plea bargain, Mr. Umaña operated under a basic misunderstanding of what the Government would have to prove to convict him and sentence him death. Throughout the pretrial proceedings, trial counsels' conduct failed to comport with minimal standards of practice in capital cases and, as a result, they were unable to gain the trust of their client or to convince that they were telling him the truth. In contravention of established standards in capital cases, trial counsel neglected to spend enough time with Mr. Umaña to understand his misconceptions of the trial and to explain to him, in a manner he could understand, his chances of succeeding at trial.

524

Trial counsel knew, months before discussing the plea offer with Mr. Umaña, that he worked with a full-scale IQ less than 70 and poorly functioning frontal lobe of his brain. Crim. Doc 662 at 2 (*Ex Parte*). Trial counsel believed Dr. Weinstein, and argued to the trial court, that Mr. Umaña suffered from intellectual deficits in everyday life. Trial counsel knew that Mr. Umaña had not provided mitigation specialist McGough with enough information to locate mitigation witnesses, in El Salvador, other that Mr. Umaña's father. *Id.* at 3. Yet trial counsel made no special effort to make sure that Mr. Umaña understood the quality of the evidence he faced in the penalty hearing. Where a client has a compromised understanding due to intellectual disabilities or other problems, counsel have a duty to ensure that all aspects of the plea negotiation process are fully understood and considered. This is especially true in dealing with a traumatized client whose initial responses may be marked by fear or a brain-damaged client who has a susceptibility to impulsive decision making. See Appx. 215, 216, Declarations of Dr. Stewart; Appx. 29, Neurobehavioral Assessment by Dr. Gur; Appx. 27 at ¶ 7-8, Declaration of Dr. Merikangas. Particularly considering the combination of deficits Mr. Umaña suffers from, counsel had an obligation here to work carefully and slowly, and with outside assistance, if necessary, to explain the plea and trial possibilities.

Furthermore, counsel failed to overcome the significant barriers caused by Mr. Umaña's foreign national status. For example, trial counsel could not speak Mr. Umaña's native language and thus could not directly communicate with him. Cultural barriers also often present obstacles that are difficult to surmount absent a detailed awareness of the client's cultural background. In many Latin American countries, for instance, the criminal justice system was traditionally an inquisitorial model based on the Spanish system. In these systems, the judge or magistrate directs the investigation and there is no adversarial process. Most inquisitorial systems have no plea

525

bargaining. A foreign national from such a country would likely have little to no understanding of the role of a public defender or what a plea bargain is. These inquisitorial processes were often rife with corruption and often were greatly distrusted by the citizens. Because the inquisitorial system was widely seen as a contributor to gross violations of human rights, most of Latin America began the slow process of judicial reform, and changes were introduced in El Salvador 1997 when Mr. Umaña was in his mid-teens. Given the historical absence of plea bargains in Latin American countries and the historical differences between the systems, trial counsel was obligated to ensure Mr. Umaña fully understood the decisions he faced in his capital case.

In addition, trial counsel began their efforts to communicate with their client about the benefits of a plea bargain much too late in the process. In this regard, upon information and belief, counsel did not have substantial conversations with him about a deal until after the death penalty had already been authorized. They also did not adequately continue to discuss the possibility and to address the misconceptions or fears Mr. Umaña may have had at the outset.

There is a reasonable probability that, had trial counsel adequately consulted with and advised their client, the result of the proceeding would have been different, and he would have reached an agreement with the Government for a penalty less that death. Had trial counsel adequately explained the benefits of a plea bargain, the risks of going to trial early and in a timely fashion, there is a reasonable likelihood that a deal would have been reached.

Alternatively, had trial counsel adequately investigated and developed evidence of trauma, brain damage, intellectual disability, and mental illness, they likely would have persuaded the DOJ to prosecute Mr. Umaña non-capitally or, in the alternative, to offer a plea deal that did not require him to cooperate with the DOJ. *See* Appx. 237, Declaration of Dr. Sermeño; Appx. 214, Declaration of Dr. Sapia.

**CLAIM XXV. THE IMPOSITION OF THE DEATH PENALTY ON ALEJANDRO UMAÑA WAS BASED ON RACE AND GEOGRAPHY, TWO CONSTITUTIONALLY IMPERMISSIBLE SENTENCING FACTORS, IN VIOLATION OF HIS FIFTH, SIXTH, AND EIGHTH AMENDMENT RIGHTS.**

All other claims and allegations in this Motion are incorporated into this claim by this reference.

Mr. Umaña was deprived of his Fifth, Sixth, and Eighth Amendment rights when the Department of Justice ("DOJ") approved the federal capital prosecution for Mr. Umaña. The imposition of the death penalty on Mr. Umaña was based in part on both his race and national

527

origin and the race of the victim, as well as the geographic location where his crime occurred. Had certain basic demographic facts been different in Mr. Umaña's case – were Mr. Umaña not a Hispanic defendant and native of El Salvador – he may not have received a sentence of death. The biased nature of DOJ's decision to seek death was revealed by the prosecutors' sentencing phase closing argument, where the prosecutor told jurors, among other discriminatory comments, that they should give Mr. Umaña "American justice" for "bringing El Salvador here." The Constitution does not tolerate a system in which capital-charging decisions are based in any part on the arbitrary fact of a defendant or victim's race, ethnicity, national origin, or the geographic location where a defendant is prosecuted. *McCleskey v. Kemp*, 481 U.S. 279 (1987); *Gregg v. Georgia*, 428 U.S. 153 (1976); *United States v. Armstron*g, 517 U.S. 456 (1996).

**A. The Attorney General's Decision to Seek the Death Penalty Based on Mr. Umaña's Race Violates His Constitutional Rights.**

The arbitrary application of the federal death penalty based on consideration of the race of the defendant and victim has been well-documented. In September 2000, the DOJ released a study (the "September 2000 Study") on its imposition of the federal death penalty in the late twentieth century. The September 2000 Study presented evidence of both racial bias and a lack of geographical uniformity. *See* U.S. Dep't of Justice, *The Federal Death Penalty System: A Statistical Survey (1988-2000)* (Sept. 12, 2000). Racial disparities begin at the initial decision by the Attorney General to authorize the case for capital prosecution: 71 (44.7%) of the 159 cases authorized for capital prosecution during the study period were Black defendants, 44 (27.7%) were white, 31 (20.1%) were Hispanic, and 12 were "other" (7.5%). *Id.* at Tbl. 1A. Racial disparities persisted in other discretionary decisions, with the DOJ finding that white defendants were almost twice as likely as non-white defendants to receive plea agreements that removed the death penalty from consideration. *Id.* at 12, 32. This was true at the time of Mr. Umaña's indictment; it was true

528

when his death sentence was returned; and it remains true today as he awaits execution. When these statistics are viewed in combination with the facts of Mr. Umaña's case, and the evidence and arguments presented by the Government at trial, it is clear that race, ethnicity, and national origin were essential motivating factors in the Government's decision to seek the death penalty.

These same impermissible racial concerns may have motivated the Government to seek the death penalty in the Western District of North Carolina rather than allowing the case to remain in Guilford County, North Carolina. The jury venires in the Western District have smaller percentages of non-white persons than those in Guilford County. As Mr. Jeffrey Martin, a statistician, explains in a report and will testify at a hearing, there is a statistically significant absolute and comparative disparity between the jury-eligible population in the Charlotte Division of the Western District of North Carolina and Guilford County. Appx. 273 ¶11; *see also Berghuis v. Smith*, 559 U.S. 314, 323 (2010) (listing absolute disparity and comparative disparity as two measures of underrepresentation). The absolute disparity, which is determined by subtracting the percentage of a group in one population from the percentage of that same group in another population, is 5.69% less Black or African-American persons in the Charlotte Division, and 1.15% less Hispanic or Latino persons for the same locales. *Id.* at ¶¶ 72, 75. The second measure of underrepresentation, comparative disparity, is calculated by dividing the absolute disparity of a group by the percentage of that group in another population. When compared to Guilford County, the comparative disparity is 21.85% less Black or African American persons in the Charlotte Division and 35.76% more Hispanic or Latino persons in the Charlotte Division. *Id.* at ¶¶ 73, 76.[157]

---

[157] The racial makeup of the venires may have motivated the Government's decision effectively to prosecute Mr. Umaña for the Fairfax Avenue and Lemon Grove Shootings in the Western District

**B. The Attorney General's Decision to Seek the Death Penalty Based on Geographic Location Violates Mr. Umaña's Constitutional Rights.**

The Government also acted in violation of Mr. Umaña's constitutional rights when it authorized federal prosecutors to seek a sentence of death based in part on consideration of geography. In its September 2000 Study, the DOJ found a significant lack of geographical uniformity in its imposition of the death penalty. According to the study, forty-two percent of the cases submitted to the Attorney General came from five of the ninety-four total federal districts; in contrast, U.S. Attorneys from forty districts had never sought the death penalty. *See* U.S. Dep't of Justice, *The Federal Death Penalty System: A Statistical Survey (1988-2000)*, at 12. By having committed his crime in North Carolina rather than elsewhere, Mr. Umaña was more likely to receive a sentence of death. Mr. Umaña's misfortune of falling subject to the arbitrary imposition of the death penalty based on geography violates his Fifth, Sixth, and Eighth Amendment rights.

The Government's decision to prosecute in the Western District of North Carolina also appeared to be based on impermissible geographic considerations. There is currently no one on death row in the federal system from the Middle District of North Carolina, where the shootings

---

of North Carolina, rather than in California state court, where Mr. Umaña's co-defendants in the Fairfax Avenue shooting were tried. If Mr. Umaña had been treated as his co-defendants, a starkly more diverse jury would have decided Mr. Umaña's case. Mr. Martin, a statistician, explained that the 2010 American Community Survey 5 Year Average numbers for Los Angeles County, California details a jury-eligible population that is 56.17% White, 11.18% Black or African American, 0.56% American Indian or Alaska Native, 14.05% Asian, 0.31% Native Hawaiian or Pacific Islander, 14.92% of some other race, and 2.81% multi-racial. Appx. 273 at 2. 33.11% of the jury eligible population is Hispanic or Latino. *Id.* at 3. The absolute disparity between the LA County jury-eligible population and the Charlotte Division of the Western District of North Carolina jury-eligible population is 14.87% more Black or African-American persons in the Charlotte Division and 29.88% less Hispanic or Latino persons in the Charlotte Division, and the comparative disparity is 57.07% and 925.87% respectively. *Id.* at ¶¶ 77-82.

530

occurred in this case. In contrast, three persons are on death row from the Western District of North Carolina, including Mr. Umaña.

### A. Counsel Were Ineffective.

To the extent that counsel failed to object to, or otherwise challenge, the Government's use of race and geography in its decision to seek the death penalty, their failure denied Mr. Umana his right to effective assistance of trial counsel, in violation of the Fifth, Sixth and Eighth Amendments. Counsel's failure to properly raise and litigate these issues at trial constitutes deficient performance, and but for counsel's errors, there is a reasonable probability of a different outcome in both the guilt phase and the penalty phase.

To the extent that counsel could have raised the Government's use of race and geography in its charging decision, counsel's failure to do so constitutes ineffective assistance of counsel in violation of the Fifth, Sixth and Eighth Amendments. There is a reasonable probability that the results of Mr. Umaña's appeal would have been different had counsel raised this issue.

**CLAIM XXVI. THE FAILURE TO PRESERVE MR. UMAÑA'S RIGHTS UNDER THE VIENNA CONVENTION AND HIS RIGHTS TO CONSULAR ASSISTANCE VIOLATED MR. UMAÑA'S FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS AND ARTICLE VI OF THE CONSTITUTION.**

All other claims and allegations in this Motion are incorporated into this claim by this reference. In support of this claim, Mr. Umaña alleges the following facts, among others, to be presented after full discovery and an evidentiary hearing:

Mr. Umaña was born in Escuintla, Guatemala. Appx. 10. Mr. Umaña's parents lived in Guatemala for the early years of Mr. Umaña's life. The Government was aware of Mr. Umaña's

531

status as a Guatemalan citizen[158] before indicting him in this case and before seeking the death penalty. On June 14, 2008, the National Civil Police of El Salvador interviewed Mr. Umaña's mother, Leticia Diaz Ramirez, at the request of the Government. She provided information about her son's birth. She stated that Mr. Umaña was born in Escuintla, Guatemala, and she provided a copy of Mr. Umaña's Guatemalan birth certificate. Appx. 43

The Government therefore knew that Mr. Umaña was born in Guatemala, not in El Salvador. The Government did not notify Mr. Umaña of his Vienna Convention right to assistance from the Guatemalan Consulate and did not contact that entity on his behalf. This violated the Vienna Convention and Mr. Umaña's Fifth, Sixth, Eighth, and Fourteenth Amendment rights.

Alternatively, trial counsel should have known near the beginning of their representation through reasonable defense investigation that Mr. Umaña was a Guatemalan citizen. *See* Claim I.B.5. When counsel ultimately received official documentation of Mr. Umaña Guatemalan birth from the Government shortly before trial, they still did not inform Mr. Umaña of his Vienna Convention rights to Guatemalan consular assistance, contact the Guatemalan Consulate to obtain Consular assistance, or raise or litigate the constitutional violations arising from the Government's failure to notify Mr. Umaña of his rights to Guatemalan Consular assistance at critical early stages of the prosecution or litigate the Government's failure to inform the Guatemalan Consulate before authorizing Mr. Umaña's case as a capital prosecution. Counsel's failures constitute prejudicially deficient performance in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

---

[158] Mr. Umaña is a native Guatemalan citizen by birth. *See* Constitución de la Republica de Guatemala [constitution] art. 144

### A. The Law

The Vienna Convention on Consular Relations ("Vienna Convention") is "an international treaty that governs relations between individual nations and foreign consular officials." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 366 (2006) (Breyer, J., dissenting). Article 36 of the Vienna Convention "addresses communication between an individual and his consular officers when the individual is detained by authorities in a foreign country." *Sanchez-Llamas*, 548 U.S. at 337. The text of Article 36 articulates the obligations of a detaining state:

> (b) if he so requests, the competent authorities of the receiving State shall, without delay[159], inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph;

> (c) consular officers shall have the right to visit a national of the sending State who is in prison, custody or detention, to converse and correspond with him and to arrange for his legal representation. They shall also have the right to visit any national of the sending State who is in prison, custody or detention in their district in pursuance of a judgment.

Vienna Convention, art. 36(1)(b), 21 U.S.T. 77 (Dec. 14, 1969).

The Vienna Convention was binding on the Government at the time of Mr. Umaña's prosecution. U.S. CONST. Art. VI, cl. 2 ("all Treaties made . . . under the Authority of the United States, shall be the supreme Law of the Land"). The Vienna Convention imposes on the Government three specific obligations. *Osagiede v. United States*, 543 F.3d 399, 402 (7th Cir.

---

[159] Courts have held that "without delay" is satisfied if the consulate is notified within three days of the detention of the foreign national. *See Sanches-Llamas*, 548 U.S. at 362 (citing *Case Concerning Avena and other Mexican Nationals* (Mex.v.U.S.), 2004 I.C.J. 12, ¶ 97 (Mar. 31, 2004) (*Avena*) (the U.S.'s notification of Mexican consulate within three working days of detainee's arrest satisfied Article 36(1)(b)'s "without delay" requirement)).

2008) ("Article 36 imposes three separate obligations on a detaining authority: (1) inform the consulate of a foreign national's arrest or detention without delay; (2) forward communications from a detained national to the consulate without delay; and (3) inform a detained foreign national of 'his rights' under Article 36 without delay.").

In addition to the treaty, the Government promulgated rules to ensure the Department of Justice complies with Article 36. *See* 28 C.F.R. § 50.5 (2022) (requiring arresting officers with the Department of Justice to "inform the foreign national that his consul will be advised of his arrest" in every instance in which a foreign national is arrested).

Mr. Umaña expects to demonstrate at a hearing that both the Government and trial counsel were aware of these rights and obligations under the Vienna Convention.  Indeed, these rights were well-established and well-publicized before Mr. Umaña's arrest, capital authorization, and trial. In one of the earlier Supreme Court cases considering violations of Article 36 of the Vienna Convention, the Court addressed the claim that Virginia failed to inform a foreign national of his rights under the Vienna Convention. *Breard v. Greene*, 523 U.S. 371 (1998). The Court noted that the Vienna Convention "arguably confers on an individual the right to consular assistance following arrest," providing the foundation for the innumerable Vienna Convention claims that would follow. *Id*. at 375-77.

Only one year later, in 1999, the Court vacated stays of execution for German nationals Karl LaGrand, *Stewart v. LaGrand*, 525 U.S. 1173 (1999), and Walter LaGrand, *Stewart v. LaGrand*, 526 U.S. 115 (1999), though the Court did not review any claims based on the Vienna Convention. Karl LaGrand was executed on February 24, 1999, and Walter Lagrand on March 3, 1999.  Subsequently, the ICJ issued a decision in *LaGrand Case (Germany v. United States of*

534

*America)* in 2001, finding that the United States violated its obligations under Article 36. 2001 I.C.J. 466 ¶ 128(3)-(7).

The ICJ revisited this issue in 2004 when it decided *Case Concerning Avena and Other Mexican Nationals (Mexico v. United States of America)*. The ICJ held that the Vienna Convention created individual rights, that the United States had violated these rights, and that the United States must "provide, by means of its own choosing, review and reconsideration of the convictions and sentences of the [convicted] Mexican nationals" to determine whether the violations "caused actual prejudice," without allowing procedural default rules to bar such review. 2004 I.C.J. 12 ¶ 121-122, 153(9). Finally, in 2005, the U.S. Supreme Court dismissed a certiorari petition as improvidently granted in *Medellin v. Dretk*e, a case out of Texas involving a Mexican citizen on death row but discussed the issues of asserting a Vienna Convention claim in federal habeas corpus proceedings and recognized the *Avena* and *LaGrand* decisions by the ICJ. 544 U.S. 660 (2005).36. 2001 I.C.J. 466 ¶ 128(3)-(7).

These cases made headlines across the country. *See, e.g.*, Roger Cohen, *U.S. Execution of German Stirs Anger*, N.Y. Times, March 5, 1999, at A14; Raymond Bonner, *U.S. Bid to Execute Mexican Draws Fire*, N.Y. Times, Oct. 30, 2000, at A20; Marlise Simons, *World Court Finds U.S. Violated Consular Rights of 2 Germans*, N.Y. Times, June 28, 2001, at A10; *2 U.S. Executions Violated Rights of Germany, U.N. Says*, St. Louis Post-Dispatch, June 28, 2001, at A7; Ginger Thompson, *An Execution in Texas Strains Ties with Mexico and Others*, N.Y. Times, Aug. 16, 2002, at A6; Marlise Simons, *World Court Tells U.S. to Delay Executing 3*, N.Y. Times, Feb. 6, 2003, at A13; Toby Sterling, *World Court Directs U.S. to Stay 3 Executions Court Wants to Review Legal Issues in the Cases*, St. Louis Post-Dispatch, Feb. 6, 2003, at A2; Anthony Deutsch, *U.S.*

535

*Violated Rights of Mexicans on Death Row, World Court Says*, St. Louis Post-Dispatch, Apr. 1, 2004. All these cases took place before Mr. Umaña's trial.

During the same period, there was also a well-developed body of materials discussing the Vienna Convention right to consular notification and the significance of Consular assistance in capital cases, including articles in lawyers' periodicals and law reviews. *See, e.g.*, Logene Foster & Stephen Doggett, *Vienna Convention: New Tool for Representing Foreign Nationals in the Criminal Justice System*, The Champion, Mar. 1997; Robert F. Brooks & William H. Wright Jr., *States Deny Treaty Rights to Foreign Defendants*, Nat'l L.J., Nov. 4, 1996, at B8.

Therefore, prior to Mr. Umaña's trial, national judicial and public attention focused on the plight of foreign nationals on death row in light of U.S. violations of the Vienna Convention. The Vienna Convention was the "Law of the Land," (U.S. Const. art. VI, cl. 2), and 28 C.F.R. § 50.5 required Department of Justice officers to honor its obligations. There were "hundreds of cases in which courts had addressed [Article 36] rights, even in a criminal setting." *Osagiede*, 543 F.3d at 411. In addition, the Government and the Consulate had promulgated guidelines and directives to protect foreign nationals' right to consular assistance.[160]

**B. The Government's Failure to Honor Its Treaty, International Law, and Constitutional Obligations Violated the Fifth, Sixth, Eighth, and Fourteenth Amendments and Article VI.**

As described above, the Government knew Mr. Umaña was a Guatemalan citizen. Nevertheless, the Government did nothing. As set forth below, the Government's failure to honor

---

[160] *See Osagiede*, 543 F.3d at 402 ("[F]ederal law enforcement agencies have also long been instructed by the State Department that they must comply with the requirements of Article 36") (citing U.S. Department of State, Pub. No. 10518, *Consular Notification and Access: Instruction for Federal, State, and Local Enforcement and Other Officials Regarding Foreign Nationals tn the United States* 13-15 (Jan. 1998) ("[W]hen foreign nationals are arrested or detained, they must be advised of the right to have their consular officials notified[.]")).

its constitutional and treaty obligations violated Mr. Umaña's Fifth, Sixth, Eighth, and Fourteenth Amendment Rights and Article VI.

### 1. The Government Violated its Duty to Inform Mr. Umaña of His Right to Guatemalan Consular Assistance and to Notify the Guatemalan Consulate of His Detention

Under the Vienna Convention, the Government must inform a detained foreign national of his right to request assistance from his consulate and notify the sending state's consulate upon the detainee's request. *Medellin v. Texas*, 552 U.S. 491, 499 (2008) (summarizing Vienna Convention, Article 36(1)(b), 21 U.S.T. 77, 100, 101 (1969)); *Osagiede*, 543 F.3d at 402; *Faulder v. Johnson*, 81 F.3d 515, 520 (5th Cir. 1996) (The Vienna Convention "requires an arresting government to notify a foreign national who has been arrested, imprisoned or taken into custody or detention of his right to contact his consul."); *Baires v. United States*, 707 F. Supp. 2d. 656 (E.D. Va. 2010) ("Law enforcement officers who arrest a national of a foreign country are required to notify a consular representative of the arrestee's country promptly.")

This duty is also established by the Department of Justice's Statement of Policy. 28 C.F.R. § 50.5 (2022). These rules are "designed to establish a uniform procedure for consular notification where nationals of foreign countries are arrested by officers of this Department on charges of criminal violations" and require that "[i]n every case in which a foreign national is arrested the arresting officer shall inform the foreign national that his consul will be advised of his arrest unless he does not wish such notification to be given."[161] *Id*. § 50.5(a); *see also United States v. Cardoso-Lopez*, 2009 WL 3198658, at *2 (7th Cir. Oct. 5, 2009) (citing 28 C.F.R. 50.5(a)(3) and holding

---

[161] If there is a treaty in place between the U.S. and the foreign state requiring notification, the U.S. Attorney will notify the consulate regardless of the detainee's wishes and then inform the detainee of that action. 28 C.F.R. § 50.5(a)(3).

that "[th]e obligation to inform thus lies solely with the government"). Additionally, "the local office of the Federal Bureau of Investigation or the local Marshal's office, as the case may be, shall inform the nearest U.S. Attorney of the arrest and of the arrested person's wishes regarding consular notification." 28 C.F.R. § 50.5(a)(2). Then, the U.S. Attorney will notify the consulate if appropriate. *Id.* § 50.5(a)(3).

Despite these federal and treaty-based obligations, the Government held a meeting on August 11, 2008, to discuss Mr. Umaña's case and authorize the Federal Government to prosecute Mr. Umaña capitally. To this day, the Government has not fulfilled its obligations under the Vienna Convention and federal law, as the Government never contacted the Guatemalan Consulate and never informed Mr. Umaña of his Article 36 right to assistance from the Guatemalan Consulate. The Government's disregard for Mr. Umaña's Vienna Convention rights and its own federal obligations violated Mr. Umaña's due process rights.

### 2. The Government violated Mr. Umaña's right to due process and a fair trial in violation of the Fifth and Sixth Amendments.

The Consulate plays a unique and pivotal role in assisting a foreign national's defense, yet the Government deprived Mr. Umaña of that benefit throughout his trial. *See Osagiede*, 543 F.3d at 403 ("[T]he assistance of an attorney cannot entirely replace the unique assistance that can be provided by the consulate"); *Ledezma v. State*, 626 N.W.2d 134, 152 (Iowa 2001) (concluding that local counsel "are not equipped to provide the same services as the local consulate"); Linda Jane Springrose, Note, *Strangers in a Strange Land: The Rights of Non-Citizens Under Article 36 of the Vienna Convention on Consular Relations*, 14 Geo. Immigr. L.J. 185, 195 (1999) ("[Consular] functions are very likely to make a difference for a defendant who chooses to exercise his right to contact consul, particularly since his attorney is not equipped to perform the same services as the consul."). In fact, the U.S. State Department has "described this right of access as the right to a

538

'cultural bridge,' and has acknowledged '[n]o one needs that cultural bridge more than the individual . . . who has been arrested in a foreign country . . . .'" Mark J. Kadish, *Article 36 of the Vienna Convention on Consular Relations: A Search for the Right to Consul*, 18 Mich. J. Int'l L. 565, 606-07 (1997) (quoting U.S. Dep't of State, 7 Foreign Affairs Manual 403 (1984)).

Courts have previously addressed the harmful impact of the prosecution's Vienna Convention violations on the trial process. In *Valdez v. State*, 46 P.3d 703 (Okla. Crim. App. 2002), the Oklahoma Court of Criminal Appeals reviewed a Vienna Convention claim on the merits in a successive post-conviction petition. The facts demonstrated that the Consulate discovered extensive mitigation evidence after Mr. Valdez's conviction and death sentence that was not presented at trial due to the lack of consular assistance. *Id.* at 710. The court found that "trial counsel, as well as representatives of the State who had contact with Mr. Valdez before trial and knew he was a citizen of Mexico, failed in their duties to inform Mr. Valdez of his right to contact his consulate." *Id*. In light of this, the Court concluded that "this Court cannot have confidence in the jury's sentencing determination and affirm its assessment of a death sentence where the jury was not presented with very significant and important evidence bearing upon Mr. Valdez's mental status and psyche at the time of the crime." *Id*. Although the claim was procedurally defaulted, the court "exercise[d] its power to grant relief when an error complained of has resulted in a miscarriage of justice, or constitute[d] a substantial violation of a constitutional or statutory right" and remanded the case for resentencing. *Id.* at 710-11.

The Government arrested, interrogated, charged, capitally prosecuted, and convicted Mr. Umaña without having contacted the Guatemalan consulate at any point during this process, demonstrating a disregard for its obligations under the Vienna Convention and its own policies, promulgated by the Department of Justice, to prevent exactly this sort of violation and subsequent

539

harm. To this day, the Government never fulfilled its obligation to contact the Guatemalan consulate or inform Mr. Umaña of his rights to Guatemalan consular assistance.

The facts of this case are beyond explanation or excuse and show an absolute disrespect for the Vienna Convention, federal legislation, and due process rights. *See Mora v. New York*, 524 F.3d 183, 206 (2d Cir. 2008) (the Supreme Court has instructed that we "should give respectful consideration to the interpretation of an international treaty rendered by an international court with jurisdiction to interpret such." (quoting *Breard*, 523 U.S. at 375)). "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935).

In this case, the Government lost sight of its duty to ensure that "justice shall be done" and instead disregarded and dismissed its obligations to inform Mr. Umaña of his right to Guatemalan consular assistance and to notify the Guatemalan Consulate of Mr. Umaña's arrest, capital prosecution, trial, and conviction. Mr. Umaña needed this consular assistance to receive a fair trial, and he had a right to this due process under federal legislation, the Vienna Convention, and the Constitution. Yet the Government deprived Mr. Umaña of this assistance, which infected every phase of Mr. Umaña's trial and defense in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

### 3. The Government violated Mr. Umaña's right to present mitigating evidence under the Fifth and Eighth Amendments.

In addition to violating Mr. Umaña's due process rights generally, the Government's failure to fulfill its obligation of consular notification also impeded counsel's ability to seek consular assistance in developing mitigation evidence located in Guatemala, thereby depriving Mr.

Umaña of the full opportunity to investigate and present mitigating evidence to a jury in violation of the Fifth and Eighth Amendments. "A defendant has the right to present all relevant mitigating evidence during the penalty phase of a capital trial." *Williams v. Norris*, 612 F.3d 941 (8th Cir. 2010) (citing *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (concluding that the Eighth and Fourteenth Amendments require that neither the judge nor jury "be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death")). In *Lockett v. Ohio*, the Court found that Eighth Amendment created this right because "in capital cases the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Id*. (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976)). This conclusion rests "'on the predicate that the penalty of death is qualitatively different' from any other sentence," and "this qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed." *Id*. (quoting *Woodson*, 428 U.S. at 305).

Because the Government did not fulfill its consular notification obligations, Mr. Umaña's ability to investigate these critical mitigation areas was compromised. Mr. Umaña's defense did not investigate and did not present accurate mitigating evidence to a jury concerning his life and family history. Following full discovery and an evidentiary hearing, Mr. Umaña expects to demonstrate the wealth of mitigating evidence that the Guatemalan consulate could have helped develop, including evidence regarding the circumstances of his family's migration to Guatemala to escape the Civil War; the circumstances of his family's life in Escuintla; the circumstances of his birth; evidence regarding the toxins to which Mr. Umaña was exposed in utero and as an infant

541

(*see* Claims I & II; Appx. 212 (Report of Dr. Andres Lugo)); and the circumstances of Mr. Umaña's migration from El Salvador to the United States (*see* Appx. 112 (Decl. Luis Ramos) (describing migration from El Salvador through Mexico to the United States, that geographically must have included travel through Guatemala)).

Following full discovery and a hearing, Mr. Umaña expects to demonstrate that the Guatemalan consulate also could have assisted Mr. Umaña in other ways, most notably by providing him with language assistance that could have prevented the separate and distinct constitutional violations alleged in Claim VIII.

Thus, the Government's disregard for its duties under the Vienna Convention directly undermined Mr. Umaña's constitutional rights. *See* 39 Am.Jur.2d Habeas Corpus § 43 (explaining that if the Government's misconduct "denied the habeas petitioner a specific constitutional right, rather than the general due process right to a fair trial, a valid habeas corpus claim may be established without proof that the entire trial was rendered fundamentally unfair") (citing *Brown v. Sirmons*, 515 F.3d 1072, 1083 (10th Cir. 2008)).

### 4. The Government's violation of its obligation of consular notification under the Vienna Convention and federal law prejudiced Mr. Umaña.

The Government's failure to inform Mr. Umaña of his right to assistance from the Guatemalan Consulate and to notify the Guatemalan Consulate of Mr. Umaña's arrest, detention, and capital charges deprived Mr. Umaña of consular assistance, resulting in prejudice. Consular assistance is unique from the assistance of local counsel, as the Guatemalan government is best situated to make legal claims on international law, obtain Guatemalan records, and locate Guatemalan witnesses, among other activities. *See Osagiede*, 543 F.3d at 403 ("[T]he assistance of an attorney cannot entirely replace the unique assistance that can be provided by the consulate."); *Ledezma v. State*, 626 N.W.2d 134, 152 (Iowa 2001) (explaining that local counsel "are not

542

equipped to provide the same services as the local consulate"); William J. Aceves, *Murphy v. Netherland*, 92 Am. J. Int'l L. 87, 89 ("At a minimum, [consular access] provides a cultural bridge for detained nationals who must otherwise navigate through an unfamiliar and often hostile legal system."). This assistance is distinct and invaluable, as demonstrated by court decisions finding that a defendant was prejudiced when deprived of consular assistance. *Osagiede*, 543 F.3d at 403 ("This assistance can be invaluable . . . [t]he consulate can provide critical resources for legal representation and case investigation.").

This assistance was particularly necessary in this case, where the country in which Mr. Umaña had resided before emigrating to the United States (and whose consular assistance the Government knew he had sought) was actively working with the United States government to secure his conviction. *See* Appx. 10, Declaration of Leticia Ramirez; Def. Tr. Ex. 36, Social History Report.

The Government knew that Mr. Umaña sought assistance from the Salvadoran consulate. The Government knew that Mr. Umaña sought this assistance because the Government intercepted Mr. Umaña's privileged communications seeking that assistance and used them against him at his capital trial. *See, e.g.*, GPT at 600 (introducing Movant's letter to Consulate (Government Exhibit 151) during testimony of Susan Conrad); *id.* at 960-61 (Government indicating admission of the contents of Exhibit 151 in evidence as a standard for handwriting comparison); *id.* at 982-83 (introducing another letter to the Consulate (Exhibit 235) during testimony of Forensic Document Examiner Jeffrey Taylor); *id.* at 1037-38 (Court and counsel discussion of the letter to the Consulate in determining its admissibility); *id.* at 1058 (Court discussion of the contents of Exhibit 151 regarding admissibility).

543

The Government's interception of Mr. Umaña's communications with the Salvadoran consulate violated Mr. Umaña's Vienna Convention rights. *See* Vienna Convention Art. 35(2) ("The official correspondence of the consular post shall be inviolable."); *id.* Art. 33 ("The consular archives and documents shall be inviolable at all times and wherever they may be."). The Vienna Convention requires that "[a]ny communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay." *Id.* Art. 36(1)(b); *see also Osagiede*, 543 F.3d at 402; U.S. Dep't of State, *Consular Notification and Access* 34 (3rd ed. 2010) (specifically advising law enforcement that, absent any security concerns, consular communications should be private and unmonitored); 28 C.F.R. § 540.18(a) (privileging consular correspondence as "Special Mail" that can only be inspected in the presence of the inmate and "may not be read or copied"). Yet, the Salvadoran consulate did nothing to protect its detained national. Under these circumstances, there can be no substitute for the assistance of the Guatemalan consulate, which represented a government that was not actively involved in Mr. Umaña's prosecution and could have provided him consular assistance unfettered by divided loyalties.

**C. Counsel's Failure to Notify Mr. Umaña of His Rights to Guatemalan Consular Assistance Under the Vienna Convention; to Contact the Guatemalan Consulate; and Counsel's Failure to Raise and Litigate the Government's Failure to Honor Its Treaty, International Law, and Constitutional Obligations Violated the Fifth, Sixth, Eighth, and Fourteenth Amendments and Article VI.**

As described above, counsel knew or should have known Mr. Umaña's status as a Guatemalan national by virtue of birth. Yet, counsel failed to notify Mr. Umaña of his rights under the Vienna Convention to Guatemalan assistance, to contact the Guatemalan Consulate, to request Guatemalan Consulate assistance, and to raise and litigate the Government's violations under

544

federal, constitutional, and international law. Counsel's failures constitute prejudicially deficient performance.

Counsel's performance is measured against an objective standard of reasonableness "considering all the circumstances." *Strickland*, 466 U.S. at 688. "[P]revailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable." *Wiggins v. Smith*, 539 U.S. 510, 522 (2003) (citing *Strickland*, 466 U.S. at 688-89).

Here, trial counsel had a long-established professional obligation to investigate and discover Mr. Umaña's nationality, immediately notify him of his right to contact the consulate, and litigate all Government violations of international law in light of Mr. Umaña's status. The right to consular assistance and counsel's obligation to preserve that right were well-known long before Mr. Umaña's trial. *See Murphy v. Netherland*, 116 F.3d 97, 100 (4th Cir. 1997) (holding in a capital case, treaties such as the Vienna Convention on Consular Relations "are one of the first sources that would be consulted by a reasonably diligent counsel representing a foreign national"); *Ledezma v. State*, 626 N.W.2d 134, 152 (Iowa 2001) (concluding that "all criminal defense attorneys representing foreign nationals should be aware of the right to consular access as provided by Article 36, and should advise their clients of this right"); *cf. Sanchez-Llamas v. Oregon*, 548 U.S. 331, 364 n.3 (2006) (Ginsburg, J., concurring) (recognizing the viability of "an ineffective-

assistance-of-counsel claim predicated on his trial counsel's failure to assert the State's violation of those [Article 36] rights").[162]

To begin, trial counsel had an obligation to know the relevant statutes and case law on this issue. "All lawyers that represent criminal defendants are expected to know the laws applicable to their client's defense." *Osagiede*, 543 F.3d at 409 (citing *Julian v. Bartley*, 495 F.3d 487 (7th Cir. 2007)). Two courts of appeals have held that a reasonably competent attorney should be aware of a client's Vienna Convention rights. *See Osagiede*, 543 F.3d at 411 (holding that "criminal defense attorneys representing a foreign national in 2003 should have known to advise their clients of the right to consular access and to raise the issue with the presiding judge"); *Murphy v. Netherland*, 116 F.3d 97, 100 (4th Cir. 1997) (holding that "a reasonably diligent search by Murphy's counsel . . . would have revealed the existence and applicability (if any) of the Vienna Convention").

As noted previously, "[t]he law was on the books; the violation was clear. Simple computer research would have turned it up." *Osagiede*, 543 F.3d at 409. Nevertheless, counsel did not invoke Mr. Umaña's rights under the Vienna Convention to assistance from the Guatemalan consulate,

---

[162] In addition to the language in Justice Ginsburg's concurrence, a considerable portion of oral argument in *Sanchez-Llamas* was "spent discussing a defense counsel's role in notifying foreign nationals of Article 36 requirements and benefits." Mark J. Kadish & Charles C. Olson, *Sanchez-Llamas v. Oregon and Article 36 of the Vienna Convention on Consular Relations: The Supreme Court, The Right to Consul, and Remediation*, 27 Mich. J. Int'l L. 1185, 1218 (2006). Several Justices commented that defense counsel "should be taxed with knowing that [a foreign national has a right to consular assistance] . . . because it's the law of the land . . . . [T]he obligation is on the lawyer to [ask if the defendant received notice of his Article 36 rights] just as the lawyer would [ask if they received] the Miranda warnings." *Id.* (quoting Transcript of Oral Argument at 36-37, *Sanchez-Llamas v. Oregon*, 548 U.S. 331 (2006) (No 04-10566), available at http://www.supremecourtus.gov/oral_arguments/argument_transcripts/04-10566.pdf (hereinafter "Transcript of Oral Argument")). Therefore, if counsel does not inform the client about his right to consular assistance, "then that's ineffective assistance in an appropriate circumstance . . . . And the other obligation is, counsel, you have to raise this issue as soon as everybody learns about it . . . ." *Id.* (citing Transcript of Oral Argument at 31).

even though counsel knew that the Salvadoran government, with which Mr. Umaña was in communication, was also actively involved in Mr. Umaña's prosecution. *See* Appx. 36. Counsel's failure to discover and uphold those rights did not meet the minimum standards of effective representation. *Osagiede*, 543 F.3d at 405 (finding that Mr. Osagiede "argued, correctly, that the rights conferred by the Vienna Convention were individual rights," and his attorney's "failure to know the laws applicable to his case could constitute constitutionally deficient performance").

Counsel had an obligation to discover his client's nationality, inform him of his right to consular notification and assistance from all interested nations, and seek a remedy for the Government's Article 36 violations. *See Deitz v. Money*, 391 F.3d 804 (6th Cir. 2004), *abrogated on other grounds by Stone v. Moore*, 644 F.3d 342 (6th Cir. 2011) (remanding to determine if trial attorney's failure to "notify Deitz of his right to contact the Mexican consulate . . . deprived him of the effective assistance of counsel"); *Ledezma v. State*, 626 N.W.2d 134, 152 (Iowa 2001) (concluding that "all criminal defense attorneys representing foreign nationals should be aware of the right to consular access as provided by Article 36, and should advise their clients of this right").

Counsel's obligations were articulated in the 2003 edition of the ABA Guidelines, reflecting what had already become the standard of practice by capital defense attorneys. *See Hamblin v. Mitchell*, 354 F.3d 482, 487 (6th Cir. 2003) (The 2003 ABA Guidelines "represent a codification of longstanding, common-sense principles of representation understood by diligent, competent counsel in death penalty cases."); *Strickland*, 466 U.S. at 688 (1984) (observing that "[p]revailing norms of practice as reflected in American Bar Association standards . . . are guides to determining what is reasonable" assistance of counsel). The Guidelines articulate specific obligations for counsel representing a foreign national:

Guideline 10.6 <u>Additional Obligations of Counsel Representing a Foreign National</u>

547

> A. Counsel at every stage of the case should make appropriate efforts to determine whether any foreign country might consider the client to be one of its nationals.
>
> B. Unless predecessor counsel has already done so, counsel representing a foreign national should:
>
>> 1. immediately advise the client of his or her right to communicate with the relevant consular office; and
>>
>> 2. obtain the consent of the client to contact the consular office. After obtaining consent, counsel should immediately contact the client's consular office and inform it of the client's detention or arrest.

ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (rev. ed. 2003) (hereafter "ABA Guidelines") (emphasis added); *see also Kadish*, *supra* at 1218 ("[A] defense attorney representing a foreign national has two obligations with regard to Article 36. First, counsel is charged with a duty to notify a foreign national of her consular assistance rights. Second, counsel must raise any Article 36 violation at the proper time. Failure to do either of these should satisfy the deficient performance prong of the Strickland ineffectiveness test.").

Counsel failed to conduct an adequate investigation into Mr. Umaña's background and history as a Guatemalan citizen. "[I]t is imperative that counsel begin investigating mitigating evidence and assembling the defense team as early as possible – well before the prosecution has actually determined that the death penalty will be sought." Guideline 1.1, History of Guideline. Discovering Mr. Umaña's birthplace and early childhood history should have been a central factor in the initial defense investigation into Mr. Umaña's social and family history. *See Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (finding the investigation was inadequate because "counsel abandoned their investigation of petitioner's background after having acquired only rudimentary

548

knowledge of his history from a narrow set of sources" (citing the 1989 ABA Guidelines at 11.8.6, p. 133 (stating that among the mitigation topics counsel must explore are the defendant's "family and social history")).

It is well established that "an understanding of the client's extended, multi-generational history is often needed for an understanding of his functioning, construction of the [mitigation] narrative normally requires evidence that sets forth and explains the client's complete social history from before conception to the present." Guideline 10.11, Commentary; *see also Williams v. Taylor*, 529 U.S. 362, 396 (2000) (finding trial counsel were ineffective because they had not "fulfilled their obligation to conduct a thorough investigation of the defendant's background" as required under the ABA Guidelines); *Wiggins*, 539 U.S. at 524; *Rompilla*, 545 U.S. at 387 (recognizing the ABA Guidelines as the normative standards for defense counsel in capital cases). It is, therefore, "necessary to locate and interview the client's family members . . . and virtually everyone else who knew the client and his family." Guideline 10.7, Commentary.

Here, counsel should have known early on through reasonable investigation that Mr. Umaña was born and spent his infancy in Guatemala. Yet Mr. Umaña's counsel failed to conduct a critical mitigation investigation in violation of prevailing professional standards and Mr. Umaña's Sixth Amendment right to effective counsel. Had counsel undertaken a reasonable investigation into Mr. Umaña's childhood, they would have discovered a wealth of mitigating information never presented at his capital trial. *See* Claim I. They also would have learned that Mr. Umaña was entitled to consular assistance, not just from El Salvador, which was actively assisting in his prosecution, but also from Guatemala.

In sum, counsel had a clear and well-established obligation to investigate and discover Mr. Umaña's Guatemalan citizenship, notify Mr. Umaña of his rights as a Guatemalan citizen, and contact the Guatemalan Consulate to obtain assistance for Mr. Umaña. Guideline 10.6, Commentary ("Subsection A is included in the Guideline to emphasize that the determination of nationality may require some effort by counsel. A foreign government might recognize an American citizen as one of its nationals on the basis of an affiliation (e.g. one grandparent of that nationality) that would not be apparent at first glance."). Counsel's total failure to investigate and develop the claims arising from Mr. Umaña's status, notify Mr. Umaña of his rights to Guatemalan consular assistance under the Vienna Convention, and seek a remedy for the Government's violation of Mr. Umaña's rights was objectively unreasonable and constituted deficient performance.

## D. Conclusion

Trial counsel had well-established obligations to discover Mr. Umaña's Guatemalan citizenship, know the law surrounding Mr. Umaña's rights as a foreign national, notify Mr. Umaña of his right to Guatemalan consular assistance, and seek a remedy for the Government's Article 36 violation. These obligations were enshrined in the ABA Guidelines, federal statutes, and prevailing case law and were the subject of national public discussion. However, trial counsel violated every one of these professional obligations. This support could have included assisting in plea negotiations, initiating legal submissions seeking a remedy for the Government's Article 36 violation (including the Government's illegal interception of Mr. Umaña's letters to the Salvadoran consulate), providing language assistance, and obtaining mitigating evidence. Without this assistance, however, trial counsel failed to obtain a plea, never sought a remedy for the Government's violations, and did not investigate or present any mitigating evidence from Mr.

550

Umaña's family and social history in Guatemala. Trial counsel never traveled to Guatemala, obtained no document from Guatemala other than a single document provided by the U.S. government in discovery (Mr. Umaña's birth certificate), did not interview any maternal family members, and failed to develop evidence of the toxic exposures Mr. Umaña suffered in utero and as an infant. This vast part of Mr. Umaña's history was completely absent from the trial. These failures by Mr. Umaña's counsel deprived him of his Sixth Amendment right to effective assistance of counsel.

To the extent that counsel could have raised the Government's violations of the Vienna Convention on appeal, counsel's failure to do so constitutes ineffective assistance of counsel in violation of the Fifth, Sixth and Eighth Amendments. There is a reasonable probability that the results of Mr. Umaña's appeal would have been different had counsel raised this issue.

## CLAIM XXVII.  TRIAL COUNSEL FAILED TO ADEQUATELY PRESERVE ISSUES FOR APPEAL IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.

All other claims and allegations in this Motion are incorporated into this claim by this reference.

Counsel unreasonably failed to object to numerous errors at trial that subsequently required appellate issues to be raised under the "plain error" standard of review or not even addressed. These included the following issues that were briefed on appeal:

i. Whether Juror 286 was actually biased because she believed law enforcement to be more truthful.

ii. Whether the prosecutor improperly argued that Mr. Umaña was "only killer" in MS-13, especially when he was not permitted to present evidence of others who had killed.

iii. Whether the prosecutor's "ready for some American justice" and us-versus-them themed arguments improperly urged the jury to consider ethnicity and national origin as aggravating factors.

iv. Whether the prosecutor's use of religious imagery, including telling the jury that the devil was "in his heart" and Mr. Umaña was sending a message from the devil, to the jury was improper.

Mr. Umaña was prejudiced twofold by counsel's omissions: once at the time of trial, when counsel failed to raise these objections at a time when there was a reasonable probability that the Court could have corrected these errors, and a second time on appeal, when Mr. Umaña was deprived of review or more favorable standards of review for his legal claims, and was instead subjected to no review or the much more onerous "plain error" standard.

**CLAIM XXVIII.    EXECUTING SOMEONE WITH BRAIN DAMAGE AND THE OTHER MENTAL IMPAIRMENTS FROM WHICH MR. UMAÑA SUFFERS WOULD VIOLATE THE EIGHTH AMENDMENT.**

All other claims and allegations in this Motion are incorporated into this claim by this reference.

Alejandro Umaña is markedly brain-damaged and has been since early childhood at least. As a result, he has serious neuropsychiatric disorders that cause him to suffer from cognitive impairment, poor decision-making, impulsivity, marked poor judgment, and trouble modulating his emotions. Mr. Umaña also suffers from compound trauma and has been diagnosed with an intellectual disability. He is unable to assess situations correctly, has a difficult time adjusting to unexpected stimuli or changes that he is not expecting, is more likely to act without being able to evaluate his options and alternatives fully, and is more likely to act reflexively and impulsively. These impairments were all true at the time of his pretrial hearing on intellectual disability and at

the time of trial. *See* Atkins Def. Exhs. 14 & 17; Appx. 72, Declaration of Dr. Merikangas; Appx. 70, at p. 3, 19, Declaration of Dr. Weinstein; NT Atkins Hrg 11/30/09 at 274, 277.

The United States Supreme Court has held that no one who satisfies the criteria for intellectual disability can be executed consistent with the requirements of the Eighth Amendment. *Atkins v. Virginia*, 536 U.S. 304 (2002); *Hall v. Florida*, 572 U.S. 701 (2014). The Court reached this conclusion in part because capital punishment's dual purposes of deterrence and retribution are not served for persons such as Mr. Umaña, with a limited understanding of their actions and with a reduced ability to control their behavior and conform their conduct to the requirements of the law. Mr. Umaña expects to demonstrate at a hearing that there is a developing national consensus against the execution of defendants with severe mental illness, like Mr. Umaña.

Executing someone like Mr. Umaña, who suffers from brain damage, trauma, and low intelligence that results in impaired cognition, judgment, impulse control, and decision making would violate the Eighth Amendment. *See*, *e.g.*, *Trop v. Dulles,* 356 U.S. 86, 101 (1958) ("A court must look to the "evolving standards of decency that mark the progress of a maturing society" in defining the contours of that which is "cruel and unusual."). In each case in which the Supreme Court has reversed capital sentences for ineffective assistance of counsel based on failure to conduct mitigation investigation, the Court has noted mental disorders or impairments that bear the hallmarks of those from which Mr. Umaña suffers. *See Williams v. Taylor*, 529 U.S. 362, 370 (2000) (describing petitioner as possibly having "mental impairments organic in origin"); *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (relying on social services records that documented impairments and "difficulty coping with demanding situations"); *Rompilla v. Beard*, 545 U.S. 374, 391 (2005) (reporting test scores showing "third grade level of cognition after nine years of schooling" and organic brain damage); *Porter v. McCollum*, 558 U.S. 30, 36 (2009) (per curiam)

553

(finding trial counsel  ineffective for failing to discover substantial difficulties with reading, writing, and memory, as  well as cognitive deficits; finding that state postconviction experts could not rule out "brain  abnormality"); *Sears v. Upton*, 561 U.S. 945, 949 (2010) (per curiam) (describing significant  frontal lobe damage suffered as a child, drug and alcohol abuse in teens, problems with  "planning, sequencing and impulse control," and "pronounced frontal lobe pathology."). By the same token, the Supreme Court's Eighth Amendment cases prohibiting the death  penalty for certain categories of offenders rely heavily on neuroscience to explain why people  with particular deficits, attributable either to developmental neurological stage or organic brain  disorder, are not eligible for execution. *See Roper v. Simmons*, 543 U.S. 551 (2005) (barring execution of people who committed capital offenses as juveniles); *Atkins v. Virginia*, 536 U.S. 304 (2002) (barring execution of the intellectually disabled). The Supreme Court described in *Roper* and *Atkins* the characteristics of capital offenders that led to these exclusions: disabilities in reasoning, judgment, and impulse control, as well as an underdeveloped sense of  responsibility and vulnerability to negative influences. *See Atkins*, 536 U.S. at 320; *Roper*, 543 U.S. at 569. In other words, the Supreme Court has recognized that precisely the sorts of  impairments that Mr. Umaña exhibits because of his brain damage exempt capital offenders  from execution. *See also* Act of January 9, 2021, 2020 Ohio Laws 98 (codified at Ohio Rev. Code § 2929.02) (banning the execution of any person that was seriously mentally ill at the time of the offense); *Coonce v. United States*, 142 S. Ct. 25 (2021) (Sotomayor, J., dissenting from denial of certiorari) (discussing states that abolished the death penalty based on changing attitudes and understanding of mental health and development); *Hodge v. Kentucky*, 568 U.S. 1056 (2012) (Sotomayor, J., dissenting from denial of certiorari) ("Mitigation evidence need not, and rarely could, explain a heinous  crime;

554

rather, mitigation evidence allows a jury to make a reasoned moral decision whether the individual defendant deserves to be executed, or to be shown mercy instead.")).

Our highest court has also held that capital punishment must be "limited to those offenders who commit 'a narrow category of the most serious crimes,' and whose extreme culpability 'makes them the most deserving of execution.'" *Kennedy v. Louisiana*, 554 U.S. 407, 420 (2008) (quoting *Roper v. Simmons*, *supra*, at 568). Mr. Umaña's actions certainly resulted in tragedy, the loss of two lives. But his shooting resulted from his processing a threat of a physical assault through a badly damaged brain further disordered by Post-Traumatic Stress Disorder and limited intelligence; that processing magnified the assault into a mortal threat, that processing gave Mr. Umaña very limited choices; he reacted criminally but not with extreme culpability. *See* Appx. 216 at ¶ 5-15, Declaration of Dr. Stewart.

It is difficult to imagine counting Mr. Umaña – a man whose already badly damaged brain was further compounded by relentless exposure to a lifetime of trauma – as the kind of offender with a level of culpability deserving of execution. Executing someone with Mr. Umaña's impairments would violate the Eighth Amendment.

## CLAIM XXIX. THE CUMULATIVE EFFECT OF COUNSEL'S INEFFECTIVENESS IN MR. UMAÑA'S CASE, IN VIOLATION OF THE FOURTH, FIFTH, SIXTH, AND EIGHTH AMENDMENTS, WARRANTS POSTCONVICTION RELIEF.

All other claims and allegations in this Motion are incorporated into this claim by this reference.

Deficient performance under the Sixth Amendment is proved by showing "that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. A movant "must identify the acts or omissions of counsel that are alleged not to have been the result

555

of reasonable professional judgment." *Id*. at 690. "The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id*. *Strickland* thus requires a court to assess the totality of counsel's acts and omissions when deciding whether the representation was deficient.

Similarly, *Strickland* requires that this Court consider the cumulative effect of counsel's deficient performance when determining prejudice. *Id.* at 695. *Strickland* repeatedly describes a single ineffective assistance of counsel claim as consisting of multiple errors or omissions that result in prejudice. *See*, *e.g.*, *id.* at 693 ("Even if a defendant shows that *particular errors* of counsel were unreasonable . . . the defendant must show that *they* actually had an adverse effect on the defense." (emphasis added)); *id.* at 694 (holding that a petitioner must show "a reasonable probability that, but for counsel's unprofessional *errors*, the result of the proceeding would have been different" (emphasis added)).

The Sixth Circuit has agreed that *Strickland* claims must be examined cumulatively, *see United States v. Dado*, 759 F.3d 550, 563 (6th Cir. 2014) ("[E]xamining an [IAC] claim requires the court to consider 'the combined effect of all acts of counsel found to be constitutionally deficient, in light of the totality of the evidence in the case.'" (quoting *Lundgren* v. *Mitchell*, 440 F.3d 754, 770 (6th Cir. 2006))), as have courts reviewing capital § 2255 cases, *see, e.g.*, *Johnson v. United States*, 860 F.Supp.2d 663, 756 (N.D. Iowa 2012) ("*Strickland* stands for the proposition that a multifaceted claim of ineffective assistance of counsel must be treated as a single claim.").

These holdings are also confirmed by the Supreme Court's post-*Strickland* decisions. In *Williams v. Taylor*, 529 U.S. 362 (2000), the Court identified multiple categories of mitigating evidence omitted by trial counsel's deficient mitigation investigation. Nevertheless, those omissions were treated collectively as part of the singular failure of "trial counsel [to] fulfill their

556

obligation to conduct a thorough investigation of the defendant's background." *Id.* at 396. Similarly, in *Wiggins v. Smith*, 539 U.S. 510 (2003), the Sixth Amendment violation was predicated on multiple investigatory omissions, including a failure to investigate the facts behind a social service report and to commission a detailed social history. *See id.* at 525, 538. Yet *Wiggins* treated the investigatory omissions and multiple categories of evidence as a single IAC claim: "In order for counsel's inadequate performance to constitute a Sixth Amendment violation, petitioner must show that counsel's *failures* prejudiced his defense." *Id.* at 534 (emphasis added). And, more recently, in *Porter* v. *McCollum*, 558 U.S. 30 (2009), the Court addressed an IAC claim in which counsel failed to learn about the client's "abusive childhood, his heroic military service and the trauma he suffered because of it, his long-term substance abuse, and his impaired mental health and mental capacity[.]" 558 U.S. at 33. *Porter* grouped all categories of mitigating evidence together *both* for the deficiency and prejudice analyses. *See id.* at 40 (finding single deficiency in "fail[ure] to uncover and present any evidence of Porter's mental health or mental impairment, his family background, or his military service"); *id.* at 40-41 (whether "that deficiency" prejudiced Porter by looking at "the totality of the available mitigation evidence") (internal quotations omitted).

Each of the individual assertions of ineffective assistance of counsel and *Brady* violations in Mr. Umaña's § 2255 motion are sufficiently prejudicial to warrant habeas relief. Cumulatively, they confirm that Mr. Umaña is entitled to postconviction relief.

**CLAIM XXX.  THE CUMULATIVE EFFECT OF THE INEFFECTIVE ASSISTANCE OF COUNSEL AND THE GOVERNMENT'S *BRADY* VIOLATIONS, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS, UNDERMINE CONFIDENCE IN THE RESULT OF MR. UMAÑA'S TRIAL.**

All other claims and allegations in this Motion are incorporated into this claim by this reference.

Even where an individual error is insufficient to raise a probability that the outcome of a trial would have been different, the cumulative impact of *Brady* and *Strickland* error can suffice to warrant habeas relief. *See Kubat v. Thieret*, 867 F.2d 351, 370 (7th Cir. 1989) (relying on "errors" language from *Strickland* to conclude that "*Strickland* clearly allows the court to consider the cumulative effect of counsel's errors in determining whether a defendant was prejudiced"); *Dugas v. Coplan*, 428 F.3d 317, 335 (1st Cir. 2005) (adopting the reasoning from *Kubat*); *Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001) (holding that "totality of the circumstances" language from *Strickland* mandates an aggregate error analysis); *Richards v. Quarterman*, 566 F.3d 553, 564 (5th Cir. 2007) ("We will address each aspect of Davis's performance the district court found deficient before considering whether Richards was cumulatively prejudiced thereby."); *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001) (remanding for cumulative prejudice analysis of *Brady* and *Strickland* error); and *Gonzales v. McKune*, 247 F.3d 1066, 1078 n.4 (10th Cir. 2001), *vacated in part on other grounds*, 279 F.3d 922, 925-26 (10th Cir. 2002) (en banc) (noting that language from *Strickland* "makes it clear that all acts of inadequate performance may be cumulated in order to conduct the prejudice prong").

The Fourth Circuit's decision in *Fisher v. Angelone*, 163 F.3d 835 (4th Cir. 1998), is consistent with considering the prejudice of trial counsel's constitutional errors cumulatively. In *Fisher*, petitioner alleged that his trial counsel was ineffective for five distinct reasons. *Id.* at 843. The court concluded that counsel's actions were not deficient for all but one alleged error. For one error, the court did not address counsel's performance but concluded that even if trial counsel had done as the petitioner maintains counsel should have, the petitioner was not prejudiced. *Id.* at 850. After discussing and dismissing each allegation of ineffective assistance of counsel, the court turned to petitioner's argument that the court should consider these errors cumulatively. *Id.* at 532. In

558

rejecting petitioner's proposal, the court clarified "[t]o the extent this Court has not specifically stated that ineffective assistance of counsel claims, like claims of trial court error, must be reviewed individually, rather than collectively, we do so now." *Id*. This conclusion, however, only came after the court had already dismissed four of the five claims as meritless on the performance prong.

*Fisher* did not forestall a court from considering the *prejudice* of constitutionally ineffective counsel cumulatively. In a subsequent unpublished case, *United States v. Russell*, 34 F. App'x 927, 927 (4th Cir. 2002), the court limited *Fisher* to cases where "individual claims . . . were reviewed on the merits and determined not to amount to error." Unlike in *Fisher*, "the district court did not review the individual claims of error on the merits" but instead "held that, even if there were errors, there was no prejudice to [petitioner]." *Id.* at 928. Accordingly, the court granted petitioner's certificate of appealability and remanded it so that the district court could properly consider whether counsel's deficient performance when considered cumulatively prejudiced petitioner. *Id.*

Here, Mr. Umaña has already demonstrated that prior counsel's failure to litigate these issues individually constituted deficient performance. To reach this claim, the court necessarily will have determined that the claims, while individually meritorious, were individually harmless.

These errors were cumulatively prejudicial, establishing prejudice for an ineffectiveness inquiry.

**CLAIM LIX. THE UNCONSTITUTIONAL ALIEN-WITH-A-FIREARM CONVICTION MUST BE VACATED BASED ON *REHAIF*, AND MR. UMAÑA'S DEATH SENTENCES ACCORDINGLY MUST BE VACATED.**

The claims and factual allegations set forth in all other sections of all prior submissions and exhibits are incorporated by reference and realleged as if set forth entirely herein.

559

Mr. Umaña's conviction for being an unlawful alien in possession of a firearm, 18 U.S.C. §§922(g)(5) and 924(a)(2), is unconstitutional and invalid, in light of *Rehaif v. United States*, 588 U.S. , 139 S.Ct. 2191 (2019). Thus, his §922(g) conviction must be vacated. The invalid §922(g) conviction affected the jury's penalty-phase deliberations, and thus his death sentences must be vacated as well. Mr. Umaña was charged and convicted, inter alia, with being an unlawful alien in possession of a firearm in violation of 18 U.S.C. §922(g)(5). Count 27, Third Superseding Indictment (Crim. Doc. 623), at 52.

Mr. Umaña's jury was instructed that only three elements were necessary for conviction:

> One, the defendant knowingly possessed the firearm described in count eight of the indictment, that is, a Ruger .45 caliber semi automatic pistol -- count twenty-seven of the indictment.
>
> Two, that during the possession, the defendant was an alien unlawfully residing in the United States.
>
> Three, and that the possession of this firearm was in or affecting interstate or foreign commerce.

GPT,[163] at 1251-53. The Court further defined an "alien" as: "someone who is not a natural born or naturalized citizen or a national of the United States." *Id*. at 1253. The jury was not instructed that it must find Mr. Umaña knew he belonged to the relevant category of persons barred from possessing. *See Rehaif*, 139 S.Ct. at 2194, 2200.

The jury found Mr. Umaña guilty of being an alien in possession of a firearm, and the Court sentenced him to the statutory maximum of 120 months imprisonment on that count. Guilt Phase Verdict (Crim. Doc. 1043); Judgment (Crim. Doc. 1168).

After Mr. Umaña's direct appeal concluded, the Supreme Court held in *Rehaif* that, to

---

[163] Collectively, Crim. Docs. 1255-1258, 1339-1345, No. 3:08-cr-00134-RJC-DSC-2 (W.D.N.C.).

560

secure conviction for alien in possession of a firearm under §922(g), "the Government must prove both that the defendant knew he possessed a firearm *and that he knew he belonged to the relevant category of persons barred from possessing a firearm*." 139 S.Ct. at 2194, 2200.

*Rehaif* announced a new, retroactive rule applicable on collateral review. A rule is new if it "was not dictated by precedent existing at the time the defendant's conviction became final." *Teague v. Lane*, 489 U.S. 288, 301 (1989). A rule is not dictated by existing precedent unless the rule would have been "apparent to all reasonable jurists." *Lambrix v. Singletary*, 520 U.S. 518, 528 (1997). A rule applies retroactively on collateral review if it is a "new substantive rule" or if it is one of "a small set of watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." *Schriro v. Summerlin*, 542 U.S. 348, 351-52 (2004) (quotation marks and emphasis omitted). Substantive rules include those that "narrow the scope of a criminal statute by interpreting its terms." *Id.* at 351-52.

By these standards, *Rehaif* is a new substantive, retroactive, constitutional rule. Clearly the rule announced in *Rehaif* was not apparent to all reasonable jurists, since every circuit to have interpreted the mens rea requirement of 18 U.S.C. §§ 922(g), 924(a) had decided the question the other way. *See id.* at 2201 (Alito, J., dissenting). And the new rule plainly narrowed the scope of the criminal statute. Before *Rehaif*, a prosecutor only had to prove a person knowingly possessed a firearm; after *Rehaif*, the prosecutor must further prove the person knew they were not supposed to have it. *Id.* at 2196-97 (majority op.). Moreover, "the Government has conceded in other cases that pursuant to a directive from the Department of Justice, the new rule announced in *Rehaif* may be raised in an initial proceeding brought under 28 U.S.C. §2255 and will be retroactively applicable in that context." *Clark v. Werlich*, No. 19-cv-1012-NJR, 2020 U.S. Dist. LEXIS 85696, at **7-8 (S.D. Ill. 5/15/20) (dismissing §2241 petition brought under §2255(e) savings

561

clause, as petitioner had avenue to raise claim by filing §2255 motion in district court of conviction); *Amelia v. Werlich*, No. 19-cv-815-RJD, 2020 U.S. Dist. LEXIS 41016, at *2 (S.D. Ill. 3/10/20) (same). Accordingly, *Rehaif* applies retroactively to Mr. Umaña's case.

Because the prosecution did not establish, and the jury did not make a finding, that Mr. Umaña knew he was prohibited from possessing a firearm based on his knowledge of his inclusion in the class of persons prohibited from possessing, his §922(g) conviction must be vacated under *Rehaif*. Mr. Umaña's §922(g) conviction is invalid because it was secured through a defective indictment that failed to allege his knowledge of the relevant prohibited status as required under *Rehaif*. *See United States v. Moore*, 810 F.3d 932, 936 (4th Cir. 2016); *United States v. Kingrea*, 573 F.3d 186, 191 (4th Cir. 2009) (indictment must contain all elements of offense charged; "mere reference to the applicable statute does not cure" failure "to include every essential element"). Additionally, due process, the Sixth Amendment, and the Eighth Amendment were violated because he did not receive a jury finding, based solely on the evidence, of proof beyond a reasonable doubt as to every element of the offense. *Hurst v. Florida*, 136 S. Ct. 616, 618 (2016); *Ring v. Arizona*, 536 U.S. 584, 589 (2002); *Apprendi v. New Jersey*, 530 U.S. 466, 476-77 (2000); *United States v. Gaudin*, 515 U.S. 506, 514 (1995); *Victor v. Nebraska*, 511 U.S. 1, 5 (1994); *Chandler v. Florida*, 449 U.S. 560, 574 (1981); *In re Winship*, 397 U.S. 358, 364 (1970). The evidence was insufficient to convict Mr. Umaña of a § 922(g) offense because the government failed to establish he knew his prohibited status at the time he possessed the firearm. *See Jackson v. Virginia*, 443 U.S. 307, 316, 320-21 (1979). Additionally, his Sixth Amendment right to a complete verdict on every element of the offense was violated by failing to instruct the jury on the knowledge-of-status element of § 922(g). *United States v. McFadden*, 823 F.3d 217, 224 (4th Cir. 2016). Finally, his right to "a meaningful opportunity to present a complete defense"

was violated by failure to charge and instruct jurors on the knowledge of status element required under *Rehaif.  See California v. Trombetta*, 467 U. S. 479, 485 (1984); *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006); *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *see also Rock v. Arkansas*, 483 U.S. 44, 51 (1987); *Crane v. Kentucky*, 476 U.S. 683, 690 (1986); *Strickland v. Washington*, 466 U.S. 668, 684-85 (1984); *United States v. Cronic*, 466 U.S. 648, 656 (1984); *Washington v. Texas*, 388 U.S. 14, 23 (1967); *In re Oliver*, 333 U. S. 257, 273 (1948).

There is a reasonable probability that, but for failure to instruct on the *Rehaif* knowledge element, the result of the proceeding would have been different.  *Rehaif*'s knowledge- of-status element requires "proof that an alien *actually knew* – not should have known or even strongly suspected but *actually knew* – that his continued presence in the country was illegal." *Rehaif*, 139 S.Ct. at 2208 (Alito, J., dissenting).

Here, the evidence did not establish Mr. Umaña actually knew his continued presence in the country was illegal.  Mr. Umaña had limited education and cognitive impairments. *See infra*. Although he had several prior encounters with police, police did not detain him in any immigration facility, place him in immigration or removal proceedings, or inform him he was an unlawful alien.  The jury heard evidence that police encountered Mr. Umaña in Los Angeles in August 2005 and took no immigration action against him.  GPT, at 116-18. Police also arrested Mr. Umaña in North Carolina for cocaine possession on August 6, 2007, but he was released from pre-trial detention and no immigration or removal proceedings were initiated against him.  GPT, at 120-21, 173-80, 296-302, 522.  An ICE agent even testified about the typical procedure:  when an unlawful immigrant is about to be released from jail, ICE processes and deports that person, as was done to co-defendant Manuel De Jesus Ayala.  GPT, at 859-60.  But Mr. Umaña had interacted with police several times, had lawfully obtained a government-issued identification

563

card (GPT, at 301-02), and even was arrested in North Carolina on felony drug charges – all without being detained, deported, or placed in removal proceedings.

Mr. Umaña was re-arrested on December 12, 2007 for the Las Jarochitas shooting of December 7, 2007. GPT, at 522, 788-89. Although ICE Agent Jose Romero testified at trial about *a different ICE agent's* interview with Mr. Umaña, Agent Romero was not present for the interview (thus Romero's testimony was triple-hearsay and a confrontation clause violation), and no evidence established what Mr. Umaña actually said during his interrogation with the unidentified ICE agent or what his knowledge of status actually was. GPT, at 858-63. Mr. Umaña certainly could have admitted to facts that make him "illegal" – such as admitting to entering the country without immigration inspection, but being questioned and inspected by police after entry – *without knowing or understanding that those facts* make him "illegal." *Rehaif*, 139 S.Ct. at 2198 (discussing when mistake of law *is* an excuse). After his prior contacts with police with no immigration consequences and his obtaining a government-issued identification card, there's a reasonable probability jurors would not have concluded, beyond a reasonable doubt, that Mr. Umaña actually knew his status as an unlawful alien that prohibited him from possessing a firearm.

Moreover, because Mr. Umaña's *actual knowledge* is at issue under *Rehaif*, relevant defense evidence would have been admissible to disprove or rebut proof of knowledge, and such evidence must be considered in evaluating this claim. Lay evidence would have shown that Mr. Umaña had only a third-grade education, likely in a remedial classroom, while growing up in poverty in war-torn El Salvador. PPT,[164][2] at 535, 541-61, 562, 569, 635; 2255 Motion (Civ. Doc. 24) at 53-57, 20-29, 32-57, 68-79, 97-100; Suppl./Amend. 2255 Motion (Civ. Doc. 71) at 3-13,

---

[164] Collectively, Crim. Docs. 1259-1261, 1346-1351, No. 3:08-cr-00134-RJC-DSC-2 (W.D.N.C.).

108-18, 123-36. He worked only unskilled manual labor jobs, sometimes as an assistant or helper to a skilled laborer, in El Salvador and the United States. *Id.*

Additionally, expert testimony, such as psychological, psychiatric, and educational expert testimony, would be admissible to rebut the government's allegation that Mr. Umaña had *actual knowledge* of his disqualifying status. *See* Fed.R.Evid. 702; *United States v. Worrell*, 313 F.3d 867, 873 (4th Cir. 2002) (mental health evidence admissible to negate intent). Expert testimony would have shown Mr. Umaña had low educational attainment and was cognitively impaired.[165] 2255 Motion (Civ. Doc. 24) at 64-67, 79-88, 100-02; Suppl./Amend. 2255 Motion (Civ. Doc. 71) at 3-13, 108-18, 123-36. Given his low education, impairments, and multiple encounters with police without any immigration consequences, there is a reasonable probability jurors would not have concluded beyond a reasonable doubt that Mr. Umaña actually knew his continued presence in the country was unlawful.

In short, Mr. Umaña's §922(g) conviction was obtained without proof of, nor a jury finding on, the necessary knowledge-of-status element. There is a reasonable probability jurors would not have unanimously found beyond a reasonable doubt that Mr. Umaña actually knew his disqualifying status. To the extent counsel could have raised this claim at trial or on direct appeal, counsel's failure to do so constitutes ineffective assistance. Vacatur of Mr. Umaña's 922(g) conviction (Count 27) is required.

Moreover, vacating the unconstitutional conviction in Count 27 also necessitates vacating the death sentences imposed on Counts 22, 23, 24, and 25.

---

[165] Counsel maintains that, above and beyond cognitive impairment, Mr. Umaña is intellectually disabled and suffers from multiple other developmental, cognitive, and mental health disorders, as articulated in his 2255 Motion and Supplement/Amended 2255 Motion. *See* Civ. Docs. 24, 71

In *Johnson v. Mississippi*, 486 U.S. 578 (1988), the Supreme Court held that where a jury imposed a sentence of death, having considered as aggravation a conviction that is later vacated, the defendant is entitled to a new sentencing hearing. The Court reasoned that a sentence of death imposed under such a circumstance is inconsistent with the Eighth Amendment's prohibition against cruel and unusual punishment because "the jury was allowed to consider evidence that had been revealed to be materially inaccurate." *Id*. at 579. The Supreme Court conducted a similar analysis in *United States v. Tucker*, 404 U.S. 443, 449 (1972), a non-capital case. In *Tucker*, the Court affirmed the judgment of the Ninth Circuit ordering resentencing after two prior convictions known to the sentencer were later invalidated. *Id*. at 593. Finding the sentence was imposed "at least in part on misinformation of constitutional magnitude," the Court declared that it would be "callous to assume, now that the constitutional invalidity of the respondent's previous convictions is clear, that the [sentencer] will upon reconsideration 'undoubtedly' impose the same sentence." *Id*. at 447, 449 n.8.

The determinative factor is whether the invalidated conviction was known to, and possibly considered by, the sentencer. When a defendant has been convicted and sentenced on multiple counts, and one of the convictions is later determined to be invalid, the defendant must be resentenced on the remaining valid counts, unless it is established that the sentencer did not rely on the invalid count in imposing the sentence. *See James v. United States*, 476 F.2d 936, 937 (8th Cir. 1973) (citing *Tucker*). Where it "appear[s] possible that [the sentencer] might have relied in part on an unconstitutional conviction," the defendant must be resentenced. *Id. See also Bourgeois v. Whitley*, 784 F.2d 718, 721 (5th Cir. 1986); *Jerkins v. United States*, 530 F.2d 1203, 1204 (5th Cir. 1976); *United States v. Pinkney*, 551 F.2d 1241, 1246 n.37 (D.C. Cir. 1976).

The principle that a sentence must be vacated if it could have been influenced by an

566

invalid conviction applies with even greater force in the case of jury sentencing, because the court can never determine with certainty what factors influenced the jury. *Cf. Wren v. United States*, 540 F.2d 643, 644 (4th Cir. 1975) ("In short, to terminate further inquiry, the district judge must be able to say either from recollection or reconstruction that had he known at the time of sentencing that the earlier convictions were invalid, he would have nevertheless imposed the same sentence.'") (quoting *Gardner v Florida*, 430 U.S. 349, 359 (1977)).

Under the possibility standard, resentencing is required when there is a possibility that an invalid conviction influenced even a single juror's weighing or penalty-selection decision. *Johnson*, 486 U.S. at 586; *Kubat v. Thieret*, 867 F.2d 351, 373 (7th Cir. 1989) (finding a violation of Eighth and Fourteenth Amendment based on "substantial possibility that one or more" jurors was influenced by erroneous jury instruction); *cf. Wiggins v. Smith*, 539 U.S. 510, 537 (2003) (to satisfy *Strickland* prejudice, petitioner must show "a reasonable probability that at least one juror would have struck a different balance"); *Buck v. Davis*, 137 S. Ct. 759, 776 (2017) (same).

Like *Johnson* consideration-of-invalid-conviction error, *Wiggins*, *Buck*, and other ineffective assistance of counsel cases require resentencing where a constitutional error may have affected even a single juror's decision to recommend death. Notably, though, the standard for establishing prejudice in *Johnson/Tucker* context is less stringent than the standard for establishing prejudice in the ineffective-assistance context. Under *Johnson*, as explained above, a capital defendant need only show a *possibility* that an invalid conviction affected at least one juror's penalty determination, whereas a capital defendant claiming *Wiggins* error must show a *reasonable probability* that counsel's deficiency did so. "A 'reasonable probability' [for purposes of an ineffective-assistance claim] is a higher standard than *Johnson*'s 'possibility.'" *Powell v. Kelly*, 531 F. Supp. 2d 695, 732 n.40 (E.D. Va. 2008).

Here, there is more than a possibility that at least one juror's weighing and penalty-selection decision would have been different without the unconstitutional §922(g) conviction. During the penalty phase, jurors were instructed they could rely on any and all evidence presented in the guilt phase when deliberating and deciding on penalty phase issues. PPT, at 12, 818. During deliberations, the jury considered materially inaccurate evidence that the government had proved Mr. Umaña was guilty of unlawful alien with a firearm, when in fact the government had not met its burden of proving the necessary element of Mr. Umaña's knowledge to convict of that crime. There is no basis upon which to conclude that the jury's death verdicts were not based in part on Mr. Umaña's §922(g) conviction.

Alternatively, "[a]n invalidated sentencing factor (whether an eligibility factor or not) will render the sentence unconstitutional by reason of its adding an improper element to the aggravation scale in the weighing process *unless* one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances." *Brown v. Sanders*, 546 U.S. 212, 220-21 (2006) (original emphasis). "This test is not, as Justice Breyer describes it [in dissent], 'an inquiry based solely on the admissibility of the underlying evidence." *Id.* "If the presence of the invalid sentencing factor allowed the sentencer to consider evidence that would not otherwise have been before it, due process would mandate reversal without regard to the [*Sanders*] rule." *Id.* Additionally, "skewing that could result from the jury's considering *as aggravation* properly admitted evidence that should not have weighed in favor of the death penalty" gives rise to constitutional error "where the jury could not have given aggravating weight to the same facts and circumstances under the rubric of some other, valid sentencing factor." Id.

Here, initially, Mr. Umaña's unconstitutional §922(g) conviction was not merely an invalid sentencing factor. Instead, it was an additional, unproven count of conviction that would

568

not have otherwise been before the sentencer.  Thus, due process requires reversal of the death sentences.

Finally, the Constitution and federal law guarantee Mr. Umaña a jury finding on weighing and a jury finding on sentence-selection, free of constitutional error.  Mr. Umaña's right to a jury determination – rather than appellate reweighing or harmless-error reweighing – is guaranteed by Due Process, the Sixth Amendment, and the Eighth Amendment.

The Supreme Court held in *Ring v. Arizona* "that capital defendants 'are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment' – in particular, the finding of an aggravating circumstance." *McKinney v. Arizona*, 707-08 (2020), *quoting Ring*, 536 U.S. 584, 589 (2002).  In *Hurst v. Florida*, the Supreme Court "applied *Ring* and decided that Florida's capital sentencing scheme impermissibly allowed 'a sentencing judge to find an aggravating circumstance, independent of a jury's factfinding, that is necessary for imposition of the death penalty.'" *Id.*, *quoting Hurst*, 577 U.S. , 136 S. Ct. 616, 618 (2016).  States are not constitutionally required to mandate that juries, rather than judges, weigh aggravation and mitigation or make the ultimate sentencing decision.  *Id.*  Thus, states that permit trial-judge weighing or sentence-selection may engage in appellate reweighing.  *Id.* at 706.

But when a state mandates certain trial, capital sentencing, and appellate procedures, it creates Fourteenth Amendment life and liberty interests in those procedures, which are protected under federal due process.  *Evitts v. Lucey*, 469 U.S. 387, 393 (1985); *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980); *Ford*, 477 U.S. at 428-29.  "[I]t would be unthinkable that the same Constitution would impose a lesser duty on the Federal Government." *Bolling v. Sharpe*, 347 U.S. 497, 500 (1954).  Thus, where federal statutory law mandates certain trial, sentencing, or appellate procedures, there is also a federal due process life and liberty interest in that procedure.  Here,

federal statutory law creates a due process liberty interest in jury factual findings on weighing and sentence selection, whether in the first instance or after the mix of the sentencing package has been altered by vacatur of some counts of conviction.

Under the Federal Death Penalty Act, Mr. Umaña has the right to jury weighing of aggravation and mitigation and a jury *fact-finding* as to the ultimate sentence-selection. Unless the defendant and government both waive jury, the weighing of aggravation and mitigation and the ultimate sentence-selection decision all rest with the jury. 18 U.S.C. §3593(b), (d), (e). Although the jury's penalty-selection decision is called a "recommendation," the trial court must ("shall") impose whatever sentence the jury unanimously selects. 18 U.S.C. §3593(e), §3594.

Because the Federal Death Penalty Act provides Mr. Umaña the right to a jury determination on weighing aggravation and mitigation, and a jury determination on his penalty selection, appellate reweighing and harmless-error analysis are inapplicable and inappropriate. Instead, if there is constitutional error in the penalty selection process, remand for resentencing by jury is required.

Relatedly, the Fourth Circuit has fully endorsed the sentencing package doctrine. *United States v. de Jesus Ventura*, 864 F.3d 301, 309 (4th Cir. 2017). "'[W]hen a defendant is found guilty on a multicount indictment, there is a strong likelihood that the [sentencer] will craft a disposition in which the sentences on the various counts form part of an overall plan,' and that if some counts are vacated, 'the [sentencer] should be free to review the efficacy of what remains in light of the original plan.'" Id. This accounts for "the holistic approach that a [sentencer] should employ when sentencing a defendant convicted of multiple offenses." *Id.* (citations omitted). Here, if any of Mr. Umaña's counts of conviction are vacated, then application of the sentencing package doctrine is appropriate and necessary. Every aspect of Mr. Umaña's original sentence –

from findings on aggravation and mitigation, findings on weighing, and findings as to ultimate selection of the penalty – was conducted by the jury. As such, if any counts of conviction are vacated, this holistic approach requires the original sentencer – a jury – to review the efficacy of what sentences remain.

Accordingly, Mr. Umaña requests vacatur of his §922(g) conviction (Count 27) under the rule of *Rehaif*, and vacatur of his remaining sentences, including his death sentences, based on *Rehaif* error in his §922(g) conviction.

## REQUEST FOR RELIEF

WHEREFORE, based upon the foregoing, all other proceedings and submissions, Movant, Alejandro Umaña, respectfully requests that the Court grant him the following relief:

A) That Movant be granted such discovery as is necessary for full and fair resolution of the claims contained in this Motion;

B) That leave to amend this Motion be granted;

C) That an evidentiary hearing be conducted on all claims involving disputed issues of fact;

D) That Respondents be Ordered to respond to this Motion; and

E) That Movant's convictions and sentences be vacated.

Respectfully submitted,

*/s/ Kelly D. Miller*
KELLY D. MILLER
Asst. Federal Public Defender
Federal Public Defender
Middle District of Pennsylvania
100 Chestnut Street, Suite 300
Harrisburg, PA 17101
Tel: 717-782-3843
Fax: 717-782-3966
kelly_miller@fd.org

Dated: March 23, 2023

**CERTIFICATE OF SERVICE**

I, Kelly D. Miller, hereby certify that I have electronically filed the foregoing document with the Clerk of Court using the CM/ECF system and a copy of the foregoing document has been served this day upon the following via CM/ECF:

Anthony J. Enright
Assistant United States Attorney
Suite 1650, Carillon Building
227 West Trade Street
Charlotte, NC 28202
anthony.enright@usdoj.gov

/S/ KELLY D. MILLER
KELLY D. MILLER
Asst. Federal Public Defender
Federal Public Defender
Middle District of Pennsylvania
100 Chestnut Street, Suite 300
Harrisburg, PA 17101
Tel: 717-782-3843
Fax: 717-782-3966
kelly_miller@fd.org

Dated: March 23, 2023