# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
### CIVIL NO. 3:16CV57

| | |
|---|---|
| ALEJANDRO RAMIREZ UMAÑA, | ) |
| | ) |
| Movant, | ) |
| | ) |
| vs. | ) |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Respondent. | ) |
| _____ | ) |

## MOTION TO DISMISS
## ALEJANDRO UMAÑA'S MARCH 2023 AMENDED 2255 MOTION

I.  BACKGROUND ..................................................................................... 2

   A.  Umaña joins MS-13 and becomes a gang leader in Charlotte. ........................................................................................ 2

   B.  Umaña murders two individuals in a family restaurant in Greensboro, because one of the victims referred to his gang, MS-13, as "fake." ............................................................ 4

   C.  After committing the murders, Umaña and other gang members attempt to rob a drug dealer. ...................................... 6

   D.  Police arrest Umaña a few days later. ........................................ 7

   E.  Umaña continues his gang leadership while in prison, orchestrating the intimidation of witnesses and participating in other violent misconduct. ................................. 7

   F.  After Umaña is indicted, his defense team conducts an extensive pretrial investigation, endeavors to have this Court declare him ineligible for the death penalty, and seeks to limit the evidence introduced against him. ................. 9

      1.  Umaña is indicted and charged with nine federal crimes, including four arising out of his murders of Ruben and Manuel. ........................................................ 9

      2.  This Court appoints two experienced attorneys, who represent Umaña zealously. ................................. 11

      3.  This Court finds that Umaña is not mentally retarded. ..................................................................... 12

   G.  This Court presides over a three-phase trial. .......................... 13

      1.  The jury finds Umaña guilty on all counts submitted to it. ............................................................... 13

      2.  The jury sentences Umaña to death. .......................... 16

   H.  The Fourth Circuit affirms Umaña's conviction and death sentence. .......................................................................... 17

   I.  Umaña moves to vacate his sentence under 28 U.S.C. § 2255. ......................................................................................... 18

ii

II. DISCUSSION .................................................................................21

    A.    **Several principles are dispositive of Umaña's claims.** ...........24

        1.    Most of Umaña's claims are moot, because they challenge death sentences to which Umaña is no longer subject. ...............................................................25

        2.    This Court has already held that many of Umaña's claims fail as a matter of law. .......................26

        3.    To the extent Umaña's amended motion presents new grounds for relief, they are untimely ....................28

    B.    **This Court should dismiss Umaña's ineffective-assistance-of-counsel claims** .......................................30

        1.    Umaña's claims 1, 3, 5, 9, 10, 19, and 23, which challenge his attorneys' performance in connection with the death sentences he received, are moot and meritless. .................................35

        2.    Umaña's claim 2, which alleges ineffective assistance related to the use of Umaña's mental health in mitigation, is mostly moot and entirely meritless. ....................................................38

        3.    This Court should dismiss Claim 8, which alleges that the performance of Umaña's attorneys was deficient with respect to jail letters introduced during trial. ..................................................39

        4.    This Court should dismiss Claim 11, challenging counsel's performance related to Umaña's tattoos. ..........................................................48

        5.    This Court should dismiss Claim 13, which alleges that Umaña's attorneys were deficient for failing to seek more continuances. ..............................50

        6.    This Court should dismiss Claim 14, which alleges that Umaña's attorneys were constitutionally compelled to object to this Court's decision to excuse some jurors for cause. ........51

iii

7.      This Court should dismiss Claim 16, which challenges the voir dire Umaña's attorneys conducted of potential jurors. ...................................... 57

8.      This Court should dismiss Claim 17, which alleges that Umaña's attorneys were deficient for omitting to challenge this Court's jury venires. .......... 63

9.      This Court should dismiss Claim 18, which challenges the conduct of Umaña's trial counsel related to the United States' exercise of peremptory strikes. ........................................................ 65

10.    This Court should dismiss Claim 24, which asserts that Umaña's attorneys were constitutionally deficient for failing adequately to explain the benefits of "a plea deal." ........................ 67

11.    This Court should dismiss Claim 27, which alleges that Umaña's trial attorneys were constitutionally deficient for failing to preserve issues he raised on appeal. ........................................... 70

**C.**    **This Court should dismiss Claim 6, which alleges the United States unconstitutionally suppressed information related to his death sentences. ............................ 72**

**D.**    **This Court should dismiss Claims 29 and 30, which seek relief based on the "cumulative effect" of Umaña's allegations of ineffective assistance of counsel and *Brady* violations. ............................................................................... 73**

**E.**    **This Court should dismiss Claims 4, 7, 12, 15, 20, 22, 21, 25, 26, 28 and 59, which allege that the United States and this Court violated Umaña's rights under the Constitution and the Vienna Convention. ............................... 76**

1.      Umaña cannot overcome his procedural default or the relitigation bar. ................................................. 77

2.      The errors Umaña alleges would be harmless. ........... 80

3. This Court should dismiss claims 4, 12, 25, and 28, which challenge Umaña's commuted death sentences, because they are moot, procedurally defaulted or subject to the relitigation bar, harmless, and without merit. ......................................... 81

4. This Court should dismiss Claim 7, which alleges that the United States knowingly introduced false evidence. ................................................. 83

5. This Court should dismiss Claim 15, which alleges "misconduct related to the jury." ..................... 87

6. This Court should dismiss Claim 20, which alleges that Umaña's attorneys' agreement to the dismissal of jurors for cause and issues related to interpreters violated his constitutional rights............. 98

7. This Court should dismiss Claim 21, which challenges the security measures this Court adopted. .................................................... 100

8. This Court should dismiss Claim 22, which challenges Umaña's convictions under § 924(c) and (j) on counts 23 and 25......................................... 103

9. This Court should dismiss Claim 26, which relates to the Vienna Convention............................. 108

10. This Court should dismiss amended Claim 59, which challenges Umaña's conviction on Count 27 for possession of a firearm by an alien unlawfully in the United States, 18 U.S.C. § 922(g)(5).................................................. 110

F. This Court should dismiss Umaña's claims of ineffective assistance of appellate counsel...........................119

1. Umaña's claims of ineffective assistance of appellate counsel are meritless as a matter of law. .......................................................... 120

2. Umaña's claims of ineffective assistance of appellate counsel are untimely. ................................ 122

3. Umaña's claims of ineffective assistance of
appellate counsel are moot and conclusory................ 125

**III.   CONCLUSION** ........................................................................................**126**

vi

The United States respectfully requests that this Court dismiss or deny Alejandro Ramirez Umaña's amended motion under 28 U.S.C. § 2255, which he filed in March of 2023. *Amended Mot.* (Doc. No. 146). The majority of that 592-page motion challenges death sentences a jury imposed on Umaña in 2010. President Biden commuted those sentences to life imprisonment at Umaña's request in 2024, rendering most of his motion moot. The remainder of the motion asserts challenges to Umaña's convictions for crimes including murder in aid of racketeering, which carries a mandatory-minimum penalty of life imprisonment; possession of a firearm in furtherance of a crime of violence; and participation in a racketeering conspiracy. These challenges fail as a matter of law for multiple reasons. And the trial evidence establishing Umaña's guilt — including eyewitness testimony and Umaña's own admissions that he murdered Ruben and Manuel Garcia with a firearm in a crowded family restaurant for his fellow MS-13 cohorts in response to a perceived insult to the gang — was overwhelming and largely uncontroverted. None of the things about which his motion complains would call for this Court to disturb Umaña's convictions or the life sentences he is now serving.

Despite its length, Umaña's amended 2255 motion does not allege any cognizable facts that, if proved, would entitle him to relief on any of his claims. The motion and the record of Umaña's criminal case and direct appeal conclusively show that Umaña is entitled to no relief. This Court should, therefore, dismiss or deny his motion.

## I. BACKGROUND

### A. Umaña joins MS-13 and becomes a gang leader in Charlotte.

Umaña joined the gang Mara Salvatrucha, also known as MS-13, in El Salvador. *United States v. Umaña*, 750 F.3d 320, 330 (4th Cir. 2014). "MS-13 was formed in Los Angeles in the 1980s by immigrants from Central America, predominantly El Salvador." *Id.* "The gang uses violence and extortion to gain and control territory, and for a member to build his reputation in MS-13, he has to be ready to attack rival gang members or anyone else who disrespects the gang." *Id.* "MS-13 punishes betrayal by putting the 'green light' on the member, which constitutes an order that he be targeted for death." *Id.* "MS-13 has become a transnational organization, with groups, or 'cliques,' across the United States, in Canada, and in Central America." *Id.*

Umaña "illegally entered the United States in 2004." *Id.*; J.A. 2099, J.A. 3160, J.A. 4031–33.[1] He left El Salvador with "U.S. Dollars," and he traveled through Guatemala and Mexico to the United States. J.A. 4031–33. "[H]e purposefully did not take any identifying documents" such as a "passport." J.A. 4031. He was able to cross the borders without passports because they were "not well patrolled" and "not very secure." J.A. 4031. He swam across a river to get

---

[1] Citations to "J.A." refer to the Joint Appendix Umaña filed in the Fourth Circuit during his direct appeal, which contains much of the record of his criminal case. The United States filed a copy of that appendix with this Court as Exhibit 1 to its March 23, 2017, response to Umaña's first motion for discovery. *Ex. 1* (Doc. No. 50, 3:16-CV-57).

into Mexico. *Id.* He bought "medium chain box cutters." J.A. 4031–32. And he used them to break into freight cars that took him to the border of the United States, where he crossed a river to enter the country. J.A. 4031–32. Umaña's father later sent him identification. J.A. 4031–32.

Umaña lived initially in Los Angeles and later moved to New York. *Umaña*, 750 F.3d at 330–31. By the summer of 2007, Umaña "had built up a substantial reputation within MS-13." *Id.* at 331; J.A. 1362–63, J.A. 1365–68, 1445, J.A. 1536–37, J.A. 2864, J.A. 1897. Other MS-13 members treated Umaña "[l]ike he was big time." *Id.*; J.A. 1362–63, J.A. 1365–68, J.A. 1445, J.A. 1536–37, 1897.

In the fall of 2007, MS-13 leaders sent Umaña to North Carolina to run the Charlotte "cliques" of MS-13 members. *Umaña*, 750 F.3d at 331; J.A. 1863, J.A. 1896–97, J.A. 1889–90, J.A. 1904–05. Those cliques had been "experiencing significant infighting." *Umaña*, 750 F.3d at 331. "Because of his experience and exposure to gang life in Los Angeles, Umaña was ordered to 'set them straight' in North Carolina." *Id.*

"Umaña conducted numerous meetings with MS-13 members in Charlotte." *Id.* Charlotte MS-13 members committed armed robberies, thefts, extortion, and violent crimes for the gang, and Umaña instructed those members how to conduct their business. J.A. 1867–69, J.A. 1905–14, J.A. 1934–36. "He inspected the gang members' guns; he emphasized to them the importance of respect; and he told them to merge the Charlotte cliques together." *Umaña*, 750

3

F.3d at 331. Umaña told Charlotte MS-13 members that one of his goals "for Charlotte was to commit ten of the bloodiest murders Charlotte has ever seen. Salvadorian style, which means, you know, whacking people with a machete, cutting heads off and just chopping people up." J.A. 1917, J.A. 1983.

B. **Umaña murders two individuals in a family restaurant in Greensboro, because one of the victims referred to MS-13 as "fake."**

On the evening of Saturday, December 8, 2007, Manuel Garcia and his brother Ruben joined several of Manuel's coworkers at Las Jarochitas Mexican restaurant in Greensboro, North Carolina. J.A. 1605–10. Las Jarochitas is a small, family restaurant located in a strip mall, near a Toys 'R' Us toy store. J.A. 1605–08, J.A. 2167. A number of people were in the restaurant, including the daughter of the restaurant's owners and her months-old baby son, who sat in his carrier in a booth. J.A. 1609–10, J.A. 1629–30, J.A. 2575, J.A. 2581.

Also in the restaurant was Umaña, accompanied by a number of other MS-13 members. J.A. 1251, J.A. 1613–15, J.A. 1619–21, J.A. 1638, J.A. 1657. An argument arose over the music playing on the jukebox. J.A. 1615–19, 1656. An MS-13 member known as "Spider" stood up and became aggressive. J.A. 1618. Manuel bought Spider and his cohorts a bucket of beer to try to calm things down, but the gang members did not accept the gesture. J.A. 1619. Restaurant employees asked the gang members to leave, and one of the members told Manuel "to not mess with them because they were . . . from MS." J.A. 1619–21, 1649. Ruben replied that he was not scared and stated that the gang was "fake

4

to him." J.A. 1621. MS-13 has a "rule" requiring gang members to "attack" or "kill" any nonmember who "disrespects the gang." J.A. 2158.

Umaña pulled out a gun and, holding it sideways, pointed it at Ruben and Manuel. J.A. 1625. Umaña "stood there for a minute." J.A. 1627. During that time, with Umaña's gun pointed at them, the brothers "stood still" and "stood quiet." J.A. 1627.

Umaña fired five shots. J.A. 1621, J.A. 1658, J.A. 1677, J.A. 2115. He first shot Ruben in the chest, and Ruben fell back from the impact. J.A. 1630. Umaña shot Manuel in the head. J.A. 1658–59, J.A. 1690–91. People in the restaurant ran or hid in booths or bathrooms, and bullets lodged in the kitchen and restroom. J.A. 1628–29, J.A. 1633–35, J.A. 1658–59, J.A. 1682–83, J.A. 2581–83. A third victim, Jorge Martinez, suffered a bullet wound in his shoulder. J.A. 2593–95.

Although Ruben continued to gasp for breath for a time after police arrived, both Manuel and Ruben died at Las Jarochitas of the wounds that Umaña inflicted. J.A. 1581–83. Emergency medical providers took Martinez to the hospital. J.A. 2595.

Umaña fled with his MS-13 cohorts to Charlotte. J.A. 1928. During the trip, Umaña cocked his gun and talked about bullets for the weapon. J.A. 1928.

Umaña stopped at a nightclub called El Vaquero in Charlotte, put the gun in the face of one of his cohorts, Rony Lopez, also known as "Nene," and told him to smell it. J.A. 1460, J.A. 1928. After Lopez said the gun smelled like

5

gunpowder, Umaña urinated on his hands to remove the gunpowder.  J.A. 1928.

Umaña told other members of MS-13 that he had shot two people at Las Jarochitas and demonstrated the shooting.  J.A. 1459–60, J.A. 1463–65.  He explained that he shot the victims because "they insulted the MS 13," noting that he had acted for himself and for his fellow gang members.  J.A. 1464–65.

Umaña left the club with fellow gang member Rony Lopez, who had been working with police as an informant.  J.A. 1931–34.  "When asked about the prospect of being pulled over by the police with the murder weapon, [Umaña] responded, as recorded on tape, that the officer would be on the wrong end of his gun, as 'she is always close by.'" *United States v. Umaña*, 750 F.3d 320, 332 (4th Cir. 2014); J.A. 1933.  In the recorded conversation, Umaña continued to brag about his murders.  J.A. 1932–1934.  "I just went pop, pop to him, pop," said Umaña, making motions with his hand.  J.A. 1934.  "[A]nd I shot another dude," he continued.  J.A. 1934.

C. **After committing the murders, Umaña and other gang members attempt to rob a drug dealer.**

Later the same day, Umaña returned to El Vaquero with other gang members to rob an individual known as "Gordo."  J.A. 1457–1458, J.A. 1921, J.A. 1935.  MS-13 "charged rent" to drug dealers who operated in the club, requiring them to "pay money to the MS 13."  J.A. 2111.  Gordo had been selling drugs in the club, which MS-13 controlled, without "paying his rent" to the gang.  J.A. 1457–1458, J.A. 1921, J.A. 1935.

6

After two attempts to rob a prostitute's house failed, Umaña's fellow MS-13 member Mariachi developed the plan to rob Gordo as "plan B." J.A. 1454–1456, J.A. 1458, J.A. 1921. Umaña and other MS-13 members confronted Gordo in the bathroom, made him "take his pockets out of his pants," and searched him. J.A. 1935–1936. They did not locate anything on Gordo. J.A. 1935–1936.

**D.      Police arrest Umaña a few days later.**

Toward the end of the evening, Umaña went to the home of another gang member in Charlotte, Jaime Sandoval, also known as "Pelon," where Umaña stayed. J.A. 1936, J.A. 2035. Umaña spoke of Martinez, the third victim that he had shot, and "lamented that he 'didn't kill that son of a bitch.'" *Umaña*, 750 F.3d at 332.

Police arrested Umaña several days after the shooting. J.A. 1936, J.A. 1938. Umaña was sitting on the couch at Sandoval's home and had stashed his gun — the murder weapon — in the cushions. J.A. 1938–39. After his arrest, Umaña told another gang member that the police had been "lucky" because Umaña had tried to grab his gun when the arrest occurred. J.A. 1468.

**E.      Umaña continues his gang leadership while in prison, orchestrating the intimidation of witnesses and participating in other violent misconduct.**

Umaña continued his violent gang activity from prison and orchestrated a plan to intimidate witnesses to his murder of the Garcia brothers. *Umaña*, 750 F.3d at 332; J.A. 2126–27. While in jail, Umaña sent a message to Misterio, the MS-13 gang member who took over Umaña's role in Charlotte, to ensure that

7

nobody would testify against Umaña in court.  J.A. 1470, J.A. 1946–47, J.A. 2126–2127.  Misterio met with a number of other gang members, including Alexander Granados, known as "Gorilon"; Sandoval; and individuals known as "Chicago" and "Peligroso," and determined that the witnesses would "have to be killed" so they "would not appear in court."  J.A. 2126–2127.  Sandoval, Chicago, and Peligroso drove to Las Jarochitas in Greensboro, armed with guns, "to intimidate the owners so [they] wo[uld]n't testify."  J.A. 1495, J.A. 2128–29, J.A. 2184–86, J.A. 2193–96.  Sandoval walked into the restaurant and told the owner, "I know your children are going to testify."  J.A. 2160–61, J.A. 2186.  Sandoval left after learning that restaurant had a new owner.  J.A. 2163–64.

Umaña and his cohorts also sought to kill or injure witnesses who were fellow gang members.  MS-13 members suspected Rony Lopez, who had driven Umaña back to Charlotte after he murdered the Garcia brothers, of cooperating with police.  J.A. 1468–69, J.A. 2119–20.  The gang put a "green light" on Lopez.  J.A. 2120.  "When there's a green light, that person has to be killed."  J.A. 2120.  And MS-13 members unsuccessfully sought to "take Rony out."  J.A. 1469.  Among the several people to whom Umaña bragged about his murders in Las Jarochitas was Mariachi, also known as Juan Vela Garcia.  J.A. 1407, J.A. 1422, J.A. 1464–65.  Umaña personally directed that Juan Vela Garcia "get a green light put on him, too."  Exh. 2, at 2[2]; *see also* J.A. 1497.

---

[2]  Exhibit 2 refers to Exhibit 2 to the United States' March 23, 2017, response to Umaña's first motion for discovery.  (Doc. No. 50-11, 3:16CV57).  It

**F.** **After Umaña is indicted, his defense team conducts an extensive pretrial investigation, endeavors to have this Court declare him ineligible for the death penalty, and seeks to limit the evidence introduced against him.**

**1.** **Umaña is indicted and charged with nine federal crimes, including four arising out of his murders of Ruben and Manuel.**

A federal grand jury indicted Umaña and a host of other MS-13 members. J.A. 318–319. The indictment charged Umaña with five non-capital offenses related to his participation in that gang. J.A. 318–423.[3] Count one charged Umaña, along with 25 other members of MS-13, with conspiracy to participate in the conduct of the affairs of an enterprise through a pattern of racketeering activity, 18 U.S.C. § 1962(d). J.A. 318–42. Count twenty-seven charged Umaña with possession of a firearm by an alien illegally in the United States, 18 U.S.C. § 922(g)(5). J.A. 369. Count twenty-eight charged Umaña and cohorts with attempted and substantive robbery under the Hobbs Act, 18 U.S.C. § 1951, arising out of their robbery of Gordo on December 8, 2007. J.A. 370. Count sixty-one charged Umaña and several cohorts with conspiracy to tamper with witnesses in June of 2008, 18 U.S.C. § 1512(b)(1). J.A. 405–407. And count sixty-three charged Umaña and his cohorts with the substantive offense of witness tampering, 18 U.S.C. § 1512(b)(1). J.A. 409.

consists of a selection of exhibits admitted during Umaña's trial.

[3] Beyond these five counts, the grand jury charged two additional non-capital counts, count 58 and 62, which the Court later dismissed or granted judgment of acquittal on. J.A. 2317, J.A. 2370–71.

9

The grand jury charged Umaña with four offenses related to his murders of Ruben and Manuel Garcia. Counts twenty-two and twenty-four charged Umaña with murdering Ruben and Manuel, respectively, for the purpose of maintaining or increasing Umaña's position in an enterprise — MS-13 — engaged in racketeering activity, 18 U.S.C. § 1959(a)(1). J.A. 364, J.A. 366. Counts twenty-three and twenty-five charged Umaña with use of a weapon during or in relation to a crime of violence — the racketeering conspiracy and murder — resulting in the murder of Ruben and Manuel, respectively, 18 U.S.C. § 924(c), (j)(1). J.A. 365, J.A. 367.

The maximum penalty for each of Umaña's four murder-related offenses was death. 18 U.S.C. § 1959(a)(1). "[O]nly two penalties" are authorized "for the crime of murder in aid of racketeering," charged in counts twenty-two and twenty four. *United States v. Under Seal*, 819 F.3d 715, 720 (4th Cir. 2016). The statutorily authorized penalties for that crime were "death or life imprisonment." *Id.*; 18 U.S.C. § 1959(a)(1); J.A. 3375. The penalties for use of a weapon resulting in murder during or in relation to a crime of violence, as charged in counts twenty-three and twenty-five, include death, life imprisonment, or "any term of years." 18 U.S.C. § 924(j)(1). The United States sought the death penalty on these four charges, and this Court severed Umaña's trial from that of his MS-13 cohorts. J.A. 73.

10

## 2. This Court appoints two experienced attorneys, who represent Umaña zealously.

In October of 2008, this Court appointed two experienced attorneys, Mark Foster and John Bryson, to represent Umaña. J.A. 72. The United States provided discovery to Umaña's attorneys under a "limited open file policy." J.A. 238. As of June 2009, the United States had produced more than 40,000 pages of reports and statements and approximately 400 hours of recorded conversations. J.A. 312; *Amended 2255 Mot.* 351. Although they received ample discovery, Umaña's attorneys were not shy about asking the United States for more when they believed they might be entitled to it. *See, e.g.*, App'x 49 to *2016 2255 Mot.* (Doc. No. 22-11, 3:16-CV-57).

The record, of course, discloses only a fraction of the work that Umaña's defense team did for him. What it does reveal reflects a thorough investigation and zealous advocacy. Members of the defense team traveled to El Salvador, for example, at least five times. J.A. 3085–87, J.A. 3119, J.A. 3902. They interviewed family members, school administrators, employers, and people who knew Umaña in his youth. J.A. 3085–87, J.A. 3119, J.A. 3902. And Umaña was evaluated by numerous defense experts, who, among other things, conducted psychological evaluations, administered a positron-emission-tomography ("PET") scan, comprehensively evaluated Umaña's brain function, tested his intelligence, and performed a physical neurological evaluation. J.A. 662, J.A. 673–74, J.A. 783, J.A. 788, J.A. 3902, J.A. 3931, J.A. 3988–89, J.A. 3990. The defense team

11

included Richard McGough, a mitigation specialist fluent in Spanish who had prior experience with Salvadorian nationals charged in capital cases in the United States.  J.A. 3082–83.  He and other members of the defense team, of course, interviewed Umaña himself "on many occasions."  J.A. 3084.

Counsel zealously sought to protect Umaña from damning evidence in advance of trial.  Counsel, for example, vigorously challenged the admission of Umaña's confession of participating in three murders in Los Angeles, moved to strike the nonstatutory aggravating factors related to these murders, and challenged the reliability of other evidence about those events.  J.A. 177, J.A. 189, J.A. 193, J.A. 1138.  Although these efforts were largely unsuccessful, Umaña's attorneys succeeded in precluding the jury from hearing evidence that Umaña and his cohorts had decapitated an individual in El Salvador for attempting to leave MS-13.  J.A. 3227.  Counsel also secured the dismissal of two counts against Umaña.  J.A. 2317, J.A. 2370.

### 3. This Court finds that Umaña is not mentally retarded or intellectually disabled.

In September of 2009, Umaña's attorneys moved for a "pretrial hearing to determine whether [Umaña] is mentally retarded and thus ineligible for the death penalty."  J.A. 512 (citing *Atkins v. Virginia*, 536 U.S. 304, 321 (2002)).  As this Court explained, "the Eighth Amendment prohibits imposing the death penalty on mentally retarded persons."  J.A. 1000 (citing *Atkins*, 536 U.S. at 321).  After hearing evidence from both parties, this Court denied Umaña's request to

declare him ineligible for the death penalty on grounds of mental retardation. J.A. 1016. After Umaña's trial, the Supreme Court and Congress adopted the term "intellectual disability." *Hall v. Florida*, 572 U.S. 701, 705 (2014). "[M]ental retardation" and "intellectual disability" are different terms for an "identical phenomenon." *Id.*

### G. This Court presides over a three-phase trial.

This Court "divided the trial" of Umaña "into three phases." *Umaña*, 750 F.3d at 333. The first phase required the jury to "determine guilt or innocence." *Id.* The second phase required the jury to "determine Umaña's eligibility for the death penalty." *Id.* And, after the jury found Umaña "death eligible," it was asked during the third phase "to select between the death penalty and life imprisonment without the possibility of release." *Id.*

#### 1. The jury finds Umaña guilty on all counts submitted to it.

During the four-day guilt phase of the trial, the jury heard from a host of witnesses, including other MS-13 members, who described the gang's criminal activities, Umaña's participation, and Umaña's efforts to lead Charlotte's MS-13 members in violent crime. *See, e.g.*, J.A. 1362–65, J.A. 1365–68, J.A. 1444–46, J.A. 1459–65, J.A. 1470–1472, J.A. 1856, J.A. 1863–1877, J.A. 1882–1886, J.A. 1889–92, J.A. 1896–97, J.A. 1904–05, J.A. 1912–1918, J.A. 1928, J.A. 1931–36, J.A. 2105–2112, J.A. 2114. Rony Lopez and Juan Ruben Vela Garcia described meetings in which Umaña inspected weapons and told other MS-13 members how to conduct gang business. J.A. 1444–1447, J.A. 1890–92, J.A. 1904–1905,

13

J.A. 1912–1917.  Gorilon, also known as Alexander Granados, described meeting Umaña on several occasions with other gang members and Umaña's "identify[ing] himself as an MS 13 member."  J.A. 2112–2117.  The jury heard recordings Rony Lopez had made of gang meetings in which Umaña participated and gang conversations with him.  J.A. 1913–1918, J.A. 1925–1928.

When Rony Lopez identified Umaña to the jury, Umaña "flashed signs at the witness."  J.A.  1897–1898.  In Spanish, Umaña said, "[Y]our family's going to pay, mother —."  J.A. 2936.  Lopez testified during the guilt phase that the signs Umaña flashed were "MS signs."  J.A. 1897.

Agent Jose Romero of Immigration and Customs Enforcement testified that Umaña "admitted to being illegally in the country."  J.A. 2099.  Agent Romero explained that Umaña "claimed he was a citizen of El Salvador."  J.A. 2099.  And the agent confirmed that Umaña has "no legal status" in the United States.  J.A. 2099.

Mariachi and Rony Lopez both testified about the plan to rob Gordo at El Vaquero.  J.A. 1454–1456, J.A. 1458, J.A. 1921–1924.  Rony Lopez testified that he saw Umaña and other MS-13 members confront and search Gordo without finding anything.  J.A. 1935–1936.

Abel Santos described seeing Umaña murder Ruben and Manuel in Las Jarochitas.  *See, e.g.*, J.A. 1615–39.  Marco Mejia also saw the shooting and described it for the jury.  J.A. 1651–1663.  The jury heard from MS-13 members who described Umaña's admissions that he committed the murders and that he

14

did so for his fellow gang members.  *See, e.g.*, J.A. 1459–65, J.A. 1928–1939, J.A. 2115–2116.  And the jury heard Umaña brag about the murders in recorded conversations.  J.A. 1932–1934.

The jury heard about the message Umaña sent from jail to Misterio to ensure that nobody would be "speaking out" against him in "court."  J.A. 2126–27.  Granados, who was present at the meeting in which Misterio relayed the message he received from Umaña described it and the plan to kill the witnesses.  J.A. 2126–2127.  The jury heard about the trip MS-13 members took to Greensboro "to intimidate the owners" of Las Jarochitas "so [they] wo[uld]n't testify."  J.A. 1495, J.A. 2128–29, J.A. 2160–61, J.A. 2184–86, J.A. 2193–96.  And the jury heard about and saw some of Umaña's written work from jail, orchestrating efforts to kill or injure witnesses.  *See, e.g.*, J.A. 1804–40.

Umaña did not present any evidence during the guilt phase.  J.A. 2375.  During closing argument, Umaña's attorney told the jury it was "only going to talk about the murder" counts.  J.A. 2420.  He urged the jury not to credit the testimony of the eyewitness to Umaña's shooting of Ruben and Manuel.  J.A. 2421–22.  And he argued that the murders were not federal crimes because they were "a purely spontaneous act that had nothing to do with MS 13."  J.A. 2444.

The jury returned a verdict of guilty on all nine of the counts submitted to it.  J.A. 2552.  During the second phase of the trial, the jury returned a verdict finding Umaña eligible for the death penalty on all four counts arising out of his murders of Ruben and Manuel.  J.A. 2607–08, J.A. 2621–22, J.A. 2624–25.

15

### 2.    The jury sentences Umaña to death.

During the third phase of the trial, the only question before the jury was whether Umaña's sentence on counts twenty-two, twenty-three, twenty-four, and twenty-five should be "death" or "life imprisonment without the possibility of release."  J.A. 3375–3337, J.A. 3396.  The applicable statute authorized only those penalties for counts twenty-two and twenty-four.  J.A. 3375.  For the other two counts, the Federal Death Penalty Act ordinarily authorizes capital sentencing juries to recommend one of three sentencing options, "death," "life imprisonment without possibility of release," or "some other lesser sentence."  18 U.S.C. § 3593(e).  A recommendation of death or life imprisonment binds the court.  18 U.S.C. § 3594.  "Otherwise," the Act directs the court to "impose any lesser sentence that is authorized by law," including life imprisonment without the possibility of release.  *Id.*  Umaña, however, elected to have the court instruct the jury that the "only" two options were "death or life without the possibility of parole," on all four counts.  J.A. 3376–77.  The United States did not object to Umaña's election, J.A. 3377, and the court instructed the jury accordingly, J.A. 3396.

The jury heard extensive evidence of aggravating circumstances and a mitigation case by defense counsel during the multi-day penalty phase.  That penalty trial is summarized in the United States' *March 2017 Response to Umaña's Motion for Leave to Conduct Discovery* (Doc. No. 52, 3:16-CV-57) (hereinafter "*Mar. 2017 Response*"), at 16–33, and its *March 2023 Motion to*

16

*Dismiss* (Doc. No. 143, 3:16-CV-57) (hereinafter *Mar. 2023 Mot. to Dismiss*), at 13–31. Umaña's attorneys argued to the jury that the "right decision in this case" was "to impose a life sentence." J.A. 3419.

The jury sentenced Umaña to death on each of his death eligible convictions. J.A. 3543–49, J.A. 3552–58, J.A. 3561–67, J.A. 3570–76. The jury had deliberated for seven-and-one-half hours. J.A. 3499, J.A. 3526.

## H.    The Fourth Circuit affirms Umaña's conviction and death sentence.

On appeal, Umaña was represented by Zandra Lopez and her team at the Federal Defenders of San Diego, Inc. *Br. of Appellant*, *United States v. Umaña*, No. 10-6, (4th Cir. Sept. 3, 2013) (Doc. No. 99), at 1, 151. His nearly 35,000-word brief raised a host of arguments challenging his "capital convictions and the death sentence." *Id.* at 151.

The Court of Appeals for the Fourth Circuit affirmed Umaña's convictions and sentence. *Umaña*, 750 F.3d at 360. The court "carefully considered each of his arguments." *Id.* at 359. It reviewed the record. *Id.* And the court concluded that "Umaña had a fair trial and that the death penalty was justified by the jury's factual findings and by law and was not imposed under the improper influence of passion, prejudice, or any other arbitrary factor." *Id.* The United States Supreme Court denied Umaña's petition for a writ of certiorari on June 22, 2015. *Umaña v. United States*, 135 S. Ct. 2856 (2015).

17

## I.     Umaña moves to vacate his sentence under 28 U.S.C. § 2255.

On June 22, 2016, represented by Zandra Lopez and her team, Umaña filed a 418-page motion under 28 U.S.C. § 2255 to vacate his convictions and death sentence, containing 30 "claims." *2016 2255 Mot.* (Doc. No. 22).  At Umaña's request, this Court allowed Umaña to litigate a motion for discovery before ordering the United States to respond to the 2255 motion itself, *Sept. 6, 2016, Order* (Doc. No. 30, 3:16CV57), but explained that Umaña would not be entitled to discovery on claims that fail as a matter of law.  *Jan 26, 2017, Order* (Doc. No. 47, 3:16CV57), at 3 (citing *Thomas v. Taylor*, 170 F.3d 466, 474 (4th Cir. 1999)).  Within the 45-day period this Court established in a scheduling order, Umaña moved for leave to seek discovery in support of many of his claims. *Mar. 2022 Order Denying Leave for Discovery* (Doc. No. 108, 3:16CV57) (hereinafter "*Mar. 2022 Order*"), at 1.  His motion reflected what this Court described as a "kitchen-sink approach to seeking discovery" and the "perfect example of an improper fishing expedition."  *Id.* at 53.  The United States filed a response, arguing, among other things, that many of Umaña's claims failed as a matter of law.  *Mar. 2017 Response.*  This Court denied Umaña's discovery motion in a detailed order analyzing Umaña's claims and requests.  *Mar. 2022 Order.*  It found that Umaña was not entitled to discovery for numerous reasons, including that the facts alleged in support of many of his 2255 claims were insufficient as a matter of law.  *See e.g., id.* at 5, 9, 11, 13, 15, 17–18, 22–23, 26–27, 33–35.

18

Umaña moved four times for leave to amend his 2255 motion, and this Court granted three of the four motions. *October 11, 2022, Order* (Doc. No. 131, 3:16CV57) (hereinafter "*Oct. 2022 Order*"), at 3, 55. This Court allowed multiple amendments to claim 22 of Umaña's original 2255 motion. *Id.* And it allowed Umaña to amend his motion to include an additional claim, which he proffered as "claim 59." *Id.*

The motion for leave to amend that this Court denied was filed by Zandra Lopez and her team in February of 2018. *Feb. 2018 Proposed Amended 2255 Mot.*, *Umaña*, 3:16-CV-57 (W.D.N.C. Feb. 22, 2018) (Doc. No. 69) (hereinafter "*Feb. 2018 Proposed 2255 Mot.*") The motion sought to add 28 new claims and 221 pages. *Id.* Among many other things, the proposed amendment Lopez filed accused Lopez and her team of providing Umaña ineffective assistance of counsel on appeal. *Id.* at 205–207. The United States opposed the motion, arguing that Umaña's February 2018 claims were untimely and otherwise failed as a matter of law. *U.S. Response to Feb. 2018 Mot. for Leave to Amend* (Doc. No. 77, 3:16-CV-57) (hereinafter "*Feb. 2018 Response*"), at 1–59. And this Court denied Umaña's motion, finding that amendment would be futile. *Oct. 2022 Order* 55. Umaña's claim of ineffective assistance of appellate counsel was untimely by about 20 months, and this Court held that it did not relate back to any claims in Umaña's initial motion and that Umaña was not entitled to equitable tolling. *Id.* at 51–53. This Court also considered Umaña's allegations on the merits and concluded that they failed as a matter of law. *Id.* at 52–53.

19

This Court ordered the United States to respond to Umaña's 2016 2255 motion, and the United States moved to dismiss it.  *Mot. to Dismiss* (Doc. No. 143).  It argued that Umaña's 2255 motion "did not allege cognizable facts that, if proved, would entitle him to relief on any of his claims."  *Id.* at 7.

Twenty-one days after the United States moved to dismiss, Umaña filed, on March 23, 2023, a 592-page "Amended Motion" under § 2255, claiming the right to do so "as a matter of course" under Federal Rule of Criminal Procedure 15(a).  *Amended Mot.* (Doc. No. 146, 3:16-cv-0057).  The amended motion represents that the "31 claims" it contains "are the same 30 Claims that were included in the *Initial 2255 Motion* and Supplemental Claim 59, except where such claims have been supplemented with allegations of ineffective assistance of appellate counsel."  *Amended Mot. 3.*  "Umaña's Initial 2255 Motion and Supplemental Claim 59," the amended motion says, "alleged both his grounds for relief and the factual bases supporting those grounds (except for the claims of ineffective assistance of appellate counsel, as described above), as required by Rule 2 of the Rules Governing Section 2255 Cases in the United States District Courts."  *Id.* at 4.  "Mr. Umaña brings this amendment," he told this Court, "solely to proffer to this Court additional evidence (in the form of witness affidavits, expert reports, and other materials) in support of the allegations he previously pled."  *Id.* at 4.

About a year after he filed his amended 2255 motion, Umaña successfully petitioned President Biden to commute his death sentences to life imprisonment.

20

On December 27, 2024, President Biden commuted "the sentences of death imposed" on Umaña to "life imprisonment without the possibility of parole." *Executive Grant of Clemency* 2, *United States v. Ayala*, No. 3:08-CR-134 (W.D.N.C. Dec. 27, 2024) (Doc. No. 1803).

In January of 2025, this Court ordered the United States to respond to Umaña's amended 2255 motion. *Jan. 6, 2025 Order* (Doc. No. 179, 3:16CV57). The United States has filed the motion to dismiss currently before this Court, consistently with the applicable rules. *See* R. Governing § 2255 Proceedings 4 & advisory committee's note (noting that "the response to a Section 2255 motion may be a motion to dismiss").

## II.    DISCUSSION

This Court should dismiss or deny Umaña's amended 2255 motion, because the claims that it presents fail as a matter of law. "A criminal trial is the 'main event' at which a defendant's rights are to be determined." *McFarland v. Scott*, 512 U.S. 849, 859 (1994). And Umaña stands duly convicted after a trial and an appeal that found it to be "fair." *Umaña*, 750 F.3d at 360. Because they follow the "main event" and seek "an extraordinary remedy that should not be employed to relitigate trials," "habeas corpus petitions must meet heightened pleading requirements." *McFarland v. Scott*, 512 U.S. 849, 856 (1994) (cleaned up); *Folkes v. Nelsen*, 34 F.4th 258, 267 (4th Cir. 2022). A motion under section 2255 must, among other things, "specify all the grounds for relief available to the moving party." R. Governing § 2255 Proceedings 2(b)(2). And it must "state the

21

facts supporting each ground."  R. Governing § 2255 Proceedings 2(b)(1).

A 2255 motion "can be dismissed without a hearing" if "the petitioner's allegations, accepted as true, would not entitle the petitioner to relief." *Engelen v. United States*, 68 F.3d 238, 240 (8th Cir. 1995); *Hill v. Ozmint*, 339 F.3d 187, 201 (4th Cir. 2003) (affirming dismissal of habeas petition without a hearing where movant failed to allege "facts that, if true, *would* entitle him to relief"). This Court need not accept every kind of allegation contained in a 2255 motion. *Engelen*, 68 F.3d at 240.  It "need not assume the credibility of factual assertions, as it would in civil cases," for example, "where the assertions are contradicted by the record in the underlying proceeding." *Puglisi v. United States*, 586 F.3d 209, 214 (2d Cir. 2009); *Schriro v. Landrigan*, 550 U.S. 464, 474 (2007) ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."); *Raines v. United States*, 423 F.2d 526, 531 (4th Cir. 1970).  "Speculative allegations" are also insufficient.  *Walton v. Johnson*, 440 F.3d 160, 178 (4th Cir. 2006).  A 2255 motion "must contain assertions of fact that a petitioner is in a position to establish by competent evidence.  Airy generalities, conclusory assertions and hearsay statements will not suffice." *Haouari v. United States*, 510 F.3d 350, 354 (2d Cir. 2007) (ellipses omitted) (quoting *United States v. Aiello*, 814 F.2d 109, 113 (2d Cir. 1987)); *accord United States v. Roane*, 378 F.3d 382, 400–01 (4th Cir. 2004).

The cognizable allegations entitling Umaña to relief must appear in the

2255 motion itself. R. Governing § 2255 Proceedings 2(b)(2); *Schriro*, 550 U.S. at 474 (holding that the focus is on the "*petition*'s factual allegations, which, if true, would entitle the applicant to federal habeas relief"); *Tyler v. Mitchell*, 416 F.3d 500, 504 (6th Cir. 2005); *Ramsey v. United States Parole Comm'n*, 840 F.3d 853, 863 (D.C. Cir. 2016). Allegations presented in a reply or elsewhere do not count, *Mitchell*, 416 F.3d at 504; *Ramsey*, 840 F.3d at 863, particularly since the statute of limitations ran years ago and this Court has already resolved multiple motions for leave to amend. Nor can Umaña use an evidentiary hearing or discovery to fish for additional facts that do not appear in his amended 2255 motion. *Cf. Amended Mot.* 266 n.74, 369, 390, 440. "[A]n evidentiary hearing is an instrument to test the truth of facts already alleged in the habeas petition." *Jones v. Polk*, 401 F.3d 257, 268 (4th Cir. 2005). And Umaña has already litigated the propriety of discovery. *Mar. 2022 Order* 2. In any event, he is not entitled to discovery for claims that fail as a matter of law. *Id.* (citing *United States v. Roane*, 378 F.3d 382, 403 (4th Cir. 2004), and *Thomas v. Taylor*, 170 F.3d 466, 474–75 (4th Cir. 1999)).

Simply put, claims that the cognizable allegations in Umaña's motion would not establish if proved or that otherwise fail as a matter of law are subject to dismissal. *United States v. Jackson*, 32 F.4th 278, 283, 287 (4th Cir. 2022); *Ozmint*, 339 F.3d at 201 (4th Cir. 2003); *Thomas v. Taylor*, 170 F.3d 466, 474–75 (4th Cir. 1999). That principle calls for this Court to dismiss Umaña's amended 2255 motion in its entirety.

23

The 31 claims in Umaña's amended 2255 motion fall into five categories. First, Umaña asserts seventeen claims of ineffective assistance of trial counsel.[4] Second, Umaña asserts a claim that the United States unconstitutionally suppressed evidence in violation of its *Brady* obligation. Third, Umaña asserts two claims based on the alleged "cumulative effect" of his allegations of ineffective assistance of counsel and *Brady* violations. Fourth, Umaña asserts eleven claims alleging violations of his rights under the Constitution and the Vienna convention, claims that have several features in common. Finally, Umaña has alleged claims of ineffective assistance of appellate counsel, scattering them throughout his amended motion. This discussion addresses several principles applicable to Umaña's claims before addressing these five categories in turn.

## A.   Several principles are dispositive of Umaña's claims.

Beyond the pleading standards applicable to 2255 motions, several principles require dismissal of one or more of Umaña's claims. President Biden's commutation order renders most of Umaña's claims moot. This Court has already held many of them to fail as a matter of law. And to the extent his amended motion alleges transactions or occurrences that Umaña did not include in his original motion or timely, prior amendments made with this Court's leave,

---

[4] Several of Umaña's claims that fall into other categories assert ineffective-assistance-of-trial-counsel theories alongside other theories. Those claims, including their ineffective-assistance components, are addressed in their respective sections.

his claims are untimely.

### 1. Most of Umaña's claims are moot, because they challenge death sentences to which Umaña is no longer subject.

First, the commutation of Umaña's death sentences renders Umaña's 2255 motion moot to the extent he collaterally attacks those sentences. *Blount v. Clarke*, 890 F.3d 456, 462 (4th Cir. 2018); *United States v. Surratt*, 855 F.3d 218, 219 (4th Cir. 2017) (en banc); *United States v. Temoney*, No. 24-4046, 2025 WL 1767995, at *1 (4th Cir. June 26, 2025) (unpublished decision). Umaña "is no longer serving a judicially imposed sentence" on the capital counts, "but a presidentially commuted one." *Surratt*, 855 F.3d at 219 (Wilkinson J., concurring); *Executive Grant of Clemency* 2. "Absent some constitutional infirmity in the commutation order," which Umaña has not alleged, this Court "may not readjust or rescind what the President, in the exercise of his pardon power, has done." *Surratt*, 855 F.3d at 219 (Wilkinson J., concurring). Challenges to the death sentences "no longer present a live dispute, since Umaña is no longer subject to a sentence of [death] but [is] instead serving a substantially reduced sentence that was the product of the" former President's "act of executive clemency." *Blount*, 890 F.3d at 462.

The clemency order is dispositive of the bulk of Umaña's amended motion. Claims 1, 3, 4, 5, 6, 9, 10, 12, 13, 14, 19, 23, 24, 25, and 28 are moot in their entirety. *See* §§ II.B.1, 5, 6, 10; II.C; & II.E.3, *infra*. And Claims 2, 7, 8, 11, 16, 26, 27, 29, 30, and Umaña's theories of ineffective assistance of appellate counsel

25

are moot in large part.  *See* §§ II.B.2, 3, 4, 7; II.D; II.E.4, 9; II.F.  This Court

"lack[s] the authority to grant [Umaña] 'any effectual relief whatever,'" on

Umaña's claims challenging the death sentences to which he is no longer subject.

*Blount*, 890 F.3d at 462. (quoting *Chafin v. Chafin*, 568 U.S. 165, 172 (2013)).

These claims should, therefore, be "dismissed as moot."  *Id.*

> **2.      This Court has already held that many of Umaña's claims fail as a matter of law.**

Second, this Court has already held that many of Umaña's claims fail as a

matter of law.  In its *March 2022 Order* denying Umaña's request for discovery,

this Court held that Umaña failed to allege facts that, if proved, would entitle

him to relief on a number of claims in whole or in part, including claims 1–7, 11,

13–15, 17, 18, 21, 23, and 25.  This Court should dismiss those claims for the

reasons stated in this Court's *March 2022 Order* and the United States' *March

2017 Discovery Response*.  The United States' *March 2023 Motion to Dismiss*,

moreover, explains why those claims not fully addressed by this Court's order

also fail as a matter of law.  *Mar. 2023 Mot. to Dismiss* (Doc. No. 143, 3:16CV57),

at 35–138.

Although the *March 2022 Order* and the United States' earlier motion to

dismiss address the 30 claims in Umaña's initial 2255 motion, supplemented

with claim 59, they apply with equal force to the claims in Umaña's amended

2255 motion.  The amended motion represents that its claims "are the same 30

Claims that were included in the *Initial 2255 Motion* and Supplemental Claim

59." *Amended Mot. 3.* The only "except[ion]" is Umaña's "allegations of ineffective assistance of counsel," which this motion to dismiss addresses separately. *See* § II.F, *infra.*

Umaña represents that his amendment is "solely to proffer to this Court additional *evidence* (in the form of witness affidavits, expert reports, and other materials) in support of the allegations he previously pled." *Id.* at 4. (emphasis added). Because the factual allegations "previously pled" would not entitle Umaña to relief for the reasons stated in this Court's order and the United States' earlier motion to dismiss, even if proved, dismissal of those claims remains appropriate, regardless of what "evidence" exists to support them. *cf. id.*; *Hill v. Ozmint*, 339 F.3d 187, 201 (4th Cir. 2003).[5]

Simply put, this Court has already considered and rejected many of the issues Umaña's amended 2255 motion seeks to present. It has done so properly. And "[w]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *United States v. Lentz*, 524 F.3d 501, 528 (4th Cir. 2008) (discussing the "law of the case doctrine"). Nothing in Umaña's amended motion calls for conclusions different

---

[5] In briefs, Umana has criticized the United States for pointing out his representations about the limited nature of his amended 2255 motion. *See U.S. Reply ISO Stay Request* (Doc. No. 155, 3:16CV57), at 9–10. Umana cannot, however, repudiate the contents of his amended 2255 motion in a brief. *See S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013) ("It is well established that parties cannot amend their complaints through briefing or oral advocacy.").

27

from those this Court has already reached rejecting Umaña's claims.[6]

### 3.    To the extent Umaña's amended motion presents new grounds for relief, they are untimely.

Third, to the extent Umaña's amended motion presents new grounds for relief, they are untimely. Umaña was required to file his 2255 motion within the "1–year period of limitation" that ended on June 22, 2016, the day that he filed his original, 410-page motion. 28 U.S.C. § 2255(f)(1); *Umaña v. United States*, 135 S. Ct. 2856 (June 22, 2015) (denying certiorari); *Clay v. United States*, 537 U.S. 522, 527 (2003). Because Umaña filed his amended 2255 motion more than six-and-a-half years later, it is untimely except insofar as it "relates back" to the original 2255 motion, to the extent that motion was earlier timely amended with this Court's leave. *Mayle v. Felix*, 545 U.S. 644, 654, 661 (2005); *United States v. Pittman*, 290 F.3d 314, 317 (4th Cir. 2000).

The relation-back doctrine extends only to amended claims that arise out of the same "conduct, transaction, or occurrence" and share a "common core of

---

[6] If this Court were to consider new material that appears in Umana's March 2023 amended motion as facts pleaded in support of his claims, this Court's *October 2022 Order* would call for dismissal of much of it. Umana's amended motion repeats allegations from the February 2018 proposed amendment that this Court's *October 2022 Order* denied him leave to file, *see, e.g.*, *Amended Mot.* 288 n.81, 328–336, 348–349. *See U.S. Mot. to hold Mar. 23 Filing in Abeyance* (Doc. No. 152, 3:16-CV-57), at 2–5; *see, e.g.*, *Amended Mot.* 288 n.81, 328–336, 348–349. Claims and allegations from the February 2018 proposed amendment that appear in Umana's 2023 amended motion warrant dismissal for the reasons described in this Court's *October 2022 Order* and the United States' response to Umana's February 2018 motion for leave to amend (Doc. No. 77, 3:17-CV-57).

28

operative facts" with claims properly set out in the original motion. *Felix*, 545 U.S. at 646. The doctrine applies, for example, to amended claims that represent a "slightly *more* specific iteration" of original claims previously set out with specificity. *Hill v. Mitchell*, 842 F.3d 910, 923 (6th Cir. 2016) (emphasis in original) (citing *Woodward v. Williams*, 263 F.3d 1135, 1142 (10th Cir. 2001)). Courts have also held the doctrine to permit amendments that "clarified or amplified a claim" arising out of the same set of facts alleged in the original motion. *Id.* The relation-back doctrine applied, for example, "where the original petition challenged the trial court's admission of recanted statements" and "the amended petition challenged the court's refusal to allow the defendant to show" that the *same* statements "had been recanted." *Id.* (quoting *Mayle*, 545 U.S. at 664 n.7). Claims that are "completely new," in contrast, "cannot relate back" to an original pleading. *Pittman*, 209 F.3d at 318.

"An amended habeas petition" does not benefit from the relation-back doctrine to the extent that "it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Felix*, 545 U.S. at 650. The operative facts for an "ineffective assistance" claim, for example, include the specific "acts or omissions of counsel" that are allegedly deficient. *Strickland v. Washington*, 466 U.S. 668, 690 (1984). So an amended claim alleging an attorney's "failure to effectively cross-examine" witnesses does not relate back to a claim that the attorney failed "to object to the admission of evidence." *United States v. Hernandez*, 436 F.3d 851, 853–54, 858 (8th Cir. 2006);

29

*see also Turner v. United States*, 699 F.3d 578, 584 (1st Cir. 2012); *United States v. Ciampi*, 419 F.3d 20, 24 (1st Cir. 2005) (explaining that an amended claim alleging *attorney* malfeasance does not relate back to a claim alleging an error by the *court*). Nor does a claim that an attorney inadequately cross-examined one witness relate back to a claim that the attorney inadequately cross-examined a different witness. *Mandacina v. United States*, 328 F.3d 995, 1003 (8th Cir. 2003) (cited with approval in *Felix*, 545 U.S. at 664 n.7).

Umaña's amended motion asserts that it satisfies the "relation back" doctrine because "[t]he 31 Claims in this *Amended 2255 Motion* are the same 30 Claims that were included in the *Initial 2255 Motion* and Supplemental Claim 59," with the exception of his new allegations of "ineffective assistance of appellate counsel." *Amended Mot.* 3. If this Court accepts that representation as true, those claims should be dismissed for the reasons stated in this Court's prior order and the United States' prior motion to dismiss. *See* § II.A.2., *supra*. Umaña's allegations of ineffective assistance of appellate counsel, on the other hand, do not relate back, *see* § II.F, *infra*, nor does his amended motion to the extent its claims are not "the same," *Amended Mot.* 3, and allege new conduct, transactions, or occurrences. This Court should dismiss these new allegations as untimely.

B. **This Court should dismiss Umaña's ineffective-assistance-of-counsel claims.**

This Court should dismiss claims 1–3, 5, 8–11, 13–14, 16–19, 23–24, and

27, which allege ineffective assistance of Umaña's trial counsel, because they fail as a matter of law.  To establish ineffective assistance of counsel, Umaña has the burden to prove that the performance of his attorneys fell below an objective standard of reasonableness, judged "from counsel's perspective at the time." *Strickland v. Washington*, 466 U.S. 668, 689 (1984).  He must also establish prejudice in the form of "a reasonable probability" that, "but for counsel's errors," he "would not have been convicted."  *United States v. Luck*, 611 F.3d 183, 186 (4th Cir. 2010).

The *Strickland* standard that Umaña must meet to demonstrate constitutionally deficient performance by his attorneys is well established.  Six attributes are particularly relevant to Umaña's allegations.

First, "a convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  *Strickland*, 466 U.S. at 690. "[V]ague and conclusory allegations contained in a § 2255 petition may be disposed of without further investigation by the District Court."  *United States v. Dyess*, 730 F.3d 354, 359 (4th Cir. 2013); *Roane*, 378 F.3d at 400–01; *Rose v. United States*, No. 3:08CV216, 2008 WL 2115133, at *1 (W.D.N.C. May 16, 2008).

Second, the standard focuses not on "what is prudent or appropriate, but only what is constitutionally compelled."  *Burger v. Kemp*, 483 U.S. 776, 794 (1987).  The Supreme Court has emphasized that "the Sixth Amendment does not guarantee the right to perfect counsel."  *Burt v. Titlow*, 571 U.S. 12, 24 (2013).

31

And an attorney may provide assistance that qualifies as effective under the Constitution with conduct that is "far from exemplary." *Id.* at 23–24. It is not enough to establish, for example, that trial counsel "could well have made a more thorough investigation than he did." *Burger*, 483 U.S. at 794. Nor would a showing that conduct "deviated from best practices or most common custom" be enough to establish ineffective assistance. *Harrington v. Richter*, 562 U.S. 86, 105 (2011). Even "a lawyer's violation of ethical norms does not make the lawyer *per se* ineffective." *Titlow*, 571 U.S. at 24. The question the constitutional standard asks "is whether an attorney's representation amounted to incompetence under 'prevailing professional norms.'" *Richter*, 562 U.S. at 105.

Third, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690–91. "There are countless ways to provide effective assistance in any given case." *Id.* And "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690–91. The burden rests with Umaña to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689.

"An ambiguous or silent record is not sufficient" to disprove the presumption that counsel acted reasonably. *Sallahdin v. Mullin*, 380 F.3d 1242, 1252 (10th Cir. 2004) (cleaned up) (quoting *Chandler v. United States*, 218 F.3d

32

1305, 1314 n.15 (11th Cir. 2000) (en banc)).[7] "[B]ecause counsel's conduct is presumed reasonable," for Umaña to "show that the conduct was unreasonable, [he] must establish that no competent counsel would have taken the action that his counsel did take." *Chandler*, 218 F.3d at 1315 (emphasis added); *accord Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2559 (2018); *Premo v. Moore*, 562 U.S. 116, 124 (2011); *Sallahdin*, 380 F.3d at 1253; *Jackson v. United States*, 638 F. Supp. 2d 514, 533 (W.D.N.C. 2009).

Fourth, an attorney is not unreasonable for declining to take steps or introduce evidence that operates as a "doubled edged sword," with potential both to help and hurt the defense case. *Truesdale v. Moore*, 142 F.3d 749, 754 (4th Cir. 1998). The Fourth Circuit instructs that the best course for a court reviewing a theory that counsel failed to introduce additional evidence "is to credit plausible strategic judgments," *id.*, which *Strickland* instructs attorneys are presumed to have made, 466 U.S. at 690.

Fifth, the reasonableness of counsel's performance during Umaña's criminal case is judged "from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689.

---

[7] Umaña filed affidavits signed by his trial attorneys along with his 2255 motion. *Bryson Decl.* (Doc. No. 22-4, 3:16CV57), at 80; *Foster Decl.* (Doc. No. 22-4, 3:16CV57), at 83. The two-page affidavits are notably silent about the vast majority of decisions that trial counsel made. *Id.*

33

Finally, courts evaluating ineffective-assistance-of-counsel claims recognize that "more is not always better," *Chandler*, 218 F.3d at 1318. "Indeed, it can be positively detrimental to a client's chances not to set priorities but rather to scattershot the case by raising every objection at trial." *United States v. Mason*, 774 F.3d 824, 830 (4th Cir. 2014). "Good advocacy requires 'winnowing out' some arguments, witnesses, evidence, and so on, to stress others." *Chandler*, 218 F.3d at 1318; *see also United States v. Terry*, 366 F.3d 312, 318 (4th Cir. 2004).

"[C]ounsel is not obliged to advance every available nonfrivolous argument." *Smith v. Collins*, 977 F.2d 951, 960 (5th Cir. 1992). Nor are attorneys penalized for failing to raise meritless, "novel," or "long-shot contentions." *Mason*, 774 F.3d at 830. An attorney is not constitutionally obligated to assert even a constitutional claim that he is "likely" to win if "defense counsel could . . . reasonably believe[] his client's interest would be best served" by foregoing the matter. *Bucci v. United* States, 662 F.3d 18, 26 (1st Cir. 2011). "The *Strickland* standard for ineffective assistance," moreover, "reflects the reality that lawyers do not enjoy the benefit of endless time, energy or financial resources." *Id.* at 31 (quoting *Rogers v. Zant*, 13 F.3d 384, 387 (11th Cir. 1994)). Competent counsel is entitled "to balance limited resources in accord with effective trial tactics and strategies." *Richter*, 562 U.S. at 107.

Each of Umaña's 17 alleged claims of ineffective assistance of counsel fails as a matter of law. The majority of his claims are moot. And if this Court

34

accepted the cognizable factual allegations in Umaña's motion as true, they would fail to establish the two elements of ineffective assistance of counsel.

      **1.     Umaña's claims 1, 3, 5, 9, 10, 19, and 23, which challenge his attorneys' performance in connection with the death sentences he received, are moot and meritless.**

In the light of President Biden's commutation order, this Court should dismiss Umaña's claims challenging the performance of his attorneys in connection with the death sentences he received. These claims are moot because they challenge death sentences to which Umaña is no longer subject. *Executive Grant of Clemency* 2. This court "lack[s] the authority to grant [Umaña] 'any effectual relief whatever'" on these claims. *Blount*, 890 F.3d at 462. So the court should "dismiss[]" them "as moot." *Blount*, 890 F.3d at 462; *Temoney*, No. 24-4046, 2025 WL 1767995, at *1; § II.A.1, *supra*.

If a live, justiciable controversy continued to exist about the performance of Umaña's counsel related to the penalty he received, Umaña's ineffective assistance of counsel claims would fail on the merits as a matter of law. Whether or not the facts he alleges would establish that the performance of his attorneys was deficient, the record would preclude Umaña from establishing that he suffered prejudice from that performance.

The only question that remained about Umaña's penalty after he was convicted was whether it would be "death" or "life imprisonment." J.A. 3396. Umaña faced a mandatory minimum of life imprisonment on two counts of conviction. And he does not contend that his attorneys were deficient for electing

35

to limit the jury's options to death or life imprisonment on the other two capital counts, J.A. 3375–3337, or for arguing that "the right decision" was "to impose a life sentence," J.A. 3419. To the contrary, he alleges that his attorneys should have done more "to make the case for life." *Amended Mot.* 4–5.

Umaña is now serving the term of life imprisonment that he asked for. *Executive Grant of Clemency* 2. No "reasonable probability" exists that Umaña would have received a more favorable sentence if his attorneys had performed differently. *Strickland* 466 U.S. at 689. Because the record precludes Umaña from establishing prejudice in connection with his attorneys' performance related to his sentence, his claims challenging that performance fail as a matter of law to the extent they are not moot. *See Landrigan*, 550 U.S. at 468–69; *Raines,* 423 F.2d at 531.

The commutation order requires dismissal of Umaña's claims 1, 3, 5, 9, 10, 19, and 23 in their entirety, because they challenge Umaña's death sentences. Claim 1 challenges Umaña's attorneys' investigation and presentation of "mitigation evidence at the penalty phase of his trial." *Amended Mot.* 35–103. Claim 3 challenges his attorneys' efforts to persuade this Court at Umaña's *Atkins* hearing that Umaña "cannot constitutionally be executed," *Amended Mot.* 157–168. Claim 5 challenges the performance of his attorneys related to evidence the United States presented during the penalty phase of Umaña's participation in murders in Los Angeles. *Amended Mot.* 180–242. Claim 9 alleges that Umaña's attorneys were deficient for omitting to introduce "[d]uring the penalty

36

phase" a note Umaña wrote apologizing for attempting to bring a shank into the courtroom and proclaiming himself "a gang member." *Amended Mot.* 321–327. Claim 10 challenges his attorneys' handling of "evidence that Mr. Umaña had committed additional murders in El Salvador" at the "penalty phase." *Amended Mot.* 327–336. Claim 19 alleges that his attorneys should have done more to seek suppression of and rebut evidence of Umaña's April 2008 confession, *Amended Mot.* 423–431, which was introduced during the penalty phase, J.A. 2619, J.A. 2750–2756, J.A. 2781. And claim 23 challenges his attorneys' performance "at the presentation to the Department of Justice in opposition to the authorization of a capital prosecution." *Amended Mot.* 520–523.[8]

The commutation order also requires dismissal of claims 13, 14, and 24, in their entirety. Because this Court might find further discussion of those claims helpful, however, they are addressed separately below. *See* §§ II.B.5, 6, & 10, *infra.*

Finally, the commutation order requires dismissal of claims 2, 8, 11, 16, and 27, in part. *See* §§ II.B.2, 3, 4, 7, and 27, *infra.* Parts of those claims challenge Umaña's now commuted death sentences. *See id.*

---

[8] This Court also properly held that there "is no Sixth amendment right to counsel in connection with the Department of Justice's capital authorization procedure" and that Umaña could assert "no viable § 2255 claim" of ineffective assistance in any event. *Mar. 2022 Order* 47–49.

37

**2. Umaña's claim 2, which alleges ineffective assistance related to the use of Umaña's mental health in mitigation, is mostly moot and entirely meritless.**

The bulk of Umaña's claim 2, which alleges that his attorneys should have done more to present a "compelling mental health case" at the "penalty phase of his trial," *Amended Mot.* 104; *id.* at 103–157, is moot and meritless in the light of the commutation order. Subsections A, B, C, D, and E of that claim challenge counsel's performance in connection with Umaña's "sentencing determination," contending that if his attorneys had performed differently, "there is a reasonable probability that at least one juror would have voted to return a sentence of life imprisonment." *Amended Mot.* 106, 116, 127, 145, 149. The commutation order renders these parts of the claim moot and meritless for the reasons explained in § II.B.1, *supra.*

The remaining part of claim 2 — subsection F — alleges that Umaña's trial attorneys were deficient for omitting to introduce expert mental-health evidence during the "guilt-innocence" phase to "demonstrate that he lacked the *mens rea*" for murder. *Amended Mot.* 155–57. These allegations are not materially different from those that appear in Umaña's original motion, *2016 2255 Mot.* 96–97. This Court rejected Umaña's original claim, holding that Umaña failed to "allege sufficient facts to show that counsel's performance fell below an objective standard of reasonable competence or that had counsel presented additional evidence, it would have altered the outcome." *Mar. 2022 Order* 33.

This Court's rationale for rejecting Umaña's original claim 2 applies with

38

no less force to Umaña's amended claim.  The jury heard evidence that Umaña "stood there for a minute" with his gun pointed at Ruben and Manuel, before Umaña fired five shots, shooting one victim after another.  J.A. 1621 J.A. 1627, J.A. 1630, J.A. 1658–59, J.A. 1677, J.A. 1682–83.  And it heard that Umaña urinated on his hands to remove the gunpowder, admitted murdering the victims and that he "shot another dude," bragged that he did so for his fellow gang members, and made clear that he was fully prepared to shoot a police officer. J.A. 1928, J.A. 1933–1934, J.A. 1464–65.  A reasonable attorney could easily conclude that an expert would not likely convince a jury that Umaña was incapable of forming the *mens rea* needed for murder and instead focus his "limited resources" elsewhere.  *Richter*, 562 U.S. at 107; *Mason*, 774 F.3d at 830. The overwhelming evidence of Umaña's culpable mens rea in the record, moreover, forecloses any reasonable probability that the jury would have acquitted Umaña if it had heard the kind of expert testimony he describes.

### 3. This Court should dismiss Claim 8, which alleges that the performance of Umaña's attorneys was deficient with respect to jail letters introduced during trial.

This Court should dismiss Claim 8, *Amended Mot.* 290–321, which challenges Umaña's attorneys' litigation of letters Umaña wrote "expressing his continuing loyalty to the gang," expressing "hatred of his enemies," and giving "orders to execute rivals and intimidate potential witnesses against him," *Umaña*, 750 F.3d at 332, in jail.  To the extent this claim challenges Umaña's attorney's performance during the "penalty phase," including his attorneys'

39

handling of much of the evidence; the United States' discussion of exhibit 170 during the penalty phase closing argument; and contentions during the penalty phase that letters "contained 'orders' to 'get Chipis,'" *see, e.g.*, *Amended Mot.* 293–294, 305–307, 313–314, the commutation order renders it moot and meritless for the reasons described in § II.B.1, *supra.*

To the extent this claim is not moot, it is meritless as a matter of law because the record and Umaña's motion establish that counsel's performance with respect to jail-letter exhibits was well within the wide range of reasonable professional assistance. Counsel objected to these exhibits on numerous grounds, including "authenticity, relevance, and undue prejudice"; went through letters individually, discussing portions counsel contended were "very unfairly prejudicial"; and obtained an evidentiary hearing at which this Court heard from four witnesses. J.A. 2138, J.A. 2192–93, J.A. 2196–97, J.A. 2204, J.A. 2210–93, J.A. 2510–11, J.A. 2514, J.A. 2866. Counsel also elicited testimony from Susan Conrad, an expert in language in Central American dialect who reviewed more than 300 letters, that Umaña was a "very poor writer" in terms of "punctuation." J.A. 1808, 1841.

This Court heard extensive argument, considered the substance of the letters, admitted some, and excluded others in their entirety in oral and written orders. J.A. 2297–2299, J.A. 2514–2516, J.A. 2860–67, J.A. 2910. "There are countless ways to provide effective assistance in any given case." *Strickland*, 466 U.S. at 689. Umaña cannot establish that his attorneys were constitutionally

40

deficient for responding to the jail-letter evidence the way they did instead of the way Umaña's amended motion suggests.

Umaña's contention that his attorneys were deficient because they omitted to object to Federal Bureau of Investigation language analyst Susan Conrad's expert testimony on the ground that she did not have the qualifications to translate documents, *2255 Mot.* 296–298, 310–312, is untimely. Umaña did not allege this purportedly unconstitutional omission in his original 2255 motion, *2016 2255 Mot.* 210–234; it is "completely new." *Pittman*, 209 F.3d at 318. It does not arise out of the same "conduct, transaction, or occurrence" as any of Umaña's original claims. *Felix*, 545 U.S. at 646. And it does not "relate back" to the original motion. *See* § II.A.3, *supra*; *Hernandez*, 436 F.3d at 853–54, 858; *Mandacina*, 328 F.3d at 1003. Because this claim is untimely by many years, this Court should dismiss it. *See* § II.A.3, *supra*.

If Umaña's claim about his attorney's omission to object to Susan Conrad's testimony were timely, it would be meritless as a matter of law. Susan Conrad was tendered "as an expert in language in the central American dialect." J.A. 1808. She received bachelor's and master's degrees in Spanish and taught Spanish language and linguistics at the university level. J.A. 1804–1806. She had years of experience with the Federal Bureau of Investigation as a contract linguist and language analyst. J.A. 1807. And she had experience in both "[i]nterpreting" and "document translation," including "verbatim and summary document translation," J.A. 1807, which she explained in detail, J.A. 1809–1810.

41

Before testifying about translations, she described the translation process, and she testified that all "translations ha[d] been quality controlled by" the Bureau's "language services section," J.A. 1809–1810.

A reasonable attorney could easily "think" that an objection to Susan Conrad's expert testimony "would have failed." *Premo*, 562 U.S. at 124. That she was not "certified by" or associated with "the American Translators Association" did not disqualify her as an expert. *Cf. Amended Mot.* 297. An expert may be qualified "by knowledge, skill, experience, training, or education," Fed. R. Evid. 702; *United States v. Smith*, 919 F.3d 825, 835 (4th Cir. 2019), and Susan Conrad's testimony established that she had all of the above. She expressly testified that she had experience in "document translation," including "verbatim and summary document translation." J.A. 1807. That she *also* had "experience as an interpreter" does not disqualify her testimony about translations. *Cf. Amended Mot.* 297. And her translations do not violate the "rules for hearsay," *Amended Mot.* 297, because Federal Rule of Evidence 703 "permits a qualified witness to provide an expert translation" even if based on hearsay. 29 Charles Alan Wright et al., *Federal Practice & Procedure* § 6274 & n. 64.50 (2d ed.) A reasonable attorney could have concluded that a successful objection would have been a long shot. *Mason*, 774 F.3d at 830. And a reasonable attorney could also have concluded that if this Court had deemed Susan Conrad unqualified to testify about the translations, the United States would have called another qualified expert, from the Bureau's language-services section, J.A. 1809–1810, or

42

elsewhere.  To the extent counsel omitted to challenge Susan Conrad's testimony or exhibits introduced during that testimony, therefore, counsel's performance was well within the bounds of reasonable professional assistance.

Counsel was also not deficient for declining to seek redactions of the letters this Court admitted over counsel's objection or to exclude portions of those letters.  *Cf. Amended Mot.* 298–305.  This Court enjoys "wide discretion" over the admission of evidence.  *United States v. Tsarnaev*, 142 S. Ct. 1024, 1040 (2022).  And, contrary to what Umaña's motion suggests, "the Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment," *Dawson v. Delaware*, 503 U.S. 159, 165 (1992).  *Cf. Mot.* 290, 300.  *Dawson* required the exclusion of evidence of "abstract beliefs" that a jury could find "morally reprehensible" because those beliefs were "*totally without relevance* to Dawson's sentencing proceeding."  *Dawson*, 503 U.S. at 166 (emphasis added).  The statements about which Umaña complains were, in contrast, relevant to the issues before the jury and well within this Court's discretion to admit.

A reasonable attorney could easily "think" an effort to limit the admission of documents this Court determined admissible "would have failed."  *Premo*, 562 U.S. at 124.  The content about which Umaña primarily complains, "references to the 'Beast' and the devil," *Amended 2255 Mot.* 299, was highly probative of Umaña's conspiracy to participate in MS-13, his motive to advance his position in

43

that gang, and his allegiance to that gang, issues before the jury during the guilt and punishment phases of the trial. The jury heard that members of MS-13 routinely invoke "la bestia," or "the devil." J.A. 1296, J.A. 1310, J.A. 1357. The "devil's horns" are a "sign for MS," and members believe "that the devil will help you do stuff if you act upon what he says." J.A. 1871. Umaña even "'threw' MS–13's gang sign — the horns of the devil" — when "he was in the courtroom." *Umaña*, 750 F.3d at 354. Similarly probative of Umaña's loyalty to MS-13 are the passages he describes from letters to fellow MS-13 members expressing solidarity with fellow "gangbangers." *Amended Mot.* 301 (quoting Tr. Ex. 176a). The passage Umaña describes as a discussion of the "struggle of 'my people'" ends, for example, with, "fuck them *because the Salvatrucha will remain here.*" *Id.* at 303 (emphasis added) (quoting Tr. Ex. 161a). This evidence is highly relevant to Umaña's devotion to MS-13; that it casts Umaña in a negative light does not mandate its exclusion. *Dawson,* 503 U.S. at 165 (endorsing the admission of evidence of a "defendant's membership in an organization that endorses the killing of any identifiable group"). To the extent Umaña's comments suggest an expectation of punishment or the death penalty, they are probative of his consciousness of guilt. *Cf. Amended 2255 Mot.* 304. To the extent they suggest "poverty," they suggest a circumstance that the defense sought to emphasize, J.A. 3432. *Cf. Amended 2255 Mot.* 304. And the "[c]oarse language and other remarks" about which Umaña now complains, *Amended 2255 Mot.* 303, did not present a "genuine risk that the emotions of the jury" would "be excited to

44

irrational behavior." *United States v. Mohr*, 318 F.3d 613, 618 (4th Cir. 2003); *United States v. Pirani*, 406 F.3d 543, 555 (8th Cir. 2005).

A reasonable attorney could easily conclude that this Court would not have made the redactions or exclusions Umaña's 2255 motion proposes, and counsel would not have been unreasonable for declining to pursue them in any event. "Good advocacy requires 'winnowing out' some arguments, witnesses, evidence, and so on, to stress others." *Chandler*, 218 F.3d at 1318. A reasonable attorney could also conclude, after counsel's unsuccessful attempt to exclude the exhibits in their entirety, that redacted versions would invite the jury to wonder unhelpfully about what might be in the portions of Umaña's violent letters jurors were not permitted to see.

Counsel's contention that his attorneys were deficient for omitting to request limiting instructions, *Amended 2255 Mot.* 298–299, fails as a matter of law because it is conclusory, "completely new," *Pittman*, 209 F.3d at 318, and does not contain facts that, if true, would establish deficient performance. Umaña does not identify any limiting instruction that counsel was "constitutionally compelled" to request. *Burger*, 483 U.S. at 794. This Court should, therefore, dismiss this claim as conclusory, untimely, and meritless as a matter of law.

Counsel was also not "constitutionally compelled," *Burger*, 483 U.S. at 794, to present more evidence that the code Umaña used in his letters did not require a "high degree of skill" and that the "writing in the letters was poor."

45

*Amended Mot.* 307–312. A reasonable defense attorney could well decide not to place even more emphasis on Umaña's use of code, because, whether sophisticated or not, it showed that he understood the need to use code to evade police and that he was largely successful in employing the code despite his relative lack of education. *See* J.A. 655. Nor was counsel compelled to present a "defense linguist" to testify that Umaña's writing was "poor." *2255 Mot.* 227–28. Counsel elicited expert testimony that Umaña's punctuation was poor; the record indicates the United States' expert would have disputed that it was poor in other ways, J.A. 1808, 1841; and this Court found that Umaña was able to "communicate cogently in writing," J.A. 1004. Counsel reasonably chose to highlight academic deficiencies in other ways, instead of asking the jury to focus even more on Umaña's violent letters reflecting his gang allegiance. *See, e.g.*, J.A. 3119.

Umaña's allegations that his attorneys were constitutionally deficient for omitting to present "their own expert or translation" of Umaña's letters or an "expert in rap lyrics" to opine that his "artistic abilities and command of language are limited," *Amended 2255 Mot.* 309–313, are "completely new" and untimely, *Pittman*, 209 F.3d at 318. *Compare 2016 2255 Mot.* 227–228. If this claim were not untimely, the facts it alleges, if proved, would not establish ineffective assistance of counsel. A reasonable attorney could easily choose to focus his "limited resources" elsewhere. *Richter*, 562 U.S. at 107; *Chandler*, 218 F.3d at 1318.

46

Counsel was also not deficient for declining to present or highlight more evidence "of Mr. Umaña's belief in God." *Amended 2255 Mot.* 314–315. A reasonable attorney could have recognized what his amended motion says: Courts ordinarily "condemn the injection of religion into legal proceedings." *Id.* at 316. Umaña's attorneys, moreover, could reasonably have concluded that highlighting Umaña's religious beliefs would have been minimally probative and a potential double-edged sword.

Nor are Umaña's allegations capable of establishing a reasonable probability that the result would have been different if counsel had pursued the tactics he proposes in his 2255 motion. No reasonable probability exists that this Court — which held the jail-letter exhibits admissible and allowed Susan Conrad's testimony as an expert — would have excluded the portions he challenges or excluded her translation evidence. Redaction, excerpts, and limitations on expert testimony would not likely have helped Umaña in the light of the violent conduct Umaña proposed not only in the letters, but also elsewhere such as meetings with other MS-13 members. *See United States v. Boyd*, 53 F.3d 631, 637 (4th Cir. 1995) (evidence admissible if "far less prejudicial" than other properly admitted evidence). And the additional evidence Umaña's amended 2255 motion proposes would have been minimally helpful in the light of other evidence the jury heard that covered similar ground or that was likely to have been introduced or highlighted to rebut it. No reasonable probability exists that, had his counsel's performance been different, Umaña would not have been

47

convicted.  And no reasonable probability exists that he would have received a sentence more favorable than the life sentence he is currently serving.

### 4. This Court should dismiss Claim 11, challenging counsel's performance related to Umaña's tattoos.

This Court should dismiss Claim 11, which challenges his attorneys' performance related to Alexander Granados's testimony about MS-13 tattoos. *See Mar. 2022 Order* 27–29 (rejecting this claim in Umaña's original 2255 motion); *see also Mar. 2017 Response* 93–94.  On cross examination, defense counsel asked Granados, "[W]hen you talked to the police, didn't you tell them that when you get jumped in, you are supposed to kill an enemy?"  J.A. 2150.  Granados replied, "That is when you win the two letters."  J.A. 2150.  On redirect, the United States asked what Granados had meant.  J.A. 2157.  Granados replied, "In order to earn the two letters, you have to kill someone."  J.A. 2157.  Asked what "two letters" Granados was talking about, Granados said, "About MS."  J.A. 2157.  Umaña acknowledges that "Umaña had tattoos of the letters MS on his body." *Amended Mot.* 339.

Omitting to object to Granados's testimony was not objectively unreasonable.  *Cf. Amended Mot.* 336–341.  Contrary to what Umaña asserts, *id.* at 337, counsel is *not* constitutionally required to raise every possible objection at trial.  *Mason*, 774 F.3d at 830.  That MS-13 rewarded its members with status symbols for killing was directly relevant to an element of an offense with which Umaña was charged:  that Umaña had committed murder "with the purpose of

48

maintaining or enhancing a defendant's or another's relative position" within the enterprise, MS-13.  J.A. 2484.

Nor was counsel deficient for failing to introduce Rony Lopez's testimony from another trial.  *Cf. Amended Mot.* 338.  Lopez testified, "If somebody has MS tatted on them, that means they earned the letters and they did something major to earn those letters."  *Jan. 2010 Trial Tr.* 567 (Dkt. No. 1080, 3:08CR134).  He explained that, to earn "MS" tattoos, members "have to, one, kill or, as they say, put in work for the gang.  Rob people.  Just different types of crimes."  *Id.*  This evidence was, at best, a double-edged sword, and counsel could reasonably have decided not to introduce further corroboration that Umaña had engaged in "major" criminal activity to "earn" MS-13 accolades, *Jan. 2010 Trial Tr.* 567, in the past.  *See Truesdale*, 142 F.3d at 754.

To the extent Umaña alleges that his attorneys were deficient for omitting to consult or call "gang expert" Thomas Ward, *Amended 2255 Mot.* 338–339, this entirely new claim is untimely and does not relate back to Umaña's earlier 2255 motion, *cf. 2016 2255 Mot.* 244–251.  *See* § II.A.3, *supra*.  In addition to being untimely, this claim is meritless.  Umaña alleges that Ward would have said that the idea that a gang member "must commit a murder in order to get a tattoo of the gang's initials" is an "urban myth" and that "most members get a tattoo of their gang's name in order to show their affiliation and dedication to the gang." *Amended Mot.* 339.  A reasonable attorney could easily conclude that this evidence would not have been helpful to Umaña or would have at best cut both

49

ways.  *See Truesdale*, 142 F.3d at 754.  The proffered testimony suggests that Umaña's motivation to show his "affiliation and dedication to the gang" was strong, *Amended Mot.* 339, and would have added to the mountain of evidence showing that Umaña knowingly participated in an MS-13 racketeering conspiracy and that his desire to maintain or enhance his position in the gang motivated his murder of Ruben and Manuel.

The facts that Umaña has alleged would not, if proved, establish either deficient performance or prejudice.  The jury heard ample evidence that Umaña had killed and participated in violent crimes.  *See* § 1.G.1, *supra.*  Granados did not purport to tell the jury what, if anything, Umaña personally did to earn his tattoos.  And the evidence of Umaña's crimes was overwhelming.  No reasonable probability exists that the jury would have acquitted Umaña if it had not heard Granados's general testimony about "MS" tattoos.

### 5. This Court should dismiss Claim 13, which alleges that Umaña's attorneys were deficient for failing to seek more continuances.

This Court should dismiss Claim 13, which alleges that Umaña's attorneys were constitutionally deficient for omitting to seek more continuances of the *Atkins* hearing and Umaña's trial, *Amended Mot.* 351–360, for at least three reasons.  First, apart from vague and conclusory allegations that his attorneys presented "an inadequate defense against the Government's case," *Amended Mot.* 351, the motion challenges his attorneys' handling of the "*Atkins* hearing," *id.* at 352–355, their preparation of Umaña's "mitigation case," *id.* at 355–359, and his

50

defense against "non-statutory aggravators" presented during the penalty phase, *id.* at 359 — all sentencing issues. The claim is therefore moot and meritless for the reasons described in § II.B.1, *supra.* Second, as the United States has previously explained, this Court granted the defense multiple continuances, Umaña's attorneys reasonably believed the Court would not grant another, and his allegations if proved would not establish a reasonable probability that he would have received another continuance or a reasonable probability of a different result. *Mar. 2017 Response* 97–100. Umaña's claim therefore fails as a matter of law. *Id.* Finally, Umaña's amended Claim 13 is not materially different from his original Claim 13, which this Court held failed to set forth a prima facie claim of deficient performance or prejudice. *Mar. 2022 Order* 29–31. Because it is moot and meritless as a matter of law, this Court should dismiss the claim.

> **6. This Court should dismiss Claim 14, which alleges that Umaña's attorneys were constitutionally compelled to object to this Court's decision to excuse some jurors for cause.**

This Court should dismiss Claim 14, which alleges that Umaña's attorneys were constitutionally compelled to object to this Court's decision to excuse some jurors for cause. *Amended Mot.* 360–369. The parties jointly agreed that several potential jurors should be excused for cause. *Aug. 21, 2012, Order* (Doc. No. 1519, 3:08CR134), at 1. This Court reviewed the questionnaires submitted by the prospective jurors and agreed with the parties that 54 jurors warranted dismissal for cause. *Id.* Umaña identifies four prospective jurors by juror number whom he

contends stated on questionnaires that they could "never" vote to impose the death penalty.  J.A. 364–365.  And he contends that his attorneys were constitutionally deficient for agreeing that these jurors should be excluded for cause based on their questionnaires.  J.A. 360–366.

This Court should dismiss Claim 14 for two reasons.  The commutation of Umaña's death sentence renders it moot and meritless.  And it fails to allege facts that, if proved, would entitle Umaña to relief even if the commutation order did not affect the claim.

First, the commutation of Umaña's death sentence renders this claim moot and meritless.  *See Henninger v. Wainwright*, 467 F.2d 217, 217 (5th Cir. 1972).  Umaña contends that his attorneys permitted a violation of the "*Witherspoon-Witt*" rule, *Amended Mot.* 361–362, 366, which ensures "[c]apital defendants" the "right to be *sentenced* by an impartial jury," *Uttecht v. Brown*, 551 U.S. 1, 22 (2007) (emphasis added).  That right is infringed if the government "eliminat[es] from the venire those whose scruples against the death penalty would not substantially impair the performance of their duties." *Id.* at 6–10, 22 (discussing *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968), and *Wainwright v. Witt*, 469 U.S. 412, 518 (1985)).  As Umaña recognizes, the remedy for a *Witherspoon-Witt* error is "vacation of a death sentence" imposed by the erroneously selected jury. *Amended Mot.* 366 (quoting *Gray v. Mississippi*, 481 U.S. 648, 659 (1987)).  "*Witt-Witherspoon* error precludes the government from imposing the death penalty," but it "does not" mandate "reversal of the underlying conviction."  *United States*

52

*v. Quinones*, 511 F.3d 289, 305 (2d Cir. 2007) (citing decisions); *Witherspoon*, 391 U.S. at 521 n.21.

Although the same jury determined Umaña's guilt and imposed his now-commuted death sentence, Umaña's contention that his attorneys failed to secure an "impartial jury that has not been tilted in favor of capital *punishment*" is a claim of *sentencing* error. *Amended Mot.* 361 (quoting *Uttecht*, 551 U.S. at 9); *Uttecht*, 551 U.S. at 22. This Court cannot order Umaña's "death sentence to be set aside," as he requests, *id.* at 366, because he is no longer serving a death sentence. Claim 14 is moot because this Court cannot grant Umaña "any effectual relief whatever" on it. *Blount*, 890 F.3d at 462; *Henninger*, 467 F.2d at 217. And because no reasonable probability exists that, if his attorneys had performed differently, Umaña would have received a sentence more favorable than the life sentence he is currently serving, his claim would be meritless for the reasons described in § II.B.1, *supra*.

Second, even if the commutation order did not affect Claim 14, it would fail as a matter of law. The parties jointly agreed that several potential jurors should be excused for cause. *Aug. 21, 2012, Order* (Doc. No. 1519, 3:08CR134), at 1. The facts Umaña alleges do not establish "incompetence under 'prevailing professional norms.'" *Richter*, 562 U.S. at 105. Nor do they establish a reasonable probability that, but for counsel's agreement to this list, Umaña would not have been convicted.

First, counsel's decision not to oppose excusing for cause four jurors who

stated that they could never impose the death penalty was not objectively unreasonable. An attorney is not constitutionally compelled to raise every possible objection, or even every objection his client is entitled to pursue. *Mason*, 774 F.3d at 830; *Bucci*, 662 F.3d at 26. Although "removal for cause" is impermissible for a "juror who is" not "substantially impaired in the ability to impose the death penalty," *Uttecht*, 551 U.S. at 9, a competent defense attorney could choose not to object to a juror's exclusion for cause for any number of sound reasons. An attorney might choose not to object, for example, because a juror appears to be "substantially impaired." *Uttecht*, 551 U.S. at 19. Or an attorney, familiar with "the entire *voir dire*," might view the juror as among those more "favorable to the state." *Id.* at 10, 19.

A reasonable attorney could "think" that objections to the court's decision to excuse these jurors for cause "would have failed." *Premo*, 562 U.S. at 124. The relevant standard does not require absolutes, *Uttecht*, 551 U.S. at 7, but Umaña alleges that each of the jurors about whom he alleges specific facts represented they would "never" vote to impose the death penalty, *Amended Mot.* 364–365. A reasonable attorney could well conclude that the court would likely exclude these jurors and that neither opposition nor an "attempt to rehabilitate" them would be fruitful. *Cf. Amended Mot.* 363.

Counsel's decision not to oppose exclusion of these jurors would have been objectively reasonable even if an objection had potential merit. Umaña's motion suggests that all four of the jurors about which he alleges specific facts indicated

54

they viewed murder "in furtherance of racketeering" or "in relation to a crime of violence" as particularly serious. *Amended Mot.* 364–365. One of the jurors additionally indicated a strong religious view against "murder." *Id.* at 364. Umaña's attorneys were experienced, familiar with the entire venire, and could reasonably have concluded that these jurors could be among those more "favorable to the state." *Uttecht*, 551 U.S. at 19. And counsel could reasonably have concluded that efforts to "rehabilitate" through voir dire the jurors — who allegedly expressed views specific to "murder," "racketeering," and "crime[s] of violence," *Amended Mot.* 364–365 — risked highlighting the worst facts about the murders Umaña committed.

Umaña's own allegations establish that his attorneys' approach to voir dire protected his "right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause." *Uttecht*, 551 U.S. at 9. His motion acknowledges that the court seated jurors who indicated the "death penalty" was "wrong" and "should be abolished." *Amended Mot.* 368. In the light of the entire venire, the likelihood that a for-cause challenge would have failed, the risk that rehabilitation efforts would do more harm than good, and counsel's obligation to make choices about what objections to pursue and forego in the light of the ordinary constraints a trial places on time and resources, counsel's decision to forego objections to this Court's decision to exclude these jurors for cause was well within the bounds of "reasonable professional judgment." *Strickland*, 466 U.S. at 690.

Umaña has also failed to allege facts that, if proved, would demonstrate a reasonable probability that, but for counsel's agreement to this list, Umaña would not have been convicted. He concedes that the Court seated jurors who indicated strong opposition to the death penalty. *Amended Mot.* 368. The jury still found Umaña guilty. No reasonable probability exists that the result would have been different if counsel had pursued objections to this Court's exclusion of jurors for cause.

Umaña has not attempted to show that counsel's performance affected his verdict or sentence. *See Amended Mot.* 366–369. He instead contends that if any juror was erroneously excluded for cause, his "death sentence" must be "set aside" automatically. *Id.* at 366–367. This contention forecloses Umaña from establishing prejudice, because he is no longer serving any death sentence. In any event, Supreme Court precedent makes clear that a *Witt-Witherspoon* error does not require reversal of "the conviction." *Witherspoon*, 391 U.S. at 522; *Gray*, 481 U.S. at 650. And Claim 14 does not allege a standalone violation of the *Witt-Witherspoon* rule; it alleges "counsel's deficient performance." *Amended Mot.* 366. To establish ineffective assistance of counsel — including for failure "to raise timely objections to the trial court's striking of" jurors for cause — Umaña must "satisfy the second prong of *Strickland*" and prove that the alleged "deficiencies in counsel's performance" were "prejudicial to the defense." *Stamper vs. Muncie*, 944 F.2d 170, 177 (4th Cir. 1991); *see also Weaver v. Massachusetts*, 137 S. Ct. 1899, 1905, 1908 (2017) (finding claim that counsel was ineffective in failing to

56

object to courtroom closure required proof of actual prejudice even though error was "structural" and not subject to harmless-error analysis on direct appeal).

The facts Umaña has alleged do not establish a "reasonable probability" that "the jury would not have convicted him" if "his attorney had objected" to exclusion of the jurors he describes. *Weaver*, 137 S. Ct. at 1912. Nor do they establish that any "failure to object rendered the trial fundamentally unfair." *Id.* Claim 14 therefore fails as a matter of law, and this Court should dismiss it.

### 7. This Court should dismiss Claim 16, which challenges the voir dire Umaña's attorneys conducted of potential jurors.

This Court should dismiss Claim 16, which alleges that Umaña's attorneys were constitutionally deficient for omitting to conduct their voir dire of some jurors differently. *Cf. 2255 Mot.* 398–408. Umaña had a right to a trial "by an impartial jury," meaning a jury "capable and willing to decide the case solely on the evidence before it." *United States v. Powell*, 850 F.3d 145, 149 (4th Cir. 2014) (quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982)). And this Court's multi-faceted jury-selection process, which included six days of thorough voir dire by counsel (Docs. No. 1353, 1354, 1355, 1356, 1357, 1358, 3:08CR134), appropriately protected Umaña's rights.

This Court instructed prospective jurors about their obligation to consider mitigating evidence and asked jurors if they had life experiences that would make it difficult to consider aggravating and mitigating factors. *See, e.g.*, J.A. 1066–68, J.A. 1077–78 (reflecting only a portion of jury selection); *Voir Dire Tr.*

57

(Docs. No. 1353, 1354, 1355, 1356, 1357, 1358, 3:08CR134). This Court "permitted lengthy individual in-court voir dire," *2255 Mot.* 276, 302, that spanned six days and produced more than 1500 pages of transcript; J.A. 1018–1131; *Voir Dire Tr.* (Docs. No. 1353, 1354, 1355, 1356, 1357, 1358, 3:08CR134). And Umaña's attorneys questioned jurors individually, with the benefit of prospective jurors' answers to a 23-page questionnaire. *Id.*

Umaña has alleged no facts establishing that his attorneys were constitutionally compelled to conduct their voir dire, which was part of this Court's thorough jury-selection process, differently. Courts "accord 'particular deference' to the judgment of trial counsel during *voir dire*," *Gardner v. Ozmint*, 511 F.3d 420, 426 (4th Cir. 2007), and the voir dire counsel conducted fell well within the bounds of professional assistance. Nor can Umaña establish that he suffered prejudice from his attorneys' performance.

Umaña's attorneys were not constitutionally compelled to conduct a different voir dire of ████████. *Cf. Amended Mot.* 399–402.





Umaña's allegation that his attorneys failed to question "all jurors about views and beliefs on mitigation evidence," *Amended Mot.* 403–408, fails as a matter of law for at least two reasons. The commutation order renders it moot and meritless. And it would be meritless independently of the commutation order.

First, the commutation order renders moot Umaña's claim that his attorneys omitted adequately to voir dire jurors about their ability "to fairly consider any mitigating evidence." *Amended Mot.* 403. "[I]nadequacy of *voir dire*" to ensure that a capital jury will appropriately consider "mitigating factors" is an error related to the sentence only. *See Morgan v. Illinois*, 504 U.S. 719, 739 (1992). As the *Morgan* decision on which Umaña relies explains, such an error results in vacatur of the death "sentence" imposed by the improperly constituted jury. 504 U.S. at 739. But it has "no bearing on the validity" of the underlying

59

"conviction." *Id.* Umaña's allegation that his attorney's performance was inadequate "to uncover such jurors who are unwilling to consider factors in mitigation" is, accordingly, a challenge to the death sentences Umaña is no longer serving. That challenge is moot and meritless for the reasons described in § II.B.1, *supra*.

Second, Umaña's claim is meritless as a matter of law in any event. His contention that counsel limited its voir dire to "general fairness" and "follow the law" questions, *Amended Mot.* 403, is both conclusory and contradicted by the record, which shows that both this Court and counsel asked jurors pointed and specific questions based on their experiences and answers to other questions. *2255 Mot.* 276, 302; J.A. 1018–1131; *Voir Dire Tr.* (Docs. No. 1353, 1354, 1355, 1356, 1357, 1358, 3:08CR134); *see also Juror Questionnaire* (Doc. No. 672, 3:08CR134). "There are countless ways to provide effective assistance in any given case." *Strickland*, 466 U.S. at 690–91. And allegations that counsel did not follow up to jurors' answers the way his postconviction attorneys would have, or "probe" jurors enough about their views on "exposure to the violence of civil war," "lack of schooling beyond the third grade," and other specific points he sought to establish during the mitigation phase of the trial, *Amended Mot.* 403–406, if proved, would not overcome the "strong[] presum[ption]" that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," *Strickland*, 466 U.S. at 690.

Umaña's allegations also fail to establish prejudice, which, for a claim of

60

ineffective assistance of counsel, requires him to show a reasonable probability that the presence of the jurors about which he complains "change[d] the outcome of the trial." *Canfield v. Lumpkin*, 998 F.3d 242, 248 (5th Cir. 2021); *Buckner*, 453 F.3d at 201. Umaña does not attempt to meet this standard, *Amended Mot.* 304–05, and he cannot. He has not alleged any facts that establish a reasonable probability that the jury would not have sentenced him to death if he had conducted a different voir dire.

Umaña instead asks this Court to hold that he establishes prejudice if he establishes that his voir dire caused this Court to seat a "biased juror," *2255 Mot.* 407 (quoting *Hughes v. United States*, 258 F.3d 453, 458 (6th Cir. 2001)). That standard, which the Fourth Circuit has not adopted, *see Gardner v. Ozmint*, 511 F.3d 420, 426 n.2 (4th Cir. 2007), would require Umaña to "show that the juror" empaneled because of counsel's deficient voir dire "was actually biased against him," *Miller v. Francis*, 269 F.3d 609, 616 (6th Cir. 2001) (discussing *Hughes*, 258 F.3d at 458). Umaña's allegations do not meet the standard that he proposes.

Even if Umaña were required to prove, as he contends, only that counsel's deficient voir dire caused this Court to empanel a "biased juror," *2255 Mot.* 304, the facts his 2255 motion alleges would fall far short. At the outset, even if proved, the facts Umaña alleges would leave "too many assumptions" to establish that a different voir dire would have led to a "different jury composition." *See Wilder v. United States*, 806 F.3d 653, 659 (1st Cir. 2015). The facts — as opposed to conclusions — Umaña alleges do not establish that a different voir

61

dire by counsel would have exposed any disqualifying bias, led to meritorious challenges for cause, or led to peremptory challenges by his attorneys. *See id.* Beyond those failures, his allegations fail to establish any of the jurors about which he complains "was actually biased," *Francis*, 269 F.3d at 616.

Umaña's allegations do not show that ▮▮▮▮▮▮ was actually biased against him.

Umaña's allegations about "all jurors" are even more deficient in their failure to include facts establishing bias. *Cf. Amended Mot.* 403–08. That the jury did not make the "findings" that Umaña urged on the "verdict form" plainly does not establish bias. *Cf. Amended Mot.* 406. The jury returned the verdict *after* hearing all of the evidence. Its findings do not establish that the jury was unwilling or incapable of deciding the case "solely on the evidence before it." *Powell*, 850 F.3d at 149. And his contention that the "Government's closing argument" somehow shows that jurors empaneled by this Court were biased, *Amended Mot.* 407, is a non-sequitur. Absent indications to the contrary, jurors are "presumed to be impartial," *Powell*, 850 F.3d at 149. That the jury did not

62

return the verdict Umaña asked for does not overcome that presumption.

The facts Umaña alleges would not entitle him to relief on Claim 16, even if proved. This Court should, therefore, dismiss that claim.

> **8.      This Court should dismiss Claim 17, which alleges that Umaña's attorneys were deficient for omitting to challenge this Court's jury venires.**

This Court should dismiss Claim 17, which alleges that his attorneys were constitutionally deficient for omitting to timely challenge "the grand and petit jury venires" on the ground that they are not "drawn from a 'fair cross section' of the community where the proceedings are held." *Amended Mot.* 408–416. Umaña has alleged no facts known to his attorneys "at the time" before trial that would have "constitutionally compelled" them to use their limited resources to pursue such a claim. *Burger*, 483 U.S. at 776. The burden for establishing even a "prima facie" violation of the fair-cross section requirement is significant, requiring a showing not only that the representation of an allegedly excluded group is "not fair and reasonable" but also that the "underrepresentation is due to the systematic exclusion of the group in the jury selection process." *Duren v. Missouri*, 439 U.S. 357, 364 (1979). And this Court and the Fourth Circuit had previously rejected similar challenges to the Western District of North Carolina's jury-selection process, which relies on voter registration lists. *United States v. McGrady*, Nos. 96-4269, 96-4288, 96-4270, 96-4271, 1999 WL 95633, at *3 (4th Cir. Feb. 17, 1999) (unpublished decision); *Mackins v. United State*s, No. 3:97CR22-T, 2009 WL 1563920, at *3 (W.D.N.C. June 1, 2009).

63

A reasonable attorney could easily have concluded that a venire challenge would not have been likely to succeed. And as Umaña practically acknowledges, Umaña's attorneys had no reason to believe that a successful venire challenge would have produced a "different result" for their client. *Amended Mot.* 415. His attorneys' omission to pursue such a claim was well within the bounds of reasonable professional assistance.

None of the facts Umaña alleges overcome the strong presumption that counsel's performance was reasonable. *Strickland*, 466 U.S. at 690. That counsel intended to address "race and national identity issues in their mitigation arguments," *Amended Mot.* 410, did not constitutionally compel them to pursue a long-shot venire challenge that they had no reason to think would affect the outcome. And the existence of a "right to access the venire composition procedures, or the actual venire composition itself" does not establish deficient performance. *Id.* at 409. That Umaña's attorneys "could" have "made a more thorough investigation" of the matter does not mean that they were "constitutionally compelled" to do so. *Burger*, 483 U.S. at 794.

The opinion Umaña proffers of an "expert in statistics" describing "disparities in racial makeup" in the venire, *Amended Mot.* 412–415, does not help Umaña. As this Court has recognized, "a showing of 'mere statistical underrepresentation, without evidence of actual discriminatory or exclusionary practices,' is insufficient to set forth" even a "prima facie violation" of the fair-cross section requirement. *Mar. 2022 Order* 40; *Molina-Sanchez v. United States*,

64

No. 3:12-CR-316, 2018 WL 490551, at *6 (W.D.N.C. Jan. 19, 2018). Umaña does not allege any nonspeculative facts that, if true, would establish that "underrepresentation is due to the systematic exclusion of the group in the jury selection process." *Duren v. Missouri*, 439 U.S. 357, 364 (1979). And the Fourth Circuit has rejected claims that the "Western District of North Carolina's" district "Jury Selection Plan" involves the kind of "'systematic' exclusion," Umaña must show to make even a prima facie case. *McGrady*, 1999 WL 95633, at *3. Umaña does not allege that his expert's opinion was known to his attorneys before trial, but even if it were, a reasonable attorney could easily have declined to pursue a venire challenge.

Nor has Umaña alleged facts which, if proved, would establish "that he was prejudiced by his counsel's alleged ineffectiveness." *Mackins*, 2009 WL 1563920, at *3. He cannot establish a reasonable probability that his challenge would have been successful. *Id.* He cannot establish a reasonable probability that "the outcome would have been different." *Id.* at *3. And he cannot come close to establishing that counsel's decision to forego this challenge "undermined" the "fundamental fairness of his trial." *Amended Mot.* 415 (quoting *Weaver v. Massachusetts*, 582 U.S. 286, 300 (2017)).

9. **This Court should dismiss Claim 18, which challenges the conduct of Umaña's trial counsel related to the United States' exercise of peremptory strikes.**

This Court should dismiss Claim 18, which challenges the conduct of Umaña's trial counsel related to the United States' exercise of peremptory strikes

65

under *Batson v. Kentucky*, 476 U.S. 79, 100 (1986). *Cf. Amended Mot.* 423–416. As Umaña previously conceded, his attorneys "made a *Batson* objection every time the Government used a peremptory strike to dismiss an African American." *2016 2255 Mot.* 308. This "Court required the Government to explain the basis of its strikes." *Amended Mot.* 416. And this "Court concluded that the Government" produced "facially race-neutral reasons." *Amended Mot.* 417.

Umaña's motion does not allege any facts that, if true, would establish that the performance of his attorneys was constitutionally deficient. He has failed to overcome the presumption that "trial counsel heard the prosecutor's explanation" and reasonably "determined that it was race neutral and legally unassailable under *Batson*, such that it was unnecessary for him to argue that the prosecutor's explanation was pretextual." *Dandridge v. Fitzpatrick*, No. 08-CV-0027OT, 2010 WL 3241504, at *5 (W.D.N.Y. Aug. 16, 2010). Indeed, Umaña's motion does not even identify any of the reasons the United States gave for its strikes, *Amended Mot.* 423–416, let alone any that a reasonable attorney would feel constitutionally compelled to prove were pretextual. Nothing in the portions of the record Umaña selectively quotes, nor the fact that one of the prosecutors was once "a state prosecutor," *Amended Mot.* 417–422, proves that the United States engaged in "purposeful discrimination" on the basis of race and concealed its "*actual* motivation" when responding to this Court's inquiries, *United States v. Parada*, 134 F.4th 188, 201 (4th Cir. 2025). Umaña has not alleged any facts that, if true, would establish that his attorney's performance fell outside of the wide range of

66

reasonable professional assistance.

"*Batson* errors," moreover, "are not presumptively prejudicial when raised in an ineffective assistance of counsel claim," *United States v. King*, 36 F. Supp. 2d 705, 709 (E.D. Va. 1999); *Purvis v. Crosby*, 451 F.3d 734, 743 (11th Cir. 2006), and the facts Umaña alleges do not establish prejudice. *Cf. Amended Mot.* 423–416. None of the facts he alleges show that any *Batson* claim would have been meritorious, and he therefore cannot show a "reasonable probability of success." *Sneed v. Fla. Dep't Corrs.*, 496 F. App'x 20, 25 (11th Cir. 2012).

**10. This Court should dismiss Claim 24, which asserts that Umaña's attorneys were constitutionally deficient for failing adequately to explain the benefits of "a plea deal."**

This Court should dismiss Claim 24, which asserts that Umaña's attorneys were constitutionally deficient for failing adequately to explain the benefits of "a plea deal," *Amended Mot.* 524–527, for at least two reasons. The commutation order renders Umaña's claim moot and meritless. And it would fail as a matter of law in any event.

First, the commutation order renders Umaña's claim moot and meritless. Umaña does not allege that the government communicated a plea offer for a sentence of less than life imprisonment. *Amended Mot.* 524–527. And the prejudice he alleges is the loss of an opportunity to receive a "penalty less tha[n] death." *Amended Mot.* 527. Umaña is no longer serving a "penalty" of "death," *id.*, so for the reasons explained in § II.B.1, *supra*, Claim 24 challenging that penalty is moot and meritless.

67

Second, Umaña's claim would fail as a matter of law in any event. This Court has recognized that "to obtain post-conviction relief on a theory" that a movant's "attorney's constitutional deficiencies caused him to proceed to trial instead of pleading guilty," the movant "has the burden to prove five elements." *Clinton v. United States*, No. 3:10-CR-208-RJC, 2015 WL 5155372, at *3 (W.D.N.C. Sept. 2, 2015) (citing *Missouri v. Frye*, 566 U.S. 134 (2012), *Lafler v. Cooper*, 566 U.S. 156 (2012), and *Merzbacher v. Shearin*, 706 F.3d 356, 369–70 (4th Cir. 2013)). First, Umaña "must prove that the government communicated a plea offer that either lapsed or was rejected by" him. *Id.*; *Frye*, 566 U.S. at 145–46. Second, Umaña must "demonstrate a reasonable probability the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it." *Clinton*, 2015 WL 5155372, at *3 (quoting *Frye*, 566 U.S. at 148). "The plea offer must be sufficiently definite to enable the Court to determine that the agreement ultimately would have been entered." *Id.* (citing *Merzbacher*, 706 F.3d at 369–70). "Third," Umaña "must prove that 'the performance of his counsel was deficient when he advised" Umaña "to reject the plea offer." *Id.* (quoting *Lafler*, 566 U.S. at 163). Fourth, Umaña must "demonstrate a reasonable probability he would have accepted the earlier plea offer had he been afforded effective assistance of counsel." *Id.* (quoting *Frye*, 566 U.S. at 147). Finally, Umaña must show "a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or" lower sentence. *Id.* (quoting *Frye*, 566 U.S. at 147).

68

Umaña's allegations, if proved, would not establish ineffective assistance of counsel. His allegations fail at the first step. He does not allege that the United States "communicated a plea offer" that either lapsed or that he rejected. *Id.*; *Frye*, 566 U.S. at 145–46. Accepted as true, Umaña's allegations would establish — at best — that the United States agreed to "have a *conversation* with trial counsel *regarding* a plea deal" that "began with various conditions." *Amended Mot.* 524. "[A] defendant has no right to be offered a plea." *Frye*, 566 U.S. at 145–46. And Umaña cannot establish ineffective assistance of counsel in connection with advice about a plea bargain that was never offered. *See United States v. Ramirez*, 751 F.3d 604, 607 (8th Cir. 2014) (government's expression of an "interest in negotiating" is not enough).

Umaña's allegations also do not come close to establishing terms "sufficiently definite to enable the Court to determine that" an "agreement ultimately would have been entered." *Clinton*, 2015 WL 5155372, at \*3 (citing *Merzbacher*, 706 F.3d at 369–70). Indeed, his allegations do not even identify what benefits he would have purportedly received in exchange for his guilty plea. If this Court accepted Umaña's factual allegations as true, he would not be able to "demonstrate a reasonable probability the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it." *Frye*, 566 U.S. at 148. Umaña does not even allege that he was willing before trial to admit his factual guilt of the charges against him, an admission necessary to render plea acceptance reasonably probable. *See United States v. Moore*, 681 F.

69

App'x 241, 245 (4th Cir. 2017) (unpublished decision) (describing the Department of Justice's policy against *Alford* pleas).

Nor do Umaña's allegations establish deficient advice. They describe a host of challenges Umaña purportedly faces and some information about Umaña's background. *Amended Mot.* 524–527. But Umaña does not identify any nonconclusory, reasonably specific act or omission by counsel, *Dyess*, 730 F.3d at 360, let alone one counsel was constitutionally compelled to undertake or avoid.

Finally, Umaña's conclusory allegation that "there is a reasonable probability" that with different advice he would have reached agreement for a "penalty less than death," *Amended Mot.* 527, is insufficient to establish the prejudice element of ineffective assistance of counsel. Umaña has not even alleged that he was, before trial, willing to admit his guilt and adhere to the terms of any plea agreement. He cannot show a reasonable probability that he "would have accepted" an offered plea or "a reasonable probability" that the "plea would have been entered without the prosecution canceling it or the trial court refusing to accept it." *Frye*, 566 U.S. at 134. And because he is serving a "penalty less tha[n] death," the facts he alleges, if proved, would not establish a reasonable probability of a more favorable "end result," *Frye*, 566 U.S. at 147.

**11. This Court should dismiss Claim 27, which alleges that Umaña's trial attorneys were constitutionally deficient for failing to preserve issues he raised on appeal.**

This Court should dismiss Claim 27, which lists, with little elaboration, four issues Umaña raised on direct appeal and contends that his trial attorneys

70

were constitutionally deficient for failing to preserve. *Amended Mot* 551–552. The Fourth Circuit "carefully considered *each* of" Umaña's "arguments." *Umaña*, 750 F.3d at 359 (emphasis added). It also reviewed the record, and it "conclud[ed] that Umaña had a fair trial and that the death penalty was justified by the jury's factual findings and by law and was not imposed under the improper influence of passion, prejudice, or any other arbitrary factor." *Id.* The Fourth Circuit explicitly rejected his argument about actual bias of Juror 286 on the merits, independently of the plain-error standard or any failure to preserve it below. *See Umaña*, 750 F.3d at 341. And his remaining arguments are moot because they concern the United States's closing argument during the penalty phase. *See* § II.B.1, *supra*.

Umaña has not alleged facts establishing that his attorneys acted unreasonably to the extent they did not preserve any of the claims his motion identifies. "[C]ounsel is not obliged to advance every available nonfrivolous argument." *Collins*, 977 F.2d at 960. And each of the claims he identifies is meritless or, at best, a "long-shot contention[]," *Mason*, 774 F.3d at 830, or harmless error. He has identified no claim "that no competent attorney would think" would "have failed." *Premo*, 562 U.S. at 124. And he has identified no unpreserved claim that an attorney could not reasonably believe should be foregone in the light of Umaña's interests, the time and resource constraints of trial, and the value in narrowing issues and focusing the attention of the court or the jury. *Bucci*, 662 F.3d at 26. In short, Umaña's numbered list does not come

71

close to overcoming the strong presumption that his trial attorneys acted within the bounds of reasonable professional assistance. Nor can he establish prejudice in the form of a reasonable probability that the outcome of his proceedings would have been different if he had presented at trial the claims that the Fourth Circuit considered and rejected on appeal.

**C.    This Court should dismiss Claim 6, which alleges the United States unconstitutionally suppressed information related to his death sentences.**

This Court should dismiss Claim 6, which alleges that the United States violated its constitutional obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), by omitting to disclose evidence relevant during the *Atkins* hearing and penalty phase, *Amended Mot.* 243–266, for at least two reasons. The commutation order renders this claim moot and meritless. And this Court previously rejected Umaña's discovery contentions.

First, the commutation order renders Umaña's discovery claim moot and meritless. Subsection B.4 of the claim concerns information Umaña alleges was material to the *Atkins* hearing to determine whether Umaña was "eligible for the death penalty." *Amended Mot.* 265–266. The rest of the claim concerns evidence he contends was material to the penalty phase of the trial, *id* at 243–265, where the only issue was whether Umaña would receive "death" or "life imprisonment," J.A. 3396. Because the claim challenges death sentences to which Umaña is no longer subject, it is moot. *See* §§ II.A.1, II.B.1, *supra.* A successful *Brady* claim, moreover, requires Umaña to demonstrate "a reasonable probability that, had the

72

evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Dugan*, 136 F.4th 162, 170 (4th Cir. 2025). Umaña is serving the life sentence he sought at the penalty phase. J.A. 3419. Umaña's discovery claim is therefore meritless as a matter of law, because he cannot establish a reasonable probability that he would have received a more favorable outcome.

Second, this claim is meritless as a matter of law for the reasons this Court described in its March 2022 Order. Umaña's *Amended Motion* alleges that the United States suppressed three categories of information: that Roberto Ramos was unable, at trial, to identify Umaña as one of the shooters in the Lemon Grove murders, *Amended Mot.* 245–250; nine "video/audio recordings by LAPD" of interviews with Freddy Gonzalez and others, *id.* at 250–254; and statements made by Umaña's mother, *id*, at 254–266. This Court evaluated each category of information and found that Umaña failed to allege facts identifying exculpatory or material *Brady* information the United States failed to disclose. *Mar. 2022 Order.* 13 (alleged information about Roberto Ramos); *id.* at 7–9, 14–15, 19–21 (interview recordings); *id.* at 29–31 (statements by Umaña's mother). These findings provide an alternative ground for this Court to dismiss Claim 6. *See also Mar. 2017 Response* 38, 40–61.

D. **This Court should dismiss Claims 29 and 30, which seek relief based on the "cumulative effect" of Umaña's allegations of ineffective assistance of counsel and *Brady* violations.**

This court should dismiss claims 29 and 30, which do not allege any

additional facts but instead allege that the "cumulative impact of *Brady* and *Strickland* error" Umaña alleged elsewhere in his 2255 motion entitle him to relief. *Amended Mot.* 555–559. These claims fail as a matter of law, for at least two reasons.

First, as explained in response to Umaña's individual claims, Umaña has failed to allege facts that, if true, would establish *any Brady* or *Strickland* error. Umaña's allegations of *Brady* error are moot and this Court has already held Umaña's allegations insufficient to establish a *Brady* violation. *See* § II.C, *supra.* Many of Umaña's ineffective-assistance claims are also moot, and Umaña has not alleged facts that would establish that the performance of his multiple, experienced attorneys was constitutionally deficient. *See* § II.B., *supra.*

The failure of Umaña to establish any individual claims is dispositive, because "ineffective assistance of counsel claims, like claims of trial court error, must be reviewed individually, rather than collectively." *Fisher v. Angelone*, 163 F.3d 835, 853 (4th Cir. 1998). When a "cumulative error" analysis applies, moreover, it "aggregates only actual errors to determine their cumulative effect." *United States v. Mullins*, 263 F. App'x 342, 345 (4th Cir. 2008) (unpublished decision). Because the facts Umaña alleges would not prove "multiple errors, there is nothing to aggregate" and no "cumulative effect" theory would apply, even if it were available for the kind of claims Umaña pursues. *Id.*

Second, even if Umaña had alleged facts establishing a cognizable combination of constitutional errors, those facts would not establish "a reasonable

74

probability that he would not have been convicted." *Luck*, 611 F.3d at 186. The evidence of Umaña's guilt was overwhelming. And to the extent the facts Umaña alleges about his attorneys might describe some of the "countless" other "ways to provide effective assistance," *Strickland*, 466 U.S. at 690–91, none of those facts, if proved, would establish a reasonable probability of a different result.

The evidence of Umaña's guilt was overwhelming. The jury heard from multiple eyewitnesses that Umaña murdered two people, after as much as a minute's contemplation, for suggesting that his gang was fake. *See* §§ I.A, D.1, *supra*. The jury heard direct testimony that Umaña urinated on his hands afterward, telling another gang member that he did so to remove the gunpowder. J.A. 1928; *see also* J.A. 1492. And the jury heard testimony that Umaña admitted the murders and told his fellow gang members that he committed the murders for them and for himself because his victims "insulted the MS 13." J.A. 1463–65. Umaña did not seriously dispute the overwhelming evidence of his other crimes, J.A. 2420, and for good reason. The jury heard, from MS-13 members whom he instructed, that Umaña had come to North Carolina with the goal of helping MS-13 "commit ten of the bloodiest murders Charlotte has ever seen." J.A. 1917; §§ I.A, I.D.1, *supra*. The jury heard undisputed evidence of Umaña's illegal possession of a firearm, his admission he was illegally in the United States, and his efforts to rob a rival drug dealer. §§ I.A. I.C. I.G.1. It heard corroborated testimony describing Umaña's efforts to orchestrate the assault or murder of witnesses. *See* § I.B., *supra*. And Umaña threw gang signs

and threatened the family of a witness in open court, in front of the jury. *See* § I.G.1, *supra.*

The "record provides" well more than "strong support for the conclusion" that Umaña "would have been convicted," *Strickler v. Greene*, 527 U.S. 263, 294 (1999), even if his attorneys had taken the approaches that his 2255 motion describes. His experienced attorneys worked with a host of experts and specialists and investigated and presented a strong mitigation case appropriately focused on sparing his life. *See* § I.F, *supra.* Despite Umaña's ongoing efforts to convince others of his commitment to his gang and to violence by presenting gang signs and threats in court, his attorneys vigorously endeavored to persuade the jury not to convict him of the most serious charges. In the light of the overwhelming evidence, however, the jury convicted him. It later unanimously sentenced him to death.

Umaña has not alleged any unconstitutional errors or omissions of counsel that, alone or in combination, had a reasonable probability of changing the jury's verdict of guilt. And Umaña's *Brady* claim is moot and meritless for reasons this Court has already recognized. *See* § II.C, *supra.* This Court should, therefore, dismiss claims 29 and 30.

E. **This Court should dismiss Claims 4, 7, 12, 15, 20, 21, 22, 25, 26, 28 and 59, which allege that the United States and this Court violated Umaña's rights under the Constitution and the Vienna Convention.**

This Court should dismiss Claims 4, 7, 12, 15, 20, 21, 22, 25, 26, 28, and

76

59, which allege that the United States and this Court violated Umaña's rights under the Constitution and the Vienna Convention. These claims have several features in common. They are subject to the rules governing procedural default and relitigation on collateral review, rules that preclude relief for Umaña. And they require a showing of prejudice that the facts he alleges would not establish, even if he were able to prove them. Beyond those deficiencies, each claim is legally insufficient on its face in the light of the record, and many are moot. This section first discusses the rules governing procedural-default, relitigation, and prejudice before addressing each claim individually.

### 1. Umaña cannot overcome his procedural default or the relitigation bar.

Umaña's claims 4, 7, 12, 15, 20, 21, 22, 25, 26, 28, and 59, among others, were or ought to have been raised during his criminal case and on direct appeal. *Murray v. Carrier*, 477 U.S. 478, 491 (1986). "Habeas review is an extraordinary remedy and 'will not be allowed to do service for an appeal.'" *Bousley v. United States*, 523 U.S. 614, 621 (1998) (quoting *Reed v. Farley*, 512 U.S. 339, 354 (1994)). Umaña cannot use a motion under § 2255 to relitigate issues previously raised at trial or on direct appeal. *See Kaufman v. United States*, 394 U.S. 217, 227 n.8 (1969); *United States v. Dyess*, 730 F.3d 354, 360 (4th Cir. 2013); *United States v. Roane*, 378 F.3d 382, 396 n.7 (4th Cir. 2004) (citing *Boeckenhaupt v. United States*, 537 F.2d 1182, 1183 (4th Cir. 1976)). To the extent Umaña's claims include arguments previously rejected by this Court or the Fourth Circuit,

they are subject to that relitigation bar and should be dismissed for that reason.

For the most part, Umaña failed to raise claims 7, 12, 15, 20, 21, 22, 25, 26, 28, and 59, during his original criminal case and on direct appeal. And his failure to do so precludes him from raising them now. Contrary to what Umaña has suggested during this 2255 proceeding, this Court may dismiss his claims without an evidentiary hearing or further proceedings based on his procedural default. *Thomas v. Taylor*, 170 F.3d 466, 468, 470 (4th Cir. 1999); *see also Fitzgerald v. Greene*, 150 F.3d 357, 362, 366 (4th Cir. 1998); *Washington v. Murray*, 952 F.2d 1472, 1481 (4th Cir. 1991).

"Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice,' or that he is 'actually innocent.'" *Bousley*, 523 U.S. at 621 (citations omitted); *United States v. Draven*, 77 F.4th 307, 315 (4th Cir. 2023). Umaña cannot establish the combination of cause and actual prejudice, and he cannot establish actual innocence.

Umaña cannot establish cause and prejudice to overcome his procedural default. "The existence of cause for a procedural default must turn on something external to the defense, such as the novelty of the claim or a denial of effective assistance of counsel." *United States v. Pettiford*, 612 F.3d 270, 280 (4th Cir. 2010). The Fourth Circuit has held that an argument that 18 U.S.C. § 924(c)'s residual clause is unconstitutionally vague was novel before 2015, because "the Supreme Court overturn[ed] its own precedent" foreclosing such a claim. *United*

78

*States v. McKinney*, 60 F.4th 188, 195 (4th Cir. 2023) (emphasis omitted). Although that argument forms part of Umaña's claim 22, which fails as a matter of law for other reasons, *see* § II.E.8, *infra*, none of his other claims come close to meeting the standard for novelty. *See McKinney*, 60 F.4th at 194. And Umaña cannot establish ineffective assistance of counsel or any other "external" factor that would establish cause. *Id.*

Although Umaña has alleged that the performance of his attorneys was constitutionally deficient, these allegations do not help him establish cause. First, Umaña's allegations, even if proved, would not establish the elements of ineffective assistance of his trial counsel under the Sixth Amendment. *See* § II.B., *supra*. And "[a]ttorney error short of ineffective assistance of counsel does not constitute cause for a procedural default." *Murray v. Carrier*, 477 U.S. 478, 492 (1986). Second, Umaña was required to raise his claims both at trial and on appeal. *Id.* at 491. As explained in § II.F, *infra*, Umaña cannot establish that the performance of his appellate attorneys was constitutionally deficient.

In addition to establishing cause for his procedural default, Umaña must establish prejudice, which means that the errors he alleges "worked to his *actual and substantial disadvantage*, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 171 (1982). The standard requires the Court to "ask whether it is likely a defendant, had he known of the error, would not have" been convicted of the "count of conviction" he challenges. *See McKinney*, 60 F.4th at 196.

79

Umaña cannot meet this standard.  He cannot show that he would have prevailed on any of his theories if he had raised them.  And he cannot show that he suffered actual prejudice from a handful of particular jurors who were seated, the security measures employed by the court, his attorneys' native language or the interpreters this Court appointed, from lack of consular notification, from the fact that Umaña was convicted before the Supreme Court's recent decisions about the residual clause and the alien-in-possession statute, or from any of the other issues he raises.

Nor can Umaña establish actual innocence.  None of the errors Umaña alleges plausibly "resulted in the conviction of one who is actually innocent." *Bousley*, 523 U.S. at 624.  That standard "means factual innocence, not mere legal insufficiency." *Id.*  The evidence establishing Umaña's guilt was overwhelming and largely uncontested.  Umaña cannot plausibly meet the high bar he would have to meet to establish actual innocence.

### 2. The errors Umaña alleges would be harmless.

If Umaña were able to overcome his procedural default and the numerous other legal defects in his theories, the errors he alleges would be harmless. When considered on collateral review, an error in a criminal case "is harmless unless it 'had a substantial and injurious effect or influence in determining the jury's verdict.'" *Fry v. Pliler*, 551 U.S. 112, 114 (2007) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993)); *United States v. Smith*, 723 F.3d 510, 511 (4th Cir. 2013).  This standard is "even *more* stringent" than the "plain-error

80

review" standard that applies to unpreserved claims "on direct appeal." *United States v. Said*, 26 F.4th 653, 660 (4th Cir. 2022) (emphasis in original). "[A]mbiguity," "speculation," and "uncertainty" about the effect of an error is "insufficient." *Id.* at 661–663. "[T]he court must find that the defendant was actually prejudiced by the error." *Id.* at 661 (quoting *Davis v. Ayala*, 576 U.S. 257, 268 (2015). The facts Umaña's motion alleges in support of his theories, if true, would not meet this standard. So he is "not entitled to habeas relief." *Id.* at 665.

      **3.**     **This Court should dismiss claims 4, 12, 25, and 28, which challenge Umaña's commuted death sentences, because they are moot, procedurally defaulted or subject to the relitigation bar, harmless, and without merit.**

This Court should dismiss Claims 4, 12, 25, and 28, which challenge Umaña's now-commuted death sentences. Claim 4 alleges that Umaña's "execution would violate the Eighth Amendment" because he is a "person with intellectual disability." *Amended Mot.* 168–179. Claim 12 alleges that the United States engaged in prosecutorial misconduct by introducing during the penalty phase unredacted exhibits that his attorneys did not ask to be redacted. *2255 Mot.* 343–351. Claim 25 alleges that "the imposition of the death penalty" was unconstitutionally "based on race and geography." *Amended Mot.* 527–531. And Claim 28 asserts that the Constitution forbids "executing" Umaña because he allegedly suffers from "brain damage, trauma, and low intelligence." *Id.* at 552–555.

81

These claims are moot because they challenge death sentences to which Umaña is no longer subject. *Executive Grant of Clemency* 2; *see* §§ II.A.1, II.B.1. This court "lack[s] the authority to grant [Umaña] 'any effectual relief whatever,'" these claims. *Blount*, 890 F.3d at 462. So the court should "dismiss[]" them as moot. *Id.*; *Temoney*, No. 24-4046, 2025 WL 1767995, at *1.

If these claims were not moot, the relitigation bar or Umaña's procedural default would bar them. The relitigation bar forecloses Claim 4, as this Court held. *Mar. 2022 Order* 35. Umaña "cannot seek to relitigate his *Atkins* hearing in this § 2255 proceeding." *Id.*; *May 2017 Discovery Response* 114–118. And it forecloses several parts of Claim 12.[9] If the relitigation doctrine did not bar these claims, Umaña procedural default would, for the reasons explained in § II.E.1, *supra*. The commutation order supplies an additional reason Umaña cannot overcome his procedural default. Because he is now serving the life sentence that his convictions require and that he asked for, J.A. 3419, he cannot establish that he suffered actual prejudice from any errors related to his death sentence. *See Frady*, 456 U.S. at 171.

---

[9] Umaña argued on direct appeal that the United States improperly failed to redact references to accusations against Umaña in El Salvador and references to the interviewing officer's belief that Arevalo was telling the truth in Arevalo's interview transcript. *Br. of Appellant*, *United States v. Umaña*, No. 10-6 (4th Cir. Sept. 3, 2013), at 89–91. And he argued that the United States improperly "introduced Arevalo's hearsay statement accusing Umaña of committing" the "Lemon Grove Park murder." *Umaña*, 750 F.3d at 349. The Fourth Circuit "carefully considered" and rejected each of these arguments. *Id.* at 349–350, 359. Umaña cannot relitigate under § 2255 these claims that he previously litigated "on direct appeal." *Roane*, 378 F.3d at 396 n.7.

82

Umaña's commutation order also establishes that the errors alleged in these claims are harmless, if they otherwise would not have been. Because his death sentence was commuted, Umaña was not "actually prejudiced" by any "error" leading to the imposition of that sentence. *Said*, 26 F.4th at 661.

These claims are also meritless as a matter of law for reasons independent of the commutation order. Claim 4 fails because this Court has already determined that Umaña is not mentally retarded or intellectually disabled. *See Mar. 2022 Order* 35; *May 2017 Discovery Response* 114–118. Claim 12 fails as a matter of law for the reasons described in the United States' March 2023 Motion to Dismiss. *See Mar. 2023 Mot. to Dismiss* 90–98. Claim 25 fails for the reasons described in this Court's March 2022 order and the United States' March 2017 discovery response. *Mar 2022 Order* 47; *Mar. 2017 Discovery Response* 130–31. And Claim 28 fails for the reasons described in the United States' March 2023 Motion to Dismiss. *See Mar. 2023 Mot. to Dismiss* 105–108. Nothing in Umaña's amended motion calls for a different conclusion about these claims.

### 4. This Court should dismiss Claim 7, which alleges that the United States knowingly introduced false evidence.

This Court should dismiss Claim 7, which alleges that the United States introduced and failed to correct false testimony under *Napue v. Illinois*, 360 U.S. 264, 269 (1959). *Amended Mot.* 266–290. Umaña alleges that the United States violated its obligations under *Napue* and related decisions during the *Atkins* hearing, *Amended Mot.* 267–272; through the testimony of Alexander Granados

at the guilt and penalty phase, *id.* at 272–280; through the testimony of Freddy Gonzalez at the "Penalty Phase," *id.* at 280–285; through the testimony of Detective Gene Parshall at the "Penalty Phase," *id.* at 280, 285–288, and through the "Umaña's Interrogation Transcript," *id.* at 280, 285–288, which was introduced during the penalty phase, J.A. 2781. This Court should dismiss these claims for several reasons.

First, the commutation order renders all parts of this claim other than Umaña's challenge to Alexander Granados's testimony during the guilt phase moot and meritless as a matter of law. Those parts challenge a proceeding to determine Umaña's eligibility for the death penalty, *Amended Mot* 267–272, and the penalty phase, *id.* at 280–290, where the only issue was whether Umaña would receive "death" or "life imprisonment," J.A. 3396. Because those parts of the claim — subparts A, B, and D — challenge death sentences to which Umaña is no longer subject, they are moot. *See* §§ II.A.1, II.B.1, *supra.* To prove a *Napue* error, moreover, Umaña must establish a "reasonable likelihood that the false testimony could have affected the judgment of the jury." *Juniper v. Davis*, 74 F.4th 196, 211 (4th Cir. 2023). Umaña is currently serving the life sentence he asked the jury to impose. J.A. 3419. His *Napue* claims related to penalty proceedings are, therefore, meritless as a matter of law.

Second, Umaña's challenge to Granados's testimony, which the defense initially introduced on "cross-examination" during the guilt phase, *Amended Mot.* 272–280, is meritless as a matter of law. To prevail on a *Napue* claim, Umaña

84

would be required to prove "(1) the testimony was false, (2) the Government knew the testimony was false; and (3) there is a reasonable probability that the false testimony could have affected the verdict." *Roane*, 378 F.3d at 400 (citations omitted). As mentioned above, Granados testified that "you have to kill someone" to earn "the two letters," "MS." *See* § II.B.8, *supra*; J.A. 2157.

The facts Umaña alleges, if proved, would not establish that Granados's testimony about "MS" tattoos was false or that the United States knew of any falsity. Lack of corroboration does not establish falsity, let alone knowing falsity. *Cf. Amended Mot.* 275–276. Nor does Rony Lopez's testimony that an MS-13 member could "kill" or "[r]ob people" to earn tattoos. *Jan. 2010 Trial Tr.* 567 (Dkt. No. 1080, 3:08CR134). "Mere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony." *United States v. Griley*, 814 F.2d 967, 971 (4th Cir. 1987). And the statement of a "gang expert and professor" working with the defense that "not one gang member" has ever mentioned the practice "to [him]" does not prove a *Napue* error. *Id.* at 276–277. The expert's experience does not prove that Granados was testifying falsely about his own experience, and it says nothing about what "the Government knew." *Roane*, 378 F.3d at 400.

Nor would any alleged falsity in Granados's testimony be material. The jury heard strong evidence, including Umaña's own admissions, eyewitness testimony, and Umaña's own recorded statements, of extraordinary violence Umaña perpetrated, including multiple killings. *See* §§ I.B–E, G, *supra*.

85

Granados, moreover, did not purport to know what, if anything, Umaña did to earn his own tattoos. And common sense would tell the jury that a person can go to a commercial tattoo parlor and request any tattoo he wants, without killing anyone.

Umaña, moreover, knew how he got his own tattoos well before the trial began, and that "prior knowledge" precludes him from obtaining relief now. *United States v. Meinster*, 619 F.2d 1041, 1045 (4th Cir. 1980). "When [a] defendant knows about the" allegedly "false testimony and fails to bring it to the jury or the court's attention, the assumption is that he did so for strategic reasons, and the defendant will not be allowed to question his own strategic choices on appeal." *United States v. Mangual-Garcia*, 505 F.3d 1, 10 (1st Cir. 2007). The same reasoning carries even greater force when applied to a postconviction claim presented years later.

Third, Umaña's procedural default, described in § II.E.1, *infra*, bars all of Umaña's *Napue* claims. The commutation order provides an additional barrier to Umaña's ability to overcome that default with respect to his claims concerning evidence presented at the *Atkins* hearing and penalty phase. The commutation order precludes Umaña from establishing that any of that evidence resulted in actual prejudice.

Finally, this Court's prior decisions provide additional grounds for dismissal of several of Umaña's *Napue* claims. This Court previously evaluated the first three of Umaña's *Napue*-error theories and found that they did not

86

establish that the United States knowingly presented false testimony. *Mar. 2022 Order.* 31, 33 (addressing the *Atkins* hearing); *id.* at 27–28 (addressing Granados's testimony); *id.* at 9–10 (addressing Gonzalez's testimony). And Umaña's allegation that the admission of his interview transcript constitutes *Napue* error does not appear in Umaña's original 2255 motion. *Compare 2016 2255 Mot.* 192–210. He attempted to present it as part of "Claim 35" in his 2018 proposed amendment, *2018 Proposed Amendment* (Doc. No. 71), at 44, 64–65, and this Court denied him leave to file that claim, correctly concluding it is untimely and did not relate back to his original motion. *Oct. 2022 Order* 14.

In short, Umaña's *Napue* claim is moot, meritless, procedurally defaulted, and foreclosed by this Court's prior decisions. This Court should, therefore, dismiss Claim 7.

### 5. This Court should dismiss Claim 15, which alleges "misconduct related to the jury."

This Court should dismiss Claim 15, which alleges "misconduct related to the jury." *Amended Mot.* 369–398. Umaña's motion contends that jurors gave inaccurate answers during voir dire, *Amended Mot.* 370–391; that jurors were tainted by bias, *id.* at 392–93; that juror omissions precluded him from making intelligent peremptory challenges, *id.* at 393; and that one juror was barred from service by statute, *id.* at 394–97. He also contends that the security measures he complains about in "Claim XXI" establish juror misconduct, *id.* at 397–398, and makes conclusory allegations that his trial and appellate attorneys were

87

ineffective, *id.* at 397–398.

Umaña's juror-misconduct theories fail as a matter of law for four reasons. First, they are barred by Umaña's procedural default. Second, this Court's *March 2022 Order* forecloses his juror-misconduct claim. Third, none of his theories would entitle him to relief, even if Umaña proved the facts he alleges. Finally, Umaña has not alleged facts establishing that he suffered prejudice from any alleged juror misconduct.

### a. Umaña's procedural default bars his juror misconduct claims.

Because Umaña failed to present his juror-misconduct claims during his criminal case and on direct appeal, his procedural default bars them. *See* § II.E.1, *supra.* They therefore fail as a matter of law, and this Court should dismiss them. *Cleary v. United* States, 144 F. App'x 204, 204 (2d Cir. 2005) (juror-misconduct claim barred by procedural default); *Palmer v. United States*, 46 F. App'x 5, 8 (1st Cir. 2002) (juror-bias claim barred by procedural default); *Higgs v. United States*, 711 F. Supp. 2d 479, 553 (D. Md. 2010) (holding numerous juror-misconduct claims barred by procedural default, in federal death-penalty case), *aff'd*, 663 F.3d 726 (4th Cir. 2011).

### b. This Court's March 2022 Order forecloses Umaña's juror-misconduct claim.

This Court's March 2022 order also establishes that Umaña's juror-misconduct claim fails as a matter of law. This Court held that the allegations in Umaña's original 2255 motion were insufficient to set forth a claim of juror

88

misconduct.  *Mar. 2022 Order* 35–38.  Umaña's amended claim does not include anything that would call for a different conclusion.

### c. Umaña has not made a prima facie case for relief based on allegedly inaccurate answers by jurors during voir dire.

Umaña has not alleged facts that, if proved, would entitle him to relief based on what he alleges to be inaccurate answers by jurors to questions posed during voir dire.  *Cf. Amended 2255 Mot.* 370–391.  Umaña accuses four jurors, █████████████████████████, of giving inaccurate answers.  *Id.*  To obtain relief based on "juror deceit during voir dire or on jury questionnaires," Umaña "must first demonstrate that a juror failed to answer honestly a material question and then further show that a correct response would have provided a valid basis for a challenge for cause."  *Jones v. Cooper*, 311 F.3d 306, 310 (4th Cir. 2002) (quoting *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984)).  "[T]he test applies equally to deliberate concealment and to innocent non-disclosure." *Id.*  This Court would have been required to excuse jurors for cause "only 'where a per se rule of disqualification applie[d]'" or where declining to do so would "demonstrate[] a clear disregard for the actual bias" of the juror.  *Umaña*, 750 F.3d at 338 (quoting *United States v. Fulks*, 454 F.3d 410, 432 (2006)).  The facts Umaña alleges, if proved, would not meet this test.

### i. Umaña's claim for relief based on Juror ██'s statements fails as a matter of law.

█████████████████████████████████████████████████████

█████████████████████████████████████████

89



90



Case 3:16-cv-00057-MOC    Document 189    Filed 08/19/25    Page 97 of 134



██████████ ██████████████████ ████████

###### ii. Umaña's claims for relief based on statements by Jurors ████████████ fail as a matter of law.

Umaña's allegations against Jurors ████████████, if proved, would not entitle Umaña to relief. The jurors were asked, "Have you or any immediate family or close friend ever been arrested, charged with a crime, or been the subject of an investigation." *Amended Mot.* 389–390. Umaña's amended motion does not say what answers these jurors gave, but it nevertheless concludes that those answers were "inaccurate." *Id.* ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████ *Id.*

Umaña all but concedes that his allegations are "speculative," *Amended Mot.* 390–391, and the information his motion alleges about these jurors would not have formed the basis for a challenge for cause. *Jones*, 311 F.3d at 313. ████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

93

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████ Incorrect disclosure by jurors only warrants relief when it denies a defendant his constitutional "right to an impartial jury." *McDonough*, 464 U.S. at 549. The facts that Umaña has alleged would establish nothing of the kind.

### a. Umaña's "[a]ctual and implied bias claims" fail as a matter of law.

The facts Umaña has alleged, if proved, would not establish that the jury was tainted by actual or implied bias, irrespectively of the jurors' answers to voir dire questions. *Cf. Amended Mot.* 392–393. The information that Umaña alleges "does not give rise to an inference that the juror[s were] biased against" Umaña. *Jones*, 311 F.3d at 313. ████████████████████████████████████

████████████████████████████████████████████████████████

████ And "the doctrine of implied bias is limited in application to those extreme situations where the relationship between a prospective juror and some aspect of the litigation is such that is highly unlikely that the average person could remain impartial in his deliberations under the circumstances." *Umaña*, 750 F.3d 320, 341 (4th Cir. 2014). "Implied bias might arise," for example, "where there is 'a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal

94

transaction.'" *Id.* (quoting *Smith v. Phillips*, 455 U.S. 209, 222 (1982) (O'Connor, J., concurring)).

Umaña's allegations about

. And he all but acknowledges that he has not "plead[ed] allegations establishing" that alleged "deceptions" by other jurors would meet the standard a bias claim requires. *Id.* at 393.

### b. Precedent forecloses Umaña's theory about peremptory challenges.

The Supreme Court has specifically rejected Umaña's theory that he is entitled to relief because "non-disclosures" by jurors deprived him of the ability to "intelligently exercise his peremptory challenges." *Amended Mot.* 393; *McDonough*, 464 U.S. 548, 549, 555–56 (rejecting conclusion that new trial is warranted if failure to disclose information "prejudiced the [party's] right of peremptory challenge"); *Zerka v. Green*, 49 F.3d 1181, 1185 (6th Cir. 1995) ("The

95

Supreme Court in *McDonough* explicitly rejected the argument that a plaintiff who is prevented from intelligently utilizing his peremptory challenges is entitled to a new trial, and it counseled against exactly this sort of endless second-guessing."). His claim therefore fails as a matter of law.

### c. Umaña's contention that ▮▮▮▮▮ was statutorily barred from jury service would not entitle him to relief.

Umaña's contention that ▮▮▮▮ was barred from jury service by statutes, ▮▮▮▮▮▮▮▮▮▮ *Amended Mot.* 394–96, offers him no assistance for at least three reasons, in addition to Umaña's procedural default. First, a violation of these statutes would not be cognizable under 2255, which embraces only errors that are constitutional, jurisdictional, or "fundamental" and "inherently result[ing] in a miscarriage of justice." *United States v. Foote*, 784 F.3d 931, 936 (4th Cir. 2015). Second, Umaña's counsel was well aware of ▮▮▮ ▮▮▮▮▮▮, *Amended Mot.* 399–400, and waived any right to invoke the statutory bar by omitting to do so during voir dire. *See United States v. Brazelton*, 557 F.3d 750, 755 (7th Cir. 2009). Third, Juror ▮▮▮▮ ▮▮▮▮ would not be an "extraneous," let alone "improper," matter before the jury. *Amended Mot.* 394–396; *Warger v. Shauers*, 135 S. Ct. 521, 529 (2014) (The "general body of experiences that jurors are understood to bring with them to the jury room" is not "extraneous" information). Finally, to the extent Umaña relies on "28 U.S.C. § 1865(b)(5)," *Amended Mot.* 395, that statute is inapplicable because he has not alleged facts that if proved, would establish that ▮▮▮▮

96

had "a charge pending against him" or had "been convicted" of a "crime punishable by imprisonment for more than one year" at the time of his jury service, 18 U.S.C. § 1865(b)(5).

### d. Umaña's complaint about security measures this Court imposed does not establish jury misconduct.

This Court's order directing the United States Marshals Service to "assist the jurors in securing their vehicle and belongings contained within each day during the trial" and to make arrangements "for the transportation of jurors between a site designated by" the service "and the United States Courthouse," *Amended 2255 Mot.* 396, does not entitle Umaña to relief on collateral review related to the jury or otherwise. As explained in § II.E.6, *infra*, Umaña's challenge to the security measures this Court imposed in response to Umaña's efforts to smuggle a shank into the courthouse during jury selection, among a host of other security threats, fails as a matter of law. Umaña's relabeling "Claim XXI" as a claim of "extraneous evidence that would impact deliberations," *Amended Mot.* 397–398, does not make it any more viable.

### e. Umaña's conclusory allegations of ineffective assistance of counsel do not state any viable claim.

The conclusory allegations of ineffective assistance of trial and appellate counsel Umaña includes at the end of Claim 25, *Amended Mot.* 397–98, do not state any viable claim. For the reasons explained in § II.B.11, Umaña has not alleged facts establishing ineffective assistance of counsel during "voir dire." *Amended Mot.* 397. And for the reasons explained in § II.F, Umaña cannot

97

establish ineffective assistance of appellate counsel.

### f. The juror misconduct Umaña alleges would be harmless if proved.

Finally, all of Umaña's theories of juror misconduct also fail as a matter of law because, even if proved, they would not have had a "substantial and injurious effect of influence in determining the jury's verdict." *Fitzgerald v. Greene*, 150 F.3d 357, 366 (4th Cir. 1998) (quoting *Brecht*, 507 U.S. at 637–38). The Fourth Circuit has "repeatedly examined instances of juror misconduct and bias for harmlessness" under this standard, including the kinds of allegations raised by Umaña. *Sherman v. Smith*, 89 F.3d 1134, 1138 (4th Cir. 1996). The evidence of Umaña's guilt was overwhelming and largely uncontested, *see* § I.B–E & G.1, II.D, *supra*. And the jury found him guilty *unanimously* and then went on unanimously to sentence him to death. Even if Umaña could establish that one of the jurors was improperly on the jury, his or her "presence on the jury" would be harmless, *Fitzgerald*, 150 F.3d at 366, as would any alleged improper influence.

### 6. This Court should dismiss Claim 20, which alleges that Umaña's attorneys' agreement to the dismissal of jurors for cause and issues related to interpreters violated his constitutional rights.

This Court should dismiss Claim 20, which alleges that Umaña's attorneys' agreement to the dismissal of jurors for cause and issues related to interpreters violated his constitutional rights. *Amended Mot.* 431–437. The cognizable facts he alleges would not entitle him to relief, if proved.

98

Umaña has not alleged facts that, if true, would establish that his attorneys' agreement to the dismissal of jurors for cause entitles him to relief. As explained above, *see* § II.A.6, *supra*, Umaña has not alleged facts establishing that his attorneys were constitutionally deficient for agreeing to the dismissal of some jurors for cause based on their questionnaires. To the extent he contends that the dismissal of these jurors at his attorneys' request independently violates his constitutional rights, that contention fails as a matter of law for several reasons. First, Umaña's procedural default bars it. *See* § II.E.1, *supra*. Second, Umaña did not have a constitutional right to be present when this Court ordered in writing the excusal of the jurors he complains about, based on written submissions, and with the agreement of both parties. *Aug. 21, 2012, Order* (Doc. No. 1519, 3:08CR134), at 1. "The presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." *United States v. Gagnon*, 470 U.S. 522, 526 (1985). Third, if Umaña had such a right, he waived it by agreeing through counsel to the dismissal of the jurors without proceedings in his presence. *Id.* at 529–30 (right to be present subject to waiver); *Amended Mot.* 360–361 (conceding that counsel agreed the jurors could be excused for cause "before jury selection begins"). Finally, the facts Umaña alleges would not establish that his absence had "a substantial and injurious effect or influence" on the verdict. *Fry*, 551 U.S. at 114.

Nor has Umaña alleged facts establishing that he was in any way denied

his right to be present or that counsel was deficient in a way related to Umaña's ability to communicate with counsel or understand the language used during the proceedings. *Cf. Amended Mot.* 435–437. First, the record refutes Umaña's contention that no "interpreter" was provided for Umaña to communicate with his legal team. *Id.* at 436. This Court appointed an interpreter at counsel's request. *Aug. 7, 2008, Mot. To Appoint Expert Interpreter* (Doc. No. 210, 3:08-CR-134; *Aug. 7,* 2008 *Order* (Doc. No. 211, 3:08-CR-134). The record reflects that Umaña had an interpreter throughout the proceedings, *see, e.g.*, J.A. 68, J.A. 108–113, J.A. 122, J.A. 560, J.A. 1100, J.A. 1204, J.A. 1225, J.A. 1486, J.A. 2116, and that the interpreter translated Umaña's communications, J.A. 2735. The record is dispositive. *Landrigan*, 550 U.S. at 474; *Raines*, 423 F.2d at 531. Second, this Court has already held Umaña's allegations in his original 2255 motion support of this part of Claim 20 insufficient. *Mar. 2022 Order* 50. The allegations in Umaña's amended motion do not make the claim any more viable. Third, Umaña's procedural default bars his claim. *See* § II.E.1, *supra*. Finally, Umaña's allegations if proved would not establish any error that had "a substantial and injurious effect or influence" on the verdict. *Fry*, 551 U.S. at 114.

Umaña has not alleged facts that, if proved, would entitle him to relief on Claim 20. This Court should, therefore, dismiss the claim.

### 7. This Court should dismiss Claim 21, which challenges the security measures this Court adopted.

This Court should dismiss Claim 21, which challenges the security

100

measures this Court adopted for Umaña's trial. *Amended Mot.* 437–440. Umaña attempted to bring this knife into the courthouse on the first day of jury selection:



J.A. 2920–21, 2929; Exh. 2, at 34. Umaña sought — at times successfully — to have witnesses injured or killed, including the owners of the restaurant where he murdered the Garcia brothers, testifying witnesses, and witnesses whom Umaña successfully frightened, who did not testify. J.A. 2738, J.A. 2741–42, J.A. 2745, J.A. 2789–91, J.A. 2804; Exh. 2, at 2, 10–11, 20, 28–29, *Mar. 2017 Discovery Response* 7–9. Umaña and his gang had issued "green lights" —orders to kill —

101

against multiple testifying witnesses. J.A. 2120. Gang members told witnesses, "[i]f you talk to police . . . we're going to kill you." J.A. 1865, J.A. 1878. Umaña's gang, moreover, required its members to "attack" or "kill" any nonmember who "disrespects" the gang. J.A. 2158. And during Rony Lopez's testimony at trial, Umaña threw gang signs and threatened the witness's family in Spanish, saying, "[Y]our family's going to pay, mother —." J.A. 2936.

Umaña's challenge to the security measures this Court adopted in the light of the extraordinary security risks that Umaña and his cohorts presented fails as a matter of law. *See Mar. 2022 Order* 45; *Mar. 2017 Discovery Response* 127–30. This Court addressed claim 21 in Umaña's original 2255 motion and rejected it as a matter of law. *Mar. 2022 Order* 45. The Court held in its *March 2022 Order* that Umaña failed "to plead sufficient facts to set forth a prima facie claim that he suffered prejudice from the imposed security measures, and even if so, such measures would be justified in light of" Umaña's "conduct and risk of harm to those in the courtroom and the public." *Id.* Nothing in Umaña's amended motion calls for a different conclusion. Umaña's procedural default also bars his claim. *See* § II.E.1, *supra.* And his conclusory allegation that trial counsel was deficient "to the extent" counsel "agreed to or failed to object to circumstances that created" an allegedly "hostile atmosphere" does not allege any facts that overcome the presumption that counsel acted reasonably or establish prejudice. *Cf. Amended Mot.* 439–40. For those reasons and the reasons described in the United States' March 2017 Discovery Response, *Mar. 2017 Response* 127–30, this

102

Court should dismiss Claim 21.

### 8. This Court should dismiss Claim 22, which challenges Umaña's convictions under § 924(c) and (j) on counts 23 and 25.

This Court should dismiss Claim 22, which challenges the validity of Umaña's convictions on counts 23 and 25. *Amended Mot.* 440–520. These counts each charge Umaña with causing the death of another by possession of a firearm in furtherance of a "crime of violence" under 18 U.S.C. §§ 924(c) and 924(j)(1). J.A. 365, 367. Each count alleges two predicate crimes of violence: conspiracy to participate in a racketeering enterprise, 18 U.S.C. § 1962, and the substantive offense of murder in aid of racketeering, 1959(a)(1), sometimes known as "VICAR murder," *United States v. Tipton*, 95 F.4th 831, 846 (4th Cir. 2024). J.A. 365, 367.

Umaña contends that the predicate offenses underlying counts 23 and 25 no longer qualify as "crimes of violence" in the light of *United States v. Davis*, which held that the residual clause of the definition of that term is unconstitutionally vague, 588 U.S. 445, 448 (2019). *Amended Mot.* 465. This Court rejected that contention as a matter of law, holding that Umaña's murder-in-aid-of-racketeering offenses continue to qualify as crimes of violence "under § 924(c)'s force clause." *Umaña v. United States*, 229 F. Supp. 3d 388, 392 (W.D.N.C. 2017). Subsequent Fourth Circuit precedent has confirmed that this Court's decision was correct. *Tipton*, 95 F.4th at 850.

The Fourth Circuit has held that murder in aid of racketeering under

103

§ 1959(a)(1) categorically "qualifies as a § 924(c) 'crime of violence,'" *id.* at 850, but Umaña's racketeering-conspiracy offense does not, *United States v. Simmons*, 11 F.4th 239, 260 (4th Cir. 2021). This Court's holding about the racketeering-conspiracy offense does not help Umaña, however, because "a § 924(c) conviction may stand even if the jury based its verdict on an invalid predicate, so long as the jury *also* relied on a valid predicate." *Tipton*, 95 F.4th at 844 (quoting *United States v. Said*, 26 F.4th 653, 659 (4th Cir. 2022)). A § 924(c) "conviction" must "be upheld" against a *Davis* challenge on collateral review "unless the defendant shows 'more than a reasonable possibility' that the conviction rested solely on an invalid predicate offense." *Id.*

The record precludes Umaña from establishing a reasonable possibility "that the jury did *not* rely on the valid VICAR murder predicate" for his "§ 924(c) convictions." *Tipton*, 95 F.4th at 852. And it does so overwhelmingly.

Most obviously, the jury found Umaña guilty of the predicate VICAR murder offenses, which were charged in counts 22 and 24, expressly identifying the respective victims as "Ruben Garcia Salinas" and "Manuel Garcia Salinas." J.A. 2556–57. And "the evidence" showed the murders "to involve the use of firearms." *Said*, 26 F.4th at 662. "[C]ommon sense" establishes that the jury had "those crimes in mind when they convicted," *id.*, Umaña of using a firearm in relation to a "crime of violence resulting in the death of Ruben Garcia Salinas" and a "crime of violence resulting in the death of Manuel Garcia Salinas," J.A. 2557.

104

The "trial evidence," moreover, contained "compelling and substantial proof" that Umaña "personally committed" the "charged VICAR murder offenses." *Tipton*, 95 F.4th at 851. During the guilt phase, the jury heard direct evidence that Umaña personally pulled out a gun in the Las Jarochitas family restaurant, pointed it at Ruben and Manuel Garcia Salinas, stood still for a minute, and then shot each of the two brothers to death. §§ I.B, G.1, *supra*. Abel Santos, who was with Umaña in the family restaurant in which the murder occurred, testified that "the defendant" — the one with distinctive "eyelid tattoos" — "pulled the gun out," "pointed it at Ruben and Manuel," "stood there for a minute," and shot the brothers. J.A. 1622, 1624–1628. The jury heard direct testimony that Umaña urinated on his hands afterward, telling another gang member that he did so to remove the gunpowder from his hands. J.A. 1928; *see also* J.A. 1492. And the jury heard direct testimony that Umaña told his fellow gang members that he shot people in the Las Jarochitas restaurant and that he did so for himself and his fellow gang members, because "they insulted the MS 13." J.A. 1463–65.

The jury's verdict and the evidence leave no room for Umaña to "demonstrate more than a reasonable possibility that the jury did not rely on the valid VICAR murder predicate for" either of his "§ 924(c) convictions." *Id.* Claim 22 therefore fails as a matter of law.

Umaña, moreover, was obligated to raise his claim during his criminal case

105

and on direct appeal,[10] and his procedural default bars his claim.  *See* § II.E.1, *supra*; *United States v. Draven*, 77 F.4th 307, 315 (4th Cir. 2023).  He cannot establish cause and prejudice to overcome his default.  *Id.*  Nor can he establish that he is actually innocent of counts 23 and 25.  *Id.*

If Umaña could establish cause for his procedural default of his *Davis* claim, he would remain unable to establish the requisite "actual" prejudice, which asks "whether it is likely a defendant, had he known of the error," would not have been convicted of "the count of conviction," *see United States v. McKinney*, 60 F.4th 188, 196 (4th Cir. 2023).  Because murder in aid of racketeering "remains a crime of violence," Umaña cannot "demonstrate prejudice."  *Draven*, 77 F.4th at 307.

Nor can Umaña establish "actual innocence" as required to overcome his procedural default in the absence of a showing of cause and prejudice.  *Id.* Umaña has the burden to "demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Bousley*, 523 U.S. at 624 (cleaned up).  "'[A]ctual innocence' means factual innocence, not mere legal insufficiency."  *Id.*  The evidence of Umaña's guilt included the testimony of eyewitnesses who watched him use a gun to commit the

---

[10]  Umaña's allegation that "he raised the claim timely" is baseless.  *Cf. Amended Mot.* 508 (citing (Doc. No. 104, 3:16CV57), at 16).  The document he cites refers only to Umaña's filing of a "*Johnson* claim" in "June 2016" as part of his "§2255 motion."  (Doc. No. 104, 3:16CV57), at 16.  To avoid the procedural-default bar, Umaña was required to raise his claim years earlier, during his original criminal proceeding and his direct appeal.  *Murray*, 477 U.S. at 491.

premeditated murder of two individuals and Umaña's own statements bragging about committing the offense for the benefit of his gang.  The record precludes Umaña from overcoming his procedural default by establishing actual innocence.

Finally, Umaña's allegation of ineffective assistance of counsel — "To the extent prior counsel could have raised this claim previously, counsel's failure to do so was ineffective," *Amended Mot.* 498 — is insufficient as a matter of law. First, Umaña's allegation, which does not appear in his original 2255 motion, is untimely.  The "right" to effective assistance of counsel was not "initially recognized by the Supreme Court" in *Davis* or related decisions, 28 U.S.C. § 2255(f)(3); it has been well-established for decades.  *See Strickland v. Washington*, 466 U.S. 668, 690 (1984).  Umaña was required to assert any ineffective-assistance challenge to counts 23 and 25 along with his other ineffective-assistance claims, within one year after his judgment became final in 2015.  28 U.S.C. § 2255(f)(1).  Second, the conclusory nature of Umaña's allegation alone makes it insufficient.  *See Roane*, 378 F.3d at 400–01.  Third, even if it were not untimely or conclusory, his allegation would not establish a valid claim.  An attorney is not deficient "for failing to" pursue "long-shot" claims, *Mason*, 774 F.3d at 830, or predict future decisions like *Davis*.  Nor could Umaña establish prejudice, because his *Davis* claim remains meritless today. *Strickland*, 466 U.S. at 689.

Umaña's claim 22 is meritless as a matter of law and barred by Umaña's procedural default.  This Court should, therefore, dismiss it.

107

### 9. This Court should dismiss Claim 26, which relates to the Vienna Convention.

This Court should dismiss Claim 26, which relates to the Vienna Convention. *Amended Mot.* 531–551. Umaña claimed Salvadorian citizenship, J.A. 2099, and sought assistance from the Consulate of El Salvador, J.A. 1005. But he alleges that the United States "did not notify Mr. Umaña of his Vienna Convention right to assistance from the *Guatemalan* Consulate and did not contact that entity on his behalf." *Amended Mot.* 532, 536–544 (emphasis added). And he alleges that his trial attorneys were constitutionally deficient for failing to notify Umaña of his rights under the convention, contact the Guatemalan Consulate, litigate the alleged failure by the United States, and investigate Umaña's "background and history as a Guatemalan citizen" for mitigation purposes. *Id.* at 532, 544–551.

Umaña's claim that the United States violated his rights under the Vienna Convention fails for at least four reasons. First, Umaña's procedural default bars his claim. *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 360 (2006) (holding that procedural-default rules apply to the Convention); § II.E.1, *supra*. Second, "Article 36 of the Vienna Convention," the Article on which Umaña relies, *Amended Mot.* 533, "does not create an individually enforceable right." *Medellin v. Dretke*, 371 F.3d 270, 280 (5th Cir. 2004). Third, if individually enforceable, the Convention would not create a remedy that would relieve Umaña of his convictions or sentence. *See United States v. Li*, 206 F.3d 56, 60 (1st Cir. 2000)

108

(assuming that the Convention confers individual rights, dismissal of an indictment and suppression of evidence are not appropriate remedies). Fourth, a claim based on an alleged violation of the Convention would not be cognizable under 28 U.S.C. § 2255 because it would not be a "constitutional" or "jurisdictional" claim or a claim based on "a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Foote*, 784 F.3d 931, 936 (4th Cir. 2015); *see also Medellin v. Dretke*, 544 U.S. 660, 664 (2005) (noting that a violation of the Convention's "consular access provisions" may "not be cognizable in a federal habeas proceeding"). Finally, even if Umaña were somehow denied a right under the Convention relevant to his criminal case, the denial would not have had a substantial and injurious effect on the verdict. *Fry*, 551 U.S. at 114. This Court has already found that Umaña failed in his original 2255 motion to allege facts sufficient to show that "a different outcome would have resulted had the Government notified him of the right to consular assistance." *Mar 2022 Order* 47. Nothing in Umaña's amended motion warrants a different conclusion.

Umaña's allegations of ineffective assistance of counsel related to the Convention and Guatemala are also insufficient. Even if this Court assumes that Umaña — who left Guatemala when he was three or four years old, spent much of his early life in El Salvador, and sought assistance from the Salvadorian consulate, J.A. 1005 — was eligible for consular assistance *from Guatemala*, counsel could reasonably have determined that his client's "interest would be best

109

served" by focusing on matters other than enforcing rights related to assistance from another consulate. *See Bucci*, 662 F.3d at 26. And he has not alleged facts establishing a reasonable probability that counsel's performance related to Guatemalan consular assistance, the Vienna Convention, or litigation related to the matter would have affected the outcome of his trial. Umaña's allegation that his attorneys failed to conduct an adequate "mitigation investigation" into Umaña's Guatemalan background, *Amended Mot.* 544–550, is moot and meritless since he is no longer serving the death sentence those allegations necessarily challenge. *See* § II.B.1, *supra.* Umaña has not identified in any event evidence from Guatemala that counsel was constitutionally compelled — but failed — to investigate or present or alleged any facts establishing a reasonable probability that he would not have been convicted if his attorneys had handled the Convention differently. *Richter*, 562 U.S. at 107; *Van Hook*, 558 U.S. at 11; *Strickland*, 466 U.S. at 699.

Umaña's amended motion does not allege facts that, if proved, would entitle Umaña to relief on Claim 26. This Court should, therefore, dismiss the claim.

**10. This Court should dismiss amended Claim 59, which challenges Umaña's conviction on Count 27 for possession of a firearm by an alien unlawfully in the United States, 18 U.S.C. § 922(g)(5).**

This Court should dismiss Umaña's amended Claim 59, which challenges the validity of Umaña's conviction on Count 27 for possession of a firearm by an

110

alien unlawfully in the United States, 18 U.S.C. § 922(g)(5), in the light of the Supreme Court's 2019 decision in *Rehaif v. United States*, 139 S. Ct. at 2194 (2019). *Amended Mot.* 559–571. That decision held that § 922(g)(5) requires that the violator "know that he is an alien 'illegally or unlawfully in the United States.'" *Id.* at 2198. Umaña's claim fails for multiple reasons, most notably because the record makes clear that Umaña well knew he was an alien illegally or unlawfully in the United States when he used a gun to murder his victims.

In advance of his trial, Umaña met with Dr. Enrique Suarez. J.A. 807, J.A. 815–18, J.A. 4030–31. Dr. Suarez interviewed Umaña in connection with his claim that he is intellectually disabled or mentally retarded. *Id.*

Umaña told Dr. Suarez that he "entered this country illegally in 2004." J.A. 4031. And Umaña described the details of his illegal entry. J.A. 4031–33. He left El Salvador with "U.S. Dollars," and he traveled through Guatemala and Mexico to the United States. J.A. 4031–33. He told Dr. Suarez "he purposefully did not take any identifying documents (i.e., passport)." J.A. 4031. He explained that he was able to cross the borders without passports because they were "not well patrolled" and "not very secure." *Id.* He swam across a river to get into Mexico. *Id.* He then bought "medium chain box cutters" and used them to break into freight cars that took him to the border of the United States, where he crossed a river to enter the country. J.A. 4031–32. Umaña's father later sent him identification. *Id.*

At trial, the jury heard testimony not only that Umaña "left El Salvador

111

and illegally entered the United States," J.A. 3160, but also that he "*admitted* to being illegally in the country," J.A. 2099 (emphasis added). Special Agent Jose Romero of the Immigration and Customs Enforcement agency testified about Umaña's admission without objection. J.A. 2099.

The jury heard evidence that Umaña knowingly possessed a firearm after he illegally entered the country, using it to murder two people. The jury heard direct evidence that Umaña personally pulled out a gun in the Las Jarochitas family restaurant, pointed it at Ruben and Manuel Garcia Salinas, stood still for a minute, and then shot each of the two brothers to death. J.A. 1622, J.A. 1624–1628. The jury also heard that Umaña urinated on his hands afterward to remove the gunpowder and bragged about the shooting to his fellow gang members. J.A. 1463–65, J.A. 1492, J.A. 1928. And the jury heard that he bragged, on tape, about the threat he posed to police officers because his gun was "always close by." *Umaña*, 750 F.3d at 332.

This Court instructed the jury about the elements of possession of a firearm by an alien unlawfully in the United States. J.A. 2489. "One, the defendant knowingly possessed the firearm." *Id.* "Two," "during the possession, the defendant was an alien unlawfully residing in the United States." *Id.* And "[t]hree," "the possession of this firearm was in or affecting interstate or foreign commerce." *Id.* at 2489.

The jury found Umaña guilty of all counts, including count 27. § 1.G, *supra*. This Court imposed for Umaña's section 922(g)(5) conviction a prison

112

sentence of 10 years, which it ordered to run concurrently with the prison sentences it imposed on other counts for which the jury did not impose a death sentence, including his life sentence on count one.  J.A. 3698.

Several years after Umaña's conviction, the Supreme Court decided *Rehaif v. United States*, which held that § 922(g) requires proof "that the defendant knew he possessed a firearm and also that he knew he had the relevant status when he possessed it."  139 S. Ct. at 2194 (2019).  A conviction under § 922(g)(5), therefore, requires that a violator "know that he is an alien 'illegally or unlawfully in the United States.'"  *Id.* at 2198.  In June of 2020, four years after he filed his 2255 motion, Umaña moved for leave to amend his motion to include Claim 59, his *Rehaif* claim, and this Court granted the motion.

Claim 59 in Umaña's amended 2255 motion contends that his indictment and jury instructions on Count 27 were inadequate because they did not include the knowledge-of-status element described in *Rehaif*.  *Amended Mot.* 562.  He also includes a conclusory sentence alleging, "To the extent trial counsel could have raised this claim at trial or on direct appeal, counsel's failure to do so constitutes ineffective assistance."  *Id.* at 565.

Umaña's amended Claim 59 fails as a matter of law.  Umaña's procedural default bars his challenges to the indictment and jury instructions.  He cannot establish any prejudicial error.  And his ineffective-assistance-of-counsel allegation fails as a matter of law for a variety of independent reasons.

113

### a. Umaña's procedural default bars his claim.

First, Umaña's procedural default bars his *Rehaif* claim. *See* section II.E.1, *supra*; *United States v. Waters*, 64 F.4th 199, 204 (4th Cir. 2023); *Wallace v. United States*, 43 F.4th 595, 602 (6th Cir. 2022). The record precludes Umaña from establishing any of the requirements he must to overcome that default.

Umaña cannot establish the cause necessary to overcome his procedural default. *See* section II.E., *supra*. Cause requires a "factor external to the defense" that impeded his attorney's efforts to comply with the requirement that he timely raise objections. *Davila v. Davis*, 137 S. Ct. 2058, 2065 (2017). That the Supreme Court had not issued its decision in *Rehaif* while Umaña's criminal case was before this Court does not establish cause. *See Bousley*, 523 U.S. at 623 (1998) (rejecting arguments that section 2255 movant demonstrated cause for failure to raise argument based on a new Supreme Court holding issued after his case became final). An argument in favor of *Rehaif*'s interpretation of section 922(g)(5) would not have been novel. *DeCastro*, 49 F.4th at 846; *Young*, 2022 WL 2136864, at *2; *United States v. Innocent*, 977 F.3d 1077, 1084 (11th Cir. 2020); *see also United States v. Allen*, 734 F. App'x 898 (4th Cir. 2018) (unpublished decision) (addressing the argument addressed by *Rehaif* before *Rehaif* was decided), *cert. granted, judgment vacated*, 139 S. Ct. 2774 (2019). Umaña's attorneys were not constitutionally deficient for failing to predict *Rehaif*. *Wallace*, 43 F.4th at 602; *Gant*, 2021 WL 4472820, at *3. And to the extent *Rehaif*'s interpretation of the statute was foreclosed by Fourth Circuit precedent,

114

the "futility" of the argument at the time "cannot serve as 'cause' for a procedural default in the context of collateral review."  *Whiteside v. United States*, 775 F.3d 180, 185 (4th Cir. 2014) (en banc).

Even if he could somehow establish cause, Umaña would remain unable to establish the requisite "actual prejudice."  *Bousley*, 523 U.S. at 622 (cleaned up). The record, which is controlling, *Landrigan*, 550 U.S. at 474, establishes that Umaña *knew* that he "entered this country illegally in 2004" because he told multiple people that he did so.  *Exh.* 1 at 2099, 4031.  The record includes Umaña's own account of his weeks-long "journey" across multiple borders that he knew were "patrolled."  *Id.*  It includes his admission that he "purposefully did not take any identifying documents," bought wire cutters, broke into train cars, and swam across rivers to "enter[] this country illegally."  J.A. 4031.  Simply put, "[s]omeone in" Umaña's "position cannot plausibly argue that he did not know" he was illegally in the United States.  *United States v. Williams*, 946 F.3d 968, 974 (7th Cir. 2020).

The jury heard undisputed testimony that Umaña "*admitted* to being illegally in the country," *id.* at 2099 (emphasis added), so he cannot establish that "it is likely" he would not have been convicted had his indictment been different and had this Court instructed the jury that it needed to find that he knew he was illegally in the country.  *McKinney*, 60 F.4th at 193.  Umaña argues that Agent Romero's testimony was inadmissible under the "hearsay" rule and "[C]onfrontation [C]lause."  *Amended Mot.* 564.  But the evidence was admitted

115

without objection, and he did not present this evidentiary argument in his original 2255 motion.  Umaña's argument about the admissibility of this evidence is itself procedurally defaulted, not cognizable on collateral review, *Foote*, 784 F.3d 936, and untimely by several years, 28 U.S.C. § 2255(f)(1).  His argument that he could have raised reasonable doubts about his knowledge with evidence of cognitive impairments, *Amended Mot.* 564–565, is belied by his ability to recount the details of his journey and the illegal nature of his entry in his 2009 interview with Dr. Suarez.  And that interview, along with Agent Romero's testimony and other evidence, confirms that any defense Umaña might have mounted if the jury had been instructed the way he proposes would have been refuted by his own statements.  Umaña cannot establish that any *Rehaif*-related error "worked to his actual and substantial disadvantage." *Murray v. Carrier*, 477 U.S. 478, 494 (1986) (cleaned up).

Nor can Umaña establish "actual innocence" as required to overcome his procedural default in the absence of a showing of cause and prejudice.  Umaña has the burden to "demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Bousley*, 523 U.S. at 624 (cleaned up).  "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Id*.  Umaña cannot possibly meet this standard in the light of his multiple statements acknowledging his awareness that he entered the United States illegally.

116

### b. Umaña's *Rehaif* argument fails as a matter of law.

Umaña's *Rehaif* claim also fails as a matter of law independently of his procedural default. As discussed above, Umaña can obtain relief on collateral review only from an error that "had a substantial and injurious effect or influence in determining the jury's verdict." *Fry*, 551 U.S. at 114; *Smith*, 723 F.3d at 511. The Supreme Court has held that, to establish a plain *Rehaif* error affecting substantial rights on direct appeal, a defendant convicted of possession of a firearm by a convicted felon under § 922(g)(1) must make an "adequate showing" on "appeal" that "he would have presented evidence in the district court that he did not in fact know he was a felon when he possessed firearms." *Greer v. United States*, 141 S. Ct. 2090, 2097 (2021). The Court's reasoning applies with equal force to a conviction under § 922(g)(5): A person "illegally or unlawfully in the United States," 18 U.S.C. § 922(g)(5), "ordinarily knows he is" illegally or unlawfully in the United States, *see Greer*, 151 S. Ct. at 2097. "And a habeas petitioner who has procedurally defaulted his claim 'must clear a significantly higher hurdle than would exist on direct appeal.'" *Waters*, 64 F.4th at 204–05; *Said*, 26 F.4th at 660, 661 n.14

The record establishes that any deviation from the strictures of *Rehaif* did not have "a substantial and injurious effect or influence on the jury's verdict." *Id.* at 660. As mentioned above, the evidence presented to the jury included undisputed testimony that Umaña "admitted to being illegally in the country." J.A. 2099. The testimony was admitted without objection. It was well founded in

117

the light of Umaña's statements to Dr. Suarez.  And those statements would have rebutted and left no room for even a long-shot defense that Umaña might have forgotten about the journey to illegally enter the country.  J.A. 4031.

### c. Umaña's conclusory allegation of ineffective assistance of counsel also fails as a matter of law.

Umaña's conclusory allegation of ineffective assistance of counsel, *Amended Mot.* 565, fails as a matter of law for several reasons.  First, Umaña's allegation is untimely.  The "right" to effective assistance of counsel was not "initially recognized by the Supreme Court" in *Rehaif*, 28 U.S.C. § 2255(f)(3); it has been well-established for decades.  *See Strickland v. Washington*, 466 U.S. 668, 690 (1984).  Umaña was required to assert any ineffective-assistance challenge to count 27 along with his other ineffective-assistance claims, within one year after his judgment became final in 2015.  28 U.S.C. § 2255(f)(1).  Second, the conclusory nature of Umaña's allegation alone makes it insufficient.  *See Roane*, 378 F.3d at 400–01.  Third, even if it were not untimely or conclusory, his allegation would not establish a valid claim.  An attorney is not deficient "for failing to" pursue "long-shot" claims, *Mason*, 774 F.3d at 830, or predict *Rehaif*, *Wallace*, 43 F.4th at 602.  Nor could Umaña establish prejudice in the form of a reasonable probability that he would not have been convicted of possession of a firearm by an alien unlawfully in the United States.  *Strickland*, 466 U.S. at 689.  The jury heard evidence that Umaña knew and admitted that he was in the country illegally.  J.A. 2099.  And if counsel had successfully sought the

118

instruction or superseding indictment he proposes or otherwise pursued a lack-of-knowledge defense, the record makes clear that the United States would have introduced additional evidence overwhelmingly refuting his defense, *see e.g.*, J.A. 4031.

### F. This Court should dismiss Umaña's claims of ineffective assistance of appellate counsel.

Finally, this Court should dismiss the claims of ineffective assistance of appellate counsel Umaña has scattered throughout his amended motion. *See, e.g. Amended Mot.* 177–180, 319–321, 350, 398, 437, 440, 531, 551, 565. He asserts, for example, that his appellate attorneys were constitutionally deficient in their litigation of this Court's *Atkins* determination. *Id.* at 177–180. *Id.* He asserts that his appellate attorneys should have challenged the admission of translations of his jail letters. *Id.* 319–321. He conclusorily asserts that his appellate attorneys were deficient for failing to challenge on appeal this court's security measures, *id.* at 440, alleged violations of the Vienna convention, *id.* at 551, the government's alleged use of race and geography in the decision to seek the death penalty, *id.* at 531, and the introduction at the penalty phase of unredacted exhibits he did not ask "to be redacted," *id.* at 344, 350. He twice repeats a conclusory allegation that appellate counsel should have raised issues of "juror misconduct" and "exposure to extraneous evidence," to "the extent that counsel could have." *Amended Mot.* 398, 437. And he makes a conclusory allegation that his appellate attorneys, years before the Supreme Court's 2019 decision in

119

*Rehaif*, should have raised his *Rehaif* claim. *Amended Mot.* 565.

Umaña's allegations of ineffective assistance of appellate counsel, if proved, would not entitle him to relief, for at least three reasons. They are meritless as a matter of law. They are untimely. And they are for the most part both moot and conclusory.

### 1. Umaña's claims of ineffective assistance of appellate counsel are meritless as a matter of law.

First, Umaña's claims of ineffective assistance of appellate counsel are meritless as a matter of law. To establish ineffective assistance of appellate counsel for failing to press a contention, Umaña would have to show, at a minimum, that his appellate attorneys failed to present a claim that "was plainly stronger than those actually presented to the appellate court." *Davila v. Davis*, 127 S. Ct. 2058, 2067 (2017). Umaña would also have to show prejudice in the form of a "reasonable probability" that, but for his attorneys' unreasonable failure to present an additional issue, "he would have prevailed on his appeal." *Smith v. Robbins*, 528 U.S. 259, 286 (2000).

This Court has already rejected Umaña's claims of ineffective assistance of appellate counsel. *Oct. 2022 Order* 53. In 2018, Umaña moved for leave to amend his 2255 motion to add a claim of ineffective assistance of appellate counsel. *Feb. 2018 Proposed Amendment* 207. He broadly argued that his attorneys were constitutionally compelled to raise the issues presented in his original 2255 motion and in the supplement. *Id.* This Court denied Umaña leave

120

to amend, holding that the "proposed claim would" fail "as a matter of law and allowing leave to amend would be futile." *Oct. 2022 Order* 53. Nothing in Umaña's amended motion calls for a different conclusion.

Umaña's appellate attorneys filed a brief just shy of the 35,000 words the Fourth Circuit permitted, raising twelve multi-part claims, *Br. of Appellant*, *United States v. Umaña*, No. 10-6 (4th Cir. Sept. 3, 2013), including an argument that Umaña had a Sixth Amendment right to confrontation during the penalty phase of his trial, an argument that divided the panel deciding his appeal, *Umaña*, 750 F.3d at 360 (Gregory, J., dissenting).[11] The same issue further divided the entire court of appeals, which voted to deny rehearing en banc by a vote of 8–5. *United States v. Umaña*, 762 F.3d 413, 413–14 (4th Cir. 2014).

Umaña could not possibly establish that any of the claims his appellate attorneys failed to present would have been "plainly stronger" than the confrontation claim that divided the appellate court, in addition to the numerous other claims his attorneys presented. *Davis*, 127 S. Ct. at 2067. Even in an ordinary case that does not involve an appellate claim as strong as Umaña's confrontation claim, "it is difficult to demonstrate that" appellate "counsel was incompetent" for failing to present additional claims. *Robbins*, 528 U.S. at 288. The claims Umaña seeks to present that were not already litigated and decided against him, moreover, are unpreserved, and "[i]n most cases, an unpreserved

---

[11] Umaña's appellate attorneys also filed a 17,176-word reply brief. *Reply Br. of Appellant*, *United States v. Umaña*, No. 10-6, at 77 (4th Cir. Jan. 4, 2014).

121

trial error will not be a plainly stronger ground for appeal than preserved error." *Davis*, 127 S. Ct. at 2067. And if Umaña could somehow show deficient performance, he could not establish a reasonable probability that "he would have prevailed on his appeal" with any of the claims he contends his appellate attorneys should have raised. *Id.* at 286. In short, Umaña cannot establish that his appellate attorneys were constitutionally deficient for failing to raise additional claims.

### 2. Umaña's claims of ineffective assistance of appellate counsel are untimely.

Second, even if Umaña's challenge to his appellate attorneys' performance had potential merit, it would be untimely. As explained above, the limitation period governing Umaña's 2255 motion expired on June 22, 2016. § II.A.3, *supra*. Umaña filed his amended motion containing his ineffective-assistance-of-appellate-counsel claims on March 23, 2023, *Amended Mot.* 1, more than six-and-a-half years too late. § II.A.3, *supra*.

Umaña's claims of ineffective assistance of appellate counsel do not "relate back" to Umaña's original 2255 motion. *Id.* That original motion alleges errors by the government, his trial attorneys, and this Court. *2016 2255 Mot.* 1–383. But it does not allege any claims based on errors or omissions by the attorneys who represented him on direct appeal. His newly minted complaints about his appellate attorneys concern different purported errors or omissions by a different set of attorneys that purportedly occurred during a different proceeding at a

122

different time.  "[T]hey arise from separate occurrences of 'both time and type.'" *Pittman*, 209 F.3d at 318 (quoting *United States v. Craycraft*, 167 F.3d 451, 457 (4th Cir. 1999)).  In this Court's words, Umaña's "proposed claim against *appellate* counsel does not relate back to his original claims against *trial* counsel." *McCoy v. United States*, No. 3:01CV305-02, 2006 WL 1896601, at *11 (W.D.N.C. July 6, 2006) (emphasis in original); *Pittman*, 209 F.3d at 318–19 (claim alleging counsel's failure to appeal did not relate back to claim asserting ineffective assistance of counsel during sentencing); *Osborne v. Graham*, No. 15-CV-6042 CJS, 2018 WL 1827673, at *9 (W.D.N.Y. Apr. 17, 2018) ("[A] claim of ineffective assistance of appellate counsel does not relate back to a claim of ineffective assistance of trial counsel, or vice versa, since the claims pertain to different attorneys and different venues.").

This Court properly held Umaña's ineffective-assistance-of-appellate claims untimely when presented in 2018.  *Oct. 2022 Order* 53.  They are five-years-more untimely in Umaña's 2023 amended motion.

This Court also rejected in its *October 2022 Order* a contention by Umaña that he was entitled to "equitable tolling of the statute of limitations."  *Id.* at 51–53.  "Equitable tolling of petitions for collateral review is available only when a defendant demonstrates '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing.'"  *Whiteside v. United States*, 775 F.3d 180, 184 (4th Cir. 2014) (en banc) (quoting *Holland v. Florida*, 560 U.S. 631, 649 (4th Cir. 2010)).  The relevant

123

circumstance must be "truly 'extraordinary,'" must be "external to the party's own conduct," and must be "beyond the defendant's control." *Id.* at 184–85; *Menominee Indian Tribe of Wis. v. United States*, 136 S. Ct. 750, 756 (2016). And the circumstance must have "prevented [Umaña] from filing within the limitations period at all." *Whiteside,* 775 F.3d at 185.

Umaña's amended motion does not contain a request for equitable tolling. But it repeats an assertion he has made in the past in support of such a request. *See Amended Mot.* 3–4 n.3, 168. He asserts that his original "2255 counsel were also direct appeal counsel," creating a "conflict of interest." *Id.* This Court properly rejected this purported conflict as a basis for equitable tolling. *Oct. 2022 Order* 52. As this Court recognized, the asserted conflict did not "prevent[]" Umaña "from timely filing the proposed" claim. *Id.* Zandra Lopez, who represented Umaña on direct appeal, filed in February 2018 a proposed 2255 amendment accusing herself and her own team of ineffective assistance of appellate counsel. *Feb. 2018 Proposed 2255 Mot.* 205–207. Because the alleged conflict did not prevent her from filing the claim, it did not "prevent[her] from filing within the limitations period." *Whiteside,* 775 F.3d at 185. Nor would the alleged conflict qualify as an "extraordinary" circumstance "external to the party's own conduct," *id.* at 184–85, as explained in the *United States' Response to Umaña's February 2018 Motion for Leave to Amend* (Doc. No. 77, 3:16CV57), at 52–53. And if Umaña could somehow justify *some* delay, he would not be entitled to the more than *six-and-a-half years* of tolling that would be necessary to make

124

his claims timely. *See id.* at 54–56. The attorney who filed Umaña's amended motion in 2023 represented him for six years before she filed it. *Mar. 28, 2017, Notice of Appearance* (Doc. No. 55, 3:17CV57). If Umaña could somehow meet the other requirements for equitable tolling, he would be unable to establish that he was, for that entire six-year period, "pursuing his rights" to file the claims "diligently." *Whiteside*, 775 F.3d at 184.[12]

### 3. Umaña's claims of ineffective assistance of appellate counsel are moot and conclusory.

Finally, Umaña's claims of ineffective assistance of counsel fail as a matter of law, in whole or in part, for two additional reasons. First, to the extent Umaña contends that his appellate attorneys were ineffective for failing to raise challenges to his death sentences, the claim is moot. *See* §§ II.A.1, II.B.1, *supra*. The remedy for ineffective assistance of appellate counsel is a "belated appeal on the issue that counsel ineffectively failed to present." *See Herrington v. Dotson*, 99 F.4th 705, 721 (4th Cir. 2024) (quoting *Payne v. Stansberry*, 760 F.3d 10, 18 (D.C. Cir. 2014)). The commutation order, however, renders any appeal of the death sentence moot. *Surratt*, 855 F.3d at 219; *Temoney*, 2025 WL 1767995, at *1. This Court, therefore, lacks authority to grant "any effectual relief" on any

---

[12] Umana, of course, did unsuccessfully seek leave to file a claim of ineffective-assistance-of-appellate counsel in February of 2018. *Oct. 2022 Order* 51–53. To the extent refiling substantially the same claim repeatedly or after this Court expressly denied leave to file it would have been "futile," that futility would not justify equitable tolling. *Whiteside*, 775 F.3d at 185. And this Court's prior rulings continue to bar the claim today. *See* § II.A.2, *supra*.

125

claims that challenge his counsel's performance with respect to the death sentences Umaña is no longer serving. *Blount*, 890 F.3d at 462. Second, the majority of Umaña's ineffective-assistance-of-appellate-counsel claims are conclusory. *See Amended Mot.*, 398, 437, 440, 531, 551, 565. This Court can properly dismiss them "without further investigation." *Dyess*, 730 F.3d at 354.

## III.  CONCLUSION

The United States respectfully requests that this Court dismiss or deny Umaña's amended 2255 motion. A remedy under § 2255 is an extraordinary remedy designed "to correct real and obvious wrongs," *Rich v. Calderon*, 187 F.3d 1064, 1068 (9th Cir. 1999); it is not a mechanism to "relitigate" Umaña's "trial." *McFarland*, 512 U.S. at 856. Although Umaña's amended 2255 motion is remarkably long, it does not allege cognizable facts that, if proved, would entitle him to relief on collateral review.

RESPECTFULLY SUBMITTED, this 19th day of August, 2025.

RUSS FERGUSON
UNITED STATES ATTORNEY

/s/Anthony J. Enright
Assistant United States Attorney
United States Attorney's Office
227 West Trade Street, Suite 1650
Charlotte, North Carolina 28202
(704) 344-6222 (phone)
(704) 344-6629 (fax)
anthony.enright@usdoj.gov

126

## **ARTIFICIAL-INTELLIGENCE CERTIFICATION**

No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg.

Every statement and citation of an authority contained in this document has been checked by an attorney or a paralegal working at his direction as to the accuracy of the proposition for which it is offered, and the citation of authority provided.

s/ANTHONY J. ENRIGHT
Assistant United States Attorney

127

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 19th day of August, 2025, I caused to be served a copy of the foregoing motion to be served on counsel for Umaña via electronic case filing

s/ANTHONY J. ENRIGHT
Assistant United States Attorney

128